Michael D. Hausfeld
Megan E. Jones
HAUSFELD LLP
1700 K Street, NW, Suite 650
Washington, DC 20006
Tel: (202) 540-7200
Fax: (202) 540-7201
Email: mhausfeld@hausfeldllp.com
          mjones@hausfeldllp.com

Michael P. Lehmann (Cal. Bar No. 77152)
Jon T. King (Cal. Bar No. 205073)
Arthur N. Bailey (Cal. Bar No. 248460)
HAUSFELD LLP
44 Montgomery St., 34th Floor
San Francisco, CA 94104
Tel: (415) 633-1908
Fax: (415) 358-4980
Email: mlehmann@hausfeldllp.com
          jking@hausfeldllp.com
          abailey@hausfeldllp.com

William A. Isaacson
Tanya Chutkan
Jack Simms
BOIES, SCHILLER & FLEXNER LLP
5301 Wisconsin Avenue, Suite 800
Washington, DC 20015
Tel: (202) 237-2727
Fax: (202) 237-6131
Email: wisaacson@bsfllp.com
          tchutkan@bsfllp.com
          jsimms@bsfllp.com

*Counsel for Plaintiff and the Proposed Classes*

[Additional counsel listed on signature page]

**UNITED STATES DISTRICT COURT**
**NORTHERN DISTRICT OF CALIFORNIA**

**BZ**

EDWARD C. O'BANNON, JR., on behalf of himself and all others similarly situated,

Plaintiff,

v.

NATIONAL COLLEGIATE ATHLETIC ASSOCIATION (a/k/a the "NCAA"); and COLLEGIATE LICENSING COMPANY (a/k/a "CLC"),

Defendants.

Case No.

**CV 09 3329**

**CLASS ACTION COMPLAINT**

**DEMAND FOR JURY TRIAL**

CLASS ACTION COMPLAINT

**INTRODUCTION**

1.     Plaintiff and putative Class Representative Edward C. O'Bannon, Jr. ("Ed O'Bannon") brings this action both individually and on behalf of damages and injunctive relief classes (collectively, the "Classes") consisting of former student-athletes who competed for National Collegiate Athletic Association "("NCAA") member colleges or universities on those schools' (1) "Division I" men's basketball athletic teams; and (2) "Football Bowl Subdivision" (formerly known until 2006 as "Division I-A") men's football athletic teams whose images have been licensed or sold by Defendants, their co-conspirators, or their licensees during the four years preceding the filing of this Complaint (the "Class Period"), or may be in the future. For purposes of the injunctive relief class only, Plaintiff also brings this action on behalf of current student-athletes competing on the teams described above, as well as former student-athletes, as both groups' future compensation rights are impacted by the anticompetitive practices described herein.

2.     Defendants NCAA, the Collegiate Licensing Company (the NCAA's licensing arm), and their co-conspirators, including the NCAA's members schools and conferences, have committed *per se* violations of the federal antitrust laws by engaging in a price-fixing conspiracy and a group boycott / refusal to deal that has unlawfully foreclosed class members from receiving compensation in connection with the commercial exploitation of their images following their cessation of intercollegiate athletic competition. Plaintiff also sets forth a claim for unjust enrichment and requests that the Court require Defendants to provide an accounting of ill-gotten gains and the monies unlawfully withheld from class members. Plaintiff further requests that the Court establish a constructive trust for the benefit of class members and for the purpose of holding in trust the licensing revenues that Defendants and their co-conspirators have unlawfully diverted from class members.

3. As utilized herein, the term "former student athletes" includes those individuals that have permanently ceased competing on teams because of, for example, graduation; exhaustion of eligibility; injury; voluntary decisions to cease competition; and involuntary separations from teams due to decisions by coaches, schools, conferences, and/or the NCAA, and also includes those individuals that subsequently became professional athletes, whether prior to or after the exhaustion of their intercollegiate eligibility, and further includes current students that have remained in school but ceased competing on a collegiate athletic team.

4. The term "Damages Class" refers to former student-athletes as described herein. The term "Declaratory and Injunctive Relief Class" includes both former and current student-athletes as described herein. The terms "Class" or "Classes" include both Damages and Declaratory and Injunctive Relief class members, unless otherwise specified.

5. Defendant NCAA describes itself as "the organization through which the colleges and universities of the nation speak and act on athletics matters at the national level" and states that it is a "voluntary association of more than 1,000 institutions, conferences and organizations." The NCAA's official "licensing representative" is a for-profit entity called The Collegiate Licensing Company ("CLC"), a defendant herein, which is a division of IMG Worldwide, Inc. ("IMG"). CLC states on its website that there is a "$4.0 billion annual market for collegiate licensed merchandise."

6. As described below, the NCAA has unreasonably and illegally restrained trade in order to commercially exploit former student-athletes previously subject to its control, with such exploitation affecting those individuals well into their post-collegiate competition lives. The NCAA's conduct is blatantly anticompetitive and exclusionary, as it wipes out in total the future ownership interests of former student-athletes in their own images -- rights that all other members of society enjoy -- even long after student-athletes have ceased attending a university.

7. The NCAA's business partner, Thought Equity Motion, has described the NCAA's video content archive as "one of the most unique and valuable content collections in the world." The NCAA, through its member conference and schools, and in conjunction with its for-profit business partners, has eliminated the rights of former student-athletes to receive even a single dollar from the substantial revenue streams described herein. Former-student athletes do not share in these revenues even though they have never given informed consent to the widespread and continued commercial exploitation of their images. While the NCAA, its member conferences and schools, and its for-profit business partners reap millions of dollars from revenue streams including television contracts, rebroadcasts of "classic" games, DVD game and highlight film sales and rentals, "stock footage" sales to corporate advertisers and others, photograph sales, video game sales, and jersey and other apparel sales, former student-athletes whose likenesses are utilized to generate those profit-centers receive no compensation whatsoever.

8. Only within recent years has the NCAA entered into some of the licensing partnerships detailed herein that unlawfully utilize the images of Class members. The related available content featuring likeness of former student-athletes, such as DVDs, photos, and video games, continues to grow in both availability and popularity, and growth will continue to explode as merchandise continues to be made available in new delivery formats as developing technology and ingenuity permits, as exemplified by the substantial library of "on demand" internet content now available for sale for NCAA games going back several decades.

9. The NCAA accomplishes this unreasonable restraint of trade in part by requiring all student-athletes to sign a form each year – currently known as "Form 08-3a" – that purports to require each of them to relinquish all rights in perpetuity to the commercial use of their images, including after they graduate and are no longer subject to NCAA regulations. Form 08-3a is

CLASS ACTION COMPLAINT - 4 -

1   purposefully misleading, incomplete and ambiguous on its face, and student-athletes, including

2   minors, must sign it under duress and without informed consent.

3       10. The NCAA further requires student-athletes to sign at least one other similarly illegal

4   consent form pursuant to Article 12.5.1.1 of its Bylaws (the "Institutional, Charitable,

5   Educational, or Nonprofit Promotions Release Statement"), that allows schools and conferences

6   to commercially exploit former student-athletes by effecting another purported perpetual release

7   of rights. The NCAA's Bylaws contain further provisions allowing for-profit third parties to

8   benefit financially from the commercial exploitation of former student-athletes. The penalty for a

9   student-athlete who refuses to sign the forms described herein is that the student-athlete is

10  declared permanently ineligible for participation on his or her respective team, unless he or she

11  later signs the forms.

12

13      11. More specifically, Form 08-3a purports to cause student-athletes to release in

14  perpetuity their rights to obtain compensation in connection with use by the NCAA, or the

15

16  NCAA's designated "third parties," of a student-athlete's "name or picture to generally promote

17  NCAA championships or other NCAA events, activities or programs." Similar language is

18  contained in the "Institutional, Charitable, Educational, or Nonprofit Promotions Release

19  Statement." The NCAA, without advising its student-athletes, has taken that purposefully

20  ambiguous language as a license to develop an array of multi-media revenue streams for itself

21

22  without providing any compensation whatsoever to the former athletes whose images are sold

23  over and over again via NCAA-owned, controlled, and licensed entities. Form 08-3a and the

24  "Institutional, Charitable, Educational, or Nonprofit Promotions Release Statement" are contracts

25  of adhesion, imposed via anticompetitive conduct and agreement, and are plainly unenforceable.

26      12. The NCAA's forms in fact do not in any way grant licenses in perpetuity, or even

27  ones extending beyond the conclusion of any student-athlete's collegiate athletics career.

28

CLASS ACTION COMPLAINT          - 5 -

1  Student-athletes have not transferred or conveyed their rights in the licensing or use of their

2  image following the cessation of their participation on NCAA teams. The NCAA and its

3  members have no right to license or use players' images upon the conclusion of their participation

4
   in intercollegiate athletics. The NCAA and its members, however, have agreed to act as if their
5
6  forms do grant perpetual licenses with no limits, and further agreed to license and use the

7  wrongfully obtained rights.

8      13. In addition to agreeing to wrongfully interpret the release forms as perpetual licenses,

9  the NCAA has organized, maintained, and operated an illegal horizontal cartel consisting of its

10 member schools and conferences, additionally facilitated by Defendant CLC. That cartel has

11 collectively and illegally conspired to limit and depress the compensation of former student-
12
   athletes for continued use of their images to zero. Defendants' and their co-conspirators' actions
13
14 further constitute a group boycott / refusal to deal. Their concerted action requires all student-

15 athletes to sign each year the forms described herein that purport to require each of them to

16 relinquish all rights in perpetuity for use of their images. This concerted action is in effect a

17 refusal to deal with Class members on future post-competition rights issues.

18     14. The NCAA's abridgement of former student-athletes' economic rights in perpetuity
19
   is unconnected to any continuing pro-educational benefits for former student-athletes, who by
20
21 definition are no longer student-athletes. Defendants' patently anticompetitive and illegal scheme

22 has unreasonably restrained trade, and is a *per se* violation of the Section 1 of the Sherman Act.

23     15. In additional to violating the federal antitrust laws, Defendants have unjustly

24 enriched the NCAA, its member conferences and schools, and its for-profit business partners.

25 Defendants' actions have deprived Class members of their ability to exploit their right of

26 publicity, which protects the misappropriation of a person's identity for commercial use by
27

28

CLASS ACTION COMPLAINT            - 6 -

1  another, and such use can consist of the person's name, visual likeness, or other "indicia of

2  identity" such as voice, photograph, signature, or physical mannerisms.

3        16. In September of 2008, the NCAA's President, Myles Brand, acknowledged that

4
   student-athletes possess a right of publicity. In connection with an explanation as to why the
5

6  NCAA would not sue its business partner, the CBS television network, over its use of college

7  player information in its "fantasy sports" statistical game, President Brand wrote the following:

8              Some have urged the NCAA to seek legal remedy to this poke in
             the eye of intercollegiate athletics. They want us to sue the
9            producers on the grounds that the use of names of student-athletes
             violates the principle of amateurism.
10

11           Well, it does.

12           But that likely isn't good enough to bring suit. The stake in the
             ground is the right to control publicity by athletes of their names,
13           likenesses and identification. Indeed, courts might very well find
             that student-athletes should be held apart from professional athletes
14           in this application. The benefit that naturally comes with the
             publicity of names and statistics for professionals is critical enough
15           that those athletes assign their rights to organizations to manage.

16
             But in the case of intercollegiate athletics, the right of publicity is
17           held by the student-athletes, not the NCAA. We would find it
             difficult to bring suit over the abuse of a right we don't own.
18

19  The NCAA's express acknowledgement of current student-athletes' rights of publicity is equally

20  applicable to former student-athletes.

21        17. In the NCAA's 2009 "State of the Association" speech, Wallace I. Renfro, the

22  NCAA's vice president and senior advisor to President Myles Brand, stated the following:

23           There are commercial activities in which universities should not
24           engage even if it generates substantial revenues for athletics. A
             crystal clear example is that student-athletes should not be
25           commercially exploited. They are students, not professionals.
             Exploiting student-athletes for commercial purposes is as contrary
26           to the collegiate model as paying them.

27
             There are several orthogonal parameters that must be understood in
28           order to find the balance point for commercial activity. These

CLASS ACTION COMPLAINT                           - 7 -

1
2
3

> parameters include the locus of responsibility for controlling commercial activity, the underlying types of activity relevant to college sports, and the potential for diminishing or eliminating cases of run-away commercialism.

4   Whatever "orthogonal parameters" are being weighed by the NCAA and its business partners,

5   they do not include any form of compensation to former student-athletes.

6       18.   Reasonable and less restrictive alternatives are available than the NCAA's "zero

7   compensation" policy for former student-athletes' licensing rights.  For example, all of the major

8
9   professional sports, including basketball and football, have identified and utilized group-licensing

10  methods to share revenues among teams and players.  Additionally, other reasonable and less

11  restrictive alternatives could include the establishment of funds for health insurance, additional

12  educational or vocational training, and/or pension plans to benefit former student athletes.

13      19.   On behalf of the Damages Class described herein, Plaintiff seeks relief herein

14  including monetary damages, to be automatically trebled under the federal antitrust laws;

15  disgorgement and restitution of all monies by which the Defendants have been unjustly enriched;

16
17  and declaratory relief that Form 08-3a, the "Institutional, Charitable, Educational, or Nonprofit

18  Promotions Release Statement," and any similar forms regarding future compensation rights are

19  void and unenforceable.  Plaintiff further seeks an accounting of the monies received by

20  Defendants, their co-conspirators, and their licensees in connection with the exploitation of

21  Damages Class members' images, and the establishment of a constructive trust to benefit

22  Damages Class members.

23
24      20.   Plaintiff, on behalf of both former and current student-athletes, additionally requests

25  injunctive relief permanently enjoining the NCAA from utilizing the provisions Form 08-3a, the

26  "Institutional, Charitable, Educational, or Nonprofit Promotions Release Statement," and any

27  similar forms that purport to deprive former student-athletes of compensation rights, and further

28

CLASS ACTION COMPLAINT          - 8 -

enjoining Defendants from selling, licensing, or using former student-athletes' rights that Defendants do not own.

## JURISDICTION AND VENUE

21. The Court has subject matter jurisdiction under 28 U.S.C. § 1331 (federal question) and 28 U.S.C. § 1337 (commerce and antitrust regulation), as this action arises under Section 1 of the Sherman Act, 15 U.S.C. § 1, and Sections 4 and 16 of the Clayton Act, 15 U.S.C. §§ 15(a) and 26. The Court has supplemental subject matter jurisdiction over the pendent state law claims under 28 U.S.C. § 1367. The Court also has jurisdiction over this matter pursuant to 28 U.S.C. § 1332(d), in that this is a class action in which the matter or controversy exceeds the sum of $5,000,000, exclusive of interest and costs, and in which some members of the proposed class are citizens of a state different from the Defendants.

22. Venue is proper because Defendants reside, are found, have agents, and transact business in this District as provided in 28 U.S.C. § 1391(b) and (c) and in Sections 4 and 12 of the Clayton Act, 15 U.S.C. §§ 15 and 22.

23. This Court has personal jurisdiction over Defendants because, *inter alia*, they: (a) transacted business throughout the United States, including in this District; (b) participated in organizing intercollegiate athletic contests, and/or licensing or selling merchandise throughout the United States, including in this District; (c) had substantial contacts with the United States, including in this District; and (d) were engaged in an illegal anticompetitive scheme that was directed at and had the intended effect of causing injury to persons residing in, located in, or doing business throughout the United States, including in this District. Additionally, numerous NCAA Division I universities or colleges are found within this District, *i.e.*, the University of California's Berkeley campus ("Cal"), Stanford University, Santa Clara University, the University of San Francisco ("USF"), and St. Mary's College.

