1   Gregory L. Curtner (*Pro Hac Vice*)
    curtner@millercanfield.com
2   Robert J. Wierenga (SBN183687)
    wierenga@millercanfield.com
3   Kimberly K. Kefalas (*Pro Hac Vice*)
    kefalas@millercanfield.com
4   Atleen Kaur (*Pro Hac Vice*)
    kaur@millercanfield.com
5   MILLER, CANFIELD, PADDOCK AND STONE, P.L.C.
6   101 North Main St., 7th Floor
    Ann Arbor, MI  48104
7   Telephone:  (734) 663-2445
    Facsimile:  (734) 663-8624
8

9   Jason A. Geller (SBN168149)
    jgeller@longlevit.com
10  Glen R. Olson (SBN111914)
    golson@longlevit.com
11  LONG & LEVIT LLP
12  465 California Street, 5th Floor
    San Francisco, CA  94104
13  Telephone:  (415) 397-2222
    Facsimile:  (415) 397-6392
14

15  Attorneys for Defendant
    National Collegiate Athletic Association
16

17              **UNITED STATES DISTRICT COURT**
                **NORTHERN DISTRICT OF CALIFORNIA**
18                   **OAKLAND DIVISION**

19
    EDWARD C. O'BANNON, JR., on behalf of   | Case No. 4:09-cv-03329-CW
20  himself and all others similarly situated,
                                             | **NOTICE OF MOTION AND MOTION TO**
21                Plaintiff,                 | **DISMISS COMPLAINT PURSUANT TO**
                                             | **FED. R. CIV. P. 12(b)(1), 12(b)(6);**
22  v.                                       | **STATEMENT OF RELIEF SOUGHT AND**
                                             | **MEMORANDUM OF POINTS AND**
23  NATIONAL COLLEGIATE ATHLETIC             | **AUTHORITIES IN SUPPORT**
24  ASSOCIATION and COLLEGIATE
    LICENSING COMPANY,                       | Date:      November 17, 2009
25                                           | Time:      2:00 P.M.
                  Defendants.                | Dept:      Courtroom 2, 4th Floor
26                                           | Judge:     Hon. Claudia Wilken
27                                           | Date Compl. Filed: July 21, 2009
28

**DEFENDANT NCAA'S BRIEF IN SUPPORT OF MOTION TO DISMISS**
Case No. 4:09-cv-03329-CW

1

**TABLE OF CONTENTS**

2

Page

3

NOTICE OF MOTION AND STATEMENT OF RELIEF SOUGHT ......................................... 1

4

MEMORANDUM OF POINTS AND AUTHORITIES .......................................................... 2

5

O'BANNON'S COMPLAINT ........................................................................................... 2

6

LEGAL STANDARD ...................................................................................................... 3

ARGUMENT ................................................................................................................. 4

7

I.   O'BANNON HAS FAILED TO ALLEGE A PERSONAL CLAIM AGAINST

8

     THE NCAA ......................................................................................................... 4

9

     A.   O'Bannon has failed to adequately allege that defendants are restraining
          him from selling his images .......................................................................... 5

10

     B.   O'Bannon has failed to allege Article III standing, antitrust standing or
          antitrust injury ............................................................................................. 7

11

          1.   O'Bannon has failed to allege Article III standing ..................................... 7

12

          2.   O'Bannon has failed to allege antitrust standing ....................................... 8

13

II.  O'BANNON HAS FAILED TO ALLEGE THAT THE NCAA HAS

14

     "CONSPIRED" TO "RESTRAIN TRADE" ............................................................ 12

15

     A.   O'Bannon has failed to allege that the NCAA is "restraining" trade, even if
          the factual deficiencies of his complaint are ignored ...................................... 12

16

     B.   O'Bannon's "Form 08-3a" allegations are insufficient to state a Section 1
          claim ........................................................................................................... 13

17

     C.   O'Bannon's "Bylaw 12.5.1.1" allegation is not sufficient .................................. 16

18

     D.   O'Bannon has alleged no other facts sufficient to support his conspiracy
          allegations ................................................................................................... 18

19

III. O'BANNON HAS FAILED TO ALLEGE INJURY TO COMPETITION .................... 19

20

IV.  O'BANNON HAS FAILED TO ALLEGE A RELEVANT MARKET ......................... 20

21

     A.   O'Bannon fails to identify a product ............................................................... 20

22

     B.   O'Bannon fails to allege facts regarding substitute products ............................. 21

23

V.   O'BANNON'S CLAIMS ARE BARRED BY THE STATUTE OF LIMITATIONS ...... 22

24

VI.  O'BANNON'S COMMON LAW CLAIMS MUST BE DISMISSED ........................... 25

25

26

27

28

1

2

3

4

5

6

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28

# INDEX OF AUTHORITIES

**Page(s)**

CASES

*Adidas America, Inc. v. NCAA,*
64 F. Supp. 2d 1097 (D. Kan. 1999) ..................................................................... 22

*American Ad Management, Inc. v. General Telephone Co. of California,*
190 F.3d 1051 (9th Cir. 1999)............................................................................... 9

*Aurora Enters. v. NBC,*
688 F.2d 689 (9th Cir. 1982)................................................................................. 24

*B.V. Optsiche Industrie De Oude Delft v. Hologic, Inc.,*
909 F. Supp. 162 (S.D.N.Y. 1995)........................................................................ 22

*Balistreri v. Pacifica Police Dep't,*
901 F.2d 696 (9th Cir. 1988)................................................................................. 3

*Bell Atlantic Corp. v. Twombly,*
550 U.S. 544.......................................................................... 3, 4, 6, 15, 18, 20

*Bourns, Inc. v. Raychem Corp.,*
331 F.3d 704 (9th Cir. 2003)................................................................................. 10

*Bubar v. Ampco Foods, Inc.,*
752 F.2d 445 (9th Cir. 1985)................................................................................. 10

*Cascade Health Solutions v. PeaceHealth,*
515 F.3d 883 (9th Cir. 2008)................................................................................. 4

*County of Santa Clara v. Astra USA, Inc.,*
No. C 05-03740, 2006 WL 2193343 (N.D. Cal. July 28, 2006)............................. 25

*Cyntegra, Inc. v. Idexx Laboratories,*
322 Fed. Appx. 569 (9th Cir. 2009)...................................................................... 8

*Daniel v. American Bd. of Emergency Medicine,*
269 F. Supp. 2d 159 (W.D.N.Y. 2003) ................................................................. 11

*Dry v. Methodist Medical Center of Oak Ridge, Inc.,*
No. 89-5470, 893 F.2d 1334 (6th Cir. Jan. 19, 1990)........................................... 5, 6

*E&E Co., Ltd. v. Kam Hing Enterprises, Inc.,*
No. C-08-0871, 2008 WL 3916256 (N.D. Cal. Aug. 25, 2008) ............................. 21

1
2
3
4
5
6
7
8
9
10
11
12
13
14
15
16
17
18
19
20
21
22
23
24
25
26
27
28

*Eagle v. Star-Kist Foods, Inc.*,
    812 F.2d 538 (9th Cir. 1987) ................................................................................................... 9

*Eichman v. Fotomat Corp.*,
    880 F.2d 149 (9th Cir. 1989) ................................................................................................. 24

*Electronics For Imaging, Inc. v. Coyle*,
    No. C 01-4853, 2005 WL 1661958 (N.D. Cal. July 14, 2005) ........................................ 20, 21

*Floors-N-More, Inc. v. Freight Liquidators*,
    142 F. Supp. 2d 496 (S.D.N.Y. 2001) .................................................................................... 15

*Franklin v. Sacramento Area Flood Control Agency*,
    No. CIV. 07-1263, 2009 WL 2399569 (E.D. Cal. Apr. 29, 2009) ........................................ 23

*Fresh Made, Inc. v. Lifeway Foods, Inc.*,
    No. Civ. A. 01-4254, 2002 WL 31246922 (E.D. Pa. Aug. 9, 2002) ................................. 21, 22

*Gerlinger v. Amazon.com Inc.*,
    526 F.3d 1253 (9th Cir. 2008) ............................................................................................. 7, 8

*Glen Holly Entertainment, Inc. v. Tektronix Inc.*,
    352 F.3d 367 (9th Cir. 2003) ............................................................................................... 8, 9

*Gough v. Rossmoor Corp.*,
    585 F.2d 381 (9th Cir. 1978) ................................................................................................. 19

*Graco, Inc. v. PMC Global, Inc.*,
    No. 08-1304, 2009 WL 904010 (D.N.J. Mar. 31, 2009) ........................................................ 21

