1    Michael D. Hausfeld *pro hac vice*        William A. Isaacson
     Megan E. Jones *pro hac vice*             Tanya Chutkan
2    HAUSFELD LLP                              Jack Simms
     1700 K Street, NW                         BOIES, SCHILLER & FLEXNER LLP
3    Suite 650                                 5301 Wisconsin Avenue, Suite 800
     Washington, DC 20006                      Washington, DC 20015
4    Tel: (202) 540-7200                       Tel: (202) 237-2727
     Fax: (202) 540-7201                       Fax: (202) 237-6131
5    Email: mhausfeld@hausfeldllp.com          Email: wisaacson@bsfllp.com
6          mjones@hausfeldllp.com                     tchutkan@bsfllp.com
                                                      jsimms@bsfllp.com
7    Michael P. Lehmann (Cal. Bar No. 77152)
     Jon T. King (Cal. Bar No. 205073)
8    Arthur N. Bailey (Cal. Bar No. 248460)
9    HAUSFELD LLP
     44 Montgomery St., 34th Floor
10   San Francisco, CA 94104
     Tel: (415) 633-1908
11   Fax: (415) 358-4980
     Email: mlehmann@hausfeldllp.com
12          jking@hausfeldllp.com
            abailey@hausfeldllp.com
13

14   *Counsel for Plaintiff and the Proposed Classes*

15   [Additional counsel listed on signature page]
16

17                  **UNITED STATES DISTRICT COURT**

18          **NORTHERN DISTRICT OF CALIFORNIA – OAKLAND DIVISION**

19

20   ED O'BANNON, on behalf of himself      )   Case No. 4:09-cv-03329 CW
     and all others similarly situated,      )
21                                           )
                 Plaintiff,                  )   **PLAINTIFF'S OPPOSITION TO NCAA'S**
22                                           )   **MOTION TO DISMISS THE COMPLAINT**
     v.                                      )
23                                           )   Date: November 17, 2009
     NATIONAL COLLEGIATE ATHLETIC            )   Time: 2:00 p.m.
24   ASSOCIATION (a/k/a the "NCAA"); and     )   Dept: Courtroom 2, 4th Floor
     COLLEGIATE LICENSING COMPANY            )   Judge: Honorable Claudia Wilken
25   (a/k/a "CLC"),                          )
     Defendants.                             )   Date Complaint Filed: July 21, 2009
26                                           )
                                             )
27

28

## TABLE OF CONTENTS

I.     INTRODUCTION AND ISSUES TO BE DECIDED ........................................... 1

II.    FACTUAL ALLEGATIONS ......................................................................... 2

III.   ARGUMENT ............................................................................................. 3

    A.    The Appropriate Standard of Review ...................................................... 3

    B.    Plaintiff Has Adequately Pled A Conspiracy And Its Effects On Him...................... 3

    C.    Plaintiff Has Adequately Pled A Group Boycott ........................................ 8

    D.    Plaintiff Has Article III Standing ........................................................ 10

    E.    Plaintiff Has Established Antitrust Standing And Injury ................................ 12

    F.    The NCAA Misapplies "*Walker Process*" Cases To This Case .......................... 13

    G.    Injury To Competition Is Satisfactorily Established Here ............................. 15

    H.    A Relevant Market Need Not Be Alleged Here ......................................... 16

    I.     Plaintiff's Claims Are Not Time-Barred ............................................... 19

    J.     Plaintiff's Common Law Claims Are Sufficiently Pled ................................. 20

IV.    CONCLUSION ........................................................................................ 21

V.     APPENDIX: SUMMARY OF FACTS ALLEGED IN COMPLAINT ........................... 22

# TABLE OF AUTHORITIES

**Cases**

*Amarel v. Connell*
102 F.3d 1494 (9th Cir.1996)................................................................. 13

*Arizona v. Maricopa County Med. Soc'y.*
457 U.S. 332 (1982)............................................................................ 4

*Armstrong Surgical Center, Inc. v. Armstrong County Memorial Hosp.*
185 F.3d 154 (3d Cir.1999)................................................................. 9

*Associated Gen. Contractors of Cal, Inc. v. Cal. State Council of Carpenters*
459 U.S. 519 (1983).......................................................................... 11

*Bell Atlantic Corp. v. Twombly*
550 U.S. 544 (2007)........................................................................... 6

*Big Bear Lodging Ass'n v. Snow Summit, Inc.*
182 F.3d 1096 (9th Cir. 1999)........................................................... 17

*Blue Shield of Virginia v. McCready*
457 U.S. 465 (1982)............................................................................ 4

*Bourns, Inc. v. Raychem Corp.*
331 F.3d 704 (9th Cir. 2003).............................................................. 14

*Bubar v. Ampco Foods, Inc.*
752 F.2d 445 (9th Cir.1985)............................................................... 14

*Churchill Downs Inc. v. Thoroughbred Horsemen's Group, LLC*
605 F.Supp. 2d 870 (W.D.Ky., 2009)................................................... 8

*Columbia Steel Casting Co., Inc. v. Portland Gen. Elec. Co.*
111 F.3d 1427 (9th Cir.1996)............................................................. 19

*Continental Ore Co. v. Union Carbide & Carbon Corp.*
370 U.S. 690 (1962)............................................................................ 6

*Costco Wholesale Corp. v. Maleng*
522 F.3d 874 (9th Cir. 2008).............................................................. 6

*County of Santa Clara v. Astra USA, Inc.*
No. C 05-03740, 2006 WL 2193343 (N.D. Cal. July 28, 2006)............ 20

*Denney v. Deutsche Bank AG*
443 F.3d 253 (2d Cir. 2006)............................................................... 12

*Dooley v. Crab Boat Owners Ass'n.*
No. C 02-0676 MHP, 2004 WL 902361 (N.D. Cal. Apr. 26, 2004)........ 9

*Federal Trade Comm'n v. Superior Court Trial Lawyers Ass'n*
493 U.S. 411 (1990)............................................................................ 4

*Fortner Enterprises, Inc. v. United States Steel Corp.*
    394 U.S. 495 (1969) ................................................................................. 15

*Fox v. Piche*
    No. 08 Civ.1098, 2008 WL 4334696 (N.D. Cal. Sept. 22, 2008)..................... 19

*Freeman v.San Diego Ass'n of Realtors*
    322 F.3d 1133 (9th Cir. 2003)..............................................................4, 17

*Gerlinger v. Amazon.com Inc.*
    565 F.3d 1253 (9th Cir. 2008)................................................................. 12

*Glen Holly Entertainment, Inc. v. Tectronix, Inc.*
    352 F.3d 367 (9th Cir. 2003)...............................................................12, 15

*Golden Bridge Technology, Inc. v. Nokia, Inc.*
    416 F.Supp.2d 525 (E.D. Tex. 2006) ........................................................ 13

*Greene County Memorial Park v. Behm Funeral Homes, Inc.*
    797 F.Supp. 1276 (W.D.Pa.,1992) ............................................................. 8

*Harkins Amusement Enters., Inc. v. Gen. Cinema Corp.*
    850 F.2d 477 (9th Cir. 1988), *cert. denied*, 488 U.S. 1019 (1989) ........................................ 16

*Hennegan v. Pacifico Creative Serv.*
    787 F.2d 1299 (9th Cir. 1986)................................................................. 20

*In re Abbott Laboratories Norvir Antitrust Litig.*
    Nos. C 04-1511 CW, C 04-4203 CW, 2007 WL 1689899 (N.D. Cal. June 11, 2007) ............ 14

*In re Airport Car Rental Antitrust Litig.*
    474 F.Supp. 1072 (N.D. Cal. 1979)............................................................. 4

*In re Currency Conversion Fee Antitrust Litig.*
    Nos. M 21-95, 05 Civ. 7116 (WHP), 2009 WL 151168 (S.D.N.Y. Jan. 21, 2009)...................12

*In re Netflix Antitrust Litig.*
    506 F.Supp. 2d 308 (N.D. Cal. 2007)......................................................... 14

*In re Static Random Access (SRAM) Antitrust Litig.*
    580 F. Supp. 2d 896 (N.D. Cal. 2008) ........................................................ 7

*In re Tableware Antitrust Litig.*
    363 F.Supp.2d 1203 (N.D. Cal.2005)..........................................................17

*In re Tableware Antitrust Litig.*
    484 F.Supp. 2d 1059 (N.D. Cal. 2007) ....................................................14, 15

*In re Tamoxifen Citrate Antitrust Litig.*
    466 F.3d 187 (2d Cir. 2006)..................................................................... 6

*International Ass'n of Heat and Frost Insulators v. United Contractors Ass'n.,*
   483 F.2d 384 (3d Cir.1973)..............................................................................4

*Jacobi v. Bache & Co.*
   377 F.Supp. 86 (S.D.N.Y.1974)........................................................................4

*Jensen Enterprises Inc. v. AT & T Inc.*
   No. C 06-247 SI, 2007 WL 2009797 (N.D.Cal. Jul 06, 2007)................................12

*Kendall v. VISA U.S.A., Inc.*
   518 F.3d 1042 (9th Cir. 2007)..........................................................................7

*Knevelbaard Dairies v. Kraft Foods*
   232 F.3d 979 (9th Cir. 2000).......................................................................4, 17

