Gregory L. Curtner (p*ro hac vice*)
Robert J. Wierenga (SBN183687)
Kimberly K. Kefalas (p*ro hac vice*)
Atleen Kaur (p*ro hac vice*)
Suzanne L. Wahl (p*ro hac vice*)
MILLER, CANFIELD, PADDOCK AND STONE, P.L.C.
101 North Main St., 7th Floor
Ann Arbor, MI  48104
Telephone:  (734) 663-2445
Facsimile:  (734) 663-8624
Email: curtner@millercanfield.com
       wierenga@millercanfield.com
       kefalas@millercanfield.com
       kaur@millercanfield.com
       wahl@millercanfield.com

Jason A. Geller (SBN168149)
Glen R. Olson (SBN111914)
David Borovsky (SBN 216588)
LONG & LEVIT LLP
465 California Street, 5th Floor
San Francisco, CA  94104
Telephone:  (415) 397-2222
Facsimile:  (415) 397-6392
Email: jgeller@longlevit.com
       golson@longlevit.com
       dborovsky@longlevit.com

Attorneys for Defendant
National Collegiate Athletic Association

## UNITED STATES DISTRICT COURT
## NORTHERN DISTRICT OF CALIFORNIA
## OAKLAND DIVISION

| | |
|---|---|
| EDWARD C. O'BANNON, JR., on behalf of himself and all others similarly situated,<br><br>Plaintiff,<br><br>v.<br><br>NATIONAL COLLEGIATE ATHLETIC ASSOCIATION and COLLEGIATE LICENSING COMPANY,<br><br>Defendants. | Case No. 4:09-cv-03329-CW<br><br>**DEFENDANT NCAA'S REPLY BRIEF IN SUPPORT OF MOTION TO DISMISS UNDER FED. R. CIV. P. 12(b)(1), 12(b)(6)**<br><br>Date:       November 17, 2009<br>Time:      2:00 P.M.<br>Dept:      Courtroom 2, 4th Floor<br>Judge:    Hon. Claudia Wilken<br><br>Date Compl. Filed: July 21, 2009 |

# TABLE OF CONTENTS

**Page**

INTRODUCTION AND ISSUES TO BE DECIDED.................................................................... 1

STATEMENT OF RELEVANT FACTS .................................................................................... 1

I.     O'BANNON HAS FAILED TO ALLEGE A PERSONAL CLAIM ..................... 1

II.    O'BANNON HAS FAILED TO ESTABLISH ARTICLE III STANDING........... 3

III.   O'BANNON HAS FAILED TO ESTABLISH ANTITRUST STANDING ......... 5

IV.   O'BANNON'S ANTITRUST CLAIMS ARE INSUFFICIENTLY PLED ........... 6

     A.    O'Bannon Has Not Sufficiently Pled A Conspiracy To Fix Prices............. 6

     B.    O'Bannon Has Not Sufficiently Pled A Concerted Refusal to Deal .......... 9

V.    O'BANNON HAS FAILED TO ALLEGE PER SE ANTITRUST VIOLATIONS ................................................................................................. 11

VI.   O'BANNON HAS FAILED TO ALLEGE INJURY TO COMPETITION ......... 12

VII.  O'BANNON HAS FAILED TO ALLEGE A RELEVANT MARKET ............... 13

VIII. O'BANNON'S CLAIMS ARE BARRED BY THE STATUTE OF LIMITATIONS ................................................................................................. 14

IX.   O'BANNON'S COMMON LAW CLAIMS ARE PROPERLY DISMISSED....................................................................................................... 15

# INDEX OF AUTHORITIES

**Page(s)**

CASES

*Adeduntan v. Hosp. Authority of Clarke County,*
  No. 3:04-CV-65, 2005 WL 2074248 (M.D. Ga. Aug. 25, 2005)...........................................13

*Aurora Enters. v. NBC,*
  688 F.2d 689 (9th Cir. 1982).............................................................................................14

*Bell Atlantic Corp. v. Twombly,*
  550 U.S. 544 (2007) ...................................................................................................2, 4, 9

*Bourns, Inc. v. Raychem Corp.,*
  331 F.3d 704 (9th Cir. 2003).................................................................................................5

*Bubar v. Ampco Foods, Inc.,*
  752 F.2d 445 (9th Cir. 1985).............................................................................................5, 6

*Cyntegra, Inc. v. Idexx Laboratories, Inc.,*
  322 Fed. Appx. 569 (9th Cir. 2009)......................................................................................6

*Cyntegra, Inc. v. Idexx Laboratories, Inc.,*
  520 F. Supp. 2d 1199 (C.D. Cal. 2007)................................................................................6

*Daniel v. Am. Bd. of Emergency Medicine,*
  269 F. Supp. 2d 159 (W.D.N.Y. 2003) ...........................................................................3, 13

*Eagle v. Star-Kist Foods, Inc.,*
  812 F.2d 538 (9th Cir. 1987)..................................................................................................3

*Eichman v. Fotomat Corp.,*
  880 F.2d 149 (9th Cir. 1989)...............................................................................................14

*Formula One Licensing v. Purple Interactive,*
  No. C 00-2222, 2001 WL 34792530 (N.D. Cal. Feb. 6, 2001)...........................................11

*Gerlinger v. Amazon.com, Inc.,*
  526 F.3d 1253 (9th Cir. 2008)...............................................................................................4

