PAGES 1 - 75

UNITED STATES DISTRICT COURT

NORTHERN DISTRICT OF CALIFORNIA

BEFORE THE HONORABLE CLAUDIA WILKEN, JUDGE

| | | |
|---|---|---|
| SAMUEL KELLER, | ) | |
| | ) | |
| PLAINTIFF, | ) | NO. C-09-1967 CW |
| | ) | |
| VS. | ) | THURSDAY, DECEMBER 17, 2009 |
| | ) | |
| ELECTRONIC ARTS, NCAA, | ) | OAKLAND, CALIFORNIA |
| COLLEGIATE LICENSING CO., | ) | |
| | ) | |
| DEFENDANTS. | ) | |
| _____ | ) | |
| EDWARD C. O'BANNON, | ) | |
| | ) | |
| PLAINTIFF, | ) | C-09-3329 CW |
| VS. | ) | |
| | ) | |
| NCAA AND COLLEGIATE | ) | |
| LICENSING COMPANY, | ) | |
| | ) | |
| DEFENDANTS. | ) | |
| _____ | ) | |
| BRYON BISHOP, | ) | |
| | ) | |
| PLAINTIFF, | ) | C-09-4128 CW |
| VS. | ) | |
| | ) | |
| ELECTRONIC ARTS, NCAA AND | ) | |
| COLLEGIATE LICENSING CO., | ) | |
| | ) | |
| DEFENDANTS. | ) | |
| _____ | ) | |

CAPTION CONTINUED ON NEXT PAGE

**REPORTER'S TRANSCRIPT OF PROCEEDINGS**

**REPORTED BY:**          DIANE E. SKILLMAN, CSR 4909, RPR, FCRR
                         OFFICIAL COURT REPORTER

```
1   CRAIG NEWSOME,                    )
                                      )
2            PLAINTIFF,               )        C-09-4882 CW
      VS.                             )
3                                     )
    NCAA AND COLLEGIATE               )
4   LICENSING COMPANY,                )
                                      )
5            DEFENDANTS.              )
    _____)
6   MICHAEL ANDERSON,                 )
                                      )
7            PLAINTIFF,               )        C-09-5100 CW
      VS.                             )
8                                     )
    NCAA AND COLLEGIATE               )
9   LICENSING COMPANY,                )
                                      )
10           DEFENDANTS.              )
    _____)
11  DANNY WIMPRINE,                   )
                                      )
12           PLAINTIFF,               )        C-09-5134 CW
      VS.                             )
13                                    )
    NCAA AND COLLEGIATE               )
14  LICENSING COMPANY,                )
                                      )
15           DEFENDANTS.              )
    _____)
16  SAMUEL JACOBSON,                  )
                                      )
17           PLAINTIFF,               )        C-09-5372 CW
      VS.                             )
18                                    )
    NCAA AND COLLEGIATE               )
19  LICENSING COMPANY,                )
                                      )
20           DEFENDANTS.              )
    _____)
21

22

23            CAPTION CONTINUED ON NEXT PAGE

24

25
```

```
1   DAMIEN RHODES,                    )
                                      )
2              PLAINTIFF,             )          C-09-5378 CW
    VS.                               )
3                                     )
    NCAA AND COLLEGIATE               )
4   LICENSING COMPANY,                )
                                      )
5              DEFENDANTS.            )
    _____ )
6


7


8   APPEARANCES:

9   FOR PLAINTIFF              HAGENS BERMAN SOBOL SHAPIRO
    SAMUEL KELLER:             11 WEST JEFFERSON STREET, STE. 1000
10                             PHOENIX, ARIZONA 85003
                         BY:  ROBERT B. CAREY, ESQUIRE
11                             LEONARD W ARAGON, ESQUIRE

12                             THE PAYNTER LAW FIRM PLLC
                               1200 G STREET N.W., STE. 800
13                             WASHINGTON, DC 20005
                         BY:  STUART MCKINLEY PAYNTER, ESQUIRE
14


15
    FOR PLAINTIFF              HAUSFELD LLP
16  EDWARD O'BANNON:           1700 K STREET, NW, SUITE 650
                               WASHINGTON, DC 20006
17                       BY:  MICHAEL D. HAUSFELD, ESQUIRE

18                             HAUSFELD LLP
                               44 MONTGOMERY STREET, STE. 3400
19                             SAN FRANCISCO, CALIFORNIA 94104
                         BY:  MICHAEL LEHMANN, ESQUIRE
20                             JON T. KING, ESQUIRE

21


22


23                  (APPEARANCES CONTINUED)

24


25
```

```
 1

 2
      FOR PLAINTIFF            WEINSTEIN KITCHENOFF & ASHER
 3    BRYON BISHOP:            1845 WALNUT STREET, STE. 1100
                               PHILADELPHIA, PENNSYLVANIA 19103
 4                        BY:  STEVEN A. ASHER, ESQUIRE

 5                             RAM & OLSON
                               555 MONTGOMERY STREET, STE. 820
 6                             SAN FRANCISCO, CALIFORNIA 94111
                          BY:  MICHAEL F. RAM, ESQUIRE
 7                             KARL OLSON, ESQUIRE

 8

 9    FOR PLAINTIFF            LIEFF, CABRASER, HEIMANN & BERNSTEIN
      CRAIG NEWSOME:           275 BATTERY STREET, 30TH FLOOR
10                             SAN FRANCISCO, CALIFORNIA 94111
                          BY:  KELLY M. DERMODY, ESQUIRE
11                             JOSEPH R. SAVERI, ESQUIRE

12
      FOR PLAINTIFF            CAFFERTY FAUCHER LLP
13    MICHAEL ANDERSON         1717 ARCH STREET, STE. 3610
      & DANNY WIMPRINE:        PHILADELPHIA, PENNSYLVANIA 19103
14                        BY:  BRYAN CLOBES, ESQUIRE

15
      FOR PLAINTIFF            REINHARDT WENDORF & BLANCHFIELD
16    SAMUEL JACOBSON:         332 MINNESOTA STREET
                               SAINT PAUL, MINNESOTA 55101
17                        BY:  GARRETT D. BLANCHFIELD, ESQUIRE

18
                               PEARSON SIMON WARSHAW & PENNY
19                             44 MONTGOMERY STREET, STE. 2450
                               SAN FRANCISCO, CALIFORNIA 94104
20                        BY:  JESSICA L. GRANT, ESQUIRE

21

22

23

24

25
```

```
 1    FOR PLAINTIFF              FARUQI & FARUQI
      DAMIEN RHODES:             2600 PHILMONT AVENUE, STE. 324
 2                               HUNTINGDON VALLEY, PENNSYLVANIA 19006
                           BY:  STEPHEN E. CONNOLLY, ESQUIRE
 3
                                 LIEFF, CABRASER, HEIMANN & BERNSTEIN
 4                               275 BATTERY STREET, 30TH FLOOR
                                 SAN FRANCISCO, CALIFORNIA 94111
 5                         BY:  JOSEPH R. SAVERI, ESQUIRE

 6
      FOR DEFENDANT             KEKER & VAN NEST
 7    ELECTRONIC ARTS:          710 SANSOME STREET
                                 SAN FRANCISCO, CALIFORNIA 9411
 8                         BY:  ROBERT A. VAN NEST, ESQUIRE
                                   ADAM LAURIDSEN, ESQUIRE
 9

10    FOR DEFENDANT             KILPATRICK STOCKTON
      CLC:                      1100 PEACHTREE STREET, NE, STE. 2800
11                               ATLANTA, GEORGIA 30309
                           BY:  R. CHARLES HENN JR., ESQUIRE
12
                                 KILPATRICK STOCKTON
13                               607 14TH STREET, NW, STE. 900
                                 WASHINGTON, DC 20005
14                         BY:  PETER M. BOYLE, ESQUIRE

15
      FOR DEFENDANT             MILLER, CANFIELD, PADDOCK AND STONE
16    NCAA:                     101 NORTH MAIN, 7TH FLOOR
                                 ANN ARBOR, MICHIGAN 48104
17                         BY:  GREGORY L. CURTNER, ESQUIRE
                                 ROBERT J. WIERENGA, ESQUIRE
18
                                 NCAA
19                               P.O. BOX 6222
                                 INDIANAPOLIS, INDIANA 46206
20                         BY:  ELSA KIRCHER COLE, VICE PRESIDENT OF
                                 LEGAL AFFAIRS AND GENERAL COUNSEL
21
                                 LONG & LEVIT
22                               465 CALIFORNIA STREET, 5TH FLOOR
                                 SAN FRANCISCO, CALIFORNIA 94104
23                         BY:  JASON A. GELLER, ESQUIRE

24

25
```

| 1 | <u>THURSDAY, DECEMBER 17, 2009</u>                          3:05 P.M. |

THURSDAY, DECEMBER 17, 2009                                3:05 P.M.

         **THE CLERK:**  CALLING THE MATTER OF KELLER VERSUS

ELECTRONIC ARTS, CIVIL ACTION C-09-1967, O'BANNON VERSUS NCAA,

CIVIL ACTION NUMBER C-09-3329, BISHOP VERSUS ELECTRONIC ARTS,

CIVIL ACTION C-09-4128, NEWSOME VERSUS NCAA, CIVIL ACTION

NUMBER C-09-4882, ANDERSON VERSUS NCAA, CIVIL ACTION NUMBER

C-09-5100, WIMPRINE VERSUS NCAA, CIVIL ACTION C-09-5134,

JACOBSON VERSUS NCAA, CIVIL ACTION NUMBER C-09-5372 AND RHODES

VERSUS NCAA, CIVIL ACTION NUMBER C-09-5378.

         COUNSEL, PLEASE STATE YOUR APPEARANCES FOR THE

RECORD.

         **THE COURT:**  DO IT IN THE ORDER THAT I SET.  AND IF

THERE IS MORE THAN ONE ATTORNEY FOR ANY GIVEN CLIENT, IF YOU

CAN JUST INTRODUCE YOUR COLLEAGUE RATHER THAN HAVE EVERYBODY

COME UP AND SAY THEIR NAME.

         KELLER?

         **MR. CAREY:**  ROB CAREY FROM HAGENS BERMAN ALONG WITH

LEONARD ARAGON HAGENS BERMAN AND STUART PAYNTER OF THE PAYNTER

LAW FIRM ON BEHALF OF MR. KELLER.

         **MR. VAN NEST:**  BOB VAN NEST, YOUR HONOR, KEKER & VAN

NEST FOR ELECTRONICS ARTS DEFENDANT IN THE KELLER CASE.  I AM

HERE WITH ADAM LAURIDSEN.

         **MR. HENN:**  I'M CHARLIE HENN WITH KILPATRICK

STOCKTON.  I'M HERE WITH PETE BOYLE FROM MY FIRM AND WE'RE HERE

1     ON BEHALF OF THE COLLEGIATE LICENSING COMPANY.

2              **MR. CURTNER:**  GOOD AFTERNOON, YOUR HONOR, MY NAME IS

3     GREG CURTNER.  I'M HERE WITH MY PARTNER ROBERT WIERENGA AND

4     ELSA KIRCHER COLE, WHO IS THE GENERAL COUNSEL OF THE NCAA.

5              **THE COURT:**  OKAY.

6              O'BANNON.

7              **MR. HAUSFELD:**  GOOD AFTERNOON, YOUR HONOR,

8     MICHAEL --

9              **MR. CURTNER:**  AND JASON GELLER.  I'M SORRY.

10    MR. GELLER IS HERE AS WELL.

11             **MR. HAUSFELD:**  MICHAEL HAUSFELD FOR PLAINTIFF

12    O'BANNON.  WITH ME IS MICHAEL LEHMANN AND JON KING ALSO FROM

13    OUR LAW FIRM.

14             **THE COURT:**  OKAY.  AND DO WE HAVE THE SAME DEFENDANT

15    ATTORNEYS FOR ALL OF THE DEFENDANTS IN THAT CASE?

16             **MR. CURTNER:**  YES.

17             **THE COURT:**  SO, BISHOP?

18             **MR. ASHER:**  GOOD AFTERNOON, YOUR HONOR, MY NAME IS

19    STEVE ASHER.  I'M FROM PHILADELPHIA, PENNSYLVANIA.  I'M HERE

20    FOR PLAINTIFF BRYON BISHOP.  I AM HERE WITH CARL OLSON AND MIKE

21    RAM FROM SAN FRANCISCO.  THEY'RE LOCAL COUNSEL.

22             **THE COURT:**  OKAY.

23             AGAIN, THE DEFENDANTS ARE THE SAME ATTORNEYS FOR ALL

24    THESE CASES, I AM ASSUMING?

25             **MR. BOYLE:**  THAT'S CORRECT, YOUR HONOR.

1          **THE COURT:**  SO, NEWSOME?  WHO HAS THE PLAINTIFF IN

2     NEWSOME?

3          **MS. DERMODY:**  GOOD AFTERNOON, YOUR HONOR, KELLY

4     DERMODY AND MY PARTNER JOSEPH SAVERI FOR THE NEWSOME

5     PLAINTIFFS.

6          **MR. SAVERI:**  GOOD AFTERNOON, YOUR HONOR.

7          **THE COURT:**  AND ANDERSON?

8          **MR. CLOBES:**  GOOD AFTERNOON, YOUR HONOR, BRYAN

9     CLOBES FROM PHILADELPHIA, CAFFERTY FAUCHER, COUNSEL FOR

10    ANDERSON AND PLAINTIFF WIMPRINE AS WELL, IN BOTH THOSE CASES.

11         **THE COURT:**  OKAY.

12         JACOBSON?

13         **MR. BLANCHFIELD:**  GOOD AFTERNOON, YOUR HONOR,

14    GARRETT BLANCHFIELD HERE ON BEHALF OF PLAINTIFF JACOBSON.  I'M

15    HERE WITH JESSICA GRANT, WHO IS LOCAL COUNSEL.

16         **THE COURT:**  AND RHODES?  ANYBODY HERE ON RHODES?

17         **MR. CONNOLLY:**  GOOD AFTERNOON, YOUR HONOR, STEVE

18    CONNOLLY ON BEHALF OF DAMIEN RHODES AND CO-COUNSEL JOSEPH

19    SAVERI.

20         **MR. SAVERI:**  I DIDN'T MEAN TO STAND IN MY

21    CO-COUNSEL'S WAY.

22         GOOD AFTERNOON, YOUR HONOR JOSEPH SAVERI, AGAIN, ON

23    BEHALF OF PLAINTIFF.

24         **THE COURT:**  OKAY.

25         IN TERMS OF CONSOLIDATION, I'M GENERALLY INCLINED TO

1    CONSOLIDATE FOR ALL PURPOSES WITH THE POSSIBLE EXCEPTION OF

2    TRIAL.  AND IF I DO CONSOLIDATE ALL THE CASES, AND IT TURNS OUT

3    THAT THE TRIAL ISN'T MANAGEABLE WITH ALL THOSE ISSUES, THEN WE

4    CAN ALWAYS DE-CONSOLIDATE AND PICK AND CHOOSE WHAT ISSUES

5    SHOULD BE TRIED TOGETHER OR SEPARATELY.

6            BUT IN TERMS OF SCHEDULING AND CASE MANAGEMENT AND

7    DISCOVERY, I THINK IT MAKES SENSE TO CONSOLIDATE THEM AND DO

8    THE THINGS IN THE MOST EFFICIENT WAY THAT WE CAN.

9            IN THAT REGARD, I AM SORT OF INTERESTED IN THESE

10   TENNESSEE CASES AND THE NEW JERSEY CASE.  I DON'T KNOW IF IT

11   WOULD MAKE SENSE TO MOVE TO TRANSFER THE TENNESSEE CASES HERE

12   OR MOVE TO TRANSFER THESE CASES TO TENNESSEE.  YOU SAY YOU ARE

13   GOING TO REMOVE THE NEW JERSEY CASE, OR TRY TO, YOU CAN THEN

14   PERHAPS TRANSFER THAT, MAYBE SOMEONE WANTS TO SUGGEST AN MDL;

15   DOES IT MAKE SENSE TO PROCEED IN BOTH TENNESSEE AND NEW JERSEY

16   AND HERE ON THESE CASES?

17           **MR. VAN NEST:**  YOUR HONOR, BOB VAN NEST FOR

18   ELECTRONICS ARTS.  WE ARE ONLY IN THE KELLER CASE, NOT IN

19   O'BANNON.

20           WITH RESPECT TO THE TENNESSEE CASES, THE STATUS

21   THERE IS THAT THEY WERE FILED IN STATE COURT, REMOVED, THERE

22   HAS BEEN A MOTION TO REMAND, WHICH HAS NOT BEEN RESPONDED TO.

23   SO THOSE CASES ARE NOT PERMANENTLY IN FEDERAL COURT YET.

24           **THE COURT:**  ARE THEY ALL IN FRONT OF ONE JUDGE IN

25   TENNESSEE?

1          **MR. VAN NEST:**  THEY ARE.

2          **THE COURT:**  WHO IS IT?  DO WE KNOW THE --

3          **MR. CURTNER:**  YOUR HONOR, JUST TO CLARIFY.

4          **THE REPORTER:**  COUNSEL, I'M SORRY.

5          **MR. CURTNER:**  I'M SORRY, GREG CURTNER FOR THE NCAA.

6          **THE REPORTER:**  THANK YOU.

7          **MR. CURTNER:**  IN THE TENNESSEE CASE, KNUCKLES, THERE

8    WERE SEPARATE CASES FILED IN STATE COURT AGAINST EA AND NCAA

9    AND CLC.  THEY WERE BOTH REMOVED.  I UNDERSTAND THERE HAS BEEN

10   A MOTION TO REMAND THE EA SPORTS MATTER, BUT WE HAVE NOT YET

11   RECEIVED A MOTION TO REMAND, ALTHOUGH WE WOULDN'T BE SURPRISED

12   BUT THAT WE GET ONE.

13         **THE COURT:**  THE QUESTION IS, DOES ANYONE KNOW WHO

14   THE JUDGE IS IN TENNESSEE OR IF THERE IS MORE THAN ONE?

15         NO.  OKAY.

16         YOU MIGHT KEEP THAT IN MIND.

17         **MR. CURTNER:**  YOUR HONOR, WE CERTAINLY AGREE THAT IT

18   WOULD MAKE SENSE IF THOSE STAY IN FEDERAL COURT THAT THEY BE

19   ALL HEARD IN THE SAME PROCEEDING, AND WE WOULD INTEND TO MOVE.

20         YOU HAVE ALREADY RULED ON OUR MOTION TO CHANGE VENUE

21   TO INDIANA, SO IT PROBABLY LOOKS LIKE OUR NEXT MOVE IS TO BRING

22   IT ALL HERE.  WE HAVE TO MAKE SURE IT'S GOING TO STAY IN

23   FEDERAL COURT FIRST.

24         **THE COURT:**  OKAY.  WELL, YOU CAN EVEN TALK TO THE

25   PLAINTIFFS AND TELL THEM ABOUT THIS CASE AND PERHAPS THEY WOULD

1    AGREE TO STAY IN FEDERAL COURT AND GET TRANSFERRED TO A PLACE

2    WHERE THEY WOULD HAVE SO MUCH COMPANY.

3              **MR. VAN NEST:**  I THINK THEY ARE WELL AWARE OF THIS

4    CASE, YOUR HONOR.

5              **THE COURT:**  OKAY.

6              AS FAR AS THE REST OF CASE MANAGEMENT, I GUESS WE

7    WILL TALK ABOUT THAT LATER, BUT IN TERMS OF THE MOTION TO

8    DISMISS, LET'S START WITH KELLER.

9              I CAN GIVE YOU MORE THAN A HALF AN HOUR, BUT I DON'T

10   HAVE AN UNLIMITED AMOUNT OF TIME FOR ALL OF THESE MOTIONS, SO

11   WE WILL HAVE TO DIVIDE IT UP IN SOME KIND OF WAY.

12             **MR. VAN NEST:**  YOUR HONOR, ON THE DEFENSE SIDE, WE

13   HAVE DONE THAT.  I INTENDED TO START AND CONSOLIDATE BOTH THE

14   MOTION TO DISMISS AND THE SLAPP MOTION FILED BY ELECTRONICS

15   ARTS ON KELLER.  THAT COVERS A LOT OF THE ISSUES, AND THEN

16   THERE WOULD BE SHORT PRESENTATIONS FROM THE NCAA AND POSSIBLY

17   CLC.

18             **THE COURT:**  OKAY.

