MICHAEL D. HAUSFELD (*pro hac vice*)
mhausfeld@hausfeldllp.com
HILARY K. SCHERRER (SBN 209451)
hscherrer@hausfeldllp.com
SATHYA S. GOSSELIN (SBN 269171)
sgosselin@hausfeldllp.com
SWATHI BOJEDLA (*pro hac vice*)
sbojedla@hausfeldllp.com
HAUSFELD LLP
1700 K Street, NW, Suite 650
Washington, D.C. 20006
Telephone:      (202) 540-7200
Facsimile:      (202) 540-7201

MICHAEL P. LEHMANN (SBN 77152)
mlehmann@hausfeldllp.com
BRUCE J. WECKER (SBN 78530)
bwecker@hausfeldllp.com
HAUSFELD LLP
44 Montgomery Street, Suite 3400
San Francisco, California  94104
Telephone:      (415) 633-1908
Facsimile:      (415) 358-4980

*Plaintiffs' Class Counsel with Principal
Responsibility for the Antitrust Claims*

# UNITED STATES DISTRICT COURT

## NORTHERN DISTRICT OF CALIFORNIA

### OAKLAND DIVISION

| | |
|---|---|
| EDWARD C. O'BANNON, JR. on behalf of himself and all others similarly situated,<br><br>Plaintiffs,<br><br>v.<br><br>NATIONAL COLLEGIATE ATHLETIC ASSOCIATION (NCAA); ELECTRONIC ARTS, INC.; and COLLEGIATE LICENSING COMPANY,<br><br>Defendants. | Case No. 4:09-cv-3329 CW<br><br>**ANTITRUST PLAINTIFFS' TRIAL BRIEF**<br><br>Judge:      The Honorable Claudia Wilken<br>Courtroom:  2, 4th Floor<br>Trial:      June 9, 2014 |

1

**TABLE OF CONTENTS**

**Page**

2

I.      INTRODUCTION ................................................................................................. 1

3

II.     OVERVIEW ......................................................................................................... 1

4

III.    LEGAL FRAMEWORK...................................................................................... 2

5

IV.     THE NCAA'S CONTRACT, COMBINATION, OR CONSPIRACY ............................. 4

6

V.      THE RELEVANT MARKETS............................................................................ 9

7

VI.     THE RESTRAINT'S SIGNIFICANT ANTICOMPETITIVE EFFECTS ...................... 10

8

VII.    THE NCAA'S PURPORTED PROCOMPETITIVE JUSTIFICATIONS ARE
        ILLUSORY ......................................................................................................... 11

9

        A.      Consumer Demand Will Persist, and Even Increase, Absent the
                Restraint. ................................................................................................. 12

10

11

        B.      The Restraint Is Unnecessary to Preserve Whatever Competitive
                Balance Might Presently Exist. ............................................................... 15

12

        C.      The Restraint Is Not Essential to the Integration of Athletics and
                Education, Nor Can the NCAA Demonstrate that the Integration of
                Athletics and Education Stimulates Competition in the Relevant
                Markets..................................................................................................... 17

13

14

        D.      Extinguishing the Restraint Will Increase Output ................................... 19

15

VIII.   LESS RESTRICTIVE ALTERNATIVES ........................................................ 20

16

IX.     WEIGHING OF PROCOMPETITIVE BENEFITS AND ANTICOMPETITIVE
        EFFECTS ............................................................................................................ 21

17

X.      INJUNCTIVE AND DECLARATORY RELIEF .............................................. 22

18

XI.     DEFENSES ......................................................................................................... 24

19

        A.      Joint Venture ........................................................................................... 24

20

        B.      Consent..................................................................................................... 25

21

22

23

24

25

26

27

28

ANTITRUST PLAINTIFFS' TRIAL BRIEF
4:09-CV 3329 CW

1

## <u>TABLE OF AUTHORITIES</u>

2

**Page(s)**

3

**FEDERAL CASES**

4

*American Needle, Inc. v. NFL,*
   560 U.S. 183 (2010) ........................................................................................... 24, 25

5

*American States Ins. Co. v. Kearns,*
6
   15 F.3d 142 (9th Cir. 1994) ....................................................................................... 23

7

*Broad. Music, Inc. v. Columbia Broad. Sys., Inc.,*
   441 U.S. 1 (1979) ..................................................................................................... 25
8

9

*California Concrete Pipe Co. v. Am. Pipe & Constr. Co.,*
   288 F. Supp. 823 (C.D. Cal. 1968) ............................................................................ 7

10

*Cont'l T. V., Inc. v. GTE Sylvania Inc.,*
11
   433 U.S. 36 (1977) ................................................................................................ 3, 21

12

*Easyriders Freedom F.I.G.H.T. v. Hannigan,*
   92 F.3d 1486 (9th Cir. 1996) ..................................................................................... 22
13

14

*FTC v. Superior Court Trial Lawyers Ass'n,*
   493 U.S. 411 (1990) ................................................................................................. 17

15

*Hodgers-Durgin v. De La Vina,*
16
   199 F.3d 1037 (9th Cir. 1999) ................................................................................... 22

17

*Idaho Watersheds Project v. Hahn,*
   307 F.3d 815 (9th Cir. 2002) ..................................................................................... 22
18

19

*In re NCAA Student-Athlete Name & Likeness Licensing Litig.,*
   No. 09-1967, 2013 WL 5778233 (N.D. Cal. Oct. 25, 2013) ....................................... 24

20

*In re NCAA Student-Athlete Name & Likeness Licensing Litig.,*
21
   No. 09-1967, 2014 WL 1410451 (N.D. Cal. Apr. 11, 2014) ......................................... passim

22

*In re NCAA Student-Athlete Name & Likeness Licensing Litig.,*
   No. 09-1967, 2014 WL 1949804 (N.D. Cal. May 12, 2014) ............................... 10, 11, 21
23

24

*In re NCAA Student-Athlete Name & Likeness Licensing Litig.,*
   No. C 09-01967 CW, 2013 WL 5979327 (N.D. Cal. Nov. 8, 2013) ............................ 22

25

*Laumann v. National Hockey League,*
   907 F.Supp.2d 465 (S.D.N.Y. 2012) .......................................................................... 25
26

27

*Nat'l Soc'y of Prof'l Eng'rs v. United States,*
   435 U.S. 679 (1978) ................................................................................................. 17
28

*NCAA v. Bd. of Regents of Univ. of Oklahoma*,
468 U.S. 85 (1984) ................................................................................................................ 24

*Paladin Assoc., Inc. v. Montana Power Co.*,
328 F.3d 1145 (9th Cir. 2003) ................................................................................... 3, 4, 5, 21

*Perma Life Mufflers, Inc. v. Int'l Parts Corp.*,
392 U.S. 134 (1968) ............................................................................................................. 25

*Radio Corp. of Am. v. Raytheon Mfg. Co.*,
296 U.S. 459 (1935) ............................................................................................................... 7

*Redel's Inc. v. General Elec. Co.*,
498 F.2d 95 (5th Cir. 1974) .................................................................................................... 7

*Sullivan v. Nat'l Football League*,
34 F.3d 1091 (1st Cir. 1994) ............................................................................................... 11

*Tanaka v. Univ. of S. California*,
252 F.3d 1059 (9th Cir. 2001) ............................................................................................... 3

*United States v. Topco Assoc., Inc.*,
405 U.S. 596 (1972) ............................................................................................................. 11

*Zenith Radio Corp. v. Hazeltine Research, Inc.*,
395 U.S. 100 (1969) ............................................................................................................. 23

**FEDERAL STATUTES**

15 U.S.C. § 26 ................................................................................................................. 22, 23

28 U.S.C. § 2201 ............................................................................................................. 22, 23

**RULES**

Fed. R. Civ. P. 23(b)(2) ........................................................................................................ 22

**OTHER AUTHORITIES**

EINER ELHAUGE, UNITED STATES ANTITRUST LAW AND ECONOMICS 17 (2008) .......................... 25

## I.     **INTRODUCTION**

The Antitrust Plaintiffs ("APs") hereby submit their trial brief in response to the Court's request at the May 15, 2014 telephonic hearing and the Court's May 23, 2014 order (Case No. 09-1967, Dkt. No. 147 (hereafter, "Dkt. __")).

