GLENN D. POMERANTZ (State Bar No. 112503)
glenn.pomerantz@mto.com
KELLY M. KLAUS (State Bar No. 161091)
kelly.klaus@mto.com
CAROLYN HOECKER LUEDTKE (State Bar No. 207976)
carolyn.luedtke@mto.com
ROHIT K. SINGLA (State Bar No. 213057)
rohit.singla@mto.com
MUNGER, TOLLES & OLSON LLP
560 Mission Street
Twenty-Seventh Floor
San Francisco, California 94105-2907
Telephone:     (415) 512-4000
Facsimile:     (415) 512-4077

GREGORY L. CURTNER (*Pro Hac Vice*)
gcurtner@schiffhardin.com
ROBERT J. WIERENGA (State Bar No. 183687)
rwierenga@schiffhardin.com
KIMBERLY K. KEFALAS (*Pro Hac Vice*)
kkefalas@schiffhardin.com
SCHIFF HARDIN LLP
350 Main St., Suite 210
Ann Arbor, MI  48104
Telephone:     (734) 222-1500
Facsimile:     (734) 222-1501

Attorneys for Defendant
National Collegiate Athletic Association

UNITED STATES DISTRICT COURT

NORTHERN DISTRICT OF CALIFORNIA, OAKLAND DIVISION

| | |
|---|---|
| EDWARD O'BANNON, et al. | Case No. 09-CV-3329-CW |
| Plaintiffs, | **DEFENDANT NCAA'S TRIAL BRIEF** |
| v. | Judge:      Hon. Claudia Wilken<br>Date:       June 9, 2014<br>Courtroom:  2, 4th Floor |
| NATIONAL COLLEGIATE ATHLETIC ASSOCIATION; ELECTRONIC ARTS, INC.; and COLLEGIATE LICENSING COMPANY, | |
| Defendants. | |

## TABLE OF CONTENTS

**Page**

I.   INTRODUCTION AND OUTLINE OF TRIAL BRIEF ..................................... 1

II.  THE NCAA'S RULES.................................................................................. 1

III. THE NCAA'S RULES CAN AND SHOULD BE SUSTAINED FROM
     ANTITRUST CHALLENGE WITHOUT A FULL-BLOWN RULE OF REASON
     INQUIRY ........................................................................................................ 2

IV.  THE CHALLENGED RULES ALSO SURVIVE RULE OF REASON
     ANALYSIS ..................................................................................................... 6

     A.   APs Will Fail to Show that the Challenged Rules Produce Anticompetitive
          Effects in a Relevant Market ................................................................. 6

          1.   APs Will Fail to Prove the Existence of Either Alleged Market.................. 6

               (a)   The College Education Market for Division I/FBS Men's
                     Basketball and Football SAs ..................................................... 7

               (b)   APs Will Fail to Prove the Existence of a "Group Licensing"
                     Market for the Use of their NIL in Game Broadcasts .................... 7

               (c)   APs Will Fail to Prove the Existence of a "Group Licensing"
                     Market for Footage or Videogames ................................. 13

          2.   APs Will Fail to Prove Anticompetitive Effects in Any Relevant
               Market ........................................................................................ 14

          3.   The Rules Do Not Restrain Former SAs from Licensing their NIL .......... 16

          4.   The Challenged Rules Are Not Commercial Activity Subject to the
               Sherman Act ................................................................................ 17

     B.   The Challenged Rules Promote Competition in Multiple Ways ........................... 19

          1.   The Rules Increase Consumer Choice and Demand ................................. 19

          2.   The Rules Increase Output ....................................................... 19

          3.   The Rules Maintain Competitive Balance ................................................. 20

          4.   The Rules Further the Integration of Athletics and Education................... 21

V.   NO LESS RESTRICTIVE ALTERNATIVE TO THE CHALLENGED RULES
     WOULD ACHIEVE THEIR PROCOMPETITIVE BENEFITS........................................ 23

1

## TABLE OF AUTHORITIES

2

**Page**

3

**FEDERAL CASES**

4

*Agnew v. NCAA,*
    683 F.3d 328 (7th Cir. 2012) ........................................................................... 4, 5

5

6

*Allison v. Vintage Sports Plaques,*
    136 F.3d 1443 (11th Cir. 1998) ........................................................................... 8

7

*Am. Ad Mgmt., Inc. v. Gen. Tel. Co. of Cal.,*
    190 F.3d 1051 (9th Cir. 1999) ........................................................................... 12

8

9

*Am. Ad Mgmt., Inc. v. GTE Corp.,*
    92 F.3d 781 (9th Cir. 1996) ................................................................................. 7

10

11

*Am. Motor Inns, Inc. v. Holiday Inns, Inc.,*
    521 F.2d 1230 (3d Cir. 1975) ............................................................................ 25

12

*Am. Needle, Inc. v. NFL,*
    560 U.S. 183 (2010) ..................................................................................... 3, 20

13

14

*Apex Hosiery Co. v. Leader,*
    310 U.S. 469 (1940) ........................................................................................... 18

15

16

*Atl. Richfield Co. v. USA Petroleum Co.,*
    495 U.S. 328 (1990) ........................................................................................... 15

17

*Banks v. NCAA,*
    977 F.2d 1081 (7th Cir. 1992) ............................................................................. 4

18

19

*Bassett v. NCAA,*
    528 F.3d 426 (6th Cir. 2008) ............................................................................. 18

20

21

*Bepco, Inc. v. Allied-Signal, Inc.,*
    106 F. Supp. 2d 814 (M.D.N.C. 2000) ............................................................... 16

22

*Broad. Music, Inc. v. Columbia Broad. Sys., Inc.,*
    441 U.S. 1 (1979) ................................................................................................. 3

23

24

*Broadcom Corp. v. Qualcomm Inc.,*
    501 F.3d 297 (3d Cir. 2007) .............................................................................. 12

25

*Brooke Grp. Ltd. v. Brown & Williamson Tobacco Corp.,*
    509 U.S. 209 (1993) ...................................................................................... 7, 12

26

27

*C.B.C. Distribution & Mktg., Inc. v. Major League Baseball Advanced Media, L.P.,*
    505 F.3d 818 (8th Cir. 2007) ............................................................................... 8

28

1

**TABLE OF AUTHORITIES**
(continued)

2

Page

3

*Cargill, Inc. v. Monfort of Colo., Inc.*,
   479 U.S. 104 (1986) ................................................................................. 12

4

*Chicago Prof'l Sports Ltd. P'ship v. Nat'l Basketball Ass'n*,
   95 F.3d 593 (7th Cir. 1996) ............................................................... 14, 19

5

6

*Cnty. of Tuolumne v. Sonora Cmty. Hosp.*,
   236 F.3d 1148 (9th Cir. 2001) .......................................................... 21, 23

7

8

*Dedication & Everlasting Love to Animals v. Humane Soc. of U.S., Inc.*,
   50 F.3d 710 (9th Cir. 1995) ..................................................................... 18

9

*Deutscher Tennis Bund v. ATP Tour, Inc.*,
   610 F.3d 820 (3d Cir. 2010) ..................................................................... 21

10

*Eastern Food Servs., Inc. v. Pontifical Catholic Univ. Servs. Ass'n, Inc.*,
   357 F.3d 1 (1st Cir. 2004) ......................................................................... 14

11

12

*Ettore v. Philco Television Broad. Corp.*,
   229 F.2d 481 (3d Cir. 1956) ..................................................................... 10

13

14

*Fisher v. Univ. of Texas at Austin*,
   133 S. Ct. 2411 (2013) .............................................................................. 22

15

16

*FTC v. Indiana Fed'n of Dentists*,
   476 U.S. 447 (1986) ................................................................................... 6

17

18

*Gaines v. NCAA*,
   746 F. Supp. 738 (M.D. Tenn. 1990) .................................................... 4, 18

19

*Glen Holly Entm't, Inc. v. Tektronix Inc.*,
   343 F.3d 1000, amended, 352 F.3d 367 (9th Cir. 2003) ............................ 5

20

21

*Gough v. Rossmoor Corp.*,
   585 F.2d 381 (9th Cir. 1978) ................................................................ 6, 14

22

23

*Grutter v. Bollinger*,
   539 U.S. 306 (2003) ............................................................................ 22, 23

24

*Hairston v. Pac 10 Conference*,
   101 F.3d 1315 (9th Cir. 1996) .................................................................... 6

25

26

*Helix Milling Co. v. Terminal Flour Mills Co.*,
   523 F.2d 1317 (9th Cir. 1975) .................................................................... 6

27

*Howard Hess Dental Labs. Inc. v. Dentsply Int'l, Inc.*,
   602 F.3d 237 (3d Cir. 2010) ..................................................................... 12

28

**TABLE OF AUTHORITIES**
(continued)

Page

*In re Hayes Microcomputer Prods., Inc. Patent Litig.*,
   No. C 84 4882 SC, 1989 WL 252349 (N.D. Cal. Mar. 22, 1989).....................................10, 11

*In re New Motor Vehicles Canadian Exp. Antitrust Litig.*,
   522 F.3d 6 (1st Cir. 2008) .................................................................................................12

*Jones v. NCAA*,
   392 F. Supp. 295 (D. Mass. 1975) .................................................................................18

*Justice v. NCAA*,
   577 F. Supp. 356 (D. Ariz. 1983)......................................................................................4

*Klor's, Inc. v. Broadway-Hale Stores, Inc.*,
   359 U.S. 207 (1959) .......................................................................................................18

*L.A.P.D. Inc. v. Gen. Elec. Corp.*,
   132 F.3d 402 (7th Cir. 1997) ..........................................................................................14

*Law v. NCAA*,
   134 F.3d 1010 (10th Cir. 1998) ........................................................................................4

*Los Angeles Mem'l Coliseum Comm'n v. Nat'l Football League*,
   726 F.2d 1381 (9th Cir. 1984) ..........................................................................................6

*LucasArts Entm't Co. v. Humongous Entm't Co.*,
   870 F. Supp. 285 (N.D. Cal. 1993) ................................................................................14

*M&H Tire Co., Inc. v. Hoosier Racing Tire Corp.*,
   733 F.2d 973 (1st Cir. 1984) ..........................................................................................25

*Mahaffey v. Official Detective Stories, Inc.*,
   210 F. Supp. 251 (W.D. La. 1962) ...................................................................................8