CLASS ACTION COMPLAINT                    - 9 -

1

**INTRADISTRICT ASSIGNMENT**

2      24. This action arises in Alameda County because that is where a substantial part of the

3   events that give rise to the claim occurred. Within this County is found the Cal campus. The

4   University fields at least 27 intercollegiate sports teams, including an NCAA Division I men's

5
    basketball team, and a Football Bowl Subdivision men's football team, both of which compete in
6
7   the Pacific-10 Conference (the "Pac-10 Conference"). Former student-athletes on both of these

8   teams have been, and will be, subjected to the continuing violations described herein, as are

9   current student-athletes on those teams for purposes of the Declaratory and Injunctive Relief

10  Class. Pursuant to Civil Local Rule 3-2(d), this action should be assigned to the Oakland

11  Division.

12

**PLAINTIFF**

13
14      25. Plaintiff Edward C. O'Bannon, Jr. ("Ed O'Bannon") is a resident of Henderson,

15  Nevada. Mr. O'Bannon competed on the University of California, Los Angeles ("UCLA") men's

16  basketball team in the 1991-92, 1992-93, 1993-94, and 1994-5 seasons. In the 1994-95 season,

17  Mr. O'Bannon led his team to a national championship, and scored 30 points and had 17

18  rebounds in the championship game. Mr. O'Bannon received the John R. Wooden award as the

19  nation's most outstanding men's basketball player for the 1994-95 season, and also was selected

20
    by the Associated Press as the 1994-95 NCAA postseason tournament's Most Outstanding Player
21
22  ("MOP"). Mr. O'Bannon competed pursuant to the NCAA's rules and regulations, and has been

23  deprived of compensation by Defendants and their co-conspirators for the continued use of his

24  image following the end of his intercollegiate athletic career.

25      26. Mr. O'Bannon's image, along with those of other Damages Class members, is being

26  offered for sale and/or used during the Class Period in at least the ways described below, without

27  informed consent from him and without compensation paid to him. For example, on the NCAA's

28

CLASS ACTION COMPLAINT                - 10 -

1   On Demand on-line store, operated in connection with its for-profit business partner Thought

2   Equity Motion, a two DVD "1995 Men's Basketball National Championship Box Set" is offered

3   for \$39.99, and described as follows: "Ed O'Bannon, earning MOP honors, lead UCLA back to

4   prominence by defeating Arkansas 89-78 for their 11th title in school history. The box set also

5

6   includes the 1995 Final Four Highlights Video featuring UCLA, Arkansas, North Carolina,

7   Oklahoma St." The Final Four Highlights Video is separately offered for sale for \$24.99.

8   UCLA's NCAA tournament first round game against Florida International from 1994-95 is

9   offered for sale at \$24.99, and its description includes the following: "UCLA was led by All-

10   Tournament Team selections Toby Bailey and Ed O'Bannon, the tournament's Most Outstanding

11   Player." UCLA's regional semi-final game against Missouri is offered for \$24.99, and its

12

13   description includes the following: "UCLA was led by All-Tournament Team selections Toby

14   Bailey and Ed O'Bannon, the tournament's Most Outstanding Player." UCLA's national semi-

15   final game against Oklahoma State is offered for sale at \$24.99, and its description includes the

16   following: "UCLA was led by All-Tournament Team selections Toby Bailey and Ed O'Bannon,

17   the tournament's Most Outstanding Player."

18   27. As additional examples, other DVDs offered for sale utilizing the image of Mr.

19   O'Bannon and other Damages Class members from the 1994-95 season include DVDs of

20

21   UCLA's regional final game versus the University of Connecticut, available for \$24.99, and the

22   championship game versus Arkansas offered for sale at \$24.99. An NCAA tournament first-

23   round game against Tulsa from the 1994-95 season is available for "pre-order," and a description

24   notes that "production of this game has been delayed." For the 1992-93 season, a "Michigan

25   Men's Basketball Fab Five 1993" three DVD set is offered for \$59.99, and one of the games

26   included is a regional game versus UCLA. That game is also separately offered for sale at

27   \$24.99. Also available for "pre-order" is UCLA's first round game versus Iowa State. For the

28

CLASS ACTION COMPLAINT   - 11 -

1   1991-92 season, four UCLA NCAA tournaments games (against Robert Morris, Louisville,

2   Indiana, and New Mexico State) are available for pre-order.

3       28. The DVDs described above are available through numerous other outlets, including

4   UCLA's Official On-Line DVD store, where the 1995 championship game is currently listed as

5   the number three top-selling basketball DVD, amazon.com, CBS Sports' "Online DVD Store,"

6
7   and wal-mart.com, on which the description of the 1995 championship game includes the

8   following: "The following content was provided by the publisher . . . The Bruins held off the

9   Razorbacks for a convincing 89-78 victory as Ed O'Bannon, the tournament's Most Outstanding

10  Player, led the Bruins back to the top of the college basketball mountain as the 1995 National

11  Champions."

12
13      29. As an additional example, a DVD of the 1995 Championship game, featuring Mr.

14  O'Bannon and other Damages Class members, is available for rental from Blockbuster Video and

15  Netflix.

16      30. As another example of formats in which Damages Class members' images are being

17  utilized subject to the anticompetitive restraints detailed herein, on one of the NCAA's on-line

18  photo stores, at least three images of Mr. O'Bannon are offered for sale. Interested purchasers

19  must call the website's operator to discuss pricing options. The photos are described as follows:

20
21  "UCLA center George Zidek (25) and Oklahoma State center Bryant Reeves (50) and UCLA

22  forward Ed O'Bannon (31) during the NCAA Final Four basketball championship semifinal game

23  held in Seattle, WA at the Kingdome."; "UCLA forward Ed O'Bannon (31) and Arkansas center

24  Dwight Stewart (15) during the NCAA Men's National Basketball Final Four championship game

25  held in Seattle, WA at the Kingdome. UCLA defeated Arkansas 89-78 for the title. O'Bannon

26  was named MVP for the tournament."; "UCLA's Ed O'Bannon turns cameraman as he cuts the

27  net following UCLA's 89-78 victory over Arkansas in the Division I Men's Basketball

28

CLASS ACTION COMPLAINT          - 12 -

1 Championship April 3, 1995 in Seattle, Washington. O'Bannon was named MVP of the

2 tournament."

3 31. As another example of formats in which Damages Class members' images are being

4 utilized subject to the anticompetitive restraints detailed herein, the NCAA and its partner

5 Thought Equity Motion also offer for sale to corporate advertisers and others a "stock footage"

6 clip running 1 minute and 7 seconds that features Mr. O'Bannon's performance in the 1994-95

7 NCAA championship game, as well as interview footage with Mr. O'Bannon and others. The

8 clip is described as follows: "Ed O'Bannon helps carry UCLA in the 1995 Men's NCAA Division

9 I Basketball Championship against Arkansas." It appears that at least one additional clip

10 featuring Mr. O'Bannon (titled "1995 UCLA vs. Missouri Ed O'Bannon (#31)") is available.

11 Interested parties must contact Thought Equity for pricing, which appears to vary depending on

12 intended usage.

13

14 32. As another example of formats in which Damages Class members' images are being

15 utilized subject to the anticompetitive restraints detailed herein, Mr. O'Bannon's likeness is

16 utilized by the NCAA's business partner and co-conspirator Electronic Arts, Inc. as a part of its

17 NCAA Basketball 09 video game's "Classic Teams" feature (as described more herein) where

18 game players can select Mr. O'Bannon's 1995 UCLA team.

19

20 33. As another example of formats in which Damages Class members' images are being

21 utilized subject to the anticompetitive restraints detailed herein, UCLA games featuring Mr.

22 O'Bannon also are periodically rebroadcast on ESPN Classic.

23

24 34. As a result of the federal antitrust violations described herein, Plaintiff was injured in

25 his business or property, and was unfairly deprived of compensation in connection with the use

26 and sale of his image.

27

28

CLASS ACTION COMPLAINT - 13 -

1

## DEFENDANTS

2      35.  Defendant the National Collegiate Athletic Association (the "NCAA") is an

3    unincorporated association with its principal place of business located in Indianapolis, Indiana.

4      36.  Defendant Collegiate Licensing Company ("CLC") is a for-profit corporation

5    incorporated under the laws of Georgia with its principal place of business located at 290

6    Interstate N Circle SE, Suite 200, Atlanta, Georgia 30339.  IMG College, a division of IMG

7

8    Worldwide, Inc. ("IMG"), identifies CLC as its "licensing team," and states that CLC is "the

9    unrivaled leader in collegiate brand licensing, managing the licensing rights for nearly 200

10   leading institutions that represent more than $3 billion in retail sales and more than 75% share of

11   the college licensing market."  IMG identifies itself as "a leading collegiate marketing, licensing

12   and media company."

13

14      37.  Whenever in this Complaint reference is made to any act, deed, or transaction of the

15   Defendants, the allegation means that the Defendants engaged in the act, deed, or transaction by

16   or through their officers, directors, agents, employees, or representatives while they were actively

17   engaged in the management, direction, control or transaction of Defendants' business or affairs.

18

## CO-CONSPIRATORS

19      38.  Electronic Arts, Inc. ("EA") is a non-defendant co-conspirator.  EA is publicly traded

20   on the NASDAQ stock exchange (ticker symbol:  ERTS) and identifies itself as "the world's

21

22   leading interactive entertainment software company" and states that it "develops, publishes, and

23   distributes interactive software worldwide for video game systems, personal computers, cellular

24   handsets and the Internet."  In its 2008 fiscal year, EA had revenues of $3.67 billion and 27 of its

25   titles sold more than one million copies.  As described herein, the NCAA has entered into license

26   agreements with EA relating to the use of the likenesses of members of the Classes in video

27   games available via various platforms.

28

39.  Various other persons, firms, corporations, and entities have participated as unnamed co-conspirators with Defendants in the violations and conspiracy alleged herein, including the NCAA's member schools and conferences.  In order to engage in the offenses charged and violations alleged herein, these co-conspirators have performed acts and made statements in furtherance of the antitrust violations and other violations alleged herein.

40.  At all relevant times, each co-conspirator was an agent of Defendants and each of the remaining co-conspirators, and in doing the acts alleged herein, was acting within the course and scope of such agency.  Defendants and each co-conspirator ratified and/or authorized the wrongful acts of Defendants and each of the other co-conspirators.  Defendants and the co-conspirators, and each of them, are participants as aiders and abettors in the improper acts and transactions that are the subject of this action.

### INTERSTATE TRADE AND COMMERCE

41.  The business activities of Defendants that are the subject of this action were within the flow of, and substantially affected, interstate trade and commerce.

42.  During the Class Period, Defendants transacted business in multiple states in a continuous and uninterrupted flow of interstate commerce throughout the United States.

### CLASS ACTION ALLEGATIONS

43.  Plaintiff brings this action under Federal Rule of Civil Procedure  23(b)(2) and (b)(3) on his own behalf and on behalf of the following two classes (the "Classes"):

The "Declaratory and Injunctive Relief  Class":

> All current and former student-athletes residing in the United States who compete on, or competed on, an NCAA Division I college or university men's basketball team or on an NCAA Football Bowl Subdivision (formerly known as Division I-A until 2006) men's football team and whose images may be, or have been, licensed or sold by Defendants, their co-conspirators, or their licensees after the conclusion of the athlete's participation in intercollegiate athletics.

> The Class also excludes the officers, directors, and employees of Defendants, the officers, directors and employees of any NCAA

1    Division I college or university, and the officers, directors, or
     employees of any NCAA Division I athletic conference.

2

     The "Damages Class":

3

4    All former student-athletes residing in the United States who
     competed on an NCAA Division I college or university men's
     basketball team or on an NCAA Football Bowl Subdivision
5    (formerly known as Division I-A until 2006) men's football team
     whose images have been licensed or sold by Defendants, their co-
6    conspirators, or their licensees during the four years preceding the
     filing of this Complaint and continuing until a final judgment in this
7    matter. The class does not include current student-athletes.

8    The Class also excludes the officers, directors, and employees of
     Defendants, the officers, directors, and employees of any NCAA
9    Division I college or university, and the officers, directors, or
     employees of any NCAA Division I athletic conference.

10

11   Members of the Damages and Declaratory and Injunctive Relief Classes are collectively referred

12   to herein as the "Class" or the "Classes" unless otherwise individually specified.

13   44. In addition to seeking certification of nationwide classes for the antitrust claims,

14   Plaintiff also seeks certification of a nationwide class for purposes of his unjust enrichment /

15   constructive trust and accounting claims.

16

17   45. Plaintiff does not know the exact number of Class members, because that information

18   is in the exclusive control of Defendant NCAA and third parties, namely, the NCAA's member

19   athletics conferences and schools. However, due to the nature of the trade and commerce

20   involved, Plaintiff believes that the Class members number in the thousands and are

21   geographically diverse so that joinder of all Class members is impracticable. Given that the

22   NCAA is selling and licensing the images of players from many decades, as described herein, it

23

24   stands to reason that there are more former student athletes than current ones affected by the

25   NCAA's anticompetitive practices described herein.

26   46. There are questions of law and fact common to members of both the Damages Class

27   and the Declaratory and Injunctive Relief Class, including but not limited to the following:

28

CLASS ACTION COMPLAINT                    - 16 -

a. whether Defendants and their co-conspirators engaged in or entered into a contract, combination, or conspiracy among themselves to fix, depress, maintain, and/or stabilize prices paid to Class members for use of their images after the conclusion of their participation in intercollegiate athletics;

b. whether Defendants' unlawful conduct has enabled them to decrease, maintain, or stabilize below competitive levels the output, and compensation / royalties that Class members would receive for use, of their images / likenesses in a market free of anticompetitive constraints;

c. the duration of the contract, combination, or conspiracy alleged herein;

d. whether Defendants violated Section 1 of the Sherman Act;

e. whether Defendant NCAA's Form 08-03a, and any similar forms, are void and unenforceable;

f. whether Defendant NCAA's "Institutional, Charitable, Educational, or Nonprofit Promotions Release Statement," and any similar forms, are void and unenforceable; and

g. whether the conduct of Defendants and their co-conspirators caused injury to the business or property of Plaintiff and Class members.

47. Additional common questions of law of fact specific to the Damages Class include the following:

a. the appropriate measure of damages sustained by Plaintiff and Class members; and

b. whether Defendants have been unjustly enriched.

48. The common questions with respect to the Damages Class predominate over questions, if any, that affect only individual Damages Class members.

49. With respect to the Declaratory Relief and Injunctive Relief Classes, common questions of law or fact include the following:

a. whether injunctive relief is appropriate;

b. if injunctive relief is appropriate, what types of such relief are suitable in this matter;

c. whether declaratory relief is appropriate;

d. whether a constructive trust for the benefit of class members should be established; and

e. whether an accounting is appropriate.

50. With respect to members of the Declaratory and Injunctive Relief Class, Defendants have acted or refused to act on grounds generally applicable to the Class, thereby making appropriate final injunctive relief or corresponding declaratory relief with respect to the class as a whole.

51. Plaintiff's claims are typical of, and not antagonistic to, the claims of the other Class members. By advancing his claims, Plaintiff will also advance the claims of all Class members, because Defendants participated in activity that caused all Class members to suffer similar injuries.

52. Plaintiff and his counsel will fairly and adequately protect the interests of absent Class members. There are no material conflicts between Plaintiff's claims and those of absent Class members that would make class certification inappropriate. Counsel for Plaintiff are highly experienced in complex class action litigation, including antitrust litigation, and will vigorously assert Plaintiff's claims and those of absent Class members.

53. A class action is superior to other methods for the fair and efficient resolution of this controversy. The class action device presents fewer management difficulties, and provides the benefit of a single adjudication, economy of scale, and comprehensive supervision by a single court. The damages suffered by Plaintiff and each Damages Class member are relatively small as compared to the expense and burden of individual prosecution of the claims asserted in this litigation. Thus, absent class certification, it would not be feasible for Plaintiff and Class members to redress the wrongs done to them. It also would be grossly inefficient for the judicial system to preside over large numbers of individual cases. Further, individual litigation presents

1    the potential for inconsistent or contradictory judgments and would greatly magnify the delay and

2    expense to all parties and to the judicial system. Therefore, the class action device presents far

3    fewer case management difficulties and will provide the benefits of unitary adjudication,

4    economy of scale, and comprehensive supervision by a single court.