*In re Graphics Processing Units Antitrust Litigation*,
    527 F. Supp. 2d 1011 (N.D. Cal. 2007) ................................................................................. 18

*In re Static Random Access Memory (SRAM) Antitrust Litig.*,
    580 F. Supp. 2d 896 (N.D. Cal. 2008) (Wilken, J.) .............................................................. 15

*Indiana Telecom Corp. Inc. v. Indiana Bell Telephone Co., Inc.*,
    No. IP97-1532-C-H/G, 2001 WL 1168169 (S.D. Ind. Sept. 25, 2001) ........................... 11, 13

*International Norcent Technology v. Koninkijke Philips Electronics N.V.*,
    No. CV 07-00043, 2007 U.S. Dist. LEXIS (C.D. Cal. Oct. 29, 2007) ................................... 15

*JES Properties, Inc. v. USA Equestrian, Inc.*,
    No. 802CV1585T24MAP, 2005 WL 1126665 (M.D. Fla. May 9, 2005) ............................... 11

*Kendall v. Visa U.S.A., Inc.*,
    518 F.3d 1042 (9th Cir. 2008) ........................................................................................... 6, 18

iii
**DEFENDANT NCAA'S BRIEF IN SUPPORT OF MOTION TO DISMISS**
Case No. 4:09-cv-03329-CW

1

2

3

4

5

6

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28

*Les Shockley Racing, Inc. v. Nat'l Hot Rod Ass'n*,
884 F.2d 504 (9th Cir. 1989)................................................................. 4, 11, 19, 20

*Lujan v. Defenders of Wildlife*,
504 U.S. 555 (1992) ............................................................................................ 7

*Mathison v. Bumbo*,
No. SA CV08-0369, 2008 U.S. Dist. LEXIS 108511 (C.D. Cal. 2008) ................................... 6

*McGlinchy v. Shell Chemical Co.*,
845 F.2d 802 (9th Cir. 1988)................................................................................ 19

*Newcal Indus., Inc. v. Ikon Office Solution*,
513 F.3d 1038 (9th Cir. 2008)......................................................................... 4, 20

*Pace Indus., Inc. v. Three Phoenix Co.*,
813 F.2d 234 (9th Cir. 1987).......................................................................... 22, 23, 24

*Parrish v. National Football League Players Ass'n*,
534 F. Supp. 2d 1081 (N.D. Cal. 2007) ............................................................... 6, 10

*Petrochem Insulation, Inc. v. Northern Cal. & N. Nev. Pipe Trades Council*,
No. C-90-3628, 1992 WL 131162 (N.D. Cal. Mar. 19, 1992)................................ 15

*Pool Water Products v. Olin Corp.*,
258 F.3d 1024 (9th Cir. 2001)............................................................................... 9

*Pritikin v. Department of Energy*,
254 F.3d 791 (9th Cir. 2001)................................................................................ 7

*Rebel Oil Co. v. ARCO*,
51 F.3d 1421 (9th Cir. 1995)................................................................................ 9

*Renee v. Duncan*,
573 F.3d 903 (9th Cir. 2009)................................................................................ 7

*Rutman Wine Co. v. E. & J. Gallo Winery*,
829 F.2d 729 (9th Cir. 1987)................................................................... 11, 13, 18, 19, 20

*Rx.com v. Medco Health Solutions, Inc.*,
322 Fed. Appx. 394 (5th Cir. 2009) .................................................................. 24

*Shepard Indus., Inc. v. 135 East 57th Street, LLC*,
No. 97 Civ. 8447, 1999 WL 728641 (S.D.N.Y. 1991) ......................................... 22

*Situ v. Leavitt*,
No. C06-2841, 2006 WL 1530129 (N.D. Cal. June 2, 2006) ................................ 6

iv
**DEFENDANT NCAA'S BRIEF IN SUPPORT OF MOTION TO DISMISS**
Case No. 4:09-cv-03329-CW

1

2

3

4

5

6

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28

*Sprewell v. Golden State Warriors,*
   266 F.3d 979 (9th Cir. 2001)............................................................................................. 6

*Tanaka v. USC,*
   252 F.3d 1059 (9th Cir. 2001)......................................................................................... 20

*Ticketmaster LLC v. RMG Techs., Inc.,*
   536 F. Supp. 2d 1191 (C.D. Cal. 2008).......................................................................... 22

*Trane U.S. Inc. v. Meehan,*
   563 F. Supp. 2d 743 (N.D. Ohio 2008).......................................................................... 24

*UGG Holdings, Inc. v. Severn,*
   No. CV 04-1137, 2004 WL 5458426 (C.D. Cal. Oct. 1, 2004) ...................................... 21, 22

*Varner v. Peterson Farms,*
   371 F.3d 1011 (8th Cir. 2004)........................................................................................ 24

*Von Saher v. Norton Simon Museum of Art at Pasadena,*
   --- F.3d ---, No. 07-56691, 2009 WL 2516336 (9th Cir. Aug. 19, 2009) .............................. 23

*Warth v. Seldin,*
   422 U.S. 490 (1975)........................................................................................................... 8

*Wilson Learning Corp. v. Schlechte,*
   No. Civ. 04-4703, 2005 WL 2063944 (D. Minn. Aug. 24, 2005) ......................................... 24

*Wollman v. Gross,*
   637 F.2d 544 (8th Cir. 1980)........................................................................................... 23

*Zenith Radio Corp. v. Hazeltine Research, Inc.,*
   401 U.S. 321 (1971)......................................................................................................... 23

STATUTES

15 U.S.C. § 15b.................................................................................................................. 22

COURT RULES

Fed. R. Civ. P. 12(b)(1)........................................................................................................ 1

Fed. R. Civ. P. 12(b)(6)........................................................................................... 1, 3, 20, 22

1

## NOTICE OF MOTION AND STATEMENT OF RELIEF SOUGHT

2

PLEASE TAKE NOTICE that on November 17, 2009 at 2:00 p.m. before the Honorable

3

Claudia Wilken, defendant National Collegiate Athletic Association. ("NCAA") will, and hereby

4

does, move the Court for an order dismissing the complaint pursuant to Federal Rules of Civil

5

Procedure 12(b)(1) and 12(b)(6) on the following grounds:

6

7

1.      Plaintiff has failed to allege facts establishing that he has personally been injured

8

by the wrongdoing alleged in the Complaint, and thus has failed to establish his standing to bring

9

this action.  Dismissal is therefore required under Fed. R. Civ. P. 12(b)(1).

10

2.      Plaintiff's antitrust claims – Counts I and II of the Complaint – should be

11

dismissed pursuant to Fed. R. Civ. P 12(b)(6) for the following reasons:

12

13

a.      Plaintiff has failed to allege facts demonstrating that he has suffered

14

antitrust injury or possesses antitrust standing;

15

b.      Plaintiff has failed to allege facts demonstrating that the NCAA has

16

restrained trade, either alone or by conspiring with others;

17

c.      Plaintiff has failed to allege facts demonstrating that the NCAA's alleged

18

wrongdoing has injured competition as a whole in any relevant market;

19

20

d.      Plaintiff has failed to allege a legally cognizable relevant market; and

21

e.      Plaintiff's claims are barred by the statute of limitations.

22

3.      Plaintiff's common law claims – Counts III and IV of the Complaint – are wholly

23

derivative of plaintiff's antitrust claims and should be dismissed pursuant to Fed. R. Civ. P.

24

12(b)(6) because his antitrust claims are infirm.

25

For each of these reasons, the NCAA respectfully requests that the Court grant this

26

Motion and dismiss Plaintiff's causes of action against the NCAA with prejudice.

27

28

1

2

## <u>MEMORANDUM OF POINTS AND AUTHORITIES</u>

3

Plaintiff Edward O'Bannon ("O'Bannon") claims that he is the victim of a vast antitrust

4

conspiracy aimed at preventing him from selling images of himself playing basketball for UCLA.

5

O'Bannon alleges – insufficiently – that the NCAA has "conspired" with its member institutions

6

to "coerce" student-athletes into signing a form in which they give the NCAA permission to use

7

their image to promote its championships and activities.  He also alleges – again, insufficiently –

8

that he has not received what he regards as his proper share of the money that the NCAA, schools

9

and third parties make from licensing NCAA and school intellectual property.