*Local 36 of Intern. Fishermen & Allied Workers of America v. U.S.*
   177 F.2d 320 (9th Cir. 1949)............................................................................9

*Lujan v. Defenders of Wildlife*
   504 U.S. 555 (1990)......................................................................................11

*Lujan v. National Wildlife Federation*
   497 U.S. 871 (1989)......................................................................................11

*Malley-Duff & Associates, Inc. v. Crown Life Ins. Co.*
   734 F.2d 133 (3d Cir. 1984).............................................................................9

*McNeil v. National Football League*
   790 F.Supp. 871 (D. Minn.1992).......................................................................5

*Newcal Indus., Inc. v. Ikon Office Solution*
   513 F.3d 1038 (9th Cir. 2008).....................................................................17, 18

*Northern Pacific Rwy. Co v. United States*
   356 U.S. 1 (1958)..........................................................................................16

*Northwest Wholesale Stationers, Inc. v. Pac. Stationery and Printing Co.*
   472 U.S. 284 (1985)........................................................................................8

*Pace Indus., Inc. v. Three Phoenix Co.*
   813 F.2d 234 (9th Cir. 1987)...........................................................................19

*Perry v. Rado*
   504 F.Supp.2d 1043 (E. D. Wash. 2007)...........................................................15

*Plascencia v. Lending 1st Mortg.*
   No. C 07-4485 CW, 2009 WL 2569732 (N.D. Cal. Aug. 21, 2009).........................10

*Pool Water Products v. Olin Corp.*
   258 F.3d 1024 (9th Cir. 2001).........................................................................15

*Rebel Oil Co., Inc. v. Atlantic Richfield Co.*
   51 F.3d 1421 (9th Cir.1995).......................................................................15, 17

*Red Lion Medical Safety, Inc. v. Ohmeda, Inc.*
  63 F.Supp. 2d 1218 (E.D. Cal.1999) ................................................................ 19

*Ross v. Bank of America*
  524 F.3d 217 (2d Cir. 2008).................................................................... 11, 12

*Sony Electronics, Inc. v. Soundview Technologies, Inc.*
  157 F.Supp. 2d 180 (D.Conn. 2001) ................................................................ 4

*St. Paul Fire & Marine Ins. Co. v. Barry*
  438 U.S. 531 (1978) ................................................................................... 8

*Syufy Enters. v. Am. Multicinema, Inc.*
  793 F.2d 990 (9th Cir. 1986)...................................................................... 18

*Total Renal Care, Inc. v. Western Nephrology*
  *and Metabolic Bone Disease*
  2009 WL 2596493 (D. Colo. Aug 21, 2009) ............................................... 13

*United States v. General Motors Corp.*
  384 U.S. 127 (1966) ................................................................................... 9

*Warth v. Seldin*
  422 U.S. 490 (1975) ................................................................................. 11

*Westman Commission Co. v. Hobart Corp.*
  461 F. Supp. 627 (D. Colo. 1978) .............................................................. 9

*Zenith Radio Corp. v. Hazeltine Research*
  401 U.S. 321 (1971) ................................................................................. 19

**Other Authorities**

Black's Law Dictionary
  (8th ed. 2004) ........................................................................................... 8

William C. Holmes, *Antitrust Law Handbook*........................................... 8

1

## I. INTRODUCTION AND ISSUES TO BE DECIDED

2    Plaintiff Ed O' Bannon ("Plaintiff") has filed a 73 page, 210 paragraph "Class Action

3 Complaint" (July 21, 2009) ("Compl." or "Complaint") alleging that the National Collegiate

4 Athletic Association ("NCAA") and Collegiate Licensing Company ("CLC"), among others,

5 committed *per se* violations of federal antitrust laws by engaging in a price-fixing conspiracy and

6 a group boycott/refusal to deal that has unlawfully foreclosed putative Class members from

7 receiving compensation in connection with the commercial exploitation of their images following

8 their cessation of intercollegiate athletic competition. Plaintiff also asserts a claim for unjust

9 enrichment, and requests that the Court require Defendants to provide an accounting of monies

10 claimed to have been unlawfully withheld from class members.

11    The NCAA has moved to dismiss the Complaint on multiple grounds: (1) that Plaintiff has

12 not alleged that Defendants are restraining him from selling his images ("Notice of Motion And

13 Motion To Dismiss The Complaint Pursuant To Fed. R. Civ. P. 12(b)(1), 12(b)(6); Statement of

14 Relief Sought And Memorandum of Points And Authorities In Support," pp. 5-6 (Oct. 13, 2009)

15 ("NCAA Memo")); (2) that Plaintiff has not adequately pled Article III standing, antitrust

16 standing, or antitrust injury (*id*., pp. 7-12); (3); that Plaintiff has failed to allege that the NCAA

17 conspired to restrain trade (*id*., pp. 12-19 ); (4) that Plaintiff has not adequately alleged injury to

18 competition (*id*. pp. 19-20); (5) that Plaintiff has not adequately alleged a relevant market (*id*. pp.

19 20-22); (5) that Plaintiff's claims are barred by the statute of limitations (*id*., pp. 22-25); and (6)

20 that Plaintiff's common law claims must be dismissed (*id*., p. 25). For the reasons set forth below,

21 none of these objections has merit and the NCAA's motion must therefore be denied. [1]

22

23 [1] Defendants are well aware that Plaintiff intends to file an amended complaint after the Court decides Plaintiff's pending motion to consolidate the present case with *Keller v. Electronic Arts,*

24 *Inc., et al*., Case No. CV 09 1967 (CW). Defendants, however, refused to stipulate to a deferral of motion to dismiss briefing until after the filing of the amended complaint. Plaintiff anticipates

25 pleading additional factual material further illustrating the plausibility of Plaintiff's allegations. For example, since the filing of the Complaint, Plaintiff has located detailed and specific material

26 regarding communications and meetings between Defendants NCAA, CLC, and co-conspirator Electronic Arts, Inc. ("EA") regarding the use of current and former players' images in EA's

27 video-games that EA has referred to as an "ongoing discussion." As Plaintiff will plead in more detail, these communications included admissions that "substantial concessions" were obtained

28 allowing more and more realistic depictions of player likenesses including former players. EA noted that the gist of these discussions was "O.K., how far can we go?" The goal of these

## II.    FACTUAL ALLEGATIONS

The NCAA, through its partners and its co-conspirators, has made clear its intent with regard to the use of former NCAA Division 1 student athletes' images:

- "collecting royalties, enforcing trademarks, and *pursuing new market opportunities*" (Compl. ¶97) (emphasis added);

- "delivering value through the preservation and *monetization* of the NCAA's footage assets"  (*id.* ¶120) (emphasis added);

- "drive *revenue generation*" (*id.*) (emphasis added);

- "*monetize* their video assets across the entire spectrum of emerging media" (*id.*) (emphasis added);

- "exploding growth in emerging media such as online and mobile advertising and entertainment translates to *significant new revenue streams* for footage licensing and programming opportunities" (*id.* ¶125) (emphasis added); and

- "*offer platforms* that provide *companies* immediate access to more than 110 million loyal, passionate collegiate fans" (*id.* ¶101) (emphasis added).

The use of these images is not centered on protecting the sanctity of amateur athletics. It is about creating a lucrative stream of revenue, from which Plaintiff, and putative Class members, are being paid an artificially low royalties of zero dollars and being excluded from the market as a result of a group boycott. By their terms, revenue opportunities were designed by the NCAA and its co-conspirators for "colleges, universities, athletic conferences, bowl games, and other collegiate institutions." *Id.* ¶99 (former student athletes are excluded). The "rights to these schools, conferences, and properties include some, or all, of the following:  radio and television programs, publishing, printing, creative design, marketing, licensing, Internet, national

_____

discussions was to maximize profits for all concerned and to avoid compensation obligations to current and former student-athletes whose images are used in the video-games.

1   advertising and signage sales, and numerous lifestyle and event marketing platforms." *Id.* ¶100.

2       The NCAA, its member conference and schools, and its for-profit business partners reap

3   billions[2] of dollars from revenue streams including television contracts, rebroadcasts of "classic"

4   games, DVD game and highlight film sales and rentals, "stock footage" sales to corporate

5   advertisers and others, photograph sales, video game sales, and jersey and other apparel sales.

6   Compl. ¶ 7.   Former student athletes -- whose likenesses are utilized to generate those profits –

7   are paid an artificially set wage of zero dollars by the NCAA and its co-conspirators.   *Id.*

8   Examples of these culled from the Complaint are summarized in the Appendix to this brief.

9       Unlike other cases involving the NCAA, this case does not involve questions of the

10  protection of amateur sports, the student athlete experience, or other goals.  The damages class

11  here (Compl. ¶43) involves *former* student athletes, who are citizens not subject to NCAA

12  governance, and who should be entitled to control, license, and profit from their own image and

13  likeness.