*Gratz v. Bollinger,*
  539 U.S. 244 (2003) ..............................................................................................................4

*Hunt v. Crumboch,*
  325 U.S. 821, 826 (1945) ......................................................................................................8

*In re Tableware Antitrust Litigation*,
  484 F. Supp. 2d 1059 (N.D. Cal. 2007) ........................................................ 12

*Indiana Telecom Corp. Inc. v. Indiana Bell Telephone Co., Inc.*,
  No. IP97-1532-C-H/G, 2001 WL 168169 (S.D. Ind. Sept. 25, 2001) ...................................... 3

*JES Properties, Inc. v. USA Equestrian, Inc.*,
  No. 802CV1585T24MAP, 2005 WL 1126665 (M.D. Fla. May 9, 2005) .............................. 3

*Kendall v. Visa U.S.A., Inc.*,
  518 F.3d 1042 (9th Cir. 2008)........................................................................ 2, 4, 9

*Leonard v. Clark*,
  No. 91-35770, 1993 U.S. App. LEXIS 36532 (9th Cir. Dec. 27, 1993)................................. 5

*Les Shockley Racing, Inc. v. Nat'l Hot Rod Ass'n*,
  884 F.2d 504 (9th Cir. 1989) ......................................................................... 12

*McMahon v. Pier 39 Ltd. Partnership*,
  01 Civ. 01125, 2001 WL 1463814 (N.D. Cal. Nov. 8, 2001).................................. 15

*Midwestern Machinery Co., Inc. v. Northwest Airlines, Inc.*,
  392 F.3d 265 (8th Cir. 2004)......................................................................... 15

*NCAA v. Board of Regents*,
  468 U.S. 85 (1984)........................................................................................ 11

*Newcal Indus., Inc. v. Ikon Office Solution*,
  513 F.3d 1038 (9th Cir. 2008)........................................................................ 13

*NYNEX Corp. v. Discon, Inc.*,
  525 U.S. 128 (1998)....................................................................................... 11

*Ortiz v. Fibreboard Corp.*,
  527 U.S. 815 (1999),........................................................................................ 4

*Pace Indus., Inc. v. Three Phoenix Co.*,
  813 F.2d 234 (9th Cir. 1987)........................................................................... 14

*Parrish v. NFLPA*,
  534 F. Supp. 2d 1081 (N.D. Cal. 2007) ............................................................ 2

*Pool Water Products v. Olin Corp.*,
  258 F.3d 1024 (9th Cir. 2001)......................................................................... 5

*Rivera v. Wyeth-Ayerst Laboratories*,
  283 F.3d 315 (5th Cir. 2002)........................................................................... 4

**DEFENDANT NCAA'S REPLY IN SUPPORT OF MOTION TO DISMISS**
Case No. 4:09-cv-03329-CW

*Sanjuan v. Am. Bd. of Psychiatry and Neurology, Inc.*,
    40 F.3d 247 (7th Cir. 1994) ............................................................................... 13

*Sprewell v. Golden State Warriors*,
    266 F.3d 979 (9th Cir. 2001) ............................................................................... 4

*Tanaka v. University of Southern California*,
    252 F.3d 1059 (9th Cir. 2001) ............................................................................ 11

*Tietsworth v. Sears, Roebuck and Co.*,
    No. 5:09-cv-00288, 2009 WL 3320486 (N.D. Cal. Oct. 13, 2009) ..................................... 10

*U.S. v. Solinger*,
    457 F. Supp. 2d 743 (W.D. Ky. 2006) ................................................................... 13

*Varner v. Peterson Farms*,
    371 F.3d 1011 (8th Cir. 2004) ............................................................................ 14

## INTRODUCTION AND ISSUES TO BE DECIDED

Despite filing a lengthy complaint, plaintiff Edward O'Bannon's claim that he has been "excluded" from the collegiate licensing market through a vast conspiracy designed to "boycott" him, or alternatively has been victimized by a conspiracy to "fix" the price for his image at zero, is based on one – and only one – alleged fact: Mr. O'Bannon supposedly has not received royalty checks from the NCAA or other, largely unnamed, third parties.

That's it.  That is all there is to Mr. O'Bannon's claim, as he effectively concedes in his opposition to the NCAA's motion.  His only "proof" of his alleged Section 1 "conspiracy" is the fact that he supposedly hasn't been paid some unspecified amount.

As the NCAA shows below, that is not nearly enough.  Mr. O'Bannon has failed to plead the most basic facts necessary to support his claims, and none of those pleading deficiencies is fixed by the fact that Mr. O'Bannon has filed an exceptionally long complaint, or has filled that complaint with antitrust buzzwords and conclusory antitrust allegations, or hopes to pursue this case as a class action.  Mr. O'Bannon's complaint should be dismissed.

## STATEMENT OF RELEVANT FACTS

The relevant facts remain the same as in the opening brief.  *See* NCAA Br. at 2-3.

## I.   O'BANNON HAS FAILED TO ALLEGE A PERSONAL CLAIM

As the NCAA showed in its opening brief:

- O'Bannon has failed to allege that anyone ever asked, let alone "forced," him to sign NCAA Form 08-3a or any of the other NCAA forms that he claims are anticompetitive, nor has he alleged that he actually signed any of those forms;

- O'Bannon has failed to allege facts demonstrating that the NCAA, or anyone else, has prevented him from selling or attempting to sell his collegiate image, or charging whatever price he deems appropriate for that image, through the use of any NCAA form ("misinterpreted" or not) or any other means; and

- O'Bannon has failed to allege facts demonstrating that he has ever participated in the so-called "collegiate licensing market," that he ever had any intention of doing so, or that he has any ability to do so.