19             **MR. VAN NEST:**  SO, HANDLING THOSE TWO MOTIONS

20   TOGETHER, YOUR HONOR, I INTEND TO MAKE JUST FOUR POINTS.

21             AND THE FIRST POINT IS THAT ELECTRONIC ARTS VIDEO

22   GAMES ARE CERTAINLY ENTITLED TO FIRST AMENDMENT PROTECTION JUST

23   LIKE A NOVEL, OR A MOVIE, OR ANY OTHER EXPRESSIVE WORK.

24             **THE COURT:**  IN GENERAL THAT'S TRUE UNLESS THEY FALL

25   SHORT ON SOME OTHER GROUND.

1       **MR. VAN NEST:**  INDEED.  AND HERE, BOTH IN CALIFORNIA

2    AND IN THE NINTH CIRCUIT, THE TRANSFORMATIVE USE TEST IS THE

3    TEST THAT'S APPLIED IN DETERMINING WHETHER OR NOT THERE IS A

4    CLAIM FOR PRIVACY.

5       AND HERE, THESE GAMES ARE SO TRANSFORMATIVE THAT

6    THEY CLEARLY QUALIFY FOR FIRST AMENDMENT PROTECTION AS A MATTER

7    OF LAW BECAUSE THEY ARE SO MULTIFEATURED, AS YOU WILL SEE IN A

8    MINUTE, AND HAVE SO MANY ELEMENTS IN THEM, IT COULD NEVER BE

9    SAID THAT THE LIKENESS OF MR. KELLER OR ANY OTHER ATHLETE, EVEN

10   IF WE WERE USING IT, WAS THE SUM AND SUBSTANCE FOR THE ENTIRETY

11   OF THE GAME ITSELF.  SO UNDER THAT TRANSFORMATIVE USE TEST, AS

12   I WILL GO INTO IN A MOMENT WE'RE ENTITLED TO A DISMISSAL NOW.

13      **THE COURT:**  I AM NOT SURE I WOULD LOOK AT THE

14   TRANSFORMATION THAT BROADLY.  I THINK ONE WOULD NEED TO LOOK AT

15   THE TRANSFORMATION OF THE INDIVIDUALS AND NOT JUST HOW MUCH

16   OTHER STUFF THEY WERE PUT IN WITH.

17      **MR. VAN NEST:**  WELL, LET'S GO TO THAT, YOUR HONOR,

18   BECAUSE I THINK THE TEST REALLY IS IN BOTH THE WINTER CASE AND

19   ALL THE CASES THAT HAVE LOOKED AT THIS, IS THE WORK AS A WHOLE

20   TRANSFORMATIVE?  IS THE WORK AS A WHOLE TRANSFORMATIVE?

21      WHAT WE ARE SAYING HERE TODAY IS EVEN IF WE WERE

22   USING THE LIKENESS, WHICH WE DON'T CONCEDE AS A MATTER OF FACT,

23   BUT AS A MATTER OF PLEADING FOR TODAY'S PURPOSES WE WILL

24   CONCEDE IT, YOU LOOK AT THE WORK AS A WHOLE, AND SEE WHETHER OR

25   NOT, GIVEN ALL ITS ASPECTS, IT'S TRANSFORMATIVE OR NOT.

1          SO, FOR EXAMPLE, LOOKING AT THESE VIDEO GAMES, THEY

2     HAVE CONTAINED WITHIN THEM ORIGINAL GRAPHICS THROUGHOUT,

3     ANIMATION OF PLAY ACTION, THEY HAVE MUSIC, THEY HAVE SOUND

4     EFFECTS, THEY HAVE VOICE COMMENTARY, WHICH HAS NOTHING TO DO

5     WITH ANY INDIVIDUAL LIKENESS OF ANY PARTICULAR ATHLETE.  AND

6     BEYOND THAT --

7          **THE COURT:**  UNLESS YOU UPLOAD THE ADD-ONS, IN WHICH

8     CASE THE ANNOUNCER USES THEIR NAME.

9          **MR. VAN NEST:**  THE ANNOUNCER DOESN'T USE THE NAME.

10    THE UPLOAD, YOUR HONOR, IS PROVIDED BY THIRD PARTIES.  LET'S

11    ASSUME FOR TODAY'S PURPOSE, LET'S ASSUME FOR TODAY'S PURPOSE

12    THAT THAT'S PART OF THE GAME, EVEN THOUGH WE WOULDN'T CONCEDE

13    THAT AS A MATTER OF FACT DOWN THE LINE.

14          EVEN THEN, YOU LOOK AT THE VISUAL EFFECTS AS A

15    WHOLE.  AND HERE YOU HAVE PLAY ACTION ON THE FIELD, YOU HAVE

16    STADIUMS, YOU HAVE FANS --

17         **THE COURT:**  THE STADIUMS ARE THE STADIUMS THAT THEY

18    PLAYED IN.

19         **MR. VAN NEST:**  THEY ARE.

20         **THE COURT:**  THEY ARE NOT TRANSFORMED.

21         **MR. VAN NEST:**  THEY ARE --

22         **THE COURT:**  WHAT I'M LOOKING AT IS THIS ULALA CASE,

23    WHERE NOT ONLY WAS MS. ULALA LOOKING DIFFERENT, BUT SHE WAS PUT

24    IN THE 25TH CENTURY, AND SHE WAS A REPORTER INSTEAD OF A

25    SINGER, AND HERE YOU HAVE GOT PEOPLE IN PRESENT TIME IN THEIR

1   PRESENT STADIUMS, THEY'RE FOOTBALL PLAYERS NOT 25TH CENTURY

2   REPORTERS.

3           **MR. VAN NEST:**  THAT'S ALL TRUE.  BUT IN ULALA, YOUR

4   HONOR, THEY TALKED ABOUT A LOT OF ASPECTS.  THEY TALKED ABOUT

5   THE CONTEXT, THE SURROUNDING, AND SO ON AND SO FORTH.

6           **THE COURT:**  RIGHT.

7           **MR. VAN NEST:**  IN THESE GAMES, AND I ENCOURAGE THE

8   COURT TO LOOK AT THEM IF YOUR HONOR HASN'T, FOR EXAMPLE, THE

9   STADIUMS THEY PLAY IN ARE GRAPHIC REPRESENTATIONS.  THEY ARE

10  ART IN AND OF THEMSELVES CREATED BY ELECTRONIC ARTS.

11          **THE COURT:**  RIGHT, BUT THEY LOOK LIKE THE COLLEGE

12  FOOTBALL STADIUMS THAT THE PEOPLE PLAYED IN.  THEY AREN'T THE

13  25TH CENTURY, FOR EXAMPLE, OR OUTER SPACE.

14          **MR. VAN NEST:**  THEY DO, BUT WHETHER OR NOT SOMETHING

15  IS REALISTIC OR NOT IS NOT THE TEST.  THERE ARE PLENTY OF

16  EXAMPLES OF REALISTIC PORTRAYALS THAT ARE JUST AS ENTITLED TO

17  FIRST AMENDMENT PROTECTION AS --

18          **THE COURT:**  REALISM IS NOT TRANSFORMATION.

19          **MR. VAN NEST:**  IT DEPENDS ON HOW YOU LOOK AT IT,

20  YOUR HONOR.  IF, FOR EXAMPLE, YOU PORTRAY THE LIFE OF RUDOLPH

21  VALENTINO AS HIS LIFE WAS.  THE FACT THAT YOU USE HIS NAME AND

22  HIS LIKENESS AND AN ACTOR DRESSED UP TO LOOK LIKE HIM AND PLAY

23  THAT ROLE, THAT'S CLEARLY ENTITLED TO FIRST AMENDMENT

24  PROTECTION AND CAN BE TRANSFORMATIVE IN LIGHT OF THE ELEMENTS

25  AROUND IT.

1          SIMILARLY, JUST LOOKING AT IT GRAPHICALLY, THIS

2     PHOTOGRAPH OF TIGER WOODS -- HE HAS BEEN GETTING A LITTLE PRESS

3     LATELY.

4          (COUNSEL DISPLAYS BLOWUP.)

5          **THE COURT:**  THEY PAY HIM, DON'T THEY?

6          **MR. VAN NEST:**  NOT HERE THEY DID NOT.  NOT HERE.

7          THIS IS AN ETW CASE.  THIS IS A LIKENESS OF TIGER

8     WOODS ON A GOLF COURSE SURROUNDED BY FEATURES OF GREAT

9     TOURNAMENTS.  THIS WAS DECLARED BY THE SIXTH CIRCUIT TO BE

10    TRANSFORMATIVE EVEN THOUGH THERE'S VERY LITTLE IN IT OTHER THAN

11    JUST THE PICTURE OF TIGER WOODS.

12         SIMILARLY, IN THE WINTER CASE, ONE OF THE LEADING

13    CALIFORNIA CASES, THE PLAINTIFF THERE WAS -- THE PLAINTIFFS

14    WERE JOHNNY AND EDGAR WINTER.  THE CHARACTERS IN THE COMIC BOOK

15    WERE JOHNNY AND EDGAR AUTUMN.  AS YOU CAN SEE, THE FACES ARE

16    SIMILAR, THE CLOTHING IS SIMILAR, THE INSTRUMENTS ARE SIMILAR,

17    THE PHRASES ARE SIMILAR.

18         **THE COURT:**  THEY WERE.

19         **MR. VAN NEST:**  THEY ARE, AND THE COURT FOUND THAT

20    THIS WAS TRANSFORMATIVE.

21         SO THE FACT THAT SOMETHING IS REALISTIC DOES NOT

22    TAKE IT OUTSIDE OF THE STANDARD AT ALL.  THE TEST IS, IF YOU

23    LOOK AT WINTER AND YOU LOOK AT KIRBY VERSUS SEGA, THE TEST IS

24    WHAT DOES --

25         **THE COURT:**  KIRBY IS ULALA?

1          **MR. VAN NEST:**  RIGHT.  IF YOU LOOK AT THAT CASE,

2    YOUR HONOR, THE TEST IS WHAT DOES THE WORK AS A WHOLE

3    CONSTITUTE?

4          IF I MAY JUST FOR A MINUTE HERE, THEY ARE CLAIMING

5    THAT THEIR LIKENESS IS THE SUM AND SUBSTANCE OF THIS GAME AND

6    THE VALUE OF THE GAME.  AND ASSUMING FOR A MINUTE, EVEN IF WE

7    USE THEIR LIKENESS, THERE ARE SO MANY FEATURES OF THIS, THEY

8    HAVE NOTHING TO DO WITH THE LIKENESS OF KELLER OR ANY OTHER

9    COLLEGE ATHLETE.  YOU HAVE, FOR EXAMPLE, COMMENTATORS AND

10   COMMENTARY WITH NO PLAYERS INVOLVED.  YOU HAVE THE GAME --

11              **THE COURT:**  ARE THE COMMENTATORS REAL PEOPLE?

12              **MR. VAN NEST:**  SOMETIMES YES, SOMETIMES NO.

13              **THE COURT:**  ARE THEY PAID?

14              **MR. VAN NEST:**  IF THEY ARE PROFESSIONALS AND THEY

15   COME IN AND DO TAPE-OVERS, AND ACT OUT THE ROLE, THEN THEY ARE

16   PAID, BUT THEY CAN BE IMAGINARY AS WELL.  BUT THERE THEY ARE

17   BEING PAID FOR THEIR WORK AND DOING A VOICEOVER AND SO ON AND

18   SO FORTH.  THEY ARE IN A DIFFERENT CATEGORY ALTOGETHER.

19          THE USER CREATES THE IMAGE EVERY TIME.  IT'S THE

20   USER OF THE GAME THAT SELECTS THE OFFENSIVE PLAYS AND THE

21   DEFENSIVE PLAYS.  THEY ARE NOT REPLICATING ANY PARTICULAR REAL

22   GAME, THEY ARE CREATING A NEW EXPRESSION EVERY TIME THEY PLAY.

23          AND, FOR EXAMPLE, A USER COULD PLAY THIS GAME FOR A

24   YEAR AND NEVER SEE THE IMAGE THAT PLAINTIFFS CLAIM IS

25   MR. KELLER BECAUSE HE, THE IMAGE THEY'RE TALKING ABOUT MIGHT

1   APPEAR ON ONE TEAM FOR ONE YEAR FOR SOME PLAYS AND NOT OTHERS.

2   IT'S CERTAINLY NOT THE SUM AND SUBSTANCE OF THE GAME.

3            THIS IS WHAT YOU ACTUALLY SEE.  YOU SEE PLAYERS IN

4   HELMETS, IN JERSEYS WITH NUMBERS AND UNIFORMS THAT ARE LICENSED

5   FROM THE NCAA, AND THEY PLAY BASED ON THE ACTION CREATED BY THE

6   USER OF THE GAME.

7            THAT ACTION AND THAT DETERMINATION IS CREATED BY THE

8   SOFTWARE AND THE ANIMATION DESIGNED BY EA.  THE ONLY TIME IN

9   THE GAME THAT YOU EVER EVEN SEE A FACE IS AT THE COIN TOSS WHEN

10  THE CAPTAINS COME OUT.  IT TURNS OUT MR. KELLER WAS NEVER A

11  CAPTAIN.

12           EVEN HERE, THESE ARE NOT THE IMAGES OR THE NAMES OF

13  THE PLAYERS.  THESE ARE ARTISTIC FACES CREATED BY EA DESIGNERS

14  AND ENGINEERS THAT THE USER CAN MODIFY, CHANGE, SWITCH, AND

15  SUBSTITUTE.  THESE INDIVIDUAL FACES ARE ARTWORK, THEY ARE NOT

16  IMAGES.

17           AND IT GOES WITHOUT SAYING THEN, YOU'VE GOT LOTS OF

18  OTHER FEATURES.  YOU'VE GOT MASCOTS, CHEERLEADERS, REFEREES.

19  YOU'VE GOT FANS IN THE STANDS.  YOU'VE GOT ALL THE OTHER

20  ACCOUTERMENTS THAT MAY OR MAY NOT APPEAR AT A COLLEGE FOOTBALL

21  GAME.

22           AND GIVEN THE CASE LAW, YOUR HONOR, I WANT TO WALK

23  THROUGH THESE FOR JUST A MINUTE, THESE GAMES ARE FAR MORE

24  TRANSFORMATIVE THAN ANYTHING THAT HAS BEEN RULED UPON YET,

25  INCLUDING THE UNDER CASE AND INCLUDING KIRBY.  BECAUSE THOSE

1    CASES INVOLVE PRINTED EXPRESSION ON THE PAGE, OR IN CASE OF

2    KIRBY, A VIDEO GAME WITH A FIGURE IN IT THAT LOOKS LIKE, TALKS

3    LIKE, HAS LOTS OF SIMILAR CHARACTERISTICS TO THE ACTUAL ROCK

4    ARTIST FROM THE '70S, AND THE COURT HELD THAT BECAUSE OF THE

5    CONTEXT AND THE ENVIRONMENT AND THE TRANSFORMATIVE ELEMENTS,

6    THAT WAS PROTECTED BY THE FIRST AMENDMENT AND NOT SUBJECT, NOT

7    SUBJECT TO A CLAIM.  SIMILARLY --

8              **THE COURT:**  BOTH KIRBY AND WINTER STRIKE ME AS MORE

9    TRANSFORMATIVE THAN THIS CASE.

10             **MR. VAN NEST:**  I DON'T THINK SO, YOUR HONOR, BECAUSE

11   HERE, AGAIN, IT'S NOT A QUESTION OF WHETHER OR NOT IT'S

12   REALISTIC; IT'S A QUESTION OF WHAT ELEMENTS ARE IN THE GAME, OR

13   THE BOOK, OR THE NOVEL BEYOND AND SURROUNDING THE QUOTE

14   "LIKENESS" OF THE PLAINTIFF.  IF, FOR EXAMPLE --

15             **THE COURT:**  THE WORD "TRANSFORM" MEANS TO CHANGE.

16   IT SEEMS TO ME IT'S MORE A QUESTION OF HOW MUCH HAVE YOU

17   CHANGED FROM REALITY.

18             **MR. VAN NEST:**  NO, IT'S, WITH ALL DUE RESPECT, YOUR

19   HONOR, IT'S NOT HOW MUCH YOU'VE CHANGED FROM REALITY, IT'S HOW

20   MUCH YOU'VE CHANGED FROM MERELY THE CELEBRITY OF THE PLAINTIFF.

21             FOR EXAMPLE, IN THE COMEDY III CASE, THE IMAGE WAS

22   THIS IMAGE OF THE THREE STOOGES.

23             (COUNSEL DISPLAYS BLOWUP.)