## II.    **OVERVIEW**

The APs will prove at trial that the National Collegiate Athletic Association ("NCAA"), its member schools, its conferences, and its vertical business partners have conspired to deprive college athletes in Division I men's basketball and football[1] of any portion of the revenues earned through the licensing of those athletes' names, images, and likenesses ("NILs") in television broadcasts, rebroadcasts, game clips, and videogames. This anticompetitive conduct is sacrosanct to the NCAA—it is a condition of NCAA membership, a condition of eligibility for college athletes, a condition of doing business with the NCAA, and codified in the NCAA rules prohibiting payment or the promise of future payment to college athletes for any purpose. Predictably, the world's leading economists—including even the NCAA's chief expert—agree that the NCAA is a textbook cartel. And the evidence of conspiracy gathered during discovery is overwhelming.

This longstanding restraint, all the more oppressive as broadcast revenues have exploded, causes significant harm to competition in two distinct but related markets: (1) the "college education" market, in which Division I colleges and universities compete to recruit the best athletes to play football or basketball; and (2) the "group licensing" market, in which broadcasters and videogame developers compete for group licenses to use the NILs of all athletes on particular Division I football and basketball teams in live game broadcasts, archival footage, and videogames. The conspiracy limits competition for college athletes; increases the price of school

---

[1] For the sake of brevity, APs will refer to Division I men's basketball and football to mean Division I men's basketball and Football Bowl Subdivision men's football.

for college athletes; facilitates early exit by some athletes; limits consumer choice by restricting the number and quality of licensed products; and spurs inefficient substitution, including excessive expenditures on other inputs such as recruiting, coaches, and facilities.

The NCAA, meanwhile, insists that the restraint actually aids competition because it is the linchpin of consumer demand, "competitive balance," college athletes' educational experience, and uninterrupted output. But those dubious arguments rest on a shaky foundation: the speculation of self-interested declarants who benefit from the conspiracy and a flawed survey conducted at a moment when college sports fans' sympathies are rapidly shifting. Absent from the NCAA's defense is any empirical analysis supporting its assertions.

In any event, the NCAA candidly admits that it has not considered the possibility of less restrictive alternatives to the restraint. The APs have probed this question at length and discovered a host of alternatives already found in amateur sports and professional sports. Chief among them is the simplest solution: deferred compensation. By placing in trust any revenues that college athletes might earn through the licensing of their NILs—and releasing those funds upon expiration of athletic eligibility—the NCAA and its member schools could easily preserve any purported procompetitive benefits that the current status quo might yield.

At the conclusion of trial, the APs will ask the Court for a modest remedy consisting of (i) declaratory relief clarifying that the collective conduct proven at trial violates the Sherman Act and (ii) injunctive relief prohibiting the NCAA and its members schools from colluding further to deny college athletes the ability to license their NILs or receive a share of revenue associated with the licensing of their NILs. Notwithstanding the NCAA's conjecture that the sky will fall, an unfettered market *will not* bring college athletics to a halt.

## III.   LEGAL FRAMEWORK

At trial, the APs must prove "(1) that there was a contract, combination, or conspiracy; (2)

1  that the agreement unreasonably restrained trade under either a per se rule of illegality or a rule of

2  reason analysis; and (3) that the restraint affected interstate commerce." *Tanaka v. Univ. of S.*

3  *California*, 252 F.3d 1059, 1062 (9th Cir. 2001) ("*Tanaka*") (citation and quotation marks

4  omitted); *see In re NCAA Student-Athlete Name & Likeness Licensing Litig.*, No. 09-1967, 2014

5  WL 1410451, at *3 (N.D. Cal. Apr. 11, 2014) ("*NCAA I*"). This Court has previously determined

6  that the rule of reason is the appropriate analytical framework for this litigation. *Id.*

7          The rule of reason asks whether a restraint's harm to competition outweighs any

8  procompetitive effects. *Tanaka*, 252 F.3d at 1063; *NCAA I*, 2014 WL 1410451, at *3. In the first

9  step of this framework, the plaintiff must satisfy his or her burden by demonstrating that the

10  restraint produces significant anticompetitive effects within a relevant market. *Tanaka*, 252 F.3d

11  at 1063; *NCAA I*, 2014 WL 1410451, at *3. If the plaintiff satisfies this burden, the defendant

12  must furnish evidence of the restraint's procompetitive effects for the court's consideration.

13  *Tanaka*, 252 F.3d at 1063; *NCAA I*, 2014 WL 1410451, at *3. And if the defendant produces such

14  evidence, the burden shifts to the plaintiff to show that any legitimate objectives of the restraint

15  can be achieved in a substantially less restrictive manner. *Tanaka*, 252 F.3d at 1063; *NCAA I*,

16  2014 WL 1410451, at *3. At the conclusion of this burden-shifting process, the Court must

17  determine the net competitive effect of the restraint. *See Cont'l T. V., Inc. v. GTE Sylvania Inc.*,

18  433 U.S. 36, 49-50 (1977); *Paladin Assoc., Inc. v. Montana Power Co.*, 328 F.3d 1145, 1156 (9th

19  Cir. 2003) ("*Paladin*") ("The rule of reason weighs legitimate justifications for a restraint against

20  any anticompetitive effects. . . . We review all the facts, including the precise harms alleged to the

21  competitive markets, and the legitimate justifications provided for the challenged practice, and we

22  determine whether the anticompetitive aspects of the challenged practice outweigh its

23  procompetitive effects.").

24

25

26

27

28

## IV.   THE NCAA'S CONTRACT, COMBINATION, OR CONSPIRACY

After five years of litigation, the NCAA has all but conceded the existence of the restraint, which emanates principally from the NCAA's constitution, bylaws, regulations, rules, rules interpretations, and policies—and the NCAA's insistence that vertical business partners agree to be bound by the same. Together, current NCAA Constitution Articles 2.8; 3.2.4.6, and NCAA Operating Bylaws 12.02.2; 12.02.3; 12.1.2; 12.1.2.1; 12.5.1.1.1; 12.5.1.7; 12.5.1.8; 12.5.2.1; 12.5.2.2; 13.2.1; 14.1.3.1; 14.1.3.2; 16.01; 16.02.5; 18.4.2.1; 22.2.1.2; 31.6.4; 31.6.4.3; as interpreted by the NCAA "Membership Services" office, ensure that no member school or vertical business partner will pay or promise to pay at some later point in time a college athlete for the licensing of his NIL. Antitrust Plaintiffs' Trial Exhibit ("PX") 2340 (2013-2014 NCAA Division I Manual). The NCAA argues that its rules have no applicability after graduation, but it has admitted to the Court that "[w]e have bylaws that prohibit current enrolled students from cashing in on their name, image and likeness" and further that a promise of compensation for NIL licensing after graduation "would be a violation of the eligibility rules." PX 2446 at 9.