*Marjorie Webster Jr. Coll., Inc. v. Middle States Ass'n of Colleges & Secondary Sch., Inc.*,
   432 F.2d 650 (D.C. Cir. 1970) .......................................................................................18

*Matthews v. Wozencraft*,
   15 F.3d 432 (5th Cir. 1994) ..............................................................................................8

*McCormack v. NCAA*,
   845 F.2d 1338 (5th Cir. 1988).....................................................................................4, 21

*Menasha Corp. v. News Am. Mktg. In-Store, Inc.*,
   354 F.3d 661 (7th Cir. 2004) .......................................................................................7, 14

*Metro. Intercollegiate Basketball Ass'n v. NCAA*,
   339 F. Supp. 2d 545 (S.D.N.Y. 2004) ..............................................................................4

DEFENDANT'S MOTIONS *IN LIMINE*

# TABLE OF AUTHORITIES
**(continued)**

Page

*Modesto Irrigation Dist. v. Pac. Gas & Elec. Co.*,
    309 F. Supp. 2d 1156 (N.D. Cal. 2004) aff'd sub nom. *Modesto Irrigation Dist. (MID)
    v. Pac. Gas & Elec. Co.*, 158 F. App'x 807 (9th Cir. 2005) .................................................. 11

*Nat'l ATM Council, Inc. v. Visa Inc.*,
    --- F. Supp. 2d ---, 2013 WL 6671660 (D.D.C. Dec. 19, 2013)............................................. 12

*Nat'l Soc. of Prof'l Eng'rs v. United States*,
    435 U.S. 679 (1978) ................................................................................................................... 5

*NCAA v. Bd. of Regents of Univ. of Okla.*,
    468 U.S. 85 (1984) .............................................................................................................. passim

*Newcal Indus., Inc. v. Ikon Office Solution*,
    513 F.3d 1038 (9th Cir. 2008)............................................................................................ 6, 7, 14

*NFL v. Alley, Inc.*,
    624 F. Supp. 6 (S.D. Fla. 1983)................................................................................................... 8

*Oltz v. St. Peter's Cmty. Hosp.*,
    861 F.2d 1440 (9th Cir. 1988)..................................................................................................... 7

*Paladin Associates, Inc. v. Montana Power Co.*,
    328 F.3d 1145 (9th Cir. 2003)................................................................................................... 15

*Pittsburgh Athletic Co. v. KQV Broad. Co.*,
    24 F. Supp. 490 (W.D. Pa. 1938) ............................................................................................... 9

*Pool Water Prods. v. Olin Corp.*,
    258 F.3d 1024 (9th Cir. 2001)..................................................................................................... 5

*Pooley v. Nat'l Hole-In-One Ass'n*,
    89 F. Supp. 2d 1108 (D. Ariz. 2000)........................................................................................... 8

*Realnetworks, Inc. v. DVD Copy Control Ass'n, Inc.*,
    2010 WL 145098 (N.D. Cal. Jan. 8, 2010) ............................................................................... 12

*Rebel Oil Co., Inc. v. Atl. Richfield Co.*,
    51 F.3d 1421 (9th Cir. 1995)..................................................................................................... 14

*Reifert v. S. Cent. Wisconsin MLS Corp.*,
    450 F.3d 312 (7th Cir. 2006)................................................................................................. 7, 16

*Sharkey v. Nat'l Broad. Co., Inc.*,
    93 F. Supp. 986 (S.D.N.Y. 1950) .............................................................................................. 10

1

**TABLE OF AUTHORITIES**
**(continued)**

2

Page

3

*Smith v. NCAA,*
    139 F.3d 180 (3d Cir. 1998) vacated on other grounds by, 525 U.S. 459 (1999) ................... 18

4

*Somers v. Apple, Inc.,*
    729 F.3d 953 (9th Cir. 2013) ...................................................................................... 11, 15

5

6

*Sprint Nextel Corp. v. AT & T Inc.,*
    821 F. Supp. 2d 308 (D.D.C. 2011) ..................................................................................... 12

7

8

*Tanaka v. Univ. of S. Cal.,*
    252 F.3d 1059 (9th Cir. 2001) .......................................................................................... 6, 23

9

*Texaco Inc. v. Dagher,*
    547 U.S. 1 (2006) ............................................................................................................ 3, 23

10

11

*Toffoloni v. LFP Publ'g Grp.,*
    LLC, 572 F.3d 1201 (11th Cir. 2009) ...................................................................................... 8

12

13

*Toscano v. PGA Tour, Inc.,*
    201 F. Supp. 2d 1106 (E.D. Cal. 2002) ................................................................................. 12

14

15

*United States v. Brown Univ.,*
    5 F.3d 658 (3d Cir. 1993) ....................................................................................... 21, 22, 23

16

*United States v. Microsoft Corp.,*
    253 F.3d 34 (D.C. Cir. 2001) ................................................................................................ 16

17

18

*United States v. Syufy Enters.,*
    903 F.2d 659 (9th Cir. 1990) .................................................................................................. 6

19

*United States v. Visa U.S.A., Inc.,*
    344 F.3d 229 (2d Cir. 2003) ................................................................................................. 14

20

21

*Volvo Trucks N. Am., Inc. v. Reeder-Simco GMC, Inc.,*
    546 U.S. 164 (2006) ................................................................................................................ 5

22

23

*Wis. Interscholastic Athletic Ass'n v. Gannett Co., Inc.,*
    658 F.3d 614 (7th Cir. 2011) .................................................................................................. 9

24

*Zacchini v. Scripps-Howard Broad. Co.,*
    433 U.S. 562 (1977) ................................................................................................................ 9

25

26

**STATE CASES**

27

*Battaglieri v. Mackinac Ctr. For Pub. Policy,*
    680 N.W.2d 915 (Mich. Ct. App. 2004) ................................................................................. 8

28

1

**TABLE OF AUTHORITIES**
(continued)

2

Page

3

*J.C. v. WALA-TV, Inc.*,
    675 So. 2d 360 (Ala. 1996) ................................................................. 8

4

*Jaubert v. Crowley Post-Signal, Inc.*,
5
    375 So. 2d 1386 (La. 1979) ................................................................. 8

6

*Lake v. Wal-Mart Stores, Inc.*,
7
    582 N.W.2d 231 (Minn. 1998) ........................................................... 8

8

*Messenger v. Gruner + Jahr Printing & Publ'g*,
    706 N.Y.S.2d 52 (N.Y. 2000) ............................................................. 8
9

*Montgomery v. Montgomery*,
10
    60 S.W.3d 524 (Ky. 2001) .................................................................. 8

11

*WJLA-TV v. Levin*,
12
    564 S.E.2d 383 (Va. 2002) ................................................................. 8

13

**STATUTES AND RULES**

14

15 U.S.C. § 1 ................................................................................................ 18

15

Cal. Civ. Code §§ 3344, 3344.1 .................................................................... 8

16

Fla. Stat. § 540.08(4) ..................................................................................... 8

17

Haw. Rev. Stat. § 482P-7(b)(2) ..................................................................... 8

18

765 Ill. Comp. Stat. ....................................................................................... 8

19

Ind. Code Ann. § 32-36-1-1(c) ...................................................................... 8

20

Neb. Rev. Stat. § 20-202(1) ........................................................................... 8

21

Nev. Rev. Stat. § 597.790(2) .......................................................................... 8

22

Ohio Rev. Code Ann. § 2741.02(D)(1) .......................................................... 8

23

Okla. Stat. tit. 12, § 1449(D) ......................................................................... 8

24

42 Pa. Cons. Stat. Ann. § 8316(e)(2)(ii) ........................................................ 8

25

Tenn. Code Ann. § 47-25-1107(a) ................................................................. 8

26

Tex. Prop. Code Ann. § 26.012(a)(3) ............................................................ 8

27

Wash. Rev. Code. Ann. § 63.60.070(2) ......................................................... 8

28

**TABLE OF AUTHORITIES**
(continued)

Page

OTHER AUTHORITIES

11 P. Areeda & H. Hovenkamp, *Antitrust Law* (1991) ........................................................... 14, 19

11 Phillip E. Areeda, *Antitrust Law* (2011) ..................................................................................... 25

Justice & Federal Trade Comm'n, *Horizontal Merger Guidelines* 30 (Aug. 19, 2010) ............... 25

Daniel A. Rascher & Andrew D. Schwarz, *Neither Reasonable nor Necessary:*
   *"Amateurism" in Big-Time College Sports* ............................................................................ 3

Restatement (Third) of Unfair Competition § 46, § 49 (1995) ...................................................... 8

1    Defendant National Collegiate Athletic Association ("NCAA") believes the evidence will

2    show the following at trial.  The NCAA reserves the right at the conclusion of the trial to present

3    formal proposed findings of fact and conclusions of law on these or other issues.

4    **I.**      **INTRODUCTION AND OUTLINE OF TRIAL BRIEF**

5    The Antitrust Plaintiffs ("APs") have alleged a restraint of trade that consists of certain of

6    the NCAA's amateurism rules.  Section II of this brief identifies the rules at issue and briefly

7    explains why the NCAA's member colleges and institutions have adopted them.  Section III

8    explains that, because these rules help to preserve the amateur character of college sports, this

9    Court should uphold them without a full-blown rule of reason analysis.  Section IV explains why,

10   even if this Court holds that a full rule of reason analysis is necessary, the rules also should be

11   upheld for at least three reasons:  (1) APs cannot prove that the rules cause anticompetitive harm

12   in any market; (2) any anticompetitive harm does not substantially outweigh the rules' significant

13   and well-recognized procompetitive benefits; and (3) APs cannot prove that these benefits could

14   be achieved—or that NCAA sports would still be amateur—under a less restrictive alternative.

15   **II.**     **THE NCAA'S RULES**

16   Colleges created the NCAA to help enforce rules that protect the amateur and academic

17   values they have chosen for intercollegiate sports:  "[The] basic purpose of this Association is to

18   maintain intercollegiate athletics as an integral part of the educational program and the athlete as

19   an integral part of the student body and, by so doing, retain a clear line of demarcation between

20   intercollegiate athletics and professional sports."  TX 2340-15.

21   To that end, coordinating themselves through the NCAA, colleges and universities have

22   agreed on several "basic principles" for intercollegiate athletics, including two that are directly

23   relevant here:  (1) "Student-athletes ["SAs"] shall be amateurs in an intercollegiate sport, and their

24   participation should be motivated primarily by education and by the physical, mental and social

25   benefits to be derived," and (2) SAs must be students whose athletic "activities are conducted as

26   an integral part of the [SA's] educational experience."  TX 2340-17, -18.