5

6    **THE NCAA AND ITS CONTROL OF THE COLLEGIATE LICENSING MARKET**

7        54.  Each year, the colleges and universities who are members of the NCAA award more

8    than 11,500 athletic scholarships to men's football and basketball players.

9        A.     **The NCAA and its Structure and Governance.**

10

11       55.  In its most recent Consolidated Statement of Financial Position, dated August 31,

12   2008, the NCAA stated the following:

13               The National Collegiate Athletic Association (the NCAA or the
                 Association) is an unincorporated not-for-profit educational
14               organization founded in 1906. The NCAA is the organization
                 through which the colleges and universities of the nation speak and
15               act on athletics matters at the national level. It is a voluntary
                 association of more than 1,000 institutions, conferences and
16               organizations devoted to the sound administration of
                 intercollegiate athletics in all its phases. Through the NCAA, its
17               members consider any athletics issue that has crossed regional or
                 conference lines and is national in character. The NCAA strives
18               for integrity in intercollegiate athletics and serves as the colleges'
                 national athletics accrediting agency. A basic purpose of the
19               NCAA is to maintain intercollegiate athletics as an integral part of
                 the educational program and the athlete as an integral part of the
20               student body.
21
22               The NCAA operates through a governance structure which
                 empowers each division to guide and enhance their ongoing
23               division-specific activities. In Division I, the legislative system is
                 based on conference representation and an eighteen member Board
24               of Directors that approves legislation. The Division II and III
                 presidential boards are known as the Presidents Council; however,
25               legislation in Division II and III is considered through a one-
                 school, one-vote process at the NCAA Annual Convention. The
26               governance structure also includes an Executive Committee
                 composed of sixteen chief executive officer (member institution
27               chief executive officers) that oversee association-wide issues
28

CLASS ACTION COMPLAINT                    - 19 -

1

2

3

4

> which is charged with ensuring that each division operates consistently with the basic purposes, fundamental policies and general principles of the NCAA. The Executive Committee has representation from all three divisions and oversees the Association's finances and legal affairs.

5   56. On its website, the NCAA further describes itself as being "comprised of institutions,

6   conferences, organizations and individuals committed to the best interests, education and athletics

7   participation of student-athletes." The NCAA further states that its members are the "colleges,

8

9   universities and conferences that make up the NCAA," and that "[t]he members appoint volunteer

10   representatives that serve on committees which introduce and vote on rules called bylaws. The

11   members also establish programs to govern, promote and further the purposes and goals of

12   intercollegiate athletics." The NCAA additionally states "[m]any believe the Association rules

13   college athletics; however, it is actually a bottom-up organization in which the members rule the

14   Association."

15   57. The 2008-09 NCAA "Division I Manual" is comprised of the NCAA's Constitution,

16

17   its Operating Bylaws, and its Administrative Bylaws, which together span more than 400 pages.

18   These rules regulate all aspects of collegiate athletic competition, and demonstrate the NCAA's

19   control of the collegiate licensing market and the horizontal agreements by which the NCAA's

20   members agree to abide by, implement, and enforce the rules.

21

B.   **The NCAA's Anticompetitive Form 08-3a.**

22

23   58. Bylaw 12.5.1.1.1 ("Promotions Involving NCAA Championships, Events, Activities

24   or Programs") states the following:

25   > The NCAA [or a third party acting on behalf of the NCAA (e.g.,
26   > host institution, conference, local organizing committee)] may use
      > the name or picture of an enrolled student-athlete to generally
27   > promote NCAA championships or other NCAA events, activities or
      > programs.

28

CLASS ACTION COMPLAINT                    - 20 -

59.  Before a student-athlete commences athletic participation each year, the NCAA requires that he or she sign its "Form 08-3a." titled "Student-Athlete Statement."  The form is of particular importance due to its provision regarding student-athletes' release of rights in connection with use of their images.  It appears that the title of this form changes each year in connection with the applicable year.

60.  The mandatory nature of the form on which student-athletes must agree to the terms of Bylaw 12.5.1.1.1 is detailed in the Constitution and Bylaws.  Specifically, Article 3.2.4.6 of the Constitution ("Student-Athlete Statement") states the following:

> An active member shall administer annually, on a form prescribed by the Legislative Council, a signed statement for each student-athlete that provides information prescribed in Bylaws 14.1.3 and 30.12.

61.  Bylaw 14.1.3.1 ("Content and Purpose"), referred to in Article 3.2.4.6 of the Constitution, details the contents of the required form and states the following:

> Prior to participation in intercollegiate competition each academic year, a student-athlete shall sign a statement in a form prescribed by the Legislative Council in which the student athlete submits information related to eligibility, recruitment, financial aid, amateur status, previous positive drug tests administered by any other athletics organization and involvement in organized gambling activities related to intercollegiate or professional athletics competition under the Association's governing legislation. Failure to complete and sign the statement shall result in the student-athlete's ineligibility for participation in all intercollegiate competition. Violations of this bylaw do not affect a student-athlete's eligibility if the violation occurred due to an institutional administrative error or oversight, and the student-athlete subsequently signs the form; however, the violation shall be considered an institutional violation per Constitution 2.8.1.

62.  Bylaw 14.1.3.2 ("Administration") continues that "[t]he institution shall administer this form individually to each student-athlete prior to the individual's participation in intercollegiate competition each year. Details about the content, administration, and disposition of the statement are set forth in Bylaw 30.12."

1    63. Bylaw 30.12 ("Student-Athlete Statement"), referred to in Article 3.2.4.6 of the

2    Constitution and in Bylaw 14.1.3.2, states the following:

3           The following procedures shall be used in administering the
4           student-athlete statement required in Bylaw 14.1.3:

5           (a)   The statement shall be administered individually to each
                  student-athlete by the athletics director or the athletics
6                 director's designee prior to the student's participation in
7                 intercollegiate competition each academic year;

8           (b)   The statement shall be kept on file by the athletics director and
                  shall be available for examination upon request by an
9                 authorized representative of the NCAA; and

10          (c)   The athletics director shall promptly notify in writing the vice
11                president of NCAA's education services group regarding a
                  student-athlete's disclosure of a previous positive drug test
12                administered by any other athletics organization.

13   64. Form 08-3a states that it is "required by NCAA Constitution 3.2.4.6 and NCAA

14   Bylaws 14.1.3.1 and 30.12," and that its purpose is "[t]o assist in certifying eligibility." It further

15   notes that "[t]his NCAA Division I statement/consent form shall be in effect from the date this
16
17   document is signed and shall remain in effect until a subsequent Division I Student-Athlete

18   Statement/Drug-Testing Consent form is executed." Form 08-3a has seven parts, including the

19   following: "[a]statement concerning eligibility;" "[a]n affirmation of status as an amateur

20   athlete;" and "[a] statement concerning the promotion of NCAA championships and other NCAA

21   events."

22   65. Under Part IV ("Promotion of NCAA Championships, Events, Activities or

23   Programs"), student athletes must sign and agree to the following:
24
25          You authorize the NCAA [or a third party acting on behalf of the
                  NCAA (e.g., host institution, conference, local organizing
26                committee)] to use your name or picture to generally promote
                  NCAA championships or other NCAA events, activities or
27                programs.

28

CLASS ACTION COMPLAINT                    - 22 -

66. Part IV, described in the preceding paragraph, has been utilized by the NCAA, its members, and its co-conspirators to engage in the unlawful licensing of Class members' commercial rights. Its provision stating that it "shall remain in effect until a subsequent Division I Student-Athlete Statement/Drug-Testing Consent form is executed" has the effect of granting a purported release in perpetuity.

67. Notably, Form 08-3a states that it is "required by NCAA Constitution 3.2.4.6 and NCAA Bylaws 14.1.3.1 and 30.12" and that its purpose is to "assist in certifying eligibility." The referenced sections of the Constitution and Bylaws, however, do not convey, transfer, or grant any rights of the student-athlete to the NCAA, its member institutions, or its licensees. The sections referenced regarding the Constitution and Bylaws have to do with matters concerning eligibility, disclosure of educational and drug testing records, and affirmation of amateur status requirements. Relying on these provisions, the NCAA has created an anti-competitive and unconscionable perpetual release relating to image rights.

68. The "authorization" described above in Form 08-3a is entirely coerced and uninformed and is even signed, in some cases, by minors.

69. Form 08-3a is evidence of the NCAA's repeated attempts to obfuscate issues about sales of merchandise by referring to the vague and ambiguous concept of "promot[ion] of NCAA championships or other NCAA events, activities or programs of college athletics." The ambiguous word "support" also appears in the "Institutional, Charitable, Education or Nonprofit Promotions Release" mandated by Article 12.5.1.1 of the Bylaws. No reasonable person, upon reading Form 08-3a, and the "Institutional, Charitable, Education or Nonprofit Promotions Release" described below, would interpret phrases such as "support educational activities," or "generally promote NCAA championships or other NCAA events, activities or programs" to specifically grant a license in perpetuity for former players' images to be used for profit, over

1      many years, in DVDs, on-demand video, video games, photographs for sale, "stock footage" sold

2      to corporate advertisers, "classic games" for re-broadcast on television, jersey and apparel sales,

3      and other items.

4

5      70. The NCAA's releases described herein are also notable for their failure to indicate

6      that legal rights are being relinquished, and for their failure to counsel student-athletes, who are

7      sometimes minors, that they may wish to seek legal advice in connection with the release of

8      future compensation rights.

9      71. This is not the first occasion in which the NCAA has sought to prevent input from

10      legal counsel on matters that affect student-athletes' post-collegiate endeavors. In a recent

11      Opinion dated February 12, 2009, in the matter of *Oliver v. National Collegiate Athletic*

12
     *Association ("Oliver")*, Judge Tygh M. Tone of the Common Pleas Court of Erie County, Ohio,

13
     examined the NCAA's Bylaw 12.3.2.1. That Bylaw states that "A lawyer may not be present
14

15      during discussions of a contract offer with a professional organization or have any direct contact

16      (in person, by telephone or by mail) with a professional sports organization on behalf of the

17      individual. A lawyer's presence during such discussions is considered representation by an

18      agent." A player utilizing an "agent" in such negotiations is deemed ineligible under the NCAA's

19
     rules, whereas one who does not utilize an agent can retain his eligibility if he chooses to return to
20

21      school and not become a professional. The court ruled that "Bylaw 12.3.2.1 is arbitrary and

22      capricious and against the public policy of the State of Ohio as well as all states within this Union

23      and further limits the player's ability to effectively negotiate a contract."

24      72. The court in *Oliver* further stated that the effect of the Bylaw "is akin to a patient

25      hiring a doctor but the doctor is told by the hospital board and the insurance company that he (the

26      doctor) cannot be present when the patient meets with a surgeon because the conference may

27      improve his patient's decision making power." The court additionally stated that "[i]f the

28

CLASS ACTION COMPLAINT      - 24 -

Defendant [NCAA] intends to deal with this athlete or any athlete in good faith, the student-athlete should have the opportunity to have the tools present (in this case an attorney) that would allow him to make a wise decision without automatically being deemed a professional, especially when such contractual negotiations can be overwhelming, even to those who are skilled in their implementation."

73. The NCAA, through its total control of intercollegiate athletics, and due to a gross disparity in bargaining power, requires student-athletes to sign nonnegotiable forms, as the terms are nonnegotiable. Any Class member declining to do so is barred by the NCAA and the relevant member institution from all further intercollegiate athletic competition.

C. **The NCAA's Anti-Competitive "Institutional, Charitable, Educational, or Nonprofit Promotions Release Statement" Mandated by NCAA Bylaws Section 12.5.1.1.**

74. Article 12.5.1.1 ("Institutional, Charitable, Education or Nonprofit Promotions") also results in the creation of an unconscionable release that benefits member schools and conferences. This release also is the product of the anticompetitive agreement described herein among the NCAA and its members. Article 12.5.1.1 states in pertinent part the following:

> A member institution or recognized entity thereof (e.g., fraternity, sorority or student government organization), a member conference or a non-institutional charitable, educational or nonprofit agency may use a student-athlete's name, picture or appearance to support its charitable or educational activities or to support activities considered incidental to the student-athlete's participation in intercollegiate athletics, provided the following conditions are met:
>
> (a) The student-athlete receives written approval to participate from the director of athletics (or his or her designee who may not be a coaching staff member), subject to the limitations on participants in such activities as set forth in Bylaw 17;
>
> (b) The specific activity or project in which the student-athlete participates does not involve co-sponsorship, advertisement or promotion by a commercial agency other than through the reproduction of the sponsoring company's officially registered regular trademark or logo on printed materials such as pictures,

posters or calendars. The company's emblem, name, address, telephone number and Web site address may be included with the trademark or logo. Personal names, messages and slogans (other than an officially registered trademark) are prohibited;

(c) The name or picture of a student-athlete with remaining eligibility may not appear on an institution's printed promotional item (e.g., poster, calendar) that includes a reproduction of a product with which a commercial entity is associated if the commercial entity's officially registered regular trademark or logo also appears on the item;

(d) The student-athlete does not miss class;

(e) **All moneys derived from the activity or project go directly to the member institution, member conference or the charitable, educational or non-profit agency** (emphases added);

(f) The student-athlete may accept actual and necessary expenses from the member institution, member conference or the charitable, educational or nonprofit agency related to participation in such activity;

(g) The student-athlete's name, picture or appearance is not used to promote the commercial ventures of any nonprofit agency;

(h) Any commercial items with names, likenesses or pictures of multiple student-athletes (other than highlight films or media guides per Bylaw 12.5.1.7) may be sold only at the member institution at which the student-athletes are enrolled, institutionally controlled (owned and operated) outlets or outlets controlled by the charitable or educational organization (e.g., location of the charitable or educational organization, site of charitable event during the event). Items that include an individual student-athlete's name, picture or likeness (e.g., name on jersey, name or likeness on a bobble-head doll), other than informational items (e.g., media guide, schedule cards, institutional publications), may not be sold; and

(i) **The student-athlete and an authorized representative of the charitable, educational or nonprofit agency sign a release statement ensuring that the student-athlete's name, image or appearance is used in a manner consistent with the requirements of this section**. (emphasis added).

1   75. The preceding Bylaw, with its mandated release pursuant to subsection (i), has been

2   utilized by the NCAA's members to engage in the unlawful licensing of Class members' rights,

3   as intended by the NCAA. Just as described herein with respect to the NCAA's Form 08-3a, this

4   mandated release constitutes an unconscionable contract that is both procedurally and

5

6   substantively unconscionable.

7   76. Bylaw 12.5.1.7 ("Promotion by Third Party of Highlight Film, Videotape or Media

8   Guide") states the following:

9           Any party other than the institution or a student-athlete (e.g., a
            distribution company) may sell and distribute an institutional
10          highlight film or videotape or an institutional or conference media
            guide that contains the names and pictures of enrolled student-
11          athletes only if:

12
            (a)   The institution specifically designates any agency that is
13                authorized to receive orders for the film, videotape or media
                  guide;
14

15          (b)   Sales and distribution activities have the written approval of
                  the institution's athletics director;
16

17          (c)   The distribution company or a retail store is precluded from
                  using the name or picture of an enrolled student-athlete in any
18                poster or other advertisement to promote the sale or
                  distribution of the film or media guide; and
19

20          (d)   There is no indication in the makeup or wording of the
                  advertisement that the squad members, individually or
21                collectively, or the institution endorses the product or services
                  of the advertiser."

22  77. The above-provision appears to purport to give third parties (meaning for-profit

23  "distribution companies") the right to "sell and distribute" highlight films upon approval from the

24
25  school, without even mandating a release from the student-athlete. However, the release that the

26  NCAA mandates in its Bylaw 12.5.1.1(h), described a few paragraphs above, has been utilized by

27  the NCAA and its members to unlawfully license and use the commercial rights of former

28  student-athletes' rights in the use of their images.