10

O'Bannon has not even tried to allege facts demonstrating that the NCAA forms he doesn't

11

like have had *any* effect on his ability to make money by selling images of himself as a UCLA

12

basketball player.  On the contrary: O'Bannon has affirmatively alleged facts demonstrating that

13

the vague and insubstantial "conspiracy" he has alleged does not, indeed cannot, restrain him

14

from selling such images.  O'Bannon's apparent failure to profit from his own likeness has

15

nothing to do with the NCAA, and his unhappiness over the fact that others are allegedly doing so

16

has nothing to do with the antitrust laws.  The NCAA's motion should be granted.

17

## <u>O'BANNON'S COMPLAINT</u>

18

19

O'Bannon's prolix complaint is long on rhetoric and fatally short on alleged facts

20

sufficient to support his claims against the NCAA.  As a result, it is less than clear what, exactly,

21

O'Bannon regards as the "conspiracy" that supposedly gives rise to his Sherman Act Section 1

22

claims. In some allegations, O'Bannon seems to claim that the "conspiracy" he challenges is

23

between the NCAA and its members to require "all student-athletes to sign a form each year –

24

currently known as 'Form 08-3a' – that purports to require each of them to relinquish all rights in

25

perpetuity to the commercial use of their images, including after they graduate and are no longer

26

27

28

---

2

**DEFENDANT NCAA'S BRIEF IN SUPPORT OF MOTION TO DISMISS**

Case No. 4:09-cv-03329-CW

subject to NCAA regulations."  Compl. ¶9.  This allegation – frequently adorned with utterly

conclusory (and insufficient) antitrust buzz words like "cartel," "group boycott" and "illegal

conspiracy" – is repeated several times throughout the complaint.  *See, for example, id.* at ¶13.

O'Bannon also alleges that the "NCAA further requires student-athletes to sign at least one other

similarly illegal consent form pursuant to Article 12.5.1.1 of its Bylaws" that allegedly "allows

schools and conferences to commercially exploit former student-athletes by effecting another

purported perpetual release of rights."  *Id.* at ¶10.  O'Bannon then speculates that the NCAA and

others use these forms as the basis for their "collegiate licensing."  *Id.* at ¶¶11-13.

      In other allegations, however, O'Bannon claims that those forms "do not in any way grant

licenses in perpetuity," and later alleges that "no reasonable person" would read the forms to do

so.  *Id.* at ¶¶12, 69.  In these portions of the complaint, O'Bannon seems to claim that the

conspiracy is between the NCAA, its members and perhaps third parties to willfully

"misinterpret" the forms to somehow freeze former student-athletes out of the "market."  *Id.* at

¶12.  O'Bannon alleges no facts to support this implausible claim.

## LEGAL STANDARD

      A Rule 12(b)(6) motion tests the legal sufficiency of the claims asserted in the complaint.

A Rule 12(b)(6) dismissal is proper where there is either a "lack of a cognizable legal theory" or

"the absence of sufficient facts alleged under a cognizable legal theory." *Balistreri v. Pacifica*

*Police Dep't,* 901 F.2d 696, 699 (9th Cir. 1988).

      While the court must accept all factual allegations pleaded in the complaint as true, it need

not accept as true unreasonable inferences or conclusory legal allegations cast in the form of

factual allegations. *See Bell Atlantic Corp. v. Twombly*, 550 U.S. 544; 127 S. Ct. 1955, 1965

(2007).  This is particularly true in the context of antitrust claims, because "'the costs of modern

federal antitrust litigation and the increasing caseload of the federal courts counsels against sending the parties into discovery when there is no reasonable likelihood that the plaintiffs can construct a claim from the events related in the complaint."' *Id.* at 1967 (*quoting Car Carriers, Inc. v. Ford Motor Co.*, 745 F.2d 1101, 1106 (7th Cir. 1984) (alteration deleted)); *see also Cascade Health Solutions v. PeaceHealth*, 515 F.3d 883, 905 (9th Cir. 2008) (noting the potential burden of antitrust trials, and "declin[ing] to adopt a rule that might encourage more antitrust litigation than is reasonably necessary to ferret out anticompetitive practices").

## ARGUMENT

To prevail on his Section 1 claims, O'Bannon must prove three elements: (1) an agreement or conspiracy intended to restrain trade; (2) which actually restrains trade; and (3) which causes an injury to competition. *Les Shockley Racing, Inc. v. Nat'l Hot Rod Ass'n*, 884 F.2d 504, 507 (9th Cir. 1989). Further, the plaintiff must establish both the relevant market and market power. *Newcal Indus., Inc. v. Ikon Office Solution*, 513 F.3d 1038, 1045 (9th Cir. 2008). O'Bannon has not adequately alleged any of these elements.

## I.   O'BANNON HAS FAILED TO ALLEGE A PERSONAL CLAIM AGAINST THE NCAA

Despite its prolixity, the complaint's allegations about Mr. O'Bannon are remarkably spare. The complaint alleges that he played basketball at UCLA from 1991 through 1995, Compl. ¶25; that he has supposedly "been deprived of compensation by Defendants and their co-conspirators for the continued use of his image following the end of his intercollegiate career," *id*; and that it is possible to purchase video, pictures or video games of UCLA games in which he participated as a player, *id*. at ¶¶26-33. The complaint says nothing further about O'Bannon.

O'Bannon has not even attempted to explain how he, personally, was "injured" by the NCAA's "conspiracy" to force student-athletes to sign Form 08-3a or documents like it, or its "conspiracy" to "misinterpret" those forms. The complaint:

- Does **not** allege that O'Bannon signed Form 08-3a, any other document identified in the complaint, or any documents like them;

- Does **not** allege that O'Bannon has ever attempted to sell or license any kind of image or likeness of himself playing basketball for UCLA;

- Does **not** allege that NCAA, acting alone or in combination with others, has ever prevented O'Bannon from selling or licensing an image of himself playing basketball for UCLA; and

- Does **not** allege that the NCAA, UCLA or anyone else has ever denied him compensation for his collegiate image because he has signed a "perpetual release," or that O'Bannon **personally** has been injured in any way by the NCAA's alleged "wrongdoing."

The complaint, in other words, contains literally no allegations that even attempt to connect the "wrongdoing" identified in the complaint to anything that Mr. O'Bannon has done or not done, or to any "injury" that Mr. O'Bannon has supposedly suffered.

Each of these failures is fatal, as we explain below.

A.      **O'Bannon has failed to adequately allege that defendants are restraining him from selling his images**

First, O'Bannon's complaint suffers from a startlingly basic – but nonetheless fatal – flaw: O'Bannon has not alleged that he, personally, ever signed **any** of the forms that he now claims the NCAA and its "co-conspirators" have used as "perpetual waivers" for the purpose of "boycotting" O'Bannon in his supposed attempts to sell his UCLA image. *Cf.* Compl. ¶¶9, 10.

These should have been easy facts for O'Bannon to allege (even though he graduated from UCLA more than a decade ago), if they were in fact true. His failure to do so is telling and is reason enough to dismiss the complaint. *Dry v. Methodist Medical Center of Oak Ridge, Inc.*,

No. 89-5470, 893 F.2d 1334, at *3 (6th Cir. Jan. 19, 1990) (finding that the omission of an essential fact in a complaint "strongly implies its nonexistence").   In a case which begins and ends with the notion that the NCAA has "restrained trade" by supposedly forcing Mr. O'Bannon to sign a "perpetual release" under "duress," and then using that "perpetual release" to freeze him out of the "collegiate licensing" market, it was incumbent on Mr. O'Bannon to allege that he had, in fact, signed the alleged "perpetual release."   O'Bannon is not entitled to have the NCAA, or this Court, simply pretend that he has made the key allegation on which his entire case rests.[1]   *Twombly*, 127 S. Ct. at 1965 ("[A] plaintiff's obligation to provide the 'grounds' of his 'entitlement to relief' requires more than labels and conclusions . . .Factual allegations must be enough to raise a right to relief above the speculative level"); *Kendall v. Visa U.S.A., Inc.*, 518 F.3d 1042, 1047 (9th Cir. 2008); *Sprewell v. Golden State Warriors*, 266 F.3d 979, 988 (9th Cir. 2001).

Nor has O'Bannon alleged any facts to support his claim that the NCAA has actually prevented him from selling his images playing basketball for UCLA, through improper use of the "perpetual release" or any other means – another missing set of facts easy to allege if true.   In a case in which he alleges that the NCAA has "restrained" or "excluded" him from selling his image as a UCLA basketball player, it was incumbent on O'Bannon to allege (1) that he has actually attempted to sell such images and (2) that the NCAA has prevented him from doing so. His failure to do so necessitates that his complaint be dismissed.   *Twombly*, 127 S. Ct. at 1965; *Kendall,* 518 F.3d at 1047; *Dry*, 893 F.2d 1334 at *3.