14  ## III.    ARGUMENT

15  ### A.  The Appropriate Standard of Review

16      Plaintiff incorporates by reference the discussion of notice pleading standards under Fed.

17  R. Civ. P. 8 contained in his separate brief responding to CLC's motion to dismiss.

18  ### B.  Plaintiff  Has Adequately Pled A Conspiracy And Its Effects On Him

19      Plaintiff has alleged a horizontal conspiracy or agreement among Defendants and others

20  including the member institutions to fix the compensation to former NCAA Division I student

21  athletes for their images and likenesses at zero. *See* Compl. ¶ 26 (Plaintiff's image has been used

22  "without compensation paid to him").  This conspiracy has been effectuated by numerous

23  affirmative acts, including, *but not limited to*, the use of an anticompetitive "Student Athlete

24  Statement" (NCAA Form 08-3a), the form of which is prescribed in Section 12.5.1.1 of the

25

26  _____

27  [2]   Compl. ¶¶94 (in a 2007-08 analysis, the NCAA reported receiving $552 million for television and marketing rights fees), 105 (NCAA and CBS entered onto a $6 billion deal for postseason basketball rights).

28

1    NCAA's Constitution and Bylaws. *Id.* ¶¶58-78. Any conspiracy to fix prices, regardless of

2    defendants' alleged market power or purported rationale, is illegal *per se. See, e.g., Federal Trade*

3    *Comm'n v. Superior Court Trial Lawyers Ass'n,* 493 U.S. 411, 421-23 (1990) ("*Superior Court*");

4    *Arizona v. Maricopa County Med. Soc'y,* 457 U.S. 332, 344-48 (1982).

5        As the Ninth Circuit recently stated in a case involving a joint venture among real estate

6    associations fixing prices on support services provided to the association: "[n]o antitrust violation

7    is more abominated than the agreement to fix prices." *Freeman v.San Diego Ass'n of Realtors,*

8    322 F.3d 1133, 1144 (9th Cir. 2003) ("*Freeman*"). *See also Knevelbaard Dairies v. Kraft Foods,*

9    232 F.3d 979, 986 (9th Cir. 2000) ("*Knevelbaard*") ("[f]oremost in the category of *per se*

10   violations is horizontal price-fixing among competitors.")

11       It makes no difference that this case involves fixing and depressing compensation for use

12   of Class members' images, rather than inflating prices of products sold. There is case law that a

13   conspiracy to fix royalty payments can be actionable under the Sherman Act. *Sony Electronics,*

14   *Inc. v. Soundview Technologies, Inc.,* 157 F.Supp.2d 180, 186 (D.Conn. 2001) (motion to dismiss

15   denied where maker of the V chip sued Sony for conspiring with other licensees to fix the price of

16   the license royalty at an artificially low amount); *In re Airport Car Rental Antitrust Litig.,* 474 F.

17   Supp. 1072, 1108 (N.D. Cal. 1979) (found antitrust standing as the result of being excluded from

18   airport locations and suffered antitrust injury from lost license royalties).

19       This case can also be analogized to those involving conspiracies to fix wages, which have

20   been held to violate the Sherman Act. *See, e.g., International Ass'n of Heat and Frost Insulators*

21   *v. United Contractors Ass'n.,* 483 F.2d 384, 393 (3d Cir.1973); *Jacobi v. Bache & Co.,* 377

22   F.Supp. 86, 95 (S.D.N.Y.1974). The Supreme Court has noted the "broad remedial and deterrent

23   objectives" of the Clayton Act and has recognized that the statute "does not confine its protection

24   to consumers, or to purchasers, or to sellers.... The Act is comprehensive in its terms and

25   coverage, protecting all who are made victims of the forbidden practices by whomever they may

26   be perpetrated." *Blue Shield of Virginia v. McCready,* 457 U.S. 465, 472 (1982) ("*McCready*")

27   (quotation marks and citation omitted).

28

The NCAA's conduct to fix compensation to former Division I  student athletes for use of their images at zero, which wipes out in total the future ownership interests of former student athletes in their own images – is blatantly anticompetitive and a *per se* violation.  By limiting their compensation to zero, it eliminates putative Class members' "ability to engage in individual salary negotiations … and that the injury is of the type that the Sherman Act was designed to prevent." *McNeil v. National Football League*, 790 F.Supp. 871, 877 (D.Minn.1992).

Plaintiff's Complaint sufficiently alleges a conspiracy to suppress such compensation and its effects on him.

*First,* Plaintiff's Complaint contains numerous and detailed examples of compensation that the NCAA and its co-conspirators set at zero for his likeness.  For example, putative Class members' compensation for games and stock footage (Compl. ¶¶ 105-06, 108, 111, 114-16, 119), jerseys (*id.* ¶¶160, 163), video games (*id.*¶¶135, 145), and photographs (*id.*¶¶130-32) was set at zero by the NCAA and its co-conspirators.  *See* summary Appendix, attached hereto.

*Second,* Plaintiff specifically alleges that he has been injured personally by being "unfairly deprived of compensation in connection with the use and sale of his image." *Id.* ¶ 34. *See also id.* ¶ 26 (alleging that Plaintiff's image has been used "without compensation paid to him"). Concrete examples of this are given, including the "1995 Men's Basketball Championship Box Set" of DVDs offered by co-conspirator Thought Equity Motion ("TEM"), various other team or game DVDs sold by UCLA's and CBS Sports' respective online stores and by many retail chains, photographs of Plaintiff sold by NCAA's online stores, stock footage featuring him sold by NCAA in conjunction with TEM, use of his image in EA's "NCAA Basketball 09." *Id.* ¶¶26-34.

The Complaint thus contains detailed factual allegations, not legal conclusions, upon which Plaintiff bases his claims. It provides details regarding the collegiate licensing market (*id.* ¶¶ 79-90); exemplars of the litany of deals that the NCAA and its members have struck entitling Plaintiff or putative Class members to zero compensation (*id.* ¶¶  104-65, including agreements with CBS Sports, TEM, Genius Products LLC,  Replay Photos LLC, The Associated Press, EA, ESPN Classic, The Big 10 Network, and BYU Television); and further identified numerous other

1  distribution outlets (*id.* ¶ 115).

2      The NCAA attempts to compartmentalize the Complaint's discussion of Form 08-3a and

3  Bylaw 12.5.1.1 in separate sections of its brief. NCAA Memo, pp. 13-18. This approach is

4  wholly improper. In reviewing a complaint that alleges an antitrust conspiracy, courts must

5  accord plaintiffs the full benefit of their allegations without tightly compartmentalizing and

6  dismembering the various factual components. *See Costco Wholesale Corp. v. Maleng*, 522 F.3d

7  874 (9th Cir. 2008) ("in the antitrust context, the 'character and effect of a conspiracy are not to

8  be judged by dismembering it and viewing its separate parts, but only by looking at it as a

9  whole'") (quoting *Continental Ore Co. v. Union Carbide & Carbon Corp.*, 370 U.S. 690, 699

10  (1962)); *In re Tamoxifen Citrate Antitrust Litig.*, 466 F.3d 187, 200-01 (2d. Cir. 2006)) (in

11  pleading conspiracy, plaintiffs are entitled to the full benefit of their allegations "without tightly

12  compartmentalizing the various factual components and wiping the slate clean after scrutiny of

13  each").

14      Indeed, the Complaint shows how Form 08-3a, Bylaw 12.5.1.1, other articles and

15  provisions of the NCAA's Constitution and Bylaws, and other practices by the NCAA and its co-

16  conspirators, together, are used to effectuate a conspiracy that wrongfully deprives student-

17  athletes of any payment for their releases and royalties on the use of their collegiate images. This

18  more than suffices under *Bell Atlantic Corp. v. Twombly*, 550 U.S. 544 (2007).

19      In any event, the NCAA's specific attacks on the allegations concerning Form 08-3a fail.

20  The NCAA argues that Form 08-3a "does not purport to grant anyone other than the NCAA any

21  rights" and says nothing about the rights of UCLA, member schools, or former-student athletes to

22  use their images before or after graduation. NCAA Memo, p. 14. However, the NCAA misses

23  the point. Form 08-03a is the product of an illegal agreement and combination of the NCAA's

24  members and the NCAA. Furthermore, the Complaint alleges that Form 08-3a is just *one method*

25  used by NCAA to procure student-athletes' rights essentially for free; it then allegedly transfers

26  these rights to various for-profit entities --including co-defendant CLC-- which commercially

27

28

1  exploit them on behalf of the NCAA and its member schools.  Compl. ¶¶ 98-99.[3]

2      NCAA relies on *In re Static Random Access (SRAM) Antitrust Litig.,* 580 F.Supp.2d 896,

3  903-07 (N.D. Cal. 2008) ("*SRAM*") (NCAA Memo, p. 15), but that case confirms that the

4  Complaint's allegations are sufficient.  In *SRAM*, the complaint alleged a "highly concentrated"

5  market with high barriers to entry; a product that was "particularly susceptible" to price fixing; a

6  handful of entities that held "between seventy-nine and eighty-four percent of the market share;"

7  and cited emails evidencing an agreement.  *Id.* at 898.  Here, market concentration and barriers to

8  entry are even higher due to NCAA's nature, its regulations, and its selective licensing practices,

9  which significantly increase the vulnerability of the market to price fixing.  Also, the NCAA is a

10  "bottom-up" organization comprised of representatives from member schools and conferences.