*Id.* at 4-12.  In his opposition, O'Bannon essentially concedes all of this.  He does not, because he cannot, identify any portion of his lengthy complaint in which he alleges facts on any of the above topics.  As the NCAA has already demonstrated, this pleading failure by itself is sufficient to compel dismissal of O'Bannon's claims.  *Parrish v. NFLPA*, 534 F. Supp. 2d 1081, 1091 (N.D. Cal. 2007).

O'Bannon offers two other responses instead, neither of which is sufficient.

First, O'Bannon appears to claim that his complaint is sufficient because he has larded it with antitrust buzzwords like "group boycott" and "price fixing," and at in places has strung those buzzwords together into conclusory, fact-free allegations that the NCAA is wielding its forms as a "perpetual release" (even though O'Bannon agrees that the forms don't say that) against someone (not him, since he apparently didn't even sign those forms) to divert money to itself in a way that violates the Sherman Act.  *See* Opp. Br. at 5-8.  These sorts of conclusory allegations were not sufficient to state an antitrust claim in this Circuit before *Twombly*, and they certainly are not sufficient now.  *Bell Atlantic Corp. v. Twombly*, 550 U.S. 544, 555 (2007) (finding plaintiff obliged to provide "more than labels and conclusions, and a formulaic recitation of the elements of a cause of action"); *Kendall v. Visa U.S.A., Inc.*, 518 F.3d 1042, 1047 (9th Cir. 2008) ("To state a claim under Section 1 of the Sherman Act . . . claimants must plead not just ultimate facts (such as conspiracy), but evidentiary facts which will, if true, prove" the elements of the claim).

Second, O'Bannon argues that his claim is adequately alleged because he has alleged that the NCAA, UCLA and others are supposedly selling materials that use his image without payment to him.  From these bare allegations, he insists, the Court can and must infer that O'Bannon is the victim of a group boycott and price-fixing conspiracy.  *See* Opp. Br. at 12-15.

These allegations do not come close to satisfying the standards for alleging an antitrust claim. *Eagle v. Star-Kist Foods, Inc.*, 812 F.2d 538, 540 (9th Cir. 1987). The mere fact that O'Bannon has not received money for the use of his image does not create or warrant the inference that this "failure" is the result of a Section 1 conspiracy. *JES Properties, Inc. v. USA Equestrian, Inc.*, No. 802CV1585T24MAP, 2005 WL 1126665, at *11 (M.D. Fla. May 9, 2005); *Daniel v. Am. Bd. of Emergency Medicine*, 269 F. Supp. 2d 159, 183-84 (W.D.N.Y. 2003); *Indiana Telecom Corp. Inc. v. Indiana Bell Telephone Co., Inc.*, No. IP97-1532-C-H/G, 2001 WL 168169, at *13 (S.D. Ind. Sept. 25, 2001). O'Bannon should not be allowed to pursue a claim for restraint of trade without first alleging facts showing that he has, in fact, been restrained.

Worse, the "restraint" that O'Bannon is asking this Court to infer has no alleged basis in the "conspiracy" that O'Bannon has described in his complaint. O'Bannon's theory is that the NCAA is "forcing" student-athletes to sign its forms and then conspiring with others to exclude former student-athletes from the "market." But O'Bannon has not alleged that *he* was "forced" to sign those forms, or asked to do so, or even that he did do so, let alone that the NCAA has used them to exclude him from a "market." O'Bannon is thus asking this Court to connect two dots that O'Bannon himself has not connected: the NCAA's supposed "form" conspiracy, on the one hand, and the fact that people are not sending him checks for the use of his image, on the other. O'Bannon's failure – and apparent inability – to plead facts showing that he has been "restrained" is reason enough to dismiss the complaint.

## II.   O'BANNON HAS FAILED TO ESTABLISH ARTICLE III STANDING

O'Bannon's failure to allege *any* facts to show that he has actually been injured by anything the NCAA has supposedly done also compels the dismissal of his complaint for failure to establish Article III standing. O'Bannon claims that he has adequately alleged injury-in-fact through his generic allegation that he has been "injured in his business and property, and was

deprived of compensation in connection with the sale of his image" and similar allegations.  Opp.

Br. at 11, citing Compl. ¶¶ 34, 25-26.[1]  But none of the complaint paragraphs cited by O'Bannon

contain *factual* allegations demonstrating that O'Bannon has suffered an injury-in-fact as a result

of the NCAA's supposed wrongdoing.  And the boilerplate allegation that he has been "injured in

his business and property" is not sufficient.  *Twombly*, 550 U.S. at 554-55, *Kendall*, 518 F.3d at

1047; *Sprewell v. Golden State Warriors*, 266 F.3d 979, 988 (9th Cir. 2001).