24             THIS WAS RENDERED BY AN ARTIST, BUT IT IS NOTHING

25   MORE THAN THE BARE, SORT OF UNADORNED IMAGE OF THE CELEBRITIES

1   THEMSELVES PLACED ON A T-SHIRT OR SOMETIMES ON A POSTER.

2           AND THE COURT SAID THAT IS NOT TRANSFORMATIVE

3   BECAUSE THERE ARE NO OTHER ELEMENTS OF ARTISTIC CREATION AROUND

4   IT.

5           IN OUR CASE, WE HAVE TAKEN FOOTBALL PLAYERS OF A

6   GENERIC TYPE AND PLACED THEM IN A GAME THAT HAS LOTS OF OTHER

7   ELEMENTS; HAS THE ABILITY FOR THE USER TO CHANGE IT, HAS THE

8   ABILITY FOR THE USER TO PLAY A WHOLE TEAM FOR A YEAR, THE

9   STUDENT ATHLETES IN IT CAN EVOLVE DURING THE YEAR, YOU CAN PLAY

10  DIFFERENT TEAMS IN DIFFERENT STADIUMS, IN DIFFERENT TOWNS,

11  TEAMS THAT NEVER PLAYED BEFORE CAN PLAY EACH OTHER.  IN OTHER

12  WORDS, THERE ARE SO MANY ARTISTIC ELEMENTS TO THE GAMES THAT

13  THEY HAVE BEEN TRANSFORMED.

14          I WOULD SAY THIS CASE FALLS FAR TO THE RIGHT OF EVEN

15  KIRBY WHERE THERE THE MAIN FEATURE WAS THIS ONE CHARACTER.

16  YES, SHE WAS IN A DIFFERENT SETTING, BUT THE MAIN FEATURE OF

17  THE GAME WAS MS. ULALA, UNLIKE THESE GAMES WHERE THERE IS AN

18  ENTIRE EXPERIENCE AROUND COLLEGE FOOTBALL.  YOU, IN FACT,

19  EXPERIENCE AN ENTIRE AFTERNOON OR AN ENTIRE SEASON.

20          MOST OF THE CASES THAT THE PLAINTIFFS ARE RELYING ON

21  ARE CASES IN WHICH THE IMAGE OF THE PLAINTIFF IS USED IN AN

22  ADVERTISEMENT, A PROMOTION.  YOU CAN'T PUT KAREEM ABDUL-JABBAR

23  NEXT TO AN AUTOMOBILE AND SAY THAT IS TRANSFORMATIVE AND GET

24  AWAY WITH IT BECAUSE HE IS BEING USED IN AN ADVERTISEMENT TO

25  PROMOTE A PRODUCT THAT HE'S GOT NOTHING TO DO WITH.

1          THERE IS NO CLAIM HERE THAT MR. KELLER IS BEING USED

2     TO ADVERTISE THIS PRODUCT OR TO ENGAGE IN SOME KIND OF

3     COMMERCIAL SPEECH.  IT IS A TRANSFORMATIVE WORK THAT IS -- HAS

4     ELEMENTS ADDED TO IT THAT, AS A MATTER OF LAW, BASED ON THESE

5     CALIFORNIA AND OTHER CIRCUIT CASES, ESTABLISH TRANSFORMATION.

6          THERE IS A SECOND POINT I WANT TO MAKE, YOUR HONOR,

7     APART FROM TRANSFORMATION.  THERE IS A SECOND TEST.  AND THAT

8     IS THE TEST OF PUBLIC INTEREST.

9          THESE GAMES ALSO ARE EXEMPT INDEPENDENT OF THE

10    TRANSFORMATION TEST BECAUSE NCAA FOOTBALL AND BASKETBALL ARE

11    MATTERS OF PUBLIC INTEREST.  AND THERE ARE A HOST OF CASES

12    DEALING WITH FANTASY FOOTBALL AND FANTASY BASEBALL WHERE ALL

13    THE PUBLISHERS PRESENTING ARE THE NAMES, IN SOME CASES IMAGES,

14    STATISTICS AND PERSONAL INFORMATION ABOUT REAL PLAYERS IN A

15    REAL LIVE SEASON.

16         AND THE COURT IN CBS AND CBC ALL HELD THE PUBLIC

17    INTEREST TEST MEANS PUBLISHERS HAVE A RIGHT TO MAKE THAT

18    INFORMATION TO THE PUBLIC WHETHER THEY ARE DOING IT IN THE

19    SATURDAY OR SUNDAY NEWSPAPER RIGHT AFTER THE CAL GAME, OR DOING

20    IT FOR ENTERTAINMENT PURPOSES MONTHS OR YEARS LATER.  THAT WAS

21    THE RULING IN CBS, IN CBC --

22         **THE COURT:**  TO ME, THAT'S SORT OF THE OTHER END OF

23    THE SPECTRUM.  THERE IS PROTECTION AT ONE END WHERE YOU ARE

24    PROVIDING ESSENTIALLY NEWS, LIKE FACTS.  HERE'S WHAT HAPPENED

25    ON THIS DATE, HERE'S THE SCORE OF THAT GAME, HERE'S THE STAT.

1    ALL THOSE SORT OF THINGS THAT ARE REPORTING AS FACTS.  THAT'S

2    ONE END.

3            THEN YOU HAVE THE MIDDLE SECTION WHERE THERE MIGHT

4    BE LIABILITY.  AND THEN THE OTHER END WHERE YOU HAVE

5    TRANSFORMED IT SO ARTISTICALLY AND DIFFERENTLY THAT THERE IS NO

6    LIABILITY.

7            AND SO THE QUESTION IS, WHERE DO THOSE TWO ENDS STOP

8    AND THE PART IN THE MIDDLE IS THE ONE WHO'S UNPROTECTED.

9          **MR. VAN NEST:**  THOSE ARE REALLY DIFFERENT TESTS,

10   YOUR HONOR.

11         **THE COURT:**  I SEE THEM AS A CONTINUUM, ONE AT EITHER

12   END.

13         **MR. VAN NEST:**  IN EITHER CASE, I WOULD SUBMIT, THESE

14   GAMES FALL COMPLETELY WITHIN THE SPHERE THAT IS PROTECTED.

15           ON THE PUBLIC INTEREST SIDE, IF YOU CAN PROTECT THE

16   MERE PUBLICATION AS PART OF A GAME OF THE NAMES, PERSONAL

17   INFORMATION AND STATISTICS OF A PLAYER, CERTAINLY YOU CAN

18   PUBLISH INFORMATION HERE WHICH IS NOT EVEN THAT SPECIFIC ABOUT

19   COLLEGE ATHLETES AND COLLEGE PERFORMANCE IN GENERAL.  WE ARE

20   CLEARLY WITHIN THE SPHERE OF THE PUBLIC INTEREST CASES.

21           AND AS I SAID ON THE TRANSFORMATION SIDE, IF YOU CAN

22   TAKE A FIGURE OF TIGER WOODS AND PLACE A FEW ARTIFACTS AROUND

23   IT THAT REPRESENT THE HISTORY OF HIS ACHIEVEMENTS IN GOLF,

24   CERTAINLY TAKING GENERIC COLLEGE FOOTBALL PLAYERS AND PLACING

25   THEM IN A CONTEXT OF AN INTERACTIVE, MULTIFEATURED GAME WITH

1   LOTS OF OTHER ELEMENTS, IT CLEARLY PASSES THAT TEST.

2           **THE COURT:**  OKAY.  YOU MIGHT WANT TO MOVE ON TO THE

3   SLAPP SUIT.

4           **MR. VAN NEST:**  THE SLAPP SUIT, I CAN BE VERY BRIEF.

5           **THE COURT:**  THE MERITS OF IT ARE ESSENTIALLY THE --

6           **MR. VAN NEST:**  THE MERITS ARE THE SAME --

7           **THE COURT:**  -- OF WHAT YOU ARE SAYING --

8           **MR. VAN NEST:**  THE POLICY ISSUE IS, IN CALIFORNIA,

9   THE LEGISLATURE HAS DECLARED THAT THERE SHOULD BE SPECIAL

10  PROTECTION FOR PUBLISHERS, ARTISTS, NOVELISTS, PEOPLE ENGAGING

11  IN EXPRESSIVE WORKS, WHETHER THOSE ARE FOR HIRE OR NOT.

12          **THE COURT:**  WHAT'S THE SLAPP SUIT -- WHAT ARE THE

13  KINDS OF THINGS THAT THE LEGISLATURE CITED WHEN IT PASSED THE

14  STATUTE?  WHAT'S THE SORT OF GENERIC SLAPP SUIT?

15          **MR. VAN NEST:**  IT WAS STARTED PROBABLY AS A RESULT

16  OF VARIOUS LIBEL SUITS FILED BY BUSINESSES AGAINST PEOPLE WHO

17  HAD SPOKEN OUT AGAINST THOSE BUSINESSES.

18          BUT TODAY THE ANTISLAPP STATUTE HAS GONE FAR BEYOND

19  THAT.  AND IN THE HILTON CASE, THE NINTH CIRCUIT HAS HELD IT

20  APPLIES TO WORKS OF EXPRESSION LIKE THESE.  IN THAT CASE IT

21  HAPPENED TO BE A HALLMARK CARD.

22          **THE COURT:**  DO YOU HAVE A PICTURE OF THAT ONE?

23          **MR. VAN NEST:**  I SURE DO.

24          (LAUGHTER.)

25          (COUNSEL DISPLAYS BLOWUP.)

1      **MR. VAN NEST:**  I'VE GOT THEM ALL.

2          THIS IS A HALLMARK CARD WITH THE FACE OF PARIS

3  HILTON, HER NAME AND A STOCK PHRASE SHE USES, "THAT'S HOT".

4          SO THE NINTH CIRCUIT EVALUATED THIS AND DIDN'T SAY

5  THAT THIS FELL OUTSIDE THE SPHERE OF TRANSFORMATION.  IT SAID

6  IT IS A QUESTION OF FACT.  EVEN THOUGH THEY ARE USING HER FACE,

7  HER NAME, HER EXPRESSION, THESE FEW OTHER ELEMENTS ON THE PAGE

8  THEY SAID CREATE A QUESTION OF FACT.

9      **THE COURT:**  THEY DIDN'T THROW IT OUT AS A SLAPP

10  SUIT?

11      **MR. VAN NEST:**  THEY DID NOT.  THEY SAID THE SLAPP

12  STATUTE APPLIES AND WOULD APPLY TO A WORK LIKE THIS, BUT IN

13  THIS PARTICULAR CASE, THEY SAID THESE FEW OTHER ELEMENTS DO

14  CREATE A QUESTION OF FACT, EVEN THOUGH HERE THEY ARE ACTUALLY

15  USING THE FACE, THE NAME, AND A STOCK EXPRESSION.  THIS IS FAR

16  MORE -- FAR LESS PROTECTABLE THAN SOMETHING LIKE AN ELECTRONIC

17  ARTS VIDEO GAME WITH ALL OF THESE OTHER ELEMENTS IN IT.

18      **THE COURT:**  THEY SAID THERE WAS A QUESTION OF FACT

19  OR THEY SAID THERE WAS A PROBABILITY OF SUCCESS?

20      **MR. VAN NEST:**  WELL, THEY SAID PROBABILITY OF

21  SUCCESS, QUESTION OF FACT, THEY BLURRED IT UP AND SAID WE CAN'T

22  DECIDE THIS ON A SLAPP MOTION.

23          BUT AS YOUR HONOR KNOWS, IN THIS, OUR PARTICULAR

24  CASE, IF WE DEMONSTRATE, AS WE HAVE, THAT OUR CONDUCT, THESE

25  GAMES, ARE ACTS OF EXPRESSION, WHICH WE HAVE DONE, THEN THE

1   BURDEN SHIFTS TO THE PLAINTIFFS TO SHOW A PROBABILITY OF

2   SUCCESS ON THE MERITS.

3          THAT'S THE KEY LEVERAGE OF THE ANTISLAPP STATUTE;

4   THAT CHANGING OF THE BURDEN.  AND HERE, I WOULD SUBMIT AS I

5   HAVE, THAT BASED ON THE GAMES THEMSELVES, WHICH ARE BEFORE THE

6   COURT ON A REQUEST FOR JUDICIAL NOTICE, WHICH IS NOT OPPOSED,

7   THOSE GAMES ARE WHAT THEY ARE.  THEY HAVE THE ELEMENTS THEY

8   HAVE, THEY ARE BASED ON ALL THE FEATURES WE TALKED ABOUT; AS A

9   MATTER OF LAW, THEY CANNOT ESTABLISH A PROBABILITY OF SUCCESS

10  THAT WE HAVE VIOLATED THE PRIVACY RIGHTS OF MR. KELLER OR ANY

11  OTHER PUTATIVE CLASS MEMBER.

12          **THE COURT:**  LET ME SEE IF ANY OF YOUR COLLEAGUES

13  HAVE ANYTHING THEY NEED TO SAY OR ONE OF THE OTHER DEFENDANTS

14  THAT'S NOT REPETITIVE OF WHAT MR. VAN NEST SAID.

15          **MR. CURTNER:**  GOOD AFTERNOON, YOUR HONOR, FOR THE

16  RECORD, AGAIN, I'M GREG CURTNER ON BEHALF OF THE NCAA.  I WILL

17  ADDRESS ENTIRELY DIFFERENT ISSUES THAN MR. VAN NEST.

18          TO RESPOND TO YOUR PRIOR QUESTION, THE JUDGE IN

19  TENNESSEE IS LEON JENKINS.

20          **THE COURT:**  OKAY.  HE HAS ALL OF THE TENNESSEE

21  CASES?  THERE'S LIKE THREE OF THEM, IT SEEMS LIKE.

22          **MR. CURTNER:**  I THINK THERE'S ONLY TWO, BUT I

23  BELIEVE THEY'RE BOTH IN FRONT OF THAT JUDGE.  AND WE ARE

24  COMFORTABLE LITIGATING THERE.  CLOSE TO HOME FOR US.

25          LET ME JUST ADDRESS THE ISSUES THAT ARE PERTINENT

1   ONLY TO THE NCAA, AND THEY ARE REALLY DIFFERENT THAN

2   MR. VAN NEST'S ISSUES.  I WILL BE BRIEF.

3          I WANT TO MAKE FOUR POINTS, AND THEY RELATE TO THE

4   FIRST, FOURTH AND SIXTH COUNTS OF THE KELLER COMPLAINT.

5          THE FIRST COUNT IS THE INDIANA RIGHT OF PUBLICITY

6   STATUTE, AND IT IS ALLEGED ONLY AGAINST THE NCAA.  AND THE

7   STATUTE ON ITS FACE BY ITS EXPRESS AND UNAMBIGUOUS TERMS

8   REQUIRES A USE OF THE LIKENESS OF THE PERSONALITY IN QUESTION.

9          THERE IS NO REAL DISPUTE THAT THE NCAA DOES NOT USE

10  ANYWHERE, MUCH LESS IN INDIANA, THE LIKENESS OF ANYBODY.  IF

11  THERE IS ANY USE GOING ON HERE, IT'S CERTAINLY DISPUTED, IT IS

12  BY ELECTRONIC ARTS, AND THE NCAA SIMPLY DOES NOT USE ANYTHING.

13         THE MOST THE ALLEGATIONS ARE AGAINST THE NCAA IS

14  THAT IT SOMEHOW HAS TOLERATED, OR NOT STOPPED, OR NOT

15  PROHIBITED THE USE BY EA OR --

16         **THE COURT:**  OR CONSPIRED.

17         **MR. CURTNER:**  I AM COMING TO THAT.

18         **THE COURT:**  IS THERE A CONSPIRACY CLAIM AGAINST YOU?

19         **MR. CURTNER:**  BUT THE FIRST COUNT IS NOT A

20  CONSPIRACY COUNT; THE FIRST COUNT IS ONLY USE.  AND THERE'S

21  SIMPLY -- IT'S BASICALLY ADMITTED THAT THERE IS NO USE.  AND

22  YOU CANNOT REWRITE THE STATUTE, AS THE PLAINTIFFS WOULD HAVE

23  THE COURT DO, TO MAKE IT THE EQUIVALENT OF TOLERATING,

24  CONSPIRING, OR AIDING AND ABETTING, OR SOME OTHER KIND OF

25  THING.

1          **THE COURT:**  TO CHARGE CONSPIRACY, THEY HAVE TO

2     ALLEGE THAT YOU DID SOME UNDERLYING TORT AS YOU, EITHER YOU OR

3     YOUR COLLEAGUES BRIEFED, SO I GUESS THE SERIOUS THAT'S THE

4     UNDERLYING TORT AND THE BASIS FOR LIABILITY IS CONSPIRACY TO

5     COMMIT THAT TORT.

6          **MR. CURTNER:**  EXCEPT THAT THE UNDERLYING TORT OR

7     STATUTORY VIOLATION IS ALLEGED ONLY AGAINST THE NCAA, AND IT IS

8     ONLY UNDER THE INDIANA STATUTE, AND THE INDIANA STATUTE

9     REQUIRES A USE.  SO THERE CANNOT BE THE UNDERLYING VIOLATION TO

10    SUPPORT EITHER THE VIOLATION ITSELF OR THE CONSPIRACY TO

11    VIOLATE BECAUSE THERE IS NO USE.  AND THERE IS NO WAY THEY CAN

12    GET OUT OF THAT BOX.  IT'S A LOGICAL IMPOSSIBILITY SO LONG AS

13    THERE'S NOTHING TO SUPPORT, AND THERE'S NO ALLEGATION THAT

14    WOULD SUPPORT USE BY THE NCAA.

15          SECOND POINT.  THE STATUTE BY ITS EXPRESS TERMS ALSO

16    REQUIRES THAT SOME ATTRIBUTE OF THE PERSONALITY HAVE COMMERCIAL

17    VALUE THAT IS BEING USED BY THE DEFENDANT.

18          HERE, THERE IS NO ALLEGATION THAT MR. KELLER HAS

19    COMMERCIAL -- HIS PERSONALITY OR ANY ATTRIBUTE OF HIS

20    PERSONALITY HAS COMMERCIAL VALUE.  THE ONLY ARGUMENT THAT

21    PLAINTIFFS MAKE IN RESPONSE TO OUR MOTION IS THAT THE GAME HAS

22    VALUE.  AND THERE IS CERTAINLY NO DOUBT THAT THE GAME HAS

23    VALUE.  THAT DOESN'T MEAN THAT ANY GIVEN INDIVIDUAL LIKE

24    MR. KELLER HAS ANY VALUE WHATSOEVER.  HE COULD HAVE ZERO VALUE,

25    AND THERE IS NO ALLEGATION TO THE CONTRARY.

1          THE ONLY OTHER ARGUMENT THEY MAKE IS THAT IN SOME

2     DIFFERENT CIRCUMSTANCES, IN SOME DIFFERENT GAMES, SOME NFL

3     PLAYERS ARE PAID MONEY FOR THEIR LIKENESS AND FOR THE RIGHT TO

4     USE THEIR NAMES AND PHOTOGRAPHS, ET CETERA, IN A MUCH DIFFERENT

5     GAME, IN A MUCH MORE REALISTIC GAME.  BUT, AGAIN, THAT SAYS

6     NOTHING ABOUT THE CLAIM THAT MR. KELLER HAS ANY VALUE.

7          WE DO NOT KNOW WHETHER MR. KELLER'S LIKENESS,

8     PERSONALITY OR ATTRIBUTES, WHATEVER THEY CLAIM ARE BEING USED

9     BY EA, HAVE ANY VALUE WHATSOEVER ON THE FACE OF THESE

10    PLEADINGS.

11          SO, THAT TAKES CARE OF COUNT ONE.

12          THE FOURTH COUNT IS THE CONSPIRACY COUNT.  YOUR

13    HONOR HAS IT EXACTLY RIGHT.  THEY ALLEGE THE CONSPIRACY IS TO

14    VIOLATE -- IT IS TO VIOLATE THE RIGHT OF PUBLICITY STATUTE, BUT

15    THE NCAA CAN'T DO THAT BECAUSE IT DOESN'T USE ANYTHING.

16          NOW, PERHAPS, AND THEY DON'T SAY THIS, THEIR THEORY

17    IS THAT IT IS A CONSPIRACY TO VIOLATE THE CALIFORNIA LAW ON

18    PUBLICITY, BUT THEY PLEAD THEMSELVES INTO A CORNER THERE AS

19    WELL BECAUSE THEY PLEAD EXPRESSLY IN THEIR COMPLAINT IN KELLER

20    IN PARAGRAPH 13 AND PARAGRAPH 15 THAT BYLAW 12.5, WHICH

21    PROHIBITS THE USE OF NAME, PICTURES AND LIKENESSES, IS MADE

22    APPLICABLE TO CLC AND EA, AND THAT IN PARAGRAPH 15, THAT THE

23    LICENSE AGREEMENT BETWEEN CLC AND EA FOR THE USE OF VARIOUS

24    THINGS, WHICH INCLUDES THE NCAA NAME, AND THE STADIUMS, AND ALL

25    THESE OTHER THINGS, EXPRESSLY PROHIBITS THE USE OF NAMES OR

```
1    LIKENESSES.

2              SO, ON THE FACE OF THIS COMPLAINT, THE NCAA IS

3    ENFORCING ITS RULES THAT PROHIBIT THE USE OF NAMES, LIKENESSES,

4    AND PICTURES.  AND ON THE FACE OF THIS COMPLAINT, THE LICENSE

5    TO EA PROHIBITS THEM FROM DOING THOSE THINGS.

6              NOW, SO MUCH FOR THE CONSPIRACY.  THE CONSPIRACY ON

7    ITS FACE IS TO DO WHAT IS PERMITTED BY THE NCAA RULES, WHICH

8    PROHIBITS EXACTLY WHAT THEY CLAIM IS GOING ON.

9              SO THEN THEY SAY, OH, THERE IS A DIFFERENT

10   CONSPIRACY REALLY GOING ON HERE, AND THAT IS A CONSPIRACY TO

11   SORT OF SECRETLY VIOLATE THE NCAA BYLAW AND TO SECRETLY VIOLATE

12   THE LICENSE AGREEMENT EXPRESS PROHIBITIONS, BUT AS TO THAT

13   CONSPIRACY, THERE IS NOT A SHRED OF FACTUAL SUPPORT.

14             THERE IS A CONCLUSION OF CONSPIRACY, BUT THAT'S NOT

15   ENOUGH AS THE COURT WELL KNOWS FROM OTHER CASES, IN THE STATIC

16   RAM CASE AND VARIOUS OTHERS, AND TWOMBLY AND IQBAL, THAT'S NOT

17   ENOUGH.  THEY HAVE TO PLEAD FACTS TO SUPPORT THAT CONCLUSION,

18   AND THEY CAN'T.

19             NOW, THEY DO PLEAD THAT THERE WERE CONVERSATIONS

20   BETWEEN THE NCAA AND EA, BUT THOSE ARE EQUALLY CONSISTENT WITH

21   ENFORCING THE AGREEMENTS AS WRITTEN WHICH PROHIBIT THE

22   SO-CALLED IMPROPER USE.  AND THERE IS NO ALLEGATION WHATSOEVER

23   THAT WOULD SUPPORT THIS SORT OF SECRET SIDE CONSPIRACY OTHER

24   THAN A SUSPICION AND A SUMMARY CONCLUSION.  THAT DOESN'T GET

25   THEM THERE.
```

1        MY LAST POINT, THE SIXTH COUNT AGAINST THE NCAA IS A

2   CONTRACT THEORY.  THE CONTRACT IS SAID TO BE THE SIGNATURE BY

3   THE STUDENT ATHLETE DURING THE TIME THEY ARE A STUDENT ATHLETE

4   ON AN ANNUAL CERTIFICATION UNDER BYLAW 12.5.

5        YOU HAVE THAT BYLAW BEFORE YOU BECAUSE IT'S PLEAD IN

6   SOME OF THESE CASES, AND IT IS ATTACHED IN ITS ENTIRETY TO A

7   DECLARATION IN THE, ONE OF THE OTHER PLEADINGS, BUT IT'S NOT A

8   CONTRACT IN ANY FORM.

9        IT HAS NO QUID PRO QUO.  IT HAS NO OFFER.  IT HAS NO

10  ACCEPTANCE, HAS NO PERFORMANCE BY THE NCAA.  THERE IS NOTHING

11  IN IT THAT MAKES IT INTO A CONTRACT.  IT IS NOTHING BUT A

12  CERTIFICATION.

13           **THE COURT:**  OKAY.