For example, NCAA Operating Bylaw 12.5.1.1 authorizes member institutions (or an entity thereof) to use a college athlete's name, picture, or appearance to promote activities "incidental" to the athlete's participation in intercollegiate athletics with "all monies" going to the institution or its conference. Other NCAA bylaws—3.2.1.2, 14.01.3, 18.4.2.1, 22.2.1.2—require certification of compliance with NCAA legislation or adherence to NCAA rules. Of particular note, NCAA Constitution Article 12.1.2 dictates:

> An individual loses amateur status and thus shall not be eligible for intercollegiate competition in a particular sport if the individual . . . [u]ses his or her athletics skill (directly or indirectly) for pay in any form in that sport [or] [a]ccepts a promise of pay even if such pay is to be received following completion of intercollegiate athletics participation.

*Id.* In addition, NCAA Operating Bylaw 12.5.1.1.1 purportedly authorizes the NCAA and its members to use college athletes' NILs liberally: "The NCAA [or a third party acting on behalf of

the NCAA (*e.g.*, host institution, conference, local organizing committee)] may use the name or picture of an enrolled student athlete to generally promote NCAA championships or other NCAA events, activities or programs." *Id*.

The NCAA contends that its rules and interpretations are fundamental to "amateurism," an ambiguous and shifting term that it uses to defend the restraint. Under the NCAA's current conception of amateurism, Division I men's football and basketball are professional in every respect, with one exception: payments or agreements to pay players (beyond concerted limits on scholarships) are prohibited. PX 2293 at 5 ("If the student athlete were asked for permission to use or his or her image or reputation for this commercial purpose, he or she would be compelled by NCAA rules to deny granting permission"). Accordingly, it is the NCAA's position that "[a]mateur defines the participants, not the enterprise." PX 2011 at 35. "To be clear, student-athletes are amateurs. Intercollegiate athletics is not." PX 2292 at 14.

The NCAA Presidential Task Force on Commercialism, tasked with resolving the controversy over and criticism of commercial activity in college sports (PX 2034) surveyed the use of player NILs by member institutions in 2008 and found widespread commercial use and extensive agreements with commercial sponsors. PX 2033. These uses were distinct from the use of NILs in broadcasts of games and non-game events and photos where athletes are displayed next to (or wear) corporate-sponsor logos. PX 424 at 3 ("contrived, non-game photos or video that put student-athletes in close proximity of commercial products"); PX 2037 at 1 ("To say that CBS is using names and stats to sell advertising to make money and therefore is against the rules seems to cast a blind eye on all the other ways CBS and ESPN and NCAA.com etc. all use student-athlete images, footage, stats, names, news on TV, online etc. to sell advertising"). The Task Force ultimately concluded in 2009 that commercialism "should be embraced" and that "[w]hile participating is to be an avocation for students, college sports as an enterprise is a professional undertaking for everyone else." PX 2047 at 5.

A wealth of deposition testimony and documentary evidence further confirms the existence of the restraint,[2] and the NCAA has admitted as much in recent comments to the Court and the joint Pretrial Conference Statement. PX 2446 at 3; Dkt. 1071 at 6.

The NCAA clings to the notion that its eligibility rules do not affect *former* college athletes, however, blinding itself to the undisputed evidence that the relevant NIL licensing occurs before or during each college athlete's period of eligibility. PX 2101-2232 (collected media contracts). Once a college athlete graduates, his NIL rights with respect to television broadcasts, archival footage, and videogames have *already* been sold—included in contracts executed years before in which the NCAA or its constituent entities purport to have obtained all necessary rights clearances for participants in the game to be telecast or, in some instances, expressly purport to convey the right to use athletes' NILs to the broadcasters.[3] Beebe Dep. 56:18-58:13 (Big 12 represents interests of athletes in negotiating broadcast contracts). At his deposition, NCAA expert Neal Pilson testified about his experience at CBS in negotiating broadcast contracts with the NCAA and acknowledged: "In our television industry, when a broadcaster and rights holder negotiate a deal, the NILs of the people whose – who are in the event are part of the broadcast agreement." Pilson Dep. 79:4-22. "The practice in the industry is that the NIL of the people participating in the sports event are included within the broadcast agreement." *Id.* at 81:10-23.

The Court acknowledged the Catch-22 that college athletes face in denying the NCAA's motion for summary judgment:

---

[2] *E.g.*, Emmert Dep. 29-31; LeCrone Dep. 61; PX 2016; PX 2060 (Big 12 Commissioner Dan Beebe: "As background: [then-]NCAA Bylaw 12.5 permits the member schools to use player likenesses and names for specific purposes, ostensibly not crossing the line of commercialism."); 2067 (Final Report of the NCAA Task Force on Commercial Activity in Division I Intercollegiate Athletics); 2488; 2290 (2006 NCAA State of Association Speech); Dkt. No. 898-1 at 2-4.

[3] For various representative examples, *see* PX 2104, 2122, 2148, 2150, 2162, 2165, 2170, 2218, 2222, 2225, and 2229.

[S]tudent-athletes are prevented from selling or negotiating licenses for the use of their names, images, and likenesses at the exact moment when those licenses are most valuable. By the time these student-athletes have stopped participating in college sports—and are no longer bound by NCAA rules—they have effectively lost whatever bargaining power they once had in the group licensing market because the NCAA has already sold the recording and broadcasting rights for the games in which they played.

*NCAA I*, 2014 WL 1410451, at *5.

As the APs will also show, the restraint is also manifest in the various eligibility forms that the NCAA has previously claimed operate as consents to, or waivers of, the anticompetitive practices challenged in this litigation. PX 2233-77. To the extent that the NCAA persists with this argument, the APs will show that the forms are contracts of adhesion, signed without informed consent, under duress, and typically after being told a signature is required to play. PX 2060 at 4; 2248; 2266 at 15 (Vanderbilt "Student Image Consent" form signed by Chase Garnham with handwritten note: signed "w[ith] the understanding that I had to sign in order to play (by play I mean [pa]rticipating in practice, games, and interviews)"); 2046 at 1 (Faculty Athletic Representative Dr. Betsy Altmaier: "I also think the likelihood of a student-athlete not approving his or her own image use is low. Student athletes don't have much discretion as it is, and they sign these 'release' forms in a single meeting with literally a stack in front of each of them."). Moreover, as the APs have noted throughout this litigation, an otherwise legal consent obtained as "part and parcel" of an antitrust violation is void. *See, e.g., Radio Corp. of Am. v. Raytheon Mfg. Co.*, 296 U.S. 459, 462 (1935) (stating that the purported release of antitrust claims is unenforceable "when it is so much a part of an illegal transaction as to be void in its inception"); *Redel's Inc. v. General Elec. Co.*, 498 F.2d 95, 100-01 (5th Cir. 1974) (holding that a release is invalid if "the release itself was an integral part of a scheme to violate the antitrust laws"); *California Concrete Pipe Co. v. Am. Pipe & Constr. Co.*, 288 F. Supp. 823, 827 (C.D. Cal. 1968) (affirming that "[a]cts which normally are legal may become illegal if part of, or in furtherance of, an illegal conspiracy. A release, if it be an illegal contract, or a contract to achieve an illegal

purpose, is void. A release even though valid, if secured as part of or in furtherance of an illegal conspiracy becomes tainted thereby and becomes void.").