27   The NCAA's member institutions have adopted a number of rules to further these

28   principles.  According to APs, their claims are directed at only one aspect of these rules:  the rules

that prohibit SAs from being paid for the commercial use of their name, image or likeness ("NIL").  *See* Dkt. No. 999 at 1:18-19 (claims "confined" to "restraint against compensation for commercial use and licensing of SAs' NIL").  Indeed, APs have made clear that they are not challenging the NCAA's rules against SAs being paid in other ways.  *See*, *e.g.*, Dkt. No. 172 at 13:25 ("Yet that scenario—commonly known as "pay-for-play"—is not at issue in this litigation."); *Keller v. NCAA*, Dkt. No. 999 at 1:17-18 (APs are "not advocating salaries for SAs").  Rather, APs have claimed that they are challenging the rules to the extent that they prohibit group licenses of supposed rights of publicity in SAs' NIL.  *See*, *e.g.*, Dkt. No. 651 at 11:16-20, Dkt. No. 819 at 3:17-4:3, 17:7-24, 23:4-24:23 (class certification); Dkt. No. 999 at 8:13-16,  Tr. of Hr'g, Feb. 20, 2014, at 7:8-16 (summary judgment); Dkt. No. 1071 at 7:26-8:6 (pre-trial statement).

Under NCAA rules, an SA is ineligible to participate in intercollegiate athletics if he or she "[a]ccepts any remuneration for or permits the use of his or her name or picture to advertise, recommend or promote directly the sale or use of a commercial product or service of any kind."  Bylaw 12.5.2.1 (TX 2340-85).  According to APs, it is an unlawful restraint of trade to prohibit SAs from being paid for group licenses of supposed rights to use their NIL in (1) live broadcasts of football and men's basketball games, (2) rebroadcasts or other uses of footage of those broadcasts, and (3) college football and men's basketball-themed videogames.  The NCAA will address these allegations at trial as follows.

### III.   THE NCAA'S RULES CAN AND SHOULD BE SUSTAINED FROM ANTITRUST CHALLENGE WITHOUT A FULL-BLOWN RULE OF REASON INQUIRY

The Court has held that the challenged rules must be judged under the rule of reason rather than *per se* analysis.  Dkt. 1025, at 7:14-17.  We discuss the evidence in light of the traditional rule of reason analysis in Part IV, below.  Under controlling law, however, the evidence suffices for the NCAA's rules to be sustained without the need for the entirety of that analysis.

The NCAA is a joint venture.  The Supreme Court has called the NCAA and other sports organizations the "leading example[s]" of "activities [that] can only be carried out jointly" because sports require "rules on which the competitors agreed to create and define the competition to be marketed."  *NCAA v. Bd. of Regents of Univ. of Okla.*, 468 U.S. 85, 101 (1984) (quotations

1   omitted).[1]  APs' expert, Dr. Rascher, agrees that the NCAA is "appropriately described as a joint

2   venture that has, like other joint ventures, certain aspects that must be agreed upon."  Daniel A.

3   Rascher & Andrew D. Schwarz, *Neither Reasonable nor Necessary: "Amateurism" in Big-Time*

4   *College Sports,* Antitrust (Spring 2000).

5          The Supreme Court has held that, where an alleged restraint involves "the core activity of

6   the joint venture itself," there is no need to analyze whether the restraint is reasonably necessary to

7   achieve procompetitive benefits.  *Texaco Inc. v. Dagher*, 547 U.S. 1, 7-8 (2006).  Rather, an

8   agreement of this kind is "likely to survive the Rule of Reason" and can be upheld without

9   "detailed analysis" in the "twinkling of an eye."  *Am. Needle, Inc. v. NFL*, 560 U.S. 183, 203

10   (2010) (citations and internal quotation marks omitted).  *See also Broad. Music, Inc. v. Columbia*

11   *Broad. Sys., Inc.*, 441 U.S. 1, 23 (1979) ("Joint ventures and other cooperative arrangements are

12   . . . not usually unlawful, at least not as price-fixing schemes, where the agreement on price is

13   necessary to market the product at all.").

14          APs are incorrect that the standard is whether eliminating the rules would "extinguish

15   college sports altogether."  Dkt. No. 172 at 25.   As the Supreme Court has made clear, a measure

16   that creates the unique "character" of a product "enables a product to be marketed which might

17   otherwise be unavailable."  *Bd. of Regents*, 468 U.S. at 102; *see also Broad. Music, Inc.*, 441 U.S.

18   at 23-23 (upholding "blanket license" that created a "different product" with "unique

19   characteristics").  If the members' agreement *defines* the joint venture's product, then eliminating

20   the agreement would change the product from the one the venture intended to produce.

21          Accordingly, rather than conduct a "detailed analysis" of the effect of NCAA rules on

22   competition, courts have first asked whether the rules at issue define the NCAA's members'

23   product of intercollegiate athletics.  The courts are uniform on the controlling legal standard in this

24   context:  "when an NCAA bylaw is clearly meant to help maintain the 'revered tradition of

25

26   ───────────────

     [1] This reasoning was essential to the Court's holding that the NCAA's television plan was not

27   unlawful *per se*:  "Thus, despite the fact that this case involves restraints on the ability of member
     institutions to compete in terms of price and output, a fair evaluation of their competitive character
     requires consideration of the NCAA's justifications for the restraints."  *Id.* at 103.

28

amateurism in college sports' or the 'preservation of the student-athlete in higher education,' the bylaw will be presumed procompetitive, since we must give the NCAA 'ample latitude to play that role.'" *Agnew v. NCAA*, 683 F.3d 328, 342-43 (7th Cir. 2012) (quoting *Bd. of Regents*, 468 U.S. at 120).[2] "[T]he first—and possibly only—question to be answered when NCAA bylaws are challenged is whether the NCAA regulations at issue" fit this description. *Id.* at 342; *see also id.* at 343 n.7 ("One should not mistake the analysis we discuss here as requiring proof of the procompetitive nature of the NCAA's 'no payment' rules on a case-by-case basis. This analysis involves a determination of whether a rule is, on its face, supportive of the 'no payment' and 'student-athlete' models, not whether 'no payment' rules are themselves procompetitive—under *Board of Regents*, they clearly are.").

The NCAA's witnesses will explain that the rules at issue here—the rules prohibiting payments to SAs for their NIL—are designed to maintain the NCAA's core product of amateur athletics. These and other rules are promulgated by an entire Amateurism Cabinet, which is comprised of college administrators and educators and guided by the principle that "student participation in intercollegiate athletics is an avocation, and student-athletes should be protected from exploitation by professional and commercial enterprises." TX 3152-1.

Undisputed objective evidence will show that "the definitions of amateurism that have been adopted by other organizations"—the standard that APs say must be used to assess the NCAA's defense—uniformly support the NCAA's position. Dkt. No. 896-5 (Noll Merits Report) at 134. Both parties' experts have surveyed amateur sports. None of them has found a single amateur sport in which an amateur athlete can be—or has been—paid a portion of licensing revenues earned from the broadcast of a game in which he appears. No amateur athlete in any sport has been paid for a "group license" for supposed rights to show his image in a live broadcast of his sport. SAs are asking the Court for a license to be the first self-described "amateur" athletes

---

[2] *Accord Law v. NCAA*, 134 F.3d 1010, 1022 n.14 (10th Cir. 1998); *Banks v. NCAA*, 977 F.2d 1081, 1089-90 (7th Cir. 1992); *McCormack v. NCAA*, 845 F.2d 1338, 1344-45 (5th Cir. 1988); *Metro. Intercollegiate Basketball Ass'n v. NCAA*, 339 F. Supp. 2d 545, 550 (S.D.N.Y. 2004); *Gaines v. NCAA*, 746 F. Supp. 738, 743–45 (M.D. Tenn. 1990); *Justice v. NCAA*, 577 F. Supp. 356, 383 (D. Ariz. 1983).

1   in history that would be able to seek such payments.  This is clear evidence that the challenged

2   rules against payments for SAs' NIL are "meant to help maintain the revered tradition of

3   amateurism in college sports" and "the preservation of the student-athlete in higher education."

4   *Agnew*, 683 F.3d at 342 (internal quotation marks omitted).  And it suffices to dispense with APs'

5   claims that SAs are not amateurs to begin with or that NCAA rule changes permitting greater

6   *educational* support for SAs preclude NCAA sports from being amateur.  Dkt. No. 172 at 12.

7          APs' "evidence," in contrast, will be purported "expert" opinions of Roger Noll and Ellen

8   Staurowsky that the NCAA's collegiate model should be transformed to the type of "amateur"

9   model they have advocated for in their writings and that APs advocate in this case.  The law does

10  not allow this result.

11         The law is that "the NCAA plays a vital role in enabling college football to preserve its

12  character, and as a result enables a product to be marketed which might otherwise be unavailable.

13  In performing this role, its actions widen consumer choice—not only the choices available to

14  sports fans but also those available to athletes—and hence can be viewed as procompetitive."  *Bd.*

15  *of Regents*, 468 U.S. at 102.  The antitrust laws do not require the NCAA's members to take this

16  choice off the market by substituting APs' model of college sports for their own.  *See Glen Holly*

17  *Entm't, Inc. v. Tektronix Inc.*, 343 F.3d 1000, 1014, *amended*, 352 F.3d 367 (9th Cir. 2003)

18  (antitrust "laws protect customers from harm directly related to the unlawful removal of a

19  competitive product from the market").  Rather, "[t]he NCAA plays a critical role in the

20  maintenance of a revered tradition of amateurism in college sports.  *There can be no question but*

21  *that it needs ample latitude to play that role*."  *Bd. of Regents*, 468 U.S. at 120 (emphasis added).