CLASS ACTION COMPLAINT                    - 27 -

78. The *Des Moines Register* recently confirmed that schools do in fact require student-athletes to sign the NCAA's mandated consent forms, and reported the following in an article that also described two schools' receipt of funds relating to the NCAA's video-game license agreement with EA (as further detailed herein):

> The athletic departments for Iowa and Iowa State ask for student-athletes' consent before using their likeness on any promotional material for the schools.

> "Generally, the way we approach it is we've been very conservative over the years," Iowa athletic director Gary Barta said. "When we do sell the likeness of a student-athlete, we have signed permission ... and all the proceeds from those sales go back directly to benefit student-athletes in general (through the school's athletic fund)."

The "consent" and "permission," described above, however, is entirely coerced and uninformed, as intended by the NCAA and its business partners - its member schools, conferences, and for-profit licensees, and as such constitutes an unconscionable contract and is the product of anticompetitive conduct and agreement.

D.   **The Collegiate Licensing Market.**

79. The NCAA and its members control the collegiate licensing market in the United States, including licensing rights to current and former players' images and likenesses (which are utilized in, for example, items such as DVDs of game films, on-demand sales of game films, "stock footage" for corporate advertisers, "classic" games shown on the cable television network "ESPN Classic" and other networks, photographs, video games, and in other merchandise).

80. IMG, the owner of the NCAA's licensing arm, Defendant CLC, recognizes the college market on its website as follows: "IMG College is a leading collegiate marketing, licensing and media company that can create and build comprehensive marketing platforms that leverage the marketing potential of the college sports and on-campus market. " IMG continues that "[c]onsumer devotion to college institutions is unrivaled, but the complexity of the space

makes it challenging for marketers to tap the full potential. With our expertise, broad relationships and portfolio of properties, IMG College can help brands create platforms to reach millions of passionate, loyal fans." IMG further states that "[o]ur licensing team, The Collegiate Licensing Company, is the unrivaled leader in collegiate brand licensing, managing the licensing rights for nearly 200 leading institutions that represent more than $3 billion in retail sales and more than 75% share of the college licensing market." IMG on its website further states: "[h]aving originally contracted with IMG College in 1976, the NCAA has trusted the Company for nearly 30 years to lead the industry in delivering the power of the collegiate market to consumers nationwide."

81. The NCAA and its members have the ability to control price and exclude competition. The NCAA and its members control the output and set the price for licensed merchandise and licensing rights and have the power to exclude from this market any member who is found to violate its rules. The NCAA can and does exclude both current and former student-athletes from this market, as evidenced by the usage of the anticompetitive forms described herein. The NCAA and its members have obtained a 100% share in the licensing market. With respect to current student-athletes, those players would collectively have a share of that market absent the vehicles described herein by which they are required to transfer those rights to the NCAA, its members, and others. Former student-athletes, including the members of the Damages Class described herein, also would have a share of the market, absent the anticompetitive practices described herein.

82. The NCAA (through its members) thus totally controls the licensing rights market, and is able to dictate the supply and the terms upon which licensed products and licenses are bought and sold.

1

2

3

4

5

6

7

8

9

83. Another indicator of the NCAA and its members' power include the fact that *all* student-athletes are required to sign the forms described herein and pursuant to which the NCAA has unlawfully licensed the rights of former student-athletes are forced to release all future rights to the commercial use of their images. Student-athletes must sign these forms, even if he or she does not receive a scholarship. The NCAA has the power to impose and enforce the releases, and to exclude non-signing athletes from participation in all future intercollegiate competition, as well as penalize schools whose athletes violate the terms of the forms and related rules, regardless of whether the athlete receives any scholarship funds.

10

11

12

13

14

15

16

17

18

19

20

21

84. The NCAA, through its member schools, imposes a wide variety of conditions on student-athletes. For example, they may not receive compensation beyond educational expenses approved by the NCAA; they may not retain an agent for exploitation of their future professional career; they must meet minimum requirements for educational progress; and they are strictly limited in receiving compensation for non-athletic services that might be understood to reflect on their athletic ability. If student-athletes had the opportunity to receive a college education and compete at an elite level of intercollegiate competition without these restrictions, many student-athletes would choose to do so. The fact that they agree to these conditions demonstrates the market power of the NCAA member schools, i.e., the lack of any reasonable substitute for those who wish to receive a college education and compete in elite intercollegiate athletic competition.

22

23

24

25

26

27

28

85. The demand for student-athletes is such that, absent the unlawful Form 08-3a, the "Institutional, Charitable, Educational, or Nonprofit Promotions Release Statement," and any other similar device that the NCAA has utilized to attempt to eliminate compensation owed to former student-athletes, the colleges and universities participating in the relevant markets would have competed against each other by offering higher amounts of post-graduation licensing revenues to student athletes. For example, schools, in order to compete with each other, could

1  offer players a portion of the revenue that the schools in turn receive via the NCAA and other

2  sources for commercial exploitation of those players' images. But under current anticompetitive

3  conditions, compensation is "capped" at zero by artificial rules imposed by the NCAA that result

4  in lower compensation than would otherwise prevail in a more competitive market.

5

6  86. Thus, for the members of the proposed Damages Class, increased competition on the

7  terms of post-career revenue distribution for former athletes would result in additional revenue for

8  all members of the proposed class.

9  87. All NCAA members have agreed to utilize and abide by the NCAA's Bylaws,

10  including the provisions detailed herein that mandate the use of Form 08-3a and the "Institutional,

11  Charitable, Educational, or Nonprofit Promotions Release Statement" discussed herein, which

12  have been used by the NCAA and its member institutions and conferences to fix the prices at

13  which former student-athletes are paid for their commercial licensing rights or foreclosed from

14  exercising any such rights.

15

16  88. The NCAA and its members are able to engage in these anticompetitive agreements

17  and arrangements, as there are no acceptable substitutes for major college football or major

18  college basketball.

19  89. The agreement among NCAA member schools to jointly appropriate student-athletes'

20  rights after the expiration of the students' eligibility as an amateur athlete is not necessary to

21  achieve the NCAA's stated goal of clearly demarcating between college and professional sports,

22  or to serve any pro-educational purpose, or any other legitimate, pro-competitive purpose in the

23  marketing of college sports.

24

25  90. Moreover, reasonable and less restrictive alternatives are available than the NCAA's

26  "zero compensation" policy for former student-athletes' licensing rights. For example, all of the

27  major professional sports, including basketball and football, have identified and utilized group-

28

CLASS ACTION COMPLAINT - 31 -

1   licensing methods to share revenues among teams and players. Additionally, other reasonable

2   and less restrictive alternatives could include the establishment of funds for health insurance,

3   additional educational or vocational training, and/or pension plans to benefit former student

4   athletes.

5

6                              **FACTUAL ALLEGATIONS**

7   A.      **The NCAA's 2009 "State of the Association" Speech Regarding Commercial**
            **Exploitation of Student-Athletes.**

8       91.  As noted above in the Introduction, Wallace Renfro, the NCAA's vice president and

9   senior advisor to President Myles Brand gave its 2009 "State of the Association" speech. Mr.

10  Renfro's remarks are notable for the contrast with the NCAA's actual conduct in exploiting

11  former student-athletes, and his acknowledgment that "[g]eneration of much needed revenue does

12  not justify the exploitation of student-athletes." Certainly the same holds true with respect to

13  former student-athletes. Specifically, Mr. Renfro's remarks included the following:

14
15              Any adequate policy of commercial activity must ensure that
                student-athletes are not commercially exploited.
16
17              Call this the condition of non-exploitation.

18              This condition is further delineated in the paper you received as
                you arrived today. When we say "student-athlete exploitation in
19              commercial activity," we should have a specific definition in mind.

20              Since student-athletes are amateurs, not paid professionals, they
                cannot accept payment for endorsing or advertising any
21              commercial product or service.

22              It also means they should not be put in a position in which the
                natural interpretation by a reasonable person is that they are
23              endorsing or advertising a commercial product or service.

24              But most cases of exploitation are subtle and indirect.

25              Instead of obvious product endorsement, the marketing can include
                game pictures, films, audio or video of student-athletes that make it
26              appear to a reasonable person that a student-athlete is endorsing a
                specific commercial product.

27              The student-athlete may well have no knowledge or awareness that
28              his or her reputation, image or name is being used for these

    CLASS ACTION COMPLAINT                    - 32 -

1    commercial purposes.

2    But exploitation may be the result, nonetheless.

3    Generation of much needed revenue does not justify the
     exploitation of student-athletes.

4
     We can – and we should – debate the nature of proper commercial
5    conduct. However, one principle is not subject to debate:
     commercial exploitation of student-athletes is not permissible.

6    Period.

7
     B.     **The NCAA's Web of Licensing Agreements With For-Profit Entities.**
8
9         92.  In the early 1980s, the total retail market for products identified with college athletics

10   was estimated to be under $100 million per year.  The typical outlets for such sales were college

11   book stores or other campus locations.  In the mid-1990s, the market was estimated to have

12   grown to $2.5 billion per year, with the predominant sales locations being retail and chain stores.

13   IMG now estimates that the market is a $4.0 billion per year. The growth of the market has been

14   explosive, and advances in technology and product delivery outlets, namely, the internet, cable

15   television delivery systems, and video game technology advances, have accelerated the growth.

16
17        93.  A review of even the limited public information available regarding the NCAA's

18   financial operations details the explosive growth in revenue that it has received in connection

19   with sales of NCAA-related merchandise.  In its 2002-2003 Revenue Report, the NCAA listed

20   receipt of "royalties" of $3.8 million, and $6.2 million in "sales and services" (along with $370

21   million in television revenue).

22
          94.  In its 2007-08 report, the NCAA listed $552 million in total revenue for "television
23
     and marketing rights fees" of which $529 million was elsewhere attributed to revenues from its
24
25   television contract with CBS, leaving an apparent $23 million difference attributable to royalties.

26   Additionally, the NCAA reported approximately $14.5 million in revenue for "sales and

27   services."  Thus, in just a few years, it appears that the combination of royalties and sales and

28
     CLASS ACTION COMPLAINT                   - 33 -

1    services went from $10 million for the 2002-03 fiscal year ($3.8 million plus $6.2 million), to

2    $37.5 million ($23 million plus $14.5 million) in for the 2007-08 fiscal year. That number only

3    represents the NCAA's portion obtained pursuant to currently unknown royalty rates, and does

4    not represent the total value of the associated sales via the NCAA's licensees, or sales made by

5

6    member conferences and schools of goods.

7       95.    Within recent years the NCAA has entered into some of the licensing partnerships

8    detailed herein that unlawfully utilize the images of Class members. The related available content

9    featuring likeness of former student-athletes, such as DVDs, photos, and video games, continues

10    to grow in both availability and popularity, and growth will continue to explode as merchandise

11    continues to be made available in new delivery formats as developing technology and ingenuity

12

13    permits, as exemplified by the substantial library of "on demand" internet content now available

     for sale for NCAA games going back several decades.

14

15       96.   Through the NCAA's web of licensing agreements with for-profit companies, the

16    NCAA sells its rights, its members' rights, and Damages Class members' rights that unlawfully

17    exercises via the anticompetitive and unconscionable conduct described herein. On its website,

18    the NCAA directs interested parties to contact Defendant CLC for licensing information.

19       97.   Under its Frequently Asked Questions section regarding licensing, the NCAA

20

21    provides various information. Most notably, there is no information whatsoever regarding the

22    rights of players – current or former – with regard to licensed merchandise. This total absence of

23    information regarding the rights of players in the commercial licensing and usage of their images

24    also is observed on the websites of the NCAA's licensing arm, Defendant CLC. The NCAA

25    states the following regarding CLC:

26          The Collegiate Licensing Company is the licensing representative

27          for the NCAA. CLC is responsible for administering the licensing
          program, including processing applications, collecting royalties,

28          enforcing trademarks and pursuing new market opportunities for

CLASS ACTION COMPLAINT         - 34 -

1    the NCAA.

2              **i)    The Collegiate Licensing Company.**

3    98.  On its website, under "Terms of Use," Defendant CLC states the following:

4         The Collegiate Licensing Company ("CLC") is the trademark
          licensing representative for nearly 200 colleges, universities, bowl
5         games, athletic conferences, the Heisman Trophy and the NCAA
          ("CLC Institutions").  Based in Atlanta, CLC is a full-service
6         licensing company, which employs a staff of more than 80
          licensing professionals with the capability to establish and manage
7         every aspect of a collegiate licensing program.

8    99.  CLC further states that it "is a division of global sports and entertainment company

9    IMG," that it was founded in 1981, and that it is "the oldest and largest collegiate licensing

10
     agency in the U.S."  On its website, CLC provides some information regarding its history and
11
     licensing operations.  The content is notable for several reasons, as it details information about
12
13   licensing agreements for coaches, universities, and the NCAA. There is not a single word devoted

14   to the rights of former players.  Specifically, CLC states the following:

15        Since its early days in 1981, CLC's mission has been to serve as
          the guiding force in collegiate trademark licensing and one of the
16        top sports licensing firms in the country.  As such, our company
          and staff have dedicated ourselves to being a center of excellence
17        in providing licensing services of the highest quality to institutions,
          licensees, retailers, and consumers.
18
          The consolidated approach to licensing offered by CLC provides
19        every institution with a greater voice in the market, increased
          exposure, the broadest range of available licensing services, and
20        reduced administration expenses, while still allowing for
          independent decision-making by each and every client.  This
21        approach, combined with our committed staff and industry-leading
          services has helped to guide and shape the $4.0 billion annual
22        market for collegiate licensed merchandise.  CLC's long-standing
          relationships with retailers and licensees have also been essential
23        to the growth of the industry and the success of each client's
          individual licensing program.
24
          Today, the CLC Consortium represents the consolidated retail
25        power of the many colleges, universities, athletic conferences,
          bowl games, and other collegiate institutions that comprise the
26        CLC Consortium.  The collective efforts that have contributed to
          the growth of the collegiate licensing industry will remain an
27        important cornerstone of the industry in the future.

28

     CLASS ACTION COMPLAINT              - 35 -

1

   ii) **IMG.**

2

   100. As noted above, Defendant CLC identifies itself as a division of IMG.  One of IMG's

3

   divisions and/or brands appears to be known as "IMG College."   IMG has stated the following

4

   with respect to IMG College:

5

6
>   Named by the *Sports Business Journal* as America's Top Sports
>   Marketing Agency, IMG College (formerly HOST) provides

7
>   extensive, yet varied sports marketing services for several
>   NCAA® Division I universities and conferences. IMG College

8
>   represents Arizona, Cincinnati, Connecticut, Florida, Furman,
>   Gonzaga, Kansas, Kentucky, Michigan, Nebraska, Ohio State,

9
>   Oklahoma State, Oregon, Rice, South Alabama, Tennessee, Texas,
>   Western Kentucky, Wofford and several conferences, including the

10
>   Southeastern Conference, the Ohio Valley Conference, the
>   Southern Conference and the West Coast Conference.

11
>   . . .

12
>   The rights to these schools, conferences, and properties include
>   some, or all, of the following: radio and television programs,

13
>   publishing, printing, creative design, marketing, licensing, Internet,
>   national advertising and signage sales, and numerous lifestyle and

14
>   event marketing platforms.

15
>   Additionally, IMG College holds the distinct position of having the longest
>   consecutive relationship with the National Collegiate Athletic

16
>   Association® (NCAA), over and above any other contractor.
>   Having originally contracted with IMG College in 1976, the

17
>   NCAA has trusted the Company for nearly 30 years to lead the
>   industry in delivering the power of the collegiate market to

18
>   consumers nationwide.

19
>   Through an agreement with CBS Sports, IMG College oversees
>   select NCAA rights including licensing, printing & publishing and

20
>   special event promotions, like the NCAA Hoop City® interactive
>   events.

21

22
   101.   IMG also has stated the following regarding IMG College:

23
>   Host Communications, Inc. (HOST) and the Collegiate Licensing
>   Company (CLC) were joined to form IMG College, the premier

24
>   college marketing, licensing and media company. IMG College
>   creates opportunities for corporations to connect with specific

25
>   audiences within the collegiate market . . .