---

[1]      The fact that O'Bannon has brought this case as a putative class action in no way relieves him of his obligation to plead facts sufficient to support his own claims.  *Parrish v. National Football League Players Ass'n*, 534 F. Supp. 2d 1081, 1094 (N.D. Cal. 2007); *Mathison v. Bumbo*, No. SA CV08-0369, 2008 U.S. Dist. LEXIS 108511, at *6-7 (C.D. Cal. 2008); *Situ v. Leavitt*, No. C06-2841, 2006 WL 1530129, at *1 (N.D. Cal. June 2, 2006).

**DEFENDANT NCAA'S BRIEF IN SUPPORT OF MOTION TO DISMISS**
Case No. 4:09-cv-03329-CW

**B.      O'Bannon has failed to allege Article III standing, antitrust standing or antitrust injury**

The pleading failures identified above do not merely compel dismissal on *Twombly* grounds.  O'Bannon has also failed to allege facts sufficient to establish that he has either Article III standing, or antitrust standing, to pursue the claims identified in the complaint.

1.      O'Bannon has failed to allege Article III standing

First, O'Bannon's failure to allege any facts connecting the NCAA's supposed wrongdoing to any injury that O'Bannon himself has supposedly suffered means that O'Bannon has failed to satisfy Article III's "case or controversy" requirement.  As noted above, the complaint contains no allegation that O'Bannon has ever attempted to sell his UCLA image, or participate in any other way in the so-called "collegiate licensing market," let alone allegations that his attempts to do so have been frustrated or thwarted by the defendants' alleged "conspiracy."

O'Bannon has failed, in other words, to plead any facts demonstrating that he has suffered an actual, personal injury as a result of the alleged wrongdoing.  This failure deprives him of standing to bring his claims.  In order to satisfy the standing requirement, O'Bannon is required to allege (1) that he suffered an injury-in-fact, i.e., interference with a right that is "concrete and particularized" and "actual or imminent and not conjectural or hypothetical;" (2) that the defendants' alleged wrongful act caused the injury; and (3) that the injury is likely to be redressed by a favorable ruling.  *See Lujan v. Defenders of Wildlife*, 504 U.S. 555, 560-61 (1992); *Renee v. Duncan*, 573 F.3d 903, 908 (9th Cir. 2009); *Pritikin v. Department of Energy*, 254 F.3d 791, 796-97 (9th Cir. 2001).

O'Bannon has failed to satisfy at least the first two prongs of the standing test: he has not alleged that he has suffered an injury-in-fact, and he has not alleged that the NCAA's alleged wrongdoing caused him any injury.  The Ninth Circuit's recent decision in *Gerlinger v.*

7

**DEFENDANT NCAA'S BRIEF IN SUPPORT OF MOTION TO DISMISS**
Case No. 4:09-cv-03329-CW

1    *Amazon.com Inc.*, 526 F.3d 1253 (9th Cir. 2008) is directly on point.  The plaintiff in *Gerlinger*

2    was a customer of Amazon.com who claimed that Amazon and Borders Books had entered into a

3    *per se* illegal price fixing and market allocation agreement when they agreed that Amazon would

4    take over operation of the Borders website.  526 F.3d at 1255.  The Ninth Circuit  held that

5    Gerlinger had failed to establish Article III standing for his antitrust claims because he had failed

6    to "show or even allege that ***he himself*** experienced any reduced selection of titles, poorer service

7    or any other potentially conceivable form of injury, or "that he paid higher prices after the

8    agreement than he would have paid otherwise."  *Id.* at 1256 (emphasis added).

9

10        O'Bannon's claims fail for the same reason.  As noted above, he has failed to allege that he

11    himself has been prevented from selling his collegiate images, or received reduced prices for

12    those images, or suffered "any other potentially conceivable form of injury," *id.*, as a result of the

13    NCAA's alleged wrongdoing.  He therefore does not have standing to pursue an antitrust action

14    based on that alleged wrongdoing.[2]  The complaint should be dismissed.

15

16                        2.    O'Bannon has failed to allege antitrust standing

17        O'Bannon's failure to allege facts demonstrating that the NCAA's alleged "restraint" has

18    had any effect on his ability to sell his image as a UCLA basketball player also means that he has

19    failed to allege antitrust injury or antitrust standing.  In order to establish antitrust standing,

20    O'Bannon must adequately allege and prove antitrust injury.  *Glen Holly Entertainment, Inc. v.*

21    *Tektronix Inc.*, 352 F.3d 367, 371 (9th Cir. 2003); *Cyntegra, Inc. v. Idexx Laboratories*, 322 Fed.

22    Appx. 569, 572 (9th Cir. 2009).  Antitrust injury is made up of four elements: "(1) unlawful

23    conduct, (2) causing an injury to the plaintiff, (3) that flows from that which makes the conduct

24

25    ――――――――――――
     [2]    Again, O'Bannon's obligation to show that he personally has standing to pursue these
26    claims is not lessened by the fact that he purports to represent a class.  *See, e.g., Warth v. Seldin*,
     422 U.S. 490, 508 (1975) ("the plaintiff still must allege a distinct and palpable injury to himself,
27    even if it is an injury shared by a large class of other possible litigants").

28
―――――――――――――――――――――――――――――――――――――――――――――
                                            8
                **DEFENDANT NCAA'S BRIEF IN SUPPORT OF MOTION TO DISMISS**
                              Case No. 4:09-cv-03329-CW

1    unlawful, and (4) that is of the type the antitrust laws were intended to prevent." *Glen Holly*, 352

2    F.3d at 372.

3            Antitrust injury "is defined not merely as injury caused by an antitrust violation, but more

4    restrictively as 'injury of the type the antitrust laws were intended to prevent and that flows from

5    that which makes defendants' acts unlawful.'" *Id.* at 371, *quoting Brunswick Corp. v. Pueblo*

6    *Bowl-O-Mat, Inc.,* 429 U.S. 477, 489 (1977).   As the Ninth Circuit has explained:

7

8            To show antitrust injury, a plaintiff must prove that his loss flows from an
             anticompetitive aspect or effect of the defendant's behavior, since it is inimical to
9            the antitrust laws to award damages for losses stemming from acts that do not hurt
             competition.  If the injury flows from aspects of the defendant's conduct that are
10           beneficial or neutral to competition, there is no antitrust injury, even if the
             defendant's conduct is illegal *per se*.
11

12   *Rebel Oil Co. v. ARCO*, 51 F.3d 1421, 1433 (9th Cir. 1995).  Accordingly, "the antitrust laws are

13   only concerned with acts that harm 'allocative efficiency **and** raise the price of goods above their

14   competitive level . . .'" *Pool Water Products v. Olin Corp.*, 258 F.3d 1024, 1034 (9th Cir. 2001)

15   (quoting *Rebel Oil*, 51 F.3d at 1433) (emphasis in original).

16           Additionally, "the injured party must be a participant in the same market as the alleged

17   malefactors." *Id.; see also American Ad Management, Inc. v. General Telephone Co. of*

18   *California*, 190 F.3d 1051, 1057-58 (9th Cir. 1999).  In other words, the party alleging the injury

19

20   must be either a consumer of the alleged violator's goods or services or a competitor of the

21   alleged violator in the restrained market." *Eagle v. Star-Kist Foods, Inc.*, 812 F.2d 538 (9th Cir.

22   1987).

23           O'Bannon's claims flunk the antitrust injury test in several ways.

24

25           **O'Bannon has not alleged that he is an actual or potential competitor in the**

26   **"market."** First, O'Bannon has failed to allege facts showing that he was an actual competitor,

27   or ready to be a competitor, in the alleged relevant market.  "Only an actual competitor or one

28

---

9

**DEFENDANT NCAA'S BRIEF IN SUPPORT OF MOTION TO DISMISS**
Case No. 4:09-cv-03329-CW

ready to be a competitor can suffer antitrust injury." *Bourns, Inc. v. Raychem Corp.*, 331 F.3d 704, 711 (9th Cir. 2003). A prospective participant in a market has standing only if he alleges facts to show "a genuine intent to enter the market and a preparedness to do so." *Bubar v. Ampco Foods, Inc.*, 752 F.2d 445, 450 (9th Cir. 1985).