11  Compl. ¶¶55-56.  The organization enacted regulations that mandated releases and sanctions for

12  noncompliance; it instituted CLC as a "key" manager of its "amateurism regulations" (*id.* ¶139)

13  and it exploited these rights through for-profit entities.  These alleged facts and others --such as

14  the specific examples of deals involving uses of student-athletes' names, images and likenesses

15  (*see, e.g., id.* ¶¶92-165) --when construed in the light most favorable to Plaintiff support an

16  inference of a conspiracy more convincingly than the allegations and cited emails in *SRAM,* and

17  leave no question as to "who, did what, to whom (or with whom), where and when." *See Kendall*

18  *v. VISA U.S.A., Inc.,*518 F.3d 1042, 1048 (9th Cir. 2007) .

19      The NCAA's individual attacks on the Complaint's allegations regarding NCAA Bylaw

20  12.5.1.1 likewise fail.  It argues that this Bylaw does not "require a school to solicit such a

21  release" or require the student-athletes to "provide the release upon request."  NCAA memo, p.

22  17.  But Bylaw 12.5.1.1(i) expressly requires that the "student-athlete...sign a release" with

23  respect to various uses of his or her "name, picture or appearance."  Compl. ¶74.  Moreover, a

24  "bylaw" by definition is "a rule or administrative provision adopted by an organization for its

25  ─────────────────
[3]  The NCAA argues that Form 08-3a does not grant permission "for any use other than the

26  promotion of *NCAA events*."  NCAA Memo, p. 14.  However, Form 08-3a does not only

   implicate "events" but the "promot[ion]ofNCAA championships or other NCAA events, activities

27  or programs."  The Complaint alleges that NCAA unreasonably stretches this "vague and

   ambiguous concept" to advance its commercial efforts.  Compl. ¶69.

28

internal governance and its external dealings." Black's Law Dictionary (8th ed. 2004). Because the "NCAA has the power to penalize schools whose athletes violate the terms of the forms and related rules," (Compl. ¶83), it is reasonable to infer that Bylaw 12.5.1.1 releases have been procured at *all or very many* member schools. In this regard, the Complaint alleges that Bylaw 12.5.1.1 releases have "been utilized by the NCAA and its members to unlawfully license and use the commercial rights of former student-athletes' rights in the use of their images." *Id.* ¶77. The Complaint then provides a *specific example* of this at Iowa State University, quoting an article that appeared in the *Des Moines Register*. *Id.* ¶78. These allegations support the claim that the co-conspirators have been using NCAA releases to restrain trade and deprive current and former student-athletes their royalty streams.

## C.  Plaintiff Has Adequately Pled A Group Boycott

Recently, it was held that:

> Commercially motivated group boycotts are *per se* violations because "the likelihood of anticompetitive effects is clear and the possibility of countervailing procompetitive effects is remote." *Nw. Wholesale Stationers, Inc. v. Pac. Stationery and Printing Co.*, 472 U.S. 284, 294... (U.S.1985) ["*Northwest*"]. Such boycotts are "designed to 'pressure' another party into doing something by 'withholding, or enlisting others to withhold, patronage or services from the target.'" William C. Holmes, Antitrust Law Handbook § 2:16 Group boycotts-In general (quoting *St. Paul Fire & Marine Ins. Co. v. Barry*, 438 U.S. 531, 541-43... (1978)). Evidence of a group boycott used to effectuate a price-fixing arrangement is sufficient to support a per se violation. *See Super. Ct. Trial Lawyers Ass'n*, 493 U.S. at 436 n. 19, ...; see also Holmes § 2:16.

*Churchill Downs Inc. v. Thoroughbred Horsemen's Group, LLC*, 605 F.Supp.2d 870, 890 (W.D. Ky., 2009). *See* also *Greene County Memorial Park v. Behm Funeral Homes, Inc.*, 797 F.Supp. 1276, 1288 (W.D.Pa.1992) ("[g]roup boycotts, or concerted refusals to deal where a group of individuals or entities agree to stop doing business with another party, are per se violations of Section 1 of the Sherman Act")

In *Northwest*, the Supreme Court applied the *per se* rule to group boycotts where the parties aim was "to disadvantage competitors by 'either directly denying or persuading or coercing suppliers or customers to deny relationships the competitors need in the competitive

1    struggle.' " 472 U.S. at 294. The NCAA, CLC and their co-conspirators have done just that.

2    They have "*cut off access* to *a supply, facility, or market* necessary to enable the boycotted firm to

3    compete, ... and frequently the boycotting firms possessed a dominant position in the relevant

4    market." *Id.* (internal citations omitted). The NCAA, with its dominant position, has cut off

5    former student athletes from the collegiate licensing market by selling plaintiffs' own images and

6    likenesses to third parties.

7        Numerous paragraphs in the Complaint allege that Defendants conspired to boycott

8    putative Class members--including Plaintiff--in order to prevent them from being able to

9    commercially exploit their collegiate likenesses. *See, e.g.*, Compl. ¶¶ 7, 11, 81, 85-87, 173, 182-

10    188, 195-199. Additionally, Plaintiff specifically alleges that he has been injured personally by

11    being "unfairly deprived of compensation in connection with the use and sale of his image." *Id.* ¶

12    34. *See also id.* ¶ 26 (alleging that Plaintiff's image has been used "without compensation paid to

13    him"). As noted above, the Complaint offers many concrete examples to support these assertions.

14        Nonetheless, the NCAA argues "that there is not a single alleged instance of the NCAA

15    preventing [Plaintiff], or anyone else, from selling his collegiate image after graduation." NCAA

16    Memo, p. 12. *See id,* p. 15 (arguing that the Complaint "says nothing about the right of a former

17    student-athlete to sell his own collegiate image after graduation"). This argument is a jejune

18    attempt by the NCAA to obscure the real charge in the Complaint:   the charge that, as part of its

19    price-fixing conspiracy, NCAA and its co-conspirators *excluded* student-athletes from this

20    market, which impacts student-athletes' *ability* to penetrate the market after graduation. Compl.

21    ¶¶ 9-12.

22        A horizontal agreement to exclude a participant from the market is a *per se* antitrust

23    violation. *United States v. General Motors Corp.*, 384 U.S. 127, 146-147 (1966); *Malley-Duff &*

24    *Associates, Inc. v. Crown Life Ins. Co.*, 734 F.2d 133 (3d Cir. 1984); *Armstrong Surgical Center,*

25    *Inc. v. Armstrong County Memorial Hosp.*, 185 F.3d 154 (3d Cir.1999); *Local 36 of Intern.*

26    *Fishermen & Allied Workers of America v. U.S.*, 177 F.2d 320, 331 (9th Cir. 1949); *Dooley v.*

27    *Crab Boat Owners Ass'n,*  No. C 02-0676 MHP, 2004 WL 902361 at *13 (N.D. Cal. Apr. 26,

28

PLAINTIFF'S' OPPOSITION TO NCAA'S                    -9-                    CASE NO. 07-CV-5634-CRB
MOTION TO DISMISS COMPLAINT

1   2004). As such, Plaintiff is not required to demonstrate that he sold, or attempted to sell, his

2   collegiate image.

3       Setting Plaintiff's compensation for the use of his images at zero, Defendants had already

4   made deals, as noted above, for NCAA games and stock footage, jerseys, video games, and

5   photographs.  What was left for former student athletes to sell, license or profit from?  If it were

6   really true that the NCAA and its co-conspirators did not engage in a group boycott of former

7   Division I student athletes from the collegiate licensing market, third parties would have

8   contacted former student-athletes to procure the needed rights prior to offering products

9   implicating student-athlete names, likenesses or images.  This, in turn, would have increased third

10  party licensing costs and decreased the co-conspirators' overall royalty revenue, as a portion

11  would now be funneled to former student-athletes.  But as set forth in the Complaint, this largely

12  has not occurred; instead, the NCAA and other co-conspirators near-uniformly have excluded

13  former student athletes and restrained trade in the process.[4]

14      The NCAA argues that the existence of two recent exceptions where royalties *were* paid

15  to former student-athletes refute the allegations that trade has been restrained.  NCAA Memo, p.

16  13.  To the contrary, they confirm that only recently have such deals been permitted, and that

17  until recently, the NCAA and its co-conspirators successfully prevented them.  They also show

18  the NCAA's and its co-conspirators' history of ignoring student-athletes' rights to royalties when

19  brokering deals.

20  **D.  Plaintiff Has Article III Standing**

21      The standing inquiry under Article III of the United States Constitution "asks whether a

22  plaintiff has suffered an actual or imminent injury that is fairly traceable to the defendant's

23  conduct and that is likely to be redressed by a favorable court decision." *Plascencia v. Lending*

24  *1st Mortg.*, No. C 07-4485 CW, 2009 WL 2569732 at *6 n.3 (N.D. Cal. Aug. 21, 2009).  In

25

26

27  _____

    [4]  It can reasonably be inferred that, but for the preclusive nature of the alleged conspiracy,
    Plaintiff and other members of the class would gladly negotiate and/or accept royalty streams

28  with respect to uses of their collegiate names, likenesses and images.

antitrust cases, "harm to the antitrust plaintiff is sufficient to satisfy the constitutional standing requirement."*Associated Gen. Contractors of Cal, Inc. v. Cal. State Council of Carpenters,* 459 U.S. 519, 535 (1983). As the United States Supreme Court has noted, "'[a]t the pleading stage, general factual allegations of injury resulting from the defendant's conduct may suffice, for on a motion to dismiss we 'presum[e] that general allegations embrace those specific facts that are necessary to support the claim.' " *Lujan v. Defenders of Wildlife,* 504 U.S. 555, 561 (1992) (quoting *Lujan v. National Wildlife Federation,* 497 U.S. 871, 889 (1990)). *Accord Bennett v. Spear*, 524 U.S. 154, 168 (1997).