Moreover, O'Bannon must allege more than the mere fact of injury; he must allege that he

"has suffered an injury which bears a causal connection to the alleged antitrust violation,"

*Gerlinger v. Amazon.com, Inc.*, 526 F.3d 1253, 1255 (9th Cir. 2008), and that his "injury" will be

redressed by an order stopping the alleged "violation."  *Id.*  As noted above, he has done nothing

of the kind.  He has alleged no facts to connect his supposed "injury" to any of the NCAA forms

that he claims the NCAA has used to violate Section 1, nor has he alleged facts demonstrating

that any order this Court might enter in connection with those forms will redress his "injury."

O'Bannon's attempt to distinguish *Gerlinger* is unavailing.  The *Gerlinger* plaintiff, like

O'Bannon, had made the generic allegation that he had been injured by the alleged group boycott

and price-fixing conspiracy; the plaintiff claimed that he had been injured because his prices

would have been even lower in the absence of the alleged conspiracy.  *Id.* at 1256.  The Ninth

Circuit rejected this as insufficient, noting that the plaintiff had failed to show that he had suffered

---

[1]     O'Bannon also cites *Ortiz v. Fibreboard Corp.*, 527 U.S. 815 (1999), to suggest that the standing issue is somehow premature because he has brought this case as a putative class action. *See* Opp. Br. at 12 n. 5.  As later courts have noted, however, it is not appropriate to defer standing issues that exist independent of  class claims.  *See, e.g., Rivera v. Wyeth-Ayerst Laboratories*, 283 F.3d 315, 319 n. 6 (5th Cir. 2002) (when "the standing question would exist whether [the class representative] filed her claim alone or as part of a class," the court "must decide standing first").  O'Bannon's standing problem has nothing to do with the putative class claims, cannot be cured by the fact that this is a putative class action, *see Gratz v. Bollinger*, 539 U.S. 244 (2003) ("the fact that a suit may be a class action . . . adds nothing to the question of standing"), and should not be ignored.

any actual, personal injury as a result of the alleged violation. *Id.; see also Leonard v. Clark*, No. 91-35770, 1993 U.S. App. LEXIS 36532, at *11 (9th Cir. Dec. 27, 1993) (plaintiffs lacked standing because they failed to allege "the ***personal*** actual or threatened injury necessary") (emphasis in original).

O'Bannon's allegations are similarly deficient. He has alleged no facts demonstrating that he personally has been injured, nor has he alleged facts connecting his "injury" to anything the NCAA is alleged to have done. He does not have standing to bring these claims.

## III.   O'BANNON HAS FAILED TO ESTABLISH ANTITRUST STANDING

The NCAA also showed in its opening brief that O'Bannon has failed to establish his antitrust standing because he had failed to allege facts showing that he was an actual, or potential, participant in the "market." O'Bannon's two responses are not convincing.

First, O'Bannon appears to claim that he has satisfied this requirement through his generic allegation that the NCAA excludes him, and others, from the "collegiate licensing" market. Opp. Br. at 12-13.   But it is not enough for O'Bannon to merely allege that he has been "excluded" from the "collegiate licensing" market; he must also allege facts showing that he was in, or was ready to be in, the market, and was kept out by the alleged illegal activity. *See Bourns, Inc. v. Raychem Corp.*, 331 F.3d 704, 711 (9th Cir. 2003); *Pool Water Products v. Olin Corp.*, 258 F.3d 1024, 1034 (9th Cir. 2001) (quoting *Rebel Oil v. ARCO*, 51 F.3d 1421, 1433 (9th Cir. 1995)); *Bubar v. Ampco Foods, Inc.*, 752 F.2d 445, 450 (9th Cir. 1985).   O'Bannon has not even attempted to do so, and for this reason has failed to establish antitrust standing.

O'Bannon's other response is the strange argument that the "market participant" element of antitrust standing applies only to antitrust plaintiffs who are pursuing *Walker Process* claims. O'Bannon is wrong. The "market participant" test is a core element of antitrust standing, and

applies in all antitrust cases, not just in *Walker Process* cases.[2]   Indeed, the Ninth Circuit recently applied the "market participant" test to a case very similar to this one.  The plaintiff in *Cyntegra, Inc. v. Idexx Laboratories, Inc.*, 520 F. Supp. 2d 1199 (C.D. Cal. 2007), claimed that it had been wrongfully excluded from the animal diagnostic products market by the defendant's use of exclusive dealing contracts.  *Cyntegra*, 520 F. Supp. 2d at 1205-08.  The district court granted summary judgment on antitrust standing grounds because the plaintiff had failed to establish that it was either a market participant or was likely to enter the market.  *Id.*  The Ninth Circuit affirmed, citing *Bourns* for the proposition that "[o]nly an actual competitor or one ready to be a competitor can suffer antitrust injury."  *Cyntegra, Inc. v. Idexx Laboratories, Inc.*, 322 Fed. Appx. 569, 572-73 (9th Cir. 2009) (quoting *Bourns*, 331 F.3d at 711).  The "market participant" test thus applies to O'Bannon's claims, just like it applies to the claims of all antitrust plaintiffs.

As O'Bannon seems to concede, he has alleged no facts showing that he is a participant in the "collegiate licensing" market, or that he had any inclination or ability to join that market.  Under binding Ninth Circuit authority, this pleading failure deprives him of antitrust standing.

## IV.   O'BANNON'S ANTITRUST CLAIMS ARE INSUFFICIENTLY PLED

Not only has O'Bannon failed to allege that he personally has been affected or injured by any NCAA actions, he has also failed to adequately allege that the NCAA has "conspired" with anyone to unreasonably "restrain" trade.