14           **MR. CURTNER:**  JUST TO FINISH ON THAT, THE THEORY

15  THAT'S MADE IN THEIR BRIEF IS THAT THE -- THERE IS SOME IMPLIED

16  DUTY IN THIS SO-CALLED CONTRACT BY THE NCAA NOT TO DO ANYTHING

17  THAT WOULD PREVENT THEM FROM BEING ELIGIBLE.

18        WELL, MR. KELLER WAS ELIGIBLE DURING THE ENTIRE TIME

19  PERIOD THAT HE WAS A STUDENT ATHLETE.  AND SO THE NCAA HAS NOT

20  IN ANY WAY BREACHED THIS CONTRACT, IF IT WAS A CONTRACT.  AND

21  SO THERE'S JUST NO BASIS FOR THE CONTRACT CLAIM EITHER.

22        THOSE ARE THE ONLY CLAIMS AGAINST MY CLIENT.

23        THANK YOU.

24           **THE COURT:**  OKAY.  THANK YOU.

25           **MR. HENN:**  I'M CHARLIE HENN HERE ON BEHALF OF

1    COLLEGIATE LICENSING COMPANY.  AND FOR THE MOST PART, OUR

2    RESPONSES TO THE VARIOUS CLAIMS AGAINST CLC ARE IDENTICAL TO

3    NCAA AND I AM NOT GOING TO REPEAT THOSE.

4            QUICKLY, JUST FOR THE RECORD, I UNDERSTAND THE JUDGE

5    IN THE TENNESSEE CASE IS JUDGE JORDAN, LEON JORDAN.

6            **THE COURT:**  RIGHT.

7            **MR. HENN:**  CLC DOESN'T BELONG IN THIS CASE.  CLC IS

8    JUST AN AGENT.  THEY ARE THE LICENSING AGENT FOR A NUMBER OF

9    COLLEGES AND UNIVERSITIES AS WELL AS THE NCAA.  THEIR -- THE

10   CLAIMS THAT HAVE BEEN ASSERTED AGAINST CLC ARE JUST THE CIVIL

11   CONSPIRACY COUNT AND THE UNJUST ENRICHMENT COUNT.

12           OUR UNJUST ENRICHMENT DEFENSE IS THE SAME AS THE

13   OTHERS, WHICH IS THEY HAVE PLEADED THAT A CONTRACT COVERS THE

14   SAME SUBJECT MATTER AND THUS THERE CAN'T BE A SEPARATE UNJUST

15   ENRICHMENT CLAIM --

16           **THE COURT:**  THEY PLEAD IN THE ALTERNATIVE AND THEY

17   SAY IT'S A QUESTION OF FACT AS TO WHETHER YOU ARE AN AGENT FOR

18   THIS POINT.

19           **MR. HENN:**  WELL, I THINK IF YOU LOOK AT THE WAY THE

20   COMPLAINT IS PLEADED, THEY PLEAD THAT WE ARE AN AGENT.

21           **THE COURT:**  FOR SOME PURPOSES, BUT NOT NECESSARILY

22   FOR EVERYTHING.

23           **MR. HENN:**  WELL, THEY SAY THAT WE ARE THE LICENSING

24   ARM OF THE NCAA.  THEY SAY THAT AT THE TIME THAT WE ENGAGED IN

25   THE ACTS IN THE COMPLAINT, WE REPRESENTED THE NCAA, WHICH IS

1   THE CALIFORNIA CIVIL CODE DEFINES AN AGENT AS ONE WHO

2   REPRESENTS ANOTHER.  SO THE COMPLAINT EXPRESSLY SAYS THAT.

3           IT SAYS THAT AT THE TIME WE WERE NEGOTIATING THE

4   LICENSE, CLC WAS DIRECTED BY NCAA.  IF WE WERE NOT THEIR AGENT,

5   I AM NOT SURE HOW WE COULD HAVE BEEN DIRECTED BY THEM.

6           SO, IF YOU TAKE THE COMPLAINT AT ITS FACE VALUE,

7   THEY PLEADED THAT CLC WAS AN AGENT.  IT DID EVERYTHING THAT AN

8   AGENT WOULD DO.  THERE'S NO ALLEGATION IN THE COMPLAINT, FOR

9   EXAMPLE, THAT THE CLC -- THAT CLC WASN'T AN AGENT AT ANY TIME

10  DURING THE ACTIVITIES.

11          **THE COURT:**  I DON'T THINK THEY HAVE TO ALLEGE TO THE

12  CONTRARY.

13          **MR. HENN:**  BUT --

14          **THE COURT:**  ANYWAY, GO AHEAD.

15          **MR. HENN:**  SO THEIR POINT IS, THEY SAY IT IS A

16  QUESTION OF FACT, BUT THE CASE LAW, <u>EVEREST INVESTMENTS</u>, FOR

17  EXAMPLE, SAID THAT WHEN THE COMPLAINT PLEADS THE ELEMENTS OF

18  AGENCY, THE PLAINTIFF CAN'T GO BACK LATER AND SORT OF DISTANCE

19  ITSELF FROM THOSE PLEADINGS AND SAY WELL, IT'S A QUESTION OF

20  FACT.  YOU MIGHT NOT BE AN AGENT, EVEN THOUGH I'VE SAID YOU ARE

21  AN AGENT.

22          AND IN THAT CASE, THE <u>EVEREST INVESTMENT</u> CASE, THE

23  COURT SPECIFICALLY SAID THAT WHEN -- THEY GRANTED A MOTION TO

24  DISMISS IN THAT CASE WHERE THERE WAS AN ALLEGATION OF AGENCY.

25  SO, WHERE THERE ARE THE ALLEGATION HERE, IT CAN BE DECIDED ON A

1    MOTION TO DISMISS.

2              IN THE TROOST CASE, WHICH WE CITE, THE COURT SAID

3    THAT WHERE THE PLEADINGS ARE CLEAR, AND I THINK THE LANGUAGE

4    WAS SOMETHING THAT THEY ARE SUSCEPTIBLE OF BUT A SINGLE

5    INFERENCE, IT'S NOT A QUESTION OF FACT.  THE COURT CAN ACTUALLY

6    SAY, YES, YOU ARE PLEADING THEY ARE AN AGENT, THEREFORE, THE

7    AGENT IMMUNITY DEFENSE APPLIES.

8              IN THIS INSTANCE, NO AMOUNT OF DISCOVERY WOULD

9    CHANGE THE FACT THAT CLC IS AN AGENT.  THAT'S WHAT THEY ARE.

10             **THE COURT:**  OKAY.  DID YOU WANT TO RESPOND?

11             **MR. CAREY:**  THANK YOU, YOUR HONOR, ROB CAREY.

12             YOUR HONOR, THERE CLEARLY IS A TREMENDOUS

13   MULTIFACETED EFFORT GOING ON HERE, BUT THE EFFORT IS TO MAKE

14   THIS GAME AS REALISTIC AS POSSIBLE.  IT'S TO BE AS

15   UNTRANSFORMATIVE AS THEY CAN BE.  SO IT'S MULTIFACETED AND THE

16   MULTIFACET IS SAY OVER A PHOTO OR A FILM, OR THAT THEY HAVE

17   ADDED TO ONE PRONG OF THE GAME.

18             THERE'S TWO PRONGS.  THERE'S THE BIOGRAPHIES WITH

19   THE PLAYERS ON THERE WITH ALL OF THEIR PERSONAL INFORMATION AND

20   THEN THERE'S LITTLE GAME AVATAR.  AND WHAT THEY HAVE DONE IS

21   THEY MADE LITTLE GAME AVATAR ACT JUST LIKE THE REAL LIFE

22   COUNTERPART WOULD ACT.  THEY'VE MADE IT HAVE THE SAME PLAYING

23   ABILITY, THE SAME CHARACTERISTICS.  SO THE MULTIFACET GOING ON

24   HERE IS THEY HAVE ADDED THOSE THINGS THAT DON'T EXIST IN FILM

25   AND SNAPSHOTS.

1          **THE COURT:** WHAT ABOUT THE FILM OF THE LIFE OF

2     RUDOLPH VALENTINO THAT IS ATTEMPTED TO BE MADE AS REALISTIC AS

3     RUDOLPH VALENTINO'S LIFE AND TIMES?

4          **MR. CAREY:** EXCEPT THAT THE PLAINTIFFS IN THAT CASE

5     ARGUED THAT IT WAS AN INACCURATE FALSE DEPICTION OF A LIFE

6     STORY THAT'S NOT HIS.  SO IT CLEARLY TRANSFORMED HIS LIFE TO

7     SOMETHING THEY OBJECTED TO.

8          BUT IF I UNDERSTAND THEIR POINT CORRECTLY, IF YOU

9     BACK THIS THREE STOOGES OUT AND MADE THEM DOLLS IN A FILM

10    SETTING THAT WAS ONE OF THEIR FILMS, THAT WOULD BE

11    TRANSFORMATIVE SOMEHOW.

12         THEN IF YOU ADD PLAYERS TO THE GAME WHO ARE PLAYERS

13    THAT PLAY ON THE TEAM WITH MR. KELLER, OR ANY OF THE OTHER 2800

14    PLAYERS, THAT THAT VOLUME SOMEHOW TRANSFORMS IT FROM A FOOTBALL

15    SETTING THAT IS EXACTLY THE SETTING THEY ARE IN ROUTINELY THAT

16    THEY BUY LICENSING RIGHTS FOR, TO HAVE THE STADIUM, THE LOGOS,

17    THE CHEERLEADERS, EVERYTHING LOOK JUST LIKE IT WAS WHEN THEY

18    PLAYED.

19         I THINK THE HILTON CASE SHOWED THAT'S A PROBLEM.

20    IT'S THE SETTING IN WHICH YOU WOULD FIND THAT PERSON.

21         BUT BEFORE I GO DOWN THAT ROAD, I WOULD LIKE TO

22    TURN --

23         **THE COURT:** YOU DON'T REALLY SEE PARIS HILTON ACTING

24    AS A WAITRESS.

25         **MR. CAREY:** COULD I SEE HER?  WELL, ON HER SHOW,

1    YEAH.  NO, NOT REALLY, BUT I HAVE ACTUALLY NEVER SEEN THAT

2    SHOW.

3              **THE COURT:**  I HAVEN'T EITHER.

4              **MR. CAREY:**  THE TWO PROCEDURAL ISSUES I WOULD LIKE

5    TO ADDRESS REAL BRIEFLY BEFORE I TURN TO THE TRANSFORMATIVE

6    ELEMENTS HERE, ONE IS -- AND THIS APPLIES TO THE ANTISLAPP

7    MOTION TOO.  THIS RELATES TO WHAT I THINK IS A VERY IMPORTANT

8    ISSUE.

9              IT'S THE CONTRACT -- IT'S THE ARGUMENT THAT THE EA

10   SPORTS HAS CONTRACTED AWAY ITS FIRST AMENDMENT RIGHTS.  IN THE

11   BRIEF, IT GETS VERY SHORT SHRIFT ON THEIR BRIEF.  THEY SAY

12   PLAINTIFF HAS TO PLEAD THAT THERE WAS AN EXPRESS KNOWING AND

13   VOLUNTARY RELINQUISHMENT OF THE FIRST AMENDMENT RIGHTS.

14             FIRST, THAT'S WRONG.  THAT'S NOT WHAT THEY HAVE TO

15   PLEAD.  THEY HAVE TO PLEAD FACTS THAT, WHEN TAKEN IN THE LIGHT

16   MOST FAVORABLE TO THE PLAINTIFF, COULD LEAD TO AN INFERENCE

17   THAT THERE WAS A WAIVER OF FIRST AMENDMENT RIGHTS.

18             SO THERE'S TWO THINGS.  ONE, IT IS AFFIRMATIVE

19   DEFENSE.  COMEDY III MAKES THAT CLEAR.  IT'S AN AFFIRMATIVE

20   DEFENSE.  WE DON'T HAVE TO PLEAD ANYTHING IN OUR CLAIM GUESSING

21   WHAT THEIR AFFIRMATIVE DEFENSES MIGHT BE.  AND, FRANKLY, THE

22   WAIVER IS AN AFFIRMATIVE DEFENSE TO THE FIRST AMENDMENT

23   AFFIRMATIVE DEFENSE.  SO WE DON'T HAVE TO ADD ANYTHING IN OUR

24   COMPLAINT.  BUT, MOREOVER, WE ACTUALLY DID.

25             THERE'S AN ALLEGATION IN THE COMPLAINT THAT SAYS

1    THERE'S A CONTRACT BETWEEN THESE TWO PARTIES WHERE EA SPORTS

2    RELINQUISHED ITS FIRST AMENDMENT -- WHERE IT RELINQUISHED THE

3    ABILITY TO PUT THE LIKENESSES IN THE GAME.  THAT IS A FACT THAT

4    A JURY COULD SAY, YOU KNOW WHAT?  SOPHISTICATED PERSON,

5    BARGAINING AT ARM'S LENGTH, THEY KNOW WHAT THEY ARE DOING, THEY

6    AGREED TO NOT USE THOSE LIKENESSES.  A JURY COULD INFER THAT

7    THAT'S A WAIVER OF ITS FIRST AMENDMENT RIGHT.

8              WHY THAT'S IMPORTANT IS BECAUSE UNLIKE THIS

9    SITUATION WHERE YOU ARE LOOKING AT THE TRANSFORMATIVENESS OF

10   THE PRODUCT, AND YOU HAVE THE GAME INCORPORATED INTO THE

11   COMPLAINT ESSENTIALLY, THE COURT, AS A MATTER OF LAW, COULD

12   LOOK AT THAT AND SAY, THAT IS SO TRANSFORMATIVE I DON'T NEED TO

13   SEE THE ACTUAL PERSON.  I AM GOING TO FIND THAT IS

14   TRANSFORMATIVE AS A MATTER OF LAW.  IT COULD DO THAT BECAUSE

15   THE GAME IS PART OF THE ANALYSIS.

16             IT CAN'T DO THAT FOR THE WAIVER ARGUMENT ON FIRST

17   AMENDMENT.  AND EVEN IF THE GAME IS TRANSFORMATIVE, IF THEY

18   WAIVE THOSE RIGHTS, THE TRANSFORMATIVE DEFENSE DOESN'T APPLY.

19             SO, FROM A PRACTICAL STANDPOINT, ABSENT SOME

20   INTENSIVE FACT HEARING ON THE AFFIRMATIVE DEFENSE OF WAIVER TO

21   THE AFFIRMATIVE DEFENSE OF THE FIRST AMENDMENT, YOU CAN'T

22   RESOLVE THE MOTION ON THE TRANSFORMATIVENESS OF THE MOTION.

23             SECOND, THE POSITION WE FIND OURSELVES IN IS THEY

24   HAVE INTRODUCED THE GAME BY JUDICIAL NOTICE WHICH WE DID NOT

25   OPPOSE, SO THE COURT HAS A MOTION TO DISMISS WITH THE GAME

1    INCLUDED.

2              THEY HAVE NOT -- WE ARE NOT LOOKING AT THE PLAYERS,

3    WHAT THEY ACTUALLY LOOK LIKE, WHAT THEY REALLY LOOK LIKE, WHICH

4    MEANS THAT ANY FINDING OF TRANSFORMATIVENESS WILL HAVE TO COME

5    FROM SOMETHING OTHER THAN THE PLAYERS.  BECAUSE OUR COMPLAINT

6    SAYS THAT THEY ARE EXACT REPLICAS, THEY -- WE INTRODUCE THE

7    GAME INTO IT, WE HAVE NOT HAD A CHANCE TO GO OUT AND LOOK AT

8    WHETHER OR NOT IN REALITY THOSE PLAYERS LOOK EXACTLY LIKE THE

9    PLAYERS.

10             AND THE SAME THING, I SUPPOSE, COULD BE SAID FOR THE

11   CLC LICENSING ARGUMENT THAT THEY ARE INJECTING IN WHAT WE HAVE

12   ALLEGED TO BE EXACTLY WHAT THE STADIUMS LOOK LIKE.

13             SO, IF THERE IS A TRANSFORMATIVE ELEMENT OF IT, IT'S

14   GOING TO HAVE TO COME FROM SOMETHING OTHER THAN THOSE TWO

15   THINGS.  IT'S GOING TO HAVE TO COME FROM A STORY LINE OR

16   SOMETHING OTHER THAN THE STADIUM AND THE PLAYERS, WHICH THERE

17   IS NOTHING.  IT'S AS HILTON SAID, THERE IS NO LARGER STORY

18   HERE.  THERE IS NO -- THEY DON'T HAVE A STORY.

19             THIS GAME SHIFTS STATICALLY.  IT COMES OUT OF THEIR

20   MANUFACTURING FACILITY WITH BIOGRAPHIES THAT NEVER CHANGE ANY

21   AT POINT IN THIS GAME, WITH THOUSANDS OF PLAYERS ON THERE,

22   WHERE THEY LIVE, HOW THEY PLAY, WHETHER THEY ARE RIGHT HANDED,

23   WHAT THEIR HAIR LOOKS LIKE.

24             **THE COURT:**  THEY SAY THE GAMES AREN'T THE REAL

25   GAMES.  YOU PLAY THEM AND THE REAL GAME THERE WAS A PASS AND

1    HERE THEY CAN MAKE IT A -- SOMETHING ELSE.

2             **MR. CAREY:**  I UNDERSTAND THE ARGUMENT, BUT ALL THAT

3    IS SAYING IS YOU CAN TAKE A VERY REAL LIFE REPLICA OF SAM

4    KELLER AND MAKE IT DO WHAT YOU WANT.

5             THAT WOULD BE LIKE SAYING IF YOU GAVE A MAGIC MARKER

6    TO THE THREE STOOGES T-SHIRT AND SAID CHANGE IT AFTER WE SELL

7    IT TO YOU, IT SOMEHOW BECOMES TRANSFORMATIVE ON THEIR BEHALF.

8    THEY DIDN'T TRANSFORM IT, THE PLAYERS DO.

9             **THE COURT:**  WHAT ABOUT THE OTHER END OF IT?  THE

10   PUBLIC AFFAIRS REPORTING END, HOW DO YOU DISTINGUISH FANTASY

11   FOOTBALL?

12            **MR. CAREY:**  WELL, FANTASY FOOTBALL, I MEAN THEY ARE

13   TAKING SAM KELLER'S AND EVERY OTHER PLAYER OUT THERE, THEY ARE

14   TAKING THOSE PLAYERS' STYLE OF PLAY, CHARACTERISTICS AND

15   EMBODYING THEM IN A PLAYER.

16            I THINK THE HILTON CASE SAID IT ON THESE VERY FACTS.

17   THEY SAID, LOOK, IT'S ABOUT REPORTING.  THAT STATUTE, THAT

18   EXEMPTION TO THE STATUTE DEALS WITH REPORTING.  THEY

19   SPECIFICALLY EMPHASIZED THE WORD.

20            SO THERE'S NOTHING NEWSWORTHY HERE.  THIS IS

21   NOTHING -- THERE'S 2800 PLAYERS OR SOMETHING IN EVERY ONE OF

22   THESE GAMES.  THEY ARE NOT REPORTING FACTS.  THE GAME'S NOT

23   RELYING ON HOW THAT PERSON PLAYED THE WEEK BEFORE, SOME

24   NEWSWORTHINESS ELEMENT TO HIS PLAY.  THIS HAS TO DO WITH -- AND

25   MR. KELLER COULD BE PUT BACK INTO A GAME RIGHT NOW.  THERE IS

1    NOTHING TO STOP THEM FROM DOING THAT.  THEY DO LEGACY GAMES.

2    THERE'S NOTHING NEWSWORTHY ABOUT THAT.

3              BUT I DON'T THINK IT HAS ANYTHING NEAR WHAT IT NEEDS

4    TO SAY IT FALLS UNDER THAT EXEMPTION.  I AGREE WITH THE COURT;

5    IT'S A CONTINUUM.  IF YOU WANT TO BE NEWSWORTHY AND OUT THERE

6    TELLING PEOPLE ABOUT SOMETHING, AN ISSUE OF PUBLIC INTEREST OR

7    A PUBLIC ISSUE, THEN YOU HAVE TO HAVE SOMETHING PRETTY

8    IMPORTANT.

9              THE OTHER CATEGORIES IN THAT STATUTE ARE POLITICAL

10   CAMPAIGNS, NEWS OF THE DAY, THOSE TYPES OF THINGS, NOT JUST

11   SOME FOOTBALL PLAYER WHO PEOPLE KNOW HIS NAME.  I DON'T THINK

12   THAT'S ENOUGH.

13             **THE COURT:**  YOU WANT TO TALK ABOUT NCAA AND CLC?