The experience of Electronic Arts, Inc. ("EA") demonstrates the restraint at work. The APs will present documentary evidence and testimony from Joel Linzner of EA at trial that while EA abided by the prohibition on paying college athletes for the use of their NIL in NCAA-licensed videogames, it nonetheless wanted to obtain the rights for more precise likenesses and the names[4] of every college athlete on each roster, for which EA was willing to pay more to the NCAA and the college athletes themselves. EA knew that consumers wanted those improvements to the videogames, and increased sales would result. But the NCAA remained steadfast in its prohibition against sharing revenues with players and worried that any additional similarities between the athletes and the videogames would further expose the fiction that the videogame "avatars" did not represent real people. As a result of the NCAA's intransigence, EA cancelled the NCAA Basketball videogame series in 2010 following languishing sales. The NCAA Football series met a similar fate in 2013 after the NCAA and various conferences (but not member schools) refused to renew their licensing contracts with EA, blaming the uncertainty caused by this and other litigation. This evidence (some of which was placed under seal for pretrial purposes, but which should be unsealed for use at trial) is discussed in greater detail at Dkt. 748 at 35-40; *see also* PX 305; 785; 794; 826; 1127; 2001; 2012; 2023; 2031; 2055; 2389-443.

That episode is just one demonstration of how the restraint limits consumer choice and licensing opportunities for Division I college basketball and football players. Further, the evidence concerning EA shows that the prohibition on sharing of licensing revenues with players is not justified on any principled basis. The NCAA cancelled the licenses with EA for videogames that featured actual players, in part out of fear that preserving the game might require sharing

---

[4] Rather than relying on a user download that inserted the player names into the videogame after release.

revenue with players for use of the NILs. PX 2028 at 49 ("potential need to provide additional benefits for the student-athletes given more permissive use of their likenesses?"). In the meantime, license agreements for broadcast games and other products displaying the NILs of players continue, with the NCAA taking all monies from those licensing agreements. PX 2012 ("here is a good example of the double standard not making a whole lot of sense as TV and videogame worlds converge"); 2023 at 4 ("the use of the student-athlete names or likenesses . . . If we are allowing it in broadcast, video games are literally no different now").

The restraint is thus a bundle of contradictions: the NCAA, its member schools, and its conferences enter billion-dollar contracts that include the rights of players, while at the same time limiting other commercial opportunities and excluding college athletes from the financial bonanza. As former NCAA President Myles Brand put it: "The presidents want it both ways: they want to be able to rail against commercialism and they want the revenue that comes with corporate ads." PX 2026 at 2; 2291.

## V.   THE RELEVANT MARKETS

The APs allege that the NCAA's anticompetitive conduct restrains two markets: (1) the "college education" market, in which Division I schools compete to recruit the best college athletes to play football or basketball; and (2) the "group licensing" market, in which broadcasters and videogame developers, *e.g.*, compete for group licenses to use the NILs of all college athletes on particular Division I football and basketball teams in live game broadcasts, archival footage, and videogames. *See NCAA I*, 2014 WL 1410451, at *4. APs' expert, Dr. Roger Noll, will testify at trial about his lengthy investigation of these markets. As detailed in his export report on liability, Dr. Noll has carefully scrutinized whether "colleges have . . . plausible substitutes for college athletes who want to attend college and who have the ability to play on a DI men's basketball team or an FBS football team" and whether "college athletes who want to attend college and . . . participate at the highest level in men's basketball or football have . . . plausible

alternative[s] to attending a school that plays DI men's basketball or FBS football." Dkt. 898-15

at 3. Dr. Noll's empirical analysis shows the absence of reasonable substitutes, which in turn

affirms that the college-education market exists. *Id*. at 3-4, 18-59. As for the second market, Dr.

Noll has determined that "there is enough commonality among [prevalent collegiate] licensing

activities to justify defining the relevant product market as all collegiate licensing, with several

different types of licenses as separate submarkets." *Id*. at 62. Among those is a group-licensing

submarket for purposes of creating products that contain the NILs of one or more players, which

"is more efficient than a group of separate transactions for the rights to each component of the

bundle" and the norm in professional sports. *Id*. at 62-70. Moreover, there is "no substitute for the

rights to the NILs of the players," further corroborating the existence of the markets.

Dr. Noll and the various sources he has consulted are not alone. Various NCAA

correspondence, speeches, and reports also confirm the existence of these relevant markets. *E.g.*,

PX 2001, 2006, 2007, 2012, 2020, 2025, 2029, 2038, 2495. Not surprisingly, and as the Court has

noted, the NCAA has yet to advance *any* competent evidence to refute the existence of these

relevant markets. *In re NCAA Student-Athlete Name & Likeness Licensing Litig.*, No. 09-1967,

2014 WL 1949804, at *2-4 (N.D. Cal. May 12, 2014) ("*NCAA II*").

## VI.   THE RESTRAINT'S SIGNIFICANT ANTICOMPETITIVE EFFECTS

Dr. Noll will also testify about the various ways the restraint harms competition in both

markets. In the college-education market, for example, the restraint harms competition by

reducing the price of college athletes' NILs to zero, thereby increasing the net price of college

attendance. Dkt. 898-15 at 84-93. Dr. Noll captions this as the "transfer of wealth" harm to

competition. *Id*. As for the group-licensing market, the restraint significantly limits the number

and quality of licensed products, such as EA's NCAA-licensed videogames, and eliminates

college athletes' ability to license their NIL rights. *Id*. at 98. This loss of choice results in inferior

products despite considerable consumer demand and corporate interest. Finally, the restraint compels various forms of inefficient substitution, in which, *e.g.*, entities struggle to "work around" the restraint in ways that prove costly and imperfect, as with EA's inability to include player names in the videogame titles at the time of shipment (later integrated through user downloads). *Id*. at 103-04.

The most glaring form of inefficient substitution, however, is the massive expenditure by NCAA member schools on inputs *other than college athletes* in an attempt to recruit those same college athletes. *Id*. at 105-114. While NCAA rules impose a ceiling on the total number of scholarships and the amount of each scholarship, they do not restrict member spending on other items that might conceivably attract college athletes, however flawed the substitution. *Id*. In an effort to recruit college athletes while preserving the restraint, member schools spend considerably more on recruiting expenses, coaching salaries, and facilities than if some portions of NIL revenues could be paid directly to college athletes. *Id*.; *see also, e.g*., PX 2480.

## VII.   THE NCAA'S PURPORTED PROCOMPETITIVE JUSTIFICATIONS ARE ILLUSORY

Once the APs have shown the existence of a restraint in a relevant market, it falls to the NCAA to furnish evidence of procompetitive justifications. The NCAA initially identified five proposed justifications: (1) "amateurism"; (2) competitive balance; (3) integration between athletics and education; (4) viability of sports other than men's football and basketball; and (5) enhanced output of men's football, basketball, and other sports. Dkt. 926 at 10-25.