22         The antitrust laws permit the NCAA's members to define their own product and protect

23  consumers' freedom to choose that product over others.[3]  APs cannot win by arguing that the

24

---

25  [3] *See, e.g.*, *Volvo Trucks N. Am., Inc. v. Reeder-Simco GMC, Inc.*, 546 U.S. 164, 180 (2006)
    ("Interbrand competition, our opinions affirm, is the primary concern of antitrust law.") (internal

26  quotation marks omitted); *Pool Water Prods. v. Olin Corp.*, 258 F.3d 1024, 1034 (9th Cir. 2001)
    ("It is well established that the antitrust laws are only intended to preserve competition for the

27  benefit of consumers.") (internal quotation marks and citation omitted); *Nat'l Soc. of Prof'l Eng'rs*
    *v. United States*, 435 U.S. 679, 695 (1978) ("The assumption that competition is the best method

28  of allocating resources in a free market recognizes that all elements of a bargain . . . are favorably

1   NCAA should change its product—which millions of Americans enjoy.  APs are not "entitled to

2   pre-empt the working of the market by deciding for itself that its customers do not need that which

3   they demand." *FTC v. Indiana Fed'n of Dentists*, 476 U.S. 447, 462 (1986); *see also United*

4   *States v. Syufy Enters.*, 903 F.2d 659, 668 (9th Cir. 1990) ("While the successful competitor

5   should not be raised above the law, neither should he be held down by law.").

6   **IV.      THE CHALLENGED RULES ALSO SURVIVE RULE OF REASON ANALYSIS**

7           No full rule of reason analysis is necessary.  But even it were, APs cannot prevail.  APs

8   have the "initial burden of showing that the restraint produces 'significant anticompetitive effects'

9   within a 'relevant market.'"  *Tanaka v. Univ. of S. Cal.*, 252 F.3d 1059, 1063 (9th Cir. 2001)

10  (citing *Hairston v. Pac 10 Conference*, 101 F.3d 1315, 1319 (9th Cir. 1996)).  Only if APs make

11  that showing (which they cannot do), does the NCAA have the burden to show that its rules have

12  procompetitive benefits.  *Id.*  APs must then show that these procompetitive benefits "'can be

13  achieved in a substantially less restrictive manner.'"  *Id.*  Even if proven, this alternative is merely

14  "a factor in determining the reasonableness" of the rules.  *Los Angeles Mem'l Coliseum Comm'n*

15  *v. Nat'l Football League*, 726 F.2d 1381, 1396 (9th Cir. 1984).  APs' ultimate burden is to prove

16  that the rules cause anticompetitive effects that substantially outweigh their procompetitive

17  benefits.  Antitrust Law Developments (Seventh) at 62.

18      **A.      APs Will Fail to Show that the Challenged Rules Produce Anticompetitive
                Effects in a Relevant Market**

19

20              **1.      APs Will Fail to Prove the Existence of Either Alleged Market**

21          APs must first show "that 'a relevant market' exists."  *Newcal Indus., Inc. v. Ikon Office*

22  *Solution*, 513 F.3d 1038, 1044 (9th Cir. 2008).  This "is an absolutely essential element of a rule of

23  reason case."  *Los Angeles Mem'l Coliseum Comm'n*, 726 F.2d at 1391; *see also Gough v.*

24  *Rossmoor Corp.*, 585 F.2d 381, 389 (9th Cir. 1978).

25

26  ─────────────────

27  affected by the free opportunity to select among alternative offers."); *Helix Milling Co. v.*
    *Terminal Flour Mills Co.*, 523 F.2d 1317, 1320 (9th Cir. 1975) ("A major purpose of s 1 of the
    Sherman Act is to foster competition and to protect the ability of competitors to enter markets.").

28

       (a)    *The College Education Market for Division I/FBS Men's Basketball and Football SAs*

APs first allege there is an "education" market for SAs who play men's basketball and football. At times, APs have contended that SAs are "buyers" of educational services from colleges and universities. Yet APs admit that this alleged market is *not* a "market for the education of college athletes" at all but rather a market "in which Division I colleges and universities compete to recruit" SAs to "to *play football or basketball.*" *Id.* at 19 (emphasis added); *id.* at 9 (same). In other words, in this alleged market, SAs are supposedly selling their athletic talents to colleges and universities.

At trial, the NCAA's experts will explain that APs' experts have not conducted the proper quantitative analysis of either of these alleged markets, which is required. *See*, *e.g.*, *Reifert v. S. Cent. Wisconsin MLS Corp.*, 450 F.3d 312, 318 (7th Cir. 2006) ("Actual data and a reasonable analysis are necessary to demonstrate that a product or service is a good substitute for another."). *Cf. Brooke Grp. Ltd. v. Brown & Williamson Tobacco Corp.*, 509 U.S. 209, 242 (1993) ("Expert testimony is useful as a guide to interpreting market facts, but it is not a substitute for them."). [4] They will further explain that APs' experts have improperly defined the market in terms of SAs' preferences. *See Newcal Indus., Inc.*, 513 F.3d at 1045 ("The consumers do not define the boundaries of the market; the products or producers do."). [5]

       (b)    *APs Will Fail to Prove the Existence of a "Group Licensing" Market for the Use of their NIL in Game Broadcasts*

---

[4] As set forth in the NCAA's motion for reconsideration of this Court's summary judgment order, any "education" market extends to prospective students other than football and men's basketball SAs. *See* Dkt. No. 1033 at 4-9. The NCAA's experts should be permitted to offer testimony to this effect on what is a quintessential issue of fact to be decided on a full record at trial. *See Am. Ad Mgmt., Inc. v. GTE Corp.*, 92 F.3d 781, 790 (9th Cir. 1996); *Oltz v. St. Peter's Cmty. Hosp.*, 861 F.2d 1440, 1446 (9th Cir. 1988).

[5] Judge Easterbrook has explained well why consumer preference for a particular version of a product cannot define the produce market: "Suppose that a well-conducted survey shows that vanilla is people's favorite flavor of ice cream, and by a large margin. It would not follow that vanilla ice cream is a separate market, because if its price rises any other ice cream producer could make more vanilla and less chocolate or pistachio." *Menasha Corp. v. News Am. Mktg. In-Store, Inc.*, 354 F.3d 661, 665 (7th Cir. 2004).

(i)     There is No "Group License" Market for NIL Rights in Broadcasts, Because There Are No Such Rights

The summary judgment order holds that "to establish the existence of a 'group licensing' market, [APs must show that, absent the NCAA's restraint on [SA] pay, [SAs] would have cognizable rights of publicity in the use of their [NIL] in live game broadcasts and archival game footage." Dkt. 1025 at 15:11-16. APs cannot make this showing.

No statute or court decision in any state has ever recognized a right-of-publicity claim by a participant in a sporting event against a broadcaster for the use of his NIL in a live broadcast of the game. There is simply no legal authority whatsoever for such a claim. To the contrary, numerous state right-of-publicity statutes, including California's, expressly preclude right-of-publicity claims for the use of one's NIL in the broadcast of a sporting event.[6] And numerous cases have so held under state common law.[7] Thus, there is no reason why any broadcaster would purchase any group license for the use of SAs' NIL, and APs cannot establish a "group licensing" market.

APs will also claim, as they have before, that the existence of exclusive broadcast contracts shows that there could be a group license market for the rights to use SAs' NILs. That is wrong. The law has long recognized that a team, "by reason of its creation of the game, its control of the park, and its restriction of the dissemination of news therefrom, has a property right in such news,

---

[6] Cal. Civ. Code §§ 3344, 3344.1; Fla. Stat. § 540.08(4); Haw. Rev. Stat. § 482P-7(b)(2); 765 Ill. Comp. Stat. 1075/35(b)(2); Ind. Code Ann. § 32-36-1-1(c); Neb. Rev. Stat. § 20-202(1); Nev. Rev. Stat. § 597.790(2); Ohio Rev. Code Ann. § 2741.02(D)(1); Okla. Stat. tit. 12, § 1449(D); 42 Pa. Cons. Stat. Ann. § 8316(e)(2)(ii); Tenn. Code Ann. § 47-25-1107(a); Tex. Prop. Code Ann. § 26.012(a)(3); Wash. Rev. Code. Ann. § 63.60.070(2); *see also NFL v. Alley, Inc.*, 624 F. Supp. 6, 9-10 (S.D. Fla. 1983) (live broadcasts of Miami Dolphins football games were matters of "legitimate public interest" under the Florida's right of publicity statute, Fla. Stat. § 540.08(4)).

[7] *Toffoloni v. LFP Publ'g Grp.*, LLC, 572 F.3d 1201, 1208 (11th Cir. 2009) (Georgia); *C.B.C. Distribution & Mktg., Inc. v. Major League Baseball Advanced Media, L.P.*, 505 F.3d 818, 823-24 (8th Cir. 2007) (Missouri); *Allison v. Vintage Sports Plaques*, 136 F.3d 1443, 1446 (11th Cir. 1998) (Alabama); *Matthews v. Wozencraft*, 15 F.3d 432, 439 (5th Cir. 1994) (Texas); *Pooley v. Nat'l Hole-In-One Ass'n*, 89 F. Supp. 2d 1108, 1113 (D. Ariz. 2000); *Mahaffey v. Official Detective Stories, Inc.*, 210 F. Supp. 251, 253 (W.D. La. 1962); *WJLA-TV v. Levin*, 564 S.E.2d 383, 394-95 (Va. 2002); *Montgomery v. Montgomery*, 60 S.W.3d 524, 529 (Ky. 2001); *Messenger v. Gruner + Jahr Printing & Publ'g*, 706 N.Y.S.2d 52, 54-55 (N.Y. 2000); *Lake v. Wal-Mart Stores, Inc.*, 582 N.W.2d 231, 235-36 (Minn. 1998); *J.C. v. WALA-TV, Inc.*, 675 So. 2d 360, 362 (Ala. 1996); *Jaubert v. Crowley Post-Signal, Inc.*, 375 So. 2d 1386, 1388-90 (La. 1979); *Battaglieri v. Mackinac Ctr. For Pub. Policy*, 680 N.W.2d 915, 919 (Mich. Ct. App. 2004); *see also* Restatement (Third) of Unfair Competition § 46, § 49 (1995).

DEFENDANT'S MOTIONS *IN LIMINE*

1    and the right to control the use thereof for a reasonable time following the games." *Pittsburgh*

2    *Athletic Co. v. KQV Broad. Co.*, 24 F. Supp. 490, 492 (W.D. Pa. 1938); *see also Wis.*

3    *Interscholastic Athletic Ass'n v. Gannett Co., Inc.*, 658 F.3d 614, 624 (7th Cir. 2011) (*Zacchini v.*

4    *Scripps-Howard Broad. Co.*, 433 U.S. 562 (1977) "makes clear that the *producer* of entertainment

5    is entitled to charge a fee in exchange for consent to broadcast") (emphasis added); *id.* at 628

6    (noting that "*the producer* of the entertainment—the NFL, FIFA, or the NCAA—normally signs a

7    lucrative contract for exclusive, or semi-exclusive, broadcast rights for the performance")

8    (emphasis added).[8]  None of these cases held that a participant in a sporting event has a right to be

9    compensated because his image appears in a broadcast of the event.