26
>   Through its unique relationships with many of the elite universities
>   and conferences, IMG College ultimately offers platforms that

27
>   provide companies immediate access to more than 110 million
>   loyal, passionate collegiate fans and alumni and more than 15

28
>   million students enrolled in NCAA member institutions.

CLASS ACTION COMPLAINT                            - 36 -

102. IMG also has stated that it "helps marketers leverage the passion and loyalty of America's strongest collegiate brands." It further has stated that "IMG College is a leading collegiate marketing, licensing and media company that can create and build comprehensive marketing platforms that leverage the marketing potential of the college sports and on-campus market." IMG also has stated that "[c]onsumer devotion to college institutions is unrivaled, but the complexity of the space makes it challenging for marketers to tap the full potential. With our expertise, broad relationships and portfolio of properties, IMG College can help brands create platforms to reach millions of passionate, loyal fans."

103. IMG has also stated that "[o]ur licensing team, The Collegiate Licensing Company, is the unrivaled leader in collegiate brand licensing, managing the licensing rights for nearly 200 leading institutions that represent more than \$3 billion in retail sales and more than 75% share of the college licensing market."

C. **Description of Revenue Streams Relating to the Commercial Exploitation of Images of Former Student-Athletes.**

104. There are a vast number of revenue streams generated in connection with collegiate sports. Many of those revenue streams are generated at least in part from the continuing commercial exploitation of the images of former student-athletes. The following descriptions detail some of the current revenue streams of which Plaintiff is aware.

a. **Media Rights for Televising Games.**

105. The NCAA, as well as individual conferences and schools, negotiates various deals with television networks to televise regular season and post-season games. In 1999, the NCAA and the CBS television network negotiated a deal that became effective in 2003, and that provided CBS with an 11-year right to televise the NCAA men's postseason basketball tournament in exchange for a staggering \$6 billion.

106.    In 2008, the ESPN network and the NCAA's Southeastern Conference negotiated

a deal by which ESPN will pay the Southeastern Conference \$2.25 billion over 15 years to have

the rights to televise all conference games that are not televised by the CBS network under

another deal. In 2008, the Big Ten Network, operated by media giant News Corp., reached a deal

with the Big Ten Conference to televise conference games, and was estimated to potentially

require a \$2.8 billion payment to the Big Ten Conference over the course of 25 years.

107.    Many telecasts of games, in particular the NCAA tournament games, frequently

show video clips of former student-athletes competing in prior tournament games as means of

further enhancing viewers' experience of the current games. No valid and lawful releases with

informed consent from Class members have been obtained for the use of those clips, and any

purported transfer of former student-athletes' rights relating to this usage is the product of the

anticompetitive agreement described herein.

### b. **DVD and On-Demand Sales and Rentals.**

108.    The NCAA, in March of 2007, launched its "NCAA On Demand" website, which

offers for sale telecasts of games from numerous decades in the DVD and "on-demand" delivery

formats. This is not to be confused with a separate on-demand service by which live games are

shown. In the "About Us" section of the website, the NCAA states the following:

> NCAA On Demand is a partnership between the NCAA and
> Thought Equity Motion, centered on providing fans of college
> athletics access to memorable moments and games of past
> collegiate events. NCAA On Demand will initially focus on NCAA
> championships, but will expand into the premier site for college
> athletics video with content from games and events from regular
> season and conference championships as well as unique content that
> has never been seen before.
>
> Through a number of relationships NCAA On Demand will provide
> fans with video imagery in a variety of formats from DVDs to
> digital video. Fans will be able to relive past games through video
> streaming or purchase the game for their own collection.
> Additionally, NCAA On Demand will develop key elements that

CLASS ACTION COMPLAINT                    - 38 -

1      will allow fans to truly integrate with the collegiate athletics
2      experience.

3      109.   Thought Equity Motion Inc. ("Thought Motion") identifies itself as the "world's

4  largest supplier of online motion content, licensing and professional representation services to the

5  agency, entertainment and corporate production industries." Thought Equity has entered into a

6  partnership with the NCAA to offer for sale DVDs and internet content utilizing images of Class

7  Members. Additionally, Thought Equity offers for sale more than 12,000 video clips of portions

8  of NCAA games for uses including corporate advertisements, corporate in-house presentations,
9

10  films, and television programs, as well as additional highlight films, complete games and

11  interviews that utilize the images of Class Members. On its website, Thought Equity states the

12  following:

13          We're pleased to announce the launch of NCAA On Demand. For
            the first time, college sports fans and athletes can access the entire
14          NCAA Championship Collection, which contains nearly 5,000
            championship games. While many fans have experienced college
15          sports through football bowl games or March Madness, NCAA On
16          Demand now makes championships from all 23 NCAA sports
            available.
17

18          Select content is available through free Internet streaming, so you
            can check out classic college highlights of Michael Jordan, Magic
19          Johnson, Larry Bird and many others.

20      110.   In an article dated March 7, 2007, the NCAA and Thought Equity issued a press

21  release that stated in part the following:

22          "The NCAA is excited that supporters of collegiate athletics will
            have unprecedented access to the NCAA Championship Collection.
23          We are pleased to open our archives to fans, former student-
            athletes, and member institutions that have added so much to
24          American sports and society," said Greg Shaheen, NCAA's senior
25          vice president for Basketball and Business Strategies.

26          "NCAA On Demand has always been a big part of our vision for
            making the NCAA video archive more accessible and valuable,"
27          said Kevin Schaff, CEO of Thought Equity Motion. "Since we took
28          over the management of the archive in 2005, we have had

CLASS ACTION COMPLAINT                    - 39 -

1
2
3

> thousands of requests for classic games from fans and former
> student-athletes from all over the country. Through our partnership
> with the NCAA, we are proud to be able to make these moments
> accessible to the people who created them."

4    111.    The "accessibility" to "former student-athletes" comes at a price, and there is

5    substantial irony in that such individuals must pay $24.99 to purchase footage of a game in which

6    they played, and for which they never lawfully licensed, conveyed, or transferred their rights for

7    compensation for use of those images, and for which are not provided any compensation in

8    connection with any sales. Meanwhile, the NCAA and Thought Equity, a for-profit entity,

9
     receive a continuing revenue stream.

10

11    112.    At least the following numbers of games are available in various Men's sports:

12    Basketball – 2,468; Football – 464; and Baseball – 525. Purchases of individual games typically

13    cost $24.99. Various box sets are also available, and the purchase price typically exceeds $100

14    for those sets.

15    113.    Defendant CLC, the NCAA's official licensing company, states on its website, as a

16
     part of its "Terms of Use" Agreement, the following:

17

18   > The Collegiate Exchange ("TCE") - TCE is CLC's online business-
>     to-business trading exchange. TCE is provided by CLC in
19   >     conjunction with iCongo.com. Through this site, retailers can view
>     catalogs from participating licensees and place orders for collegiate
20   >     merchandise. Only collegiate retail stores and licensees can
>     participate in this program. There are costs for licensees to
21   >     participate in TCE. Please visit
>     http://www.thecollegiateexchange.com to view terms and
22   >     conditions specific to TCE.

23   The Collegiate Exchange's website in turn indicates that retailers can purchase hundreds of

24   licensed products for sale, including "Highlight Tapes/DVDs."

25
     114.    The NCAA also recently entered into yet another venture with a for-profit entity to
26
     sell DVDs. On January 20, 2009, the NCAA announced the release of its DVD titled "NCAA

27   March Madness: The Greatest Moments of the NCAA Tournament," with a suggested retail price

28

CLASS ACTION COMPLAINT                - 40 -

of $19.95. The NCAA's business partners in this venture are a for-profit entity called Genius

Products LLC, as well as Thought Equity. In a press release, the three entities described the DVD

as "the first DVD officially produced and branded by the NCAA to feature the greatest moments

from more than 70 years of tournament action." In the partners' press release, Thought Equity is

described as "the world leader in providing access to high quality film, video and music content.

The company's forward-thinking approach to digital video has produced an array of products and

services to meet the exploding demand of new media."

115.    NCAA DVDs also are available through myriad other outlets. For example,

hundreds of NCAA DVDs are available from CBS Sports' "Online DVD Store." On

Amazon.com, more than 1,600 NCAA sports DVDs are for sale. NCAA DVDs also are for sale

via myriad other outlets, such as, for example, walmart.com, the NBC network's sports website,

FantasyPlayers.com's website, Barnes & Noble's website, and the Big Ten Network's website.

116.    Additionally, hundreds of NCAA games and highlight films are available for rental

from Blockbuster Video and Netflix, including via their websites.

117.    No valid and lawful releases with informed consent from Class members have

been obtained for the use of their images in DVDs and on-demand delivery formats, and any

purported transfer of former student-athletes' rights relating to this usage is the product of the

anticompetitive agreement described herein.

118.    Only through the discovery process will Plaintiff be able to ascertain the true scope

of sales, in terms of outlets, license agreements, and sales volume of DVD products containing

the images of class members.

### c. Video-Clips Sales to Corporate Advertisers and Others.

119.    Via Thought Equity's website, there are more than 12,000 NCAA related clips

spanning several decades offered for sale as "stock footage." The overwhelming majority of

1     them are from NCAA Division I men's basketball games. The clips run for varying time periods,

2     generally ranging from 10 seconds to several minutes. Many of them indicate that the full game

3     for which from which the clips were culled, as well as related highlight films, also are available

4
      for sale via Thought Equity. For many items, prices are not shown, and prospective buyers are

5
      asked to contact the company for pricing. One interview clip appeared to cost approximately

6
7     $150.

8          120.    In a brochure describing its partnership with the NCAA, Thought Equity makes

9     clear the unmistakable pecuniary purpose of its venture with the NCAA. For example, Thought

10    Equity touts its role in "[d]elivering value through the preservation and monetization of the

11    NCAA's footage assets." Thought Equity further states that "[i]n 2005, the NCAA was searching

12
      for a partner to preserve and manage the vast NCAA content library with two primary directives

13
14    in mind: 1. Preservation of historic footage and current content [and] 2. Accessibility to the entire

15    NCAA footage library to drive revenue generation." Thought Equity continues that "[a]s the

16    NCAA's exclusive licensing agent, Thought Equity drives revenue through the licensing of

17    NCAA sports content for use in films, commercials, corporate productions, documentaries and

18    emerging media applications." Thought Equity further states that it has assisted the NCAA in

19    being "among the first-to-market with innovative ways to monetize their video assets across the

20
21    entire spectrum of emerging media." Thought Equity continues that it "is committed to the

22    continued growth of this amazing library, enhancing its value through the preservation and

23    monetization of the NCAA's valuable footage assets, [and] providing the premiere online

24    destination" for NCAA footage.

25         121.    Thought Equity further states that "[y]ear over year, Thought Equity Motion has

26    grown licensing revenue by nearly 100%." Kevin Schaff, Thought Equity's founder and CEO is

27

28

CLASS ACTION COMPLAINT                    - 42 -

1    quoted as stating that its NCAA collection "is one of the most unique and valuable content

2    collections in the world."

3         122.    Thought Equity also stresses its cost-saving function as follows: "Thought Equity

4    also staffs the functions of receiving and fulfilling all footage requests, including research and

5

6    technical support – costs that previously added to the NCAA national office overhead." Thought

7    Equity further states that it provides services including restoration, digitizing content, and making

8    content available on-line "at no charge to the NCAA."

9         123.    Thought Equity further notes that "[t]o date, Thought Equity has digitized and

10    brought online nearly 7,000 hours of NCAA sports action and manages more than 20,000 hours

11    of content in the NCAA library." Thought Equity further notes that "[n]ew NCAA content is

12    continually added to ensure the online library is a timely resource for NCAA content."

13

14         124.    Thought Equity additionally states that "NCAA footage is sought-after content for

15    advertisers, corporations and entertainment producers as it delivers all the action, drama and

16    emotion unique to athletic competition." Thought Equity further states that "[b]ringing the

17    NCAA content online has been a key component to unlocking the value of the library." Thought

18    Equity also states that its online platform has "help[ed] drive revenue growth by making

19    purchasing content easy and fast."

20

21         125.    Thought Equity further states that "NCAA Corporate Champions and Partner

22    companies as diverse as Coca-Cola, AT&T, State Farm Insurance, and Lowe's have tapped the

23    NCAA library to create messaging to inform and inspire their audiences." Thought Equity further

24    states that it has "licensed NCAA content for use in hundreds of television programs, films,

25    commercials and corporate productions." Moreover, Thought Equity states that "[l]ooking to the

26    future, exploding growth in emerging media such as online and mobile advertising and

27

28

CLASS ACTION COMPLAINT        - 43 -

1  entertainment translates to significant new revenue streams for footage licensing and

2  programming opportunities."

3  126. Thought Equity further states that its library can be utilized to allow NCAA

4  member institutions to create other revenue centers, e.g., "to create original programs and

5

6  promotions such as coaches' shows, Hall of Fame and museum exhibits, web sites and

7  entertainment featured on in-venue video boards."

8  127. Thought Equity further states that it "brings value to the NCAA by continually

9  creating innovative ways to leverage their video assets," and touting its "ability to drive revenue

10  employing its deep licensing expertise."

11  128. Thought Equity further states that "[a]ny use of NCAA content featuring

12  individuals or brands must be cleared for use," and that it "brings deep expertise to navigating the

13

14  complexities of clearing NCAA student athletes, individual's licenses and institutional

15  trademarks, protecting both amateur status and rights."

16  129. No valid rights from Damages Class members have been obtained by the NCAA,

17  its members or its licensees for the use of those class members' images in video clips for sales to

18  corporate advertisers and others, and any purported transfer of former student-athletes' rights

19  relating to this usage is the product of the anticompetitive agreements described herein.

20

21  **d. Photos.**

22  130. Replay Photos, LLC ("Replay Photos") operates "The Official NCAA Photo

23  Store" in conjunction with the NCAA through which photographs of Class members are available

24  for purchase, as well as a separate website, through which additional photographs of Class

25  members are available for purchase. Thousands of photographs from postseason tournaments in

26  numerous sports are offered for sale.

27

28

CLASS ACTION COMPLAINT                - 44 -

131.     In February of 2009, the NCAA and The Associated Press announced a three-year

partnership and in a press release stated the following:

> The NCAA and The Associated Press this week announced a three-year
> content partnership making AP the worldwide distributor of NCAA
> Championship photography and creating the largest collection
> anywhere of collegiate sports photos.  Under the agreement, AP Images
> will serve as the NCAA's exclusive photo licensing agent, including
> retail sales of archival photos, for all NCAA Championships and
> events.

. . .

> "In partnership with Rich Clarkson and Associates, the NCAA has
> compiled an archive of photos representing the greatest moments in
> NCAA Championship history," said Greg Weitekamp, NCAA director
> of broadcasting.  "Combine the history of the NCAA photo archives
> with the depth of photos compiled by AP Images over the last 100
> years, and the NCAA and the AP Images partnership will create the
> single greatest collection of collegiate sports photos."

. . .

> The new agreement between the NCAA and AP Images will allow the
> NCAA to include NCAA photos in the AP Images archives, where they
> will then be made available for editorial and commercial use.  In
> addition, the partnership will provide the NCAA with access to AP
> Images' archive of NCAA photography.

> The partnership with the NCAA, headquartered in Indianapolis, will
> also include a consumer outlet at NCAA.com, where consumers will be
> able to purchase photos.  NCAA Championship photos will be available
> on the APImages.com site.

132.     Replay Photo also has entered into contractual arrangements with at least 62

universities by which it offers for sale thousands of photographs of current and former student-

athletes.  Framed versions of the photographs can cost up to several hundred dollars.  The list of

available sports include at least the following:  men's and women's basketball; football; baseball;

crew; men's and women's cross country; golf; gymnastics; men's and women's soccer; softball;

men's and women's swimming and diving; men's and women's tennis; men's and women's track

and field; men's and women's volleyball; water polo; and wrestling.