O'Bannon has alleged no facts to show that he is an actual competitor in the "collegiate licensing market," or that he has "a genuine intent to enter the market and a preparedness to do so." He has alleged no facts demonstrating that he has ever attempted to sell or license his image as a UCLA basketball player, or that he has any plans or ability to do so in the future. As this Court has recently held, this failure is fatal to his claims. In *Parrish v. National Football League Players Association*, 534 F. Supp. 2d 1081 (N.D. Cal. 2007), this Court dismissed a claim brought by former NFL players alleging that the NFL Players Association had illegally licensed their names, images and likenesses. One reason for the dismissal was the players' failure to allege that they had taken any steps to license their own image or that they competed in the licensing "market" in any way. *Id.* at 1091. O'Bannon's claim fails for the same reason.

**O'Bannon has not alleged that the NCAA's "wrongful" conduct injured him.** As noted above, O'Bannon has also failed to allege that he has actually been "restrained" in his attempts to sell his own image as a UCLA basketball player, or indeed that he even owns such images. *See* Section I.A., above. He has thus failed to allege that he has actually been injured by the NCAA's alleged "restraint." For this reason as well, he has failed to allege antitrust injury.

**O'Bannon has not alleged an injury that the antitrust laws were designed to prevent**. Finally, O'Bannon has failed to allege that his alleged injury – whatever that is – flows from an allegedly anticompetitive act by the NCAA, i.e., an act that harms "allocative efficiency *and* raise[s] the price of goods above their competitive level." The complaint contains no allegation

---

10

**DEFENDANT NCAA'S BRIEF IN SUPPORT OF MOTION TO DISMISS**
Case No. 4:09-cv-03329-CW

of fact demonstrating that the alleged "restraint" has caused the output of products in the "collegiate licensing market" to go down, or has raised the prices of those "products." While the complaint contains the bare allegation that the supposed restraint "has artificially limited supply and depressed prices" for use of former student-athletes' collegiate images, Compl. ¶182, the Ninth Circuit has long held that such boilerplate allegations are insufficient. To allege antitrust injury, O'Bannon "may not merely recite the bare legal conclusion that competition has been restrained unreasonably." *Les Shockley*, 884 F.2d at 508. "[A]t a minimum," he must "sketch the outline of the antitrust violation with allegations of supporting factual detail." *Id.*; *see also Rutman Wine Co. v. E. & J. Gallo Winery*, 829 F.2d 729, 736 (9th Cir. 1987) ("The pleader may not evade [antitrust] requirements by merely alleging a bare legal conclusion; if the facts do not at least outline or adumbrate a violation of the Sherman Act, the plaintiffs `will get nowhere merely by dressing them up in the language of antitrust.").

Indeed, O'Bannon's real complaint does not appear to be that the NCAA has restrained competition in the "collegiate licensing market;" but rather that the NCAA has allegedly *engaged* in such competition and has failed to pay O'Bannon the sums he believes he is due from the NCAA's efforts. *See* Compl. ¶183 ("Plaintiff and the members of the Class received less than they otherwise would have received for the use of their images in a competitive marketplace, were thus damaged, and seek to recover for those damages"). That is simply not antitrust injury. *JES Properties, Inc. v. USA Equestrian, Inc.*, No. 802CV1585T24MAP, 2005 WL 1126665, at *11 (M.D. Fla. May 9, 2005) (not being able to share in alleged monopoly profits is not antitrust injury); *Daniel v. American Bd. of Emergency Medicine*, 269 F. Supp. 2d 159, 183-84 (W.D.N.Y. 2003) (plaintiff's inability to charge allegedly artificially inflated prices not antitrust injury); *Indiana Telecom Corp. Inc. v. Indiana Bell Telephone Co., Inc.*, No. IP97-1532-C-H/G, 2001 WL

1168169, at *13 (S.D. Ind. Sept. 25, 2001) ("Loss of business to a competitor is not, without more, an antitrust injury.").

O'Bannon has, in sum, utterly failed to allege facts sufficient to support his claim that he has suffered any injury at all, let alone antitrust injury.  That failure is reason enough to dismiss the complaint.

## II.  O'BANNON HAS FAILED TO ALLEGE THAT THE NCAA HAS "CONSPIRED" TO "RESTRAIN TRADE"

Nor has O'Bannon alleged facts sufficient to support his claim that the NCAA has been conspiring with its member schools or conferences to "restrain" trade in a "collegiate licensing market."

### A.  O'Bannon has failed to allege that the NCAA is "restraining" trade, even if the factual deficiencies of his complaint are ignored

First, O'Bannon has utterly failed to allege facts demonstrating that the NCAA has actually restrained trade in any market.  Although the complaint is replete with conclusory allegations that the NCAA and its "co-conspirators" have artificially "fixed" the price of former student-athlete image rights at zero, or have "boycotted" former student-athletes who wanted to sell images of themselves playing college ball, the complaint contains no factual allegations to back those claims up.  There is not a single alleged instance of the NCAA preventing O'Bannon, or anyone else, from selling his collegiate image after graduation.  Nor is there a single alleged instance of O'Bannon, or anyone else, being told that the price for his collegiate image is zero, because the NCAA had secured a "perpetual release" for those images.

On the contrary: O'Bannon *admits* that former student-athletes are not restrained from making individual deals for the sale of their collegiate images.  In Paragraph 133 of the complaint, O'Bannon alleges that former NCAA football players have struck deals with

**DEFENDANT NCAA'S BRIEF IN SUPPORT OF MOTION TO DISMISS**
Case No. 4:09-cv-03329-CW

McFarlane Toys to produce "action figures" in which they are shown playing in their collegiate uniforms. O'Bannon admits that the former student-athletes *will receive a royalty* from McFarlane Toys – as will the schools in question, for use of their uniforms. *Id.* There is no mention of the NCAA receiving any money, nor is there any mention of the NCAA using its alleged "perpetual release" to prevent the former student-athletes from receiving payment for the use of their images. *Id.*

O'Bannon makes a similar admission in Paragraph 143, where he admits that former NCAA football players have entered into licensing deals with Electronic Arts to use their collegiate likenesses in advertisements for EA's video games. Again, there is no mention of the NCAA receiving any money, nor is there any mention of the NCAA using its alleged "perpetual release" to prevent those former student-athletes from receiving payment for the use of their images. *Id.*

The complaint cannot survive these admissions that former student-athletes are free to enter into licensing agreements for their collegiate images, especially when those admissions are coupled with O'Bannon's utter failure to allege facts to support his conclusory claim that the NCAA somehow uses its forms as a "perpetual release" to block such payments (or divert them to itself). O'Bannon cannot sue the NCAA for restraining trade without first alleging facts demonstrating that the NCAA has actually done so. *Rutman Wine*, 829 F.2d at 736 ("if the facts do not at least outline or adumbrate a violation of the Sherman Act, the plaintiffs `will get nowhere merely by dressing them up in the language of antitrust.").

**B.** **O'Bannon's "Form 08-3a" allegations are insufficient to state a Section 1 claim**

Moreover, none of O'Bannon's "conspiracy" allegations are sufficient to support his Section 1 claim even when taken on their own terms. While O'Bannon focuses most of his

13

attention on what he calls NCAA Form 08-3a, that language provides no support for O'Bannon's "perpetual license" theory:

> You authorize the NCAA [or a third party acting on behalf of the NCAA (e.g., host institution, conference, local organizing committee)] to use your name or picture to generally promote NCAA championships or other NCAA events, activities, or programs.

Compl. ¶65.  Form 08-3a thus provides only that the NCAA, or someone acting on its behalf, can use a student-athlete's "name or picture" to promote NCAA events, activities or programs.  It does not purport to grant **anyone** other than the NCAA any rights, nor does it grant permission for any use other than the promotion of **NCAA events**.  It says nothing about granting UCLA, or any other NCAA member school, the right to use student-athlete images, before or after graduation.  It says nothing about the use of student-athlete images in video games.  And perhaps most importantly, it says absolutely nothing about the right of a former student-athlete to sell his own collegiate image after graduation.  O'Bannon has not even tried to allege that it somehow grants the NCAA an exclusive license to his or anyone else's image.  He alleges, instead, the opposite.