The NCAA's assertion that Plaintiff has failed to allege Article III standing ignores the Complaint, which alleges injury to Plaintiff caused by Defendants' anticompetitive conduct. "As a result of the federal antitrust violations described herein, Plaintiff was injured in his business and property, and was deprived of compensation in connection with the sale of his image." Compl. ¶ 34.  Plaintiff also alleges that he "has been deprived of compensation by defendants and their co-conspirators for the continued use of his image following the end of his intercollegiate athletic career." *Id.* ¶ 25.   Absent defendants' anticompetitive conduct,

> colleges and universities participating in the relevant market would have competed against each other by offering higher amounts of post-graduation licensing revenue to student athletes....But under current anticompetitive conditions, compensation is "capped" at zero by artificial rules imposed by the NCAA that result in lower compensation that would otherwise prevail in a more competitive market.  (*Id.* ¶ 85).

Plaintiff's injury meets the "actual or imminent" test because it has already occurred. Defendants have foreclosed Plaintiff from receiving compensation from the ongoing commercial exploitation of his image from the sale of games, DVDs and other forms of media. *Id.* ¶¶ 25-26. Plaintiffs' alleged injury is concrete and particularized.  The injury alleged will continue as long as Plaintiff is foreclosed from receiving compensation for the commercial exploitation of his image.

As said in *Ross v. Bank of America*, 524 F.3d  217 (2d Cir. 2008), "[t]here is no

heightened standard for pleading an injury in fact sufficient to satisfy Article III standing simply because the alleged injury is caused by an antitrust violation." The court went on to note that "[i]njury in fact is a low threshold, which we have held 'need not be capable of sustaining a valid cause of action,' but 'may simply be the fear or anxiety of future harm.'" *Id.* at 222 (quoting *Denney v. Deutsche Bank AG*, 443 F.3d 253, 264 (2d Cir. 2006)). *See In re Currency Conversion Fee Antitrust Litig.*, Nos. M 21-95, 05 Civ. 7116 (WHP), 2009 WL 151168 at *2-*3 (S.D.N.Y. Jan. 21, 2009) (assertions of deprivation of consumer choice brought about by mandatory arbitration clauses sufficed for Article III standing). [5]

The NCAA's reliance on *Gerlinger v. Amazon.com Inc.*, 565 F.3d 1253 (9th Cir. 2008) ("*Gerlinger*") is misplaced. Unlike the plaintiff in *Gerlinger*, Plaintiff alleges injury-in fact by loss of revenue as a direct result of Defendants' wrongful conduct. Plaintiff received zero compensation. These allegations are deemed true on this motion to dismiss. *Warth v. Seldin*, 422 U.S. 490, 501 (1975).

### E. Plaintiff Has Established Antitrust Standing And Injury

The NCAA argues that Plaintiff has failed to allege antitrust injury and antitrust standing because he is not a participant in the same market as Defendants. According to the NCAA, Plaintiff lacks antitrust standing because he does not currently participate in the market for commercial exploitation of collegiate players images. The NCAA's argument ignores that the anticompetitive conduct alleged here includes *the exclusion* of Plaintiff and the putative Class members from that market in which he would be participating but for the anticompetitive conduct. Compl. ¶2. As the Complaint alleges:

> The NCAA can and does exclude both current student athletes from

---

[5] Indeed, the United States Supreme Court indicated in *Ortiz v. Fibreboard Corp.*, 527 U.S. 815, 821 (1999), that even class certification issues can be "logically antecedent" to Article III concerns, and are properly treated before resolution of Article III standing issues. *See, e.g., In re Pharmaceutical Indus. Average Wholesale Price Antitrust Litig.*, 263 F.Supp. 2d 172, 194 (D. Mass. 2003); *In re Buspirone Patent Litig.*, 185 F.Supp. 2d 363, 377 (S.D.N.Y. 2002); *In re Relafen Antitrust Litig.*, 221 F.R.D. 260, 268-70 (D. Mass. 2004); *Jepson v. Ticor Title Ins. Co.*, No. C 06-1723 JCC, 2007 WL 2060856 at *1 (W.D. Wash. May 1, 2007).

this market, as evidenced by the anticompetitive forms described herein.... With respect to current student-athletes, those players would collectively have a share of the market absent the vehicles described herein by which they are required to transfer those rights to the NCAA, its members, and others. Former student athletes, including members of the Damages Class described herein, also would have a share of the market, absent the anticompetitive practices described herein. (*Id.* ¶ 81).

One form of antitrust injury is "[c]oercive activity that prevents its victims from making free choices between market alternatives." *Amarel v. Connell*, 102 F.3d 1494, 1509 (9th Cir.1996) (internal quotation marks and citation omitted). Plaintiff and the putative Class members were denied any "viable choice between market alternatives" by being required to surrender the right to sell their own images and likeness after completing their education rather than being allowed to sell those images themselves in an unrestrained market. As in *Glen Holly Entertainment, Inc. v. Tectronix, Inc.*, 352 F.3d 367 (9th Cir. 2003) ("*Glen Holly*"), defendants' anticompetitive conduct here caused antitrust injury to Plaintiff by excluding him from the market. *Jensen Enterprises Inc. v. AT & T Inc.*, No. C 06-247 SI, 2007 WL 2009797 at \*6 (N.D. Cal. Jul 6, 2007); *Total Renal Care, Inc. v. Western Nephrology and Metabolic Bone Disease*, 2009 WL 2596493 at \* 5 (D. Colo. Aug 21, 2009) (antitrust standing is clear when the plaintiff alleges that defendant "engaged in an exclusionary practice designed to rid the market of the plaintiff or to preclude its entry..."). *See Golden Bridge Technology, Inc. v. Nokia, Inc.*, 416 F.Supp. 2d 525, 534 (E.D. Tex. 2006) (antitrust injury and standing adequately alleged where plaintiff alleged it was excluded from market for licensing cellular communication technology although plaintiff had never previously been able to license).

**F.  The NCAA Misapplies "*Walker Process*" Cases To This Case**

Defendants rely on inapposite cases involving "*Walker Process*" patent claims, which hold that a party does not have standing unless it was already participating in or prepared to enter the affected market when the anticompetitive conduct was committed.  These cases do not apply here, where the anticompetitive conduct itself was complete exclusion from the relevant market and Plaintiff alleges that absent this anticompetitive, exclusionary conduct, Plaintiff would have been a market participant.  Furthermore, unlike the cases that the NCAA cites, Plaintiff does not

1    need to prepare in order to compete in the market from which he has been excluded.

2        The NCAA cites *Bourns, Inc. v. Raychem Corp.*, 331 F.3d 704 (9th Cir. 2003) ("*Bourns*")

3    and *Bubar v. Ampco Foods, Inc.*, 752 F.2d 445, 450 (9th Cir.1985) ("*Bubar*") to argue that only

4    active competitors or those fully prepared to compete have antitrust standing. *Bourns* and *Bubar*,

5    however, address standing for  *Walker Process* claims, under which "possession and use of a

6    fraudulently-acquired patent could be treated as an offense under the antitrust laws if the patent

7    was employed to produce monopoly power in a specified market." *Bourns*, 331 F.3d at 711.  The

8    court in *Bourns* affirmed summary judgment because plaintiff failed to show injury from the

9    patent abuse because it was "unprepared to enter the business" and "was not assembling the

10   personnel, the equipment, the facilities, nor acquiring the knowledge, nor allocating the capital to

11   put it into the production of PPTCs." *Id.* at 712.

12       Obviously, this is not a *Walker Process* claim case where standing requires actual

13   competition or preparations to compete.  *See In re Netflix Antitrust Litig.*, 506 F.Supp.2d 308,

14   315 (N.D. Cal. 2007) (recognizing that the *Bourns* standing standard is limited to *Walker* Process

15   claim cases).[6] Cases not involving *Walker Process* claims recognize that antitrust standing is not

16   limited to competitors but includes all parties  whose injury is "inextricably intertwined" with the

17   violation.  In *re Abbott Laboratories Norvir Antitrust Litig.*, Nos. C 04-1511 CW, C 04-4203

18   CW, 2007 WL 1689899 (N.D. Cal. June 11, 2007), this Court rejected the argument that the

19   plaintiffs lacked antitrust standing because they were not market participants holding that

20   defendants' argument "ignores the exception to the market participant requirement for parties

21   whose injuries are "inextricably intertwined" with the injuries of market participants." *Id.* at *5.

22       Similarly, in *In re Tableware Antitrust Litig.*, 484 F.Supp.2d 1059 (N.D. Cal. 2007),

23   Chief Judge Walker denied a motion to dismiss challenging antitrust standing and held that

24   "under *McCready*, although plaintiffs were not the direct target of defendants' boycott, their

25   injuries were 'inextricably intertwined with the injury the conspirators sought to inflict' on Bed,

26   Bath & Beyond." *Id.* at 1066.  Here, Plaintiff's loss of licensing revenue is clearly "inextricably

27

28

1    intertwined" with the antitrust violations because he is a direct and intended target of the

2    anticompetitive conduct.