### A.   O'Bannon Has Not Sufficiently Pled A Conspiracy To Fix Prices

O'Bannon claims his "conspiracy" to "fix prices" is sufficiently alleged based on (a) his claim that the NCAA's forms (NCAA Form 08-3a) and amateurism bylaws are "the product of an illegal agreement and combination of the NCAA's members and the NCAA," Opp. Br. at 6, (b)

---

[2]   The Ninth Circuit's decision in *Bubar*, which affirmed that only plaintiffs with "a genuine intent to enter the market and a preparedness to do so" have antitrust standing, did ***not*** involve any *Walker Process* claims.  *Bubar*, 752 F.2d 445.

his unsupported claim that "the NCAA and its co-conspirators" set "prices" for the use of former student-athlete likenesses at zero, *id.* at 5, and (c) his lists of multiple independent, unrelated and varied commercial deals related to college sports, *id.* at 5 and Appx.

None of this, however, renders O'Bannon's "conspiracy" claim plausible, because O'Bannon has failed to include a single factual allegation supporting the claim that the NCAA agreed with *anyone* on the prices to be paid by *anyone* for the use of former student-athlete likenesses.  O'Bannon has not alleged any facts to support (a) any connection between the various commercial activities he's apparently feeling left out of,  or (b) any connection between Form 08-3a or any NCAA amateurism bylaws, on the one hand, and O'Bannon's alleged failure to receive what he claims is "due" compensation, on the other.  O'Bannon cannot rely on the "joint" nature of NCAA rulemaking to satisfy his conspiracy allegations when the rules in question simply do not, on their face, even purport to do what O'Bannon claims.  NCAA Br. at 13-18.  Neither Form 08-3a nor Bylaw 12.5.1.1 purport to "fix prices" (between the NCAA and its members, or between the NCAA and other entities) for the use of former student-athlete likenesses.[3]

O'Bannon cannot rely on the NCAA's bylaws to support a conspiracy not even arguably set forth therein, and, as the NCAA demonstrated previously, O'Bannon has pled no facts to support his conclusory assertion that there must be some shadow conspiracy between the NCAA and its members, and perhaps others, that exists outside of the Bylaws.

Having pled himself into a corner, O'Bannon now claims as evidence of a horizontal

---

[3]    O'Bannon argues at length that the forms required by Bylaw 12.5.1.1, really are "mandatory" and really do constitute an agreement supported by the NCAA's ability to "penalize" schools.  Opp. Br. at 7-8.  This argument is both wrong and beside the point.  It is wrong because the language from Bylaw 12.5.1.1 that O'Bannon has cited does not support his interpretation of the Bylaw, and he has pled no other facts to support that interpretation.  NCAA Br. at 16-18.  And it is beside the point because  Bylaw 12.5.1.1, and any "release" referenced therein, doesn't apply to former student-athletes, doesn't require any price-fixing or boycotting thereof, and, in fact, serves to ensure that schools who *choose* to utilize *current* student-athlete likenesses in their promotional activities *obtain permission* before so doing.  *Id.* at 16-17.

price-fixing conspiracy his allegations regarding the, as he describes it, "litany of deals" he alleges the NCAA, its conferences and its member institutions have entered with multiple independent third-parties to sell and/or license various products related to college sports.[4]  Opp. Br. at 5-6.  None of O'Bannon's allegations, however, support the inference that those deals are the product of a conspiracy between horizontal competitors.[5]   Instead, those allegations (including, *inter alia*, Compl. ¶¶ 104-65) simply set forth unrelated, independent and, importantly, ***economically vertical*** deals allegedly made between (a) the NCAA and third-parties such as EA, Thought Equity, CBS and ESPN, (b) CLC and various third-party licensees, (c) member conferences such as the Big Ten and television networks, (d) member institutions and consumers, and (e) member institutions and various licensors and vendors.  O'Bannon's complaint is devoid of allegations that tie, for example, the NCAA's alleged dealings with EA to the Big Ten Conference's alleged dealings with the Big Ten Network, and is also devoid of allegations that tie any of those deals to either Form 08-3a or Bylaw 12.5.1.1.

The mere fact that these ***vertical*** relationships allegedly exist does not support the inference that O'Bannon has been victimized by a ***horizontal*** conspiracy to "fix" the price of his image at zero.  O'Bannon's claim to the contrary is a simple *non sequitur*.  Moreover, O'Bannon

---

[4]    O'Bannon also cites an abundance of irrelevant case law regarding general antitrust principles.  None of the authority O'Bannon cites, however, stands for the proposition that a complaint survives a motion to dismiss solely on the basis of the plaintiff having (a) complained that he has been commercially wronged and (b) conclusorily asserted the existence of an implausible price-fixing conspiracy.  *Hunt v. Crumboch*, 325 U.S. 821, 826 (1945) (stating that Sherman Act "does not purport to afford remedies for all torts committed by or against persons engaged in interstate commerce.").

[5]    O'Bannon claims that the complaint contains "numerous and detailed examples" of "prices" fixed at zero.  Opp. Br. at 5.  The allegations he cites, however, do no such thing.  *See* Compl. ¶¶ 105-06 (alleging that the NCAA and several of its member conferences have television contracts for championships and regular season games), 108 (alleging that the NCAA operates a website called "NCAA On Demand"), 111 (alleging that videos of "classic games" sell for $24.95, even to the students who played in them, and arguing that student-athletes' appearance in the video was wrongful and uncompensated), 114-16 (alleging that the NCAA sells a lot of DVDs), 119, 163, 135, 145, and 130-32.