14             **MR. CAREY:**  YOUR HONOR, I WOULD TURN THAT OVER TO

15   MR. PAYNTER, WHO IS GOING TO ADDRESS THAT.

16             **THE COURT:**  ALL RIGHT.

17             **MR. PAYNTER:**  YOUR HONOR, I AM HAPPY TO --

18             **THE COURT:**  I'LL GIVE YOU A COUPLE OF MINUTES.

19             **MR. PAYNTER:**  SURE.  IF THERE'S ANYTHING IN

20   PARTICULAR YOU WANT ME TO TALK ABOUT, JUST LET ME KNOW.

21             **THE COURT:**  WELL, THE THINGS THAT THEY REFERENCED,

22   THE -- WHAT YOUR CLAIM IS AS FAR AS NCAA VIOLATING THE INDIANA

23   STATUTE AND CLC'S AGENCY -- THE AGENCY THEORY ON CLC.

24             **MR. PAYNTER:**  SURE, YOUR HONOR.

25             SO, STARTING WITH THE NCAA.  THE NCAA ARGUES THAT

1    OUR STATUTORY CLAIM FAILS BECAUSE WE DID NOT -- SAM KELLER --

2    IT DID NOT USE HIS LIKENESS AS THAT TERMS IS UTILIZED IN THE

3    STATUTE, YOUR HONOR.

4              AND THERE ARE BASICALLY TWO PROBLEMS WITH THIS

5    ARGUMENT.  FIRST OF ALL, YOUR HONOR, THE NCAA DID USE SAM

6    KELLER'S LIKENESS WHEN IT RECEIVED COPIES OF THE GAME IN

7    ADVANCE.  IT EXPRESSLY APPROVED --

8              **THE COURT:**  COPIES OF WHAT?

9              **MR. PAYNTER:**  RECEIVED COPIES OF THE GAME FROM

10   ELECTRONICS ARTS IN ADVANCE OF ITS PUBLICATION.  IT EXPRESSLY

11   APPROVED THE USE OF ITS LIKENESS IN VIOLATION OF EXPRESS DUTIES

12   NOT TO DO SO AND THEN IT PROFITED BY THE USE OF HIS LIKENESS.

13             AND, THUS, CLEARLY, YOUR HONOR, THAT IS A USE AS

14   THAT TERM IS ORDINARILY UNDERSTOOD AND IN FAVOR OF ITS VERY

15   RESTRICTIVE VIEW OF THE VERB "TO USE".  ALL THAT NCAA CITES,

16   YOUR HONOR, IS ONE RUNG OF THE MANY DEFINITIONS IN MERRIAM

17   WEBSTER'S ONLINE DICTIONARY.

18             INCIDENTALLY, THEY CITE THE NOUN EVEN THOUGH IT'S

19   USED IN THE STATUTE AS A VERB.  BUT IF YOU LOOK IT UP, YOUR

20   HONOR, YOU WOULD SEE THAT ONE OF THE OTHER COMMON DEFINITIONS

21   WOULD BE, I AM QUOTING "TO CARRY OUT A PURPOSE OR ACTION BY

22   MEANS OF," WHICH IT OBVIOUSLY WOULD APPLY HERE.

23             HERE, THE PURPOSE OF THE NCAA WAS TO PROFIT OFF

24   NCAA'S STUDENT ATHLETES' NAMES AND LIKENESS JUST IN VIOLATION

25   OF ITS CONTRACTUAL DUTIES WHILE OSTENSIBLY AND HYPOCRITICALLY,

1    YOUR HONOR, TO PROMOTE AMATEURISM, AND IT CARRIED OUT THAT

2    PURPOSE BY EXPRESSLY APPROVING EA'S VIDEO GAMES KNOWING FULL

3    WELL, YOUR HONOR, THOSE VIDEO GAMES CONTAINED PLAYER

4    LIKENESSES.

5             SO, FOR THAT REASON, THE NCAA CERTAINLY USED

6    KELLER'S LIKENESS, BUT EVEN IF YOU DID ADOPT THE NCAA'S VERY

7    RESTRICTIVE DEFINITION OF THE VERB "TO USE", YOUR HONOR, AS

8    YOUR HONOR POINTED OUT, WE HAVE ALLEGED THAT IT'S A

9    CO-CONSPIRATOR.  AS A CO-CONSPIRATOR, YOUR HONOR, THE NCAA IS

10   LIABLE FOR ALL THE ACTIONS OF ELECTRONIC ARTS.

11           **THE COURT:**  THEY SAY YOU DIDN'T ALLEGE THAT

12   ELECTRONIC ARTS VIOLATED THE INDIANA STATUTE.

13           **MR. PAYNTER:**  YOU ARE CORRECT, YOUR HONOR.  THAT IS

14   THEIR ONLY RESPONSE.  THEY SAY BECAUSE WE HAVE NOT ACTUALLY

15   ALLEGED A CAUSE OF ACTION AGAINST ELECTRONIC ARTS UNDER THE

16   INDIANA STATUTE, WE SOMEHOW CANNOT CLAIM THAT THE NCAA

17   CONSPIRED WITH THE EA IN VIOLATION OF THAT STATUTE.

18           YOUR HONOR, WHETHER OR NOT WE ALLEGE A CLAIM UNDER

19   THE INDIANA STATUTE AGAINST ELECTRONIC ARTS, IN FACT, FOR THAT

20   MATTER, YOUR HONOR, WHETHER OR NOT WE SUE ELECTRONIC ARTS AT

21   ALL.

22           **THE COURT:**  YOU DON'T HAVE TO NECESSARILY SUE THEM,

23   BUT YOU HAVE TO ALLEGE THAT SOMEBODY COMMITTED THE TORT.

24           **MR. PAYNTER:**  YES.

25           **THE COURT:**  IF THEY ARE RIGHT THAT THEY CAN'T COMMIT

1   THE TORT, THEN SOMEBODY ELSE HAS TO BE ABLE TO COMMIT THE TORT

2   BEFORE YOU CAN CONSPIRE WITH ANYONE TO --

3            **MR. PAYNTER:**  CORRECT, YOUR HONOR --

4            **THE COURT:**  -- HAVE THE TORT COMMITTED.

5            WHY DON'T YOU MOVE ON REAL QUICKLY TO THE CLC.  WE

6   NEED TO MOVE ON TO THE ANTITRUST CASE AS WELL.

7            **MR. PAYNTER:**  SURE, NO PROBLEM.

8            I THINK IT SEEMS THE THRUST OF THEIR ARGUMENT YOU

9   WERE MOST INTERESTED IN IS THIS AGENT IMMUNITY RULE, YOUR

10  HONOR.  AS YOUR HONOR CORRECTLY IDENTIFIED, IT IS AN ISSUE OF

11  FACT.  EVEN IF THE CLC WAS THE AGENT OF THE NCAA WHEN IT

12  LICENSED THE NCAA LOGOS, IT WAS NOT ACTING AS AN AGENT OF THE

13  NCAA WHEN IT AUTHORIZED THE USE OF -- WHEN IT AUTHORIZED THE

14  USE OF PLAYER LIKENESSES, YOUR HONOR, IT WAS ACTING AS A

15  CO-CONSPIRATOR OF THE NCAA.

16           BUT MORE TO THE POINT, YOUR HONOR, THE AGENT

17  IMMUNITY RULE, AND THE CASES ARE CLEAR HERE, NEVER APPLIES,

18  WOULD NOT APPLY IN THIS CASE BECAUSE THE CLC HAD INDEPENDENT

19  DUTIES THAT WERE COMPLETELY SEPARATE AND APART FROM ANY DUTIES

20  OF THE NCAA, YOUR HONOR.

21           **THE COURT:**  WHAT DUTY DID IT HAVE TO THE ATHLETES?

22           **MR. PAYNTER:**  IT HAD STATUTORY DUTIES NOT TO

23  MISAPPROPRIATE LIKENESSES, YOUR HONOR.

24           SO IF YOU LOOK AT THE BERG CASE, IT SAYS

25  SPECIFICALLY THAT THE AGENT IMMUNITY RULE NEVER APPLIES WHEN

1    THE DEFENDANT VIOLATES A DUTY THAT HE OR SHE INDEPENDENTLY OWES

2    TO THE PLAINTIFF, YOUR HONOR HONOR.

3            SO, FOR EXAMPLE, IF I WENT OUT AND CONSPIRED WITH

4    SOMEONE TO COMMIT BATTERY, YOUR HONOR, IT IS OBVIOUSLY NOT A

5    DEFENSE IN A SUBSEQUENT SUIT BY THE VICTIM IN THIS COURT TO SAY

6    THAT I WAS ONLY ACTING AS AN AGENT OF MY CO-CONSPIRATOR.

7            AND THE REASON IT WOULDN'T BE, YOUR HONOR, IS

8    BECAUSE I HAVE AN INDEPENDENT DUTY NOT TO GO AROUND BATTERING

9    PEOPLE.  SIMILARLY, YOUR HONOR, THE CLC HAS AN INDEPENDENT DUTY

10   THAT IS SEPARATE AND APART FROM ANY DUTIES OF THE NCAA NOT TO

11   GO AROUND STEALING PLAYER LIKENESSES.

12           SO IT'S NOT SURPRISINGLY, YOUR HONOR, THAT CLC DOES

13   NOT CITE A SINGLE CASE THAT APPLIED THE AGENT IMMUNITY RULE IN

14   A SITUATION WHERE THE AGENT OWED AN INDEPENDENT DUTY ITSELF.

15           **THE COURT:**  OKAY.

16           WHO WANTED TO TALK ABOUT ANTITRUST?

17           **MR. CAREY:**  MAY I SAY ONE THING FOR THE RECORD?

18           THE TIGER WOODS PICTURE, AND I DON'T KNOW IF MY

19   VERSION IS INCORRECT OR IF THIS IS ACCURATE, THE VERSION I HAVE

20   SEEN ACTUALLY HAS A MANTLE ON THE BOTTOM WITH SOME WRITING ON

21   IT.  SO I DON'T KNOW IF THAT IS ACCURATE OR NOT ACCURATE, BUT

22   TO CLIP THAT OFF IS -- I THINK NEEDS TO BE CORRECTED.

23           **MR. CURTNER:**  GOOD AFTERNOON, YOUR HONOR, GREG

24   CURTNER FOR THE NCAA.  I WILL TAKE THE LEAD ON THE ANTITRUST

25   ISSUES IN O'BANNON AND NEWSOME, AND I WILL TREAT THEM TOGETHER.

1   I THINK THE ISSUES ARE ESSENTIALLY THE SAME EVEN THOUGH THE

2   NEWSOME COMPLAINT IS MUCH MORE STRIPPED DOWN THAN THE O'BANNON

3   COMPLAINT.  THERE ARE SOME THINGS IN THE O'BANNON COMPLAINT

4   THAT WE THINK HELP US, BUT ESSENTIALLY THE NEWSOME COMPLAINT IS

5   DEFICIENT ON THE SAME GROUNDS.

6           AND ESSENTIALLY, THAT IS, THEY ARE LACKING IN ANY

7   COHERENT ANTITRUST THEORY OF WHO, WHAT, WHEN, WHERE -- WHEN OR

8   WHY, AND DO NOT MEET THE STANDARDS OF TWOMBLY OR IQBAL.

9           I WANT TO TALK SPEAK ABOUT ARTICLE III STANDING,

10  ANTITRUST STANDING, ANTITRUST INJURY, THE CONSPIRACY

11  ALLEGATIONS, THEIR WAY -- THE PLAINTIFFS ATTEMPT TO CLAIM THAT

12  IT IS A PER SE VIOLATION AND, THEREFORE, THEY DON'T NEED TO

13  MEET SOME OF THESE REQUIREMENTS, AND THE ISSUE OF WHETHER THEY

14  HAVE TO BE A MARKET PARTICIPANT OR NOT, THE ISSUE OF WHETHER

15  THEY HAVE TO PLEAD IRRELEVANT MARKET OR NOT, AND FINALLY THE

16  STATUTE OF LIMITATIONS.

17          I THINK AS TO EACH AND EVERY ONE OF THOSE, THE

18  COMPLAINTS THAT WE HAVE ARE DEFICIENT, AND AS TO ALL OR NEARLY

19  ALL OF THOSE, THEY CANNOT REMEDY IT THROUGH AMENDMENT.

20          FIRST OF ALL, THERE IS NO ALLEGATION THAT EITHER OF

21  THEM DURING THE TIME THAT THEY WERE STUDENT ATHLETES, AND THIS

22  GOES BACK TO '90S, THEY GRADUATED MOST RECENTLY IN 1995, THAT

23  EITHER OF THEM EVEN SIGNED THESE FORMS THAT THEY COULD NOW

24  COMPLAIN ABOUT.

25          **THE COURT:**  WE WILL HEAR WHAT THEY HAVE TO SAY ABOUT

1    THAT.

2              **MR. CURTNER:**  THAT THEY DID SO WILLINGLY OR

3    UNWILLINGLY, THAT THEY MAY HAVE SIGNED SOME DIFFERENT FORMS

4    THAT BEAR ON THESE ISSUES.  IN FACT, WE HAVE REASON TO BELIEVE

5    THAT SOME SCHOOLS AND SOME CONFERENCES HAVE THEIR OWN SETS OF

6    RELEASES THAT BEAR ON THESE ISSUES.

7              THERE IS NO ALLEGATION THAT SINCE THEY GRADUATED

8    THEY HAVE BEEN PROHIBITED, MUCH LESS EXCLUDED FROM DOING

9    ANYTHING.  SO FOR TEN YEARS THEY HAVE BEEN OUT OF SCHOOL, AT

10   LEAST, AND THEY HAVE BEEN FREE TO COMPETE IN ANY MARKET THEY

11   FELT LIKE COMPETING IN.

12             THERE IS NO ALLEGATION THAT THEY EVER TRIED TO SELL

13   THEIR IMAGE, THAT THEY EVER TRIED TO MAKE A VIDEO OF

14   THEMSELVES, THAT THEY EVER TOOK A PICTURE THAT THEIR MOTHER

15   TOOK WHILE THEY WERE PLAYING FOOTBALL OR BASKETBALL AND TRIED

16   TO HAVE IT BLOWN UP AND FRAMED AND SOLD THROUGH WHATEVER

17   CHANNEL OF DISTRIBUTION THEY WANTED TO, THERE IS NO ALLEGATION

18   THEY DID ANYTHING LIKE THAT.

19             **THE COURT:**  SO DO YOU VIEW THE THINGS THAT THEY

20   SIGNED, OR SOME PEOPLE MAY HAVE SIGNED, AND WHEN THEY GRADUATE

21   FROM COLLEGE, AFTER THAT, THEY ARE NOT BOUND BY IT ANYMORE?

22             **MR. CURTNER:**  IT DEPENDS ON WHICH THING WE ARE

23   TALKING ABOUT, YOUR HONOR.

24             **THE COURT:**  ANY OF THEM.  DO THEY ALL END ON

25   GRADUATION OR IS THERE SOME THAT YOU CONTEND REALLY DO CONTINUE

1    TO APPLY?

2           **MR. CURTNER:**  THE FORM O8-3A AND 09-3A, BY THEIR

3    TERMS, GIVE THE NCAA A LIMITED RIGHT, AND IT'S LIMITED TO USE

4    CERTAIN LIKENESSES THAT WERE CREATED DURING THE TIME PERIOD

5    THAT THE PERSON WAS A STUDENT ATHLETE FOR THE LIMITED PURPOSE

6    OF PROMOTING NCAA CHAMPIONSHIPS AND GENERAL NCAA EVENTS.

7           **THE COURT:**  ONLY UP UNTIL THE TIME THEY GRADUATE?

8           **MR. CURTNER:**  NO, THAT CONTINUES.  THAT IS A

9    CONTINUED --

10          **THE COURT:**  SO IF YOU WANT TO GIVE IT AWAY OR SELL

11   IT, THEN I SUPPOSE IT WOULD BE HARDER FOR THEM TO SELL IT IF

12   YOU HAVE ALREADY SOLD IT.

13          **MR. CURTNER:**  THERE IS NO PROHIBITION AGAINST THEM

14   DOING SO.  THEY CAN TAKE THE SAME LIKENESS, THE SAME PHOTOGRAPH

15   THAT WAS TAKEN AT THE SAME TIME, THE SAME VIDEO, THEY CAN MAKE

16   NEW VIDEOS AND THEY CAN DO THE SAME.

17          THERE IS NO -- THERE'S A DIFFERENCE, I THINK, YOUR

18   HONOR.  I THINK IT'S REALLY AN IMPORTANT ONE.  BETWEEN AN

19   INTELLECTUAL PROPERTY RIGHT, THAT ESSENTIALLY OUR FIX AT THE

20   TIME OF THE PERFORMANCE, OR AT THE TIME OF A PHOTOGRAPH, OR AT

21   THE TIME OF THE GAME, OR AT THE TIME OF A BROADCAST, AND WHO

22   OWNS THAT AT THAT TIME.  AND, ESSENTIALLY, THAT OWNERSHIP IS

23   FIXED AT THAT POINT IN TIME.

24          AND IF CBS TELEVISION BROADCASTS A BASKETBALL GAME

25   OR THE CONTRACT PARTNER TO THE PAC-10 CONFERENCE BROADCASTS A

1    FOOTBALL GAME, THEY HAVE A COPYRIGHT.  THEY HAVE SOME OWNERSHIP

2    RIGHTS AS OF THAT MOMENT IN TIME.

3          THAT IS ENTIRELY DIFFERENT.  OWNERSHIP IS DIFFERENT

4    FROM EXCLUSION.  EXCLUSION IS AN ANTITRUST CONCEPT.  AND THE

5    FACT THAT SOMEBODY IS OUT THERE WITH A PROPERTY RIGHT AND THERE

6    IS ALL KINDS OF PROPERTY RIGHTS FLOATING AROUND HERE.  THERE IS

7    PROPERTY RIGHTS REGARDING HATS AND T-SHIRTS AND JERSEYS AND

8    VIDEO GAMES AND ANTIQUE FOOTAGE AND ALL KINDS OF THINGS.

9    PEOPLE HAVE RIGHTS IN THOSE VARIOUS PRODUCTS THAT ARE IN THE

10   CHAIN OF DISTRIBUTION THAT ARE IN COMMERCE.  NCAA DOESN'T

11   CONTROL THEM, BUT THERE ARE A BUNCH OF THOSE RIGHTS.

12         THAT IS A COMPLETELY DIFFERENT CONCEPT THAN THE

13   CONCEPT OF EXCLUDING SOMEBODY FROM PARTICIPATING IN THAT CHAIN

14   OF COMMERCE.  THEY CAN GO OUT AND CREATE WHATEVER THEY WANT.

15   THEY WERE FREE AS SOON AS THEY STOPPED BEING A STUDENT ATHLETE

16   TO ENGAGE IN COMMERCIAL ACTIVITY.  AND THEY COULD HAVE TAKEN

17   ANYTHING THAT THEY COULD GET THEIR HANDS ON AND TRIED TO SELL

18   IT.  THEY COULD HAVE CREATED NEW WORKS, THEY COULD HAVE TAKEN

19   COPIES OF OLD WORKS SO LONG AS THEY COULD DO SO LEGALLY AND

20   TRY.  AND NOBODY HAS PREVENTED THEM.  THERE IS NOTHING

21   PREVENTING THEM FROM COMPETING IN THIS SO-CALLED MASS MARKET,

22   WHICH IS ACTUALLY A BUNCH OF DIFFERENT MARKETS.

23         SO THERE IS A BIG DIFFERENCE BETWEEN THE FACT THAT

24   SOME OF THESE RIGHTS ARE OWNED AND SOME OF THESE RIGHTS ARE NOT

25   OWNED.  AND THE PLAINTIFFS ARE FREE TO PURSUE COMMERCIAL

```
1    ACTIVITIES AFTER THEY CEASE BEING A STUDENT ATHLETE WITH REGARD

2    TO THOSE RIGHTS.

3              AND WE KNOW THAT SOME OF THE PLAINTIFFS, SOME PEOPLE

4    IN THESE GROUPS DO, AND THEY PLEAD IN THEIR COMPLAINT, IN THE

5    O'BANNON COMPLAINT, IN PARAGRAPHS 133 THROUGH 145 THAT SUCH

6    THINGS GO ON, AND THEY PLEAD THIS.  THIS IS A --

7         THE COURT:  YOU DON'T THINK THERE'S ANYTHING NEW

8    THAT HAS HAPPENED RECENTLY THAT HAS ALLOWED THAT THAT WASN'T

9    ALLOWED BEFORE?

10        MR. CURTNER:  THIS HAS ALWAYS BEEN ALLOWED.  THERE'S

11   NOTHING NEW.

12             (COUNSEL DISPLAYS OBJECT.)

13             THIS HAS BEEN ON THE MARKET FOR SOME PERIOD OF TIME.

14   THERE'S AT LEAST SIX OF THEM.  THEY'RE SHOWN ON THE BACK FROM

15   VARIOUS TEAMS.  THEY HAVE THE COLLEGE UNIFORMS.  THEY GET A

16   LICENSE FOR THE USE OF THAT FROM THE COLLEGE THROUGH CLC.  THIS

17   COMES FROM THE NFL PLAYERS ASSOCIATION.  THAT'S APPARENTLY WHO

18   CLAIMS THEY HAVE THESE RIGHTS, AND THERE IS NO LICENSE FROM THE

19   NCAA HERE.  NONE.  NCAA IS NOT INVOLVED IN THIS IN ANY WAY.  IT

20   DOESN'T HAVE ANY RIGHTS THAT ARE BEING ASSERTED AND, ACTUALLY,

21   THEY LEAVE THE NIKE SWOOSH OFF OF THE UNIFORM, TOO.  SO THEY

22   DIDN'T HAVE TO GET A LICENSE FROM NIKE.

23        THE COURT:  YOU MAY THINK THIS IS MORE MEANINGFUL TO

24   ME THAN IT IS.

25             ARE YOU SAYING THAT IS A COLLEGE PERSON OR
```

1    SOMETHING?

2              (LAUGHTER.)