The Court rejected as illegitimate the fourth of these proffered justifications because it concerns an unrelated benefit in *another* market and could be achieved through less restrictive means in any event. *NCAA I*, 2014 WL 1410451, at *16-17; *see United States v. Topco Assoc., Inc.,* 405 U.S. 596, 610 (1972); *Sullivan v. Nat'l Football League,* 34 F.3d 1091, 1112 (1st Cir. 1994). In granting summary judgment for the APs on that procompetitive justification, the Court

made clear that "the NCAA may not rely on this justification [('increased support for women's sports and less prominent men's sports')] at trial." 2014 WL 1410451, at *20. The Court has reiterated that "the NCAA may not argue that the challenged restraint helps promote women's sports or less prominent men's sports." Dkt. 1105 at 5.

### A.      Consumer Demand Will Persist, and Even Increase, Absent the Restraint.

The NCAA insists that "amateurism"—by which it must mean the prohibition on sharing revenues earned through the licensing of college athletes' NILs, at any time—is vital to consumer demand. That extreme position is not warranted by the evidence.

As a threshold matter, the NCAA's foundational assumption that college athletes in men's Division I basketball and football are "amateurs" is fallacious. As APs will establish at trial through NCAA documents and the testimony of the named plaintiffs and Dr. Ellen Staurowsky, among others, today's college athletes in Division I football and basketball do not participate in sports as an avocation but rather as a full-time pursuit, often expending 40-50 hours a week honing their athletic abilities. Winning is paramount, and the time commitment required frequently drives academic schedules and choices and adversely affects graduation rates, which lag behind those of their peers in the larger student body. *See, e.g.*, PX 2019, 2077, 2078.

Moreover, the NCAA admits that the "amateurism" moniker does not preclude it, its conferences, or its member schools from engaging in lucrative business activities, signing multi-billion-dollar media contracts, paying ever-increasing coaching salaries, and building sumptuous facilities, all of which are, the NCAA tells us, consistent with the amateur nature of college sports. That is only possible through the NCAA's selective and inconsistent application of the amateur designation. Again, as it is quick to remind the public, "student-athletes are amateurs. Intercollegiate athletics is not." PX 2292; *see* PX 2011 at 35 ("Amateur defines the participants, not the enterprise."); 2047 at 5 ("[W]hile participating is to be an avocation for students, college

sports as an enterprise is a professional undertaking for everyone else."); *see also* PX 283; 424; 2065; 2290; 2293; 2294. The NCAA even admits internally that "[t]here is a general sense that intercollegiate athletics is as thoroughly commercialized as professional sports." PX 424 at 2.

Acknowledging this definitional morass, the NCAA has changed the formal definition of amateurism numerous times—without any effect on consumer demand—and lately adopted the term "collegiate model." PX 2027, 2028, 2074. Elsewhere, the NCAA has adopted *different* amateurism rules for various sports and for its three divisions, even permitting, *e.g.*, college athletes to play one sport professionally only to return as an "amateur" in a second sport. Regardless of these inconsistencies, the NCAA cannot explain how consumer demand for college sports turns on denying players any portion of the soaring revenues while everyone else benefits.

Lacking any coherent intellectual response or support from the discovery record, the NCAA turns to a handful of irrelevant and dated surveys in support of its argument that viewership would wane if college athletes received compensation, at any time, for the use of their NILs in television broadcasts, archival footage, and videogames. The NCAA attempts to show the impossible from this evidence: that if the NCAA ever agrees to share licensing revenues with college football and basketball players, sports fans would simply stop watching and alumni would turn their backs on their schools.

As APs' expert Hal Poret will testify at trial, the NCAA surveys provide no reliable indication of future consumer behavior, much less consumer abandonment of college sports. Each survey that NCAA expert Dr. Daniel Rubinfeld cited in his opening merits report concerns whether schools should pay college athletes *a salary* in exchange for their athletic contributions. Yet that scenario—commonly known as "pay-for-play"—is not at issue in this litigation. As Mr. Poret will testify, there is no indication that survey respondents were asked, *e.g.*, about contemporaneous or deferred remuneration for the use of college-athlete NILs in television broadcasts, archival footage, and videogames. Moreover, those surveys did not probe the reasons

-13-

for opposing college-athlete salaries; were not directed at college sports fans (the actual consumers); and do not provide any reason to believe that consumers' actual behavior would track the preferences articulated in response to the surveys.

Even if the surveys could yield relevant information in principle, there are far too many lingering questions about their reliability. The Court and the parties know almost nothing about the survey methodologies, including the target population, the sampling design used in conducting the survey, the survey instrument (screening questions and main questionnaire), interviewer training and instruction, the results, including rates and patterns of missing data, and the statistical analyses used to interpret the results.

Implicitly conceding the irrelevance of earlier surveys, the NCAA commissioned a new litigation-driven survey from J. Michael Dennis last fall, purportedly in rebuttal, on which the NCAA now appears to rely. But the Dennis survey suffers from the very same problems as the earlier surveys, as Mr. Poret will again testify. Astoundingly, the Dennis survey inquires only generally about "paying money to student-athletes"—without even mentioning NIL, much less the idea of deferred compensation. And, again, any dissatisfaction expressed in response to the Dennis survey does not govern future consumer behavior; as Mr. Poret will testify, a survey response is costless, not so discontinuing a cherished pastime. What is more, the Dennis survey does not account for the obvious, that at least some of what drives fan interest in college football and basketball is the enduring connection between the university and its students, alumni, and area residents (particularly in many areas of the country without professional franchises). The injunction that APs seek would not disrupt that connection in any way. Finally, like the earlier surveys, the Dennis survey did not target college sports fans, as one would expect. Nor did the Dennis survey balance participation to reflect a representative mix of sports-fan demographics.

Dr. Noll and Dr. Daniel Rascher will also address the predictive value of public-opinion surveys in the sports arena. As they will show, public outcry over the prospect of athlete

compensation in other amateur sports, such as the Olympics, has not been a reliable indicator of subsequent consumer withdrawal. On the contrary, the Olympics have thrived since loosening the restriction on professional athletes. Likewise, the NCAA cannot reconcile its prediction that compensation in any form will extinguish consumer interest with its recent experience. Despite a steady drumbeat of well-publicized rules violations in which college athletes have accepted compensation from boosters and the like in the last few years, the growth of Division I men's basketball and football has not slowed. Fans still flocked to watch Ohio State play in the 2011 Sugar Bowl although six of its athletes had violated NCAA rules by selling signed memorabilia. Likewise, in 2013, although Texas A&M's quarterback Johnny Manziel was suspended for the first half of the season opener for allegedly selling autographs, that game, which featured Manziel in the second half, finished 61% above the average ESPN rating for comparable telecasts.

### B.     The Restraint Is Unnecessary to Preserve Whatever Competitive Balance Might Presently Exist.

The NCAA advances "competitive balance" as its second procompetitive justification, even though NCAA internal documents produced in discovery confirm that competitive balance is a fiction. At summary judgment, the NCAA relied on a raft of declarations from conference commissioners and university administrators to support this justification, which the Court found wanting for three reasons. *NCAA I*, 2014 WL 1410451, at *13-15. First, none of that material "is based on empirical evidence, factual data, or expertise in economic analysis."[5] *Id*. at *14. Moreover, "all of these declarations are self-serving because Division I conferences and universities stand to lose a significant portion of their current licensing revenue should Plaintiffs ultimately prevail in this suit." *Id*. Of particular significance, none of the declarants even attempted to ascertain what measure of competitive balance might be necessary to preserve

---

[5] Even Dr. Rubinfeld's assertions regarding competitive balance lack statistical support. *Id*. at *14.

existing consumer demand, much less determine how the restraint might assist in preserving that level of competitive balance. *Id*. In light of these deficiencies, the Court stated that it will require the NCAA to present at trial "evidence that the challenged restraint promotes a level of competitive balance that (1) contributes to consumer demand for Division I football and basketball and (2) could not be achieved through less restrictive means." *Id*. at *15.