10         SAs do not have that right because they do not create college football or basketball games

11   or control the stadiums where they are played.  Their colleges and universities—either among

12   themselves, or, in the case of the Division I Men's Basketball Championship, through the

13   NCAA—do.  Take, for example, the Cal-Stanford football game, which has been played 116 times

14   since 1892.  Cal and Stanford have scheduled this game long before any of the SAs who will play

15   in it have enrolled at either school.  Cal and Stanford decide who can play in the game, march in

16   the band, be part of the cheerleading squad, and buy tickets to enter the stadium.  Cal and Stanford

17   funded the training and equipment for the football teams, built the stadium where the game will be

18   played and contracted for security to control access to it.  As such, as a very practical matter, Cal

19   and Stanford have the power to keep every network out other than ABC and charge ABC for the

20   privilege.  *See Pittsburgh Athletic Co.*, 24 F. Supp. at 492.

21         The SAs do not.  They are only in the stadium at all because their colleges and universities

22   have agreed to let them play, just as they have agreed to let the band march, the cheerleaders

23   cheer, and the fans with tickets sit in the stands.  SAs cannot own the right to broadcast their

24

25

---

26   [8] That was the basis of Zacchini's claim against the network:  he created and owned his act.  His
     "professional property" had been appropriated.  433 U.S. at 569.  Ohio state law's protection of
27   Zacchini's property "provide[d] an economic incentive for him to make the investment required *to
     produce* a performance of interest to the public."  *Id.* at 576 (emphasis added).

28

1    games when they need the same permission that broadcasters do to be in the stadium at all.[9]

2    Rather, SAs are part of the game.  That is why their images are part of the broadcast—not because

3    any supposed rights of publicity in those images have been transferred to the broadcaster.  Indeed,

4    APs have no evidence that any such *rights* are being transferred.  Instead, the evidence will show

5    that what is being transferred is the event owner's right to broadcast the event.  To be sure, the

6    event consists of players—and a band, cheerleaders and fans—whose images will appear when the

7    event is broadcast.  But that says nothing about whether the players have enforceable rights of

8    publicity to control this appearance of their image in the same way that they can control

9    commercial uses.  No court has ever recognized such rights.

10          APs also argue that the use of broadcast revenues to fund professional players' contracts

11   shows that their purported NIL rights could be licensed on a group basis.  The evidence will show

12   that APs are wrong.  Professional athletes are paid shares of broadcast revenue as payment for

13   their labor; they do not license their NIL for use in broadcasts of their games.  Indeed, both

14   parties' experts agree that this revenue share is paid in the form of salaries for *playing* in the

15   game—which APs have expressly said they are not seeking—and not for the use of players'

16   *images in the broadcast* of the game.

17          In sum, the rights that SAs claim to have been restrained from licensing do not exist.  In

18   that case, APs' claims fail because an antitrust plaintiff cannot prove antitrust injury from a

19   supposed restriction on licensing intellectual property rights that do not exist.  *See In re Hayes*

20   *Microcomputer Prods., Inc. Patent Litig.*, No. C 84 4882 SC, 1989 WL 252349 (N.D. Cal. Mar.

21   22, 1989) ("a plaintiff does not allege an antitrust injury by claiming damages stemming from an

22

23   _____

     [9] Indeed, only where individual athletes act as co-entrepreneurs with promoters or other persons
     who organize a sporting event do they share in ownership of rights to broadcast the event.  *See*
24   *Ettore v. Philco Television Broad. Corp.*, 229 F.2d 481, 487 (3d Cir. 1956) ("Where a professional
     performer is involved, there seems to be a recognition of a kind of property right in the performer
25   to the product of his services.  The theory may be summed up as follows:  The performer, as a
     means of livelihood, contracts for his services with an entrepreneur.").  Boxing is a classic
26   example:  the fighters have ownership rights in the events because each bout is a unique and
     discrete event, created and organized separately by the fighters themselves.  *See id.*; *see also*
27   *Sharkey v. Nat'l Broad. Co., Inc.*, 93 F. Supp. 986 (S.D.N.Y. 1950).  That is not the case in college
     football and basketball games.

28

1   inability to license, what was later determined to be, an invalid patent"); *see also Modesto*

2   *Irrigation Dist. v. Pac. Gas & Elec. Co.*, 309 F. Supp. 2d 1156, 1169-70 (N.D. Cal. 2004) *aff'd*

3   *sub nom. Modesto Irrigation Dist.(MID) v. Pac. Gas & Elec. Co.*, 158 F. App'x 807 (9th Cir.

4   2005) (antitrust plaintiff "cannot prove it sustained cognizable antitrust injury" if it does not

5   possess the "legal right" to engage in the business allegedly restrained).  Indeed, there is simply no

6   authority for the proposition that an antitrust plaintiff can prevail on a claim alleging a restraint on

7   a market for property that the law does not recognize.  In order to show that there is a market to

8   use SAs' NIL in live broadcasts, APs must show that the law recognizes a property right in such

9   use.  No legal authority does so.  Accordingly, APs' claims fail as a matter of law.[10]

10        (ii)     APs' Argument that the Existence of the Right Does Not
      Matter for Antitrust Purposes is Wrong

11

12        In its order declining to certify the summary judgment decision for interlocutory appeal,

13   the Court suggested that "some broadcasters might have sought to purchase such group licenses,

14   regardless of whether the First Amendment (or any other law) actually protects them from right-

15   of-publicity liability, simply as a precaution to avoid potential liability in the face of uncertain

16   legal precedents."  Dkt. 1091 at 3:26-4:2.  Even setting aside that the legal precedents are clear,

17   not uncertain, this is incorrect as a matter of law:  to prove a market for licensing their NIL for live

18   broadcasts, APs must show that the law gives them a property right to control the appearance of

19   their images in broadcasts.  *Modesto Irrigation Dist. v. Pac. Gas & Elec. Co.*, 309 F. Supp. 2d at

20   1169-70; *In re Hayes Microcomputer Prods., Inc. Patent Litig.*, 1989 WL 252349.

21        Nevertheless, APs cannot obtain an injunction on this alternative basis, either.  APs can

22   only obtain an injunction to prevent "threatened antitrust injury."  *Somers v. Apple, Inc.*, 729 F.3d

23   _____

[10] In its motion for summary judgment and for certification for interlocutory appeal of the Court's
order resolving that motion, the NCAA explained that APs' claims fail because the First
Amendment precludes right-of-publicity claims for the use of one's image in the live broadcast of
a sporting event.  *See* Dkt. No. 926 at 3-6; Dkt. No. 978 at 1-6; Dkt. No. 1032; Dkt. No. 1056.
This remains the NCAA's position, but in light of the Court's rulings, the NCAA will not repeat it
other than to note that APs will be unable to carry their burden of demonstrating that the speech at
issue promotes a commercial transaction and/or that an identifiable and sufficiently important state
interest justifies the burden that their theory of recovery would impose on that speech.

24

25

26

27

28

1   953, 967 (9th Cir. 2013); *see also Cargill, Inc. v. Monfort of Colo., Inc.*, 479 U.S. 104, 112 (1986).

2   This threatened injury cannot be speculative.  *See, e.g., Howard Hess Dental Labs. Inc. v.*

3   *Dentsply Int'l, Inc.*, 602 F.3d 237, 251 (3d Cir. 2010) ("In a nutshell, the various examples of

4   alleged injury the Plaintiffs have brought to our attention are purely speculative and thus are

5   insufficient to justify an award of injunctive relief.").

6          APs must also prove antitrust standing.  *See Cargill, Inc.*, 479 U.S. at 112.  Antitrust injury

7   is only one factor in standing; another is "the speculative measure of the harm."  *Am. Ad Mgmt.,*

8   *Inc. v. Gen. Tel. Co. of Cal.*, 190 F.3d 1051, 1054 (9th Cir. 1999) (quotation marks omitted).  APs

9   cannot obtain an injunction to remedy purely speculative antitrust injury.  *See In re New Motor*

10  *Vehicles Canadian Exp. Antitrust Litig.*, 522 F.3d 6, 14-15 (1st Cir. 2008) (affirming dismissal of

11  antitrust claim for injunctive relief to remedy "speculative" harm); *Sprint Nextel Corp. v. AT & T*

12  *Inc.*, 821 F. Supp. 2d 308, 317 (D.D.C. 2011) (antitrust laws do "not authorize suits by those

13  whose allegations of threatened injury amount to little more than conjecture") (dismissing claim

14  for injunctive relief); *Broadcom Corp. v. Qualcomm Inc.*, 501 F.3d 297, 321 (3d Cir. 2007) ("The

15  prospective harm to competition must not, however, be speculative.").  *Cf. Brooke Grp. Ltd.*, 509

16  U.S. at 230-32 (rejecting theory of antitrust injury that "depends upon a complex chain of cause

17  and effect").

18         Courts reject theories of antitrust injury that are "based on an attenuated, speculative chain

19  of events" and that "rel[y] on numerous independent actors."  *Nat'l ATM Council, Inc. v. Visa Inc.*,

20  No. 1:11-CV-01803 (ABJ), --- F. Supp. 2d ---, 2013 WL 6671660, at *6-7 (D.D.C. Dec. 19, 2013)

21  (dismissing theory that without "access fee rules, ATM operators would offer consumers

22  differentiated access fees at the point of transaction, consumers would then demand multi-bug PIN

23  cards from their banks, their banks would provide these cards, and the market for network services

24  would become more competitive"); *see also Toscano v. PGA Tour, Inc.*, 201 F. Supp. 2d 1106,

25  1117-18 (E.D. Cal. 2002) (dismissing antitrust claims that "depend on a multitude of speculative

26  intervening events" including new "formation of competing senior professional golf tours in the

27  absence of the media rights and conflicting events rules").  *Cf. Realnetworks, Inc. v. DVD Copy*

28  *Control Ass'n, Inc.*, No. C 08-4548 MHP, 2010 WL 145098, at *5 (N.D. Cal. Jan. 8, 2010) ("Any

1   assertion by Real that the Studios' refusal to license the copying of DVDs caused an antitrust

2   injury apart . . . is contradicted by Real's assertions that it believed no license was necessary.").