CLASS ACTION COMPLAINT                          - 45 -

1

**e. Action – Figures, Trading Cards, and Posters.**

2

133.     On April 27, 2009, *Sports Business Daily* reported that certain former college

3

football players will be paid a royalty for the sale of action figures depicting them in their college

4

uniforms, and that their former schools also will be paid a royalty. Specifically, *Sports Business*

5

*Daily* stated the following:

6

7            Phoenix-based McFarlane Toys has been producing action figures
             of professional athletes for more than a decade, but never before has
8            the company tapped the college market. That will change later this
             year with the release of six action figures that portray NFL stars in
9            their college gear, including Tom Brady in his Michigan uniform
             and Peyton Manning in his Tennessee garb.
10

11           "There's not much out there on the college market that's player-
             centric," said founder Todd McFarlane, whose businesses include
12           everything from comics to toys and film animation. "If a guy had a
             decent career, let's see if the fans are still fond of him."
13           Tennessee's Peyton Manning is one of three SEC alumni in the six-
             figure set.
14

15           . . .

16           Now he's going to put some of those professional stars in their
             college football gear to tap into the passion of the college fan. In
17           addition to Brady and Manning, the company will produce action
             figures representing Adrian Peterson (Oklahoma), JaMarcus Russell
18           (LSU), Ray Lewis (Miami) and Hines Ward (Georgia).

19
             . . .
20

21           To obtain the license, McFarlane went through IMG's Collegiate
             Licensing Co., the licensing agent for those schools. He'll also pay
22           the players a royalty. Current college players are not allowed to be
             featured in commercial endeavors such as this, according to NCAA
23           guidelines, which is why McFarlane went with the professionals.

24           "There's two pieces to the deal," McFarlane said. "You pay for the
             uniform, which goes to the school, and you pay the player. That
25           beefs up the money going out, so you have to make sure you have a
             model that works."
26

27

28

CLASS ACTION COMPLAINT                    - 46 -

1
2
3

> These 6-inch-tall action figures will sell for about $10 each and hit
> stores such as Wal-Mart, Target and Toys "R" Us, as well as the
> local specialty stores that sell collectibles, by August, just in time
> for the start of a new football season.

4

. . .

5
6

> Fathead also is thought to be considering a line of posters that
> would feature NFL stars in their college uniforms.

7

. . .

8    134.   The above information is significant. The NCAA's licensing arm, Defendant

9    CLC, has participated in a deal which expressly recognizes that former college players should be

10   paid a royalty when their image is utilized for profit.

11
### f.   Video Games.

12
13   135.   The images and likenesses of college student-athletes and former student-athletes

14   also appear in video games devoted to NCAA college basketball and football. The NCAA has

15   executed a license for video games with co-conspirator Electronic Arts, Inc. ("EA") , a global

16   interactive software company. EA identifies itself as "the world's leading interactive

17   entertainment software company" and states that it "develops, publishes, and distributes

18   interactive software worldwide for video game systems, personal computers, cellular handsets

19   and the Internet."

20
21   136.   EA markets a wide variety of sports-based video games under the label EA

22   Sports. EA Sports describes their video games as including "simulated sports titles with realistic

23   graphics based on real-life sports leagues, players, events and venues." Their advertising taglines

24   - "If it's in the game, it's in the game," subsequently shortened too "It's in the game" - expressly

25   and openly makes a major selling point out of the fact that all aspects of the real-life games

26   appear in their video games. EA Sports releases new iterations of most of their games annually,

27
28

CLASS ACTION COMPLAINT                     - 47 -

three of which are titled "NCAA Football," "NCAA Basketball" and "NCAA Basketball: March Madness Edition."

137. EA's NCAA football games consistently have enjoyed sales of more than one million units per year, and currently sales are estimated at more than two million units per year. On EA's website, NCAA Football 10 for the Playstation 3 game platform is offered for sale at $59.95 per unit. In 2008, with respect to its basketball games, EA stated that "[t]he market leader in basketball videogame sales, EA SPORTS basketball franchises (NBA LIVE, NBA STREET and NCAA March Madness) have combined generated more than $1 billion in retail sales over the past 10 years." On EA's website, NCAA Basketball 09 is currently listed with a manufacturers' suggested retail price of $59.95 per unit.

138. EA has acknowledged that its NCAA games are among its major revenue drivers. For example, in its most recent SEC Form 10-K, EA stated that "[f]or fiscal year 2008, net revenue in North America was $1,942 million, driven by Rock Band, Madden NFL 08, and NCAA Football 08."

139. *Legal Affairs* magazine reported the following regarding EA's NCAA Football 06, which is instructive for its description of the game's use of player images, as well as the interaction among the NCAA and Defendant CLC and EA:

> THE BEST PLAYER IN COLLEGE FOOTBALL THIS SEASON is arguably the quarterback at the University of Southern California. He is a senior, listed at 6-foot-5 inches and 225 pounds. He wears number 11. His name is Matt Leinart. The best player in the wildly popular video game called "NCAA Football 06" also happens to be a quarterback at USC. He, too, is a senior, listed at 6-foot-5 inches and 225 pounds. And, not coincidentally, he wears number 11. His name, however, is QB #11.
>
> You don't have to know a PlayStation from a train station to get what's going on. QB #11 is the digitized analogue of Leinart; he resembles the living version right down to the mop of dark hair on his head. So why doesn't the game from Electronic Arts use Leinart's name? National Collegiate Athletic Association

regulations prohibit companies from profiting off a student-athlete's likeness, so EA does this two-step - with the NCAA's blessing. In exchange for a cut of revenues from the video game, the association has granted the software company the right to reproduce the stadiums, uniforms, and mascots of schools that are members of the NCAA, and the game-makers do so with almost photographic accuracy. Under the current regulations, the only thing off-limits is the use of players' names and recognizable facial features. The NCAA doesn't want member-schools marketing their student-athletes for commercial purposes, and, in order to prohibit them from doing that, it has to restrain itself as well.

Even though QB #11 is not identified by name, however, EA and the NCAA might struggle to keep straight faces when they claim that he is not supposed to represent Leinart for the purpose of making a profit. EA is the North Star of a burgeoning sports video game industry, which made revenues of $1.9 billion in 2004, and the company's hallmark is precise, nay obsessive, attention to detail. EA's slogan boasts, "If it's in the game, it's in the game." That means nailing the little stuff, capturing nuances like a player's wristband placement and facemask style. In its annual iterations of "NCAA Football," the software company makes the game as lifelike as possible, within the constraints marked by the NCAA. A quick survey of the rest of the players for USC's 2005-2006 Trojans reveals that everyone has a digitized doppelganger that's dead on. Tight end Dominique Byrd -- pardon, TE#86 -- sports braids like his real-life model's. The height and weight of backup defensive end Rashaad Goodrum, aka DE #44, are as true as Leinart's, though Goodrum played just a few downs during the 2004-2005 season.

"NCAA Football 06" has pinpoint-accurate rosters for all 117 Division 1-A football programs (which engage in the highest level of collegiate competition), not to mention graphics so advanced that you can see the stadium reflected in a quarterback's helmet, the face paint on a cheerleader's cheeks, the Nike swoosh on a tailback's cleats, and the haze around the lights during a night game at the University of Florida's stadium, the Swamp. For all these reasons, the omission of players' names seems little more than a formality, done with a wink and a nudge in order to keep the NCAA satisfied.

Especially since an owner of the video game can change QB #11 to Matt Leinart by fiddling with a few buttons. Once the owner inputs a player's name, it appears on the back of the player's jersey and can be shouted by the virtual announcers who do the play-by-play for the games within the game. Game owners can also adjust a virtual player's facial hair, adding, say, a goatee to match the real player's face, since players are known to change their looks from time to time. Although not approved by the NCAA, memory cards for

CLASS ACTION COMPLAINT                      - 49 -

automatically uploading each school's roster are available from independent manufacturers. Oddly, the main difference between the players and their video facsimiles are their hometowns, which in the game are intentionally off by a few suburbs (QB #11's "hometown" of La Habra, Calif., is 15 miles from Leinart's native Santa Ana). But the point is, in EA's hyper-detailed world, video game characters now have hometowns. The NCAA's amateurism regulations, originally designed to guard against things like posters and trading cards featuring individual athletes, likely never contemplated a day when an amateur's digital likeness could fetch a profit.

. . .

A key player in managing that distinction is the Collegiate Licensing Company or CLC, which handles product licensing for collegiate sports organizations like bowl games committees, athletic conferences, and the NCAA. CLC performs two tasks for the association: protecting the amateur standing of its members' athletes and obtaining for members the most lucrative licensing deals.

. . .

THIS IS NOT THE FIRST TIME that the NCAA's rules about amateurism have struggled to address new licensing opportunities. About 15 years ago, college-apparel sales exploded into a substantial source of revenue for major athletic programs, and one of the touchiest issues involved replica jerseys. They featured a star player's number and school colors, but not his name, even though every fan knew whose jersey he was buying. Replica jerseys are still big business: Every Saturday, Matt Leinart looks up to see USC's stands swelling with a sea of maroon No. 11 jerseys, which sell for about $50 each online and at the campus bookstore.

The jerseys were green-lighted under the NCAA's rules for the same reason that "NCAA Football" was approved: The association considers a jersey number a step removed from a player's identity. "I see nothing wrong with selling jerseys with just numbers on them," Brand said at last summer's meeting. "But I would draw the line at selling the names."

The argument can be made that the video game industry deserves more leeway than apparel makers, because games ostensibly promote entire teams—even if those teams feature a few superstars. "The jerseys are centered around one or two players, whereas the video game features every player on the team," CLC's Battle explained. "If the video games wanted to use the name and likeness of one or two players, that would be impossible. But if we're

CLASS ACTION COMPLAINT - 50 -

1

2

3

4

> looking at a situation where the entire team is being promoted, it
> may change the discussion." EA would argue that the video games
> are similar to television broadcasts, which are obviously filled with
> plenty of highlights and interviews with individual players, yet are
> licensed by the NCAA for big bucks and regarded as innocuous
> staples of Americana.

5

6

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28

140. EA has expressly incorporated the likenesses of Damages Class members into its games. As one example, NCAA Basketball 09 has a "Classic Teams" feature in which game players can choose to utilize "classic teams." These "classic teams" expressly utilize the likeness of Class members, in a fashion identical to that described above. A post on EA's game forum website dated March 12, 2009 identifies the roster of each of these classic teams, and provides the players' name; position; uniform number; type of t-shirt worn underneath a jersey; sock length; and use of ankle braces, knee braces, wrist taping. The post further specifically identifies the following "classic teams" as being incorporated into the game: 2008 Kansas Jayhawks; 2007 Florida Gators; 2006 George Mason Patriots; 2005 North Carolina Tarheels; 2005 Illinois Fighting Illini; 2004 Connecticut Huskies; 2003 Syracuse Orangemen; 2002 Maryland Terrapins; 2001 Duke Blue Devils; 1999 Connecticut Huskies; 1997 Arizona Wildcats; 1996 University of Massachusetts Minutemen; 1996 Kentucky Wildcats; 1995 Wake Forest Demon Deacons; 1995 UCLA Bruins; 1994 Arkansas Razorbacks; 1993 North Carolina Tarheels; 1993 Michigan Wolverines; 1992 Duke Blue Devils; 1991 UNLV Runnin' Rebels; 1991 Georgetown Hoyas; 1991 Arkansas Razorbacks; 1990 LSU Tigers; 1990 Loyola Marymount Lions; 1990 Georgia Tech Yellow Jackets; 1989 Syracuse Orangemen; 1989 Michigan Wolverines; 1988 Kansas Jayhawks; 1987 Indiana Hoosiers; 1986 Navy Midshipmen; 1986 Louisville Cardinals; 1986 Duke Blue Devils; 1985 Villanova Wildcats; 1985 St. John's Redmen; 1984 Georgetown Hoyas; 1983 North Carolina State Wolfpack; 1983 Houston Cougars; 1982 North Carolina Tarheels; 1981 Virginia Cavaliers; 1981 Indiana Hoosiers; 1980 Louisville Cardinals; 1979 Michigan State Spartans; and 1979 Indiana State Sycamores.

CLASS ACTION COMPLAINT                          - 51 -

141. All of EA Sports' NCAA-related video games use photographic-like realism in the depiction of all aspects of the visual presentation, including the player uniforms, school logos, stadiums and mascots. While not identifying them by name, EA Sports also uses likenesses of numerous specific former student-athletes in their games. The players on the virtual college teams in the games correspond exactly to their real-life counterparts in many characteristics, such as position, jersey number, race, size, height, weight and home state. Even uniquely identifiable idiosyncratic characteristics of real-life players appear in their video game virtual counterparts.

142. Each year, the NCAA games sold by Electronic Arts feature the likenesses of players, including ones that no longer are NCAA athletes. For example, NCAA Football 09 and NCAA Basketball 09 are currently for sale, and feature substantial numbers of former NCAA players. Additionally, versions based on prior years are also for sale. For example, "March Madness 06," "March Madness 07," and "March Madness 08" are all listed for sale via Electronic Arts' website, which also notes that the games are available via retailers. These games also feature the likenesses of substantial numbers of former players.

143. On April 23, 2009, EA announced that former college players Michael Crabtree, Brian Johnson, Brian Orakpo and Mark Sanchez "will be featured on platform exclusive covers of EA SPORTS NCAA® Football 10, available in stores July 14th" and that "[e]ach cover athlete led his team on a memorable run toward the BCS National Championship, helping to shape the competitive landscape of college football in 2008." Electronic Arts further stated that "[d]eveloped in Orlando, Florida by EA Tiburon, and licensed by The Collegiate Licensing Company, NCAA Football 10 will be available on the Xbox 360® video game and entertainment system, the PlayStation®2 and PLAYSTATION®3 computer entertainment systems, and the PSP® (PlayStation®Portable)." On Electronic Arts' website, the players' mentioned above appear in mock-ups of packaging covers for the game, as well as sample screen shots from the game, in

CLASS ACTION COMPLAINT - 52 -

1  their college team uniforms. The cover of NCAA Basketball 09 features the likeness of former

2  UCLA basketball player Kevin Love in his collegiate uniform. It appears that licensing deals

3  have been struck with the players utilized on the covers.

4
5  144.    An EA press release dated September 11, 2008, in which EA announced the

6  release of NCAA Basketball 09, also stated that "*NCAA Basketball 09* will feature Division I

7  coaches in-game for the first time. Each coach will provide real time instruction and feedback,

8  helping gamers control the tempo by executing their team's offense and defense to perfection." It

9  appears that licensing deals have been struck with these coaches for use of their likenesses.

10  145.    EA and the NCAA also purposefully and knowingly allow third parties to create

11  and market modifications to the NCAA games which allow players to upload complete roster

12  information for various teams, including player names. The NCAA and CLC have allowed this

13  because it benefits them financially by increasing the popularity of EA's NCAA games, thereby

14  increasing the royalty payments to the NCAA.

15

16  146.    The NCAA, as well as individual schools and conferences, benefits financially

17  from the NCAA's license agreement with EA. For example, the *Des Moines Register* recently

18  reported that one school alone, Iowa State University, has received royalties from football and

19  basketball video games averaging $17,600 a year in the last two years. It was further reported

20  that for the University of Iowa, "such [video game royalty] allocations come from the Big Ten

21  Conference as part of a package that includes television and other licensing revenue."

22

23  147.    The NCAA also had a license with 2K Sports, a subsidiary of Take-Two

24  Interactive Software, Inc., for video games rights for college basketball. 2K Sports has produced

25  several iterations of their college basketball video game between 2005 and 2008 (College Hoops

26  2K6, College Hoops 2K7, and College Hoops 2K8.) which they still market and sell. 2K Sports

27

28

CLASS ACTION COMPLAINT              - 53 -

1  discontinued the series and the NCAA subsequently granted Electronic Arts the exclusive license

2  for college basketball.