These shortcomings in O'Bannon's "Form 08-3a" theory are compounded by the fact that the vast majority of the "revenue streams" that the complaint identifies, *see* Compl. ¶104, have no arguable relation to the authorization found in Form 08-3a.  For the companies and products listed in the complaint, O'Bannon has failed to allege (1) that the NCAA is making sales of these products, (2) that sales are made pursuant to a "perpetual release," or (3) that the companies listed are making sales as part of a conspiracy with the NCAA to misinterpret Form 08-3a or any other release.  *See id.* at ¶114 (CBS and DVDs of NCAA championship broadcasts); ¶¶135-148 (Electronic Arts and video games); ¶132 (Replay Photo and photographs); ¶¶149-155 (ESPN, the Big Ten Network and Brigham Young University and "classic" college football and basketball games); ¶¶157-165 (Wal-Mart and replica jerseys).

There is thus a fundamental mismatch between O'Bannon's alleged "restraint" – e.g., the "unconscionable release" that allows the NCAA (only) to use his name or image when promoting its championships or "events, activities or programs" (only) – and the licensing activity that O'Bannon claims results from that "restraint," most of which does not even allegedly involve actions by the NCAA to promote its championships or events.  O'Bannon's bare and conclusory allegations provide no reasonable basis for inferring that the Form 08-3a "release" is somehow responsible for O'Bannon's alleged failure to receive the payment he thinks he is owed from the commercial activities identified in the complaint.  *Twombly*, 127 S. Ct. at 1965.

O'Bannon attempts to solve this problem by alleging that the NCAA and its member institutions have all "conspired" to "misinterpret" Form 08-3a to allow such activity.  Compl. ¶12. The problem is that O'Bannon has not alleged a single fact to support his wholly conclusory allegation that the NCAA is orchestrating a vast conspiracy to "misinterpret" the terms of its own forms.  O'Bannon's fanciful claims cannot survive in the absence of such allegations.  *See In re Static Random Access Memory (SRAM) Antitrust Litig.*, 580 F. Supp. 2d 896, 904 (N.D. Cal. 2008) (Wilken, J.); *International Norcent Technology v. Koninkijke Philips Electronics N.V.*, No. CV 07-00043, 2007 U.S. Dist. LEXIS, at *38-39 (C.D. Cal. Oct. 29, 2007) ("As with the magic words "coerce," "combine," and "conspiracy," a mere allegation that parties entered into an agreement to restrain trade does not suffice to state a § 1 claim"); *Floors-N-More, Inc. v. Freight Liquidators*, 142 F. Supp. 2d 496, 501 (S.D.N.Y. 2001) ("plaintiff must do more than allege the existence of a conspiracy – it must allege some facts in support of the claim"); *Petrochem Insulation, Inc. v. Northern Cal. & N. Nev. Pipe Trades Council*, No. C-90-3628, 1992 WL 131162, at *6 (N.D. Cal. Mar. 19, 1992) (dismissing a complaint that "fail[ed] to state with whom

the supposed agreement was made; what its terms were; . . . or [to] state what acts any defendant undertook in furtherance of it").

O'Bannon also appears to claim that Form 08-3a is used by the NCAA to prohibit schools from "compet[ing] against each other by offering higher amounts of post-graduation licensing revenues to student athletes."  Compl. ¶85.  Again, however, Form 08-3a does not even arguably do so.  It gives the NCAA permission to use a student-athlete's "name or picture" to promote NCAA "events, activities or programs."  And that is all it does.  Form 08-3a, according to the terms O'Bannon himself has alleged, simply does not address the question whether NCAA members may, consistent with NCAA rules, "compete[] against each other by offering higher amounts of post-graduation licensing revenues to student-athletes."[3]

### C.    O'Bannon's "Bylaw 12.5.1.1" allegation is not sufficient

O'Bannon also alleges that the "NCAA further requires student-athletes to sign at least one other similarly illegal consent form pursuant to Article 12.5.1.1 of its Bylaws (the "Institutional, Charitable, Educational or Nonprofits Promotions Release Statement"), that allows schools and conferences to commercially exploit former student-athletes by effecting another purported perpetual release of rights."  Compl. ¶10.

The problem, again, is that the Bylaw in question says no such thing.

Bylaw 12.5.1.1 – *as O'Bannon admits* – does not require student-athletes to provide their schools with a release.  Bylaw 12.5.1.1 says only that NCAA schools "may use a student-athlete's name, picture or appearance to support its charitable or educational activities or to support activities considered incidental to the student-athlete's participation in intercollegiate athletics" *if*

---

[3]    There are NCAA Bylaws that address this topic, but O'Bannon is not challenging them in this litigation.

they obtain a release from the student-athlete "ensuring that the student-athlete's name, image or appearance is used in a manner consistent with the requirements of this section."  Compl. ¶74 (quoting NCAA Division I Bylaw 12.5.1.1(i)).  The Bylaw does ***not*** say that student-athletes must provide the release upon request, *id.*, nor has O'Bannon identified any Bylaw that requires a student-athlete to do so or any Bylaw that requires a school to solicit such a release.[4]  O'Bannon cannot turn Bylaw 12.5.1.1 into a NCAA-mandated release simply by labeling it as such.

Moreover, Bylaw 12.5.1.1 applies only to student-athletes; it does not even mention former student-athletes.  Compl. ¶74.  By his own admission, O'Bannon was not a student-athlete at any time relevant to his claims.  *Id.* at ¶¶1, 2.  O'Bannon has not even attempted to explain, or allege facts to demonstrate, how a NCAA rule that applies only to student-athlete likenesses could have been used by the NCAA, or anyone else, to "restrain" him from selling his image as a UCLA basketball player ***when he was no longer a student-athlete***.  Even if one ignores all of the other flaws with O'Bannon's conclusory claim that Bylaw 12.5.1.1 results in a "mandated release" that creates an "unconscionable contract," *id.* at ¶75, O'Bannon's claim founders on the fact that the "contract," according to the "terms" O'Bannon himself has alleged, did not apply to O'Bannon during the time period relevant to this case.

Finally, O'Bannon has alleged no facts sufficient to demonstrate how the Bylaw 12.5.1.1 "release" is supposedly used by the NCAA, its member institutions, or anyone else to restrain

---

[4]  O'Bannon attempts to address this issue in Paragraph 78 of the complaint, but those allegations do not come close to fixing the problem.  First, that paragraph says nothing about the ***NCAA*** requiring student-athletes to sign the "release" forms, nor does it say anything about NCAA members agreeing to require such signatures.  Without such allegations, O'Bannon's Section 1 claim goes nowhere.  Second, the paragraph discusses only Iowa and Iowa State – not UCLA, or any other of the more than 300 Division I schools – and is thus simply irrelevant to O'Bannon's claim.  Finally, the paragraph does not even demonstrate that Iowa and Iowa State "require" their student-athletes to sign the supposed "release" forms; rather, it says that Iowa sells the likenesses of student athletes only when it has the "signed permission" of the student-athlete.

trade in the "collegiate licensing market."   Although O'Bannon has made the conclusory

allegation that "the NCAA's members" use the Bylaw 12.5.1.1 "release" to "engage in unlawful

licensing" of former student-athlete images, *id.* at ¶75, and to "exclude both current and former

student-athletes" from the "market," *id.* at ¶81, he provides no facts to support, or even explain,

these claims.[5]   His conclusory allegations are entitled to no deference on this motion in the

absence of such alleged facts.[6]

### D.   O'Bannon has alleged no other facts sufficient to support his conspiracy allegations

Nor are O'Bannon's allegations saved by the conclusory boilerplate that he has sprinkled

throughout the complaint regarding the NCAA's alleged "conspiracy" with its "co-conspirators"

to engage in a "group boycott" or otherwise "restrain" him from selling his image as a UCLA

basketball player.   After *Twombly*, such allegations are not even arguably sufficient to support a

Section 1 claim of conspiracy.   *Twombly*, 127 S. Ct. at 1965; *Rutman Wine*, 829 F.2d at 736; *In re*

*Graphics Processing Units Antitrust Litigation*, 527 F. Supp. 2d 1011, 1023 (N.D. Cal. 2007).   A

complaint must answer the basic questions: "who did what, to whom (or with whom), where, and

when." *Kendall,* 518 F.3d at 1047-48 ("A bare allegation of a conspiracy is almost impossible to

---

[5]     Moreover, the vast majority of the "revenue streams" that O'Bannon has alleged result
from the NCAA's "restraint" has nothing to do with Bylaw 12.5.1.1 – which merely states that
schools do not violate NCAA rules by using student-athlete likenesses to support the schools'
"charitable or educational activities or to support activities considered incidental to the student-
athlete's participation in intercollegiate athletics."   The complaint's allegations do nothing to
connect the NCAA's decision to allow schools to use student-athlete likenesses for charitable or
educational activities, on the one hand, with O'Bannon's claim that he has been "restrained" from
selling his image as a UCLA basketball player in the "markets" identified in the complaint, on the
other.   O'Bannon's Bylaw 12.5.1.1 theory is a *non sequitur.*
[6]     O'Bannon's "Bylaw 12.5.1.7" theory fails for all of the reasons his Bylaw 12.5.1.1 theory
fails.   The text of the Bylaw does not even arguably support O'Bannon's claim that the NCAA
uses the Bylaw as part of some conspiracy to "restrain" the "collegiate licensing market" through
an assertion of "perpetual releases."   O'Bannon's wholly conclusory claim to the contrary is not
sufficient to support his claims.