3          The NCAA's reliance on *Rebel Oil Co., Inc. v. Atlantic Richfield Co.*, 51 F.3d 1421 (9th

4    Cir.1995) ("*Rebel Oil*") and *Pool Water Products v. Olin Corp.*, 258 F.3d 1024 (9th Cir. 2001)

5    ("*Pool Water*") is also misplaced. The appellate court in *Rebel Oil* affirmed a *summary judgment*

6    in a monopolization case where plaintiff failed to show market power and failed to show that

7    predatory pricing that resulted in lower prices to consumers resulted in any antitrust injury. 51

8    F.3d  at 1433-35, 1438.  In *Pool Water*, decided *after a trial*, it was also held that plaintiff had

9    failed to prove antitrust injury from alleged predatory pricing.  258 F.3d at 1035-36.  *Rebel Oil*

10   and *Pool Water* do not apply to cases like this one, where Plaintiff is a direct victim of

11   anticompetitive exclusion from the market and antitrust injury is challenged in a motion to

12   dismiss.  *See Glen Holly,* 352 F.3d at 377 (distinguishing *Pool Water* as "inapposite and

13   unhelpful") Accordingly, Plaintiff has adequately alleged antitrust injury and standing.

       **G. Injury To Competition Is Satisfactorily Established Here**

15         Plaintiff's specific antitrust theories of relief are (1) horizontal price fixing and (2) an

16   exclusionary group boycott.  As noted above, both are subject to *per se* condemnation under

17   section 1 of the Sherman Act.   As such, Plaintiff need not plead harm to competition, something

18   which is presumed in a *per se* case. *See Northern Pacific R Co v. United States*, 356 U.S. 1, 5

19   (1958) ("[T]here are certain agreements or practices which because of their pernicious effect on

20   competition and lack of any redeeming virtue are conclusively presumed to be unreasonable and

21   therefore illegal without elaborate inquiry as to the precise harm they have caused or the business

22   excuse for their use.' ") (quoting *Northern Pacific Rwy. Co v. United States*, 356 U.S. 1, 5

23   (1958)).

24         Nonetheless, the NCAA that Plaintiff fails to allege an injury to competition, asserted to

25   be a "necessary" element of Plaintiff's first and second claims for relief.  NCAA Memo, p. 19.

26   Plaintiff, in fact, has laid out in great detail the underlying facts that demonstrate how defendants

27   agreed to restrain compensation to be paid to former athletes for the sale and use of their images,

28

PLAINTIFF'S' OPPOSITION TO NCAA'S          -15-          CASE NO. 07-CV-5634-CRB
MOTION TO DISMISS COMPLAINT

1   injuring competition in that market, and how that restriction further harmed competition in the

2   market for licensing rights in general.  *See Harkins Amusement Enters v. Gen. Cinema Corp.,* 850

3   F.2d 477, 487 (9th Cir. 1988), *cert. denied,* 488 U.S. 1019 (1989) (injury to competition found

4   where the appellant "alleged that *competition itself has been eliminated* as a result of [the]

5   conspiratorial conduct. This is precisely the type of allegation required to state an injury to

6   competition.") (emphasis added).   Similarly, harm to competition can come from taking steps to

7   decrease supply to a market. *See Perry v. Rado,* 504 F.Supp. 2d 1043, 1047 (E. D. Wash. 2007)

8   (suggesting that a proper pleading for purposes of demonstrating harm to competition can allege a

9   decrease in the supply in the relevant market).  Here, Plaintiff has set forth ample facts explaining

10  how Defendants actions have decreased supply.

11       Plaintiff alleges that defendants suppress prices so that former athletes (*i.e.*, Plaintiff and

12  other purported class members) get zero dollars on the open market as prospective sellers of their

13  images while they were members of the NCAA - in effect extinguishing their ability to compete

14  as sellers. Compl.  ¶¶ 173, 182.  Plaintiff further alleges that these actions gave Defendants the

15  ability to set the prices they conspired to set. *Id.* at ¶¶ 180; 176. Also, Plaintiff asserts in his

16  complaint that if not for Defendants' conspiratorial conduct, "many more licenses would be sold"

17  and that "[t]his *output restriction* … has the effect of *raising the prices* charged by the NCAA

18  and CLC for licensing rights." *Id.* ¶ 181 (emphasis added).   These detailed factual allegations set

19  forth clear claims of harm to competition under both of Plaintiff's antitrust allegations.

20       **H. A Relevant Market Need Not Be Alleged Here**

21       The NCAA argues that Plaintiff has failed to "adequately allege a relevant market."

22  NCAA Memo, p. 20.  It is wrong for two reasons.  *First*, because Plaintiff alleges *per se*

23  violations of the Sherman Act, it is unnecessary to define the relevant market. *Second*, even if

24  this Court concludes that Plaintiff's alleged Sherman Act violations are governed by the rule of

25  reason, Plaintiff has adequately defined the relevant market at this stage in the litigation.

26  Therefore, Plaintiff's alleged market definition is sufficient and dismissal is inappropriate.

27       Where, as here, a *per se* violation is claimed, no relevant market needs to be shown. *See*

28

1   *Knevelbaard*, 232 F.3d at 986; *Big Bear Lodging Ass'n v. Snow Summit, Inc.*, 182 F.3d 1096,

2   1104-1105 (9th Cir. 1999); *In re Tableware Antitrust Litig.*, 363 F.Supp. 2d 1203, 1206 (N.D.

3   Cal. 2005).[7] Plaintiff has alleged that the NCAA "organized, maintained, and operated an illegal

4   horizontal cartel consisting of its member schools and conferences" (Compl. ¶ 13), and that CLC

5   "facilitated" that cartel's efforts to "artificially fix, depress, maintain, and/or stabilize prices

6   received by Plaintiff and Class members for use and sale of their images" (*id.* ¶ 173).  Plaintiff

7   also alleges that this conduct constitutes a group boycott/refusal to deal. *Id.* ¶ 174.  As noted

8   above, group boycotts that are the result of horizontal agreements among direct competitors are

9   also *per se* violations of Section 1.

10       Thus, in a *per se* price-fixing case brought under Section 1 of the Sherman Act, no

11   allegations regarding any defined relevant market are required.  The same holds true for a group

12   boycott case.  The Complaint, which includes allegations that: (1) the conspiracy had the effect of

13   artificially fixing the price received by Plaintiff and class members for use and sale of their

14   images in the United States, and (2) the NCAA and its co-conspirators refused to deal with

15   Plaintiff and putative Class members on post-competition rights issues, does not require any

16   market definition in this case.[8]

17

18   ─────────────────
     [7]   Likewise, there is no weighing of alleged procompetitive justifications if defendants have
     committed a *per se* antitrust violation. *Freeman,* 322 F.3d at 1144.

19
     [8]  In its criticism of Plaintiff's market definition, the only case the NCAA cites involving an
20   alleged *per se* Section 1 violation is *Newcal Indus v. Ikon Office Solution*, 513 F.3d 1038 (9th Cir.
     2008) ("*Newcal*").  In *Newcal,* the plaintiff did allege one per se tying violation, but also alleged
21   three Section 1 violations governed by the rule of reason (vertical restraint of trade, vertical
     exclusive dealing, and rule of reason tying), and two Section 2 violations (conspiracy to
22   monopolize, and attempted monopolization).  It was therefore necessary to define the relevant
     market.  Such is not the case here.It should be noted that even were the Court to apply a Rule of
23   Reason analysis to the claims presented here, that analysis would not involve an extensive
     consideration of the market. In *NCAA v. Board of Regents of the University of Okla,*, 468 U.S. 85
24   (1984). There, the United States Supreme Court struck down the NCAA's plan to limit the
     number of televised intercollegiate football games under what has come to be known as the
25   "quick look" Rule of Reason. saying "[t][hus, the NCAA television plan on its face constitutes a
     restraint upon the operation of a free market, and the findings of the District Court establish that it
26   has operated to raise prices and reduce output. Under the Rule of Reason, these hallmarks of
     anticompetitive behavior place upon petitioner a heavy burden of establishing an affirmative
27   defense which competitively justifies this apparent deviation from the operations of a free
     market." *Id.* at 113.
28

Even assuming *arguendo* that the NCAA is correct and Plaintiff does have the burden of defining the relevant market, Plaintiff has sufficiently done so. Plaintiff need not plead the elements of relevant market or market power with specificity. *Newcal*, 513 F.3d at 1045. The validity of a relevant market is "typically a factual element rather than a legal element," so "alleged markets may survive scrutiny under Rule 12(b)(6) subject to factual testing by summary judgment or trial." *Id* [9]. The relevant market "must be a product market," and therefore must be defined by products or producers, not consumers. *Id.*

Plaintiff has identified the market as the "collegiate licensing market." Compl. ¶ 79. Despite the NCAA's assertion that Plaintiff "has failed to provide anything more than a legal conclusion that this market exists" (NCAA Memo, p. 20), in fact Plaintiff has provided specific statements from industry participants themselves that establish the existence of this distinct market. Compl. ¶ 5 ("market for collegiate licensed merchandise"); ¶ 99 ("collegiate licensing agency"); ¶ 36 ("the unrivaled leader in collegiate brand licensing, managing the licensing rights for . . . more than 75% share of the college licensing market." (emphasis added). *See also id.* ¶ 80 (same). In fact, on CLC's website under the heading "Brand Protection," CLC specifically refers to the "early days of collegiate licensing," and states that "the market continues to mature." Exhibit A to CLC's Motion to Dismiss.[10] Finally, despite NCAA's assertion to the contrary, Plaintiff's proposed relevant market encompasses "the product at issue and all economic substitutes." *Newcal*, 513 F.3d at 1045. Plaintiff has alleged that there are no such substitutes, and provided several statements from industry participants in support of the uniqueness of the

---

[9] *See Syufy Enters. v. American Multicinema, Inc.*, 793 F.2d 990, 994 (9th Cir. 1986) (defining the relevant market "is a factual issue which is decided by the jury"); *Rebel Oil Co. v. Atl. Richfield Co.,* 133 F.R.D. 41, 44 (D. Nev. 1990) ("[t]he Ninth Circuit has established that both market definition and market power are essentially questions of fact appropriate for jury consideration.") (collecting cases), *rev'd in part on other grounds*, 51 F.3d 1421 (9th Cir. 1995).