**DEFENDANT NCAA'S REPLY IN SUPPORT OF MOTION TO DISMISS**
Case No. 4:09-cv-03329-CW

has conceded that former student-athletes are capable of selling licenses for the use of their collegiate likeness, and that such deals take place. Compl. ¶¶ 133-34, 143. O'Bannon has not even attempted to allege facts showing that the "prices" paid in those deals were "fixed" by the NCAA or anyone else, through the use of Form 08-3a, Bylaw 12.5.1.1 or any other means.

O'Bannon has alleged absolutely no facts to support his assertion that the NCAA "fixes" the prices that he, or any other former student-athlete, receives for use of his collegiate image. Instead, he asks the Court to infer that "prices" are "fixed" based solely on his bare assertion that prices would be higher if the NCAA's alleged "violation" was not occurring. That is not sufficient, even at this stage of the case. *Twombly*, 550 U.S. at 549-52, *Kendall*, 581 F.3d at 1047-48.

### B. O'Bannon Has Not Sufficiently Pled A Concerted Refusal to Deal

Nor has O'Bannon sufficiently pled a group boycott between the NCAA and its alleged "co-conspirators." O'Bannon argues otherwise based on (1) his flawed price-fixing conspiracy allegations, Opp. Br. at 9, (2) citations to his complaint containing unsupported assertions and legal conclusions, and (3) his claim that he is not being inundated with either offers or cash for the use of his likeness. None of these assertions makes up for the fact that, as with the price-fixing "conspiracy" allegations addressed above, O'Bannon's "concerted refusal to deal" claims are unsupported by fact or plausible, reasonable, warranted inferences arising therefrom.

First, O'Bannon's "price fixing" and "group boycott" claims are fatally circular. O'Bannon argues that his "price fixing" claims are supported by his allegations that he has been boycotted from participating in the alleged "collegiate licensing" market. *Id.* at 5, 9. In the next breath, however, he argues that his faulty and insufficient "boycott" claims are supported by his allegations that the NCAA has engaged in . . . a "price-fixing" scheme. This circular argument

gets O'Bannon nowhere.  As shown above, O'Bannon's "price fixing" allegations are insufficient to support either that claim or the "group boycott" claim.

O'Bannon also cites to a number of complaint allegations in support of his claim that his group boycott theory is sufficiently alleged.  *Id.* at 9.  But none of those allegations do anything of the sort; they merely repeat the insufficient and unsupported assertions discussed above and recite O'Bannon's conclusory legal allegations.[6]  None of the paragraphs cited contain any ***factual*** allegations that would, even if true, sufficiently and plausibly demonstrate an entitlement to relief on any Section 1 theory.

Finally, O'Bannon argues that his group boycott claim is sufficiently pled because, after all, if there were no group boycott, former student-athletes like O'Bannon would presumably be approached with offers to license their likenesses, names or images in the so-called "collegiate licensing market."  *Id.* at 10.  This argument gets O'Bannon nowhere, because he has alleged that such deals ***do*** take place, Compl. ¶¶ 133-34, 143, and has alleged no facts to support the inference that the NCAA's rules or forms have any effect on either the number or terms of such deals.  In the face of that admission, O'Bannon's claim that the existence of a "group boycott" can be inferred from the supposed absence of transactions involving former student-athletes is not plausible and cannot support his claims.[7]  O'Bannon's insufficiently alleged Section 1 claims should be dismissed.

---

[6]     *See, e.g.*, Compl. ¶¶ 7 (alleging that Thought Equity sells video of college sports); 11 (alleging that Form 08-3a "purports to cause student-athletes to release in perpetuity their rights"); 81 (alleging, in conclusory fashion, that the "NCAA and its members have the ability to control price and competition," and "can and does exclude both current and former student-athletes" from the "licensing market"); 85-87; 173; 182-88; and 195-99.

[7]     O'Bannon attempts to explain away his admission that former student-athletes are free to license their collegiate images to third parties by claiming that the "conspiracy" has only recently "allowed" such deals.  Opp. Br. at 10.  This claim must be ignored because the complaint contains no facts to support it.  "It is axiomatic that the complaint may not be amended by briefs in opposition to a motion to dismiss."  *Tietsworth v. Sears, Roebuck and Co.*, No. 5:09-cv-00288, 2009 WL 3320486, at *13 (N.D. Cal. Oct. 13, 2009).

**DEFENDANT NCAA'S REPLY IN SUPPORT OF MOTION TO DISMISS**
Case No. 4:09-cv-03329-CW

1

## V.   O'BANNON HAS FAILED TO ALLEGE *PER SE* ANTITRUST VIOLATIONS

2

3         O'Bannon's argument that his claims are entitled to *per se* treatment fails for several

4    reasons.   First, the Supreme Court has recognized that because the NCAA is "an industry in

5    which horizontal restraints on competition are essential if the product is to be available at all," the

6    *per se* rule does not apply to alleged NCAA "restraints."   *NCAA v. Board of Regents*, 468 U.S. 85,

7    101 (1984) (declining to apply *per se* treatment to NCAA plan limiting amount of televised

8    college football); *Tanaka v. University of Southern California*, 252 F.3d 1059, 1062-63 (9th Cir.