3              **MR. CURTNER:**  LET ME TRY.  THIS SHOWS THAT NO ONE IS

4    BEING EXCLUDED.

5              **THE COURT:**  BECAUSE THAT'S A COLLEGE PERSON?

6              **MR. CURTNER:**  THIS WAS A COLLEGE PERSON WHO IS NOW A

7    PRO PLAYER, BUT HE'S IN HIS COLLEGE UNIFORM.  AND HE OBVIOUSLY

8    IS ABLE TO COMPETE IN THIS BROAD MARKET AND IS SELLING THESE

9    THINGS.  WE BOUGHT IT AT A STORE FOR $16.95.

10             AND THERE'S ALWAYS BEEN OPPORTUNITIES FOR FORMER

11   COLLEGE PLAYERS TO DO VARIOUS COMMERCIAL THINGS AS A RESULT OF

12   THEIR NOTORIETY.  SOME OF THEM COACH.  SOME OF THEM TEACH.

13   SOME OF THEM DO LEARNING VIDEOS THAT THEY SELL TO TEACH YOUNG

14   PEOPLE HOW TO PLAY THOSE SPORTS.  THERE IS A WIDE VARIETY OF

15   THINGS THEY CAN DO.

16             THERE'S NOTHING THAT STOPS MR. O'BANNON FROM TAKING

17   A PHOTO THAT HIS FATHER TOOK WHEN HE WAS A PLAYER, BLOWING IT

18   UP AND MAKING IT GLOSSY, PUTTING A FRAME AROUND IT, SIGNING HIS

19   NAME TO IT, WRITING HIS AUTOBIOGRAPHY, AND SELLING IT.  NOTHING

20   STOPPING HIM FROM DOING THAT.

21             AND THE IMPORTANT POINT IS THERE IS NO ALLEGATION

22   THAT HE EVER DID THOSE THINGS, OR TRIED TO DO THOSE THINGS, WAS

23   READY TO DO THOSE THINGS OR, MOST IMPORTANTLY, HAS BEEN

24   PROHIBITED BY ANYBODY FROM DOING ANY OF THOSE THINGS.

25             THAT DEFEATS HIS ARTICLE III STANDING.  THAT DEFEATS

1    ANTITRUST STANDING, AND THAT MEANS THAT HE CANNOT COMPLY WITH

2    THE RULE THAT IS CLEAR IN THE NINTH CIRCUIT THAT HE HAS TO BE A

3    MARKET PARTICIPANT OR BE READY TO BE A MARKET PARTICIPANT.

4            THEY TRIED TO DISTINGUISH --

5            **THE COURT:**  WHAT ABOUT THE GROUP BOYCOTT THEORY?

6            **MR. CURTNER:**  THEY TRY TO GET AROUND THAT AND

7    SEVERAL OTHER THINGS BY SAYING THAT THIS IS A GROUP BOYCOTT.

8    IT'S NOT A GROUP BOYCOTT.

9            THE NCAA IS NOT IN A HORIZONTAL RELATIONSHIP WITH

10   ANY OF THESE FOLKS.  WE'RE NOT COMPETITORS WITH ANY OF THESE

11   OTHER DEFENDANTS, AND THE RELATIONSHIP BETWEEN THE NCAA AND CLC

12   AND THE RELATIONSHIP BETWEEN CLC AND ELECTRONIC ARTS IS

13   VERTICAL.  ONE SUPPLIES THE OTHER TO THE OTHER.

14           AND THE SUPREME COURT IN NYNEX VERSUS DISCON MADE IT

15   ABSOLUTELY CLEAR THAT THIS GROUP BOYCOTT THEORY CANNOT APPLY

16   UNLESS YOU'VE GOT HORIZONTAL COMPETITORS, LIKE ALL OF THE

17   PARTICIPANTS IN THE OIL BUSINESS, AGREEING TO USE THEIR POOLED

18   POWER WHERE THAT POOLED POWER GIVES THEM MONOPOLY POSITION IN A

19   MARKET TO COERCE THE BEHAVIOR OF ANOTHER COMPETITOR IN THAT

20   MARKET.

21           THAT'S WHAT A GROUP BOYCOTT IS ALL ABOUT.  AND THAT

22   IS WHAT THE SUPREME COURT MADE ABSOLUTELY CLEAR, IF IT WASN'T

23   CLEAR IN THE EARLIER CASES, IN NYNEX VERSUS DISCON, WE DON'T

24   HAVE ANYTHING RESEMBLING THAT.

25           AND WE ALSO HAVE -- THERE'S NOTHING HERE RESEMBLING

1   A PRICE-FIXING AGREEMENT.  THEY TRY TO SAY THIS IS PRICE-FIXING

2   WHICH IS PER SE, BUT NONE OF THESE AGREEMENTS, THIS FORM 08-3,

3   OR 09-3 AND BYLAW 12.5 OR 12.5.1 SAY NOTHING ABOUT PRICE.

4              NOW, IT IS TRUE THAT STUDENT ATHLETES ARE PROHIBITED

5   FROM EARNING MONEY OUTSIDE OF THEIR SCHOLARSHIP WHILE THEY'RE A

6   STUDENT ATHLETE, BUT NONE OF THESE THINGS SAY ANYTHING ABOUT

7   THE PRICE OF ANYTHING AFTER THEY FINISH THEIR CAREER AS A

8   STUDENT ATHLETE.

9              **THE COURT:**  WHAT ABOUT DURING THE CAREER?

10             **MR. CURTNER:**  THEY ARE NOT CHALLENGING THAT.  THEY

11  ARE NOT CHALLENGING THAT.  AT LEAST I DON'T UNDERSTAND THEM TO

12  BE DOING SO.  THEY SAY THAT THEY ARE NOT CHALLENGING THE

13  PRINCIPLE OF AMATEURISM.  IF THEY WANT TO CHALLENGE THAT, THEN

14  THEY RUN INTO THE PROBLEM THAT THE UNITED STATES SUPREME COURT

15  HAS ALREADY PASSED THAT.  AND THERE'S BOARD OF REGENTS VERSUS

16  NCAA IN 1984, THE SUPREME COURT SAID IT'S OKAY TO HAVE RULES

17  ABOUT COLLEGE SPORTS, INCLUDING "THEY SHALL NOT BE PAID," AND

18  THAT'S A QUOTE.

19             **THE COURT:**  HAVE YOU LICENSED THEIR LIKENESSES OR

20  WHATEVER IT IS YOU LICENSE EVEN WHILE THEY ARE STILL IN SCHOOL

21  AND THE GAMES INCLUDE STUDENTS WHO ARE STILL IN SCHOOL, NO?

22             **MR. CURTNER:**  THE KELLER COMPLAINT DOES INCLUDE

23  THAT, SOMETHING CLOSE TO THAT CLAIM.

24             **THE COURT:**  BUT NOT O'BANNON?

25             **MR. CURTNER:**  O'BANNON, IT'S UNCLEAR WHETHER HE IS

1    TRYING TO ALSO CLAIM SOMETHING THAT OVERLAPS WITH KELLER TO

2    THAT REGARD.

3            BUT BOTH OF THEM AFFIRMATIVELY PLEAD THAT THE NCAA

4    RULE AND THE NCAA LICENSES PROHIBIT EXACTLY WHAT THEY -- THIS

5    COMMERCIAL ACTIVITY.  THERE IS SOME LIMITED THINGS THAT ARE

6    ALLOWED UNDER BYLAW 12.5 AND THE SCHOOLS, FOR EXAMPLE, ARE

7    ALLOWED TO SELL T-SHIRTS AND JERSEYS ONLY ON CAMPUS AND FOR

8    LIMITED PURPOSES, AND SOME DO AND SOME DON'T.

9            **THE COURT:**  YOU LICENSE THEIR LIKENESSES TO BE USED

10   CURRENTLY FOR MONEY-MAKING PURPOSES BY SOMEONE OTHER THAN THEM,

11   AND FOR THEM NOT TO GET ANY OF IT.

12           **MR. CURTNER:**  YOUR HONOR, I MUST RESPECTFULLY

13   DISAGREE.  WE ABSOLUTELY DO THE OPPOSITE.  WE PROHIBIT THEIR

14   LIKENESS.

15           **THE COURT:**  THEIR STATS AND THEIR --

16           **MR. CURTNER:**  WE DON'T LICENSE THAT EITHER.  WE

17   DON'T LICENSE ANYTHING ABOUT THEM.

18           EA USES CERTAIN ASPECTS OF THEM.  THE NCAA'S LICENSE

19   TO EA SPORTS IS OF THE NCAA'S LOGO.  WE GIVE EA SPORTS THE

20   RIGHT TO USE THE NCAA NAME, THE LITTLE BLUE BALL, AND VARIOUS

21   OTHER MARKS OF NCAA.  THERE IS ANOTHER LICENSOR CALLED NCAA

22   FOOTBALL THAT'S OWNED BY A SEPARATE ORGANIZATION THAT'S ALSO

23   LICENSED TO THEM.

24           THE NCAA DOES NOT LICENSE THEIR USE OF STUDENT

25   ATHLETES' NAMES, LIKENESSES, PHOTOGRAPHS, REPLICAS, STATS, OR

1    ANYTHING OF THE KIND.  THE NCAA PROHIBITS THEM FROM DOING THOSE

2    THINGS AND THE NCAA POLICIES THOSE PROHIBITIONS TO MAKE SURE

3    THEY DON'T GO OVER THAT LINE.  AND THEY HAVE DONE THEIR BEST TO

4    KEEP THEM FROM GOING OVER THAT LINE EVEN THOUGH IT'S CLEAR THAT

5    EA WANTS TO MAKE THEIR GAME AS REALISTIC AS POSSIBLE.

6              WE DO NOT GIVE PERMISSION.  THEY TAKE THAT ON THEIR

7    OWN TO GET THOSE RIGHTS, EITHER PUBLICLY OR --

8              **THE COURT:**  YOU GIVE THEM PERMISSION FOR A NUMBER OF

9    THINGS AND CHARGE, I GUESS, A FAIR AMOUNT OF MONEY FOR DOING

10   SO.

11             **MR. CURTNER:**  IT'S NOT VERY MUCH MONEY, BUT THAT'S A

12   DIFFERENT STORY.

13             BUT THE THINGS THAT THE NCAA LICENSES ARE ITS OWN

14   MARKS AND ITS OWN NAMES, ITS OWN PROPERTY RIGHTS.

15             **THE COURT:**  WHO LICENSES THE COLLEGE LOGOS AND THE

16   COLLEGE FIGHT SONGS AND THE COLLEGE UNIFORMS --

17             **MR. CURTNER:**  THE COLLEGES DO.

18             **THE COURT:**  -- THE COLLEGE MASCOTS, AND ALL THAT?

19             **MR. CURTNER:**  THE COLLEGES DO.

20             **THE COURT:**  THROUGH YOU, THOUGH.

21             **MR. CURTNER:**  THROUGH CLC.  THE NCAA DOES NOT

22   CONTROL THAT.  THE NCAA IS A NONPARTICIPANT IN THAT.

23             THE NCAA ONLY CONTROLS ACTUALLY ONE THING, AND THAT

24   IS -- OR ONE GROUP OF THINGS, AND THAT IS ITS POST-SEASON

25   CHAMPIONSHIPS.  AND ITS PRINCIPAL ONE IS COLLEGE BASKETBALL,

1    THAT'S MARCH MADNESS AND FINAL 4, AND ALL THAT STUFF.  NCAA

2    OWNS THAT AND IT SELLS THAT, AND IT GETS QUITE A LOT OF MONEY

3    WHICH IT GIVES TO THE SCHOOLS.  AND IT ALSO RUNS CHAMPIONSHIPS

4    IN 28 OTHER SPORTS, INVOLVING 45,000 STUDENT ATHLETES OR

5    SOMETHING LIKE THAT.

6              IT DOES NOT CONTROL THE BOWL GAMES.  THOSE ARE OWNED

7    BY THE BOWLS AND BY THE BCS, WHICH IS A CONSORTIUM OF

8    CONFERENCES.  THE NCAA HAS A VERY LIMITED ROLE IN ALL OF THESE

9    THINGS AND IT DOES ITS BEST TO KEEP IT ALL NONCOMMERCIAL.

10   THAT'S ITS FUNCTION IN THE WORLD.

11             SO THE SUPREME COURT HAS ALREADY SAID THAT THE

12   NCAA'S FUNCTION IN ALL OF THESE THINGS SHOULD BE JUDGED UNDER

13   THE RULE OF REASON, NOT UNDER ANY PER SE RULE.  THAT'S WHAT

14   BOARD OF REGENTS STANDS FOR.

15             THE PLAINTIFFS HAVE NOT PLEAD A COGNIZABLE RELEVANT

16   MARKET.  THEY HAVE A MESS OF MARKETS HERE.  THEY HAVE DONE NONE

17   OF THE THINGS THAT ARE REQUIRED TO PLEAD A PROPER RELEVANT

18   MARKET THAT SHOW THE BOUNDARIES OF SUBSTITUTABILITY, WHAT ARE

19   THE CLOSE SUBSTITUTES, WHAT ARE OUTSIDE OF THAT.  THEY JUST SAY

20   EVERYTHING COLLEGE COMPETES WITH EVERYTHING COLLEGE AND DOESN'T

21   COMPETE WITH EVERYTHING ELSE.  THAT'S NOT A RELEVANT MARKET.

22   THAT CANNOT STAND.

23             FINALLY, MR. O'BANNON AND MR. NEWSOME HAVE BEEN OUT

24   OF COLLEGE FOR 15 YEARS OR SO NOW, SINCE 1995.

25             **THE COURT:**  CONTINUING THAT IS PART --

1          **MR. CURTNER:**  NOTHING HAS CHANGED SINCE THE STATUTE

2     OF LIMITATIONS BEGAN RUNNING.

3          **THE COURT:**  WHO ELSE WANTS TO TALK ABOUT ANTITRUST

4     BRIEFLY?

5          **MR. BOYLE:**  YOUR HONOR, PETER BOYLE FOR CLC.

6          I WILL TRY TO KEEP THIS BRIEF.  I KNOW WE ARE UNDER

7     TIME CONSTRAINT.

8          LET ME QUICKLY HIT THE NEWSOME HIGHLIGHTS.  NEWSOME

9     IS A STRIP-DOWN VERSION OF THE O'BANNON COMPLAINT.  IT IS SO

10    STRIPPED DOWN IT BARELY SAYS ANYTHING IN TERMS OF FACTUAL

11    CONTENT.  AND SPECIFICALLY WITH RESPECT TO CLC, THERE ARE ONLY

12    ABOUT SEVEN OR EIGHT ALLEGATIONS ABOUT CLC IN THE ENTIRE

13    COMPLAINT.  THEY ARE FAIRLY INNOCUOUS FOR THE MOST PART.

14         CLC IS A GEORGIA CORPORATION.  IT IS FOR-PROFIT

15    CORPORATION.  THERE IS SOME QUOTES FROM THE WEBSITE THAT REALLY

16    DON'T GO TO ANY CONSPIRACY THEORY.

17         AND WE'VE CITED BOTH IN THE O'BANNON MOTION AND THE

18    NEWSOME MOTION CASES THAT SHOW, FOR THE PLAINTIFFS HERE TO

19    STATE A CLAIM AGAINST CLC, THEY HAVE TO ALLEGE FACTUAL CONTENT

20    THAT SHOWS CLC PARTICIPATED IN THESE CONSPIRACIES.

21         IN NEWSOME, THE ONLY THING ALLEGED ABOUT CLC --

22         **THE COURT:**  COULD YOU TALK ABOUT O'BANNON INSTEAD?

23         **MR. BOYLE:**  SURE, IF YOU PREFER.

24         **THE COURT:**  IF THERE IS NOT ENOUGH IN NEWSOME AND

25    IT'S IN O'BANNON, IT WILL BE IN NEWSOME SOON, SO YOU MIGHT AS

1    WELL TALK ABOUT O'BANNON.

2              **MR. BOYLE:**  UNDERSTOOD, YOUR HONOR.  UNDERSTOOD.

3              WITH RESPECT TO O'BANNON, AS A PRACTICAL MATTER, FOR

4    O'BANNON TO STATE A CLAIM AGAINST CLC, HE HAS TO SHOW THAT CLC

5    HAS LICENSED THESE PARTICULAR RIGHTS, THE RIGHTS OF PUBLICITY

6    OF FORMER NCAA ATHLETES.

7              LET ME TELL YOU THREE REASONS WHY HE HASN'T DONE

8    THAT AND HE CAN'T DO THAT.

9              NUMBER ONE, CLC IS A TRADEMARK COMPANY.  IT ONLY

10   HANDLES TRADEMARK RIGHTS.  IT DOESN'T HANDLE THESE OTHER TYPES

11   OF RIGHTS.

12             THERE IS NO CONSPIRACY REGARDING THESE NCAA FORMS

13   THAT CONVEY ANY RIGHT WHATSOEVER TO THE PLAINTIFFS' LIKENESS OR

14   NAME TO CLC FOR LICENSING PURPOSES.

15             AND AS MR. CURTNER SAID, THE FORMER NCAA ATHLETES

16   ACTUALLY DO LICENSE THEIR IMAGES AND CLC ACTUALLY PARTICIPATES

17   IN DEALS FOR FORMER NCAA ATHLETES.  PUTATIVE CLASS MEMBERS

18   LICENSE THEIR OWN RIGHTS.

19             NOW WITH RESPECT TO THE FIRST POINT --

20             **THE COURT:**  DIRECTLY TO YOU AND YOU PAY FOR THEM?

21             **MR. BOYLE:**  EXCUSE ME?

22             **THE COURT:**  DIRECTLY TO YOU AND YOU PAY FOR THEM?