Again, the NCAA apparently plans to disregard this ruling. It intends to present *more* testimony from conference and university personnel (including some of the *same* people who provided declarations in connection with summary judgment) of the very type the Court has rejected. Dkt. 1070-2 at 2-6. If there is a failure of proof by the NCAA, this procompetitive justification will fall by the wayside. If the NCAA does come forward, finally, with some competent evidence, the APs intend to respond by presenting statistical evidence through Drs. Noll and Rascher confirming what every college sports fan already knows: a few colleges dominate college football and basketball by consistently recruiting the best players and fielding the strongest teams—and removing the restraint will not exacerbate this imbalance. Dkt. 898-15 at 141. Dr. Noll will also testify to the near-consensus among economists that the NCAA's eligibility rules do not ensure competitive balance and may actually impede it.

The APs will also present evidence that the NCAA does not actually subscribe to the competitive-balance myth. Internally, it has readily acknowledged that competitive balance does not exist, necessitating yet more terminology changes—from "competitive balance" to "competitive equity" to "commitment to fair competition." PX 424 at 4 ("The top 25 percent of Division I is setting the spending pace for the rest of the division, although the bottom 25 has largely stopped trying to compete and is content with the prestige that comes with being in the same neighborhood. . . . So, what we really see are the 'haves' the 'have-nots' and the 'forget-about-its.'"); 425; 2049 at 1 ("competitive advantage or disadvantage doesn't appear to have any rational connection to the principle of amateurism"); 2080 at 4 ("the data would indicate that there

is already significant disparity in competition, with the teams from the six FBS AQ conferences dominating competition on the field"); 2096; 2284. An "impartial observer would likely conclude that even with the emphasis given and number of attempts to legislate it across a broad spectrum of institutions, 'competitive equity' has failed." PX 2083 at 4-5.

C.   **The Restraint Is Not Essential to the Integration of Athletics and Education, Nor Can the NCAA Demonstrate that the Integration of Athletics and Education Stimulates Competition in the Relevant Markets.**

The NCAA's third justification—dubbed the integration of athletics and academics—will fare no better. The NCAA cannot demonstrate that Division I men's basketball and football players are "students first, athletes second," as it maintains, nor can the NCAA explain how the restraint actually stimulates competition in the relevant markets by "integrating" college athletes into the academy. The Court expressed similar skepticism at summary judgment. However laudable the educational mission of member schools may be, social welfare goals cannot immunize anticompetitive conduct under the Sherman Act. *NCAA I*, 2014 WL 1410451, at *15 (citing *FTC v. Superior Court Trial Lawyers Ass'n*, 493 U.S. 411, 424 (1990); *Nat'l Soc'y of Prof'l Eng'rs v. United States*, 435 U.S. 679, 695 (1978)). And a cartel may not divert price-fixing profits to charitable pursuits in an effort to evade antitrust liability. After five years of litigation, "the NCAA has not provided evidence that improving the educational experiences of student-athletes or advancing the educational mission of colleges ultimately promotes its product: namely, college sports." *NCAA I*, 2014 WL 1410451, at *15. The Court noted further:

> [T]he NCAA has not explained how the challenged restraint in this case—which limits, rather than increases, the financial benefits provided to college students—would enhance consumer choice in the markets Plaintiffs have identified. It has also failed to present any evidence showing that the integration of athletics and education actually benefits Division I college sports fans or student-athletes. Instead, it has submitted a collection of declarations from university administrators describing how the challenged restraint benefits *other* college students.

1   *Id.* (emphasis in original). Accordingly, the Court instructed the NCAA that if it persists with this

2   argument at trial, it must introduce evidence demonstrating that the restraint "actually

3   contributes" to the integration of athletics and education—and that the integration of athletics and

4   education in turn enhances competition in the markets identified by the APs. *Id.*

5         Once again, the NCAA apparently intends to ignore this ruling and present the same

6   discredited speculation from university and conference personnel. *See* Dkt. 1070-2 at 6-8. If the

7   NCAA can finally muster competent evidence on this point, the APs intend to respond through

8   the testimony of fact witnesses, including the named plaintiffs, who will confirm through

9   experience and empirical data that academics are frequently subordinate to athletics for Division I

10  men's football and basketball players. The APs will also respond with NCAA documents and the

11  testimony of Dr. Staurowsky, who will establish that the restraint *does not* contribute to the

12  integration of athletics and education, as evidenced by a mountain of scholarship, NCAA-

13  generated reports, authoritative third-party studies, and internal NCAA documents, and that the

14  integration of athletics and education grows more tenuous each day as academic priorities give

15  way to business imperatives.

16

17        The evidence will show that Division I football and basketball players are simply not

18  receiving the same education as their peers in the student body. Unlike their counterparts, college

19  athletes are not "students first," as evidenced by, *inter alia*, the substantial time commitment

20  required of their sports, the attendant prioritization of athletic endeavors above academic pursuits,

21  scholarships contingent on athletic performance, differing admissions standards, and lagging

22  graduation rates. Outside of this litigation, the NCAA and its member schools are quick to

23  acknowledge the persistent problem. PX 424 at 2 ("We know from a couple of surveys [the

24  NCAA has] done . . . that student-athletes spend as much as 45 hours a week on their sport. . . .

25  We have a 20-hour rule for structured [athletic] activity. We have a wink-and-a-nod approach to

26  voluntary [athletic] activity."); 2017 at 25 ("One of the more damaging results of such increased

27

28

ANTITRUST PLAINTIFFS' TRIAL BRIEF
4:09-CV 3329 CW

pressure on intercollegiate athletics has been to isolate the activity from the academic mission of the university at exactly the moment when better integration of athletics and academics is needed"); 2019, 2057, 2087-89, 2281, 2282, 2297, 2487 ("Academics/Athletics Balance: There is extremely strong sentiment that this is far out of balance in favor of athletics . . . . In terms of numbers of games played, many are concerned that there are simply too many games . . . that too much time away from academics").

Even assuming *arguendo* that the NCAA could prove at trial that Division I athletics and academics are integrated, it cannot show that the restraint is responsible for that integration. Moreover, the NCAA cannot demonstrate that the restraint promotes competition in either market in this respect. At summary judgment, the NCAA suggested in passing that the college-education market is an obvious fit because of its name. Dkt. 926 at 20. But that assumption ignores the nature of this particular market, which is not some nebulous market for the education of college athletes but rather the market "in which Division I colleges and universities *compete to recruit* the best student-athletes to play football or basketball," as the Court has recognized. *NCAA I*, 2014 WL 1410451, at *2 (emphasis added). The NCAA has never suggested that colleges and universities successfully compete for and recruit college athletes by touting how the deprivation of NIL revenue nevertheless will enhance their educational experience. Nor can it do so now. The restraint is common to all member schools. There can be no differentiation on this point *attributable to the restraint* that might facilitate recruitment.