3     APs' theory that broadcasters would have licensed, or will license, NIL rights in broadcasts

4   in the absence of any legal authority recognizing such rights is exactly the type of attenuated,

5   speculative theory of antitrust injury that the law does not allow.  The evidence will show that

6   broadcasters have never purchased group licenses of SAs' NIL rights from colleges, universities,

7   conferences and/or the NCAA and that no NIL *rights* of any SAs are being transferred to networks

8   when the NCAA, conferences or colleges license broadcast rights.  This is why broadcasters

9   negotiating licenses to televise team sporting events—and their experienced counsel—never even

10  mention whether the teams or leagues who own the rights to broadcast these events have obtained

11  these supposedly essential NIL rights from the players.  And that is why the licenses themselves

12  do not grant these rights to the broadcasters.  *See*, *e.g.*, TX 2102, 2110, 2118, 2117, 2119, 2147,

13  2151, 2226, 3028, 3029.

14    As such, there is no evidence that broadcasters who purchased these licenses actually

15  exchange value for the SAs' supposed NIL rights.  APs will point to a few license agreements that

16  refer to the use of SAs' NIL in live broadcasts as evidence that such NIL rights actually exist and

17  are transferred.  But APs will have no evidence that any broadcaster believed that such a transfer

18  of rights was occurring or necessary.  And APs will have no evidence—none—that any portion of

19  a license fee was paid for the supposed "right," or that any such provision affected the value of

20  any license in any way.  The record evidence, in fact, will show the opposite.

21     *(c)* *APs Will Fail to Prove the Existence of a "Group Licensing"*
          *Market for Footage or Videogames*

22

23    APs will not prove group licensing markets for footage or videogames, either.  With

    respect to footage, there can be no market for group licenses of SAs' NIL for promotional

24  purposes because state right-of-publicity laws do not recognize a cause of action for non-

25  commercial uses which are also, as this Court has recognized, protected by the First Amendment.

26  *See* Dkt. No. 1025 at 25-26.  As to commercial uses, as explained in Part IV.A.3 below, NCAA

27  rules prohibit licensing footage of current SAs for commercial purposes, so there is no market for

28

1    any rights that APs claim to have in such footage.

2         With respect to EA's videogames, there is no market for group licenses to use SAs' NIL

3    because the games did not use SAs' real names or faces and/or were a transformative use protected

4    by the First Amendment.  As such, there were no rights to license.  And because the NCAA and its

5    member institutions will not license the trademarks EA needs to make games with SAs' real

6    names and faces, there is no market for group licenses of SAs' NIL for those games, either.

7              **2.      APs Will Fail to Prove Anticompetitive Effects in Any Relevant Market**

8         APs will not prove—as they must—any substantial anticompetitive effects in any market

9    in which the NCAA has market power.  *See Newcal Indus., Inc.*, 513 F.3d at 1044 (antitrust

10   plaintiff must prove market power in rule of reason case); *Gough*, 585 F.2d at 390 (same).[11]  APs

11   will not present any evidence that the rules have reduced output for consumers, "which is a sound

12   general measure of anti-competitive effect," 11 P. Areeda & H. Hovenkamp, *Antitrust Law* §

13   1503(b), at 394 (1991).  Indeed, "[t]he core question in antitrust is output.  Unless a contract

14   reduces output in some market, to the detriment of consumers, there is no antitrust problem."

15   *Chicago Prof'l Sports Ltd. P'ship v. Nat'l Basketball Ass'n*, 95 F.3d 593, 597 (7th Cir. 1996).[12]

16   The evidence will reveal all four of Dr. Noll's theories of anticompetitive effects as flawed.

17

18   _____

19   [11] *See also Eastern Food Servs., Inc. v. Pontifical Catholic Univ. Servs. Ass'n, Inc.*, 357 F.3d 1, 5
     (1st Cir. 2004) ("Virtually always, anticompetitive effects under the rule of reason require that the
20   arrangement or action in question create or enhance market power."); *United States v. Visa U.S.A.,
     Inc.*, 344 F.3d 229, 238 (2d Cir. 2003) (plaintiff "must demonstrate that the defendant conspirators
21   have 'market power' in a particular market"); *L.A.P.D. Inc. v. Gen. Elec. Corp.*, 132 F.3d 402, 405
     (7th Cir. 1997) ("proof of market power is essential; without it, any case under the Rule of Reason
22   collapses").

23   [12] *See also Menasha Corp. v. News Am. Mktg. In-Store, Inc.*, 354 F.3d 661, 663 (7th Cir. 2004)
     (stating that "lower output and the associated welfare losses" are what "matter under the federal
24   antitrust laws"); *L.A.P.D. Inc.*, 132 F.3d at 404 ("Antitrust law is designed to protect consumers
     from the higher prices—and society from the reduction in allocative efficiency—that occurs when
25   firms with market power curtail output."); *Rebel Oil Co., Inc. v. Atl. Richfield Co.*, 51 F.3d 1421,
     1433-1434 & n.4 (9th Cir. 1995) ("When a firm with market power cuts output to increase prices,
26   price exceeds marginal cost.  This causes a loss to society of all that additional output which the
     firm could produce by lowering its price to marginal cost."); *LucasArts Entm't Co. v. Humongous
27   Entm't Co.*, 870 F. Supp. 285, 289 (N.D. Cal. 1993) ("Limitations imposed by the antitrust laws
     are thought to improve consumer welfare because they force firms to increase output from
28   monopolistic to competitive levels.").

1    *First*, Dr. Noll contends that but for the NCAA's rules, SAs would be paid cash for the use

2    of their NIL, which they are not paid today.  That is not an "injury of the type the antitrust laws

3    were intended to prevent and that flows from that which makes defendants' acts unlawful." *Atl.*

4    *Richfield Co. v. USA Petroleum Co.*, 495 U.S. 328, 334 (1990) (quotation marks omitted).  APs

5    have no evidence of any reduction in output or choice—or any increase in price—for colleges,

6    universities or fans.  Quite the opposite.  As a result of continued extraordinary demand for NCAA

7    sports and the advent of new television technologies, there are more live broadcasts and

8    rebroadcasts of college football and basketball than ever before.  "Where the defendant's conduct

9    harms the plaintiff without adversely affecting competition generally, there is no antitrust injury."

10   *Paladin Associates, Inc. v. Montana Power Co.*, 328 F.3d 1145, 1158 (9th Cir. 2003).

11   *Second*, Dr. Noll contends that instead of paying SAs in cash for the use of their NIL,

12   colleges and universities have supposedly spent the money on coaches, facilities and other

13   benefits, which he says is an inefficient way to recruit.  However, amenities designed to benefit

14   SAs make no sense as a measure of anticompetitive harm.  *See Somers*, 729 F.3d at 963 ("There

15   can be no antitrust injury if the plaintiff stands to gain from the alleged unlawful conduct.")

16   (quotation marks omitted).  The Court will hear testimony about the benefits that SAs have

17   received from their coaches.  Regardless, the NCAA's experts will explain that there is no

18   evidence that increased spending on coaching salaries would have been paid to SAs instead.  And

19   university administrators will testify that most major facilities projects are funded by debt or

20   donations which could not be raised to finance cash payments to SAs.

21   *Third*, Dr. Noll claims that some SAs have declined scholarships or left college early

22   because they could not obtain additional compensation to pay for the indirect costs of college not

23   covered by their scholarships.  However, Dr. Noll's method for proving this effect is pure

24   speculation.  If Dr. Noll cannot find any information about why an SA with scholarship offers did

25   not appear or stopped appearing on a college football or basketball roster, he simply assumes that

26   the explanation is that college was too expensive.  This reliance upon assertion rather than analysis

27   confirms APs' dearth of evidence that the NCAA's rules have limited output.

28

1    *Fourth*, the only products whose output Dr. Noll claims have been reduced are college-

2    themed videogames with SAs' real names and faces.[13]   As to these products, however, Dr. Noll

3    has not provided any economic analysis to determine whether the market is for college sports

4    videogames, sports videogames, or all videogames.  *See*, *e.g.*, *Reifert*, 450 F.3d at 318.  The

5    answer matters, because EA's college-themed videogames are only a fraction of the videogame

6    market.  Since APs will not prove that the relevant market is equally limited, they will not be able

7    to prove market power or significant anticompetitive effects.  *See*, *e.g.*, *United States v. Microsoft*

8    *Corp.*, 253 F.3d 34, 70 (D.C. Cir. 2001) (noting, in exclusive dealing case, foreclosure of "roughly

9    40% or 50% share usually required in order to establish a § 1 violation"); *Bepco, Inc. v. Allied-*

10   *Signal, Inc.*, 106 F. Supp. 2d 814, 828 (M.D.N.C. 2000) (foreclosure of 18.5% or 21.5% of

11   relevant market "fall[s] far short of any value presumed to be substantial").

12   **3.      The Rules Do Not Restrain Former SAs from Licensing their NIL**

13   APs contend that the NCAA has restrained both current *and* former SAs from entering into

14   group licenses for the use of their NIL.  As to former SAs, the alleged restraint can only apply to

15   licenses for the use of SAs' NIL in rebroadcasts or other non-live uses of game footage because,

16   by definition, live broadcasts involve only *current* SAs.  There is no restraint on former SAs.

17   NCAA bylaws have no force against SAs who are no longer eligible to participate in

18   NCAA sports.  APs will have no evidence to the contrary on this point.  Instead, APs will point to

19   an eligibility form that they contend SAs are required to sign in order to participate in NCAA

20   sports.  APs' theory appears to be that NCAA rules require them to sign a form giving up their

21   NIL rights after college in order to play during college and these rights "have *already* been sold"

22   when SAs graduate.  Dkt. No. 172 at 6.

23   No evidence at trial will support this theory.  The evidence will show that the only use the

24   NCAA makes of SA NILs is to "generally promote NCAA championships or other NCAA events,

25   activities or programs."  TX 2240-4.  That is all.  As relevant here, that applies only to promoting

26

27   _____
     [13] APs argue that the "NCAA would still sell jerseys tethered to actual players," but do not allege a
     market for any group licenses of NIL for jerseys.  Dkt. No. 172 at 20.

28

one event—the Division I Men's Basketball Championship.  Otherwise, the NCAA has not

obtained, does not own and does not license the right to use the NIL of any SAs.  The NCAA

owns the copyrights to footage of the Championship and licenses that footage to third-parties for

other purposes but it does not purport to license the use of SAs' NILs for those purposes.