3      148.    No valid rights from Damages Class members have been obtained by the NCAA,

4  its members, or its licenses for the use of their images in video-games, and any purported transfer

5  of former student-athletes' rights relating to this usage is the product of the anticompetitive

6

7  agreements described herein.

8          **g. Rebroadcasts of Classic Games.**

9      149.    In 1997, the ESPN cable television network acquired the Classic Sports Network

10  for an amount reported to be between $175 and $200 million, and renamed it "ESPN Classic."

11  ESPN Classic replays games from a variety of sports and seasons that are considered to be

12  "classics" in some way.  ESPN describes ESPN Classic as follows:

13

14          ESPN Classic is a 24-hour, all-sports network devoted to
            telecasting the greatest games, stories, heroes and memories in the
15          history of sports. ESPN Classic presents programming from the
            NFL, NBA, MLB, NHL, NASCAR, boxing (including the ESPN
16          Big Fights Library), tennis, golf, college football and basketball,
            Olympics and others. ESPN Classic is a wholly owned subsidiary
17          of ESPN, The Worldwide Leader in Sports.

18      150.    As indicated above ESPN Classic has acquired the rights to rebroadcast various

19  "classic" college basketball and football games, and does so. These rebroadcasts feature and

20
    utilize the images of Damages Class Members.
21

22      151.    Various conferences and universities also run their own networks that replay

23  classic games.  For example, the Big Ten Network states the following on its website:

24          **Big Ten's Greatest Games**

25          They are epic sports battles that are etched in hearts and minds of
            Big Ten fans across the nation.  They are unforgettable moments
26          that stir passion and pride.  They are echoes of both triumphant
            victories and devastating defeats.
27

28          Throughout the winter, college football fans will have the

    CLASS ACTION COMPLAINT              - 54 -

1   opportunity to relive the best of those match-ups on the Big Ten
    Network series, "The Big Ten's Greatest Games." The Big Ten
2   Network will also televise classic games throughout the basketball
3   season. Use the list to the right to find full season listings.

4   Our "Greatest Games" schedule features five Big Ten national
    championships, including Indiana's title games in 1981 and 1987,
5   Michigan's championship game in 1989 and Michigan State's titles
    in 1979 and 2000. Additional games from the NCAA Elite Eight
6   and Sweet 16 will air throughout the winter, as will memorable
7   regular season classics.

8   Northwestern's 2005 overtime victory against Iowa premiered on
    Dec. 1 and the Illinois' 2004 ACC-Big Ten Challenge win against
9   Wake Forest debuted on Dec. 8. Both games will re-air several
    times during the course of the season.
10

11  If there's a game that you want to see on "Greatest Games," use the
    form below to drop us a line. Our "Greatest Games" crew wants to
12  hear from you!

13      152.    The Big Ten Network's "Season 1" of classic men's basketball games, which was

14  broadcast in late 2007 and early 2008, featured 36 games ranging from 1983 to 2007 featuring the

15  following teams: Connecticut, Duke, Georgetown, Georgia Tech, Illinois, Indiana, Iowa,

16
    Kentucky, LSU, Michigan, Michigan State, Minnesota, North Carolina, Northwestern, Ohio
17
    State, Penn State, Purdue, Texas, and Wisconsin.
18

19      153.    It appears that by the next season, The Big Ten Network had reached an agreement

20  to show NCAA tournament games. Whereas the first season's offerings did not appear to be

21  NCAA tournament games, nearly all games shown in the next season were from the NCAA

22  tournament. The Big Ten Network's "Season 2" of classic men's basketball games, which was

23  broadcast in late 2008 through March of 2009, featured 16 games ranging from 1979 to 2008

24  featuring the following teams: Arizona, Florida, Illinois, Indiana, Indiana State, Iowa, Kansas,

25
    Kentucky, Maryland, Michigan State, Minnesota, North Carolina, Northwestern, Ohio State,
26
    Oklahoma, Purdue, Seton Hall, St. John's University, Syracuse, Wake Forest, and Wisconsin.
27

28

CLASS ACTION COMPLAINT                - 55 -

1    The games included NCAA tournament championship games, and games from the NCAA

2    tournament's "Sweet Sixteen," "Elite Eight" and "Final Four" rounds.

3        154.    The Big Ten Network had similar numbers of offerings for men's football games.

4    In Season 1, it rebroadcast approximately 30 different games ranging from the 1990 to 2006

5

6    seasons, and in Season 2 it rebroadcast a similar number of games ranging from the 1981 to 2006

7    seasons.

8        155.    As another example, the Brigham Young University cable television network,

9    available via cable systems around the country such as the Comcast network in the San Francisco

10   Bay Area, runs the "BYU Television" cable television network, on which it rebroadcasts various

11   games. For example, on May 30, 2009, the network was scheduled to run a "BYU Classic

12
     Sports" presentation of a 2002 men's basketball game between BYU and Utah, followed by a
13
     1988 game between BYU and Hawaii. Later that day, the network was scheduled to rebroadcast
14
15   a 1986 football game between BYU and the University of New Mexico.

16       156.    No valid rights from Damages Class members have been obtained by the NCAA,

17   its members, or its licensees for the use of their images in rebroadcasts of "classic" games , and

18   any purported transfer of former student-athletes' rights relating to this usage is the product of the

19   anticompetitive agreements described herein.

20

21                    **h.   Jerseys, T-Shirts and Other Apparel.**

22       157.    Defendants and their co-conspirators, through the release process described herein,

23   also have allowed former players' indicia of identity, namely, their uniform numbers and names,

24   to be utilized in connection with sales of replica and actual jerseys and other apparel offered for

25   sale. In addition to featuring sometimes current players, replica jerseys also are sold featuring the

26   numbers and names of former players.

27

28

158.    For example, the University of Connecticut, through its online athletics store, sells a replica basketball jersey bearing the number 4. This number clearly corresponds to former star player Ben Gordon, who played for three years at UConn before turning professional in 2004. Indeed, many other websites sell similar jerseys and specifically reference Mr. Gordon and his number 4.

159.    The NCAA's President, Myles Brand, was referenced in a 2004 article in *The New York Times* in connection with jersey sales featuring current players as follows: "Even Myles Brand, the President of the N.C.A.A. said he had ethical concerns about the marketing of star players' numbers, although he ruled out permitting athletes to make money from the sale of replicas of their uniforms." The article further stated that "[p]layers' number are a meaningful substitute for their names . . ."

160.    The NCAA, in fact, has examined, and blessed, its members' use of players' uniform numbers for replica jersey sales. As a 2008 article on CNBC.com stated, "For years, the NCAA has turned a blind eye to the fact that its member institutions give the [apparel companies] of the world specific numbers that match up to their best players. The schools know the reality of the situation, which is that numbers that correspond to the stars will sell better than a generic No. 1. And just because the NCAA forbids the selling of the jerseys with the names on the back doesn't mean you can cut the player out of the equation. Everyone knows what's going on."

161.    *The New York Times* further reported that "[j]erseys like these are also sold around the country in Wal-Mart, Sears and other stores under agreements with manufacturers and the [Defendant] Collegiate Licensing Company, which oversees licensing, marketing and distribution of royalties for the N.C.A.A. and nearly 200 universities, said Derek Eiler, the company's chief operating officer."

162.   *The New York Times* further reported in 2004 that "[w]hile sales figures are hard to acquire, N.C.A.A. officials estimated that Division I universities that sell the most T-shirts and other team apparel each generate about $6 million to $7 million a year in sales.  About 6 percent of those revenues, or perhaps $360,000, involves the sale of replica jerseys."

163.   In addition to replica jersey sales, dozens of the NCAA's members sell the actual jerseys worn by former players to the operators of websites such as www.collegejersey.com, which then offers the jerseys for sale, typically for prices ranging from several hundred dollars up to $1000 or more.  These jerseys often bear the players' names on the back.  For example, on June 16, 2009, there were more than 30 former UCLA football players' jerseys offered for sale that bear players' names on the back.  Additional information is supplied regarding the year the jersey was worn, and often additional details on the particular player, such as the position that he played.  In the UCLA example, the players played between 1995 and 2004.

164.   Additionally, certain schools sell "game worn" uniforms directly.  For example, as of June 16, 2009, Ohio State University was offering for sale via its online memorabilia store approximately 30 "game worn" jerseys from the 2005 season bearing various uniform numbers.  Each one is offered at $200.  The complete player roster from that season, which lists player names and uniform numbers, is readily available on-line from websites such as scout.com.

165.   No valid rights from Damages Class members have been obtained by the NCAA, its members, or its licensees for the use of their images in apparel sales, and any purported transfer of former student-athletes' rights relating to this usage is the product of the anticompetitive agreements described herein.

D.     **The Reality for Players After College.**

166.   There is a vast amount of information available that documents the realities of student-athlete life in the Division I revenue producing sports, i.e., men's basketball and football.

CLASS ACTION COMPLAINT                     - 58 -

1  Those athletes typically do not enjoy an academic experience anything like that of "regular"

2  students. Such athletes frequently are required by the university to devote more than 40 hours a

3  week to their sports, can have enormous travel demands placed upon them, are often spoon-fed a

4
5  curriculum of athlete-friendly classes that are nothing like those experienced by the general

6  student population, and their graduation rates frequently are abysmal.

7  167.    Two Michigan State University law professors, Robert A. McCormick and Amy

8  Christian McCormick, recently conducted a study regarding Division I athletes in the revenue

9  generating sports, and concluded that those athletes "daily burdens and obligations not only meet

10  the legal standard of employee, but far exceed the burdens and obligations of most university

11  employees."

12
13  168.    After they spend their college years juggling athletic and academic requirements,

14  many student-athletes wind up substantially in debt because their scholarships did not fully cover

15  the basic necessities of life. A recent study illustrated that so-called "full scholarships" can leave

16  student-athletes with as much as $30,000 in normal student expenses uncovered over the course

17  of their collegiate athletic careers.

18  169.    Moreover, many former student-athletes have continuing medical bills and

19  treatments resulting from their participation in intercollegiate athletics. These medical treatments

20
21  and attendant financial responsibility can continue long after the conclusion of a student-athlete's

22  collegiate sports career. On July 16, 2009, *The New York Times*, in an article titled "College

23  Athletes Stuck With the Bill After Injuries," reported the following:

24  > After years of concerns about inadequate health coverage for
25  > college athletes, the National Collegiate Athletic Association
   > started requiring universities to make sure their athletes had
26  > insurance before competing.

27  > But the association never established clear standards for that
   > coverage when it introduced the rule four years ago, leaving
28  > colleges to decide for themselves. While some colleges accept

CLASS ACTION COMPLAINT                         - 59 -

1    considerable responsibility for medical claims, many others
2    assume almost none, according to a review of public documents
     from a cross section of universities and interviews with current and
3    former athletes, trainers, administrators and N.C.A.A. officials.

4    . . .

5    Other athletes discover their financial problems long after their
     bodies have healed. An Ohio University football player,
6    temporarily paralyzed during a workout, learned that he still owed
     $1,800 in unpaid medical bills when he went to buy a car six years
7    after his injury.

8    Many students, whether athletes or not, have medical insurance
9    through their parents. But these plans often exclude varsity sports
     injuries, limit out-of-state treatment or do not cover much of the
10   bill. Some colleges buy secondary policies to fill the gaps,
     although even these plans have holes. And only players hurt badly
11   enough to require extensive care can turn to the N.C.A.A. for
     coverage. Its catastrophic insurance carries a $75,000 deductible,
12   which will increase to $90,000 next year.

13
     . . .
14
     Even scholarship athletes in major sports can end up in similar
15   situations.

16   Jason Whitehead, a former football player at Ohio University, was
     so badly injured during a workout in 2001 that he had to be
17   airlifted to a hospital. He was temporarily paralyzed.

18
     "The next day, when I woke up, the doctor came in and informed
19   me that surgery went well, but this was a career-ending injury," he
     said. "You're a 19-year-old kid. It took awhile to sink in."
20
     He said he took the bills not covered by his father's insurance to
21   the Ohio University trainers. His father's insurance and Ohio
     University refused to pay the claims.
22
23   Whitehead lost his scholarship one academic year after being
     medically disqualified by a team physician, per university policy.
24   University officials declined to comment on his situation, citing
     their commitment to student privacy. They also said they would
25   not pay bills for procedures that occurred more than a year earlier.

26   But Whitehead, now a 28-year-old district manager for Frito Lay
     in the Cleveland area, said he discovered he owed roughly $1,800
27   in unpaid medical bills while reviewing paperwork to buy his first
28   car about six years after his injury.

CLASS ACTION COMPLAINT                    - 60 -

1
2

"The coach says: 'You're on full scholarship. If you ever get hurt, we'll make sure to take care of you,' " he said. "There's a lot of us out there that get used."

3      170.    The overwhelming majority of players do not turn professional, and those that do

4
turn professional typically do not remain professionals for very long. Those that do become
5
6    professionals often emerge from universities totally unprepared to manage their finances, and thus

7    frequently fall prey to financial predators, as a recent expose in *Sports Illustrated* magazine

8    documented.

9      171.    The rare player who reaches the top professional ranks in basketball and is drafted

10   at least likely will have a guaranteed contract for a few years; in the National Football League, the

11   rare player who reaches the professional ranks does *not* have a guaranteed contract and can be cut

12
from the team at any time due to injury or non-performance.
13
14     172.    Whatever the realities of student-athlete life may be, the NCAA is not entitled to

15   abridge those student-athletes' economic rights in perpetuity.

16                                **ANTITRUST ALLEGATIONS**

17     173.    Defendants' contract, combination, and conspiracy described herein consisted of a

18   continuing agreement, understanding, and concert of action among the Defendants and their co-

19   conspirators, the substantial terms of which were to artificially fix, depress, maintain, and/or

20
stabilize prices received by Plaintiff and Class members for use and sale of their images at zero
21
22   dollars in the United States, its territories and possessions.

23     174.    Defendants' and their co-conspirators' actions also can be understood as a group

24   boycott/ refusal to deal.

25     175.    Defendant CLC and various co-conspirators facilitated the contract, combination

26   and conspiracy described herein, and benefited financially from its operation.

27
28

CLASS ACTION COMPLAINT                     - 61 -

176. In formulating and effectuating the contract, combination, or conspiracy,

Defendants and their co-conspirators did those things that they unlawfully combined and

conspired to do, including, among other things:

a. agreeing to artificially fix, depress, maintain, and/or stabilize prices paid to Plaintiff and Class members for use and sale of their images;

b. agreeing to limit output of the use or sale of the images of Plaintiff and Class Members;

c. agreeing to boycott and refuse to deal with Plaintiff and Class members regarding compensation for the use and sale of their images; and

d. implementing and monitoring the conspiracy among cartel members.

177. The activities described above have been engaged in by Defendants and their co-

conspirators for the purpose of effectuating the unlawful agreement to fix, depress, maintain

and/or stabilize prices paid to Plaintiff and Class members for the sale and use of their images.

178. Defendants' actions constitute an unreasonable restraint of trade.

## CAUSES OF ACTION

## FIRST CLAIM FOR RELIEF

### Violation of Section 1 of the Sherman Act – 15 U.S.C. § 1

### Unreasonable Restraint of Trade

### (Against All Defendants)

179. Plaintiff incorporates and re-alleges each allegation set forth in the preceding

paragraphs of this Complaint.

180. Defendants and their co-conspirators, specifically, the NCAA Division I and

Football Bowl Subdivision conferences and member universities, by and through Defendants' and

co-conspirators' officers, directors, employees, agents, or other representatives, have entered into

a continuing contract, combination, and conspiracy in restraint of trade to artificially depress, fix,

CLASS ACTION COMPLAINT                              - 62 -

1    maintain, and/or stabilize the prices paid (specifically, depressing, fixing, maintaining and

2    stabilizing them at zero dollars) to Class members for the use of, and to limit supply for, licensing

3    and sale of their images in the United States and its territories and possessions, in violation of

4    Section 1 of the Sherman Act (15 U.S.C. § 1).

5

6        181.    If Plaintiff and Class members were free to license and sell the rights to their

7    images, many more licenses would be sold. This output restriction also has the effect of raising

8    the prices charged by the NCAA and CLC for licensing rights.