**DEFENDANT NCAA'S BRIEF IN SUPPORT OF MOTION TO DISMISS**
Case No. 4:09-cv-03329-CW

defend against, particularly where the defendants are large institutions with hundreds of employees").

### III.    O'BANNON HAS FAILED TO ALLEGE INJURY TO COMPETITION

O'Bannon has also failed to allege facts demonstrating that the NCAA's alleged wrongdoing has caused an injury to competition as a whole in the alleged "collegiate licensing market," either by causing the output of products in the "collegiate licensing market" to go down, or raising the prices of those "products."  This, too, is fatal to his claims.

The antitrust laws exist to protect competition as whole, not to protect individual competitors, which O'Bannon cannot even seriously claim to be.  *See Gough v. Rossmoor Corp.*, 585 F.2d 381, 386 (9th Cir. 1978) ("the antitrust laws . . . were enacted for 'the protection of Competition, not Competitors,'" *quoting Brunswick Corp.*, 429 U.S. at 488 (1977)).  For this reason, O'Bannon was required to allege injury to competition as a whole "within a field of commerce in which [he] is engaged." *McGlinchy v. Shell Chemical Co.*, 845 F.2d 802, 811 (9th Cir. 1988); *see also Gough*, 585 F.2d at 386 ("The conduct must have an adverse impact on the competitive conditions in general as they exist within the field of commerce in which the plaintiff is engaged").

Moreover, O'Bannon "may not merely recite the bare legal conclusion that competition has been restrained unreasonably." *Les Shockley*, 884 F.2d at 508.  "[A]t a minimum," he must "sketch the outline of the antitrust violation with allegations of supporting factual detail." *Id.*; *see also Rutman Wine*, 829 F.2d at 736.

O'Bannon has failed to allege facts showing that the NCAA's alleged wrongdoing has injured competition as a whole in any relevant market.  While the complaint contains the bare allegation that the supposed restraint "has artificially limited supply and depressed prices" for use

---

19

**DEFENDANT NCAA'S BRIEF IN SUPPORT OF MOTION TO DISMISS**
Case No. 4:09-cv-03329-CW

of former student-athletes' collegiate images, Compl. ¶182, such "bare legal conclusions" are not

sufficient. *Les Shockley*, 884 F.2d at 508; *Rutman Wine*, 829 F.2d at 736. For this reason as well,

the complaint should be dismissed.

## IV.     O'BANNON HAS FAILED TO ALLEGE A RELEVANT MARKET

O'Bannon also fails to adequately allege a relevant market. O'Bannon has the burden of

defining the relevant market. *Tanaka v. USC*, 252 F.3d 1059, 1063 (9th Cir. 2001). A complaint

may be dismissed under Rule 12(b)(6) if the complaint's relevant market definition is facially

unsustainable. *Newcal Indus., Inc.*, 513 F.3d at 1045 (citing *Queen City Pizza, Inc. v. Domino's

Pizza, Inc.*, 124 F.3d 430, 436-37 (3d. Cir. 1997)). First, the relevant market must be defined by

the products or the producers, not its consumers. *Id.* (citing *Brown Shoe v. United States*, 370

U.S. 294, 325 (1962)). Second, the relevant market must encompass the product at issue as well

as all economic substitutes for the product. *Id.* The outer boundary for substitutes is the

reasonable interchangeability or cross-elasticity of demand. *Id.* (citing *Brown Shoe*, 370 U.S. at

325).

If a complaint fails to allege facts regarding substitute products, to distinguish among

apparently comparable products, or to allege other pertinent facts relating to cross-elasticity of

demand, as the complaint here fails to do, a court may grant a Rule 12(b)(6) motion.

### A.     O'Bannon fails to identify a product

Although O'Bannon never explicitly identifies a relevant market, the NCAA assumes for

the purposes of this motion that O'Bannon intends to argue that the relevant market is all

"products" in a so-called (and ill-defined) "collegiate licensing market." Compl. ¶79. This market

fails because O'Bannon has failed to provide anything more than a legal conclusion that this

market exists. *Twombly*, 550 U.S. at 555; *Electronics For Imaging, Inc. v. Coyle*, No. C 01-4853,

2005 WL 1661958, at *3 (N.D. Cal. July 14, 2005) (finding that statement that the market is the "printer control industry" is nothing more than a legal conclusion).

From O'Bannon's vague allegations, the NCAA literally has no idea what is included in the proposed relevant market.  Does it include the licensing of an individual university's trademarks?  The licensing of a coach's likeness?  The licensing of the image of a celebrity attending a college football game?  O'Bannon alleges that the market includes "licensing rights to current and former players' images and likenesses."  Is that the whole market, or just a subset of the market's "products?"

O'Bannon's failure to provide factual allegations that answer these sorts of questions is fatal to his antitrust claims.  When, as here, the complaint does not identify which products are in the alleged market, the proposed relevant market is legally insufficient.  *See Graco, Inc. v. PMC Global, Inc.*, No. 08-1304, 2009 WL 904010 (D.N.J. Mar. 31, 2009) (finding no relevant market when "[i]t is unclear what exactly defines the [in-plant polyurethane processing equipment] market 'materials and equipment' or the 'pump and spray industry'").

### B.   O'Bannon fails to allege facts regarding substitute products

O'Bannon's market allegations are also insufficient because he has failed to allege ***any*** facts to demonstrate that there are no reasonable substitutes for the "products" in the "collegiate licensing market" (whatever those products may be).  *See E&E Co., Ltd. v. Kam Hing Enterprises, Inc.*, No. C-08-0871, 2008 WL 3916256, at *3 (N.D. Cal. Aug. 25, 2008); *Electronics For Imaging, Inc*, 2005 WL 1661958 at *3; *UGG Holdings, Inc. v. Severn*, No. CV 04-1137, 2004 WL 5458426, at *3 (C.D. Cal. Oct. 1, 2004).

Courts have frequently granted motions to dismiss for failures of this sort.  In *Fresh Made, Inc. v. Lifeway Foods, Inc.*, a product market of "specialty Russian dairy foods, including kefir"

was insufficient when the plaintiff failed to allege why these products were distinct from the markets for yogurt, drinkable yogurt products, or even other dairy products in general. *Fresh Made, Inc. v. Lifeway Foods, Inc.*, No. Civ. A. 01-4254, 2002 WL 31246922, at *5-6 (E.D. Pa. Aug. 9, 2002). Similarly, the court in *Adidas America, Inc. v. NCAA* rejected Adidas's claim that the relevant market was "the market for the sale of NCAA Promotional Rights," since Adidas – like O'Bannon – failed to explain or even address why other similar forms of advertising were not reasonably interchangeable with NCAA promotion rights or sponsorship agreements. *Adidas America, Inc. v. NCAA*, 64 F. Supp. 2d 1097, 1103 (D. Kan. 1999).[7]

O'Bannon has failed to make any allegations as to why his proposed relevant market of "collegiate licensing" is sufficiently distinct from other licensing markets.[8] He has not even attempted to demonstrate why other types of licensing opportunities are not seen as reasonable substitutes for "collegiate licensing" opportunities. The complaint should be dismissed.

## V.   O'BANNON'S CLAIMS ARE BARRED BY THE STATUTE OF LIMITATIONS

Finally, O'Bannon's claims must be dismissed because they are time-barred. Sherman Act claims must be brought within four years of their accrual. 15 U.S.C. § 15b; *see Pace Indus., Inc. v. Three Phoenix Co.*, 813 F.2d 234, 236 (9th Cir. 1987). A claim may be dismissed under Rule 12(b)(6) on statute of limitations grounds when "the running of the statute is apparent on the face

---

[7]    *See also UGG Holdings, Inc.*, 2004 WL 5458426 at *4 ("sheepskin, fleece-lined boots" and other boots); *Shepard Indus., Inc. v. 135 East 57th Street, LLC*, No. 97 Civ. 8447, 1999 WL 728641, at *4 (S.D.N.Y. 1991) ("supplemental" cleaning and maintenance services and other kinds of cleaning and maintenance services); *B.V. Optsiche Industrie De Oude Delft v. Hologic, Inc.*, 909 F. Supp. 162, 172 (S.D.N.Y. 1995) ("chest equalization radiography" and "overall X-ray market").