[10] Plaintiff has identified many of the rights the NCAA has authorized CLC and others to license as part of that market, including the rights to major college football and basketball game films for DVD, online sale, and rebroadcast; the rights to video clips of game action for commercial usage, the rights to photographs from those games, the rights to utilize university logos, mascots, and other trademarked material in video games, the rights to reproduce replica team jerseys, as well as other related intellectual property rights. *See, e.g.,* Compl. ¶¶ 104-165. Each of these licensing rights is a product, not a consumer, and thus plaintiff has defined the market by its products. *Newcal*, 513 F.3d at 1045

---

PLAINTIFF'S' OPPOSITION TO NCAA'S
MOTION TO DISMISS COMPLAINT

CASE NO. 07-CV-5634-CRB

market for collegiate licensed products. *See, e.g.,* Compl. ¶¶ 80, 88, 101-02. This assertion is supported that allegation by reference to the inimitable nature of the product. *See, e.g., id.* ¶¶ 108, 121, 136, 151.

## I.   Plaintiff's Claims Are Not Time-Barred

While plaintiffs must file their antitrust claims under the Sherman Act within four years after a defendant commits an act that injures a plaintiff (15 U.S.C. § 15b), the Ninth Circuit has long held that an antitrust claim:

> accrues each time a plaintiff is injured by an act of the defendant and the statute of limitations runs from the commission of the act. A continuing violation is one in which the plaintiff's interests are repeatedly invaded and a [claim] arises each time the plaintiff is injured.

*Pace Indus. v. Three Phoenix Co.*, 813 F.2d 234, 237 (9th Cir. 1987) (citations omitted).

Thus, the statute of limitations does not bar antitrust claims when plaintiff alleges a "new and independent act" that inflicted an injury. *See Zenith Radio Corp. v. Hazeltine Research*, 401 U.S. 321, 338 (1971) ("[i]n the context of a continuing conspiracy to violate the antitrust laws . . . this has usually been understood to mean *that each time a plaintiff is injured* by an act of the defendants *a cause of action accrues to him* to recover the damages caused by that act and that, as to those damages, the statute of limitations runs from the commission of the act.") (emphases added). "'New and independent' acts may include active enforcement of policies first put into place outside the limitations period." *Red Lion Medical Safety, Inc. v. Ohmeda, Inc.,* 63 F. Supp. 2d 1218, 1223 (E.D. Cal.1999).

In *Columbia Steel Casting Co. v. Portland Gen. Elec. Co.*, 111 F.3d 1427, 1444 (9th Cir.1996), for example, the Ninth Circuit held that defendant's refusal to sell power to plaintiff pursuant to an eighteen-year-old market share agreement was a new and independent act because the original agreement was not a permanent and final decision that controlled subsequent events. *See Fox v. Piche,* No. 08 Civ. 1098, 2008 WL 4334696 (N.D. Cal. Sept. 22, 2008) (denying summary judgment because there was "a material issue of fact as to whether defendants committed 'new and independent'"). Likewise, paying a third party to "shepherd" potential

1    customers away from a competitor is also an overt act sufficient to restart the statute of

2    limitations each time it occurs. *See Hennegan v. Pacifico Creative Serv.*, 787 F.2d 1299, 1300-01

3    (9th Cir. 1986).

4         Plaintiff has alleged facts demonstrating a continuing violation. The NCAA has

5    repeatedly invaded Plaintiff's commercial interest by obtaining revenue from the exploitation or

6    sale of Plaintiff's image. Each sale by Defendants was a new and independent act and caused a

7    new and accumulating financial injury to Plaintiff. These sales, which Defendant had to be

8    advertised, promoted or negotiated before the sale took place, constitute independent overt acts –

9    they were far from "passive" events. Videos with Plaintiff's image are currently available for

10   purchase through on-line stores. *See* Compl. ¶¶ 26-29, 108-29 (sale of videos). Games featuring

11   Plaintiff continue to rebroadcast. *Id.* ¶¶ 30-31, 105-07, 149-56 (rebroadcasting of games). Video

12   game and jerseys, t-shirts and other apparels continue to be sold. *Id.* ¶¶ 135-48 (sale of video

13   games), 157-65 (sale of jerseys, t-shits and other apparel). There is no doubt that Defendants are

14   receiving revenue, and that these are independent acts that causing Plaintiff accumulating

15   financial injury. Thus, the statute of limitation clearly does not bar Plaintiff's claim for any harm

16   done within four years of filing the complaint.

17   **J. Plaintiff's Common Law Claims Are Sufficiently Pled**

18        Without explanation, the NCAA argues that Plaintiff's common law unjust enrichment and

19   accounting claims should be dismissed because they are "derivative" of the antitrust claims. The

20   NCAA's reliance on *County of Santa Clara v. Astra USA, Inc.*, No. C 05-03740, 2006 WL

21   2193343 (N.D. Cal. July 28, 2006) ("*Astra*") is unavailing because it does not stand for the

22   proposition for which it is cited. In *Astra*, the Court declined to grant plaintiff leave to file a third

23   amended complaint because it provided "no argument as to why its unjust enrichment claim is

24   viable," and failed to cite any decisions "involving our unusual fact pattern." *Id.* at *7. The court

25   did not grant leave to amend the accounting claim because discovery "would allow plaintiff to

26   calculate the proper price [that should have been paid for the drugs], thereby obviating the need

27   for an accounting… ." *Id.* at *6. Here, by contrast, the NCAA is comprised of more than 1,000

28

1   institutions and organizations, and through a [web of licensing agreements with for-profit

2   entities,] unlawfully obtained licensing revenues that rightfully belong to plaintiff and the class

3   members.  Compl. ¶¶ 5, 92-103.  Thus, unlike *Astra*, the amount of ill-gotten gains the NCAA

4   derived from wrongfully exploiting class members' images through numerous licensing streams

5   are not easily calculable, fixed sums.  An accounting is therefore warranted.

6   **IV.   CONCLUSION**

7       For all the foregoing reasons, the Court should deny the NCAA's motion to dismiss .

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28

1

## V.   APPENDIX: SUMMARY OF FACTS ALLEGED IN COMPLAINT

| Complaint Paragraph | Defendant | Third Party, *if applicable* | Product(s) (Emphasis added) |
|---|---|---|---|
| ¶105 | NCAA | CBS | "11 year right **to televise** the NCAA men's postseason basketball tournament in exchange for a staggering $6 billion" |
| ¶108 | NCAA | Thought Equity Motion | "partnership between NCAA and Thought Equity Motion. . . provid[ing] fans with video imagery in a variety of formats from **DVDs to digital video**.  Fans will be able to relieve past games through **video streaming** or **purchase the game** for their own collection" |
| ¶¶109-111 | NCAA | Thought Equity Motion | "offer for sale more than **12,000 video clips** of portions of NCAA games for uses including corporate advertisements, corporate in-house presentations, films, and television programs, as well as additional highlight films, complete games and interviews of" former players |
| ¶111 | CLC | | "can purchase **hundred of licensed products for sale**, including 'Highlight/DVDs'" through the Collegiate Exchange (online business-to-business trading exchange) |
| ¶114 | NCAA | Genius Products, LLC Thought Equity Motion | **Sale of DVD** titled "'NCAA March Madness: The Greatest Moments of the NCAA Tournament' with a suggest retail price of $19.95" |
| ¶115 | NCAA | Amazon.com Barnes and Noble NBC sports network Walmart.com FantasyPlayers.com Big Ten Network | "hundred of NCAA **DVDs** are available on CBS Sports 'Online DVD store'.  On Amazon.com, more than 1600 NCAA sports DVDs are for sale. NCAA DVDs also are for sale via myriad other outlets, such as, for example, walmart.com, the NBC network's sports website, FantasyPlayers.com's website, Barnes & Noble's website, and the Big Ten Network's website." |

| ¶116 | NCAA | Blockbuster Netflix | "hundreds of **NCAA games and highlight films** are available for rental from Blockbuster Video and Netflix, including via their websites" |
|------|------|---------------------|----|
| ¶119 | NCAA | Thought Equity Motion | "more than **12,000 NCAA related clips** spanning several decades offered for sale as '**stock footage**'. The overwhelming majority of them are from NCAA Division I men's basketball games. The clips run for varying time periods, generally ranging from 10 seconds to several minutes. Many of them indicate that **the full gam**e for which from the clips were culled, as well as the **related highlight films**, also are available for sale via Thought Equity… One **interview** appeared to cost $150." |
| ¶130 | NCAA | Replay Photos, LLC | Photographs of former players "available for purchase, as well as a separate website. . . . **thousands of photographs** from postseason tournaments in numerous sports are offered for sale." |
| ¶131 | NCAA | Associated Press | "a three year content partnership making the AP the **worldwide distributor of NCAA Championship photography** and creating the largest collection anywhere of collegiate sports photos" |
| ¶¶135-138 | NCAA | Electronic Arts | "NCAA has executed a license for **video games** with co-conspirator Electronic Arts" |
| ¶147 | NCAA | 2K Sports | "NCAA also had a license with 2K Sports, a subsidiary of Take-Two Interactive Software, Inc., for **video games** rights for college basketball. 2k Sports has produced several iterations of their college basketball video game between 2005 and 2008 (College Hoops 2K6, College Hoops 2K7, and College Hoops 2K8), which they market and sell." |