9    2001).

10        Second, even if the *per se* test could be applied to the NCAA, O'Bannon has not alleged

11   facts to support its use here.   His "price-fixing" claim is nothing more than a restatement of his

12   group boycott claim, as explained above, and does not involve allegedly horizontal agreements in

13   any event.   *See* IV.A.   Nor is his group boycott claim entitled to *per se* treatment.

14

15        Group boycotts cannot be treated as *per se* violations of the Sherman Act unless they take

16   the form of horizontal agreements among direct competitors.   *NYNEX Corp. v. Discon, Inc.*, 525

17   U.S. 128, 135; 119 S. Ct. 493 (1998).   O'Bannon has failed to allege such a horizontal agreement.

18   The only alleged conspirators that O'Bannon has identified are CLC and EA, and O'Bannon does

19   not even pretend that these entities are the NCAA's competitors.   CLC is alleged to be the

20   NCAA's "licensing arm," Compl. ¶ 2, and EA is alleged to be the NCAA's licensee, *id.* at ¶ 38.

21   O'Bannon also refers vaguely to the member schools and conferences,  *id.* at ¶ 15, but does not

22   allege facts showing that those entities compete directly with the NCAA.   This failure is fatal to

23   his claim.   *Formula One Licensing v. Purple Interactive*, No. C 00-2222, 2001 WL 34792530, at

24   *3 (N.D. Cal. Feb. 6, 2001) (dismissing *per se* boycott claim for failure to allege that conspirators

25   were direct competitors).

26

27

28

Nor has O'Bannon alleged other facts necessary for stating a *per se* group boycott claim, i.e., that "(1) the boycott cuts access to a supply, facility, or market necessary to enable the victim firm to compete; (2) the boycotting firm possesses a dominant market position; and (3) the practices are not justified by plausible arguments that they enhanced overall efficiency or competition." *In re Tableware Antitrust Litigation*, 484 F. Supp. 2d 1059, 1070 (N.D. Cal. 2007) (citing *Adaptive Power Solution, LLC v. Hughes Missile Systems Co.*, 141 F.3d 947, 950 (9th Cir. 1998)). O'Bannon has failed to allege to which "supply, facility or market" he has been denied access and has in fact alleged that other former student-athletes successfully participate in the collegiate licensing "market." Compl. ¶¶ 133-34, 143. He has failed to allege that the NCAA possesses a dominant market position; indeed, as explained below, he has failed to even allege a market that has been restrained. O'Bannon has failed to allege *per se* claims.

## VI. O'BANNON HAS FAILED TO ALLEGE INJURY TO COMPETITION

O'Bannon's claims also fail because he must allege injury to competition, and has failed to do so. The complaint contains only vague, conclusory or boilerplate allegations on this point. *See* Opp. Br. at 16 (citing Compl. ¶¶ 173, 176, 180 and 181).[8] Such allegations are not sufficient. *Les Shockley Racing, Inc. v. Nat'l Hot Rod Ass'n*, 884 F.2d 504, 507-08 (9th Cir. 1989) (antitrust plaintiff "may not merely recite the bare legal conclusion that competition has been restrained unreasonably" but instead must "sketch the outline of the antitrust violation with allegations of supporting factual detail"). Nor can injury to competition be inferred from O'Bannon's

---

[8] For example, ¶ 173 of the complaint states

Defendants' contract, combination, and conspiracy described herein consisted of a continuing agreement, understanding, and concert of action among the Defendants and their co-conspirators, the substantial terms of which were to artificially fix, depress, maintain, and/or stabilize prices received by Plaintiff and Class members for use and sale of their images at zero dollars in the United States, its territories and possessions.

These are not facts but are merely unsupported allegations.

**DEFENDANT NCAA'S REPLY IN SUPPORT OF MOTION TO DISMISS**
Case No. 4:09-cv-03329-CW

12

(unsubstantiated) claim that the alleged antitrust violations have depressed the amount of money he has received, or will receive, for the alleged use of his image.  The claim that the alleged "conspiracy" has reduced O'Bannon's licensing income has nothing to do with the antitrust laws, which are designed to protect competition, not competitors.  *Sanjuan v. Am. Bd. of Psychiatry and Neurology, Inc.*, 40 F.3d 247, 251 (7th Cir. 1994).  In any event, O'Bannon's failure to share in the profits of an allegedly illegal cartel cannot constitute harm to competition.  *See Daniel*, 428 F.3d at; *U.S. v. Solinger*, 457 F. Supp. 2d 743, 761 (W.D. Ky. 2006); *Adeduntan v. Hosp. Authority of Clarke County*, No. 3:04-CV-65, 2005 WL 2074248, at *8 (M.D. Ga. Aug. 25, 2005).  O'Bannon has failed to allege injury to competition.

## VII.   O'BANNON HAS FAILED TO ALLEGE A RELEVANT MARKET

Since O'Bannon is not entitled to *per se* treatment, he must also allege a relevant market. *Newcal Indus., Inc. v. Ikon Office Solution*, 513 F.3d 1038, 1044 (9th Cir. 2008).  "The outer boundaries of a product market are determined by the reasonable interchangeability of use or the cross-elasticity of demand between the product itself and substitutes for it."  *Id.* at 1045. O'Bannon has not even attempted to meet this standard.  Rather, he has collected a few snippets from CLC's and IMG's websites.  *See* Opp. Br. at 18-19 (citing Compl. ¶¶ 5, 36, 80, 99, 101-102). Those snippets cannot substitute for alleged facts showing that there are no substitutes for the multitude of "products" in O'Bannon's claimed "market."