23             **MR. BOYLE:**  WE DO NOT LICENSE THE RIGHTS OF

24   PUBLICITY OF ANYONE.  CLC ONLY LICENSES ITS TRADEMARK RIGHTS.

25   IN FACT --

```
1              THE COURT:  SO WHAT WERE YOU SAYING THAT YOU DO WITH

2   NCAA ATHLETES?

3              MR. BOYLE:  FORMER NCAA ATHLETES --

4              THE COURT:  WHAT DO YOU DO WITH THEM?

5              MR. BOYLE:  WE DON'T DO ANYTHING WITH THEM.

6   LICENSEES WILL COME TO CLC AND SOMETIMES OBTAIN TRADEMARK

7   LICENSES OF NCAA MARKS OR MAYBE SCHOOL MARKS.  THE LICENSEES,

8   IF THEY NEED TO DO SO, WILL SEPARATELY GO OUT AND OBTAIN

9   LICENSES FROM PUTATIVE CLASS MEMBERS.

10             THE MCFARLAND TOYS DEAL, THE ACTION FIGURE THAT --

11             THE COURT:  YOU ARE NOT INVOLVED IN THAT?

12             MR. BOYLE:  WE ARE ONLY INVOLVED IN THE SENSE THAT

13  WE ARE PROVIDING ONE PIECE OF THE PUZZLE.  THE LICENSEE WILL

14  INDEPENDENTLY GO OUT AND OBTAIN THE RIGHTS OF PUBLICITY IF IT

15  NEEDS TO.  IT DOESN'T ALWAYS NEED TO.

16             IN FACT, THE O'BANNON COMPLAINT SPECIFICALLY ALLEGES

17  THAT CLC IS THE TRADEMARK LICENSING REPRESENTATIVE OF THE NCAA

18  AND CERTAIN NCAA SCHOOLS.

19             THE O'BANNON COMPLAINT ALSO ALLEGES THAT THERE ARE

20  OTHER COMPANIES THAT SERVE AS LICENSING AGENTS FOR OTHER

21  RIGHTS.  BROADCAST RIGHTS, VIDEOS, PHOTOS.  CLC DOESN'T DO ANY

22  OF THAT.  CLC ONLY DOES TRADEMARK RIGHTS.

23             NOW, THE O'BANNON COMPLAINT, AND I BELIEVE THE

24  O'BANNON BRIEF, AND I BELIEVE NEWSOME AS WELL, MAKES THE

25  ARGUMENT THAT IF THERE IS NO CONSPIRACY HERE BETWEEN CLC AND
```

1    THE NCAA, WHAT ONE WOULD EXPECT TO HAPPEN IS THAT LICENSEES

2    WOULD GO OUT AND OBTAIN LICENSES FROM THESE FORMER ATHLETES.

3              THAT'S EXACTLY WHAT HAPPENS.  THE COMPLAINT ADMITS

4    THAT HAPPENS.  THERE IS VERY LITTLE IN THIS COMPLAINT ABOUT

5    CLC.  AS LONG AS IT IS, THERE IS VERY LITTLE FACTUAL CONTENT

6    ALLEGED ABOUT CLC.  AND THE FEW THINGS THAT ARE ALLEGED SHOW

7    THAT CLC ACTUALLY COOPERATES WITH LICENSEES WHO WANT TO

8    INDEPENDENTLY GO OUT AND OBTAIN LICENSES FROM FORMER NCAA

9    ATHLETES.

10             CLC WILL PROVIDE TRADEMARK LICENSES IN THOSE

11   INSTANCES SO WE CAN HAVE ACTION FIGURES.  IN FACT, THE EA VIDEO

12   DEAL THAT'S REFERENCED IN MR. O'BANNON'S COMPLAINT, IN THAT

13   SITUATION, MR. O'BANNON'S ALLEGED THAT CLC PROVIDED SPECIFIC

14   RIGHTS, TRADEMARK LICENSES, NOT ANY RIGHTS OF PUBLICITY.

15             EA ACTUALLY WENT OUT AND OBTAINED INDEPENDENTLY THE

16   RIGHTS OF PUBLICITY FROM FORMER NCAA ATHLETES SO THEY CAN USE

17   THE LIKENESSES OF THOSE ATHLETES ON THE COVER OF THE VIDEO

18   GAME.

19             SO, IT MAKES NO SENSE TO US WHEN THE COMPLAINT

20   SUGGESTS BUT DOES NOT SAY IN ANY WAY THAT'S COGNIZABLE THAT CLC

21   HAD SOME ROLE IN THE CONSPIRACY.  IT IS ALL BOILERPLATE.  IT

22   DOESN'T PAST THE TEST UNDER TWOMBLY.  IT DOESN'T PASS THE TEST

23   UNDER IQBAL.

24             ONE LAST POINT.  I KNOW WE ARE SCRUNCHED FOR TIME.

25   MR. O'BANNON AND MR. NEWSOME IN THEIR BRIEFS CITED THE GILLY

1    CASE.  AND THEY CITE IT FOR THE PROPOSITION THAT IN THE NINTH

2    CIRCUIT, THE NINTH CIRCUIT DISFAVORS DISMISSAL OF ANTITRUST

3    CASES.  JUST VERY RECENTLY, THE NINTH CIRCUIT WITHDREW THAT

4    DECISION.  AND, IN FACT, THEY ISSUED A NEW DECISION.

5            THE NEW DECISION AFFIRMS DISMISSAL OF AN ANTITRUST

6    CASE AND IT ADOPTS THE TWOMBLY STANDARD WHICH SAYS, IF AN

7    ANTITRUST CASE IS IMPLAUSIBLE ON ITS FACE AND FAILS TO STATE A

8    CLAIM, THAT CLAIM SHOULD BE DISMISSED AT THE EARLIEST POSSIBLE

9    TIME.  AND THAT IS WHAT WE ASK THE COURT TO DO.

10           **MR. HAUSFELD:**  MICHAEL HAUSFELD FOR PLAINTIFF

11   O'BANNON.

12           AND I WOULD LIKE TO TAKE AN OPPORTUNITY TO THANK THE

13   COURT FOR THE TIME THAT IT HAS EXTENDED WITH REGARD TO THE

14   ARGUMENTS AND THE COURT REPORTER FOR NOT TAKING A BREAK AT THIS

15   POINT.

16           I WOULD LIKE TO START WHERE COUNSEL JUST LEFT OFF IN

17   TERMS OF THE PLAUSIBILITY OF THE COMPLAINT AND TO PLACE IN

18   CONTEXT THE NCAA AND CLC.

19           I APPRECIATED THE FACT THAT COUNSEL FOR THE NCAA

20   REFERRED TO THE SUPREME COURT'S DECISION IN THE OKLAHOMA CASE

21   WHERE THE SUPREME COURT FOUND THAT THE NCAA IS A CLASSIC CARTEL

22   AND OPERATES TO FIX PRICES AND ENGAGE IN GROUP BOYCOTTS.

23           IN FACT, THE SUPREME COURT --

24           **THE COURT:**  BUT THEY SAID IT WAS ALL OKAY.

25           **MR. HAUSFELD:**  AS JUSTIFIED.  AND THAT'S WHAT WE

1    NEED TO LOOK AT.  THAT WAS AN INTERESTING PART OF WHAT COUNSEL

2    FOR THE NCAA SAID.

3         IT'S NOT THAT THEY HAVE AN EXEMPTION.  THEY HAVE A

4    DEFENSE.  THE DEFENSE DOES NOT MEAN THAT THERE IS NO VIOLATION.

5    IT MEANS THAT THERE IS A PLAUSIBLE COMPLAINT LITERALLY ON THE

6    FACE OF AN ORGANIZATION WHICH THE SUPREME COURT NOTED REQUIRES

7    MUTUAL COOPERATION IN ORDER TO MAKE ITS PRODUCT AVAILABLE AT

8    ALL.

9         AND, IN FACT, THE SUPREME COURT SAID THAT THE NCAA

10   COMMANDEERED THE RIGHTS OF ITS MEMBERS, THE UNIVERSITIES AND

11   OTHER INSTITUTIONS, AND ENFORCES THOSE RIGHTS THROUGH

12   PUNISHMENT, SANCTIONS, IF THERE IS A VIOLATION.  THAT'S A

13   CLASSIC CARTEL.  AND IT'S A CLASSIC CARTEL BOTH WITH RESPECT TO

14   FIXING PRICES AND A GROUP BOYCOTT.

15        IT HAS TWO IMPACTS.  ONE, THERE IS NO QUESTION THAT

16   THE NCAA AND ITS MEMBER INSTITUTIONS PROHIBIT ANY STUDENT

17   ATHLETE TO RECEIVE ANY COMPENSATION WHILE THEY ARE A STUDENT

18   ATHLETE IN ANY FORM OTHER THAN THEIR SCHOLARSHIP.  THAT'S

19   CLEAR.  THEY ENFORCE THAT RULE THROUGH ALL OF THEIR MEMBER

20   INSTITUTION.

21        **THE COURT:**  ARE YOU COMPLAINING ABOUT CURRENT

22   STUDENTS?

23        **MR. HAUSFELD:**  THAT'S AN INTERESTING ISSUE.  I

24   MIGHT, BUT NOT NECESSARILY RIGHT NOW, BUT THERE IS A CARRYOVER

25   AS YOUR HONOR SO APTLY QUESTIONED.

1          THE STUDENT ATHLETE HAS TO GIVE UP, HAS TO, IT IS

2     TAKEN FROM THE STUDENT ATHLETE ALL RIGHTS THAT THEY MIGHT HAVE

3     WHILE THEY ARE A STUDENT ATHLETE.

4          THE NCAA TAKES THOSE RIGHTS AND CONTINUES THEM IN

5     PERPETUITY.  THE NCAA SAYS AT ITS MEMBER INSTITUTIONS WITH

6     REGARD TO ITS STUDENT ATHLETES THAT COMMERCIAL WORLD, WHEN YOU

7     LOOK TO ANYONE TO PURCHASE A LICENSE WITH REGARD TO WHATEVER IT

8     IS THAT WE SELL, YOU'VE GOT TO COME TO US.  WE ARE THE

9     EXCLUSIVE LICENSOR.

10          **THE COURT:**  I DON'T KNOW ABOUT EXCLUSIVE, THEY'RE

11     SAYING ALTHOUGH THEY RETAIN THE RIGHT THAT THE ATHLETES

12     THEMSELVES ONCE THEY'RE OUT OF SCHOOL CAN GO AHEAD TRY AND SELL

13     IT AS WELL, OR IN COMPETITION.

14          AND ONE THING THEY CRITICIZE YOU FOR, BEFORE I

15     FORGET, I NEED TO KNOW WHETHER MR. O'BANNON SIGNED THE FORM OR

16     NOT, AND WHETHER HE HAS EVER ATTEMPTED OR IS ALLEGING HE WOULD

17     ATTEMPT TO SELL HIS LIKENESS, OR WHATEVER, IF HE COULD.

18          **MR. HAUSFELD:**  HE DID SIGN THE FORM.  IN FACT, I

19     DON'T BELIEVE THE NCAA OR ANY INSTITUTION WOULD ARGUE THAT IT'S

20     CLEAR THAT NO STUDENT ATHLETE WOULD BE ELIGIBLE TO COMPETE IN

21     INTER-COLLEGIATE SPORTS UNLESS THEY SIGN THE FORM.

22          **THE COURT:**  SO YOU COULD ALLEGE THAT IN AN AMENDED

23     COMPLAINT?

24          **MR. HAUSFELD:**  YES.

25          **THE COURT:**  IS HE PLANNING OR WOULD HE LIKE TO SELL

```
1    HIS LIKENESS AND IS HE SAYING HE CAN'T OR CAN'T GET ENOUGH

2    MONEY FOR IT BECAUSE OF THIS SITUATION?

3           MR. HAUSFELD:  IF I CAN, YOUR HONOR, WHAT IS IT

4    THAT, AGAIN, COUNSEL FOR THE NCAA SAID IN RESPONSE TO YOUR

5    QUESTIONS, THEY ARE THE EXCLUSIVE LICENSEE.

6           THE COURT:  THEY DIDN'T SAY "EXCLUSIVE".  THEY

7    DENIED THAT.

8           MR. HAUSFELD:  THEY ARE THE EXCLUSIVE LICENSEE OF

9    ALL RIGHTS THAT THEY HAVE WITH RESPECT TO WHATEVER IT IS THAT

10   THEY'RE LICENSING.  NO STUDENT ATHLETE HAS ANY RIGHTS WHILE

11   THEY ARE A STUDENT ATHLETE.

12          THE COURT:  NO, NOT WHILE THEY ARE A STUDENT, BUT

13   AFTERWARDS.

14          MR. HAUSFELD:  AND AFTERWARDS, WHAT DOES THE NCAA

15   REPRESENT IN TERMS OF ITS LICENSING ARRANGEMENTS WITH OTHERS?

16   THAT THEY ARE THE EXCLUSIVE LICENSEE OF ALL RIGHTS.

17          AND, IN FACT, THE DIFFICULTY HERE IS THAT THE RIGHTS

18   AFTER GRADUATION DERIVE FROM THE PLAY DURING THE TIME THAT THEY

19   WERE STUDENT ATHLETES.  AND THE NCAA HAS CONTINUED THAT AS ITS

20   ONE UNEFFECTED CONTINUUM THAT THEY ARE THE OWNERS OF ALL THOSE

21   RIGHTS RELATED TO THOSE GAMES THAT WERE PLAYED WHILE THE

22   ATHLETE WAS A STUDENT.

23          THE COURT:  THE GAMES THEMSELVES, BUT THEY ARE

24   SAYING THAT THIS ATHLETE COULD ON GO AND SELL PHOTOGRAPHS OF

25   HIMSELF OR SELL ACTION FIGURES OR WHATEVER ELSE.  BUT THE
```

1   GAMES, THAT'S A DIFFERENT QUESTION BECAUSE YOU DON'T PLAY THE

2   GAME BY YOURSELF.  THERE IS EVERYBODY ELSE IN IT.  SO YOU CAN'T

3   SELL EVERYBODY ELSE'S PARTICIPATION IN A GAME.

4          BUT THEY SAY THAT THEY COULD GO OUT AND SELL THEIR

5   LIKENESS OR THEIR PHOTO OR THEIR ACTION FIGURE OR WHATEVER

6   ELSE.

7          **MR. HAUSFELD:**  THAT IS WHERE THE NCAA HAS DONE A

8   FINE JOB IN MUDDYING THE WATERS.  IT IS -- NO ONE IS CONTESTING

9   THAT IF ANY POTENTIAL LICENSEE WOULD LIKE TO APPROACH ANY

10  SPECIFIC SINGLE ATHLETE AND ASK FOR AN ENDORSEMENT OF A PRODUCT

11  OR AN ADVERTISEMENT, THAT THEY ARE PROHIBITED FROM DOING THAT.

12         BUT WHAT IS THE NCAA DERIVING ITS REVENUE FROM?  THE

13  REPLAY, THE REBROADCAST, THE SALE OF THE GAME, THE PLAYERS, ALL

14  OF THEM, THE TEAM.  NO ONE PLAYER CAN DO THAT.  THAT'S WHY WE

15  HAVE REQUESTED THIS CASE BE CERTIFIED AS A CLASS.

16         IT'S THOSE RIGHTS BECAUSE THAT IS WHERE THE NCAA IS

17  DERIVING PART OF ITS $4 BILLION ANNUAL REVENUE, FROM LICENSING.

18  NOT ANY ONE PLAYER, BUT THE GAMES, THE SPORT THE

19  INTER-COLLEGIATE -- THE COMPETITION ITSELF.  THAT'S THE ESSENCE

20  OF THIS.

21         NOW, WHAT IS INTERESTING WAS THE ADDITION BY COUNSEL

22  FOR THE NCAA OF AN ELEMENT OVER AND ABOVE WHAT THE KENDALL CASE

23  IDENTIFIED.  THE KENDALL CASE IDENTIFIED WHO, WHAT, WHERE, AND

24  WHEN.

25         WHAT COUNSEL FOR THE NCAA SAID THIS AFTERNOON WAS

1    WHY?  I FIND THAT INTERESTING.  WHY?

2         WHY DO THEY NOT PERMIT FORMER STUDENT ATHLETES TO

3    PARTICIPATE IN THE ROYALTIES AND REVENUES DERIVED FROM THE

4    REPLAY AND/OR THE SALE OF THE GAMES THAT THEY PARTICIPATED IN

5    WHILE THEY WERE STUDENTS?

6         NOW, TRADITIONALLY, THE NCAA HAS SAID WE NEED THAT

7    TO PROTECT THE AMATEURISM OF THE STUDENT ATHLETE.  AND, IN

8    FACT, THE SUPREME COURT NOTED IN THE OKLAHOMA CASE THAT THAT

9    LITERALLY WHAT THE ESSENCE OF WHAT THE NCAA WAS INTENDED TO BE,

10   AND THAT WAS PROTECTING THE AMATEURISM OF THE STUDENT ATHLETE.

11        **THE COURT:**  COULD I ASK YOU AGAIN, WHAT YOU SAY TO

12   THEIR ARGUMENT THAT MR. O'BANNON OR OTHERS IN THE CLASS DON'T

13   ALLEGE THAT THEY ACTUALLY HAVE TRIED OR ARE PLANNING TO TRY OR

14   WOULD LIKE TO BE A MARKET PARTICIPANT?

15        **MR. HAUSFELD:**  BECAUSE, YOUR HONOR, THERE ARE

16   SIGNIFICANT, ALMOST INSEPARABLE BARRIERS TO ENTRY AS A

17   COLLECTIVE TEAM TO ASSERT A RIGHT TO PARTICIPATE IN THE

18   LICENSING AND ROYALTIES FOR REVENUE RECEIVED AFTER THEY ARE NO

19   LONGER STUDENTS DERIVED FROM THE TIME WHEN THEY WERE STUDENTS.

20        **THE COURT:**  FOR A GAME, PERHAPS, BUT WHAT ABOUT

21   THEIR INDIVIDUAL RIGHT OF PUBLICITY?

22        **MR. HAUSFELD:**  THEIR INDIVIDUAL RIGHT OF PUBLICITY

23   THEY HAVE.

24        **THE COURT:**  ARE THEY A MARKET PARTICIPANT IN THAT?

25        **MR. HAUSFELD:**  WITH REGARD TO THEIR ABILITY TO GET

1    AN ENDORSEMENT FOR A PARTICULAR PRODUCT ON AN INDIVIDUAL

2    SITUATION, YES.  THEY HAVE NOT BEEN A MARKET PARTICIPANT

3    BECAUSE THEY WERE FORECLOSED FROM THEIR ABILITY TO PARTICIPATE

4    IN THAT REVENUE AND THE ROYALTY DERIVED FROM THE TIME THAT THEY

5    DID PLAY AS A STUDENT ATHLETE.

6              **THE COURT:**  ARE YOU SAYING THAT THERE WAS SOME

7    RECENT CHANGE THAT ALLOWED INDIVIDUALS TO BECOME MARKET

8    PARTICIPANTS?  YOU SEEM TO IMPLY THAT THAT HAPPENED RECENTLY

9    FOR SOME REASON, AND I AM WONDERING WHAT THAT REASON WAS.

10             **MR. HAUSFELD:**  NO, YOUR HONOR, TWO DIFFERENT

11   MARKETS.  ONE IS THE MARKET FOR AN INDIVIDUAL ENDORSEMENT BY A

12   SPECIFIC ATHLETE.  THERE IS NO PRECLUSION THERE.  THE OTHER IS

13   THE MARKET FOR THE LICENSING OF COLLEGIATE ATHLETICS, GAMES.

14             **THE COURT:**  I KNOW.  BUT YOU, MAYBE IT WASN'T YOU,

15   BUT SOMEBODY SAID SOMETHING ABOUT THIS HAS HAPPENED A FEW TIMES

16   RECENTLY, IMPLYING THAT SOMETHING HAD CHANGED PERHAPS THAT

17   ALLOWED IT TO HAPPEN.  MAYBE IT WASN'T YOU.

18             **MR. HAUSFELD:**  NO, IT WAS COUNSEL FOR THE NCAA WHO

19   HELD UP AN ACTION FIGURE.

20             **THE COURT:**  NO, IT WAS IN THE BRIEFS.  THAT'S ALL

21   RIGHT.

22             COULD YOU TALK TO ME ABOUT -- IF THERE IS -- WELL,

23   MAYBE BRIEFLY ABOUT WHY YOU THINK THERE'S A PER SE VIOLATION

24   AND IF THERE ISN'T, WHAT YOUR RULE OF REASON ANALYSIS WOULD BE?

25             **MR. HAUSFELD:**  WELL, YOUR HONOR --

1          **THE COURT:**  YOU DID MOSTLY BRIEF THE FORMER, SO

2    MAYBE YOU SHOULD TALK ABOUT THE LATTER.  IF WE NEED TO LOOK TO

3    THE RULE OF REASON, WHAT WOULD YOUR ARGUMENT BE?

4          **MR. HAUSFELD:**  IN THE JUSTICE NCAA CASE, THE COURT

5    NOTED THE USE OF THE PER SE AND THE USE OF THE RULE OF REASON.

6          THE RULE OF REASON CAN -- OR IS UTILIZED IN ATHLETIC

7    ASSOCIATION CASES IF THERE IS A LEGITIMATE PRO-COMPETITIVE

8    PURPOSE FOR THE OTHERWISE RESTRICTIVE RULE OR REGULATION.

9    THAT'S THE WHY THAT WAS REFERENCED BY THE NCAA.

10         NOW, WHAT'S NOTED IN THE JUSTICE CASE, IS THAT IT'S

11   CLEAR THAT THE NCAA IS NOW ENGAGED IN TWO DISTINCT KINDS OF

12   RULE-MAKING ACTIVITY.  ONE IS WHERE THERE IS CONCERN WITH THE

13   PROTECTION OF AMATEURISM.

14         THE SECOND IS INCREASINGLY ACCOMPANIED BY A

15   DISCERNIBLE ECONOMIC PURPOSE.  WHERE THERE IS A DISCERNABLE

16   ECONOMIC PURPOSE THEN A PER SE RULE APPLIES, NOT THE RULE OF

17   REASON.  IF THERE IS NO LEGITIMATE JUSTIFICATION AND, IN

18   PARTICULAR, WITH THE NCAA, OF PROTECTING THE STUDENT ATHLETE,

19   THEN THERE IS NO RULE OF REASON APPROACH BECAUSE IT IS A

20   CLASSIC CARTEL WHICH HAS FIXED PRICES AND BOYCOTTED POTENTIAL

21   COMPETITORS.

22         **THE COURT:**  WELL, THEY SAY FIX PRICES ONLY IF IT'S A

23   HORIZONTAL AGREEMENT, AND THIS ISN'T.

24         **MR. HAUSFELD:**  WELL, IT IS A HORIZONTAL AGREEMENT,

25   YOUR HONOR.

1              **THE COURT:**  WHY?