### D.   Extinguishing the Restraint Will Increase Output

Finally, the NCAA predicts that certain member schools—which it cannot say—will exit Division I or shutter operations absent the restraint, thereby diminishing output as measured by the total number of teams, players, scholarships, and games. That is rank speculation, supported thus far by only a handful of self-serving declarations that suggest four schools "*could* leave

Division I" in a post-injunction world and Dr. Rubinfeld's contention that member schools "*may*" operate differently absent the restraint. *See* Dkt. 925-8 at ¶¶148-49, 151-53; Dkt. 925-15 at ¶¶67-71. Equivocation of that sort is not proof of a procompetitive benefit.

The NCAA's argument is truly incredible. Major Division I sports programs and conferences—which are locked in an arms race to build towering sports facilities and spend millions on coaches, all with the encouragement of alumni and fans—will not abandon a multi-billion-dollar sport because of the possibility of sharing certain revenues with players.

Moreover, the NCAA has an uphill battle in establishing this justification, given Dr. Noll's determination that the restraint actually *restricts* output in various ways. The NCAA cannot explain why schools would exit Division I before trimming inefficient-substitution expenditures on facilities, recruiting, and coaching and staff salaries, all of which have grown exponentially in the last decade. Nor can it explain why other schools from Division II and III would not take the place of any schools that exit Division I, as recent trends would suggest.

The Court need not look to expert testimony alone. Real-life examples of how the restraint actually *decreases* output abound. But for the restraint, EA would still be producing videogames—better videogames that consumers crave. *See, e.g.*, PX 1133, 2004, 2013, 2020, 2006 (Myles Brand (NCAA): "[I]t is far from certain that the presidents will agree to providing names and [better] likenesses in video games. They may decide to leave the money on the table."); 2007; 2023; *see generally* PX 2013 at 2 ("I know there are some parameters that might still prevent using a current student-athlete's name/likeness on products, but once they are lifted there could be some huge revenue opps for Texas and Vince [Young]."). But for the restraint, the NCAA would still sell jerseys tethered to actual players, likely even with names attached.

## VIII.   <u>LESS RESTRICTIVE ALTERNATIVES</u>

In the event that the NCAA satisfies its burden of establishing procompetitive benefits, the APs will show that the very same goals could be achieved through less restrictive alternatives.

1
2
3
4
5

For his part, Dr. Rubinfeld acknowledges that less restrictive alternatives exist, but he has chosen not to investigate them. *NCAA II*, 2014 WL 1949804, at *4 ("[T]here are changes in the rules that could be made that would still achieve the pro-competitive purposes that the NCAA has set out, but I have not seen my charge by the NCAA as advising them as to how to change their regulations.").

6
7
8
9
10
11
12
13
14
15
16
17
18
19
20

As discussed earlier, one possibility is payment for use of a college athlete's NIL into a trust fund that would only be disbursed to the college athlete after graduation or expiration of eligibility. Other alternatives include those actually raised by the NCAA, EA, or Collegiate Licensing Company, such as mandating or encouraging member schools to share revenues derived from NIL licensing with college athletes through the creation of a fund. PX 257, 1133, 2001, 2045. So too could the NCAA revise its definition of "pay" (NCAA Operating Bylaw Article 12.02.7), to permit remuneration for some or all forms of NIL licensing. Additionally, the NCAA could abolish the restraint at the national level, leaving it to individual conferences—in consultation with their member schools—to authorize or prohibit sharing NIL licensing revenues with college athletes. Finally, the NCAA is currently exploring legislative proposals that would "[i]ncrease [f]lexibility for [u]se of [l]ikeness" by permitting college athletes "to use his or her likeness to advertise their business or place of employment, even if they received the position because of their athletic[] ability," yet another less restrictive alternative. *See* PX 2093.

21
22

## IX.   WEIGHING OF PROCOMPETITIVE BENEFITS AND ANTICOMPETITIVE EFFECTS

23
24
25
26
27
28

To the extent that the NCAA is able to substantiate any of its procompetitive benefits at trial, the Court will need to weigh those benefits against the significant competitive harms caused by the restraint and the less restrictive alternatives available to the NCAA and its member schools. *See Cont'l T. V., Inc. v. GTE Sylvania Inc.*, 433 U.S. 36, 49-50 (1977); *Paladin*, 328 F.3d at 1156. Again, Drs. Noll and Rascher will testify on this topic and aid the Court in determining

1    the net competitive effect of the restraint.

2    **X.    INJUNCTIVE AND DECLARATORY RELIEF**

3         This Court certified a class for injunctive and declaratory relief under Fed. R. Civ. P.

4    23(b)(2). *In re NCAA Student-Athlete Name & Likeness Licensing Litig.*, No. C 09-01967 CW,

5    2013 WL 5979327, at *30 (N.D. Cal. Nov. 8, 2013) ("*NCAA III*"). The Court subsequently

6    modified the class definition to conform to Antitrust Plaintiffs' pleading in the Third

7    Consolidated Amended Complaint ("TCAC") (Dkt. 832). *NCAA I*, 2014 WL 1410451, at *17-20.

8    That class is defined as:

9

10        All current and former student-athletes residing in the United States who compete
          on, or competed on, an NCAA Division I (formerly known as "University
11        Division" before 1973) college or university men's basketball team or on an
          NCAA Football Bowl Subdivision (formerly known as Division I–A until 2006)
12        men's football team and whose images, likenesses and/or names may be, or have
          been, included or could have been included (by virtue of their appearance in a
13        team roster) in game footage or in videogames licensed or sold by Defendants,
          their co-conspirators, or their licensees.
14

15   *Id.* at *20.

16        The APs have withdrawn their individual claims for antitrust damages, unjust enrichment,

17   and an accounting contained in the TCAC. Dkt. 1076 at 1. Thus, the only remaining claims to be

18   tried in the upcoming bench trial are those brought under 15 U.S.C. § 26 and 28 U.S.C. § 2201 *et*

19   *seq.* for injunctive and declaratory relief.

20        To prevail on a motion for permanent injunction, a plaintiff must show: (1) the likelihood

21   of substantial and immediate irreparable injury; and (2) the inadequacy of remedies at law. *See*

22   *Hodgers-Durgin v. De La Vina,* 199 F.3d 1037, 1042 (9th Cir. 1999); *Easyriders Freedom*

23   *F.I.G.H.T. v. Hannigan,* 92 F.3d 1486, 1495 (9th Cir. 1996). In issuing a permanent injunction,

24   the Court must balance the equities between the parties and give due regard to the public interest.

25   *See Idaho Watersheds Project v. Hahn,* 307 F.3d 815, 833 (9th Cir. 2002).

26        Those requirements are satisfied here. There is a substantial, immediate, and irreparable

27

28

ANTITRUST PLAINTIFFS' TRIAL BRIEF
                                                      4:09-CV 3329 CW

injury arising from the actions of the NCAA and its member schools and conferences in enforcing rules that prohibit Division I men's football and basketball players from receiving compensation for the use of their NILs in live broadcasts, rebroadcasts, video clips, and videogames. To establish the right to injunctive relief under 15 U.S.C. § 26, a showing of threatened, not actual, injury is all that is needed (*Zenith Radio Corp. v. Hazeltine Research, Inc.*, 395 U.S. 100, 139 (1969)), and here the APs have surpassed this test. This Court has already ruled that the claims based on videogames are not mooted by the current hiatus of NCAA-licensed videogames and that the First Amendment is no bar to claims based on live broadcasts. *NCAA I*, 2014 WL 1410451, at *6-11. The injury cannot be remedied at law because the proposed injunction addresses future conduct and because the damage claims of many of the class members are sufficiently small to deter the filing of individual actions (at least in sufficient quantity for the NCAA to abandon the restraint). The balancing of the equities and consideration of the public interest are already subsumed in the rule of reason analysis described above.[6]

The APs are seeking only a prohibitory injunction—not a mandatory injunction. That injunction would merely prevent the NCAA and its members from agreeing not to compensate college athletes for use of their NIL. Free market forces would then determine whether schools decide unilaterally to compensate college athletes for use of their NILs and whether to do so by group license. Thus, the APs will not burden the Court with a request for ongoing supervision of the injunction; there is no need. APs' requested relief is simple, and the injunction would have immediate effect.