Former SAs have full ownership of their NILs and are free to take legal action against

unauthorized uses.  Named APs will testify that they have licensed their NIL after college and that

the NCAA did nothing to try and stop them.  Further, the NCAA's experts will explain that the

licensing agencies' files contain records of hundreds of licenses for former SAs.  APs cannot and

will not explain how to reconcile this testimony and evidence with their claim that the NCAA

forced them to give up and then sold their NIL rights, leaving them nothing to license.

To the contrary, the NCAA warns third-parties at every turn that they need former SAs'

consent to use their NIL.  This is an explicit term of the NCAA's licenses for its copyrighted

footage, *see* TX 3053-2, and the NCAA's licensing guidelines for its Corporate Champions and

for broadcast networks such as CBS and ESPN.[14]  The NCAA repeatedly informs other third-

parties of the same restriction.[15]  APs will fail to prove that the NCAA restrains former SAs.

### 4. The Challenged Rules Are Not Commercial Activity Subject to the Sherman Act

Evidence that the NCAA does not license SAs' NIL for commercial advantage will also

establish that the NCAA's rules are "not designed to generate profits in a commercial activity but

---

[14] *See* TX 3190-28 ("Photographic, video or other graphic individual images of [SAs] (even if only [SA] body parts; e.g., hands or feet) may be used for commercial purposes **only** after the [SA] has completed his or athletics eligibility and **upon receipt of consent from the individual pictured**.") (emphasis added); TX 3009-0042, -43 ("In _all_ instances, it will be the responsibility of the advertiser to obtain prior written consent of any individuals appearing in an advertisement or promotion.") (emphasis in original); TX 332-5 (licensing guidelines for ESPN stating that rights "to use the images of individuals have to be obtained from . . . those persons"); TX 3017-9.

[15] *See, e.g.*, TX-0293-1 (Kraft Foods) ("Please note the NCAA does [not] own the likeness to the individuals featured on the footage and does not have the ability to give the individual's consent."); TX 0308-1 (Cingular) ("Cingular will need to clear all the likenesses of the athletes that appear in the footage if they are using as a commercial or promotional application.  I cannot guarantee that the individuals will not charge a fee for the use of their likeness."); TX 3176-1 (DirecTV); TX 0336-1 (Nike); TX 303, 304, 313, 719, 3045, 3054, 3059, 3068, 3092, 3094, 3109, 3113, 3128, 3135, 3136, 3137, 3138, 3154, 3673, 3716.

to preserve amateurism by assuring that the recruitment of student athletes does not become a commercial activity." *Gaines v. NCAA*, 746 F. Supp. 738, 743-44 (M.D. Tenn. 1990). As such, they are "*anti-commercial* and designed to promote and ensure competitiveness amongst NCAA member schools." *Bassett v. NCAA*, 528 F.3d 426, 433 (6th Cir. 2008) (emphasis in original).

That is why several courts have held that the NCAA's amateurism rules are not commercial activity subject to the Sherman Act. *See id.* ("NCAA's rules on recruiting student athletes, specifically those rules prohibiting improper inducements and academic fraud, are all explicitly non-commercial."); *Smith v. NCAA*, 139 F.3d 180, 185-86 (3d Cir. 1998) *vacated on other grounds by*, 525 U.S. 459 (1999) (holding that "the Sherman Act does not apply to the NCAA's promulgation of eligibility requirements" because "[r]ather than intending to provide the NCAA with a commercial advantage, the eligibility rules primarily seek to ensure fair competition in intercollegiate athletics") (internal citations and quotation marks omitted).[16]

These decisions are consistent with Supreme Court and Ninth Circuit precedent that while "the Sherman Act expressly requires a showing of restraint 'of *trade or commerce* among the several States," "[n]ot every aspect of life in the United States is to be reduced to such a single-minded vision of the ubiquity of commerce." *Dedication & Everlasting Love to Animals v. Humane Soc. of U.S., Inc.*, 50 F.3d 710, 712-714 (9th Cir. 1995) (emphasis added) (quoting 15 U.S.C. § 1). *See also Klor's, Inc. v. Broadway-Hale Stores, Inc.*, 359 U.S. 207, 214 (1959) (The Sherman "Act is aimed primarily at combinations having commercial objectives and is applied only to a very limited extent to organizations . . . which normally have other objectives.") (citing *Apex Hosiery Co. v. Leader*, 310 U.S. 469, 493 (1940)).

---

[16] *See also Gaines*, 746 F. Supp. at 743-44; *Jones v. NCAA*, 392 F. Supp. 295, 303-04 (D. Mass. 1975) (upholding eligibility rules precluding SA compensation where plaintiff had "not shown how the action of the N.C.A.A. in setting eligibility guidelines ha[d] any nexus to commercial or business activities in which the defendant might engage"). *Cf. Marjorie Webster Jr. Coll., Inc. v. Middle States Ass'n of Colleges & Secondary Sch., Inc.*, 432 F.2d 650, 654-55 (D.C. Cir. 1970) (college accreditation policies were not commercial activity subject to Sherman Act).

B.      **The Challenged Rules Promote Competition in Multiple Ways**

1.      **The Rules Increase Consumer Choice and Demand**

As set forth above, the evidence will show that the NCAA's amateurism rules define NCAA sports as a unique product and thereby "widen consumer choice" for both fans and athletes. *Bd. of Regents*, 468 U.S. at 102.  Providing this additional choice is sufficient to sustain the NCAA's rules regardless of whether doing so increases demand.  At a minimum, however, this is also a procompetitive benefit relevant to a full rule of reason analysis.

The evidence will *also* show that, *in addition* to increasing consumer choice, the collegiate model does increase consumer demand for college sports.  The NCAA has the only statistical evidence in the record on this question—a survey by an unchallenged expert, Dr. Michael Dennis, which shows that interest in watching and attending college football and basketball games would significantly decline if SAs received payments in the amounts that APs' experts predict they would without the NCAA's rules.  Importantly, the survey shows that interest would decline among the most intense and the most casual fans alike, which corroborates other surveys and the opinions of the NCAA's experts.

APs do not have any statistical evidence to support their conjecture that fan interest would not decline if SAs were paid as APs propose.  They merely assert that it is "obvious" that "*some* of what drives fan interest" is attributable to other factors.  Dkt. No. 972 at 14 (emphasis added).  That proves nothing.  APs rely on anecdotal examples about viewership for isolated games involving SAs penalized for accepting improper payments, but make no effort to disaggregate other factors that have nothing to do with the payments, including the public's appetite for "scandals."  APs also rely on the fact that some sports have remained popular after they were professionalized, but ignore that these sports did not have to compete with already existing professional leagues as college sports would if SAs were paid for appearing in televised games.

2.      **The Rules Increase Output**

"The core question in antitrust is output."  *Chicago Prof'l Sports Ltd.*, 95 F.3d at 597.  Indeed, "a market can be said to become increasingly competitive when its output increases."  11 P. Areeda & H. Hovenkamp, *Antitrust Law*, § 1901(a), at 225.  The entire logic of a sports league

and why it "can only be carried out jointly," *Bd. of Regents*, 468 U.S. at 101, is that it increases output of competition by making it possible to organize games.  Indeed, the NCAA joint venture has increased output substantially.  Since all of the 350 member colleges and universities in Division I agree on the rules that are consistent with their values, all of them can play each other.  This provides for more permutations of possible games and potential matchups between diverse schools, which increases consumer choice and demand.  The evidence will be undisputed that one key driver of March Madness's enormous popularity is the fact that 350 schools are eligible for the tournament and the games are often never-before-seen matchups.

The NCAA will show at trial that, in a world where colleges and universities can pay SAs cash for their supposed NIL rights, the number of permutations will fall.  If some colleges and universities decide to pay their SAs for group licenses for their NILs, other colleges and universities will have no interest in having their students play against SAs at these schools.  Some will have no interest even in being part of an organization that allows these SAs to play.  Other colleges and universities will leave Division I because they simply lack the resources to compete in cash bidding for recruits.  The result will be a smaller league—fewer possible games and fewer potential matchups between different schools.  In short, less competition.

### 3. The Rules Maintain Competitive Balance

"Numerous courts, including the Supreme Court, have recognized that promoting competitive balance among sports teams serves a 'legitimate' procompetitive purpose and may justify the imposition by sports leagues of certain restraints on competition."  Dkt. No. 1025 at 33 (citing *Am. Needle*, 560 U.S. at 204).  The courts have recognized promoting competitive balance as procompetitive in itself and have not required evidence of any effect of balance on demand.

Nevertheless, the evidence also will show that competitive balance is important to demand:  if competition is too lop-sided, games are less interesting to watch, but they are also less interesting to watch if competition is so balanced that there are no dynasties and no underdogs.  The ideal is some modest level of imbalance:  enough to create storylines, but not so much as to create snoozers.  The NCAA will present evidence showing that college football and men's basketball are at least as balanced—or about as properly imbalanced—as the NFL and the NBA.

1    However, the real issue is not whether college sports are properly balanced but what

2    factors explain success in college sports and whether eliminating the NCAA's rules would change

3    those factors in ways that are inappropriate for educational institutions.

4    According to APs' experts, money is the determining factor in success in all sports.

5    Indeed, they have elevated this theory to the "Invariance Principle" which supposedly holds that,

6    no matter what the rules of a sports league are, the teams with the most money will always be the

7    best. Thus, APs' experts claim that changing the NCAA's rules will have no effect whatsoever.

8    This is wrong. The NCAA's experts will present empirical analyses showing that revenue

9    and spending are not strongly correlated with success and that, instead, non-monetary factors play

10   a large role. The NCAA's experts will also present analyses showing that, in APs' but-for world

11   where colleges can use broadcast revenues to pay SAs for their NIL, many recruits will have

12   significant—in many cases, six-figure—incentives to attend schools with more revenue. In those

13   circumstances, it is basic economics that allowing cash payments for NIL for the first time will tilt

14   the distribution of talent and success towards colleges and universities with more cash to spend.

15   However, the evidence will also show that because students choose where to go to college,

16   the NCAA's member institutions will not be able to use professional teams' methods—such as

17   drafts and trades—to preserve balance in a market for cash offers for NIL. Recruits in Oakland

18   cannot be drafted by Stanford and SAs at Berkeley cannot be traded to UCLA.