9        182.    Defendants' unlawful conduct resulted in Plaintiff and Class members losing their

10   freedom to compete. This unreasonable restraint on competition has artificially limited supply

11   and depressed prices paid by Defendants and their co-conspirators to Plaintiff and the members of

12   the Class for use of their images after cessation of participation in intercollegiate sports.

13

14       183.    Plaintiff and the members of the Class received less than they otherwise would

15   have received for the use of their images in a competitive marketplace, were thus damaged, and

16   seek to recover for those damages.

17       184.    The NCAA and its members' total abridgment of compensation rights for former

18   student-athletes are a naked, *per se* restraint of trade, and are not connected to any legitimate non-

19   commercial goal. The purpose of the NCAA's and its members' actions is solely to enhance

20   revenue for themselves and their for-profit business partners, by cutting costs, i.e., eliminating the

21

22   need to pay any compensation to former student-athletes for the continuing commercial

23   exploitation of their images and likenesses. The NCAA's actions have no relationship to any

24   alleged goal of "amateurism," as former student-athletes by definition are no longer members of

25   athletic teams under the NCAA's control.

26       185.    CLC has facilitated this illegal scheme, and has financially benefited from it.

27

28

CLASS ACTION COMPLAINT                    - 63 -

186.    As a direct and proximate *result of* Defendants' scheme, Plaintiff and the members of the Class have been injured and financially damaged in amounts which are presently undetermined. Plaintiff's and Class members' injuries consist of receiving lower prices for use of their images than they would have received absent Defendants' conduct. Plaintiff's and Class members' injuries are of the type the antitrust laws were designed to prevent and flow from that which makes Defendants' conduct unlawful.

187.    Plaintiff alternatively pleads that Defendants have violated Section 1 of the Sherman Act and that Defendants' actions violate the "rule of reason" antitrust analysis.

188.    Defendants' and their co-conspirators' cartel has collectively conspired to illegally limit and depress the compensation of former student-athletes for continued use of their images to zero. This patently anticompetitive and illegal scheme has unreasonably restrained trade.

189.    Defendants' scheme fails the "rule of reason" antitrust analysis, as its anticompetitive effects substantially outweigh any alleged procompetitive effects that may be offered by Defendants, including that their collusive conduct is shielded by its concept of "amateurism." Reasonable and less restrictive alternatives are available to Defendants' current anticompetitive practices.

190.    Plaintiff and Class members are entitled to a declaratory judgment declaring as void and unenforceable all forms that purport to grant, transfer, or convey the rights of former student-athletes in the use of their images.

191.    Plaintiff and the Class are entitled to a permanent injunction that terminates the ongoing violations alleged in this Complaint.

## **SECOND CLAIM FOR RELIEF**

**Violation of Section 1 of the Sherman Act – 15 U.S.C. § 1**

**Unreasonable Restraint of Trade – Group Boycott / Refusal to Deal**

**(Against All Defendants)**

192.    Plaintiff incorporates and re-alleges each allegation set forth in the preceding paragraphs of this Complaint.

193.    Defendants and their co-conspirators, specifically, the NCAA Division I and Football Bowl Subdivision conferences and member universities, by and through Defendants' and co-conspirators' officers, directors, employees, agents, or other representatives, entered into a continuing contract, combination, and conspiracy in restraint of trade to effectuate a horizontal group boycott of Class Members. Defendants' group boycott / refusal to deal encompasses Defendants' concerted refusal to compensate Class Members for use of their images, and to otherwise concertedly act to prevent Class Members from being compensated for use of their images, in the United States and its territories and possessions, in violation of Section 1 of the Sherman Act (15 U.S.C. § 1).

194.    Defendants' group boycott / refusal to deal includes Defendants' concerted action to require all current student-athletes to sign forms each year that purport to require each of them to relinquish all rights in perpetuity for use of their images. This concerted action is in effect a refusal to deal with Class members on future post-competition compensation rights issues, and forecloses them from access to the market. Defendants use the eligibility rules as a threat of a boycott to force all student-athletes to sign the forms.

195.    Defendants' group boycott / refusal to deal also includes Defendants' ongoing concerted action to deny Class Members compensation in the form of royalties for the continued use of their images for profit, including, but not limited to, through restrictions in the Bylaws.

196.     Plaintiff and the members of the Class received less than they otherwise would have received for the use of their images in a competitive marketplace, were thus damaged, and seek to recover for those damages.

197.     Defendants and their co-conspirators' total abridgment of compensation rights for former student-athletes are a naked, *per se* restraint of trade, and are not connected to any legitimate non-commercial goal. Defendants' actions are solely to enhance revenue for themselves and their for-profit business partners, by cutting costs, i.e., eliminating the need to pay any compensation to former student-athletes for the continuing commercial exploitation of their images and likenesses. Defendants' actions have no relationship to any alleged goal of "amateurism," or pro-educational purposes, as former student-athletes by definition are no longer members of athletic teams under the NCAA's control. Thus, the NCAA's actions directly regulate a commercial market and therefore are illegal.

198.     CLC has facilitated this illegal group boycott/refusal to deal, and has financially benefited from it.

199.     As a direct and proximate result of Defendants' group boycott, Plaintiff and the members of the Class have been injured and financially damaged in amounts which are presently undetermined. Plaintiff's and Class members' injuries consist of denial of compensation for use of their images. Plaintiff's and Class members' injuries are of the type the antitrust laws were designed to prevent and flow from that which makes Defendants' conduct unlawful.

200.     Plaintiff alternatively pleads that the Defendants' group boycott / refusal to deal violates Section 1 of the Sherman Act and their concerted actions violate the "rule of reason" antitrust analysis.

1     201.   Defendants' and their co-conspirators' cartel have collectively conspired to

2 illegally deny compensation to former student-athletes for continued use of their images in

3 unreasonable restraint of trade.

4

5     202.   Defendants' group boycott fails the "rule of reason" antitrust analysis, as its

6 anticompetitive effects substantially outweigh any alleged pro-competitive effects that may be

7 offered by Defendants, including that their collusive conduct is shielded by its concept of

8 "amateurism" or pro-educational purpose. Reasonable and less restrictive alternatives are

9 available to Defendants' current anticompetitive practices.

10     203.   Plaintiff and the Class are entitled to a permanent injunction that terminates the

11 ongoing violations alleged in this Complaint.

12

13 **THIRD CLAIM FOR RELIEF**

**Unjust Enrichment**

14

**(Against All Defendants)**

15

16     204.   Plaintiff incorporates and re-alleges each allegation set forth in the preceding

17 paragraphs of this Complaint.

18     205.   Defendants have been unjustly enriched as a result of the unlawful conduct

19 detailed herein at the expense of Plaintiff and Class members. Under common law principles of

20 unjust enrichment, Defendants should not be permitted to retain the benefits conferred upon them

21 via their wrongful conduct, and it would be unjust for them to be allowed to do so.

22

23     206.   Plaintiff seeks disgorgement of all Defendants' profits resulting from the wrongful

24 conduct described herein and establishment of a constructive trust from which Plaintiff and the

25 Class members may seek restitution.

26

27

28

CLASS ACTION COMPLAINT     - 67 -

## FOURTH CLAIM FOR RELIEF

### Accounting

### (Against All Defendants)

207.   Plaintiff incorporates and re-alleges each allegation set forth in the preceding paragraphs of this Complaint.

208.   As a result of the anticompetitive actions detailed herein, Defendants have received licensing revenues which are due to Plaintiff and Class members.

209.   The amount of money due from Defendants and their co-conspirators to Plaintiff and Class members is unknown to Plaintiff and Class members, and cannot be ascertained without an accounting of the receipts from the aforementioned transactions.

210.   Plaintiff seeks an accounting of the licensing revenues that Defendants have wrongfully diverted to themselves and to other entities.

## PRAYER FOR RELIEF

WHEREFORE, Plaintiff prays as follows:

A.   That the Court determine that this action may be maintained as a class action under Rule 23 of the Federal Rules of Civil Procedure;

B.   That the contract, combination, or conspiracy, and the acts done in furtherance thereof by Defendants and their co-conspirators, be adjudged to have been in violation of Section 1 of the Sherman Act (15 U.S.C. § 1);

C.   That judgment be entered for Plaintiff and members of the Class against Defendants for three times the amount of damages sustained by Plaintiff and the Class as allowed by law, together with the costs and expenses of this action, including reasonable attorneys' fees;

D.   That Defendants be ordered to disgorge all profits earned via the wrongful use and sale of Class members' images as described herein;

CLASS ACTION COMPLAINT                              - 68 -

E.     That Plaintiff and Class members be awarded any available prejudgment and post-judgment interest;

F.     That Plaintiff and Class members are entitled to Declaratory relief declaring as void and unenforceable any releases that purport to have caused Plaintiff and Class member to relinquish rights to compensation for use of their images after they no longer are student-athletes, and further declaring as void and unenforceable all NCAA and member license agreements that purport to represent that Class members have released future compensation rights for the use of their images after they no longer are student-athletes;

G.     That Defendants, their affiliates, successors, transferees, assignees, and the officers, directors, partners, agents, and employees thereof, and all other persons acting or claiming to act on their behalf, be permanently enjoined and restrained from, in any manner, continuing, maintaining, or renewing the contract, combination, or conspiracy alleged herein, or from engaging in any other contract, combination, or conspiracy having a similar purpose or effect, and from adopting or following any practice, plan, program, or device having a similar purpose or effect;

H.     That Plaintiff and Class members are further entitled to equitable relief permanently enjoining the future use of the release forms described herein, and enjoining Defendants from selling, licensing or using former student-athletes' rights that Defendants do not own; and

I.     That Plaintiff and Class members have such other, further, and different relief as the case may require and the Court may deem just and proper under the circumstances.

1    **JURY DEMAND**

2        Plaintiff demands a jury trial, pursuant to Federal Rule of Civil Procedure 38(b), of all

3    triable issues.

4    Dated:  July 21, 2009                                    Respectfully submitted,

5

6                                                   By:   _____

7                                                         Michael P. Lehmann (Cal. Bar No. 77152)
                                                          Jon T. King (Cal. Bar No. 205073)
8                                                         Arthur N. Bailey (Cal. Bar No. 248460)
                                                          HAUSFELD LLP
9                                                         44 Montgomery St., 34th Floor
                                                          San Francisco, CA 94104
10                                                        Tel:  (415) 633-1908
                                                          Fax:  (415) 358-4980
11                                                        Email:  mlehmann@hausfeldllp.com
                                                                    jking@hausfeldllp.com
12                                                                  abailey@hausfeldllp.com

13                                                        Michael D. Hausfeld
                                                          Megan E. Jones
14                                                        HAUSFELD LLP
15                                                        1700 K Street, NW, Suite 650
                                                          Washington, DC 20006
16                                                        Tel:  (202) 540-7200
                                                          Fax:  (202) 540-7201
17                                                        Email:  mhausfeld@hausfeldllp.com
18                                                                  mjones@hausfeldllp.com

19                                                        William A. Isaacson
                                                          Tanya Chutkan
20                                                        Jack Simms
                                                          BOIES, SCHILLER & FLEXNER LLP
21                                                        5301 Wisconsin Avenue, 8th Floor
                                                          Washington, DC 20015
22                                                        Tel:  (202) 237-2727
23                                                        Fax:  (202) 237-6131
                                                          Email:  wisaacson@bsfllp.com
24                                                                  tchutkan@bsfllp.com
25                                                                  jsimms@bsfllp.com

26

27

28

     CLASS ACTION COMPLAINT                    - 70 -

John F. Cove, Jr. (Cal. Bar No. 212213)
BOIES, SCHILLER & FLEXNER LLP
1999 Harrison Street, Suite 900
Oakland, CA 94612
Tel: (510) 874-1000
Fax: (510) 874-1480
Email: jcove@bsfllp.com

Jonathan W. Cuneo
Daniel M. Cohen
CUNEO GILBERT & LaDUCA LLP
507 C Street NE
Washington, D.C. 20002
Tel: (202) 789-3960
Fax: (202) 789-1813
Email: jonc@cuneolaw.com
        danielc@cuneolaw.com

Vincent J. Esades
HEINS MILLS & OLSON, P.L.C.
310 Clifton Avenue
Minneapolis, MN 55403
Tel: (612) 338-4605
Fax: (612) 338-4692
Email: vesades@heinsmills.com

Daniel S. Mason (Cal. Bar No. 54065)
ZELLE HOFMANN VOELBEL & MASON
        LLP
44 Montgomery Street, Suite 3400
San Francisco, CA 94104
Tel: (415) 693-0700
Fax: (415) 693-0770
Email: dmason@zelle.com

Mitchell J. Rapp (Michigan Bar No. P43081)
Shawn D. Stuckey (MN Bar No. 0388976)
ZELLE HOFMANN VOELBEL & MASON
        LLP
500 Washington Avenue South, Suite 400
Minneapolis, MN 55415
Telephone: (612) 339-2020
Facsimile: (612) 336-9100
Email: mrapp@zelle.com
        sstuckey@zelle.com

1
2
3
4
5

Brian M. Sund
Joshua G. Hauble
MORRISON FENSKE & SUND, P.A.
5125 County Road 101, Suite 202
Minnetonka, MN 55345
Tel:  (952) 975-0050
Fax:  (952) 975-0058
Email:  bsund@morrisonfenske.com
            jhauble@morrisonfenske.com

6
7
8
9

Steven J. Greenfogel
MEREDITH COHEN GREENFOGEL &
    SKIRNICK, P.C.
1521 Locust Street, 8th Floor
Philadelphia, Pennsylvania 19102
Tel:  (215) 564-5182
Fax:  (215) 569-0958
Email:  sgreenfogel@mcgslaw.com

10
11
12
13
14
15

Bruce L. Simon (Cal. Bar. No. 96241)
Jessica L. Grant (Cal. Bar. No. 178138)
PEARSON, SIMON, WARSHAW &
    PENNY, LLP
44 Montgomery Street, Suite 1430
San Francisco, CA 94104
Tel:  (415) 433-9000
Fax:  (415) 433-9008
Email:  bsimon@pswplaw.com
            jgrant@pswplaw.com

16
17
18
19
20

Eugene A. Spector
SPECTOR ROSEMAN KODROFF &
    WILLIS, P.C.
1818 Market Street, Suite 2500
Philadelphia, Pennsylvania 19103
Tel:  (215) 496-0300
Fax:  (215) 496-6611
Email:  espector@srkw-law.com

21
22
23
24
25

Jay L. Himes
Morissa Falk
LABATON SUCHAROW LLP
140 Broadway
New York, NY 10005
Tel:  (212) 907-0700
Fax:  (212) 818-0477
Email:  jhimes@labaton.com
            mfalk@labaton.com

26
27
28

CLASS ACTION COMPLAINT                    - 72 -

Gordon Ball
BALL & SCOTT, A PROFESSIONAL
    ASSOCIATION
550 Main Avenue, Suite 750
Knoxville, TN 37902
Tel:  (865) 525-7028
Fax:  (865) 525-4679
Email:  GBall@ballandscott.com

Stanley D. Bernstein
Ronald J. Aranoff
BERSTEIN LIEBHARD LLP
10 East 40th Street, 22nd Floor
New York, New York 10016
Tel:  (212) 779-1414
Fax:  (212) 779-3218
Email:  bernstein@bernlieb.com
          aranoff@bernlieb.com

Allan Steyer (Cal. Bar. No. 100318)
STEYER LOWENTHAL BOODROOKAS
    ALVAREZ & SMITH LLP
One California Street, Third Floor
San Francisco, CA 94111
Tel:  (415) 421-3400
Fax:  (415) 421-2234
Email:  asteyer@steyerlaw.com

*Attorneys for Plaintiff and the Proposed
Classes*

CLASS ACTION COMPLAINT                - 73 -