[8]    Nor has O'Bannon alleged facts to support his plainly implausible notion that all licensing rights associated with collegiate sports – from pictures, to television broadcasts, to replica jerseys, to bobbleheads – are somehow properly placed in one "market." *See Ticketmaster LLC v. RMG Techs., Inc.*, 536 F. Supp. 2d 1191, 1196 (C.D. Cal. 2008) ("Someone who wants to attend a Lakers game is not going to find the opportunity to sell tickets on TeamExchange is a reasonable substitute for a ticket to the game.").

---

of the complaint." *Von Saher v. Norton Simon Museum of Art at Pasadena*, --- F.3d ---, No. 07-56691, 2009 WL 2516336, at *13 (9th Cir. Aug. 19, 2009) (citing *Huynh v. Chase Manhattan Bank*, 465 F.3d 992, 997 (9th Cir. 2006)).  A cause of action accrues and the statutes begin to run when a defendant commits an act that injures a plaintiff's business.  *Zenith Radio Corp. v. Hazeltine Research, Inc.*, 401 U.S. 321, 338 (1971).  The statute of limitations runs from the commission of the act.  *Pace Indus., Inc.*, 813 F.2d at 237.

O'Bannon filed the complaint in this matter on July 21, 2009.  In order to avoid being time-barred, O'Bannon's claims must have accrued after July 21, 2005 or fit within some exception to the statute of limitations.  To the extent that O'Bannon's convoluted and unclear complaint has alleged any improper conduct by the NCAA, such conduct occurred either when O'Bannon was allegedly required to sign "Form 08-3a" or "at least one other similar illegal consent form pursuant to Article 12.5.1.1 of its Bylaws," Compl. ¶¶9-10, or when he ceased to be a student-athlete.  O'Bannon's complaint fails to allege when (or even if) he signed either of the forms or when he became a former student-athlete, but, for the purposes of this section, the NCAA will assume that he signed a "perpetual release" sometime between 1991 and 1995 and that he graduated in 1995.  Compl. ¶25.  In any event, his claims certainly accrued well before July 21, 2005.  O'Bannon's antitrust claims are therefore time-barred.

Since O'Bannon's claims are time barred on their face, it falls to O'Bannon to plead an exception to the statute of limitations.  *Wollman v. Gross*, 637 F.2d 544, 549 (8th Cir. 1980); *see also Franklin v. Sacramento Area Flood Control Agency*, No. CIV. 07-1263, 2009 WL 2399569, at *7 (E.D. Cal. Apr. 29, 2009).  He has failed to do so.

O'Bannon may argue that his claims are timely under the "continuing violation" doctrine, *see Pace Indus., Inc.*, 813 F.2d at 237 (citing *Hennegan v. Pacifico Creative Serv., Inc.*, 787 F.2d

---

23

**DEFENDANT NCAA'S BRIEF IN SUPPORT OF MOTION TO DISMISS**
Case No. 4:09-cv-03329-CW

1299 (9th Cir. 1986)), but has failed to allege facts sufficient to demonstrate a continuing violation.   To do so, O'Bannon had to allege facts sufficient to demonstrate that the NCAA committed an overt, injurious act within the limitations period.   *Id.* (citing *Steiner v. 20th Century-Fox Film Corp.*, 232 F.2d 190, 195 (9th Cir. 1956)).   There are two elements that characterize an overt act sufficient to restart the statute of limitations: (1) there must be a new and independent act that is not merely a reaffirmation of a previous act; and (2) it must inflict new and accumulating injury on the plaintiff.   *Id.* at 238.   O'Bannon has alleged neither.

Courts have consistently held that the performance, enforcement or benefit of an agreement made outside the limitations period does not constitute a new and independent act. *Varner v. Peterson Farms*, 371 F.3d 1011, 1020 (8th Cir. 2004); *Eichman v. Fotomat Corp.*, 880 F.2d 149, 160 (9th Cir. 1989); *Aurora Enters. v. NBC*, 688 F.2d 689, 694 (9th Cir. 1982); *Trane U.S. Inc. v. Meehan*, 563 F. Supp. 2d 743 (N.D. Ohio 2008).   O'Bannon's claims here begin and end with the notion that the NCAA wrongfully "forced" him to sign a "perpetual release" while he was still in school.   Since he graduated in 1995, Compl. ¶25, the limitations period on O'Bannon's claims expired no later than 1999, and O'Bannon cannot resuscitate those claims by arguing that the "perpetual release" he supposedly signed is still being used to his detriment.   *See Wilson Learning Corp. v. Schlechte*, No. Civ. 04-4703, 2005 WL 2063944 (D. Minn. Aug. 24, 2005) ("where a complaint complains of an anti-competitive agreement, the statute of limitations begins to runs when the claimant becomes subject to the terms of the agreement;" "Later acts in performance of the agreement do not restart the limitations period.") (citing *Varner*, 371 F.3d at 1020); *see also Rx.com v. Medco Health Solutions, Inc.*, 322 Fed. Appx. 394, 397 (5th Cir. 2009) (requiring evidence of "specific act or word of refusal during the limitations period" to find a continuing violation).

1   Having alleged that he has been injured by being "forced" to sign a "perpetual release" in

2   1995 (or earlier),  O'Bannon  cannot avoid the statute of limitations merely by claiming that he

3   has only just noticed the "release" allegedly being used in a manner he dislikes.  *See* Compl. ¶8.

4   Additionally, O'Bannon has pointed to no new "specific act or word of refusal during the

5   limitations period."  The continuing violation doctrine does not apply.

6

7   **VI.     O'BANNON'S COMMON LAW CLAIMS MUST BE DISMISSED**

8           Finally, O'Bannon's common law claims – Counts III (Unjust Enrichment) and IV

9   (Accounting) of the complaint – must be dismissed in light of the infirmity of his antitrust claims.

10  Both of those claims are wholly derivative of the antitrust claims, *see* Compl. ¶¶205, 208, and

11  neither can survive without a finding that the NCAA has actually violated the antitrust laws.

12  *County of Santa Clara v. Astra USA, Inc.,* No. C 05-03740, 2006 WL 2193343, at *6 (N.D. Cal.

13  July 28, 2006).  Since O'Bannon has failed to allege an antitrust violation, his derivative common

14  law claims necessarily fail as well.

15

16                          Respectfully submitted,

17                          MILLER, CANFIELD, PADDOCK AND STONE, P.L.C.

18

19                          By:   *s/ Gregory L. Curtner*
                                  Gregory L. Curtner (*Pro Hac Vice*)
20                                Robert J. Wierenga (SBN 183687)
                                  101 North Main St., 7th Floor
21                                Ann Arbor, MI  48104

22                                Jason A. Geller (SBN 168149)
23                                LONG & LEVIT LLP
                                  465 California Street, 5th Floor
24                                San Francisco, CA  94104

25  Dated:  October 13, 2009          Attorneys for National Collegiate Athletic Association

26

27

28
                                           25

1

**CERTIFICATE OF SERVICE**

2

   I hereby certify that on October 13, 2009, I electronically filed the foregoing document

3

with the Clerk of the Court using the CM/ECF system which will send notification to the e-mail

4

addresses registered and I hereby certify that I have mailed the foregoing document via the U.S.

5

Postal Service to the following non-CM/ECF participant:

6

7

Tanya Chutkan

8

Jack Simms
Boise Schiller & Flexner LLP

9

5301 Wisconsin Ave., Suite 800
Washington DC  20015

10

11

Carl A. Taylor Lopez
Lopez & Fantel

12

1510 114th Avenue
Seattle, WA  98122-4024

13

14

15

16

          By:  *s/ Gregory L. Curtner*

17

              Gregory L. Curtner (*Pro Hac Vice*)
              Attorneys for National Collegiate Athletic Association

18

              101 North Main St., 7th Floor
              Ann Arbor, MI  48104

19

17291292.1\063863-00041

20

21

22

23

24

25

26

27

28

26

**DEFENDANT NCAA'S BRIEF IN SUPPORT OF MOTION TO DISMISS**
Case No. 4:09-cv-03329-CW