1    Dated: October 27, 2009                    Respectfully submitted,

2
                                                By:  /s/
3                                               Michael P. Lehmann  (77152;
                                                mlehmann@hausfeldllp.com)
4                                               Christopher L. Lebsock (184546;
                                                clebsock@hausfeldllp.com.com)
5                                               Jon T. King (205073; jking@hausfeldllp.com)
                                                HAUSFELD LLP
6                                               44 Montgomery Street, Suite 3400
                                                San Francisco, CA  94104
7                                               Telephone:  (415) 633-1949
                                                Facsimile:  (415) 358-4980
8
                                                Michael D. Hausfeld  (mhausfeld@hausfeldllp.com)
9                                               Megan Jones (mjones@hausfeldllp.com)
                                                HAUSFELD LLP
10                                              1700 K Street, NW,  Suite 650
                                                Washington, DC 20006
11                                              Telephone:  (202) 540-7200
                                                Facsimile:   (202) 540-7201
12

13   William A. Isaacson (pro hac vice)            Stuart M. Paynter (Cal. Bar. No. 226147)
     Tanya Chutkan (pro hac vice)               THE PAYNTER LAW FIRM PLLC
14   Jack Simms (pro hac vice)                   1200 G Street N.W., Suite 800
     BOIES, SCHILLER & FLEXNER LLP              Washington, DC 20005
15   5301 Wisconsin Avenue, 8th Floor            Telephone: (202) 626-4486
     Washington, DC 20015                        Facsimile: (866) 734-0622
16   Tel:  (202) 237-2727                        stuart@smplegal.com
     Fax:  (202) 237-6131
17   Email:  wisaacson@bsfllp.com
             tchutkan@bsfllp.com
18           jsimms@bsfllp.com

19   John F. Cove, Jr. (Cal. Bar No. 212213)       Jonathan W. Cuneo
     BOIES, SCHILLER & FLEXNER LLP              Daniel M. Cohen
20   1999 Harrison Street, Suite 900             CUNEO GILBERT & LaDUCA LLP
     Oakland, CA  94612                          507 C Street NE
21   Tel:  (510) 874-1000                        Washington, D.C. 20002
     Fax:  (510) 874-1480                        Tel: (202) 789-3960
22   Email:  jcove@bsfllp.com                    Fax: (202) 789-1813
                                                 Email: jonc@cuneolaw.com
23                                                      danielc@cuneolaw.com

24   Vincent J. Esades                           Daniel S. Mason (Cal. Bar No. 54065)
     HEINS MILLS & OLSON, P.L.C.               ZELLE HOFMANN VOELBEL &
25   310 Clifton Avenue                         MASON LLP
     Minneapolis, MN 55403                      44 Montgomery Street, Suite 3400
26   Tel:  (612) 338-4605                        San Francisco, CA  94104
     Fax:  (612) 338-4692                        Tel:  (415) 693-0700
27   Email:  vesades@heinsmills.com              Fax:  (415) 693-0770
                                                 Email:  dmason@zelle.com
28

PLAINTIFF'S' OPPOSITION TO NCAA'S                    -24-              CASE NO. 07-CV-5634-CRB
MOTION TO DISMISS COMPLAINT

1   Mitchell J. Rapp (Michigan Bar No. P43081)     Brian M. Sund

2   Shawn D. Stuckey (MN Bar No. 0388976)      Joshua G. Hauble

ZELLE HOFMANN VOELBEL & MASON LLP   MORRISON FENSKE & SUND, P.A.

3   500 Washington Avenue South, Suite 400     5125 County Road 101, Suite 202

Minneapolis, MN  55415          Minnetonka, MN 55345

4   Telephone:  (612) 339-2020         Tel:  (952) 975-0050

Facsimile:  (612) 336-9100         Fax: (952) 975-0058

5   Email:  mrapp@zelle.com          Email:  bsund@morrisonfenske.com

         sstuckey@zelle.com               jhauble@morrisonfenske.com

6

7   Steven J. Greenfogel          Bruce L. Simon (Cal. Bar. No. 96241)

MEREDITH COHEN GREENFOGEL &     Jessica L. Grant (Cal. Bar. No. 178138)

8   SKIRNICK, P.C.           PEARSON, SIMON, WARSHAW &

1521 Locust Street, 8th Floor        PENNY, LLP

9   Philadelphia, Pennsylvania 19102     44 Montgomery Street, Suite 2450

Tel: (215) 564-5182           San Francisco, CA 94104

10   Fax: (215) 569-0958          Tel: (415) 433-9000

Email: sgreenfogel@mcgslaw.com    Fax: (415) 433-9008

11                        Email: bsimon@pswplaw.com

12                           jgrant@pswplaw.com

13   Eugene A. Spector            Jay L. Himes

SPECTOR ROSEMAN KODROFF & WILLIS,   Morissa Falk

14   P.C.                LABATON SUCHAROW LLP

1818 Market Street, Suite 2500       140 Broadway

15   Philadelphia, Pennsylvania 19103     New York, NY 10005

Tel: (215) 496-0300           Tel: (212) 907-0700

16   Fax: (215) 496-6611          Fax: (212) 818-0477

Email: espector@srkw-law.com      Email: jhimes@labaton.com

17                          mfalk@labaton.com

18   Gordon Ball              Stanley D. Bernstein

BALL & SCOTT, A PROFESSIONAL     Ronald J. Aranoff

19   ASSOCIATION            Dana Statsky Smith

550 Main Avenue, Suite 750        BERSTEIN LIEBHARD LLP

20   Knoxville, TN 37902          10 East 40th Street, 22nd Floor

Tel: (865) 525-7028           New York, New York 10016

21   Fax: (865) 525-4679          Tel: (212) 779-1414

Email: GBall@ballandscott.com     Fax: (212) 779-3218

22                        Email: bernstein@bernlieb.com

23                          aranoff@bernlieb.com

Allan Steyer (Cal. Bar. No. 100318)    Carl A. Taylor Lopez

24   STEYER LOWENTHAL BOODROOKAS   LOPEZ & FANTEL

ALVAREZ & SMITH LLP         1510 114th Avenue

25   One California Street, Third Floor    Seattle, WA 98122-4024

San Francisco, CA 94111        Tel: (206) 322-5200

26   Tel: (415) 421-3400          Email: clopez@lopezfantel.com

Fax: (415) 421-2234

27   Email: asteyer@steyerlaw.com

28   Additional Attorneys for Plaintiff

1

## CERTIFICATE OF SERVICE

2

3   I, Michael P. Lehmann, declare that I am over the age of eighteen (18) and not a party to

the entitled action. I am a partner in the law firm of HAUSFELD LLP, and my office is located

4

at 44 Montgomery Street, Suite 3400, San Francisco, California 94104.

5

6   On October 27, 2009, I filed the following:

7   **PLAINTIFF'S OPPOSITION TO NCAA'S MOTION TO DISMISS THE COMPLAINT**

8   with the Clerk of the Court using the Official Court Electronic Document Filing System which

served copies on all interested parties registered for electronic filing. The following parties not

9

registered for electronic filing will be served on October 27, 2009, via U.S. Mail:

10

11   Carl A. Taylor Lopez                Jack Simms
     LOPEZ & FANTEL                      BOIES SCHILLER & FLEXNER LLP
12   1510 114th Avenue                   5301 Wisconsin Avenue #800
     Seattle, WA 98122-4024              Washington, DC 20015

13   Jonathan W. Cuneo                   Tanya Chutkan
     CUNEO GILBERT & LADUCA LLP          BOIES SCHILLER & FLEXNER LLP
14   507 C St. N.E.                      5301 Wisconsin Avenue, Suite 800
     Washington, DC 20002                Washington, DC 20015
15

16   I also certify that I caused true and correct Chambers Copy of the foregoing document(s)

17   to be hand-delivered to the following Judge pursuant to Civil L.R. 3-12(b) by noon of the

18   following day:

19   The Hon. Claudia Wilken
     U.S.D.C., Northern District of California
20   Oakland Division
     1301 Clay Street, Suite 400 S
21   Oakland, CA 94612-5212

22

23

24   I declare under penalty of perjury that the foregoing is true and correct.

25

26                                       /s/ Michael P. Lehmann
                                         MICHAEL P. LEHMANN
27

28