Moreover, O'Bannon's opposition makes it clear that he has not alleged one product market but many.  O'Bannon lists at least ten types of "rights" that the NCAA has authorized CLC and others to license.  *Id.* at 18 n. 10.  As the NCAA demonstrated in its opening brief, these products are clearly not substitutes for one another – the clothing manufacturer that wishes to produce replica team jerseys will not be satisfied by the right to utilize a team mascot in a video game.  O'Bannon proves as much in his citations to the complaint; each citation asserts that the

individual product discussed is "unique," Compl. ¶ 108, or "one of the most unique and valuable content collections in the world," *id.* at ¶ 121.  As O'Bannon seems to agree, then, there is no single "product" of "collegiate licensing," nor is there a "collegiate licensing" market.  Having failed to allege a relevant market, O'Bannon's complaint must be dismissed.

## VIII.    O'BANNON'S CLAIMS ARE BARRED BY THE STATUTE OF LIMITATIONS

O'Bannon concedes that his claims are time-barred on their face, and claims only that they can be saved through the doctrine of continuing violation.  Opp. Br. at 20.  However, that doctrine requires O'Bannon to show (1) a new and independent act that is not merely a reaffirmation of a previous act; and (2) a new and accumulating injury on the plaintiff.  *Pace Indus., Inc. v. Three Phoenix Co.*, 813 F.2d 234, 238 (9th Cir. 1987).  O'Bannon has not alleged facts sufficient to show either.

O'Bannon has alleged only that the NCAA "invaded Plaintiff's commercial interest ***by obtaining revenue*** from the exploitation or sale of Plaintiff's image."  Opp. Br. at 20 (emphasis added).  But the *Pace* test, which O'Bannon cites, requires an injury to O'Bannon, not a benefit to the NCAA, in order to restart the statute of limitations.  *See Eichman v. Fotomat Corp.*, 880 F.2d 149, 160 (9th Cir. 1989) (finding that each payment to defendant under an allegedly anticompetitive lease did not restart the statute of limitations); *Aurora Enters. v. NBC*, 688 F.2d 689, 694 (9th Cir. 1982).  O'Bannon has not adequately alleged an injury to himself.

Moreover, O'Bannon's alleged exclusion from the market – and therefore any injury – occurred either when he signed a form governing his rights when he was a student-athlete, or when the NCAA allegedly decided not to deal with him when he became a former student-athlete.  In the former case, his "injury" is the result of the performance of an allegedly anticompetitive contract, *Varner v. Peterson Farms*, 371 F.3d 1011, 1020 (8th Cir. 2004); *Eichman*, 880 F.2d at 160; *Aurora*, 688 F.2d at 694; in the latter, it is the result of a continuing refusal to deal.

---

**DEFENDANT NCAA'S REPLY IN SUPPORT OF MOTION TO DISMISS**
Case No. 4:09-cv-03329-CW

*Midwestern Machinery Co., Inc. v. Northwest Airlines, Inc.*, 392 F.3d 265 (8th Cir. 2004); *McMahon v. Pier 39 Ltd. Partnership*, 01 Civ. 01125, 2001 WL 1463814, at *4 (N.D. Cal. Nov. 8, 2001). The continuing violation exception applies to neither. O'Bannon's claim is time-barred on its face and should be dismissed.

## IX.    O'BANNON'S COMMON LAW CLAIMS ARE PROPERLY DISMISSED

Since O'Bannon has failed to properly allege any antitrust claims, his tort claims are also properly dismissed. The NCAA does not mysteriously claim that the tort claims are derivative; O'Bannon says so himself. The complaint states that "Defendants have been unjustly enriched *as a result of the wrongful conduct detailed herein*." Compl. ¶ 205 (emphasis added). The only wrongful conduct even arguably alleged is violation of the antitrust laws. Even more bluntly, the complaint states in support of the accounting claim that "*As a result of the anticompetitive actions detailed herein*, Defendants have received licensing revenues which are due to Plaintiff." *Id.* at ¶ 208 (emphasis added). Without the antitrust claims, the tort claims must fail.

The NCAA's motion should be granted.

Respectfully submitted,

MILLER, CANFIELD, PADDOCK AND STONE, P.L.C.

By:   *s/ Robert J. Wierenga*
      Robert J. Wierenga (SBN183687)
      Attorneys for National Collegiate Athletic Association
      101 North Main St., 7th Floor
      Ann Arbor, MI  48104
      (734) 663-2445

Dated:  November 3, 2009

---

1

**CERTIFICATE OF SERVICE**

2

3       I hereby certify that on November 3, 2009, I electronically filed the foregoing document with the Clerk of the Court using the CM/ECF system which will send notification to the e-mail addresses registered.

4

5

6                                    By:    s/ Robert J. Wierenga
                                              Robert J. Wierenga (SBN183687)

7                                            Attorneys for National Collegiate Athletic Association
17413651.1\063863-00041

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28

---

**DEFENDANT NCAA'S REPLY IN SUPPORT OF MOTION TO DISMISS**
Case No. 4:09-cv-03329-CW