2              **MR. HAUSFELD:**  AS THE SUPREME COURT NOTED, BY

3    DEFINITION, THE ASSOCIATION IS A CLASSIC CARTEL.  THE CARTEL

4    IMPOSES UPON ALL OF ITS MEMBERS A PROHIBITION AGAINST COMPETING

5    WITH EACH OTHER FOR PLAYER SERVICES BY OFFERING COMPENSATION,

6    PART OF WHICH COULD BE WHEN YOU GRADUATE, WE WILL GIVE YOU

7    20 PERCENT OF THE ROYALTIES FOR MERCHANDISE, OR 30 PERCENT OF

8    THE ROYALTIES FOR MERCHANDISE.

9              THE OTHER AS WELL.  IF THE PLAYERS COLLECTIVELY AS A

10   TEAM HAVE A RIGHT TO LICENSE, THEN THEY ARE BEING EXCLUDED IN

11   COMPETITION WITH THE NCAA WHEN THE NCAA ALONE SELLS THAT RIGHT

12   AND ALONE DERIVES ALL OF THE REVENUE.  SO THERE ARE TWO FORMS

13   OF EXCLUSION AND NONCOMPETITION.

14             AT THIS POINT, WHATEVER REVENUE THE NCAA AND ITS

15   MEMBER INSTITUTIONS EXTRACT FROM THE MARKET, THEY ARE KEEPING.

16   AND, IN ESSENCE, IF THERE IS A RIGHT, AND WE CONTEND THAT THERE

17   IS, OF THE FORMER STUDENT ATHLETE TO PARTICIPATE IN THAT

18   MARKET, THEY ARE GETTING ZERO.  THAT'S THE FIX.

19             AND THEY ARE ALSO BEING PRECLUDED FROM NEGOTIATING

20   THAT RIGHT WHEN ENTERING THE MEMBER INSTITUTION.  IF, AS THE

21   NCAA SAYS, WELL, THERE IS NO PROHIBITION AND WE DON'T STOP THE

22   TEAMS AT THE END OF THEIR ENROLLMENT FROM COLLECTING ON THE

23   RIGHTS THAT THEY OTHERWISE WOULD HAVE AS LICENSEES.

24             SO, THE ISSUE IS WHETHER OR NOT YOU APPLY A RULE OF

25   REASON OR A PER SE IS NOT THE BASIS TO GRANT THE MOTION TO

```
1   DISMISS.  IT IS THE BASIS UPON WHICH THE COURT CAN GUIDE

2   WHATEVER ANTITRUST PRINCIPLES APPLY TO THE CLAIM ASSERTED.

3        THE COURT:  OKAY.  IF I WERE TO DISMISS BOTH

4   COMPLAINTS WITH LEAVE TO AMEND, OR AT LEAST DISMISS SOME PARTS

5   OF THEM BUT WITH LEAVE TO AMEND, I AM GUESSING THAT YOUR IDEA

6   IS TO FILE AN AMENDED CONSOLIDATED COMPLAINT WITH ALL OF THE

7   CASES TOGETHER?

8        MR. HAUSFELD:  WE THINK IT WOULD MAKE SENSE, YOUR

9   HONOR, BECAUSE AS YOU SAID, WITH REGARD TO CONSOLIDATION, THERE

10  IS AN OVERLAP.

11       THE COURT:  COULD YOU FILE SOMETHING THAT COULD BE

12  UNCONSOLIDATED?  IN OTHER WORDS, DON'T MIX THEM UP TOO MUCH,

13  HAVE THE CAUSES OF ACTION BE SOMEWHAT SEPARATE SO THAT IF WE

14  HAD TO DECONSOLIDATE THEM FOR TRIAL, IT WOULDN'T BE TOO

15  DIFFICULT TO DO?

16       MR. HAUSFELD:  IT WOULD NOT BE DIFFICULT AT ALL,

17  YOUR HONOR, BECAUSE THE DIFFERENT THEORIES WOULD BE IN

18  DIFFERENT COUNTS.

19       THE COURT:  OKAY.

20            AND IN TERMS OF INTERIM LEAD COUNSEL, YOUR IDEA WAS

21  THAT YOUR FIRM AND THE --

22       MR. HAUSFELD:  HAGENS BERMAN.

23       THE COURT:  WHAT IS IT?

24       MR. HAUSFELD:  HAGENS BERMAN.

25       THE COURT:  HAGENS BERMAN FIRM WOULD BE CO-LEAD
```

1   COUNSEL, ONE CONCENTRATING ON THE ANTITRUST AND ONE

2   CONCENTRATING ON THE RIGHT OF PUBLICITY?

3          **MR. HAUSFELD:**  YES, AND BECAUSE OF THE FACT THAT

4   THERE WOULD BE CLEARLY OVERLAP IN TERMS OF THE DISCOVERY THAT

5   THERE BE COORDINATION AS A RESULT OF THAT.

6          **THE COURT:**  AS FAR AS ALL THE OTHER CASES, MOST OF

7   THEM, I GUESS, ARE AMENABLE TO CONSOLIDATION AND AGREEABLE TO

8   YOU ALL AS BEING LEAD COUNSEL, BUT IT'S NOT CLEAR THAT EVERYONE

9   IS.

10          MAYBE YOU CAN TRY TO TALK TO THEM ALL AND SEE IF YOU

11   CAN REACH SOME SORT OF AGREEMENT?

12          **MR. HAUSFELD:**  YES, YOUR HONOR.

13          **THE COURT:**  THESE TWO FIRMS?

14          **MR. HAUSFELD:**  YES.

15          **THE COURT:**  I DON'T KNOW WHAT WE CAN DO IN TERMS OF

16   THE CASE MANAGEMENT TODAY, EXCEPT PERHAPS JUST SET ANOTHER

17   CONFERENCE BY WHICH I WILL HAVE RULED AND HOPEFULLY WE WILL

18   HAVE MADE SOME PROGRESS.

19          **MR. VAN NEST:**  YOUR HONOR, COULD I SAY JUST A WORD

20   ABOUT CASE MANAGEMENT?

21          **THE COURT:**  OKAY.

22          **MR. VAN NEST:**  THAT IS, I KNOW YOUR HONOR HAS

23   INDICATED AN INTENTION TO CONSOLIDATE THESE, AT LEAST FOR

24   PRETRIAL NOW.  I WOULD ASK YOU TO JUST PAUSE A MINUTE ON THAT.

25          WITH RESPECT TO ELECTRONIC ARTS AND THE KELLER CASE,

1    WHICH IS THE ONLY CASE IN WHICH WE ARE A DEFENDANT --

2              **THE COURT:**  I AM AFRAID YOU MIGHT FIND YOURSELF AS A

3    DEFENDANT IN SOME MORE CASES SOON.

4              **MR. VAN NEST:**  PERHAPS, BUT WE WILL NOT HAVE HAD A

5    CHANCE TO CHALLENGE THAT.

6              THERE ARE -- THERE IS A VERY SIGNIFICANT DIFFERENCE

7    IN THE KELLER CASE IS VERY TARGETED AND WE FEEL AS THOUGH THAT

8    CASE MIGHT BE ABLE TO MOVE MORE QUICKLY THAN THIS MUCH BROADER

9    ANTITRUST CLAIM, WHICH GOES FAR BEYOND EA VIDEO GAME AND TALKS

10   ABOUT ALL THE PRODUCTS THAT ARE SOLD AFFECTING COLLEGE

11   ATHLETES.  THAT'S ONE POINT.

12             THE SECOND POINT IS THAT WITH THE SLAPP MOTION,

13   WHOEVER IS ON THE LOSING SIDE OF THAT, HAS THE RIGHT OF AN

14   AUTOMATIC APPEAL AND I KNOW THERE WILL BE DISCUSSION BETWEEN US

15   AND THE COURT ABOUT A STAY HOWEVER THAT MOTION COMES OUT.

16             SO MY ONLY CAUTION WOULD BE BEFORE YOU FORMALLY

17   CONSOLIDATE, IT MIGHT BE BETTER TO SEE HOW THE MOTIONS COME OUT

18   AND WHAT SORT OF AN AMENDED COMPLAINT OR COMPLAINTS ARE FILED

19   BECAUSE IT MAY WELL BE THAT KELLER IS REALLY SEVERABLE AND

20   COULD BE DISPOSED OF MUCH MORE QUICKLY THAN WHAT I SUSPECT WILL

21   BE POTENTIALLY AT LEAST A MORE DRAWN OUT BATTLE.

22             **THE COURT:**  THERE WILL BE A SEPARATE COUNT.  I DON'T

23   WANT TO KEEP FILING A LOT OF COMPLAINTS.  I DON'T WANT TO HAVE

24   TWO DIFFERENT AMENDED COMPLAINTS AND THEN SEE WHAT A

25   CONSOLIDATED AMENDED COMPLAINT LOOKS LIKE.  IT'S JUST A WASTE

1    OF TIME.

2              **MR. VAN NEST:**  UNDERSTOOD.

3              **THE COURT:**  I'D RATHER JUST SEE A CONSOLIDATED

4    AMENDED COMPLAINT.  THEY'VE AGREED TO HAVE EVERYTHING BE

5    SEVERABLE AND EASILY DEFINABLE, SO IF WE HAD TO, WE COULD SEVER

6    OUT THE COUNTS THAT YOU ARE IN.  IF YOU END UP IN ANTITRUST

7    COUNTS, WHICH I SUSPECT YOU WILL --

8              **MR. VAN NEST:**  THEY WILL BE PLED WHETHER THEY CAN BE

9    SUSTAINED OR NOT IS ANOTHER THING.  THEY MAY WELL BE PLED, BUT

10   THEY HAVEN'T BEEN PLED YET.

11              AS LONG AS WE HAVE THAT AS A BACKUP, THAT MAKES A

12   LOST OF SENSE.  BECAUSE I DO THINK THE KELLER WITH THE

13   ANTISLAPP MOTION WILL HAVE SIGNIFICANT DIFFERENCES, BOTH

14   PROCEDURALLY AND SUBSTANTIVELY FROM THE REST OF THIS CASE.

15              **THE COURT:**  HOPEFULLY THEY WILL BE IN SEPARATE

16   DISCERNIBLE CAUSES OF ACTION THAT IF NECESSARY CAN BE SEVERED

17   BE AND STAYED OR PUT ON A FAST TRACK SOMETHING.

18              **MR. CURTNER:**  YOUR HONOR, FROM THE NCAA'S

19   PERSPECTIVE, WE BELIEVE THE WISEST COURSE WOULD BE TO DEFER

20   FURTHER CASE MANAGEMENT UNTIL WE GET A LOOK AT THESE AMENDED

21   COMPLAINT OR COMPLAINTS AND SEE WHAT THEORIES THEY CHOOSE TO

22   PURSUE AND WHAT DEFENSES WE MAY OR MAY NOT HAVE, OR MOTIONS WE

23   MAY OR MAY NOT HAVE.

24              WE THINK THERE IS GOING TO BE SUBSTANTIAL

25   INFIRMITIES IN THE AMENDED COMPLAINT WHETHER IT'S CONSOLIDATED

1    OR SEPARATE, BUT WE THINK THAT THE CASE MANAGEMENT SHOULD WAIT

2    UNTIL WE SEE ALL THAT.

3           **THE COURT:**  OKAY.

4           **MR. HAUSFELD:**  YOUR HONOR, IF WE MAY, ON THAT POINT,

5    IT DOESN'T SEEM TO MAKE SENSE IF THERE IS GUIDANCE THAT YOUR

6    HONOR IS GOING TO PROVIDE IN TERMS OF WHAT THE COURT FEELS

7    SHOULD FURTHER BE PLED WITH RESPECT TO CERTAIN DEFICIENCIES

8    PRESENTLY ALLEGED, WE WILL RESPOND TO THOSE.  IT DOESN'T MAKE

9    SENSE THEN TO PERMIT ANOTHER ROUND OF MOTIONS TO DISMISS THAT

10   ESSENTIALLY CONFORM THE PLEADINGS TO A LEVEL THAT IS NOT

11   SUSTAINABLE ON A MOTION TO DISMISS.

12          **THE COURT:**  I'VE NEVER HAD ANY SUCCESS IN PREVENTING

13   DEFENDANTS FROM FILING MOTIONS TO DISMISS.

14          **MR. HAUSFELD:**  WELL, JUDGE SCHIDLIN, IN A MATTER

15   THAT WE HAD IN WHICH THE DEFENDANTS MOVED TO DISMISS, THE COURT

16   INDICATED WHAT AREAS IT WOULD APPRECIATE FURTHER ELUCIDATION

17   ON, THAT WAS DONE, THE DEFENDANTS MOVED TO DISMISS BUT THE

18   COURT TOLD THEM IF THEY WERE, THEY WERE JUST GOING TO GET

19   DENIED AGAIN.

20          **THE COURT:**  I DON'T THINK THAT'S NECESSARY.  IF

21   SOMETHING IS UPHELD AND NOT DISMISSED, THEN I WON'T BE WANTING

22   TO SEE THE SAME ARGUMENTS AGAIN.  I WOULD SEE ONLY NEW

23   ARGUMENTS BASED ON NEW CHANGES.  I WOULD ASSUME THAT'S WHAT I

24   WOULD SEE.

25          **MR. VAN NEST:**  THAT'S RIGHT.  PARTICULARLY FOR EA,

1    WE HAVEN'T BEEN A DEFENDANT IN THE O'BANNON CASE.  SO WE'LL

2    CERTAINLY DEAL WITH THAT ALSO.

3            **THE COURT:**  DON'T MAKE ARGUMENTS THAT OTHER PEOPLE

4    HAVE MADE THAT ARE THE SAME --

5            **MR. VAN NEST:**  OF COURSE NOT.

6            **THE COURT:**  -- AND HAVE BEEN REJECTED.  YOU CAN

7    ASSERT THEM FOR PURPOSES OF PRESERVING THEM FOR APPEAL, BUT YOU

8    DON'T NEED TO REBRIEF THEM.

9            **MR. VAN NEST:**  ABSOLUTELY.

10           **MR. CURTNER:**  WE UNDERSTAND THAT, YOUR HONOR.

11           **THE COURT:**  OKAY.

12           **MR. HAUSFELD:**  THANK YOU, YOUR HONOR.

13           **THE COURT:**  WAIT.  I DO NEED A DATE.

14           SHEILAH, GIVE ME A DATE IN APRIL.  IF WE CAN MAKE

15   IT, WE MAY HAVE ANOTHER ROUND OF MOTIONS BEFORE THIS CASE

16   MANAGEMENT DATE, BUT JUST TO HAVE A CONTROL DATE, I WILL GIVE

17   YOU A DATE IN APRIL FOR A FURTHER CASE MANAGEMENT CONFERENCE.

18           **THE CLERK:**  APRIL 27TH.

19           **THE COURT:**  THAT'S AT 2:00 O'CLOCK FOR ALL OF THE

20   CASES.

21           NOW, YOU SAY YOU ARE HAPPY LITIGATING IN TENNESSEE.

22   ARE YOU HAPPY LITIGATING IN TWO DIFFERENT PLACES AT THE SAME

23   TIME?

24           **MR. CURTNER:**  IT WOULDN'T BE THE FIRST TIME, BUT I

25   HAVE TO SAY, I PROBABLY THINK THAT SOME FORM OF COORDINATION IS

1    APPROPRIATE.  AND WE HAVE BEEN INVOLVED IN SOME PRIOR CASES

2    WHERE WE HAVE DONE THAT WITH CASES INVOLVED IN MULTIPLE PLACES,

3    INCLUDING WITH HAGENS BERMAN.  SO I THINK WE CAN WORK OUT

4    SOMETHING.  I AM NOT QUITE SURE WHAT IS THE BEST COURSE WITH

5    THE TENNESSEE CASES AT THIS POINT, WHETHER TO SEEK A VOLUNTARY

6    TRANSFER, WHETHER TO MDL IT, OR WHETHER TO TRY AND WORK

7    SOMETHING OUT WITH COUNSEL.  I REALLY KIND OF WOULD LIKE TO SEE

8    WHERE WE ARE GOING ON THE AMENDMENTS BEFORE I DO TOO MUCH ON

9    THOSE.  I THINK SOME OF THESE BASIC STANDING AND PLEADING

10   PROBLEMS CANNOT BE CURED BY AMENDMENT, SO WE PROBABLY WILL BE

11   BACK.  OF COURSE, WE WILL AWAIT YOUR OPINION.

12          **THE COURT:**  HOW FAR ALONG ARE THE TENNESSEE CASES?

13          **MR. CURTNER:**  NOTHING HAS HAPPENED OTHER THAN

14   REMOVAL.  THEY ARE MORE RECENT THAN MOST, MOST OF MAYBE ALL OF

15   THESE CASES.

16          I MAY HAVE MISSPOKEN EARLIER.  I AM NOT SURE THAT

17   EA, ELECTRONICS ARTS TENNESSEE CASE IS BEFORE THE SAME JUDGE AS

18   THE NCAA ONE.  I WILL HAVE TO CHECK THAT.  IT MAY BE A

19   DIFFERENT JUDGE.  IT WOULD CERTAINLY MAKE SENSE TO COORDINATE

20   THESE IN SOME FORM.

21          **THE COURT:**  I WOULD ENCOURAGE ALL OF YOU TO TALK

22   AMONGST YOUR OWN SIDES AND ALSO TO TALK WITH EACH OTHER AND

23   ALSO TO TALK WITH WHOEVER IS ON THE TENNESSEE CASES AND THE NEW

24   JERSEY CASE AND SEE IF YOU CAN'T COME UP WITH SOME WAY OF AT

25   LEAST COORDINATING THEM, BUT I WOULD SAY TRY TO GET THEM ALL IN

```
1    ONE JURISDICTION.

2              MR. HAUSFELD:  THANK YOU, YOUR HONOR.

3              THE COURT:  THANK YOU.

4              MR. CURTNER:  THANK YOU.

5              MR. VAN NEST:  THANK YOU.

6

7              (PROCEEDINGS CONCLUDED AT 4:50 P.M.)

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25
```

### CERTIFICATE OF REPORTER

I, DIANE E. SKILLMAN, OFFICIAL REPORTER FOR THE UNITED STATES COURT, NORTHERN DISTRICT OF CALIFORNIA, HEREBY CERTIFY THAT THE FOREGOING PROCEEDINGS IN KELLER VERSUS ELECTRONIC ARTS, C-09-1967 CW, O'BANNON VERSUS NCAA, C-09-3329 CW, BISHOP VERSUS ELECTRONIC ARTS, C-09-4128 CW, NEWSOME VERSUS NCAA, C-09-4882 CW, ANDERSON VERSUS NCAA, C-09-5100 CW, WIMPRINE VERSUS NCAA, C-09-5134 CW, JACOBSON VERSUS NCAA, C-09-5372 CW, AND RHODES VERSUS NCAA, C-09-5378 CW, PAGES NUMBERED 1 THROUGH 75, WERE REPORTED BY ME, A CERTIFIED SHORTHAND REPORTER, AND WERE THEREAFTER TRANSCRIBED UNDER MY DIRECTION INTO TYPEWRITING; THAT THE FOREGOING IS A FULL, COMPLETE AND TRUE RECORD OF SAID PROCEEDINGS AS BOUND BY ME AT THE TIME OF FILING.

THE INTEGRITY OF THE REPORTER'S CERTIFICATION OF SAID TRANSCRIPT MAY BE VOID UPON REMOVAL FROM THE COURT FILE.


/S/ DIANE E. SKILLMAN

DIANE E. SKILLMAN, CSR 4909, RPR, FCRR