---

[6] Likewise, declaratory relief is also appropriate here. When there is an "actual controversy" between parties, a federal court may "declare the rights and other legal relations" of the parties. 28 U.S.C. § 2201. The standard used to determine whether there is an actual controversy is the same as the "case or controversy" requirement of the United States Constitution. *American States Ins. Co. v. Kearns,* 15 F.3d 142, 143 (9th Cir. 1994).

1

## XI.   **DEFENSES**

2

### A.   **Joint Venture**

3

4        The NCAA intends to argue at trial that the restraint is the product of a joint venture, and

5   therefore entitled to a presumption of reasonableness and deference from the courts. But that

6   argument assumes a disputed fact issue—whether the restraint is *essential* for the existence of

7   college sports. And it is squarely at odds with the Court's previous rulings on this very issue.

8        The Court has rejected at least twice the NCAA's argument that *NCAA v. Bd. of Regents*

9   *of Univ. of Oklahoma*, 468 U.S. 85 (1984)—a case in which the Supreme Court condemned the

10  NCAA's rules "curtailing output and blunting the ability of member institutions to respond to

11  consumer preference," *id*. at 120—somehow immunizes the NCAA's conduct here. *NCAA I*,

12  2014 WL 1410451, at *4 nn.3-4 ("This Court has previously explained why *Board of Regents*—

13  which does not examine the NCAA's ban on student-athlete compensation under the rule of

14  reason—does not control the outcome of this case."); *In re NCAA Student-Athlete Name &*

15  *Likeness Licensing Litig*., No. 09-1967, 2013 WL 5778233, at *6 (N.D. Cal. Oct. 25, 2013)

16  ("Thus, while *Board of Regents* gives the NCAA 'ample latitude' to adopt rules preserving 'the

17  revered tradition of amateurism in college sports,' . . . it does not stand for the sweeping

18  proposition that student-athletes must be barred, both during their college years and forever

19  thereafter, from receiving any monetary compensation for the commercial use of their names,

20

21  images, and likenesses.").

22        The NCAA now cloaks itself in *American Needle, Inc. v. NFL*, 560 U.S. 183 (2010) to

23

24  again insist that its concerted activity should be upheld in "twinkling of an eye." *Id*. at 203

25  (quotation marks and citation omitted). Yet *American Needle* makes clear that the truncated rule-

26  of-reason analysis the NCAA seeks is appropriate only if the restraint is necessary for "'the

27  product . . . to be available at all.'"  *Id*. at 203 (quoting *Board of Regents*, 468 U.S. at 101); *see*

28

*Broad. Music, Inc. v. Columbia Broad. Sys., Inc.*, 441 U.S. 1, 23 (1979) ("Joint ventures and other cooperative arrangements are also not usually unlawful, at least not as price-fixing schemes, *where the agreement on price is necessary to market the product at all*.") (emphasis added).[7] Despite numerous attempts, the NCAA has not yet demonstrated that the restraint is vital for college sports to endure—and trial will be no different. The evidence on this point is actually getting worse for the NCAA, as the APs will show. In recent months, NCAA member schools have been urging sweeping changes to the no-compensation rules, without a hint that any of these measures might extinguish college sports altogether. PX 2093.

## B.   Consent

The NCAA's proposed consent defense also turns on college athletes' decision to take the field despite awareness of the restraint. According to the NCAA, participation in college sports alone "eliminates any claim that their purported [NIL] rights have been misappropriated and thus any claim that there has been an antitrust violation." Dkt. 149 at 23-24. This has been the subject of exhaustive briefing, and APs need not belabor the point further here. In summary, a victim's consent to an antitrust conspiracy—hotly disputed here in any event—cannot shield a defendant from liability under the Sherman Act. *See, e.g., Perma Life Mufflers, Inc. v. Int'l Parts Corp.*, 392 U.S. 134, 143-48, 154 (1968*) (*White, J., concurring) (Harlan, J., Stewart, J., concurring in part and dissenting in part*), overruled in part on other grounds by Copperweld Corp. v. Independence Tube Corp.*, 467 U.S. 752 (1984); *see also* EINER ELHAUGE, UNITED STATES ANTITRUST LAW AND ECONOMICS 17 (2008) ("[E]ven a plaintiff that voluntarily agreed to an anticompetitive restraint can bring an antitrust claim, if it was injured by the anticompetitive aspects of that restraint or by its enforcement against it and was not equally responsible for the restraint.").

---

[7] The NCAA's reliance on *American Needle* is also misplaced because, unlike the NFL and the NHL, *see Laumann v. National Hockey League*, 907 F.Supp.2d 465, 485 (S.D.N.Y. 2012), the NCAA is not a lawful joint venture. Its member schools are independent economic entities that compete for athletes and make unilateral decisions about licensing.

1    Dated: June 3, 2014                    Respectfully submitted,

2                                           By:  _/s/ Sathya Gosselin_____

3                                           Michael D. Hausfeld (*pro hac vice*)
                                            Hilary K. Scherrer (Cal. Bar No. 209451)
                                            Sathya S. Gosselin (Cal. Bar No. 269171)
4                                           Swathi Bojedla (*pro hac vice*)
5                                           HAUSFELD LLP
                                            1700 K Street, NW, Suite 650
6                                           Washington, DC 20006
                                            Telephone:  (202) 540-7200
7                                           Facsimile:  (202) 540-7201
                                            E-mail:mhausfeld@hausfeldllp.com
8                                                    hscherrer@hausfeldllp.com
9                                                    sgosselin@hausfeldllp.com

10                                          Michael P. Lehmann (Cal. Bar No. 77152)
                                            Bruce J. Wecker (Cal. Bar No. 78530)
11                                          HAUSFELD LLP
                                            44 Montgomery St., 34th Floor
12                                          San Francisco, CA 94104
                                            Telephone:  (415) 633-1908
13                                          Facsimile:  (415) 358-4980
                                            E-mail:mlehmann@hausfeldllp.com
14                                                   abailey@hausfeldllp.com
15

16                                          *Plaintiffs' Class Counsel with Principal*
17                                          *Responsibility for the Antitrust Claims*

18

19

20

21

22

23

24

25

26

27

28

ANTITRUST PLAINTIFFS' TRIAL BRIEF
                                                           4:09-CV 3329 CW

**CERTIFICATE OF SERVICE**

I hereby certify that on June 3, 2014, I electronically filed the foregoing document with the Clerk of the Court using the CM/ECF system, which will send notification to the e-mail addresses registered.

By: */s/ Sathya S. Gosselin*

*Plaintiffs' Co-Lead Class Counsel with*
*Principal Responsibility for Antitrust Claims*
HAUSFELD LLP
1700 K St. NW, Suite 650
Washington, DC 20006

ANTITRUST PLAINTIFFS' TRIAL BRIEF
4:09-CV 3329 CW