19   ### 4.    The Rules Further the Integration of Athletics and Education

20   The NCAA will show that the rules at issue improve the quality of the education that SAs

21   receive—which is a classic procompetitive benefit. *See Cnty. of Tuolumne v. Sonora Cmty. Hosp.*,

22   236 F.3d 1148, 1160 (9th Cir. 2001) ("any anticompetitive harm is offset by the procompetitive

23   effects of SCH's effort to maintain the quality of patient care that it provides."); *see also*

24   *Deutscher Tennis Bund v. ATP Tour, Inc.*, 610 F.3d 820, 833 (3d Cir. 2010) (sport "rules and

25   regulations can be procompetitive where they enhance the 'character and quality of the

26   'product'"") (quoting *Bd. of Regents*, 468 U.S. at 112); *United States v. Brown Univ.*, 5 F.3d 658,

27   674 (3d Cir. 1993) (colleges' agreement was procompetitive if it "improved the quality of the

28   educational program"); *McCormack v. NCAA*, 845 F.2d 1338, 1345 (5th Cir. 1988) ("The goal of

DEFENDANT'S MOTIONS *IN LIMINE*

1    the NCAA is to integrate athletics with academics.").  Thus, APs are simply wrong that the

2    educational nature of NCAA rules cannot be procompetitive.  Indeed, the procompetitive benefits

3    of improving education justify restraints on competition that might otherwise violate the antitrust

4    laws.  *See Brown Univ.*, 5 F.3d at 678 ("It may be that institutions of higher education require that

5    a particular practice, which could properly be viewed as a violation of the Sherman Act in another

6    context, be treated differently.") (internal quotation marks omitted).

7           The evidence will show that the NCAA's rules improve SAs' educational experience in

8    two ways.  *First*, by ensuring that SAs' involvement in intercollegiate athletics is as students

9    rather than as professionals, the rules focus SAs on spending their time doing what students do

10   rather trying to make as much money as possible, which is what professionals do.  The NCAA will

11   present hard evidence—data—that football and men's basketball SAs, do, in fact get an education,

12   including statistical analyses showing that these SAs graduate and achieve success at equal or

13   higher rates than other young people with similar backgrounds.

14          Further, numerous college and university administrators will testify based on their many

15   decades of experience in higher education that permitting SAs to participate in a bidding war

16   would undermine their ability to be effective students.  No less than in other areas of the law, this

17   testimony about how to advance an institution's educational mission must be assessed in

18   accordance with "our tradition of giving a degree of deference to a university's academic

19   decisions, within constitutionally prescribed limits."  *Grutter v. Bollinger*, 539 U.S. 306, 328

20   (2003) ("Our scrutiny of the interest asserted by the Law School is no less strict for taking into

21   account complex educational judgments in an area that lies primarily within the expertise of the

22   university."); *see also Fisher v. Univ. of Texas at Austin*, 133 S. Ct. 2411, 2419 (2013) (affirming

23   "deference to the University's conclusion, based on its experience and expertise, that a diverse

24   student body would serve its educational goals") (internal quotations omitted).

25          APs will only point to anecdotal allegations that some SAs at some schools have not been

26   focused on or have not received a college education.  These isolated examples fail to prove that the

27   rules fail for the majority of SAs who want an education.  And, importantly, the anecdotes do not

28   show that eliminating the rules would improve education for any SA at any school.

*Second*, the rules make it possible for colleges and universities to support broad-based athletics programs that bring to campus hundreds of SAs in dozens of other sports who might otherwise not be able to attend college.  These SAs enhance the diversity of the student body with whom football and men's basketball SAs can interact, which improves their college experience. *See Brown Univ.*, 5 F.3d at 674 (district court erred by rejecting procompetitive justification that by "promoting socio-economic diversity at member institutions," policies "improved the quality of the education offered by the schools and therefore enhanced the consumer appeal").  *Cf. Grutter*, 539 U.S. at 328 (deferring to school's "educational judgment that such diversity is essential to its educational mission" and noting that the "assessment that diversity will, in fact, yield educational benefits is substantiated" by numerous studies).  Further, the opportunity to attend games in other sports and support the SAs who play in them improves the campus community for all students, including football and men's basketball SAs.  Indeed, APs admit it is "obvious" that athletics create an "enduring connection between the university and its students, alumni, and area residents."  Dkt. No. 172 at 14.  University presidents and administrators will explain that APs are wrong that their injunction "would not disrupt that connection in any way."  *Id.*

## V.  NO LESS RESTRICTIVE ALTERNATIVE TO THE CHALLENGED RULES WOULD ACHIEVE THEIR PROCOMPETITIVE BENEFITS.

As explained above, there is no need to analyze whether the rules' "legitimate objectives can be achieved in a substantially less restrictive manner."  *Tanaka*, 252 F.3d at 1063.  This inquiry has "no application here, where the challenged business practice involves the core activity of the joint venture itself."  *Dagher*, 547 U.S. at 7.  Nevertheless, under a full rule of reason inquiry, APs must "show that 'an alternative is *substantially* less restrictive and is virtually as effective in serving the legitimate objective without significantly increased cost.'"  *Cnty. of Tuolumne,* 236 F.3d at 1159 (emphasis in original) (internal quotation marks omitted).

APs agree that the governing legal standard means that any proposal for paying SAs must be consistent with amateurism:  "The issue is not whether college sports should remain amateur, but whether the NCAA's definition of an amateur and its rules to enforce that definition are reasonably necessary to retain the amateur status of college sports and the popularity of college

DEFENDANT'S MOTIONS *IN LIMINE*

athletics that, according to defendants' experts, flow from its amateur status." Dkt. No. 896-4 (Noll Reply Report) at 4.  As this Court has ordered, "Plaintiffs represented at the hearing that they will not proffer any less restrictive alternatives at trial that their experts did not discuss in their reports."  Dkt. No. 166 at 11.  In his reports, Dr. Noll analyzed two very specific methods "to address whether the objectives that are served by a reasonable definition of amateurism could be achieved by a less restrictive rule."  Dkt. No. 896-5 (Noll Merits Report) at 134.  Neither avails APs.

*First*, Dr. Noll proposes to "rely on the definitions of amateurism that have been adopted by other organizations."  *Id.*  He opines that "[t]he policies in other amateur sports identify less restrictive alternatives that the NCAA could have adopted."  *Id.*  In other words, APs recognize that other amateur sports organizations provide objective evidence of whether the NCAA's rules— and NCAA sports—are amateur.  The problem is that, as explained above, none of them allows or provides the payments for group licenses that APs claim would be consistent with amateurism.

*Second*, Dr. Noll proposes that "[r]evenues from licensing the bundle of the intellectual property of a college and the NILs of its team members would be divided between a college and its team members in accordance with common practices in other markets, and then the team share would be divided among team members in equal shares, again in accordance with common market practices."  Dkt. No. 896-5 at 134.  The "common market practices" for distributing licensing revenue that Dr. Noll has examined are "practices in professional sports."  *Id.* at 88-89.

There are two problems with this professional "yardstick" approach.  Most obviously, any proposed alternative for paying SAs that is drawn from professional sports is not an alternative way to preserve amateurism in college sports.  It is a proposal to eliminate amateurism.  Calling APs amateurs while paying them as professionals is a label, not a less restrictive alternative.

Dr. Noll's equal-sharing model also has no grounding in fact.  Equal sharing of broadcast revenue does not happen in sports.  Indeed, the evidence will show that there are no group licenses at all for the use of NFL or NBA players' NIL in live broadcasts, let alone any sport where the athletes were paid equally for such a license for the use of supposed NIL rights.

Absent any evidence that any sport—amateur or professional—has ever implemented

1  group licenses for the use of athletes' NIL in live broadcasts with equal revenue sharing, APs'

2  suggested regime is not a less restrictive alternative for what the NCAA's rules *could* be but rather

3  a proposal for what the NCAA's rules *should* be.  But

> plaintiffs cannot be permitted to offer possible less restrictive
> alternatives whose efficacy is mainly a matter of speculation.  A
> skilled lawyer would have little difficulty imagining possible less
> restrictive alternatives to most joint arrangements.  Proffered less
> restrictive alternatives should either ***be based on actual experience
> in analogous situations elsewhere*** or else be fairly obvious.
> Tending to defeat such an offering would be the defendant's
> evidence that the proffered alternative has been tried but failed, that
> it is equally or more restrictive, or otherwise unlawful.

9  11 Phillip E. Areeda, *Antitrust Law* ¶ 1913b, at 375-76 (2011) (emphasis added).  Were it

10  otherwise, "the imaginations of lawyers" would be guaranteed to "conjure up some method of

11  achieving the business purpose in question that would result in a somewhat lesser restriction of

12  trade[,]" and "courts would be placed in the position of second-guessing business judgments as to

13  what arrangements would or would not provide 'adequate' protection for legitimate commercial

14  interests."  *Am. Motor Inns, Inc. v. Holiday Inns, Inc.*, 521 F.2d 1230, 1249-50 (3d Cir. 1975).[17]

15      In short, APs' proposed alternatives are blueprints for the NCAA to produce a different

16  kind of sports, which deprives the NCAA's members of "'ample latitude' to adopt rules preserving

17  'the revered tradition of amateurism in college sports.'"  Dkt. No. 876 at 15 (quoting *Bd. of

18  Regents*, 468 U.S. at 120).  APs' claims accordingly fail.

---

[17] *See also M&H Tire Co., Inc. v. Hoosier Racing Tire Corp.*, 733 F.2d 973, 987 (1st Cir. 1984) (rejecting "less restrictive alternatives" that "are more hypothetical than practical").  *Cf.* Dep't of Justice & Federal Trade Comm'n, *Horizontal Merger Guidelines* 30 (Aug. 19, 2010) ("Only alternatives that are practical in the business situation faced by the merging firms are considered in making this determination.").

1   DATED:  June 5, 2014                    Respectfully submitted,

2                                           MUNGER, TOLLES & OLSON LLP

3

4

5                                           By:    /s/ Glenn D. Pomerantz
                                                   Glenn D. Pomerantz
6

7                                           Attorneys for Defendant
                                            National Collegiate Athletic Association
8

9                                    **CERTIFICATE OF SERVICE**

10          I hereby certify that on June 5, 2014, I electronically filed the foregoing document with the

11   Clerk of the Court using the CM/ECF system which will send notification to the e-mail addresses

12   registered.

13

14                          By:    /s/ Glenn D. Pomerantz
                                   MUNGER, TOLLES & OLSON LLP
15                                 Attorneys for NCAA

16

17

18

19

20

21

22

23

24

25

26

27

28

DEFENDANT'S MOTIONS *IN LIMINE*