VOLUME 13

PAGES 2616 – 2836

UNITED STATES DISTRICT COURT

NORTHERN DISTRICT OF CALIFORNIA

| | | |
|---|---|---|
| EDWARD O'BANNON, ET AL., | ) | |
| | ) | |
| | ) | |
| PLAINTIFFS, | ) | NO. C-09-3329 CW |
| | ) | |
| VS. | ) | WEDNESDAY, JUNE 25, 2014 |
| | ) | |
| NATIONAL COLLEGIATE | ) | OAKLAND, CALIFORNIA |
| ATHLETIC ASSOCIATION, | ) | |
| ET AL., | ) | |
| | ) | |
| DEFENDANTS. | ) | COURT TRIAL |
| _____ | ) | |

**BEFORE THE HONORABLE CLAUDIA WILKEN, JUDGE**

**REPORTERS' TRANSCRIPT OF PROCEEDINGS**

**APPEARANCES:**

**FOR PLAINTIFFS:**          HAUSFELD, LLP
                            1700 K STREET, NW, SUITE 650
                            WASHINGTON, DC 20006
                   BY:  MICHAEL D. HAUSFELD, ESQUIRE
                        SATHYA GOSSELIN, ESQUIRE


                            BOIES, SCHILLER & FLEXNER, LLP
                            5301 WISCONSIN AVENUE, N.W.
                            WASHINGTON, D.C. 20015
                   BY:  WILLIAM A. ISAACSON, ESQUIRE


                     (APPEARANCES CONTINUED)

**REPORTED BY:**          DIANE E. SKILLMAN, CSR 4909
                         RAYNEE H. MERCADO, CSR 8258
                         OFFICIAL COURT REPORTERS

TRANSCRIPT PRODUCED BY COMPUTER-AIDED TRANSCRIPTION

1                    (APPEARANCES CONTINUED)

2

3     **FOR PLAINTIFFS:**          HEINS, MILLS & OLSON, P.L.C.
                                   310 CLIFTON AVENUE
4                                  MINNEAPOLIS, MINNESOTA 55403
                               BY:  RENAE D. STEINER, ESQUIRE
5

6                                  VENABLE, LLP
                                   757 7TH STREET, NW
7                                  WASHINGTON, D.C. 20004
                               BY:  SETH ROSENTHAL, ESQUIRE
8

9                                  HAUSFELD, LLP
                                   44 MONTGOMERY STREET, SUITE 3400
10                                 SAN FRANCISCO, CALIFORNIA 94104
                               BY:  MICHAEL P. LEHMANN, ESQUIRE
11                                 BRUCE WECKER, ESQUIRE

12

13

14

15    **FOR DEFENDANT**           MUNGER, TOLLES & OLSON LLP
      **NCAA:**                    355 SOUTH GRAND AVENUE, 35TH FLOOR
16                                 LOS ANGELES, CALIFORNIA 90071
                               BY:  GLENN D. POMERANTZ, ESQUIRE
17

18                                 MUNGER, TOLLES & OLSON LLP
                                   560 MISSION STREET, 27TH FLOOR
19                                 SAN FRANCISCO, CALIFORNIA 94105
                               BY:  KELLY M. KLAUS, ESQUIRE
20                                 ROHIT K. SINGLA, ESQUIRE
                                   CAROLYN HOECKER LUEDTKE, ESQUIRE
21                                 LUIS LI, ESQUIRE
                                   JESLYN A. MILLER, ESQUIRE
22

23

24

25

I N D E X


| **PLAINTIFFS' WITNESS:** | **PAGE** | **VOL.** |
| --- | --- | --- |
| PORET, HAL | | |
| DIRECT EXAMINATION BY MS. STEINER | 2698 | 13 |
| CROSS-EXAMINATION BY MS. LUEDTKE | 2736 | 13 |
| **DEFENDANTS' WITNESSES:** | | |
| DENNIS, J. MICHAEL | | |
| DIRECT EXAMINATION BY MR. KLAUS (RESUMED) | 2620 | 13 |
| CROSS-EXAMINATION BY MR. ROSENTHAL | 2667 | 13 |
| STIROH, LAUREN | | |
| DIRECT EXAMINATION BY MR. SINGLA | 2752 | 13 |
| CROSS-EXAMINATION BY MR. ISAACSON | 2824 | 13 |

1                          I N D E X

2

3    **PLAINTIFFS' EXHIBITS:**                        **EVD.**    **VOL.**

4    2624                                            2699      13

5    2629                                            2682      13

6    2630                                            2684      13

7    2631                                            2686      13

8

9

10

11   **DEFENDANTS' EXHIBITS:**

12   3392                                            2626      13

13   3393                                            2665      13

14   4045 – 4078                                     2666      13

15

16

17

18

19

20

21

22

23

24

25

```
 1   WEDNESDAY, JUNE 25, 2014                        8:30 A.M.

 2                      P R O C E E D I N G S

 3          THE CLERK:  REMAIN SEATED.  COME TO ORDER.  COURT IS

 4   IN SESSION.

 5          THE COURT:  GOOD MORNING.

 6          MR. KLAUS:  GOOD MORNING, YOUR HONOR.

 7          THE COURT:  YOU MAY PROCEED.

 8          MR. KLAUS:  THANK YOU.

 9                  DIRECT EXAMINATION RESUMED

10   BY MR. KLAUS:

11   Q.  GOOD MORNING, DR. DENNIS.

12   A.  GOOD MORNING.

13   Q.  WHEN WE LEFT OFF YESTERDAY AFTERNOON, DR. DENNIS, YOU HAD

14   BEEN DESCRIBING THE SURVEY HAVING BEEN IN THE FIELD FOR SIX

15   DAYS.

16       AND WHAT HAPPENED AFTER THE SURVEY WAS IN THE FIELD?  WHAT

17   DID YOU DO?

18   A.  YES.  I DID A VARIETY OF QUALITY CONTROL CHECKS ON THE

19   SURVEY DATA USING STATISTICAL ANALYSIS.  ONE OF THE CHECKS I

20   DID WAS EXAMINING THOSE INTERVIEW RESPONDENTS WHO TOOK

21   RELATIVELY SHORT AMOUNT OF TIME TO ANSWER THE SURVEY

22   QUESTIONS.

23   Q.  WHY DO YOU CHECK PEOPLE WHO TAKE A RELATIVELY SHORT AMOUNT

24   OF TIME TO ANSWER QUESTIONS?

25   A.  WELL, THE THEORY WOULD BE THAT THOSE PEOPLE WHO TAKE LESS
```

1    TIME TO ANSWER THE SURVEY QUESTIONS MAY HAVE DIFFERENT

2    RESPONSES THAN THOSE WHO TAKE MORE TIME.

3        SO IT'S A WAY TO CHECK THE ACCURACY AND QUALITY OF THE

4    SURVEY DATA TO SEE IF THE PEOPLE WHO TOOK THE SURVEY IN LESS

5    TIME HAVE DIFFERENT RESPONSES AND ANSWERS THAN OTHER PEOPLE.

6    **Q.**  WHAT OTHER CHECKS DID YOU PERFORM?

7    **A.**  I ALSO LOOKED AT WHAT I CALL LATE RESPONDERS.  THESE ARE

8    INDIVIDUALS WHO TOOK THE SURVEY LATE IN THE FIELD PERIOD.  SO

9    INSTEAD OF TAKING THE SURVEY DURING THE FIRST FIVE DAYS OR

10   FOUR DAYS OF THE FIELD PERIOD, THESE ARE PEOPLE THAT TOOK THE

11   SURVEY AT THE VERY CONCLUSION, IF YOU WILL, OF THAT WEEK

12   DURING WHICH THE SURVEY WAS AVAILABLE TO BE TAKEN.

13       AND I ANALYZE THOSE CASES FOR EXACTLY THE SAME REASONS,

14   FOR ACCURACY AND REPRESENTATIVENESS CHECKS.

15   **Q.**  WHAT OTHER CHECKS DID YOU PERFORM?

16   **A.**  I ALSO LOOK AT THE ANSWERS THAT ARE WRITTEN IN TO THE

17   OPEN-ENDED QUESTIONS.  OPEN-ENDED QUESTIONS ARE QUESTIONS

18   WHERE, JUST LIKE IT SOUNDS, THEY'RE OPEN ENDED.  THE

19   RESPONDENTS CAN TYPE IN THEIR ANSWERS USING ACTUAL WORDS, AND

20   I LOOK AT THOSE RESPONSES TO SEE IF THERE'S ANY NONRELEVANT

21   TEXT THERE.

22   **Q.**  WHAT DO YOU MEAN BY "NONRELEVANT TEXT"?

23   **A.**  TEXTS THAT WOULD INDICATE THAT THE RESPONDENTS PERHAPS ARE

24   NOT PAYING ATTENTION TO THE SURVEY.

25   **Q.**  WHAT DID YOU DETERMINE AFTER DOING THESE SEVERAL CHECKS

1  YOU'VE DESCRIBED?

2  **A.**  ALL THESE QUALITY CONTROL CHECKS CAME UP POSITIVE.  THE

3  SURVEY'S ACCURATE AND RELIABLE.  THE QUICK RESPONDERS HAD VERY

4  SIMILAR RESULTS TO THE INDIVIDUALS THAT TOOK MORE TIME.  THE

5  LATE RESPONDERS HAD VERY SIMILAR RESULTS COMPARED TO THOSE WHO

6  TOOK THE SURVEY, AND I DIDN'T FIND ANY TEXT THAT GAVE ME

7  CONCERN.

8  **Q.**  WHAT DID YOU DO NEXT?

9  **A.**  AFTER THAT THERE WAS THE WEIGHTING OF THE DATA.  SO THIS

10  IS USUALLY DONE AS A STANDARD PRACTICE IN SURVEYS WHERE THERE

11  IS A DEGREE OF WHAT'S CALLED NONRESPONSE OR PATTERNS OF

12  NONRESPONSE AMONG THOSE RESPONDENTS THAT TOOK THE SURVEY.

13      SO IT'S POSSIBLE THAT -- AND IT'S A TRUISM IN ALL SURVEYS

14  THAT THERE WILL BE SOME DEMOGRAPHIC IMBALANCE IN THE SURVEYED

15  RESPONDENTS.  WEIGHTING CORRECTS FOR THAT SO THAT IF THERE IS

16  A GROUP OF PEOPLE, FOR EXAMPLE, WHO -- WHOSE SHARE OF THE

17  INTERVIEWED GROUP IS LESS THAN IT SHOULD BE COMPARED TO THE

18  U.S. CENSUS, THE WEIGHTS CORRECT FOR THAT SO THAT THE ANALYZED

19  DATA ARE BASED ON A REPRESENTATIVE SAMPLE OF THE U.S.

20  POPULATION.

21  **Q.**  ONCE YOU COMPLETED THE WEIGHTING, WHAT DID YOU CONCLUDE

22  ABOUT THE REPRESENTATIVENESS OF YOUR SAMPLE?

23  **A.**  IT'S A -- IT'S A VERY -- IT'S A VERY WELL-DONE SAMPLE.  IT

24  IS HIGHLY REPRESENTATIVE OF THE U.S. POPULATION AS MEASURED

25  AND COMPARED TO THE UNITED STATES CENSUS BUREAU.

1    **Q.**  AFTER YOU DID THE WEIGHTING, WHAT DID YOU DO?

2    **A.**  AFTER DOING THE WEIGHTING, THE -- I ANALYZED ALL THE

3    RESULTS.  I BROKE OUT THE DATA ACCORDING TO THE TOTAL

4    POPULATION.

5        SO THIS IS THE DATA SET OF 2,455 INTERVIEWS, AND THEN I

6    BROKE OUT THE DATA ACCORDING TO WHETHER THE RESPONDENT IS A

7    SO-CALLED FAN OF COLLEGE MEN'S BASKETBALL OR COLLEGE FOOTBALL

8    OR NOT A FAN.

9    **Q.**  NOW, WITH RESPECT TO THE WEIGHTING, DR. DENNIS, WITH

10   RESPECT TO THE WEIGHTING, WHAT WAS THE PROCESS YOU FOLLOWED TO

11   COMPARE THE REPRESENTATIVENESS OF YOUR SAMPLE WITH THE U.S.

12   CENSUS?

13                    (EXHIBIT DISPLAYED ON SCREEN.)

14   **A.**  YES.  THIS IS A GRAPH -- AND IT'S A LITTLE BIT

15   COMPLICATED, BUT I THINK WORTH TALKING ABOUT A LITTLE BIT.

16       THIS IS A COMPARISON OF THE DEMOGRAPHIC COMPOSITION OF THE

17   INTERVIEWED SAMPLE, THE 2,455 INTERVIEWS COMPARED TO THE

18   DEMOGRAPHIC BENCHMARKS FOR THE U.S. POPULATION AS DETERMINED

19   AND MEASURED BY THE UNITED STATES CENSUS BUREAU.

20       AND WHAT I HAVE DONE HERE IS PLOT THE DEMOGRAPHIC

21   COMPOSITION OF THE INTERVIEWED SAMPLE AND THEN PLOTTED THAT

22   AGAINST WHAT WE KNOW TO BE THE TRUTH OF THE U.S. POPULATION AS

23   MEASURED BY THE UNITED STATES CENSUS BUREAU.

24   **Q.**  WHAT ARE THE TWO AXES IN THIS GRAPH?

25   **A.**  YES.  THE "X" AXIS RUNNING FROM LEFT TO RIGHT IS THE

1    PERCENTAGE OF THE INTERVIEWED SAMPLE FOR ANY GIVEN DEMOGRAPHIC

2    CRITERION.  SO IT COULD BE AGE, 18 TO 35.  IT COULD BE MALE,

3    COULD BE FEMALE.  EACH OF THE PLOTS, PLOTTED DOTS THERE

4    INDICATES A DEMOGRAPHIC DATA POINT, IF YOU WILL.

5        THE "Y" AXIS IS THE U.S. CENSUS BUREAU BENCHMARK FOR THAT

6    EXACT SAME DEMOGRAPHIC STATISTIC.

7    Q.  AND WHAT ARE YOU LOOKING FOR ONCE YOU PLOTTED THE VARIOUS

8    POINTS OF INTERSECTION ON THIS GRAPH?

9    A.  SO FOR THE STUDY TO BE CONSIDERED REPRESENTATIVE OR

10   CERTAINLY A STRONG ARGUMENT TO BE MADE THAT THE SAMPLE IS

11   REPRESENTATIVE, THAT LINE, THAT IS A LINE DRAWN THROUGH THE

12   DOTTED -- THROUGH THE PLOTTED POINTS SHOULD BE AT A 45-DEGREE

13   ANGLE.

14       IN OTHER WORDS, THE EXACT SAME STATISTIC FOR THE

15   DEMOGRAPHIC COMPOSITION OF THE INTERVIEWED SAMPLE, SHOULD BE

16   THE SAME AS FOR THE U.S. CENSUS BUREAU.  AND THAT'S WHAT THE

17   DATA SHOW HERE BECAUSE THE PLOTTED POINTS ACTUALLY DO APPEAR

18   IN THAT 45-DEGREE LINE.

19   Q.  IS SLIDE 11 OF THE DEMONSTRATIVE SET THE ACTUAL GRAPH THAT

20   YOU USED WITH RESPECT TO PLOTTING YOUR SURVEY AGAINST THE U.S.

21   CENSUS DATA?

22   A.  YES, IT IS.

23   Q.  LET'S TURN TO THE ACTUAL SURVEY ITSELF AND TO YOUR

24   RESULTS, DR. DENNIS.

25                (SLIDE DISPLAYED ON SCREEN.)

1      BROUGHT UP SLIDE 13 OF YOUR DEMONSTRATIVE SET.  WHAT IS

2    THIS SHOWING?

3    **A.**  WHAT'S THIS SHOWING, THIS IS ACTUALLY THE VERY FIRST

4    QUESTION SHOWN TO ALL THE SURVEY RESPONDENTS.  I CALL IT A

5    WARM-UP QUESTION.  IT'S CALLED A WARM-UP QUESTION BECAUSE

6    THERE'S TRULY NO ANALYTIC OR SUBSTANTIVE VALUE TO THIS

7    QUESTION.  IT'S SIMPLY TO GET THE RESPONDENT ENGAGED IN THE

8    SURVEY PROCESS.

9      AND I DID THAT THROUGH A VERY SIMPLE AND, I THINK,

10   ENGAGING OPEN-ENDED QUESTION ABOUT WHAT DO YOU LIKE TO DO FOR

11   LEISURE ACTIVITIES.  AND THE RESPONDENTS ARE INVITED TO WRITE

12   IN THEIR ANSWERS THERE IN THE THREE BOXES.

13     I SHOULD MENTION THAT THIS SCREEN THAT YOU SEE HERE, IT'S

14   EXACTLY A REPLICA OF WHAT THE RESPONDENTS WOULD HAVE SEEN IN

15   TAKING THE SURVEY.

16   **Q.**  WE WILL BE LOOKING AT A NUMBER OF SCREEN SHOTS THAT HAVE

17   BEEN DESIGNATED EXHIBIT 3392.

18     ARE THESE SCREEN SHOTS THE SAME SCREEN SHOTS THAT THE

19   PEOPLE WHO PARTICIPATED IN YOUR SURVEY SAW WHEN THEY WERE

20   COMPLETING THE SURVEY?

21   **A.**  YES.  THAT'S CORRECT.

22        **MR. KLAUS:**  WE WOULD MOVE THE ADMISSION, YOUR HONOR,

23   OF EXHIBIT 3392.

24        **MR. ROSENTHAL:**  NO OBJECTION.

25        **THE COURT:**  RECEIVED.

1          (DEFENDANTS' EXHIBIT 3392 RECEIVED IN EVIDENCE)

2     BY MR. KLAUS:

3     Q.  AFTER THE WARM-UP QUESTION, DR. DENNIS, WHAT DID YOU ASK

4     NEXT?

5     A.  NEXT THERE WERE A FEW QUESTIONS ABOUT ACTUAL BEHAVIORS OF

6     VIEWING OR ESSENTIALLY CONSUMING SPORTS, A VARIETY OF SPORTS.

7          THIS IS THE QUESTION THAT I LIKE TO SPEND A LITTLE TIME ON

8     BECAUSE THE WORDING IS VERY IMPORTANT.  AND IT WAS USED FOR

9     THE ANALYSIS FOR BREAKING OUT DATA BY FANS AND NONFANS.

10         THIS IS A QUESTION THAT'S LITERALLY ASKING WHETHER THE

11    RESPONDENT WATCHED ON TELEVISION OR OVER THE INTERNET AT LEAST

12    ONE HALF GAME OVER THE PAST 12 MONTHS.  IN THIS CASE, IT IS

13    PROFESSIONAL FOOTBALL.

14         THE THINGS TO UNDERLINE HERE, I BELIEVE, IS THE TIME

15    PERIOD IS PRETTY WIDE.  WE ARE LOOKING AT A 12-MONTH RECALL

16    PERIOD, SO THE INDIVIDUALS RESPONDING TO THIS QUESTION ARE

17    TAKING INTO ACCOUNT THE LAST FOUR SEASONS, IF YOU WILL.  SO WE

18    CAN COVER ALL THE SPORTS AS A RESULT OF THIS QUESTION BECAUSE

19    OF THE 12-MONTH RECALL PERIOD.

20         AND, SECONDLY --

21    Q.  LET ME INTERRUPT YOU?

22    A.  YES.

23    Q.  WHEN YOU SAY "FOUR SEASONS", ARE YOU SPEAKING OF THE

24    SEASONS OF THE YEAR AS OPPOSED TO SPORTS SEASONS?

25    A.  I AM SPEAKING OF SEASONS OF THE YEAR.

DENNIS – DIRECT / KLAUS

1  **Q.**  THANK YOU.  YOU CAN CONTINUE.

2  **A.**  AND THEN THERE'S ALSO THE REQUIREMENT THAT WE ARE TALKING

3  ABOUT AT LEAST HALF A GAME WATCHED OR LISTENED TO.

4      SO IF A RESPONDENT ONLY PAID ATTENTION FOR ONE QUARTER OF

5  A FOOTBALL GAME OR THE FIRST TEN MINUTES OF A COLLEGE

6  BASKETBALL GAME, THAT WOULD NOT COUNT.

7  **Q.**  YOU SAID THAT THE QUESTION ASKED ABOUT WATCHING OVER THE

8  INTERNET OR ON TELEVISION.  WHY DID YOU INCLUDE BOTH OF THOSE

9  FORMS OF VIEWING?

10  **A.**  MY UNDERSTANDING THAT -- THAT THE MEASUREMENT REQUIRED A

11  COMPREHENSIVE LIST OF WAYS THAT THE CONSUMERS COULD HAVE

12  CONSUMED THESE COLLEGE SPORTS, AND THAT WAS NEEDED FOR THE

13  DEMAND CALCULATION.

14  **Q.**  DID YOU ALSO ASK RESPONDENTS TO RATE WHAT THEY HAD DONE IN

15  TERMS OF ATTENDING GAMES LIVE?

16  **A.**  YES.  SO THERE'S A QUESTION, IT TALKS ABOUT ATTENDING THE

17  ACTUAL GAMES.  SO, THE LIST THERE IS -- AND THIS IS THE SAME

18  LIST THAT IS PRESENTED TIME AND TIME AGAIN IN THE SURVEY.

19  IT'S ABOUT WATCHING OVER THE TELEVISION, WATCHING OVER THE

20  INTERNET, LISTENED TO, OR ATTENDED THE SPORT.

21  **Q.**  AT THE BOTTOM IT SAID THE SAME QUESTION WAS ASKED FOR

22  SEVERAL DIFFERENT TYPES OF SPORTS.

23      CAN YOU EXPLAIN WHAT'S MEANT BY THAT?

24  **A.**  YES.  THE SAME QUESTION WAS ASKED FOR EACH OF THE SPORTS

25  LISTED AT THE BOTTOM OF THE SCREEN THERE, PROFESSIONAL

1    BASKETBALL, MAJOR LEAGUE BASEBALL, COLLEGE FOOTBALL, AND MEN'S

2    COLLEGE BASKETBALL.

3    **Q.** WHY WERE YOU ASKING ABOUT PROFESSIONAL BASKETBALL AND

4    MAJOR LEAGUE BASEBALL IF YOUR SURVEY WAS DIRECTED TO COLLEGE

5    BASKETBALL AND FOOTBALL?

6    **A.** IT'S A BEST PRACTICE I USUALLY USE IN MY SURVEYS.  I

7    ATTEMPT TO CAMOUFLAGE OR DISGUISE EARLY ON IN THE SURVEY WHAT

8    THE TOPIC IS GOING TO BE.  SO I DIDN'T WANT TO SHOW MY HAND,

9    IF YOU WILL, AS A DESIGNER OF THE QUESTIONNAIRE ABOUT WHAT THE

10   MAIN TOPICS WERE GOING TO BE QUITE YET IN THE SURVEY.

11   **Q.** WHAT WAS THE NEXT SCREEN THE USER SAW?

12   **A.** SO THIS IS THE INSTRUCTIONS TO THE RESPONDENTS INFORMING

13   THEM THAT NOW WE WANT YOU TO THINK ABOUT COLLEGE FOOTBALL AND

14   MEN'S COLLEGE BASKETBALL.

15       AND THE IMPORTANT INSTRUCTION HERE, AS I MENTIONED BEFORE,

16   IS EXPLAINING TO THE RESPONDENT THE -- THE FORMS OF

17   CONSUMPTION THAT WE'RE TALKING ABOUT FOR THIS SURVEY, WATCHING

18   ON TELEVISION OR OVER THE INTERNET, LISTENED TO ON THE RADIO,

19   OR ATTENDED.

20   **Q.** WHAT WAS THE NEXT QUESTION THAT YOU ASKED THE RESPONDENT?

21   **A.** SO THIS IS A -- THE QUESTION 8.  IT'S A GENERAL AWARENESS

22   QUESTION.  IT'S A QUESTION ASKING ABOUT WHAT THE RESPONDENTS

23   MAY HAVE HEARD ABOUT IN THE PAST 12 MONTHS IN THE MEDIA ABOUT

24   PAYING MONEY TO STUDENT ATHLETES.

25       IT'S A SIMPLE YES/NO QUESTION.  HAVE THEY HEARD ANYTHING

1  OR HAVE THEY NOT HEARD ANYTHING ABOUT PAYING STUDENT ATHLETES.

2  **Q.**  WHY DID YOU ASK THEM IF THEY HAD HEARD OR NOT HEARD

3  ANYTHING ABOUT THAT SUBJECT IN THE MEDIA?

4  **A.**  I ASKED THE QUESTION; I THOUGHT IT WAS AN ENGAGING

5  QUESTION.  I THOUGHT IT MIGHT BE USEFUL AT SOME POINT IN THE

6  ANALYSIS TO LOOK AT THE AWARE AND UNAWARE GROUPS.

7      BUT IT'S -- IT'S DATA TO BE COLLECTED FOR, YOU KNOW, A

8  VARIETY OF POSSIBLE USES.

9      I ALSO THOUGHT IT WAS JUST A GOOD WARM-UP QUESTION TO

10  CONTINUE THE SERIES OF QUESTIONS I HAD BEFORE.

11  **Q.**  WERE THERE ANY RESTRICTIONS IN THE QUESTION THAT YOU'VE

12  IDENTIFIED AS QUESTION NUMBER 8 AS TO THE TYPES OF STORIES OR

13  NEWS THAT PEOPLE MIGHT HAVE HEARD IN THE MEDIA?

14  **A.**  THERE WERE NO RESTRICTIONS AT ALL.  THE RESPONDENTS COULD

15  BRING ANYTHING TO THIS QUESTION THAT THEY MAY HAVE HEARD ABOUT

16  IN THE NEWS ON THIS GENERAL TOPIC.

17  **Q.**  IF THE RESPONDENT ANSWERED THAT QUESTION "YES", WHAT DID

18  THEY SEE NEXT?

19  **A.**  THEN THEY WOULD SEE A SEPARATE QUESTION THAT IS ACTUALLY

20  SHOWN AT THE BOTTOM HALF OF THIS SCREEN.

21      AND THIS IS AN OPEN-ENDED QUESTION WHERE THE RESPONDENTS

22  INVITED TO ACTUALLY WRITE DOWN IN TEXT WHAT IS IT THEY HAVE

23  SEEN, HEARD, READ IN THE MEDIA ABOUT PAYING MONEY TO STUDENT

24  ATHLETES.

25  **Q.**  DID YOU COLLECT THE INFORMATION THAT PEOPLE HAD PUT IN IN

1  RESPONSE TO THE OPEN-ENDED QUESTION?

2  **A.**  YES, I DID.

3  **Q.**  WHAT WAS THE NEXT QUESTION THAT YOU ASKED, DR. DENNIS?

4  **A.**  SO I WOULD CHARACTERIZE THIS AS THE FIRST SUBSTANTIVE

5  QUESTION IN THE SURVEY, QUESTION 9.  I THINK THE WORDING IS

6  VERY IMPORTANT TO GO OVER.  IT WAS A VERY DELIBERATELY CREATED

7  QUESTION.

8  **Q.**  WILL YOU READ THE WORDING PLEASE, SIR?

9  **A.**  I WILL BE HAPPY TO.  IT READS:

10         "THERE HAS BEEN SOME DISCUSSION OF PAYING MONEY TO

11         COLLEGIATE FOOTBALL AND BASKETBALL STUDENT ATHLETES

12         IN ADDITION TO PROVIDING SCHOLARSHIPS THAT COVER

13         COLLEGE EXPENSES.  SOME PEOPLE ARE IN FAVOR OF PAYING

14         MONEY TO STUDENT ATHLETES WHO ARE ON COLLEGE FOOTBALL

15         OR MEN'S BASKETBALL TEAMS.  SOME PEOPLE ARE OPPOSED

16         TO PAYING MONEY TO THESE STUDENT ATHLETES.  WHICH OF

17         THESE STATEMENTS COMES CLOSEST TO YOUR OPINION."

18  **Q.**  WHAT ARE THE TWO POSSIBLE RESPONSES?

19  **A.**  THE RESPONSES ARE RANDOMIZED FOR THE RESPONDENTS.  SO

20  50 PERCENT OF THE SAMPLE SAW WHAT I'M ABOUT TO READ FIRST AND

21  THE OTHER 50 PERCENT SAW THE SECOND RESPONSE.

22      THE FIRST RESPONSE IS:  "I AM IN FAVOR OF PAYING MONEY TO

23  STUDENT ATHLETES ON COLLEGE FOOTBALL AND MEN'S COLLEGE

24  BASKETBALL TEAMS IN ADDITION TO COVERING THEIR COLLEGE

25  EXPENSES."

DENNIS – DIRECT / KLAUS

1        AND THE SECOND OPTION IS:  "I AM OPPOSED TO PAYING MONEY

2   TO STUDENT ATHLETES ON COLLEGE FOOTBALL AND MEN'S COLLEGE

3   BASKETBALL TEAMS IN ADDITION TO COVERING THEIR COLLEGE

4   EXPENSES."

5   **Q.**  HOW WAS THE QUESTION WORDED DIFFERENTLY AND WHY ON THIS

6   QUESTION AS OPPOSED TO WHAT YOU IDENTIFIED AS QUESTION 8?

7   **A.**  YES.  IN QUESTION 8 WHICH, JUST TO REMIND EVERYONE, THAT'S

8   THE OPEN-ENDED QUESTION ON AWARENESS OF THE ISSUES THAT ARE IN

9   THE MEDIA OF PAYING STUDENT ATHLETES.

10       THERE IS NO CONTEXT SETTING IN QUESTION 8.  THERE'S NO

11  EXPLANATION AS PROVIDED HERE IN OUR QUESTION 9 WITH RESPECT TO

12  IN ADDITION TO PROVIDING SCHOLARSHIPS THAT COVER COLLEGE

13  EXPENSES.

14       SO IN THIS FIRST SUBSTANTIVE MEASURE AT QUESTION 9, THIS

15  IS THE IMPORTANT CONTEXT SETTING FOR THE RESPONDENTS TO INFORM

16  THEM THAT WE'RE TALKING ABOUT A CONTEXT OF PAYING MONEY TO

17  STUDENT ATHLETES IN AN OVERALL CONTEXT IN WHICH THIS IS AN

18  ADDITION TO PROVIDING SCHOLARSHIPS.

19  **Q.**  WHAT WAS THE NEXT QUESTION IN YOUR SURVEY, DR. DENNIS?

20  **A.**  THIS IS A FOLLOW-UP QUESTION TO THE QUESTION 9, WHICH I

21  OFTEN CALLED THE FAVOR OR OPPOSE QUESTION.  AND THIS IS A

22  QUESTION TO MEASURE THE INTENSITY OF THE POSITION.

23       SO THIS IS A QUESTION THAT MEASURES THE INTENSITY OF BEING

24  IN FAVOR OR OPPOSED TO PAYING STUDENT ATHLETES.

25  **Q.**  WHAT WERE THE -- AND THE CHOICES FOR THE RESPONDENTS WERE?

1    **A.**  THERE ARE THREE CHOICES RANGING ACROSS, I FEEL VERY

2    STRONGLY ABOUT MY POSITION, I FEEL SOMEWHAT STRONGLY ABOUT MY

3    POSITION, I DO NOT FEEL STRONGLY AT ALL ABOUT MY POSITION.

4    **Q.**  WHAT WERE THE RESULTS FROM THE TWO QUESTIONS THAT YOU HAVE

5    JUST DESCRIBED ACROSS THE SAMPLE OF RESPONDENTS?

6    **A.**  SO, THIS -- THIS DATA IS A COMBINATION OF THE TWO

7    QUESTIONS, THE QUESTION 9 ABOUT FAVOR OR OPPOSE, AND ALSO THE

8    DATA THAT COMES IN FROM THE STRENGTH OF THAT FEELING OF FAVOR

9    OR OPPOSING.

10       AND COMBINING THOSE TWO DATA STREAMS, IF YOU WILL, THE

11   RESULTS ARE VERY STRONG HERE.  AS I MENTIONED YESTERDAY, ABOUT

12   SEVEN IN TEN OF THE U.S. PUBLIC IS OPPOSED TO PAYING ATHLETES.

13   THE EXACT NUMBER IS 69 PERCENT.  OF THAT 69 PERCENT THAT IS

14   OPPOSED TO PAYING STUDENT ATHLETES, NEARLY A MAJORITY OF THEM

15   FEEL VERY STRONGLY ABOUT THIS.

16       IF YOU TAKE THE VERY STRONGLY GROUP AND THE SOMEWHAT

17   STRONGLY GROUP, YOU HAVE A NET PERCENTAGE OF 55 PERCENT OF THE

18   U.S. PUBLIC THAT IS EITHER VERY STRONGLY OPPOSED OR SOMEWHAT

19   STRONGLY OPPOSED TO THE PAYING OF STUDENT ATHLETES.

20       THE NUMBERS, AS YOU CAN SEE HERE, IT'S A VERY --

21   RELATIVELY SMALL GROUP THAT DO NOT FEEL STRONGLY ABOUT THIS.

22   IT'S ONLY 12 PERCENT DO NOT FEEL STRONGLY IN TERMS OF THEIR

23   OPPOSITION TO PAYING STUDENT ATHLETES.

24       WITH RESPECT TO THE GROUP THAT FAVORS PAYING STUDENT

25   ATHLETES, THAT NUMBER, AS YOU CAN SEE ON THE SCREEN, IT'S

1    ABOUT THREE OUT OF TEN OF THE U.S. PUBLIC.  THE NUMBER IS

2    28 PERCENT.

3        ONE OF THE STRIKING THINGS FOR ME IN THIS DATA IS THAT

4    IT'S A RELATIVELY SMALL FRACTION THAT FEELS STRONGLY ABOUT

5    THEIR POSITION IN TERMS OF FAVORING THE PAYING OF STUDENT

6    ATHLETES.  THE MUCH MORE POPULATED CATEGORY THERE ARE THOSE

7    INDIVIDUALS WHO FEEL SOMEWHAT STRONGLY OR NOT STRONGLY.

8        SO, IN SUM, THE INDIVIDUALS WHO FAVOR THE PAYING OF

9    STUDENT ATHLETES FEEL LESS STRONGLY IN THEIR INTENSITY ABOUT

10   THAT POSITION COMPARED TO THOSE WHO OPPOSE.

11   **Q.**  THE RESULTS THAT YOU JUST DESCRIBED WERE ACROSS THE

12   ENTIRETY OF THE PUBLIC SAMPLED IN YOUR SURVEY, CORRECT?

13   **A.**  THAT IS CORRECT.

14   **Q.**  DID YOU ALSO ANALYZE THE VIEWS ON THE QUESTION OF PAYING

15   STUDENT ATHLETES AND THE INTENSITY OF THAT OPINION AMONG A

16   SUBSET WHO HAD ATTENDED TO COLLEGE BASKETBALL OR COLLEGE

17   FOOTBALL GAMES?

18   **A.**  I DID.

19   **Q.**  IS THAT ANALYSIS SHOWN ON THE RIGHT-HAND SIDE OF YOUR

20   DEMONSTRATIVE SLIDE 19?

21   **A.**  IT IS INDEED.

22   **Q.**  WHAT -- CAN YOU DESCRIBE WHAT THE SAMPLE IS HERE THAT

23   YOU'VE ISOLATED?

24   **A.**  YES.  THE SPORT FANS HERE THAT I'VE ISOLATED AMOUNT TO 552

25   INTERVIEWS, AND THAT IS A SUBSET OF THE 2,455 INTERVIEWS.

1      AND THE DEFINITION OF SPORTS FANS HERE ARE THOSE

2   INDIVIDUALS WHO REPORTED EARLIER IN THE SURVEY THAT THEY

3   WATCHED, VIEWED, ATTENDED AT LEAST 11 COLLEGE FOOTBALL GAMES

4   OR AT LEAST 11 OR MORE MEN'S COLLEGE BASKETBALL GAMES.

5   **Q.**  OVER THE PRECEDING YEAR?

6   **A.**  YES, THAT'S CORRECT, OVER THE PRECEDING 12 MONTHS.

7   **Q.**  TO BE CLEAR ABOUT THAT, IF -- IF A RESPONDENT HAD STATED

8   THAT THEY HAD WATCHED OR ATTENDED TEN COLLEGE FOOTBALL GAMES

9   AND THEY HAD WATCHED OR ATTENDED TEN COLLEGE MEN'S BASKETBALL

10  GAMES, WOULD THAT RESPONDENT HAVE BEEN INCLUDED IN THE FAN

11  SUBSET THAT YOU'VE DESCRIBED ON THE RIGHT-HAND SIDE OF THIS

12  DEMONSTRATIVE EXHIBIT?

13  **A.**  THE ANSWER IS NO, THAT PERSON WOULD NOT BE COUNTED AS A

14  FAN EVEN THOUGH THEY VIEWED, ATTENDED, LISTENED TO UP TO 20

15  GAMES IN THAT SCENARIO.

16  **Q.**  IF A RESPONDENT HAD ATTENDED ONE, TWO, THREE, FOUR, OR

17  FIVE COLLEGE FOOTBALL OR COLLEGE BASKETBALL GAMES IN THE

18  PRECEDING YEAR, FOR EXAMPLE AS AN ALUMNI AT A COLLEGE, BUT NO

19  MORE CONSUMPTION, WOULD THAT PERSON HAVE BEEN INCLUDED WITHIN

20  THE DEFINITION OF SPORTS FAN INDICATED ON THE RIGHT SIDE OF

21  THE SCREEN?

22  **A.**  NO, THEY WOULD NOT HAVE BEEN.

23  **Q.**  WHAT DID -- WHAT DID THE RESULTS OF YOUR ANALYSIS SHOW

24  WITH RESPECT TO THE PEOPLE YOU'VE DESCRIBED AS SPORTS FANS?

25  **A.**  YES.  AMONG THE SPORTS FANS IT'S STILL A MAJORITY THAT ARE

1    OPPOSED TO PAYING STUDENT ATHLETES.  THE NUMBER IS SIX OUT OF

2    TEN INSTEAD OF SEVEN OUT OF TEN.  THE EXACT NUMBER, AS YOU CAN

3    SEE, IS 61 PERCENT OF THE SPORTS FAN OPPOSE PAYING STUDENT

4    ATHLETES.

5        SIMILAR TO WHAT I MENTIONED EARLIER ABOUT THE GENERAL

6    PUBLIC RESULTS, FOR THE SPORTS FANS IT'S STILL ABOUT HALF WHO

7    FEEL VERY STRONGLY ABOUT THEIR POSITION IN OPPOSING THE PAYING

8    OF STUDENT ATHLETES.  AND SO IN TOTAL, AS YOU CAN SEE, IT'S

9    30 PERCENT OF THE -- OF THE FAN GROUP -- EXCUSE ME, 30 PERCENT

10   OF ALL SPORTS FANS WHO FEEL VERY STRONGLY IN THEIR OPPOSITION

11   TO PAYING STUDENT ATHLETES OR ABOUT HALF OF THOSE WHO OPPOSE

12   IN TOTAL.

13       IF YOU COMBINE THOSE TWO NUMBERS, IT'S 52 PERCENT OF FANS

14   EITHER VERY STRONGLY OR SOMEWHAT STRONGLY OPPOSE PAYING

15   STUDENT ATHLETES AND ONLY 9 PERCENT DON'T FEEL VERY STRONGLY

16   ABOUT IT.  SO THERE'S A LOT OF INTENSITY OF FEELING HERE AND

17   THE OPPOSITION TO PAYING STUDENT ATHLETES.

18       IN TERMS OF THE FAVOR RATES AMONG THE FANS, THE NUMBERS

19   ARE A LITTLE BIT HIGHER THAN WHAT YOU SEE IN THE GENERAL

20   PUBLIC NUMBER.  IT'S 37 PERCENT THAT FEEL THAT THEY ARE IN

21   FAVOR OF PAYING STUDENT ATHLETES.  AND AS YOU CAN SEE, ABOUT

22   11 PERCENT FEEL VERY STRONGLY ABOUT IT AND 19 PERCENT SOMEWHAT

23   STRONGLY, AND A VERY SMALL NUMBER NOT STRONGLY AT ALL.

24       SOME, I WOULD SAY, THAT THE OPPOSITION RATES FOR THE

25   GENERAL PUBLIC AND SPORTS FANS ARE COMPARABLE, BUT THE -- THE

1    SPORTS FANS NUMBERS ARE SLIGHTLY LOWER IN THE OPPOSITION.

2    **Q.**  AT THE BOTTOM OF THE SCREEN IT STATES "STATISTICALLY

3    SIGNIFICANT P LESS THAN 0.01".

4         WHAT DOES THAT MEAN?

5    **A.**  I'M JUST DOCUMENTING THAT THE DIFFERENCES THAT YOU SEE IN

6    THE FAVOR AND OPPOSE RATES FOR THE GENERAL PUBLIC HAVE

7    EXTREMELY LOW PROBABILITY OF OCCURRING BY RANDOM CHANCE.  IT'S

8    ANOTHER WAY OF SAYING THESE DIFFERENCES ARE REAL WITH NEAR

9    CERTAINTY.

10   **Q.**  IS THAT WITH RESPECT TO BOTH OF THESE ANALYSES THAT WE'VE

11   SEEN WHAT YOU'VE DESCRIBED AS THE GENERAL PUBLIC SAMPLE AND

12   THE SPORTS FAN SAMPLE?

13   **A.**  THAT IS CORRECT.

14   **Q.**  DR. DENNIS, DO YOU UNDERSTAND THAT THE PLAINTIFFS IN THE

15   CASE HAVE RETAINED A SURVEY EXPERT TO CRITIQUE SOME OF THE

16   WORK THAT YOU HAVE DONE?

17   **A.**  YES, I AM.

18   **Q.**  THAT PERSON IS MR. PORET, CORRECT?

19   **A.**  CORRECT.

20   **Q.**  HAVE YOU STUDIED MR. PORET'S CRITIQUES OF YOUR SURVEY WORK

21   IN THIS CASE?

22   **A.**  I HAVE.

23   **Q.**  DO YOU UNDERSTAND MR. PORET TO CRITICIZE THE RESULTS THAT

24   YOU HAVE REPORTED HERE WITH RESPECT TO FAVORING OR OPPOSING

25   THE PAYMENT TO MEN'S BASKETBALL AND FOOTBALL PLAYERS IN

1   ADDITION TO COLLEGE SCHOLARSHIPS, DO YOU UNDERSTAND THAT

2   MR. PORET HAS CRITIQUED YOUR ANALYSIS ON THE GROUND THAT THE

3   GENERAL PUBLIC, AT LEAST, INCLUDES -- OR BOTH OF THESE INCLUDE

4   SURVEY RESPONDENTS WHO MR. PORET SAYS DID NOT UNDERSTAND THE

5   NATURE OF THE QUESTIONS THAT YOU WERE ASKING HERE AND

6   ELSEWHERE IN THE SURVEY?

7   **A.**  YES, I DID.

8   **Q.**  WHAT DO YOU UNDERSTAND THE NATURE OF MR. PORET'S CRITIQUE

9   TO BE?

10  **A.**  SO THERE'S A VARIETY OF THINGS.

11      THERE'S THE CRITICISMS RELATED TO QUESTION 8 THAT I COULD

12  TALK ABOUT AND THERE ARE OTHER MORE SUBSTANTIVE ONES THAT I

13  CAN GO INTO.

14  **Q.**  WHY DON'T WE START WITH QUESTION 8, THE QUESTION THAT LED

15  TO THE OPEN-ENDED QUESTION.

16  **A.**  I WILL BE HAPPY TO START THERE.

17  **Q.**  WHAT DO YOU UNDERSTAND MR. PORET'S CRITIQUE OF YOUR SURVEY

18  TO BE?

19  **A.**  WITH RESPECT TO THAT PARTICULAR ISSUE, WHAT I UNDERSTAND

20  TO BE THE CRITIQUE IS THAT RESPONDENTS WHO ANSWERED THAT

21  OPEN-ENDED QUESTION, THAT QUESTION 8, THIS IS ABOUT -- JUST TO

22  REMIND EVERYONE, THIS IS THE QUESTION ABOUT WHAT HAS THE

23  RESPONDENT HEARD IN THE MEDIA IN THE PAST 12 MONTHS ABOUT

24  PAYING STUDENT ATHLETES.

25      THE CRITICISM THERE IS THAT THERE WAS ABOUT 200

1   RESPONDENTS THAT WROTE IN ANSWERS THAT COULD BE CONSTRUED AS

2   THINKING ABOUT ILLICIT PAYMENTS OR ILLEGITIMATE PAYMENTS THAT

3   ARE BEING MADE TO STUDENT ATHLETES AS OPPOSED TO MORE

4   STRUCTURED OR LEGITIMATE WAYS THAT STUDENT ATHLETES COULD BE

5   PAID.

6       AND I THINK THE CRITICISM IS, AS I UNDERSTAND IT, IS THAT

7   THIS WOULD POSSIBLY SHOW THAT RESPONDENTS ARE THINKING ABOUT

8   PAYMENT IN TERMS OF ILLICIT OR ILLEGITIMATE PAYMENTS BY THE

9   TIME THEY ARE ANSWERING THIS QUESTION AT QUESTION 9 WHERE THAT

10  QUESTION, OF COURSE, IS ABOUT WHETHER THE RESPONDENTS FAVOR OR

11  OPPOSE PAYING STUDENT ATHLETES IN THE CONTEXT OF IN ADDITION

12  TO COLLEGE SCHOLARSHIPS.

13      SO I THINK WHAT THE CRITICISM IS, IF I CAN SUMMARIZE IT,

14  IS THAT THE RESPONDENTS MAY HAVE BEEN CARRYING OTHER CONCEPTS

15  ABOUT ILLEGAL PAYMENT WHEN THEY ARE ANSWERING QUESTION 9 AND

16  THAT COULD HAVE BIASED THE RESULTS.

17  **Q.**  MR. PORET HAD ACCESS TO THE SAME DATA SET THAT YOU DID

18  FROM YOUR SURVEY RESULTS, CORRECT?

19  **A.**  THAT IS CORRECT.

20  **Q.**  DID -- DID THE PLAINTIFFS IN THE CASE, TO YOUR KNOWLEDGE,

21  IDENTIFY THIS SUBSET OF 200 OR SO RESPONSES TO QUESTION 8

22  THAT -- THAT HAD THE RESPONSES TO THE OPEN-ENDED QUESTION ON

23  ILLICIT PAYMENTS OF THE TYPE JUST DESCRIBED BY YOU?

24  **A.**  YES.

25  **Q.**  WHAT IS YOUR RESPONSE TO MR. PORET'S CRITIQUE ON THIS

1   ISSUE OF QUESTION 8 HAVING HAD RESIDUAL BAGGAGE FOR

2   RESPONDENTS ON LATER QUESTIONS?

3   **A.**  WELL, I DISAGREE WITH THE CRITICISM.  FIRST OF ALL, I

4   DON'T THINK IT HAS MERIT.  THE REASONS WHY ARE, I THINK,

5   PRETTY SIMPLE.

6        SOME OF IT'S EMPIRICAL BASED, OTHERS I WILL JUST EXPLAIN

7   HOW THE QUESTIONNAIRE WAS DESIGNED.

8        SO QUESTION 8 HAS, IN THAT OPEN-ENDED QUESTION, HAS NO

9   CONTEXT SETTING WHATSOEVER FOR THE RESPONDENT.  IT IS A VERY

10  GENERAL QUESTION ABOUT WHAT HAVE YOU HEARD IN THE MEDIA IN THE

11  PAST 12 MONTHS ABOUT PAYING STUDENT ATHLETES.  THERE IS NO

12  INFORMATION PROVIDED OR CONTEXT PROVIDED TO THE RESPONDENT YET

13  ABOUT WHAT FORMS OF PAYING STUDENT ATHLETES THIS SURVEY IS

14  REGARDING.  SO THERE'S NO INSTRUCTION THAT WE ARE TALKING

15  ABOUT PAYMENTS IN ADDITION TO COLLEGE ATHLETIC SCHOLARSHIPS.

16       BY THE TIME WE GET TO QUESTION 9, WHICH IS THE KEY

17  SUBSTANTIVE QUESTION THAT WE HAVE TALKED ABOUT SO FAR, THAT

18  CONTEXT SETTING HAS BEEN MADE.  AND THE RESPONDENTS HAVE BEEN

19  INFORMED THAT WE ARE TALKING ABOUT FOR THIS STUDY AND SURVEY

20  PAYING STUDENT ATHLETES IN THE CONTEXT OF IN ADDITION TO

21  COLLEGE ATHLETIC SCHOLARSHIPS.

22       SO MY FIRST REBUTTAL, IF YOU WILL, TO THAT CRITICISM WOULD

23  BE THAT I THINK IT IS BASED ON A MISUNDERSTANDING OF THE

24  QUESTIONNAIRE DESIGN.  THE QUESTION 8 WAS REALLY ABOUT A VERY

25  GENERAL PAST 12 MONTHS LOOKING AT WHAT'S BEEN IN THE NEWS,

DENNIS – DIRECT / KLAUS

1    WHEREAS QUESTION 9 IS A FOCUSED QUESTION ON A SPECIFIC CONTEXT

2    OF PAYING STUDENT ATHLETES.

3        THE EMPIRICAL PART OF THIS, AND I MENTIONED THERE WERE TWO

4    PARTS TO MY ANSWER, IS REALLY THE DATABASED ONE BECAUSE THE

5    200 CASES WHERE IDENTIFIED BY MR. PORET AS BEING POSSIBLY

6    SUSPECT, I DID LOOK AT THE DATA ONE MORE TIME AND DID A

7    WHAT-IF ANALYSIS TO DETERMINE IF THIS SURVEY RESULTS WOULD

8    HAVE CHANGED AS THE RESULT OF THE INCLUSION OR EXCLUSION OF

9    THESE SO-CALLED PROBLEMATIC 200 INTERVIEWS.

10       IT TURNS OUT THE RESULTS DON'T CHANGE AT ALL.  THE ACTUAL

11   FAVOR AND OPPOSED RATES, AND JUST TO REMIND EVERYONE, IT WAS

12   68.9 PERCENT OF THE GENERAL PUBLIC IS OPPOSED TO PAYING

13   STUDENT ATHLETES.  WHEN I BACKED OUT THOSE 200 INTERVIEWS THAT

14   ARE SUPPOSEDLY PROBLEMATIC, THE RESULT ONLY CHANGED BY ONE

15   TENTH OF 1 PERCENT.  IT CAME FROM THE 68.9 TO THE

16   68.8 PERCENT.

17       SO I WOULD DRAW FROM THAT THAT -- TO SUMMARIZE, I THINK IT

18   IS BASED ON A MISUNDERSTANDING OF THE QUESTIONNAIRE DESIGN

19   AND, SECONDLY, THERE'S NO EMPIRICAL BASIS FOR THE CRITICISM.

20   **Q.**  YOU'VE DESCRIBED WHAT THE RESULTS OF YOUR SURVEY WERE WITH

21   RESPECT TO THIS FAVOR OR OPPOSE QUESTION ON THE SUBJECT OF

22   PAYING COLLEGE ATHLETES.

23       ARE YOU AWARE OF OTHER SURVEY WORK THAT HAS BEEN DONE WITH

24   RESPECT TO SIMILAR QUESTIONS BEFORE AND AFTER YOUR SURVEY?

25   **A.**  YES, I AM.

1   **Q.**  HOW DOES -- HOW DO THE RESULTS THAT YOU HAVE DESCRIBED

2   WITH RESPECT TO THIS QUESTION COMPARE TO OTHER SURVEY RESULTS

3   THAT -- THAT YOU ARE FAMILIAR WITH?

4           **MR. ROSENTHAL:**  YOUR HONOR, I'M GOING TO OBJECT TO

5   THIS JUST FOR COMING IN FOR ITS TRUTH SO LONG AS IT ACTUALLY

6   FORMS THE BASIS FOR SOME DETERMINATION HE WAS MAKING TO

7   VALIDATED HIS RESULTS, THAT'S FINE.

8           **THE COURT:**  ALL RIGHT.  WHY DON'T YOU TRY TO LAY THAT

9   FOUNDATION, IF YOU CAN.

10          **MR. KLAUS:**  SURE.

11  **BY MR. KLAUS:**

12  **Q.**  DID YOU -- DID YOU MAKE ANY EFFORT TO COMPARE THE RESULTS

13  OF YOUR SURVEY TO OTHER SURVEYS REGARDING THE SAME QUESTION?

14  **A.**  I DID.

15  **Q.**  WHAT DID YOU DETERMINE?

16          **THE COURT:**  WHY DID YOU DO THAT?

17          **THE WITNESS:**  I DID THAT BECAUSE, FOR ME, IN A NORMAL

18  COURSE OF PRACTICE, IS TO COMPARE THE RESULTS FROM MY SURVEYS

19  TO OTHERS TO SEE IF THEY LINE UP, TO SEE IF THERE ARE ANY

20  INCONSISTENCIES.  IT COULD SPEAK TO POTENTIAL PROBLEMS WITH

21  THE SURVEY IF MY RESULTS ARE RADICALLY DIFFERENT FROM

22  PREVIOUSLY WELL DONE SURVEYS.

23  **BY MR. KLAUS:**

24  **Q.**  WHAT DID YOU FIND WHEN YOU LOOKED AT OTHER SURVEYS IN THE

25  FIELD?

1    **A.** I FOUND A LOT OF CONSISTENCY, ACTUALLY, IN THE RESULTS

2    ACROSS THE SURVEYS THAT HAVE BEEN DONE ON THIS TOPIC.

3        SOME OF THEM I WOULD NOT CHARACTERIZE AS SURVEYS, BUT MORE

4    POLLS, TELEPHONE POLLS AND OTHER SURVEYS THAT PERHAPS THEY

5    VARY IN THEIR QUALITY OR THEIR METHODOLOGY AND THEIR

6    IMPLEMENTATION.

7        BUT HOLDING THOSE VARIANCES CONSTANT, IF YOU WILL, I WAS

8    REALLY STRUCK BY HOW CONSISTENT THE FINDINGS ARE ACROSS THE

9    STUDIES THAT HAVE BEEN DONE ON THIS DATING BACK TO 2001.  AND

10   THE RESULTS FROM MY SURVEY ARE RIGHT IN THE MIDDLE OF THE

11   PACK, IF YOU WILL.

12   **Q.** CAN YOU JUST DESCRIBE -- CAN YOU DESCRIBE WHAT THE RESULTS

13   WERE THAT ARE DESCRIBED HERE ON THIS SLIDE VERY GENERALLY?

14   **A.** GENERALLY, WE ARE LOOKING AT POLLS CONDUCTED BETWEEN

15   MARCH 2001 AND ONE VERY RECENTLY IN MARCH 2014 BY ABC NEWS.

16       AND THE RESULTS SHOW OPPOSITION RATES TO THE IDEA OF

17   PAYING STUDENT ATHLETES RANGING FROM A LOW OF 59 PERCENT FROM

18   THE YOUGOV -- YOUGOV IS Y-O-U-G-O-V POLL, TO A HIGH OF THE

19   GALLUP POLL OF 75 PERCENT.

20       AND THEN, OF COURSE, IN MY SURVEY, THE NUMBER WAS

21   69 PERCENT IN THE OPPOSITION RATE.

22   **Q.** WHAT DID YOU DETERMINE BASED ON THE RESULTS OF THAT

23   COMPARISON?

24   **A.** I GUESS A COUPLE OF THINGS.

25       ONE IS I FELT THAT IT GAVE ME MORE CONFIDENCE THAT MY

1    SURVEY WAS ON THE RIGHT TRACK.

2        MORE IMPORTANTLY, IT REALLY SPEAKS TO HOW CONSTANT THIS

3    ATTITUDE AND OPINION IS AMONG THE PUBLIC.  IT HASN'T CHANGED

4    SIGNIFICANTLY.  IT HAS MINOR VARIANCES FROM POLL TO POLL AND

5    SURVEY TO SURVEY, BUT THERE'S A -- THERE'S A REAL CONSTANCY IN

6    PUBLIC OPPOSITION TO THIS IDEA OF PAYING STUDENT ATHLETES.

7    **Q.**  ONE OF THE THINGS YOU DO PROFESSIONALLY IS MARKET RESEARCH

8    FOR COMPANIES WHO ARE CONSIDERING CHANGES TO THEIR PRODUCT; IS

9    THAT RIGHT?

10   **A.**  I DO.

11   **Q.**  IF THIS WERE A MARKET RESEARCH STUDY FOR A CLIENT ABOUT

12   CHANGING THE PRODUCT, WHAT WOULD YOUR RECOMMENDATION BE BASED

13   ON THE DATA THAT YOU COLLECTED AND ANALYZED?

14   **A.**  THE SHORT ANSWER WOULD BE DON'T CHANGE YOUR PRODUCT IN

15   THIS DIRECTION.

16       I MEAN, YOU'RE POTENTIALLY GOING TO ALIENATE SIX OUT OF

17   TEN OF YOUR CUSTOMERS IF YOU WERE TO CHANGE YOUR PROGRAM IN

18   THIS DIRECTION.

19   **Q.**  WE LOOKED AT YOUR QUESTION ABOUT THE FAVOR AND OPPOSING

20   AND THE INTENSITY OF THAT OPINION.

21       WHAT DID YOU ASK NEXT, DR. DENNIS?

22   **A.**  SO, AGAIN, THIS IS GETTING INTO THE MORE SUBSTANTIVE

23   MEASURES OF THE SURVEY.

24       THIS IS A SCENARIO PRESENTED TO THE RESPONDENTS WHERE WE

25   ARE ASKING THEM TO CONSIDER AN APPROACH WHERE A STUDENT

1    ATHLETE ON A COLLEGE FOOTBALL OR MEN'S COLLEGE BASKETBALL TEAM

2    IS PAID $20,000 A YEAR.  AND VERY IMPORTANTLY THIS IS $20,000

3    A YEAR IN ADDITION TO COVERING THE ATHLETE'S COLLEGE EXPENSES.

4        THIS IS A QUESTION ASKING, I THINK, A SIMPLE QUESTION:

5    WOULD THEY BE LESS LIKELY, NO MORE OR LESS LIKELY, OR MORE

6    LIKELY TO WATCH, LISTEN TO, OR ATTEND COLLEGE FOOTBALL AND

7    MEN'S BASKETBALL GAMES IN A STATE OF THE WORLD WHERE THIS

8    SCENARIO IS TRUE WHERE THE ATHLETES ARE BEING PAID AT LEAST

9    $20,000 A YEAR.

10   **Q.**  WERE THERE OTHER DOLLAR SCENARIOS THAT YOU APPLIED THIS

11   QUESTION TO?

12   **A.**  YES.  THE SAME QUESTION WAS ASKED FOR THE SCENARIO OF

13   $50,000 A YEAR AND $200,000 A YEAR.

14   **Q.**  WHY DID YOU PICK THOSE NUMBERS FOR THIS SERIES OF

15   QUESTIONS?

16   **A.**  I PICKED THESE AS A RESULT OF READING THE REPORT FROM

17   DR. RASCHER'S MATERIALS.  HIS DAMAGES MODEL, AS I UNDERSTOOD

18   IT, INCLUDED A VARIETY OF PAYMENT LEVELS, TWO OF WHICH WERE

19   AROUND THE 20,000 AND 50,000 MARK FOR COLLEGE FOOTBALL

20   PLAYERS.  AND THEN IT COULD BE UP TO $200,000 PER YEAR, AS I

21   UNDERSTOOD IT, FOR THE COLLEGE BASKETBALL PLAYERS.

22       SO I WANTED TO HAVE A VARIETY OF SCENARIOS PRESENTED TO

23   THE RESPONDENTS SO THAT WE CAN MEASURE SENSITIVITY OF DEMAND

24   AS A FUNCTION OF THE PAYMENT LEVELS.

25   **Q.**  WHAT WAS THE SCALE, THE FIVE-POINT SCALE THAT RESPONDENTS

1  COULD ANSWER THIS QUESTION WITH?

2  **A.**  THE FIVE-POINT SCALE, AS YOU CAN SEE HERE, IS MUCH LESS

3  LIKELY, SOMEWHAT LESS LIKELY, THE MIDPOINT OR NEUTRAL OF NO

4  MORE OR LESS LIKELY, SOMEWHAT MORE LIKELY, AND MUCH MORE

5  LIKELY TO WATCH, ET CETERA.

6  **Q.**  TO BE CLEAR, WAS THE QUESTION ASKING WHETHER RESPONDENTS

7  WOULD WATCH LESS GAMES OR WHETHER THEY WOULD BE LESS LIKELY TO

8  WATCH GAMES IN THE FUTURE THAN THEY WERE AT THE PRESENT POINT

9  IN TIME?

10  **A.**  YES, THAT'S A USEFUL DISTINCTION.  IT'S ABOUT LESS LIKELY

11  TO WATCH IN THE FUTURE.

12  **Q.**  FOCUSING ON THIS SERIES OF QUESTIONS, DO YOU UNDERSTAND

13  MR. PORET TO HAVE CRITICIZED THE SURVEY ON THE GROUND THAT IT

14  IS FAILING TO ADDRESS ISSUES THAT ARE IN THIS LITIGATION?

15  **A.**  YES, I AM.

16  **Q.**  WHAT DO YOU UNDERSTAND THE NATURE OF MR. PORET'S

17  CRITICISMS IN THAT REGARD TO BE?

18  **A.**  THE FIRST CRITICISM, AS I UNDERSTAND IT, IS THAT I DID NOT

19  INCLUDE QUESTIONS OR INFORMATION ABOUT NAMES, IMAGES AND

20  LIKENESSES RIGHTS AND ABOUT PAYMENTS THAT COULD BE MADE ON THE

21  BASIS OF THOSE RIGHTS.

22      THE SECOND CRITICISM, AS I UNDERSTAND IT, IS THAT MY

23  SURVEY QUESTIONS FAILED TO INCLUDE QUESTIONS ABOUT DEFERRED

24  COMPENSATION WHERE MONEY WOULD BE PUT IN TRUST FUNDS

25  PRESUMABLY TO BE ACCESSED BY THE STUDENT ATHLETES AT A FUTURE

1    DATE.

2    **Q.**  LET'S FOCUS ON MR. PORET'S FIRST CRITICISM THAT THIS

3    QUESTION AND OTHERS WERE NOT TIED TO THE PAYMENT OF MONEY IN

4    ADDITION TO COVERING THE ATHLETE'S COLLEGE EXPENSES IN

5    EXCHANGE FOR NAME, IMAGE AND LIKENESS RIGHTS.

6        WHAT DID -- WHAT IS YOUR RESPONSE TO MR. PORET'S CRITICISM

7    IN THAT REGARD?

8    **A.**  IT WOULD BE SEVERAL-FOLD.  THE FIRST THING IS THAT I THINK

9    IT WOULD BE A VERY COMPLICATED MATTER TO DESIGN SURVEY

10   QUESTIONS TO INCORPORATE LANGUAGE AROUND NAME, IMAGE AND

11   LIKENESS RIGHTS.

12   **Q.**  WHY DO YOU THINK IT WOULD BE COMPLICATED TO DO THAT?

13   **A.**  IT'S -- IN MY OPINION, AS A SURVEY RESEARCH EXPERT, IT

14   APPEARS TO BE VERY TRICKY DISPUTED LEGAL TERRITORY FILLED WITH

15   JARGON, DIFFICULT TO FOLLOW, AND I THINK THERE'S SOME VERY

16   ILLUSIVE CONCEPTS IN HERE ABOUT NAME, USE AND LIKENESS RIGHTS

17   THAT WOULD BE DIFFICULT TO EXPLAIN TO A RESPONDENT.

18       IF I COULD EXPLAIN.  FOR THE COMMON SENSE LAY PERSON'S WAY

19   OF THINKING ABOUT THIS, THE STUDENT ATHLETES ARE OUT THERE,

20   THEY ARE PERFORMING FOR THEIR TEAMS.  THERE'S POTENTIALLY

21   PAYMENT THAT COULD BE MADE AS A RESULT OF PERFORMANCE AND WHAT

22   THEY DO IN THE REGULAR CONDUCT OF PERFORMING FOR THEIR TEAMS

23   AND THEIR COACHES.

24       TO ASK THE RESPONDENT TO CONSIDER IN COMPLETE ISOLATION

25   ANOTHER JUSTIFICATION FOR PAYING STUDENT ATHLETES AS A RESULT

1    OF SOME LEGAL CONSTRUCT OF NAME, USE AND LIKENESS RIGHTS --

2    **Q.**  NAME, IMAGE AND LIKENESS RIGHTS?

3    **A.**  EXCUSE ME?

4    **Q.**  DO YOU MEAN NAME, IMAGE AND LIKENESS?

5    **A.**  YES.  THANK YOU.

6       AND MY POINT IS THAT WOULD BE A VERY DIFFICULT SET OF

7    CONCEPTS TO EXPLAIN.  MY CONCERN WOULD BE THAT THE RESPONDENTS

8    WOULD COMMINGLE THESE TWO THINGS, AND IT WOULD BE UNABLE TO

9    SEPARATE THESE TWO DIFFERENT FORMS OF JUSTIFICATION FOR PAYING

10   STUDENT ATHLETES.

11   **Q.**  AND THE TWO DIFFERENT THINGS THAT YOU THOUGHT WOULD BE

12   DIFFICULT TO SEPARATE, JUST FOR CLARITY, WOULD BE THE -- ON

13   THE ONE HAND I THINK YOU DESCRIBED THE PERFORMANCE ON THE

14   FIELD.

15      WHAT WAS THE SECOND THING TO UNTANGLE THAT FORM?

16   **A.**  ABOUT THE POTENTIAL PAYMENTS THAT COULD BE MADE FOR THE

17   USE OF THE NAME, IMAGE AND LIKENESSES OF THESE ATHLETES ON THE

18   FIELD.

19   **Q.**  AND ON TELEVISION, WHEN THE SAME PERFORMANCE IS SHOWN ON

20   TELEVISION?

21   **A.**  THAT IS CORRECT.  I HAVE OTHER OBJECTIONS AS WELL.

22   **Q.**  WHAT OTHER RESPONSES DID DO YOU HAVE TO MR. PORET'S

23   CRITIQUES IN THIS REGARD?

24   **A.**  THE OTHER OBJECTIONS I WOULD BRING UP HERE ARE IN THE

25   CONTEXT OF THE QUALITY CONTROL TESTS THAT I DID BEFORE I

DENNIS – DIRECT / KLAUS

1    ACTUALLY LAUNCHED THE MAIN STUDY TO THE -- ULTIMATELY TO THE

2    2,455 INTERVIEWED RESPONDENTS.

3        AS I MENTIONED YESTERDAY, I DID DO QUALITY CONTROL

4    TELEPHONE INTERVIEWS WITH 15 DIFFERENT PRETEST RESPONDENTS.  I

5    TALKED IN DEPTH WITH THEM ABOUT WHAT THEY THOUGHT ABOUT THE

6    SURVEY.  IS THERE ANY INFORMATION MISSING FROM THE SURVEY?

7        WHAT DOES THE SURVEY QUESTIONS MEAN TO THEM?

8        AND IN MY FIELD THAT'S USUALLY CALLED THOUGHT ALLOWANCE

9    WHERE YOU ARE ENCOURAGING THE RESPONDENT TO THINK ALOUD ABOUT

10   WHAT THEIR MENTAL PROCESS IS AS THEY TRY TO ANSWER A SURVEY

11   QUESTION.

12       AND NONE OF THEM BROUGHT UP THIS ISSUE WHATSOEVER.  TO THE

13   CONTRARY, THEY SHOWED ME THAT THEY UNDERSTOOD THE SURVEY

14   QUESTION VERY WELL.

15       ANOTHER POINT I WOULD LIKE TO MAKE, IF I COULD, IS THAT AS

16   WE JUST EXAMINED A MINUTE AGO, THE RESULTS ACROSS ALL THE

17   POLLS IN THIS TOPIC ARE NEARLY UNANIMOUS IN SAYING THERE'S

18   HIGH LEVELS OF OPPOSITION TO PAYING STUDENT ATHLETES.

19       THIS TELLS ME THAT ADDING A LITTLE MORE INFORMATION TO

20   THESE SCENARIOS ABOUT DIFFERENT JUSTIFICATIONS FOR PAYING

21   STUDENT ATHLETES WOULD NOT RESULT IN CHANGING THE RESULTS

22   SUBSTANTIALLY.

23   Q.  ARE YOU FAMILIAR WITH ANY SURVEY THAT HAS ASKED

24   RESPONDENTS THEIR VIEWS ON PAYING STUDENT ATHLETES FOR THEIR

25   NAME, IMAGE AND LIKENESS RIGHTS?

1   **A.**   NO.   I HAVE NOT SEEN ANY IN THE PRESS, IN PEER REVIEW

2   JOURNALS, AND I HAVEN'T SEEN ANY OFFERED BY THE PLAINTIFFS ON

3   THIS POINT.

4   **Q.**   HAVE YOU SEEN ANY DESCRIPTION OF HOW ONE WOULD WRITE A

5   CLEAR UNDERSTANDABLE QUESTION FOR A RESPONDENT TO ANSWER ABOUT

6   SEPARATING THE CONCEPT OF PAYMENT FOR THE PERFORMANCE ON THE

7   FIELD AND PAYMENT FOR THE APPEARANCE OF NAME, IMAGE AND

8   LIKENESS ON TELEVISION?

9   **A.**   I HAVE NOT, AND THIS IS ONE OF MY MAJOR CONCERNS.

10  **Q.**   YOU SAID THAT THERE WERE TWO SUBSTANTIVE CRITIQUES THAT

11  YOU UNDERSTOOD MR. PORET TO HAVE TO THIS QUESTION AND OTHERS

12  ABOUT PAYMENT TO STUDENT ATHLETES.

13      WHAT WAS THAT SECOND CATEGORY?

14  **A.**   THE SECOND CATEGORY HAD TO DO WITH DEFERRED COMPENSATION

15  AND THIS SUGGESTION THAT MY SURVEY DOES NOT INCLUDE MEASURES

16  OF DEFERRED COMPENSATION.

17  **Q.**   WHAT IS YOUR RESPONSE TO MR. PORET'S CRITICISMS IN THAT

18  REGARD?

19  **A.**   MY CRITICISMS ARE SOMEWHAT SIMILAR TO WHAT I JUST

20  MENTIONED ABOUT NAME, IMAGE AND LIKENESS RIGHTS.   I'LL MENTION

21  A COUPLE OF THEM HERE.

22      ONE IS THAT THE -- THE RESPONDENTS IN MY QUALITY CONTROL

23  PRETEST DID NOT BRING THIS UP AS AN ISSUE.   THEY UNDERSTOOD

24  PAYMENT AS PAYMENT WITH RESPECT TO THE QUESTIONED WORDING.

25  THEY WERE NOT INJECTING SCENARIOS IN THEIR MINDS TO, WELL,

DENNIS – DIRECT / KLAUS

1    SUPPOSE THERE'S A TRUST FUND SET UP IN THE FUTURE, WOULD THAT

2    BE A LEGITIMATE FORM OF COMPENSATION?

3        THIS POINT ABOUT DEFERRED COMPENSATION ALSO BRINGS UP

4    ISSUES OF, I THINK, OPERATIONAL COMPLEXITY, TOO, ABOUT THE

5    FEASIBILITY OF IT ACTUALLY BEING IMPLEMENTED IN PRACTICE.

6        BUT IN SHORT, THE BOTTOM LINE FOR ME ABOUT THIS IS THAT

7    RESPONDENTS WERE FREE TO BRING IN THEIR OWN CONCEPTS OF

8    DEFERRED COMPENSATION.  IF THEY WANTED TO CONSIDER PAYING

9    STUDENT ATHLETES IN THE CONTEXT OF FUTURE PAYMENTS, THE

10   RESPONDENTS WERE PERFECTLY ABLE TO DO THAT AS A RESULT OF THE

11   WAY I ANSWERED AND WORDED THESE SURVEY QUESTIONS.

12   **Q.**  HAVE YOU SEEN ANY SURVEY ANYWHERE THAT SUGGESTS THAT THERE

13   WOULD BE SUPPORT IN THE PUBLIC FOR PAYMENT TO STUDENT ATHLETES

14   OVER AND ABOVE SCHOLARSHIP COSTS WHERE THERE WOULD BE SUPPORT

15   IF THE MONEY WAS HELD IN A TRUST FUND OR PAID AS DEFERRED

16   COMPENSATION?

17   **A.**  NO.  I HAVEN'T SEEN ANY POLLS OR SURVEYS PROVIDED BY THE

18   PLAINTIFFS OR ANYONE ELSE, FOR THAT MATTER, ON THAT POINT.

19   **Q.**  HAVE YOU SEEN ANY EVIDENCE OF QUESTION WORDING AS TO HOW

20   ONE WOULD ASK THAT SORT OF A QUESTION IN A CLEAR,

21   UNDERSTANDABLE AND INTELLIGIBLE WAY?

22   **A.**  NO, I HAVE NOT.

23   **Q.**  IF WE COULD, LET'S TURN TO THE RESULTS OF THIS QUESTION.

24   THIS IS YOUR DEMONSTRATIVE SLIDE NUMBER 22.

25               (SLIDE DISPLAYED ON SCREEN.)

1      WHAT IS THIS, DR. DENNIS?

2  **A.**   YES.  SO THIS IS A SUMMARY OF THE RESULTS FOR THE THREE

3  QUESTIONS WITH RESPECT TO PAYMENTS BEING MADE AT THE $20,000 A

4  YEAR LEVEL, THE $50,000 A YEAR LEVEL, AND THEN THE $200,000 A

5  YEAR LEVEL.

6      WHAT THE RESULTS ARE SHOWING HERE IS THAT IN THE CASE OF

7  THE $20,000 A YEAR SCENARIO, 38 PERCENT OF THE U.S. PUBLIC ARE

8  SAYING THAT THEY WOULD BE LESS LIKELY TO VIEW OR ATTEND GAMES

9  IF THE STUDENT ATHLETES WERE TO BE PAID $20,000 A YEAR.

10      TO BE CLEAR, THAT IS IN MY FIELD, WE CALL THAT A TOP TWO

11  BOX ANALYSIS.  SO IT'S A COMBINATION OF THOSE WHO ARE SAYING

12  THAT THEY ARE MUCH LESS LIKELY AND SOMEWHAT LESS LIKELY TO

13  VIEW OR ATTEND GAMES.

14  **Q.**  I PAUSE ON THAT.

15      JUST FOCUSING ON THE $20,000 RESULTS, BUT ALSO AS

16  APPLICABLE TO THE REPORTED PERCENTAGES ON THIS SLIDE FOR

17  50,000 AND 200,000, DOES THE FACT THAT 38 PERCENT OF THE

18  RESPONDENTS SAID THEY WOULD BE LESS LIKELY TO VIEW OR ATTEND

19  GAMES IF STUDENT ATHLETES WERE PAID THIS MONEY IN ADDITION TO

20  SCHOLARSHIP EXPENSES MEAN THAT 62 PERCENT OF THE PUBLIC SAID

21  THEY WOULD BE MORE LIKELY?

22  **A.**  NO, IT DOES NOT MEAN THAT AT ALL.

23  **Q.**  CAN YOU EXPLAIN WHY?

24  **A.**  YEAH.

25      THE ACTUAL -- THE MOST POPULAR CATEGORY FOR RESPONDENTS

1    WAS NO MORE OR LESS LIKELY.  SO, OBVIOUSLY, IF YOU TAKE A

2    HUNDRED PERCENT AND YOU SUBTRACT 38 PERCENT INTO THAT, YOU

3    HAVE A BALANCE OF 62 PERCENT.

4        IT TURNS OUT THAT THAT BALANCE IS ALMOST ALL IN THE

5    CATEGORY OF NO MORE OR LESS LIKELY.  ONLY ABOUT 4 TO 5 PERCENT

6    OF THE RESPONDENTS ASKED THIS QUESTION ACTUALLY SAID THEY

7    WOULD BE MORE LIKELY TO CONSUME THESE SPORTS AS A RESULT OF

8    STUDENT ATHLETES BEING PAID.

9    **Q.**  DOES THE FACT THAT 62 PERCENT WERE EITHER NO MORE OR LESS

10   LIKELY TO CHANGE THEIR BEHAVIOR OR SOME SMALL NUMBER MORE

11   LIKELY, DOES THAT CHANGE YOUR OPINION ABOUT WHAT YOU WOULD

12   ADVISE SOMEONE IF THEY WERE DOING MARKET RESEARCH ON A PRODUCT

13   CHANGE WITH RESPECT TO THE NUMBERS HERE REPORTED?

14   **A.**  I WOULD HAVE THE SAME CONCERNS IN TERMS OF WHAT I WOULD

15   ACTUALLY PROVIDE FOR RECOMMENDATIONS TO A MARKETING DEPARTMENT

16   OR A CEO WHO IS CONTEMPLATING MAKING MAJOR CHANGES TO ONE OF

17   THEIR PROGRAMS WITH THESE KINDS OF RATES.

18   **Q.**  WHY DO YOU SAY THAT?

19   **A.**  WELL, HAVING FOUR OUT OF TEN -- EXCUSE ME.

20       HAVING FOUR OUT OF TEN OF THE PUBLIC SAYING THAT THEY ARE

21   GOING TO BE LESS LIKELY TO WATCH, VIEW, OR ATTEND IF THE

22   STUDENT ATHLETES WERE TO BE PAID TWENTY PERCENT, THAT COULD

23   POTENTIALLY BE A HUGE LOSS OF MARKET SHARE FOR THAT

24   ORGANIZATION.

25       SO I WOULD GIVE THE ADVICE THAT THERE WOULD BE PERHAPS A

1    LOT OF MISGIVINGS ABOUT IMPLEMENTING CHANGES AND PAYING

2    STUDENT ATHLETES BASED ON THAT KIND OF LOSS OF MARKET SHARE.

3    **Q.**  SO 38 PERCENT OF THE 20,000 LEVEL, 47 PERCENT AT THE

4    50,000 LEVEL, AND 53 PERCENT AT THE 200,000 LEVEL, THESE

5    NUMBERS ARE BASED ON THE GENERAL PUBLIC IN YOUR SURVEY,

6    CORRECT?

7    **A.**  THAT IS CORRECT.

8    **Q.**  DID YOU ALSO ANALYZE THE RESULTS AT EACH OF THESE LEVELS

9    WITH RESPECT TO THE PEOPLE YOU HAVE DESCRIBED AS FANS IN YOUR

10   SURVEY?

11   **A.**  I DID, INDEED.

12   **Q.**  WHAT DID YOU FIND THERE?

13   **A.**  THE NUMBERS ARE FAIRLY COMPARABLE IN TERMS OF FANS SAYING

14   THAT THEY WOULD BE LESS LIKELY TO VIEW AND ATTEND GAMES.

15       AT THE $20,000 A YEAR LEVEL, YOU CAN SEE THE NUMBERS ARE

16   ALMOST IDENTICAL.  38 PERCENT FOR THE GENERAL PUBLIC,

17   36 PERCENT FOR THE FANS.

18       INTERESTINGLY ENOUGH, WHEN THE PAYMENT LEVELS INCREASE, SO

19   DOES THE RESISTANCE, IF YOU WILL, FROM FANS WITH RESPECT TO

20   PAYMENT.

21       AT THE $50,000 A YEAR LEVEL, YOU CAN SEE THAT FANS ARE AT

22   THE 52 PERCENT RATE FOR SAYING LESS LIKELY TO VIEW AND ATTEND

23   GAMES COMPARED TO 47 PERCENT OF THE TOTAL PUBLIC WHERE IT

24   REALLY STANDS OUT.  AND THIS IS A SIGNIFICANT DIFFERENCE

25   STATISTICALLY, AT THE $200,000 A YEAR LEVEL, FANS ARE SAYING

1   AT THE 62 PERCENT RATE THAT THEY WOULD BE LESS LIKELY TO VIEW

2   AND ATTEND GAMES.

3   **Q.**  YOU HAVE A LITTLE BOX THAT SHOWS THAT THE DIFFERENCE AMONG

4   FANS AT THAT LEVEL WHERE IT'S MORE LIKELY OPPOSED, P LESS THAN

5   0.05.

6       WHAT DOES THAT MEAN?

7   **A.**  THIS A SIGNIFICANCE TEST COMPARING THE LESS LIKELY RATES

8   FOR FANS COMPARED TO THE TOTAL PUBLIC.  AND IT'S SAYING

9   THAT -- IT'S A NEAR CERTAINTY THAT THIS IS A REAL DIFFERENCE

10  BETWEEN FANS AND NONFANS.  THAT DIFFERENCE COULD HAVE OCCURRED

11  BY RANDOM CHANCE LESS THAN 5 PERCENT.

12  **Q.**  WHAT IS THE BOX ALL THE WAY TO THE RIGHT, THE MORE LIKELY

13  TO VIEW AND ATTEND GAMES.

14      WHAT IS THAT SHOWING, SIR?

15  **A.**  IT SHOWS THE -- FOR THIS CASE, THE $200,000 PAYMENT LEVEL.

16  IT SHOWS THE PERCENTAGE OF THE TOTAL PUBLIC.  AND FANS THAT

17  ARE SAYING THAT THEY WOULD BE MORE LIKELY TO VIEW AND ATTEND

18  GAMES.

19  **Q.**  YOU HAVE NOT REPORTED THE SIMILAR BOX FOR THE 20 OR

20  $50,000 LEVEL.  WHAT WOULD THOSE BOXES LOOK LIKE IF THEY WERE

21  REPORTED HERE?

22  **A.**  THEY ARE ALMOST IDENTICAL.  THE NUMBERS RANGE BETWEEN 4

23  AND 6 PERCENT AND ACROSS THE BOARD.

24  **Q.**  I WOULD LIKE TO GO BACK JUST FOR A MOMENT TO SLIDE THAT

25  PRECEDED THIS ONE.

```
 1              (SLIDE DISPLAYED ON SCREEN.)
 2        DO YOU UNDERSTAND MR. PORET TO CRITICIZE WHAT YOU'VE
 3    REPORTED AT THE $20,000 LEVEL IN TERMS OF LIKELIHOOD TO EFFECT
 4    CONSUMPTION BASED ON THE INCLUSION IN THAT NUMBER OF
 5    RESPONDENTS WHO HAD NOT PREVIOUSLY WATCHED OR VIEWED OR
 6    ATTENDED GAMES WITHIN THE PRECEDING 12 MONTHS?
 7    A.  YES, I HAVE.
 8    Q.  WHAT DO YOU UNDERSTAND THE NATURE OF MR. PORET'S CRITIQUE
 9    TO BE IN THAT REGARD?
10    A.  WELL, I HAVE NOT SEEN A FULLY ARTICULATED CRITIQUE, BUT I
11    CAN SPECULATE WHAT I THINK THAT CRITIQUE IS BASED ON WHAT I
12    HAVE SEEN SO FAR.
13        THAT CRITIQUE, FROM WHAT I CAN TELL, IS THAT A THEORY THAT
14    PERHAPS RESPONDENTS ARE BEING INCONSISTENT IN HOW THEY ARE
15    ANSWERING THE SURVEY QUESTIONS.  AND THE DATA FOR THAT
16    SUPPORT, ACCORDING TO MR. PORET, I BELIEVE, IS THAT VERY EARLY
17    IN THE SURVEY I DID ASK A QUESTION ABOUT THE PAST 12 MONTHS,
18    ABOUT HOW MANY GAMES DID YOU WATCH, VIEW, OR ATTEND FOR
19    COLLEGE FOOTBALL, COLLEGE MEN'S BASKETBALL.
20        AND THERE IS CERTAINLY A GROUP OF PEOPLE THERE WHO SAID, I
21    DIDN'T WATCH ANY GAMES.  I DIDN'T WATCH ANY COLLEGE FOOTBALL
22    GAMES.  I DIDN'T WATCH ANY COLLEGE MEN'S BASKETBALL GAMES.
23        SO THAT'S EARLY IN THE SURVEY, AND IT'S A BEHAVIOR
24    QUESTION LOOKING AT THE PAST 12 MONTHS OF CONSUMING THESE
25    SPORTS.  LATER IN THE SURVEY, THERE IS A QUESTION THAT YOU SEE
```

```
 1    MERE, IT'S A SCENARIO-BASED QUESTION ABOUT FUTURE INTENTIONS.

 2    ARE YOU GOING TO BE MORE LIKELY OR LESS LIKELY TO VIEW,

 3    ATTEND, WATCH THESE SPORTS IF STUDENT ATHLETES WERE TO BE

 4    PAID.

 5        I THINK WHAT HE'S TRYING TO SAY OR ALLEGE HERE IS THAT

 6    THERE'S AN INCONSISTENCY BECAUSE YOU HAVE SOME PEOPLE WHO ARE

 7    SAYING, NO, I DID NOT WATCH ANY GAMES IN THE PAST 12 MONTHS

 8    AND THEN THEY'RE SAYING, WELL, THEY ARE GOING TO BE LESS

 9    LIKELY TO -- YOU KNOW, HOW CAN YOU MATHEMATICALLY BE LESS

10    LIKELY THAN ZERO, I THINK, IS WHERE HE'S KIND OF GOING WITH

11    THAT, BUT I DON'T THINK IT HAS ANY MERIT.

12    Q.  WHY DO YOU SAY IT DOESN'T HAVE MERIT?

13    A.  WELL, THEY ARE MEASURING VERY DIFFERENT THINGS.  THE FIRST

14    QUESTION IS A RECALL OF THE PAST 12 MONTHS FOR BEHAVIOR.  THE

15    SECOND QUESTION IS ABOUT FUTURE INTENTIONS.  YOU KNOW, HOW

16    DOES THIS NEW INFORMATION ABOUT A STATE OF THE WORLD WHERE

17    STUDENT ATHLETES WERE PAID VARIOUS AMOUNTS, HOW WOULD THAT

18    EFFECT YOUR WILLINGNESS TO BE A CONSUMER OF THESE TWO SPORTS?

19        IT'S VERY POSSIBLE, IN MY VIEW, AND I'M ACTUALLY -- I

20    THINK A PERSONAL EXAMPLE OF THIS WHERE YOU GO THROUGH PERIODS

21    OF TIME WHERE PERHAPS YOU DID NOT CONSUME ACTIVELY A SPORT.

22    YOU MAY BE VERY PASSIONATE ABOUT IT, BUT IN THE PAST 12 MONTHS

23    DID NOT ACTUALLY CONSUME IT.  THEN YOU ARE GIVEN THIS NEW

24    INFORMATION, WELL, SUPPOSE STUDENT ATHLETES WERE TO BE PAID

25    $20,000 PER YEAR, HOW WOULD THAT EFFECT YOUR FUTURE
```

1    INTENTIONS?

2        IT'S A LEGITIMATE QUESTION TO ASK PEOPLE WHO MAY OR MAY

3    NOT HAVE PARTICIPATED AND CONSUMED THESE TWO SPORTS IN THE

4    PAST YEAR.

5    **Q.**  MR. PORET, AGAIN, HAD ACCESS TO THE SAME DATA SET THAT YOU

6    DID, CORRECT?

7    **A.**  YES, HE DID.

8    **Q.**  HE COULD HAVE RECALCULATED THE RESULTS OF THE QUESTION

9    ABOUT WHERE PEOPLE WOULD BE AT THE $20,000 LEVEL IF HE HAD

10   EXCLUDED PEOPLE WHO HAD WATCHED ZERO BASKETBALL GAMES, ZERO

11   FOOTBALL GAMES, OR BOTH OF THEM IN THE PRECEDING 12 MONTHS, HE

12   COULD HAVE RERUN THAT DATA AND REPORTED THE RESULTS, CORRECT?

13           **MR. ROSENTHAL:**  OBJECTION TO WHAT MR. PORET COULD OR

14   COULD NOT HAVE DONE.  HE DID NOT DO THE SURVEY.

15           **THE COURT:**  OVERRULED.

16           **THE WITNESS:**  ANSWER THE QUESTION?

17           **MR. KLAUS:**  YES.

18           **THE COURT:**  OVERRULED MEANS YOU CAN ANSWER.

19   SUSTAINED MEANS YOU CAN'T ANSWER.

20           **THE WITNESS:**  THANK YOU.

21       YES, HE COULD HAVE ANALYZED THAT DATA.  HE HAD THE SAME

22   DATA I DID.

23   **BY MR. KLAUS:**

24   **Q.**  DID YOU TAKE THOSE PEOPLE OUT AND MAKE AN ANALYSIS OF HOW

25   THAT WOULD CHANGE THAT RESULT OF THAT $20,000 QUESTION?

1    **A.**  I DID.

2    **Q.**  WHAT DID YOU FIND?

3    **A.**  I FOUND THE NUMBERS DID NOT CHANGE BEYOND WHAT YOU WOULD

4    EXPECT WITHIN MARGIN OF ERROR, SAMPLING MARGIN OF ERROR.

5    **Q.**  CAN YOU EXPLAIN WHAT YOU MEAN BY THAT PLEASE?

6    **A.**  YES.  JUST TO BE PRECISE ABOUT IT, WHEN I EXCLUDED THOSE

7    RESPONDENTS THAT SAID THEY HADN'T WATCHED ANY COLLEGE FOOTBALL

8    GAMES IN THE PAST 12 MONTHS, I RE-RAN THE NUMBERS THERE FOR

9    THE $20,000 A YEAR SCENARIO.  AND THE NUMBER CHANGED FROM THE

10   38 PERCENT YOU SEE ON THE SCREEN TO 36.5 PERCENT.

11       THAT IS A CHANGE THAT YOU COULD HAVE EXPECTED BY RANDOM

12   CHANCE JUST BY DRAWING A NEW INDEPENDENT SAMPLE AND ASKING THE

13   SURVEY AGAIN.

14   **Q.**  FINALLY, ON THIS ISSUE, DR. DENNIS, DO YOU UNDERSTAND

15   MR. PORET TO CRITIQUE YOUR WORK ON THE GROUND THAT YOU ARE

16   MAKING CONCLUSIONS ABOUT WHAT PEOPLE SAY THEY ARE LIKELY TO DO

17   IN THE FUTURE IF THE WORLD CHANGES?

18   **A.**  YES, I'M AWARE OF THAT.

19   **Q.**  WHAT DO YOU UNDERSTAND THAT CRITIQUE TO BE?

20   **A.**  I READ IN A COUPLE OF PLACES THERE AND I THINK -- AND

21   OTHER TESTIMONY PROVIDED BY DR. RASCHER TO THE EFFECT THAT

22   MARKET RESEARCH STUDIES ARE JUST SURVEYS THAT ARE ASKING

23   PEOPLE ABOUT THEIR FUTURE INTENTIONS WITHOUT ANY CONSEQUENCES

24   TO HOW THEY ANSWER; AND THAT A MORE RELIABLE WAY IS TO

25   ACTUALLY LOOK AT BEHAVIORS AS OPPOSED TO TRYING TO MEASURE

1    PEOPLE'S OPINIONS AS A RESULT OF HYPOTHETICAL SCENARIOS PUT IN

2    FRONT OF RESPONDENTS.

3    **Q.**  WHAT IS YOUR RESPONSE TO THAT CRITIQUE, DR. DENNIS?

4    **A.**  WELL, MY CRITIQUE IS THERE'S A VERY WELL-ESTABLISHED FIELD

5    CALLED MARKET RESEARCH AND MARKET RESEARCH ANALYTICS.

6         I COULD ALSO MENTION POLITICAL ANALYSIS AS WELL IN THIS

7    REGARD WHERE THERE ARE WELL-ESTABLISHED FIELDS WITH LITERALLY

8    BILLIONS OF DOLLARS A YEAR ARE BEING SPENT ON MARKET RESEARCH

9    STUDIES TRYING TO FORECAST WHERE CONSUMER DEMAND IS GOING.

10        MOST MAJOR COMPANIES THAT ARE IN THE CONSUMER GOODS,

11   DURABLE GOODS SPACES, THEY HAVE VERY LARGE MARKET RESEARCH

12   DEPARTMENTS DOING MARKETING SURVEYS, TRYING TO FIGURE OUT THAT

13   IF THEY WERE TO TWEAK OR CHANGE THEIR EXISTING PRODUCT LINE OR

14   INTRODUCE A NEW PRODUCT TO THE MARKETPLACE, THEY ARE DOING

15   FORECASTING STUDIES TO GET A SENSE OF WHETHER THE MARKET IS

16   GOING TO BE RECEPTIVE OR NOT RECEPTIVE TO THE NEW PRODUCT.

17        SO I WOULD SAY JUST FOLLOW THE DOLLARS IN THE INDUSTRY.

18   IT'S A $38 BILLION A YEAR MARKET RESEARCH INDUSTRY.  AND MY

19   OPINION IS THAT THAT MONEY IS NOT BEING WASTED.  THESE ARE

20   RESPONSIBLE COMPANIES TRYING TO MAKE VERY BIG DECISIONS ABOUT

21   THEIR PRODUCTS AND THEIR PRODUCT INNOVATIONS, AND THEY'RE

22   USING THESE KINDS OF SURVEYS FOR THAT PURPOSE.

23   **Q.**  WE'VE LOOKED AT THE RESULTS TO THE QUESTIONS REGARDING

24   PAYMENT IN ADDITION TO COLLEGE SCHOLARSHIP EXPENSES AT VARIOUS

25   LEVELS.

1      WHAT DID YOU ASK THE RESPONDENTS NEXT?

2   **A.**  WELL THEN THE QUESTIONS ARE ABOUT ACTUAL SCENARIOS

3   PRESENTED TO RESPONDENTS.  AND THERE'S THREE DIFFERENT

4   SCENARIOS THAT I'M ASKING RESPONDENTS TO CONSIDER.

5   **Q.**  WHAT ARE THOSE SCENARIOS?

6   **A.**  THERE'S THREE MAIN SCENARIOS.  ONE IS ABOUT UNEQUAL PAY

7   FOR ATHLETES ON THE SAME TEAM.  SO THIS IS CALLED STARS, IF

8   YOU WILL, WHERE THE STARS ON A COLLEGE FOOTBALL OR MEN'S

9   COLLEGE BASKETBALL TEAM ARE THE ONES THAT ARE RECEIVING MORE

10  PAYMENT THAN OTHER PLAYERS ON THE SAME TEAM.

11      AND THEN THE SECOND ONE THERE, AS YOU CAN SEE UNDER THE

12  "IF" COLUMN, IS A SCENARIO WE ARE ASKING THE RESPONDENTS TO

13  CONSIDER WHERE STUDENT ATHLETES AT THE LARGE COLLEGES, THEY

14  MAKE MORE MONEY THAN THE SAME -- THAN STUDENT ATHLETES AT

15  SMALL COLLEGES.

16      AND THEN FINALLY A STATE OF THE WORLD WHERE THERE'S FEWER

17  ATHLETIC SCHOLARSHIPS IN TOTAL AS A RESULT OF STUDENT ATHLETES

18  BEING PAID.

19  **Q.**  THOSE ARE THE THREE IF SCENARIOS.  WHAT ARE THE THREE THEN

20  SCENARIOS THAT YOU ARE MEASURING?

21  **A.**  RIGHT.  AND THEN FOR EACH OF THESE THREE SCENARIOS,

22  THERE'S THE SAME BATTERY OF QUESTIONS ASKING THE RESPONDENTS

23  WHAT DO THEY THINK ABOUT IT?

24      WHAT EFFECT WOULD THIS STATE OF THE WORLD HAVE ON FAIRNESS

25  AND BALANCE OF COMPETITION BETWEEN COLLEGES?  WHAT EFFECT

1    WOULD THE STATE OF THE WORLD HAVE ON YOUR VIEWERSHIP, YOUR

2    ATTENDANCE OF COLLEGE SPORTS, COLLEGE FOOTBALL, OBVIOUSLY, AND

3    COLLEGE MEN'S BASKETBALL.  AND, FINALLY, WHAT EFFECT WOULD ANY

4    OF THESE SCENARIOS HAVE ON YOUR OVERALL INTERESTS IN THESE

5    SPORTS?

6        SO THERE'S A CONSTRUCT HERE OF THREE SCENARIOS AND THEN

7    FOR EACH OF THE SCENARIOS, THERE'S THREE FOLLOW-UP QUESTIONS.

8    **Q.**  WE SKIPPED PASSED THE INSTRUCTION SCREEN THAT PRECEDED

9    THESE QUESTIONS.  WAS THERE AN AMOUNT OF TIME THAT YOU ASKED

10   RESPONDENTS TO DEVOTE TO THINKING ABOUT IN ANSWERING THESE

11   QUESTIONS?

12   **A.**  I DID HAVE A CONTROL IN THIS SURVEY WHERE THE RESPONDENTS

13   WERE REQUIRED TO SPEND AT LEAST 20 SECONDS ON EACH OF THESE

14   SCREENS.

15   **Q.**  AND WHEN YOU SAY THEY WERE REQUIRED TO SPEND THAT, WHAT --

16   HOW WAS THAT ENFORCED?

17   **A.**  I LITERALLY HAD PROGRAMMED INTO THE QUESTIONNAIRE THE

18   DISABLING OF THE NEXT BUTTON THAT YOU SEE ON THE SCREEN.  THE

19   NEXT BUTTON WAS NOT ON THE SCREEN FOR THE FIRST 20 SECONDS, SO

20   THE RESPONDENTS WERE REQUIRED TO SPEND TIME ON EACH SCREEN.

21   **Q.**  SO YOU HAD THREE IF SCENARIOS, THREE THEN SCENARIOS, TOTAL

22   OF NINE DIFFERENT MEASURES ON THESE SCENARIOS; IS THAT

23   CORRECT?

24   **A.**  THAT IS CORRECT.

25   **Q.**  LET'S LOOK AT ONE IN SOME DETAIL, AND THEN WE CAN MOVE

1    THROUGH THE OTHER ONES MUCH MORE QUICKLY.

2        START WITH THE FIRST IF SCENARIO.  THIS IS WHERE THE STARS

3    RECEIVE DISPROPORTIONATE PAY TO, I BELIEVE I HEARD IT REFERRED

4    TO AS THE NONCONTRIBUTORS YESTERDAY, NOT IN -- NOT MEANT IN AN

5    UNKIND WAY I THINK IT WAS SAID, BUT IF YOU ASK THAT QUESTION,

6    CAN YOU -- WHAT DID THE RESULTS SAY THEN?

7    **A.**  THE -- WELL, IN TERMS OF THE RESULTS, AND THIS WILL BE A

8    SIMILAR -- WE WILL LOOK AT THE QUESTION FIRST.

9        SO THIS IS A SCREEN OF THE ACTUAL SURVEY THAT THE

10   RESPONDENTS TOOK.  AND JUST TO MAKE IT EASY FOR THE

11   RESPONDENTS, I PUT THE ACTUAL SCENARIO LANGUAGE AT THE VERY

12   TOP OF THE SCREEN FOR EACH OF THESE QUESTIONS SO THE

13   RESPONDENTS COULD ALWAYS HAVE IN FRONT OF THEM AS A VISUAL

14   WHAT IS THE SCENARIO WE ARE ASKING THEM TO CONSIDER.

15       AND AS YOU CAN READ, THE SCENARIO IS ABOUT, AND I HAVE

16   ALREADY EXPLAINED, ABOUT THE STARS ON THE TEAM GETTING MORE

17   PAY THAN THE NONSTARS.  THEN THIS IS THE FIRST FOLLOW-UP

18   QUESTION ABOUT WHAT EFFECT, IF ANY, WOULD THIS SITUATION HAVE

19   ON THE NUMBER OF COLLEGE FOOTBALL AND MEN'S COLLEGE BASKETBALL

20   GAMES YOU WOULD WATCH.

21       AND THE SAME CATEGORIES AS BEFORE, SO THE RESPONDENTS ARE

22   VERY FAMILIAR WITH THE RESPONSE CATEGORIES ABOUT BEING MUCH

23   LESS LIKELY TO WATCH, SOMEWHAT LESS LIKELY, NO MORE, LESS

24   LIKELY, SOMEWHAT MORE LIKELY AND MUCH MORE LIKELY.

25   **Q.**  AND TURNING TO THE RESULTS WHICH --

1          **MR. KLAUS:**  I'M HAVING A PROBLEM ON THE POWER POINT.

2     IF I MAY ASK THE DEPUTY --

3                    (SLIDE DISPLAYED ON SCREEN.)

4          THERE WE GO.  I DON'T UNDERSTAND THE MYSTERIES OF POWER

5     POINTS, DR. DENNIS, BUT IT APPEARS WE HAVE A SCREEN HERE.

6     **BY MR. KLAUS:**

7     **Q.**  WHAT IS -- WHAT IS THIS SCREEN SHOWING?

8     **A.**  SO THERE BE A SERIES OF RESULTS SIMILAR TO THIS WITH THE

9     SAME FORMAT.  AND, FRANKLY, WITH THE SUBSTANCE OF THE RESULTS

10    DON'T CHANGE THAT MUCH FROM SCENARIO TO SCENARIO.

11         AND WHAT THIS SHOWS IS A COMPARISON OF THE GENERAL

12    PUBLIC'S OPINION COMPARED TO THE SPORTS FANS FOR EACH OF THESE

13    MEASURES.

14         SO JUST TO LOOK AT THE FIRST ONE ON THE LEFT AS AN

15    EXAMPLE.  73 PERCENT OF THE PUBLIC IS TELLING US THROUGH THE

16    SURVEY THAT THEY THINK THE RESULT OF THE STARS GETTING MORE

17    PAYMENT THAN NONSTARS WOULD BE THAT THERE WOULD BE LESS

18    FAIRNESS, THERE WOULD BE LESS BALANCE -- LESS FAIRNESS IN THE

19    BALANCE OF COMPETITION.

20         THE FANS ACTUALLY TOOK A MORE NEGATIVE POINT OF VIEW ON

21    THIS.  THEY'RE ACTUALLY TELLING US THAT IN EIGHT OUT OF TEN

22    RATE, THEY WOULD BE LESS LIKELY -- THAT THEY THOUGHT THERE

23    WOULD BE, EXCUSE ME, AN IMPACT ON THE FAIRNESS AND BALANCE OF

24    COMPETITION.

25         JUST SO EVERYBODY UNDERSTANDS HOW THESE NUMBERS WORK, IF

1  YOU LOOK AT THE BOTTOM THERE, I HAD PUT IN THERE MUCH MORE AND

2  SOMEWHAT MORE LIKELY RATES.  SO THERE IS A SMALL NUMBER OF

3  PEOPLE WHO SAID THAT AS A RESULT OF THIS STATE OF THE WORLD,

4  THERE WOULD BE MORE FAIRNESS, THERE WOULD BE MORE BALANCE OF

5  COMPETITION, BUT I WOULD LIKE TO HIGHLIGHT IT IS A VERY SMALL

6  NUMBER.  YOU CAN SEE THE NUMBERS RANGE BETWEEN 4 AND 7 PERCENT

7  AS YOU GO ACROSS THESE RESULTS.

8      MOVING FROM LEFT TO RIGHT, AND WE CAN LOOK AT THE MIDDLE

9  BARS.  THIS IS THE KEY MEASURE ABOUT LESS LIKELY TO WATCH OR

10  ATTEND.  AND THERE YOU'LL SEE IT'S THE MAJORITY OF THE PUBLIC

11  AT 53 PERCENT, SAYING THAT THEY WOULD BE LESS LIKELY TO WATCH

12  OR ATTEND AS A RESULT OF STARS GETTING MORE PAYMENT THAN

13  NONSTARS.

14      AND THE PUBLIC ACTUALLY HAS A LOWER RATE COMPARED TO THE

15  FANS.  THE FANS HAD A MORE NEGATIVE REACTION THAN THE TOTAL

16  PUBLIC TO THIS SCENARIO.  THE FANS AT A 62 PERCENT RATE SAID

17  THEY WOULD BE LESS LIKELY TO WATCH OR ATTEND.

18      THEN IN TERMS OF OVERALL INTEREST IN THE COLLEGE SPORTS WE

19  HAVE BEEN TALKING ABOUT IN THIS SURVEY, YOU WILL SEE THAT,

20  AGAIN, MAJORITIES SAYING THEY WOULD HAVE LESS INTEREST.  THE

21  FANS, IN PARTICULAR, WERE AT THE 61 PERCENT RATE SAYING THEY

22  WOULD HAVE LESS INTEREST, WHILE ONLY 7 PERCENT SAID THEY WOULD

23  HAVE MORE INTEREST AS A RESULT OF THIS STATE OF THE WORLD.

24  Q.  THIS, YOU REPEATED THIS BATTERY OF ANALYSIS WITH RESPECT

25  TO EACH OF THE OTHER IF/THEN, SCENARIOS YOU DESCRIBED?

1    **A.**  I DID.

2    **Q.**  AND IN GENERAL, WITHOUT GOING THROUGH EVERY ONE, WHAT DID

3    YOU FIND WITH RESPECT TO WHETHER THERE -- PEOPLE WOULD

4    PERCEIVE MATTERS TO BE LESS FAIR OR BALANCED, WHETHER THEY

5    WOULD BE LESS LIKELY TO WATCH OR ATTEND AS COMPARED TO WHERE

6    THEY WERE IN THE PRESENT SCENARIO WHERE THEY WOULD HAVE LESS

7    INTEREST; WHAT DID YOU FIND ON EACH OF THOSE IF/THENS?

8    **A.**  THE NUMBERS ARE VERY SIMILAR.  THE FANS CONTINUE TO TAKE A

9    MORE NEGATIVE VIEW THAN THE TOTAL PUBLIC ON EACH OF THESE

10   THREE MEASURES AS YOU GO ACROSS THE DIFFERENT SCENARIOS, AND

11   THAT IN EVERY CASE THERE'S A MAJORITY OF OPINION THAT IS

12   SAYING THE NEGATIVE RESPONSE, IF YOU WILL, THAT THERE WOULD BE

13   LESS FAIRNESS, THERE WOULD BE LESS BALANCE OF COMPETITION,

14   THAT THEY WOULD BE LESS LIKELY TO WATCH OR ATTEND, OR THEY

15   WOULD HAVE LESS INTEREST.

16   **Q.**  ARE THE RESULTS AS TO THESE AND OTHER QUESTIONS REPORTED

17   IN THE TOP LINE DATA ANALYSIS THAT WAS ATTACHED AS ATTACHMENT

18   E TO YOUR EXPERT REPORT IN THIS MATTER?

19   **A.**  YES, THAT'S CORRECT.

20         **MR. KLAUS:**  WE'VE IDENTIFIED -- MARKED THAT FOR

21   IDENTIFICATION AS EXHIBIT 3393.  WE MOVE THAT FOR -- MOVE

22   ADMISSION FOR THAT TO MOVE THINGS ALONG.

23         **MR. ROSENTHAL:**  NO OBJECTION.

24         **THE COURT:**  RECEIVED.

25         (DEFENDANTS' EXHIBIT 3393 RECEIVED IN EVIDENCE)

1          **MR. KLAUS:**  AND WE WOULD ALSO -- WE'VE MARKED THE

2    DEMONSTRATIVE SLIDES WITH EXHIBIT NUMBERS 4045 TO 4078.

3       AGAIN, IN THE INTEREST OF TIME AND MOVING THINGS ALONG, WE

4    WOULD MOVE TO ADMIT THE DEMONSTRATIVE SLIDES AS EXHIBITS.

5          **MR. ROSENTHAL:**  I DO OBJECT TO THAT.  THOSE ARE JUST

6    DEMONSTRATIVE SLIDES.  ALL THE DATA IS CONTAINED IN BOTH THE

7    3392, WHICH IS THE SCREEN SHOT --

8          **THE COURT:**  RIGHT.  BUT WE HAVE BEEN ADMITTING

9    DEMONSTRATIVE SLIDES ALL ALONG, HAVEN'T WE?

10          **MR. ROSENTHAL:**  I DON'T THINK SO --

11          **THE COURT:**  WHY STOP NOW?  I THINK WE HAVE.  YOU CAN

12    RAISE IT LATER.  I DON'T SEE A PROBLEM WITH IT.

13          **MR. KLAUS:**  THANK YOU, YOUR HONOR.

14          **THE CLERK:**  ADMITTED?

15          **THE COURT:**  YES.

16       (DEFENDANTS' EXHIBITS 4045 - 4078 RECEIVED IN EVIDENCE)

17    **BY MR. KLAUS:**

18    **Q.**  DR. DENNIS, JUST TO SUMMARIZE --

19          **MR. KLAUS:**  WE CAN TAKE THE SCREEN DOWN.  THANK YOU.

20    **BY MR. KLAUS:**

21    **Q.**  -- OVERALL SUMMARY OF YOUR CONCLUSIONS WITH RESPECT TO

22    THIS MATTER?

23    **A.**  I THINK THE CONCLUSIONS FOLLOW LOGICALLY FROM THE DATA.

24    THE PUBLIC OPINION IS -- HAS VERY HIGH OPPOSITION RATES TO

25    THIS CONCEPT OF PAYING STUDENT ATHLETES.

1      THE FANS HAVE REMARKABLY SIMILAR POINTS OF VIEW ON THIS,

2  IN TERMS OF OPPOSING THE PAYING OF STUDENT ATHLETES.

3      WHEN PRESENTED ACTUAL SCENARIOS TO RESPONDENTS GIVING THEM

4  INFORMATION ABOUT VARIOUS STATES OF THE WORLD THAT COULD BE

5  CREATED AS A RESULT OF PAYINGS STUDENT ATHLETES, THE RESPONSES

6  WERE VERY CONSISTENT WITH THE EARLY MEASURES I HAD IN THIS

7  SURVEY ABOUT FAVORING OR OPPOSING PAYING STUDENT ATHLETES.

8  AND THE FANS TEND TO TAKE AN EVEN MORE NEGATIVE OUTLOOK ON THE

9  PAYING OF STUDENT ATHLETES THAN THE TOTAL PUBLIC IN GENERAL.

10      **MR. KLAUS:**  I HAVE NO FURTHER QUESTIONS OF

11  DR. DENNIS, YOUR HONOR.

12      **MR. ROSENTHAL:**  IF I MAY HAVE JUST A MOMENT TO SET

13  UP, YOUR HONOR.

14      **THE COURT:**  YOU SAID YOU ASKED EVERYONE WHETHER

15  THEY'D HEARD ABOUT THIS ISSUE.  WHAT WAS THE ANSWER?

16      **THE WITNESS:**  THERE WAS 35 PERCENT OF THE RESPONDENTS

17  WHO SAID THAT THEY HAD HEARD SOMETHING IN THE NEWS IN THE PAST

18  12 MONTHS.  AND THEN THE BALANCE SAID THEY HAD NOT HEARD ABOUT

19  ANYTHING.

20      **THE COURT:**  GO AHEAD.

21                    **CROSS-EXAMINATION**

22  BY MR. ROSENTHAL:

23  **Q.**  GOOD MORNING, DR. DENNIS.

24      BEFORE YOU PREPARED AND CONDUCTED THE SURVEY IN THIS CASE,

25  YOU DID NOT READ THE COMPLAINT, CORRECT?

1   **A.**  THAT IS CORRECT.

2   **Q.**  YOU DID NOT READ ANY OF THE PAPERS THAT WERE FILED IN

3   COURT, CORRECT?

4   **A.**  I DON'T KNOW IF THAT'S A TRUE STATEMENT.  I DO NOT KNOW

5   ALL THE PAPERS FILED IN COURT.

6   **Q.**  YOU DID NOT READ ANY EXPERT REPORTS, CORRECT -- PRIOR TO

7   CONDUCTING THE SURVEY?

8   **A.**  NO.  I SAW DR. RASCHER -- I SAW INFORMATION FROM

9   DR. RASCHER ON HIS DAMAGES MODEL, SO I CITED THAT IN MY

10  REPORT.

11          **MR. ROSENTHAL:**  IF WE CAN BRING UP DEPOSITION

12  PAGE 31, LINES -- WELL, WE WILL GO UP.  LINES 9 THROUGH 17.

13              (DEPOSITION DISPLAYED ON SCREEN.)

14  **BY MR. ROSENTHAL:**

15  **Q.**  YOU REMEMBER BEING DEPOSED IN THIS CASE, RIGHT,

16  DR. DENNIS?

17  **A.**  I DO.

18  **Q.**  YOU WERE ASKED:

19          "DID YOU READ THE NCAA'S ANSWER TO THE COMPLAINTS?"

20          **THE COURT:**  JUST READ THE ONES THAT ARE RELEVANT.

21          **MR. ROSENTHAL:**  OKAY.  LINE 15.

22      "DID YOU READ ANY EXPERT REPORTS IN THE CASE?"  AT LINE

23  15.

24          "ANSWER:  THE ANSWER IS NO.  I CAN'T THINK OF ANY

25          EXPERT REPORTS."

1    **BY MR. ROSENTHAL:**

2    **Q.**  THAT WAS YOUR ANSWER AT THE DEPOSITION; IS THAT CORRECT?

3    **A.**  YES, I SEE THAT.

4    **Q.**  YOU READ SOME NEWS REPORTS BEFORE CREATING THE SURVEY IN

5    THIS CASE, RIGHT?

6    **A.**  I SAW SOME THINGS IN THE NEWS, YES.

7    **Q.**  YOU TALKED TO THE NCAA'S LAWYERS BEFORE PREPARING THE

8    SURVEY IN THIS CASE, CORRECT?

9    **A.**  YES.

10   **Q.**  AND YOU UNDERSTOOD AT THE TIME THAT YOU CRAFTED THE SURVEY

11   THAT THE ISSUE IN THIS CASE, IN THIS LITIGATION INVOLVED

12   RESTRICTIONS ON COMPENSATING COLLEGE ATHLETES FOR THE USE OF

13   THEIR NAMES, IMAGES AND LIKENESSES, CORRECT?

14   **A.**  I HAD SOME INFORMATION ON THAT, YES.

15   **Q.**  BUT YOU DID NOT ASK -- OR THE SURVEY DID NOT ASK SPECIFIC

16   QUESTIONS REGARDING PAYMENT FOR THE USE OF NAME, IMAGE AND

17   LIKENESS, CORRECT?

18   **A.**  NO, I DIDN'T THINK IT NEEDED TO BE ASKED.

19          **MR. ROSENTHAL:**  IF WE CAN PUT UP DEFENSE EXHIBIT 3392

20   AT PAGE 13.

21              (EXHIBIT DISPLAYED ON SCREEN.)

22   **BY MR. ROSENTHAL:**

23   **Q.**  AND THE SURVEY SAID, AND WE LOOKED AT THIS SLIDE BEFORE.

24          "THERE HAS BEEN SOME DISCUSSION OF PAYING MONEY TO

25          COLLEGE FOOTBALL AND BASKETBALL STUDENT ATHLETES IN

1    ADDITION TO PROVIDING SCHOLARSHIPS THAT COVER COLLEGE

2    EXPENSES."

3    THAT WAS THE LANGUAGE YOU USED TO INTRODUCE THE SUBJECT

4    MATTER OF THE SURVEY, CORRECT?

5    **A.** WELL, NO.  THERE'S PREVIOUS SCREENS THAT TALK ABOUT THE

6    FOCUS BEING ON COLLEGE MEN'S BASKETBALL AND COLLEGE FOOTBALL.

7    SO THERE'S A PREVIOUS INSTRUCTION IN THE SURVEY TO THAT

8    EFFECT.

9    **Q.** ALSO ABOUT PAYING MONEY, CORRECT, USING THOSE SPECIFIC

10    WORDS, "PAYING MONEY", RIGHT?

11    **A.** THAT'S CORRECT.

12    **Q.** AND THAT PHRASE "PAYING MONEY" IS USED THROUGHOUT THE

13    SURVEY, CORRECT?

14    **A.** IT IS USED, YES.

15    **Q.** THE SURVEY DOES NOT INDICATE WHAT THE MONEY WOULD BE PAID

16    FOR, CORRECT?

17    **A.** THAT'S RIGHT.

18    **Q.** AND IT DOES NOT INDICATE WHAT KIND OF PAYMENT THE PLAYERS

19    MIGHT RECEIVE, CORRECT?

20    **A.** THAT'S RIGHT.  BY DESIGN, YES.

21    **Q.** BECAUSE YOU DIDN'T WANT THE RESPONDENTS TO EXCLUDE ANY

22    FORMS OF PAYMENT, CORRECT?

23    **A.** THEY WERE FREE TO BRING ANY FORMS OF PAYMENT TO THE TABLE

24    THAT THEY WANTED TO.

25    **Q.** YOU MEANT TO REPRESENT IN THE SURVEY ALL FORMS OF

1    COMPENSATION THAT THE ATHLETES COULD RECEIVE; ISN'T THAT

2    RIGHT?

3    **A.**   WELL, WITHIN THE BOUNDARIES OF THE CONTEXT BEING SET IN

4    THIS QUESTION, WHICH IS ABOUT IN ADDITION TO PROVIDING

5    SCHOLARSHIPS THAT COVER COLLEGE EXPENSES.

6        SO THE CONTEXT IS BEING SET FOR LEGITIMATE AND LEGAL

7    PAYMENTS TO THE STUDENT ATHLETES.

8    **Q.**   WELL, IT COULD INCLUDE STIPENDS, CORRECT?

9    **A.**   IT COULD.

10   **Q.**   HONORARIUMS, RIGHT?

11   **A.**   POTENTIALLY.

12   **Q.**   PER DIEM, RIGHT?

13   **A.**   IF THEY ARE ALL LEGALLY SANCTIONED, THEN THEY COULD BE

14   INCLUDED IN THAT.

15   **Q.**   SALARY, RIGHT?

16   **A.**   IF LEGALLY SANCTIONED, YES.

17   **Q.**   BONUSES TIED TO PERFORMANCE, RIGHT?

18   **A.**   POTENTIALLY, YES.

19   **Q.**   IN-KIND BENEFITS RIGHT?

20   **A.**   YEAH.  AGAIN, IF IT'S LEGALLY SANCTIONED, IT'S WITHIN A

21   LEGAL FRAMEWORK, THEN YES.

22   **Q.**   LUXURY APARTMENTS, LUXURY CARS, CORRECT?  AS LONG AS IT'S

23   LEGALLY SANCTIONED, ACCORDING TO YOU?

24   **A.**   IF IT CONSTITUTES PAYING THE STUDENT ATHLETES IN THIS KIND

25   OF LEGITIMATE SCENARIO, YES.

1    **Q.**  ANY FORM OF PAYMENT AT ALL, RIGHT?

2    **A.**  NO.

3    **Q.**  YOU SAID ANY FORM OF LEGALLY SANCTIONED PAYMENT, CORRECT?

4    **A.**  THAT'S BETTER.  THANK YOU.

5    **Q.**  BY "LEGALLY SANCTIONED", YOU THINK THAT'S IMPLIED IN THE

6    QUESTION SOMEHOW; IS THAT WHAT YOU ARE SAYING?

7    **A.**  I KNOW IT IS.

8    **Q.**  JUST BECAUSE IT SAYS IN ADDITION TO PROVIDING SCHOLARSHIPS

9    THAT COVER COLLEGE EXPENSES; IS THAT RIGHT?

10   **A.**  AND ON THE BASIS OF MY TALKING TO ACTUAL RESPONDENTS WHO

11   UNDERSTOOD THE QUESTION TO MEAN THAT, YES.

12   **Q.**  BUT THERE WERE APPROXIMATELY 200 RESPONDENTS WHO ANSWERED

13   QUESTION 8 SAYING THAT THEY WERE THINKING ABOUT PAYMENTS IN

14   TERMS OF ILLICIT PAYMENTS, RIGHT?

15   **A.**  WELL, THAT QUESTION, AS I PREVIOUSLY DESCRIBED, OCCURRED

16   EARLIER IN THE SURVEY BEFORE THE CONTEXT WAS SET THAT YOU SEE

17   HERE.

18   **Q.**  IT WAS THE QUESTION RIGHT BEFORE THIS ONE, IN FACT, RIGHT?

19   **A.**  THAT'S CORRECT.

20   **Q.**  AND THIS SAYS PAYING MONEY, WHICH, AS YOU SAID IN RESPONSE

21   TO THE PRIOR QUESTION, COULD INVOLVE ILLICIT PAYMENTS, RIGHT?

22   **A.**  NO, I DON'T THINK I SAID THAT.

23   **Q.**  WELL, YOU SAID IN QUESTION 8, YOU SAY WHAT KIND OF

24   PAYMENTS HAVE YOU HEARD ABOUT, RIGHT?

25   **A.**  YEAH.  WELL, QUESTION 8 IS ABOUT ANY KIND OF PAYMENT,

1    WHATEVER IS IN THE MINDS OF THE RESPONDENTS.

2    **Q.**  A NUMBER OF RESPONDENTS, WE ESTIMATE THE NUMBER AROUND

3    200, TALKED ABOUT -- SAID THAT THEY HAD HEARD ABOUT ILLICIT

4    PAYMENTS, RIGHT?  PEOPLE GETTING PAID UNDER THE TABLE, PEOPLE

5    GETTING PAID IN VIOLATION OF THE NCAA RULES, CORRECT?

6    **A.**  YOU'RE PUTTING WORDS IN THE QUESTIONNAIRE THAT AREN'T

7    THERE.  IT WAS A VERY GENERAL QUESTION ABOUT WHAT --

8    **Q.**  I'M JUST TALKING ABOUT THE RESPONSES, THE RESPONSES YOU

9    GOT TO THAT QUESTION.

10       A NUMBER OF PEOPLE SAID THEY HEARD ABOUT ILLICIT PAYMENTS,

11   RIGHT?

12   **A.**  A SMALL FRACTION OF PEOPLE.  WHY WOULDN'T THEY?  IT'S IN

13   THE NEWS.  SO PEOPLE ARE REFRACTING WHAT THEY READ IN THE

14   PAPERS.

15   **Q.**  AND THOSE PAYMENTS THAT THESE PEOPLE HEARD ABOUT WERE IN

16   ADDITION TO SCHOLARSHIPS THAT THE PARTICIPANTS WERE RECEIVING,

17   THAT THE PLAYERS WERE RECEIVING, CORRECT?

18   **A.**  WELL, IT'S ALWAYS -- I MEAN --

19   **Q.**  IT'S ALWAYS IN ADDITION TO SCHOLARSHIPS, RIGHT, BECAUSE

20   THAT'S WHAT THESE PLAYERS GET?

21          **MR. KLAUS:**  SORRY.  YOUR HONOR, MR. ROSENTHAL --

22          **THE COURT:**  WHAT'S YOUR OBJECTION?

23          **MR. KLAUS:**  THE OBJECTION IS HE'S BEING

24   ARGUMENTATIVE --

25          **THE COURT:**  SUSTAINED.

1           **MR. KLAUS:**  -- NOT ALLOWING THE WITNESS TO FINISH HIS

2   ANSWER.

3           **THE COURT:**  YOU CAN STOP TALKING WHEN I SUSTAIN YOUR

4   OBJECTION.

5       GO AHEAD.

6           **MR. ROSENTHAL:**  YES, YOUR HONOR.  THANKS.

7   **BY MR. ROSENTHAL:**

8   **Q.**  SO THE BOTTOM LINE, THOUGH, IN THIS QUESTION AND ALL THE

9   QUESTIONS IN THIS SURVEY, THE SURVEY DID NOT ASK WHETHER THE

10  PUBLIC -- OR WHETHER THE RESPONDENTS WERE IN FAVOR OF PAYING

11  COLLEGE FOOTBALL AND BASKETBALL PLAYERS FOR THE USE OF THEIR

12  NAMES, IMAGES AND LIKENESSES; ISN'T THAT RIGHT?

13  **A.**  RIGHT.  I DO NOT HAVE LANGUAGE IN THE SURVEY ON NAMES,

14  IMAGE AND LIKENESS RIGHTS.

15  **Q.**  AND I GUESS YOUR TERMINOLOGY, YOU DID NOT ISOLATE FOR

16  MEASUREMENT THAT PARTICULAR QUESTION, RIGHT?

17  **A.**  I'M FOND OF THAT PHRASE.  YES, I DID NOT ISOLATE FOR

18  MEASUREMENT THAT.

19  **Q.**  THAT'S CONSISTENT WITH WHAT YOU UNDERSTOOD YOUR ASSIGNMENT

20  IN THIS CASE TO BE, WHICH WAS TO DESIGN AND CONDUCT A SURVEY

21  THAT MEASURES PUBLIC OPINION TO THE IDEA THAT COLLEGE ATHLETES

22  WOULD BE PAID, CORRECT?

23  **A.**  WELL, I WAS -- WHAT I SAID YESTERDAY, IS I WAS TASKED WITH

24  DESIGNING A SURVEY THAT WOULD ALLOW FOR AN ANALYSIS OF WHAT

25  THE CONSUMPTION WOULD BE OF THESE TWO SPORTS IN THE EVENT THAT

DENNIS – CROSS / ROSENTHAL

```
 1    STUDENT ATHLETES WERE TO BE PAID.

 2    Q.  RIGHT.

 3        YOU BELIEVE YOUR ASSIGNMENT WAS TO DESIGN AND CONDUCT A

 4    SURVEY THAT MEASURES PUBLIC OPINION TO THE IDEA THAT COLLEGE

 5    ATHLETES WOULD BE PAID, CORRECT?

 6    A.  YEAH, BUT NOT JUST PAID WITHOUT ANY CONSTRAINTS AROUND

 7    THAT.  CONSTRAINTS -- I MENTIONED EARLIER THAT THESE ARE IN

 8    THE CONTEXT OF IN ADDITION TO THE COLLEGE ATHLETIC

 9    SCHOLARSHIPS.

10            MR. ROSENTHAL:  IF WE CAN CALL UP THE DEPOSITION,

11    PAGE 36, LINES 12 TO 18.

12        YOU WERE ASKED LAST NOVEMBER.

13            "AND WHAT DID YOU UNDERSTAND YOUR MISSION TO BE?"

14            YOU ANSWERED:  "AS PREVIOUSLY DESCRIBED, I UNDERSTOOD

15            I NEEDED TO DESIGN, CONDUCT AND ULTIMATELY DEVELOP

16            THE REPORT YOU SEE HERE THAT MEASURES PUBLIC OPINION

17            AND CONSUMER REACTIONS TO THIS IDEA THAT STUDENT

18            ATHLETES WOULD BE PAID."

19    BY MR. ROSENTHAL:

20    Q.  THAT WAS THE QUESTION YOU WERE ASKED AND THE ANSWER YOU

21    GAVE, CORRECT?

22    A.  YES, I SEE THAT.

23    Q.  AND YOUR ASSIGNMENT WAS NOT TO DETERMINE PUBLIC OPINION

24    AND CONSUMER REACTIONS TO THE IDEA THAT ATHLETES WOULD BE PAID

25    FOR THE USE OF THEIR NAMES, IMAGES AND LIKENESSES, CORRECT?
```

DENNIS - CROSS / ROSENTHAL

1    **A.**  RIGHT.  THAT WAS NOT MY SPECIFIC ASSIGNMENT.  MY

2    ASSIGNMENT WAS MORE GENERAL THAN THAT.

3    **Q.**  YOU TALKED A LITTLE BIT BEFORE ABOUT THE PRETEST,

4    DR. DENNIS.  AND THERE ARE 111 RESPONDENTS WHO YOU PRETESTED,

5    RIGHT?

6    **A.**  THAT'S CORRECT.

7    **Q.**  THEY WERE NOT INCLUDED IN THE ACTUAL SURVEY; IS THAT

8    RIGHT?

9    **A.**  IN TERMS -- I THINK WHAT YOU MEAN AMONG THE 2,455

10   INTERVIEWS?

11   **Q.**  CORRECT.

12   **A.**  THEY ARE NOT INCLUDED IN THAT.

13   **Q.**  AND THEN YOU HAD FOLLOW UP THINK-ALOUDS WITH 15 OF THOSE,

14   CORRECT?

15   **A.**  OF THE 111, YES.

16   **Q.**  RIGHT.

17       AND AS YOU TESTIFIED ON DIRECT EXAMINATION, NOT --

18   THOSE -- THOSE THINK-ALOUD INTERVIEWS WERE HALF AN HOUR EACH,

19   RIGHT?

20   **A.**  APPROXIMATELY, YES.

21   **Q.**  YOU TALKED TO 15 DIFFERENT PEOPLE FOR HALF AN HOUR EACH

22   ABOUT THE SURVEY, RIGHT?

23   **A.**  THAT'S CORRECT.

24   **Q.**  AND NOT ONE OF THOSE THINK-ALOUD PARTICIPANTS, NOT ONE OF

25   THOSE 15 PEOPLE BROUGHT UP THE SUBJECT OF ATHLETES BEING

1    COMPENSATED FOR THE USE OF THEIR NAME, IMAGE OR LIKENESS;

2    ISN'T THAT RIGHT?

3    **A.**  THAT'S RIGHT.

4         **MR. ROSENTHAL:**  NOW IF WE CAN GO BACK TO PAGE 13

5    PLEASE -- I AM SORRY, OF DEFENSE EXHIBIT 3392.

6              (EXHIBIT DISPLAYED ON SCREEN.)

7    **BY MR. ROSENTHAL:**

8    **Q.**  AND THE SURVEY ASKS FOR THE RESPONDENTS' OPINION ON PAYING

9    MONEY TO COLLEGE FOOTBALL AND BASKETBALL STUDENTS IN ADDITION

10   TO PROVIDING SCHOLARSHIPS THAT COVER COLLEGE EXPENSES.

11       THE QUESTION DOES NOT IDENTIFY THE PAYOR OF OR THE

12   POTENTIAL PAYOR OF THIS MONEY, CORRECT?

13   **A.**  IT DOES NOT.

14   **Q.**  IT LEAVES IT INTENTIONALLY VAGUE, RIGHT?

15   **A.**  INTENTIONALLY VAGUE, BUT I THINK RESPONDENTS UNDERSTOOD IT

16   WOULD BE SOME FORM OF LEGAL PAYMENT.

17   **Q.**  BUT IT COULD HAVE BEEN COLLEGES OR UNIVERSITIES THAT WOULD

18   MAKE THE PAYMENT, RIGHT?

19   **A.**  I THINK ACTUALLY IT'S PROBABLY WHERE RESPONDENTS ARE

20   THINKING, YES.

21   **Q.**  COULD BE MEDIA ORGANIZATIONS OR CONGLOMERATES, RIGHT?

22   **A.**  WELL, I THINK THE RESPONDENTS ARE HARDLY THAT

23   SOPHISTICATED TO THINK THAT WAY.

24   **Q.**  COULD BE THE NCAA ITSELF, RIGHT?

25   **A.**  AGAIN, THIS IS A -- YOU KNOW, IT WAS LEFT TO THE

1   RESPONDENT TO THINK ABOUT IT IN THE CONTEXT OF THE COLLEGE

2   ATHLETICS SCHOLARSHIPS WHICH ARE PROVIDED BY THE COLLEGES AND

3   UNIVERSITIES.

4   **Q.**  IT COULD BE ANY PAYOR, RIGHT?

5   **A.**  NO.  IT COULDN'T BE SOME ILLEGAL OPERATION.

6   **Q.**  IT COULD BE ALUMNI, AT LEAST AS LONG AS IT IS LEGAL IN

7   YOUR VIEW, RIGHT?

8   **A.**  WHETHER IT'S MY VIEW OR NOT DOESN'T MATTER.  IF IT'S

9   LEGAL, THAT'S THE POINT.

10  **Q.**  THE POINT IS THAT YOU LEFT IT UP TO THE RESPONDENT TO

11  INTERPRET WHO THE PAYOR WOULD BE, RIGHT?

12  **A.**  WITHIN THE CONSTRAINTS I PREVIOUSLY TALKED ABOUT.

13  **Q.**  NOW, I THINK YOU TOLD THE COURT RIGHT BEFORE I STARTED

14  ASKING QUESTIONS, DR. DENNIS, THAT 858 OF THE RESPONDENTS OR

15  ROUGHLY 38 (SIC) OF THE RESPONDENTS ANSWERED THE QUESTION

16  ABOUT WHETHER THEY HEARD ANYTHING ABOUT PAYING MONEY TO

17  STUDENT ATHLETES; IS THAT RIGHT?

18  **A.**  I BELIEVE I MENTIONED 35 PERCENT, YES.

19  **Q.**  OKAY.

20        **MR. ROSENTHAL:**  CAN WE GO TO EXHIBIT 3392 AT PAGE 11,

21  PLEASE?

22              (PAGE DISPLAYED ON SCREEN.)

23  **BY MR. ROSENTHAL:**

24  **Q.**  JUST SO WE ARE CLEAR ABOUT WHICH QUESTION WE ARE TALKING

25  ABOUT.  THIS QUESTION HERE:

1           "DURING THE PAST 12 MONTHS, HAVE YOU SEEN, HEARD, OR

2           READ ANYTHING IN THE MEDIA ABOUT PAYING MONEY TO

3           STUDENT ATHLETES WHO PLAY ON COLLEGE FOOTBALL AND

4           MEN'S BASKETBALL TEAMS?"

5      AND IT'S APPROXIMATELY 35 PERCENT OF THE RESPONDENTS WHO

6  ANSWERED THAT QUESTION "YES"; IS THAT RIGHT?

7  **A.**   THAT IS CORRECT.

8  **Q.**   OKAY.  AND CAN WE -- I THINK WE TALKED ABOUT IT BEFORE.

9           **MR. ROSENTHAL:**  CAN WE BRING UP PLAINTIFFS' EXHIBIT

10  2629?

11              (EXHIBIT DISPLAYED ON SCREEN.)

12  **BY MR. ROSENTHAL:**

13  **Q.**   AND YOU CAN TAKE A QUICK LOOK AT THE SCREEN.  MR. KLAUS

14  ASKED YOU ABOUT THE PLAINTIFFS' COMPILATION OF THE RESPONSES

15  WHERE RESPONDENTS SAID WE HEARD ABOUT THIS SUBJECT IN THE

16  CONTEXT OF SOME KIND OF ILLICIT PAYMENTS, RIGHT?

17  **A.**   WELL, THE QUESTION DOESN'T PROVIDE ANY GUIDANCE.  WHATEVER

18  THEY HEARD IN THE NEWS ON THE GENERAL TOPIC THEY CAN TALK

19  ABOUT.

20  **Q.**   RIGHT.  SO APPROXIMATELY 200 -- ACTUALLY 191 GAVE

21  RESPONSES THAT SUGGESTED THEY HEARD ABOUT ILLICIT PAYMENTS,

22  RIGHT?

23  **A.**   WELL, I ACTUALLY HAVEN'T QUALITY CONTROLLED THE CODING OF

24  THIS, SO I CAN'T TELL YOU IF 191 ARE CORRECTLY CODED OR NOT,

25  BUT I CAN SEE THAT THERE'S 191 LINES ON THE SPREADSHEET.

DENNIS – CROSS / ROSENTHAL

1  **Q.**  OKAY.  AND YOU ARE GENERALLY FAMILIAR WITH THE FACT THAT A

2  NUMBER OF PEOPLE WHO DID RESPOND TO QUESTION 8 AND FILLED IN

3  THAT BOX TALKED ABOUT HAVING HEARD ABOUT ILLICIT PAYMENTS,

4  RIGHT?

5  **A.**  IT'S WHAT'S IN THE NEWS, THE SCANDALS.  SURE.

6  **Q.**  FOR INSTANCE, THIS IS TAKEN DIRECTLY FROM YOUR EXHIBIT E

7  TO YOUR REPORT.

8       "NUMBER 12:  REMEMBER VAGUELY ABOUT PLAYERS RECEIVING

9       CARS OR MONEY.

10      "NUMBER 18:  SOME OF THE TEAMS SUPPORTERS THAT HAVE

11      BIG MONEY PAY SOME OF THE BEST PLAYERS UNDER THE

12      TABLE TO COME AND PLAY FOR THEIR TEAM.

13      NUMBER 47:  THE PRACTICE'S APPARENTLY RAMPANT AT THE

14      BIG SPORTS COLLEGES.

15      NUMBER 61:  OHIO STATE BEING BANNED FROM 2012

16      PLAYOFFS FOR BCS CHAMPIONSHIP."

17   YOU ARE FAMILIAR WITH THOSE RESPONSES TO QUESTION 8,

18  RIGHT?

19  **A.**  YES, I SEE THEM HERE.  THEY ARE A VERY SMALL SAMPLE OF THE

20  TOTAL, OF COURSE.

21  **Q.**  AND NONE OF THESE RESPONSES REFLECT AN UNDERSTANDING ABOUT

22  THE ISSUE IN THIS CASE WHICH IS RESTRICTIONS ON COMPENSATION

23  FOR PAYMENT OF NAME, IMAGE AND LIKENESS, RIGHT?

24  **A.**  I WOULDN'T EXPECT THEM TO HAVE AN UNDERSTANDING.  I

25  HAVEN'T GIVEN THEM THE CONTEXT YET IN THE SURVEY.

1   **Q.**  BUT YOU'VE JUST GIVEN THEM AN OPEN-ENDED QUESTION SAYING

2   WHAT HAVE YOU HEARD, RIGHT?

3   **A.**  COMPLETELY UNTUTORED, UNSTRUCTURED, WHAT HAVE YOU HEARD.

4   **Q.**  AND I THINK YOU SAID ON DIRECT, THE VERY NEXT QUESTION,

5   QUESTION 9A THEN GOES AHEAD TO ASK ABOUT WHETHER THEY FAVOR OR

6   OPPOSE PAYING COLLEGE FOOTBALL AND BASKETBALL PLAYERS IN

7   ADDITION TO THE COST OF THEIR SCHOLARSHIPS THAT COVER THEIR

8   EXPENSES, RIGHT?

9   **A.**  YES.

10  **Q.**  NOW, WITH RESPECT TO THIS OPEN-ENDED QUESTION 8 THAT

11  ELICITED RESPONSES LIKE THIS, YOU WERE MONITORING RESPONSES TO

12  THIS QUESTION IN REAL TIME, WEREN'T YOU?  YOU WERE MONITORING

13  THE RESPONSES AS THEY WERE COMING IN?

14  **A.**  NO.

15  **Q.**  YOU DIDN'T LOOK AT THEM UNTIL AFTER THE SURVEY WAS OVER?

16  **A.**  I PROBABLY LOOKED AT IT, I WOULD HAVE TO GO THROUGH, MAYBE

17  HALFWAY THROUGH THE FIELD PERIOD I WOULD HAVE LOOKED AT IT,

18  BUT NOT -- MY NORMAL PROTOCOL IS TO DO A PRETEST VERY WELL,

19  ANALYZE THE RESULTS FROM THE PRETEST.  AND THEN ONCE THE

20  SURVEY IS FIELDED, I CAN'T DO ANYTHING ABOUT IT.  THE SURVEY

21  IS FIELDED.

22  **Q.**  SO YOU DON'T ACTUALLY MONITOR THE RESULTS OF THE SURVEY

23  THAT -- WHEN THEY ARE COMING IN TO DETERMINE WHETHER, BEYOND

24  WHAT YOU DID IN THE PRETEST, PEOPLE ARE GETTING THE POINT OF

25  THE SURVEY.

DENNIS - CROSS / ROSENTHAL

1    **A.**   ON THE BASIS OF WHAT I DID IN MY PRETEST AND THE QUALITY

2    CONTROL INTERVIEWS ON THE TELEPHONE, THAT IS MY OPINION.

3    **Q.**   DURING THE PRETEST, PEOPLE RAISED THE ISSUE OR SAID THAT

4    THEY HEARD ABOUT COLLEGE ATHLETES RECEIVING ILLICIT PAYMENTS?

5    **A.**   WELL, WHEN I WENT THROUGH THE -- YOU ARE TALKING ABOUT THE

6    TELEPHONE INTERVIEWS --

7    **Q.**   THINK-ALOUDS, YES.

8    **A.**   SOMETIMES PEOPLE WOULD MENTION THINGS THAT THEY HEARD IN

9    THE NEWS BECAUSE I WENT THROUGH THE QUESTIONNAIRE WITH THEM.

10   SO THEY WOULD EXPLAIN TO ME WHAT THEY HEARD IN THE NEWS.

11   **Q.**   YOU DIDN'T PRODUCE YOUR NOTES FROM THOSE THINK-ALOUDS IN

12   YOUR REPORT, DID YOU?

13   **A.**   I DON'T RECALL IF I DID OR NOT.

14   **Q.**   I CAN REPRESENT THAT WE DIDN'T GET THEM.

15   **A.**   OKAY.

16          **MR. ROSENTHAL:**  ACTUALLY I WOULD LIKE TO MOVE

17   PLAINTIFFS' 2629 INTO EVIDENCE.

18          **THE COURT:**  RECEIVED.

19          **MR. KLAUS:**  NO OBJECTION.

20       (PLAINTIFFS' EXHIBIT 2629 RECEIVED IN EVIDENCE)

21          **MR. ROSENTHAL:**  IF WE CAN GO TO PLAINTIFFS' 2630

22   PLEASE.

23             (EXHIBIT DISPLAYED ON SCREEN.)

24   **BY MR. ROSENTHAL:**

25   **Q.**   IN RESPONSE TO THIS OPEN-ENDED QUESTION 8 ABOUT WHAT

DENNIS – CROSS / ROSENTHAL

1    PEOPLE HAD HEARD, THERE WERE ALSO A NUMBER OF PEOPLE WHO SAID

2    THAT THEY HEARD ABOUT THE POSSIBILITY THAT PLAYERS COULD

3    RECEIVE SALARIES OR STIPENDS FOR PLAYING, MEANING FOR THEIR

4    PERFORMANCE, RIGHT?

5    **A.**  YES.  OKAY.

6    **Q.**  AND IF WE TAKE A LOOK AT THIS EXHIBIT RIGHT HERE, WHICH IS

7    A COMPILATION OF THOSE RESPONSES.  IF WE TAKE A LOOK, FOR

8    INSTANCE, AT THE TOP LINE.

9            "NUMBER 14:  ATHLETES WOULD RECEIVE A MONTHLY

10            STIPEND, ABOUT A HUNDRED TO 250 PER MONTH.  NCAA'S

11            PROPOSAL TO START IN THE NEXT YEAR OR TWO.

12            59:  IN TWO YEARS THEY WILL BE RECEIVING SALARIES.

13            98:  PAY COLLEGE STUDENTS FOR PLAYING."

14    YOU KNOW THAT QUESTION 8, THE OPEN-ENDED QUESTION,

15    ELICITED A NUMBER OF RESPONSES LIKE THIS, RIGHT?

16    **A.**  YES, I DO.

17    **Q.**  MEANING THAT -- THAT AT LEAST WITH RESPECT TO QUESTIONS 7

18    AND 8, RESPONDENTS WERE INTERPRETING PAYING MONEY TO MEAN

19    PAYING A SALARY OR PAYING A STIPEND, RIGHT?

20    **A.**  THERE ARE SOME PEOPLE THAT BROUGHT THAT, YEAH.

21    **Q.**  THAT ALSO IS NOT WHAT'S AT ISSUE IN THIS CASE, AND YOU

22    KNEW THAT AT THE TIME THIS SURVEY WENT OUT INTO THE FIELD,

23    CORRECT?

24    **A.**  I DON'T UNDERSTAND YOUR POINT.

25    **Q.**  I WILL MOVE ON.

1      **THE COURT:**  CAN YOU ANSWER THE QUESTION?

2      **THE WITNESS:**  WELL, I UNDERSTOOD PAYMENT OF ALL THESE

3  LEGITIMATE FORMS WERE AT ISSUE IN THE CASE.  SO, MY –– THE

4  SURVEY IS ABOUT PAYING STUDENT ATHLETES MORE BROADLY.  IT'S

5  NOT JUST ABOUT SALARY, STIPENDS, ET CETERA.

6  **BY MR. ROSENTHAL:**

7  **Q.**  YOU TESTIFIED EARLIER, I THINK, THAT YOUR UNDERSTANDING

8  GOING INTO THE SURVEY, AFTER HAVING READ THE NEWS REPORTS AND

9  TALKED TO THE NCAA'S LAWYERS, WAS THAT THE ISSUE IN THIS CASE

10 WAS ABOUT COMPENSATING COLLEGE FOOTBALL AND BASKETBALL PLAYERS

11 FOR THE USE OF THEIR NAMES, IMAGES AND LIKENESSES IN VARIOUS

12 FORMS OF MEDIA, LIKE VIDEO GAMES, TELEVISION BROADCASTS AND

13 REBROADCASTS.

14     YOU KNEW THAT, RIGHT?

15 **A.**  YES.

16 **Q.**  AND YOU UNDERSTOOD THAT THESE QUESTIONS ABOUT PAYING

17 MONEY, THESE OPEN-ENDED QUESTIONS ABOUT PAYING MONEY WERE

18 ELICITING RESPONSES SUGGESTING THAT PEOPLE THOUGHT THE SURVEY

19 WAS ASKING ABOUT SALARY OR STIPEND, RIGHT?

20 **A.**  THAT THE DATA SPEAK FOR THEMSELVES ON THAT.

21     **MR. ROSENTHAL:**  MOVE TO ADMIT PLAINTIFFS' 2630, YOUR

22 HONOR.

23     **MR. KLAUS:**  NO OBJECTION.

24     **THE COURT:**  RECEIVED.

25     (PLAINTIFFS' EXHIBIT 2630 RECEIVED IN EVIDENCE)

1              **MR. ROSENTHAL:**  AND IF WE CAN PUT UP PLAINTIFFS'

2       2631, PLEASE.

3                     (EXHIBIT DISPLAYED ON SCREEN.)

4       **BY MR. ROSENTHAL:**

5       **Q.**  NOW, YOU ALSO KNEW THAT THERE WAS A VERY SMALL PERCENTAGE

6       OF PEOPLE WHO RESPONDED TO THIS OPEN-ENDED QUESTION 8 SAYING

7       THAT THEY ACTUALLY HEARD ABOUT THE ISSUE IN THIS CASE, WHICH

8       IS, PLAYERS RECEIVING COMPENSATION FOR THE USE OF THEIR NAMES,

9       IMAGES AND LIKENESSES.  YOU KNEW THAT, RIGHT?

10      **A.**  YES, I SEE IT HERE, TOO.

11      **Q.**  AND SO, FOR INSTANCE, RESPONDENT 2579, AND THAT'S THE ONLY

12      ONE I'M GOING TO READ SAYS THAT:

13              "STUDENT ATHLETES SHOULD BE ABLE TO RECEIVE MONEY FOR

14              THE USE OF THEIR NAME, MERCHANDISE, AUTOGRAPHS, ET

15              CETERA."

16          YOU KNEW THERE WERE A HANDFUL OF RESPONSES THAT INDICATED

17      THAT THAT'S WHAT PEOPLE HAD HEARD ABOUT, RIGHT?

18      **A.**  WELL, YEAH.  WHEN THE DATA REFLECTED, I SAW THAT.

19      **Q.**  SO THERE WERE 4,255 RESPONDENTS IN THE SURVEY, CORRECT?

20      **A.**  YES.

21      **Q.**  RIGHT.

22          AND ONLY ABOUT 10 TO 15 SAID IN RESPONSE TO QUESTIONS 7

23      AND 8 THAT THEY HEARD ABOUT THIS NAME, IMAGE AND LIKENESS

24      ISSUE, RIGHT?

25      **A.**  WELL, I HAVEN'T QUALITY CONTROLLED THIS CODING, BUT I DO

```
1    SEE THE EXHIBIT IN FRONT OF ME.

2    Q.  RIGHT.  BUT NONE OF THE PEOPLE THAT YOU TALKED TO IN THE

3    PRETEST RAISED THAT ISSUE, RIGHT?

4    A.  THAT'S CORRECT.

5    Q.  ALSO GOING -- WE CAN --

6           MR. ROSENTHAL:  ACTUALLY, I WOULD LIKE TO MOVE THIS

7    INTO EVIDENCE 2631.

8           MR. KLAUS:  NO OBJECTION.

9           THE COURT:  RECEIVED.

10          (PLAINTIFFS' EXHIBIT 2631 RECEIVED IN EVIDENCE)

11   BY MR. ROSENTHAL:

12   Q.  NONE OF THE RESPONDENTS WHO ANSWERED THESE -- THIS

13   OPEN-ENDED QUESTION 8, NONE OF THEM TALKED ABOUT THE CONCEPT

14   OF DEFERRED COMPENSATION, RIGHT?

15       NONE OF THEM RAISED THE ISSUE OF A TRUST FUND?

16   A.  I DON'T REMEMBER.  I DIDN'T MEMORIZE ALL 800 AND SOME OPEN

17   ENDS.

18   Q.  AS YOU TESTIFIED ON DIRECT, THERE IS NOTHING IN THE SURVEY

19   ABOUT DEFERRED COMPENSATION, RIGHT?

20   A.  IT DOESN'T EXCLUDE IT, BUT IT'S NOT CONSPICUOUSLY

21   MENTIONED.

22   Q.  YOU DIDN'T CONSIDER INCLUDING SOMETHING SPECIFIC IN THE

23   SURVEY ABOUT DEFERRED COMPENSATION AT THE TIME YOU CRAFTED IT,

24   RIGHT?

25   A.  NO, I DID NOT.
```

DENNIS - CROSS / ROSENTHAL

1    **Q.**  YOU DID NOT DISCUSS THAT TOPIC WITH ANYONE?

2    **A.**  I DON'T RECALL DISCUSSING IT, BUT IN MY OPINION IT DIDN'T

3    NEED TO BE IN THERE ANYWAY.

4    **Q.**  BUT IT'S CERTAINLY POSSIBLE THAT SOME PEOPLE, WHILE THEY

5    MIGHT BE OPPOSED TO THE CONCEPT OF PLAYING -- PAYING PLAYERS

6    CONTEMPORANEOUSLY, MIGHT BE IN FAVOR OF PUTTING THE MONEY INTO

7    TRUST AND ALLOWING THEM TO ACCESS IT ONLY AFTER THEY GRADUATE,

8    RIGHT?

9    **A.**  YOUR QUESTION TO ME IS, IS IT POSSIBLE SOME PEOPLE HAD

10   THAT OPINION?

11   **Q.**  YEAH.

12   **A.**  WELL, PEOPLE ARE FREE TO BRING WHATEVER OPINIONS THEY WANT

13   TO THE SURVEY.

14   **Q.**  AND IT'S POSSIBLE THAT SOME PEOPLE DO HOLD THAT OPINION,

15   THAT WHILE THEY MIGHT BE OPPOSED TO CONTEMPORANEOUS PAYMENT,

16   THEY ACTUALLY FAVOR OR AT LEAST NOT OPPOSE TO PUTTING THE

17   MONEY IN TRUST AND ALLOWING ATHLETES TO RECEIVE COMPENSATION

18   AFTER THEIR ELIGIBILITY EXPIRES?

19   **A.**  THEN PRESUMABLY THEY WOULD HAVE AN OPINION POSSIBLY BEING

20   IN FAVOR OF PAYING STUDENT ATHLETES FOR MY SURVEY.

21   **Q.**  THE PRETEST, AGAIN, GOING BACK TO THE THINK-ALOUDS THAT

22   YOU CONDUCTED, NO ONE AS PART OF THAT PRETEST TALKED ABOUT

23   DEFERRED COMPENSATION OR TALKED ABOUT A TRUST FUND; ISN'T THAT

24   RIGHT?

25   **A.**  THAT'S CORRECT.

1        **MR. ROSENTHAL:**  IF WE CAN BRING UP DEFENSE

2    EXHIBIT 3393 AT 13 AGAIN.  THIS IS QUESTION 9A.  I'M SORRY, IT

3    IS DEFENSE EXHIBIT 3393.  IT'S THE SURVEY.

4                    (EXHIBIT DISPLAYED ON SCREEN.)

5    **BY MR. ROSENTHAL:**

6    **Q.**  LOOK AT THE TOP LINE AGAIN.  THIS LINE:

7            "IN ADDITION TO PROVIDING SCHOLARSHIPS THAT COVER

8            COLLEGE EXPENSES."

9        THAT STATEMENT ASSUMES THAT SCHOLARSHIPS COVER ALL COLLEGE

10   EXPENSES, DOESN'T IT?

11   **A.**  NO.  WHERE DOES IT SAY THAT?

12   **Q.**  IT SAYS, "IN ADDITION TO PROVIDING SCHOLARSHIPS THAT COVER

13   COLLEGE EXPENSES," THE IMPLICATION BEING THAT SCHOLARSHIPS

14   COVER COLLEGE EXPENSES, RIGHT?

15   **A.**  YOUR QUESTION TO ME INCLUDED THE WORD "ALL", ALL –– YOU

16   SAID "ALL COLLEGE EXPENSES".  I DON'T THINK THAT THIS SENTENCE

17   ACTUALLY SAYS THAT.

18   **Q.**  IT DOESN'T SAY "SOME" EITHER, DOES IT?

19   **A.**  NO.  IT DOESN'T EXCLUDE ALL.  IT DOESN'T EXCLUDE SOME AS A

20   CONCEPT.

21   **Q.**  IF WE CAN GO TO –– I WANT TO GO TO THE ISSUE OF FANS AND

22   NONFANS NOW.

23       AND YOU SURVEYED THE GENERAL OR THE SURVEY INCLUDED A

24   REPRESENTATIVE SAMPLE OF THE GENERAL ADULT POPULATION OF THE

25   UNITED STATES, RIGHT?

1   **A.**  THAT'S CORRECT.

2   **Q.**  IT DID NOT FIRST SEEK TO ISOLATE RESPONDENTS WHO MIGHT BE

3   FANS AND THEN SURVEY ONLY WHAT THEY HAD TO SAY ABOUT THE

4   SUBJECT, RIGHT?

5   **A.**  THAT IS CORRECT.

6           **MR. ROSENTHAL:**  IF WE CAN GO TO 3393 AT 1, PAGE 1

7   PLEASE.

8                   (PAGE DISPLAYED ON SCREEN.)

9       AND IF WE CAN BLOW UP THE Q2B, QUESTION 2B.

10  **BY MR. ROSENTHAL:**

11  **Q.**  THIS IS THE QUESTION THAT ASKS HOW MANY PEOPLE -- OR HOW

12  MANY OF THE RESPONDENTS HAVE WATCHED ON TELEVISION OR OVER THE

13  INTERNET, LISTENED TO, OR ATTENDED COLLEGE FOOTBALL GAMES IN

14  THE LAST YEAR, RIGHT?

15  **A.**  THAT'S CORRECT.

16  **Q.**  AND IF YOU TAKE A LOOK NEAR THE BOTTOM, IN RESPONSE TO

17  THIS QUESTION, IT SHOWS THAT 49.6 PERCENT OF RESPONDENTS HAD

18  WATCHED, LISTENED TO, OR ATTENDED NO FOOTBALL GAMES, RIGHT?

19  **A.**  THAT'S CORRECT.

20  **Q.**  IF YOU GO NEAR THE TOP, THE SECOND LINE, IT SHOWS THAT

21  12.3 PERCENT HAD ONLY WATCHED, ATTENDED, OR LISTENED TO ONE OR

22  TWO GAMES A YEAR, RIGHT?

23  **A.**  THAT'S CORRECT.  THAT'S WHAT THE NUMBERS SAY.

24  **Q.**  SO 61.9 PERCENT OF YOUR RESPONDENTS HAD WATCHED, LISTENED

25  TO, OR ATTENDED TWO GAMES, TWO COLLEGE FOOTBALL GAMES OR LESS

1    WITHIN THE PAST YEAR, RIGHT?

2    **A.**  AS MEASURED BY HALF A GAME OR MORE, THAT'S RIGHT.

3    **Q.**  OKAY.  AND IF WE CAN GO TO PAGE 2, QUESTION FIVE.

4                      (PAGE DISPLAYED ON SCREEN.)

5        THIS QUESTION SAYS:

6            "THINKING ABOUT COLLEGE FOOTBALL, WHICH OF THE

7            FOLLOWING BEST DESCRIBES HOW OFTEN YOU WATCHED ON

8            TELEVISION OR OVER THE INTERNET, LISTENED TO, OR

9            ATTENDED GAMES DURING THE 2012-2013 SEASON?"

10       AND IF YOU TAKE A LOOK AT THE RESPONSES, THE BOTTOM SAYS,

11   56.3 NEVER WATCHED -- NEVER OR RARELY WATCHED ANYTHING, RIGHT?

12   **A.**  THAT'S RIGHT.

13   **Q.**  ANOTHER 12.9 PERCENT SAID THEY WATCHED SEVERAL GAMES -- I

14   AM SORRY, SCRATCH THAT.

15       ANOTHER 2.4 PERCENT SAID THEY ONLY WATCHED POST-SEASON

16   BOWL GAMES, RIGHT?

17   **A.**  YES.  THAT'S WHAT IT SAYS.

18   **Q.**  SO YOU'VE GOT A MAJORITY HERE WHO SAID THAT THEY NEVER OR

19   RARELY WATCHED, LISTENED TO, OR ATTENDED COLLEGE FOOTBALL

20   GAMES WITHIN THE LAST 12 MONTHS, RIGHT?

21   **A.**  IT'S A SURVEY OF PUBLIC OPINION.  THAT'S RIGHT.

22            **MR. ROSENTHAL:**  IF WE CAN GO TO 3393 AT PAGE 2, THE

23   TOP.  ACTUALLY, IT GOES FROM PAGE 1 OVER TO PAGE 2.  SO IF YOU

24   CAN BLOW UP THAT BOX.

25                      (PAGE DISPLAYED ON SCREEN.)

1    **BY MR. ROSENTHAL:**

2    **Q.**  THIS ASKS THE SAME QUESTION ABOUT HOW MANY OF THE

3    RESPONDENTS WATCHED A CERTAIN AMOUNT OF COLLEGE -- MEN'S

4    COLLEGE BASKETBALL GAMES OVER THE COURSE OF THE PAST YEAR.

5    AND --

6    **A.**  EXCUSE ME.  THIS IS SHOWING PROFESSIONAL.

7    **Q.**  I'M SORRY.  GO TO THE NEXT BOX AT THE TOP OF PAGE 2.

8    THAT'S MY FAULT.

9                    (PAGE DISPLAYED ON SCREEN.)

10        THIS BOX SHOWS OF THE RESPONDENTS, 64.2 PERCENT, THIS IS

11   NEAR THE BOTTOM, WATCHED, ATTENDED, OR LISTENED TO NO

12   COLLEGE -- MEN'S COLLEGE BASKETBALL GAMES IN THE LAST YEAR,

13   RIGHT?

14   **A.**  RIGHT.  I THOUGHT THEIR OPINIONS MATTERED, TOO.

15   **Q.**  IF WE GO TO THE TOP.

16        ANOTHER 8.6 PERCENT SAID THEY'D ONLY WATCHED ONE OR TWO

17   GAMES, OR LISTENED TO OR ATTENDED ONE OR TWO GAMES DURING THE

18   COURSE OF THE ENTIRE YEAR, CORRECT?

19   **A.**  THAT'S CORRECT.  THAT'S WHAT THE NUMBERS SAY.

20   **Q.**  SO YOU HAD ALMOST 73 PERCENT OF YOUR RESPONDENT POOL WHO

21   SAID THAT THEY HAD WATCHED, LISTENED TO, OR ATTENDED TWO GAMES

22   OR LESS; IS THAT RIGHT?

23   **A.**  THAT'S CORRECT.  THEY'RE PART OF THE PUBLIC.

24           **MR. ROSENTHAL:**  IF WE CAN GO TO DEFENSE SLIDE 4064,

25   PLEASE.

```
 1              (EXHIBIT DISPLAYED ON SCREEN.)

 2   BY MR. ROSENTHAL:

 3   Q.  MR. KLAUS SHOWED YOU THIS BEFORE.

 4       IN ORDER TO VALIDATE, OR AT LEAST TO DETERMINE THE

 5   VALIDITY OF YOUR RESULTS, YOU LOOKED AT THE RESULTS OF SIMILAR

 6   SURVEYS, AS YOU TESTIFIED ON DIRECT EXAMINATION, RIGHT?

 7   A.  WELL, IT'S NOT THE ONLY TEST I WOULD USE FOR VALIDITY, BUT

 8   IT'S ONE OF THEM.

 9   Q.  THAT'S ONE OF THE THINGS YOU LOOKED AT TO DETERMINE THAT,

10   RIGHT?

11       I'M SORRY.  MOVE ON.

12   A.  YEAH, IT'S --

13              MR. ROSENTHAL:  LET'S GO TO PLAINTIFFS' 2632.

14                  (EXHIBIT DISPLAYED ON SCREEN.)

15   BY MR. ROSENTHAL:

16   Q.  ALL RIGHT.  SO, THE GALLUP POLL THAT YOU LOOKED AT ASKED

17   WHETHER PEOPLE WERE IN FAVOR OF OR OPPOSED TO PAYING ATHLETES

18   IN ADDITION TO SCHOLARSHIPS, RIGHT?

19              MR. KLAUS:  MAY I HAVE A COPY OF 2632 WHICH WE HAVE

20   NEVER SEEN?

21                  (DOCUMENT HANDED TO COUNSEL.)

22              THE WITNESS:  I'M SORRY, WHAT'S YOUR QUESTION?

23   BY MR. ROSENTHAL:

24   Q.  THE GALLUP POLL THAT YOU LOOKED TO AS A COMPARATOR ASKED

25   WHETHER PEOPLE WERE IN FAVOR OF OR OPPOSED TO PAYING ATHLETES
```

1    IN ADDITION TO SCHOLARSHIPS, RIGHT?

2    **A.**   I REMEMBER THAT.

3    **Q.**   AND THE SUBSEQUENT *U.S.A. TODAY*, CNN, GALLUP POLL IN MARCH

4    2003 ASKED WHETHER PEOPLE WERE IN FAVOR OF OR OPPOSED TO

5    ATHLETES BEING PAID FOR PLAYING ON COLLEGE TEAMS IN ADDITION

6    TO SCHOLARSHIPS, RIGHT?

7    **A.**   I PREVIOUSLY SAID THERE WAS DIFFERENT METHODOLOGIES USED

8    ACROSS THESE POLLS.

9    **Q.**   AND THE MARIST SURVEY FROM 2012 ASKED WHETHER PEOPLE WERE

10   IN FAVOR OF OR OPPOSED TO ATHLETES BEING PAID A SALARY,

11   CORRECT?

12   **A.**   THAT'S CORRECT.

13   **Q.**   THE YOUGOV HUFFINGTON POST POLL FROM FEBRUARY OF THIS YEAR

14   ASKED WHETHER PEOPLE WERE IN FAVOR OF OR OPPOSED TO ATHLETES

15   BEING PAID BY THEIR SCHOOLS, CORRECT?

16   **A.**   I DON'T REMEMBER THAT ONE DIRECTLY, BUT I TAKE YOUR WORD

17   FOR IT.

18   **Q.**   AND THEN THE FINAL ONE THAT YOU LOOKED AT AS A COMPARATOR

19   ASKED IF PEOPLE WERE IN FAVOR OF OR OPPOSED TO PAYING SALARIES

20   BEYOND THE SCHOLARSHIPS THAT ATHLETES RECEIVED, CORRECT?

21   **A.**   RIGHT.   THERE'S A VARIETY OF QUESTION WORDINGS ON THIS

22   TOPIC.

23   **Q.**   EACH OF THOSE SURVEYS ASKED QUESTIONS SIMILAR TO THE

24   QUESTIONS THAT YOU ASKED IN THIS SURVEY, RIGHT?

25   **A.**   WELL, IN TERMS OF THE FAVOR/OPPOSED QUESTION, THESE ARE

1    SOMEWHAT SIMILAR TO WHAT I ASKED.

2    **Q.**   RIGHT.

3        AND LIKE THIS SURVEY, NONE OF THESE OTHER SURVEYS

4    QUESTIONED RESPONDENTS WHETHER THEY FAVORED OR OPPOSED PAYING

5    PLAYERS FOR THE USE OF THEIR NAME, IMAGE AND LIKENESS,

6    CORRECT?

7    **A.**   PROBABLY FOR REASONS ALREADY OUTLINED.

8    **Q.**   SO THE ANSWER IS "YES", CORRECT, NONE OF THEM DID?

9    **A.**   NONE OF THEM DID.

10   **Q.**   AND LIKE THIS SURVEY, NONE OF THESE OTHER SURVEYS

11   QUESTIONED RESPONDENTS WHETHER THEY FAVORED PLACING MONEY IN A

12   TRUST FUND TO BE ACCESSED AFTER A PLAYER GRADUATES; ISN'T THAT

13   RIGHT?

14   **A.**   THAT'S RIGHT.  THEY ARE ASKING QUESTIONS -- I THINK THEY

15   ARE ASKING VERY GOOD QUESTIONS HERE.

16   **Q.**   THEY DID THE SAME THING YOU DID, WHICH IS TESTING WHETHER

17   RESPONDENTS SIMPLY FAVORED MONEY OR PAYING A SALARY TO STUDENT

18   ATHLETES, RIGHT?

19   **A.**   WELL, THEY DID SIMILAR THINGS, YEAH.

20   **Q.**   NOW, YOU ALSO KNEW THAT SOME OF THESE SURVEYS WERE THE

21   SURVEYS THAT DR. RUBINFELD HAD BEEN RELYING ON IN PRIOR

22   REPORTS THAT HE HAD ISSUED IN THIS CASE, RIGHT?

23   **A.**   YEAH, I DID SEE SOMETHING ON THAT.

24        **MR. ROSENTHAL:**  YOU CAN TAKE THAT DOWN.  THANK YOU,

25   MATT.

1    **BY MR. ISAACSON:**

2    **Q.**  YOU HAVE DONE APPROXIMATELY SEVEN SURVEYS IN CONNECTION

3    WITH LITIGATION, RIGHT?

4    **A.**  I DON'T KNOW HOW MANY I HAVE DONE.  I KNOW I HAVE DONE A

5    FEW.

6    **Q.**  AND YOUR OPINION IS THAT LITIGATION-DRIVEN SURVEYS ARE A

7    LITTLE MORE COMPLICATED BECAUSE THE ISSUES ARE MORE

8    COMPLICATED; IS THAT RIGHT?

9    **A.**  I DON'T KNOW.  I MEAN, ALL SURVEYS ARE COMPLICATED.  THEY

10   ALL HAVE THEIR CHALLENGES.

11   **Q.**  RIGHT.  AND YOU TESTIFIED BEFORE THAT YOU DID NOT ACTUALLY

12   SPECIFICALLY TEST FOR PUBLIC ATTITUDES OR CONSUMER DEMAND --

13   I'M SORRY.

14       YOU DID NOT SPECIFICALLY TEST FOR PUBLIC ATTITUDES ABOUT

15   WHETHER PEOPLE FAVORED OR OPPOSED PAYING COLLEGE FOOTBALL AND

16   BASKETBALL PLAYERS FOR THE USE OF THEIR NAMES, IMAGES AND

17   LIKENESSES, RIGHT?

18   **A.**  I DIDN'T EXCLUDE IT FROM IT.  IF RESPONDENTS WANTED TO

19   BRING THAT THEORY AND THOSE CONCEPTS INTO THE SURVEY, THEY

20   POTENTIALLY COULD HAVE, BUT I DIDN'T CONSPICUOUSLY CALL IT OUT

21   IN THE SURVEY EITHER.

22   **Q.**  AND THE REASON THAT YOU DIDN'T SPECIFICALLY TEST FOR IT IS

23   BECAUSE YOU THINK IT IS A VERY TECHNICAL MATTER, RIGHT, BOTH

24   LEGALLY AND DEFINITIONALLY?

25   **A.**  THAT'S ONE OF THE OPINIONS I OFFERED EARLIER, YES.

1   **Q.**  AND IT STRUCK YOU IT COULD BE A VERY, VERY DIFFICULT THING

2   TO MEASURE PROPERLY IN A SURVEY, RIGHT?

3   **A.**  YES, I BELIEVE THAT.

4   **Q.**  NOW, THEORETICALLY, TESTING ON THIS ISSUE ABOUT WHETHER

5   PEOPLE FAVOR OR OPPOSE PAYING COLLEGE ATHLETES FOR THE USE OF

6   THEIR NAMES, LIKENESSES AND IMAGES, THAT COULD BE DONE, RIGHT?

7   **A.**  COULD IT BE?  PERHAPS.  IT WOULD HAVE TO BE REALLY LOOKED

8   INTO.  IT SOUNDS LIKE A VERY COMPLEX, AND IT'S A VERY

9   DIFFERENT PROJECT.

10  **Q.**  AND BECAUSE YOU BELIEVE THAT IT IS A VERY COMPLEX PROJECT

11  TO BE ABLE TO DESIGN A SURVEY LIKE THAT, YOU DO NOT THINK, OR

12  AT LEAST YOU ARE NOT REALLY SURE IT CAN BE DONE; THAT'S YOUR

13  OPINION, RIGHT?

14  **A.**  I WOULD HAVE RESERVATIONS ABOUT THE QUALITY OF THE DATA

15  THAT WOULD COME OUT OF SUCH A SURVEY FOR ALL THE REASONS I

16  MENTIONED EARLIER.

17  **Q.**  AND YOU HAVE THE SAME POSITION OR TAKE THE SAME POSITION

18  ABOUT TESTING FOR WHETHER PEOPLE FAVOR OR DISFAVOR PAYING

19  ATHLETES BY THE MEANS OF DEFERRED COMPENSATION, PUTTING MONEY

20  IN A TRUST FUND, RIGHT?

21  **A.**  YEAH.  THAT WAS ONE OF THE OPINIONS OFFERED EARLIER TODAY.

22  **Q.**  I THINK YOU TESTIFIED EARLIER, AND TELL ME IF YOU STILL

23  AGREE WITH IT, THAT YOU THINK THAT THAT ISSUE, TOO, IS

24  PROBABLY TOO COMPLEX TO TEST, RIGHT?

25  **A.**  WELL, I DON'T KNOW.  IT WASN'T -- FOR ME IN DESIGNING THE

1  SURVEY, IT WASN'T A NECESSARY INGREDIENT OF THE QUESTIONNAIRE

2  TO TALK ABOUT DEFERRED COMPENSATION.

3  **Q.**  BEFORE YOU SAID THAT IT INVOLVES OPERATIONAL COMPLEXITY

4  AND RAISES QUESTIONS ABOUT FEASIBILITY, RIGHT?

5  **A.**  THAT'S CORRECT.

6  **Q.**  AND YOU STAND BY THAT TESTIMONY?

7  **A.**  I DO.

8        **MR. ROSENTHAL:**  IF I CAN HAVE A MOMENT, YOUR HONOR?

9            (PAUSE IN THE PROCEEDINGS.)

10        **MR. ROSENTHAL:**  NO FURTHER QUESTIONS.

11        **THE COURT:**  ANY REDIRECT?

12        **MR. KLAUS:**  NO REDIRECT, YOUR HONOR.

13        **THE COURT:**  ALL RIGHT.  YOU ARE EXCUSED.  THANK YOU.

14  YOU MAY STEP DOWN.

15    WE WILL TAKE OUR BREAK UNTIL 10:30 AND YOU CAN HAVE YOUR

16  NEXT WITNESS AVAILABLE.

17    (RECESS TAKEN AT 10:18 A.M.; RESUMED AT 10:30 A.M.)

18        **THE CLERK:**  REMAIN SEATED.  COME TO ORDER.  COURT IS

19  BACK IN SESSION.

20        **THE COURT:**  IF YOU WOULD RAISE YOUR RIGHT HAND, SIR,

21  AND BE SWORN.

22    (HAL PORET, CALLED AS A WITNESS FOR THE PLAINTIFFS, HAVING

23  BEEN DULY SWORN, TESTIFIED AS FOLLOWS:)

24        **THE WITNESS:**  YES, I DO.

25        **THE CLERK:**  YOU MAY BE SEATED, AND ONCE SEATED I'M

1    GOING TO ASK THAT YOU PLEASE STATE AND SPELL YOUR FIRST AND

2    LAST NAME FOR THE RECORD.

3            **THE WITNESS:**  HAL H-A-L, PORET, P-O-R-E-T.

4            **THE CLERK:**  THANK YOU.

5                    <u>**DIRECT EXAMINATION**</u>

6    BY MS. STEINER:

7    **Q.**  MS. PORET, WHAT IS YOUR EDUCATIONAL BACKGROUND?

8    **A.**  I HAVE A BACHELOR'S AND MASTER'S IN MATH AND I HAVE A J.D.

9    FROM HARVARD LAW SCHOOL.

10   **Q.**  WHAT IS YOUR CURRENT JOB TITLE?

11   **A.**  I'M A SURVEY RESEARCHER, SENIOR PRESIDENT AT ORC

12   INTERNATIONAL.

13   **Q.**  HOW MUCH OF YOUR WORK INVOLVES LITIGATION?

14   **A.**  ABOUT 50 PERCENT OF IT IS LEGAL RELATED, NOT ALL

15   LITIGATION.

16   **Q.**  DURING YOUR TIME AT ORC, HOW MANY SURVEYS HAVE YOU

17   DESIGNED FOR USE IN LEGAL OR LITIGATION-RELATED MATTERS?

18   **A.**  I'M NOT EXACTLY SURE.  I WOULD SAY OVER A HUNDRED.

19   **Q.**  AND HOW MANY TIMES HAVE YOU SERVED AS AN EXPERT WITNESS IN

20   LITIGATION?

21   **A.**  I THINK I'VE GIVEN TESTIMONY IN SOMETHING LIKE 50 TO 60

22   CASES, EITHER BY DEPOSITION OR A TRIAL.

23   **Q.**  WHO ARE SOME OF THE COMPANIES THAT HAVE HIRED YOU TO DO

24   SURVEYS IN LITIGATION?

25   **A.**  APPLE, GOOGLE, AMAZON, NIKE, PEPSI, LG, AMERICAN EXPRESS.

1    THOSE ARE SOME OF THEM.

2    **Q.**  HAVE YOU TESTIFIED BEFORE IN THE NORTHERN DISTRICT OF

3    CALIFORNIA COURTS?

4    **A.**  YES.

5    **Q.**  AND HOW MANY CASES?

6    **A.**  MAYBE FIVE OR SIX.

7    **Q.**  CAN YOU GIVE ME A RECENT EXAMPLE OF A CASE?

8    **A.**  I -- IN THE APPLE/SAMSUNG CASE I -- I WAS A WITNESS.

9        **MS. STEINER:**  I WOULD MOVE TO ADMIT INTO THE RECORD

10   PLAINTIFFS' EXHIBIT 2624, WHICH IS MR. PORET'S C.V.

11       **THE COURT:**  RECEIVED.

12       (PLAINTIFFS' EXHIBIT 2624 RECEIVED IN EVIDENCE)

13       **MS. STEINER:**  AND I WOULD MOVE TO QUALIFY MR. PORET

14   AS AN EXPERT ON THE SUBJECT OF CONSUMER RESEARCH THROUGH

15   POLLING DATA.

16       **MS. LUEDTKE:**  NO OBJECTION.

17       **THE COURT:**  ALL RIGHT.

18   **BY MS. STEINER:**

19   **Q.**  MR. PORET, WHAT WAS YOUR FIRST ASSIGNMENT IN THIS CASE?

20   **A.**  I WAS INITIALLY ASKED TO GIVE MY OPINIONS ABOUT PROFESSOR

21   RUBINFELD'S RELIANCE ON CERTAIN SURVEYS THAT THE NCAA HAD PUT

22   FORWARD WHICH PROFESSOR RUBINFELD WAS RELYING ON FOR THE

23   OPINION THAT CONSUMERS VALUE AMATEURISM AND THAT THAT'S A

24   PROCOMPETITIVE BENEFIT TO THE NCAA.

25   **Q.**  TO BE CLEAR, WAS THE DENNIS SURVEY DONE AND SERVED ON

1    PLAINTIFFS AT THE TIME OF YOUR INITIAL REPORT?

2    **A.**  NO.

3    **Q.**  OKAY.  FOR THIS INITIAL ASSIGNMENT, WHAT MATERIALS DID YOU

4    REVIEW?

5    **A.**  I REVIEWED THE COMPLAINT IN THE CASE AND PROFESSOR

6    RUBINFELD'S INITIAL REPORT AND THE SURVEYS THAT PROFESSOR

7    RUBINFELD RELIED ON IN THIS REPORT.

8    **Q.**  WHY DID YOU READ THE MATERIALS YOU JUST DESCRIBED?

9    **A.**  SO THAT I COULD UNDERSTAND WHAT THE ISSUE WAS IN THIS CASE

10   AND REVIEW THE SURVEYS AND DETERMINE WHETHER THEY WERE

11   RELEVANT OR RELIABLE AS SUPPORT FOR PROFESSOR RUBINFELD'S

12   OPINIONS.

13   **Q.**  WHAT IS YOUR UNDERSTANDING OF THE ISSUE IN THIS CASE?

14   **A.**  MY UNDERSTANDING THAT IT'S ABOUT WHETHER STUDENT ATHLETES

15   SHOULD HAVE THE POTENTIAL TO RECEIVE SOME KIND OF COMPENSATION

16   FOR THE USE OF THEIR NAME, IMAGE OR LIKENESS IN PRODUCTS THAT

17   ARE BRINGING IN REVENUE, SUCH AS THE SALE OF JERSEYS THAT USE

18   PLAYER'S NAMES OR VIDEO GAMES THAT PLAYER'S IMAGES APPEAR IN

19   AS CHARACTERS, OR TV BROADCASTS THAT PLAYERS APPEAR IN.

20   **Q.**  WHAT IS YOUR UNDERSTANDING OF WHAT THE SURVEYS RELIED ON

21   BY DR. RUBINFELD IN HIS FIRST REPORT ASKED PEOPLE?

22   **A.**  THEY ASKED ABOUT SOMETHING VERY DIFFERENT, AND THERE'S A

23   VERY IMPORTANT DISTINCTION TO UNDERSTAND TO TALK ABOUT THESE

24   SURVEYS.

25        ON THE ONE HAND, THERE IS THE ISSUE OF HOW DO PEOPLE FEEL

1    ABOUT STUDENT ATHLETES BEING PAID SALARIES BY SCHOOLS TO PLAY

2    FOR THE TEAMS ON THOSE SCHOOLS.

3         FOR INSTANCE, SHOULD DUKE BE ABLE TO PAY A JABARI PARKER

4    $200,000 A YEAR IN SALARY TO BE ON THE DUKE TEAM OR SHOULD

5    TEXAS A&M BE ABLE TO PAY JOHNNY MANZIEL A SALARY TO PLAY ON

6    THE TEAM.  THAT'S ONE SET OF ISSUES.

7         AND THE OTHER SET OF ISSUES IS SOMETHING VERY DIFFERENT.

8    IT'S IF JERSEYS ARE BEING SOLD WITH JABARI PARKER'S NAME OR

9    JOHNNY MANZIEL'S NAME, SHOULD THEY HAVE SOME SORT OF RIGHT TO

10   RECEIVE SOME COMPENSATION FROM THE REVENUES FOR THOSE OR THE

11   SAME FROM VIDEO GAMES OR TV BROADCASTS.

12        SO WHEN YOU GET TO LOOKING AT CONSUMER SURVEYS, IT'S A

13   VERY IMPORTANT DISTINCTION, AND ALL OF THESE SURVEYS THAT

14   PROFESSOR RUBINFELD RELIED ON ADDRESSED THE FIRST ISSUE, WHICH

15   IS HOW DO PEOPLE FEEL ABOUT STUDENT ATHLETES BEING PAID A

16   SALARY.

17   **Q.**  WHAT DID DR. RUBINFELD USE THOSE FIRST SET OF SURVEYS TO

18   OPINE ON?

19   **A.**  HE USED THEM IN SUPPORT OF HIS POSITION THAT CONSUMERS

20   VALUE AMATEURISM, AND THAT IF -- IF STUDENT ATHLETES WERE

21   PAID, IT WOULD HURT DEMAND FOR THE NCAA SPORTS.

22   **Q.**  DID THE SCOPE OF YOUR ASSIGNMENT CHANGE?

23   **A.**  YES.  WELL, EVENTUALLY I WAS SHOWN THE DENNIS SURVEY AND

24   PROFESSOR RUBINFELD ALSO THEN SUBMITTED A SECOND REPORT

25   RELYING ON THE DENNIS SURVEY.  SO AT THAT POINT, I WAS ALSO

1    ASKED TO LOOK AT THE DENNIS SURVEY.

2    Q.  WHAT MATERIALS DID YOU REVIEW TO UNDERTAKE THIS ADDITIONAL

3    ASSIGNMENT?

4    A.  I REVIEWED DR. DENNIS' REPORT ON HIS SURVEY AND ALL OF THE

5    APPENDICES, INCLUDING THE DATA AND THE SURVEY INSTRUMENT, AND

6    AT THAT POINT I ALSO REVIEWED THE REPORTS FROM RASCHER AND

7    NOLL.

8    Q.  WHY DID YOU REVIEW THE RASCHER AND NOLL REPORTS?

9    A.  JUST TO SEE IF THERE WAS ANYTHING IN THERE THAT WAS

10   RELEVANT TO DR. DENNIS' OR MY OWN OPINIONS.

11   Q.  LET'S FIRST TALK ABOUT THE NON-DENNIS SURVEYS THAT

12   RUBINFELD USED IN HIS FIRST REPORT, AND THEN WE'LL TURN TO THE

13   DENNIS SURVEY THAT RUBINFELD USED IN HIS SECOND REPORT.  OKAY?

14   A.  OKAY.

15   Q.  WHEN YOU DO SURVEY WORK IN LITIGATION, WHAT IS YOUR FIRST

16   STEP?

17   A.  THE FIRST STEP IS RESEARCHING THE ISSUE ENOUGH TO MAKE

18   SURE THAT I UNDERSTAND IT AND CAN DESIGN A SURVEY THAT

19   PRECISELY ADDRESSES THE RELEVANT ISSUE.

20   Q.  WHY IS IT IMPORTANT TO UNDERSTAND THE ISSUE TO BE TESTED?

21   A.  BECAUSE YOU CAN DO EVERYTHING RIGHT IN A SURVEYOR, YOUR

22   METHODOLOGY CAN BE PERFECTLY SOUND, BUT IF YOU ARE NOT ASKING

23   THE RIGHT QUESTIONS THAT PRECISELY ADDRESS THE ISSUE, THEN THE

24   DATA THAT YOU BRING IN IS NOT USEFUL.

25   Q.  ARE LITIGATION SURVEYS MORE DIFFICULT THAN WHAT YOU WOULD

1    CALL TRADITIONAL MARKET RESEARCH SURVEYS?

2    **A.**   IN SOME RESPECTS THEY ARE.  I MEAN MAINLY WHAT WOULD COME

3    TO MIND IS THERE IS USUALLY MORE OF A NEED TO BE HIGHLY

4    FOCUSED ON A PARTICULAR ISSUE AND THEY ARE ALSO A BIT MORE

5    STRINGENT STANDARDS FOR SURVEYS THAT ARE GOING TO BE

6    CONSIDERED RELIABLE AS EVIDENCE IN A COURT CASE.

7    **Q.**   LET'S GET TO YOUR OPINIONS.

8        WHAT IS YOUR OPINION ABOUT THE SURVEYS RELIED UPON BY

9    PROFESSOR RUBINFELD IN HIS OPENING MERITS REPORT?

10   **A.**   MY OPINION IS THAT THEY DON'T PROVIDE ANY SUPPORT FOR HIS

11   OPINIONS.

12   **Q.**   WHY NOT?

13   **A.**   THE PRIMARY REASON IS THAT THEY ARE IRRELEVANT.  THEY

14   DON'T ADDRESS THE TOPIC THAT PROFESSOR RUBINFELD IS OPINING

15   ABOUT, WHICH IS THE SCENARIO IN WHICH STUDENT ATHLETES COULD

16   RECEIVE COMPENSATION FOR THE USE OF THEIR NAME, IMAGE OR

17   LIKENESS.

18       ALL OF THESE SURVEYS ASKED PEOPLE HOW THEY FEEL ABOUT

19   STUDENT ATHLETES BEING PAID A SALARY, WHICH IS A VERY

20   DIFFERENT QUESTION.  AND IT'S VERY POSSIBLE THAT PEOPLE WHO

21   ARE SAYING THEY ARE OPPOSED TO A SCHOOL PAYING A STUDENT A

22   SALARY TO BE ON THE TEAM MIGHT -- MIGHT SUPPORT ALL KINDS OF

23   OTHER PAYMENTS SUCH AS A STUDENT RECEIVING SOME KIND OF

24   COMPENSATION IF THEIR NAME IS ON A FOOTBALL JERSEY THAT'S SOLD

25   OR ANY OF THESE OTHER THINGS.

1    SO IT'S JUST THE WRONG TOPIC, AND THE DATA DOES NOT

2  ADDRESS WHAT PROFESSOR RUBINFELD IS OPINING ABOUT.

3    THE SECOND PROBLEM WITH RELYING ON THESE SURVEYS IS THAT

4  EVEN IF YOU FELT THAT PEOPLE'S OPPOSITION TO PAYING PLAYER

5  SALARIES WAS RELEVANT, NONE OF THESE SURVEYS ADDRESS THE ISSUE

6  OF WHY PEOPLE ARE OPPOSED TO PAYING SALARIES.  SO THERE'S

7  NOTHING IN THESE SURVEYS THAT SUGGEST THAT PEOPLE ARE OPPOSED

8  TO PAYING SALARIES BECAUSE OF THE AMATEUR NATURE OF IT, OR

9  THAT THIS WOULD HURT THEIR ENJOYMENT OF THE GAME.

10    AND SO THERE'S NO BASIS TO RELY ON THESE SURVEYS FOR THE

11  IDEA THAT PEOPLE WOULD STOP WATCHING SPORTS OR BE LESS LIKELY

12  TO WATCH.

13  **Q.**  WHY IS ADDRESSING A DIFFERENT QUESTION THAN THAT SOUGHT TO

14  BE RESOLVED PROBLEMATIC?

15  **A.**  IT'S PROBLEMATIC BECAUSE THE DATA DOESN'T SUPPORT THE

16  OPINIONS.  YOU NEED -- YOU NEED THE ANSWERS TO BE ADDRESSING

17  THE QUESTION THAT YOU ARE OPINING ABOUT FOR THERE TO BE ANY

18  VALUE TO IT.

19  **Q.**  HOW DO YOU KNOW THAT PEOPLE WOULD HAVE ANSWERED THE SURVEY

20  DIFFERENTLY IF IT WAS CONCEIVED AS A NIL COMPENSATION SURVEY?

21  **A.**  WELL, THERE'S TWO PARTS TO THAT ANSWER.

22    ONE IS THAT I DON'T KNOW FOR SURE ONE WAY OR THE OTHER

23  WHAT PEOPLE WOULD SAY, BUT THAT'S EXACTLY THE POINT, IS THAT I

24  DON'T KNOW AND RUBINFELD DOESN'T KNOW, AND NO ONE CAN KNOW

25  BECAUSE THE QUESTIONS WEREN'T ASKED.

1        SO THE CHIEF CRITICISM IS THE QUESTIONS WEREN'T ASKED SO

2   WE DON'T KNOW, AND THE RESULTS HAVE NO VALUE.

3        THE SECOND PART OF IT, THOUGH, IS AS SOMEBODY WHO WRITES

4   SURVEY QUESTIONS EACH DAY AND READS HUNDREDS OF THOUSANDS OF

5   SURVEY ANSWERS, I DO HAVE A PRETTY STRONG BELIEF THAT THERE

6   WOULD BE A SUBSTANTIAL DIFFERENCE IN RESULTS IF YOU ASKED

7   SOMEBODY HOW DO YOU FEEL ABOUT A SCHOOL PAYING A PLAYER

8   $200,000 A YEAR SALARY TO PLAY ON THE TEAM VERSUS HOW WOULD

9   YOU FEEL IF A PLAYER GOT SOME COMPENSATION FOR A JERSEY WITH

10  THEIR NAME ON IT BEING SOLD.

11       IT'S VERY EASY TO UNDERSTAND WHY PEOPLE MIGHT HAVE TOTALLY

12  DIFFERENT OPINIONS ON THOSE TWO QUESTIONS.

13  **Q.**  HAVE YOU TESTED THAT?

14  **A.**  NO, I HAVE NOT.

15  **Q.**  CAN YOU GIVE AN EXAMPLE FROM PRIOR WORK OF HOW PEOPLE CAN

16  ANSWER DIFFERENTLY DEPENDING ON HOW THE QUESTION IS

17  FORMULATED?

18  **A.**  SURE.  I MEAN EVEN MUCH SUBTLER DIFFERENCES RESULT IN BIG

19  DIFFERENCES IN HOW PEOPLE ANSWER.

20       I -- I RECALL A SURVEY THAT I DID WHERE PEOPLE WERE ASKED

21  HOW THEY FEEL ABOUT PRODUCTS THAT WERE MADE IN AMERICA.  AND

22  ONE GROUP OF PEOPLE WERE SIMPLY TOLD THE PRODUCTS ARE MADE IN

23  AMERICA, AND LEFT AT THAT.  WHEREAS ANOTHER GROUP WAS TOLD

24  THAT MADE IN AMERICA MEANS THE PRODUCTS ARE MANUFACTURED IN

25  AMERICA BUT THEY ARE USING PARTS THAT WERE FROM OTHER

1    COUNTRIES.  AND THEN A THIRD GROUP WAS TOLD MADE IN AMERICA

2    MEANS THAT THE PRODUCT WAS ASSEMBLED IN AMERICA BUT USING

3    COMPONENTS THAT WERE MANUFACTURED BY OTHER COUNTRIES.

4         AND IN ALL THREE OF THOSE SURVEYS, THE RESULTS ABOUT HOW

5    PEOPLE FELT ABOUT IT WERE DIFFERENT JUST BASED ON WHAT WAS

6    EXPLAINED TO THEM ABOUT WHAT MADE IN AMERICA MEANS.

7    **Q.**  WHY DO YOU CRITICIZE PROFESSOR RUBINFELD FOR USING THE

8    RESULTS OF THIS FIRST SET OF SURVEYS TO DETERMINE THE IMPACT

9    ON CONSUMER DEMAND?

10   **A.**  BECAUSE HE'S LOOKING AT PEOPLE SAYING I'M OPPOSED TO

11   STUDENTS BEING PAID A SALARY TO OPINE ON AN ISSUE THAT'S VERY

12   DIFFERENT, AND THERE'S A DRAMATIC DISCONNECT BETWEEN THOSE

13   SURVEY RESULTS AND HIS OPINIONS.  AND THERE'S ALSO A DRAMATIC

14   DISCONNECT IN THE SENSE THAT THERE'S NOTHING IN THE SURVEYS

15   THAT WOULD TELL HIM THE REASON THAT PEOPLE ARE AGAINST

16   SALARIES IS THAT THEY ENJOY THE AMATEUR NATURE OF THE GAME.

17        THERE ARE MANY OTHER REASONS PEOPLE COULD BE GIVING FOR

18   OPPOSING SALARIES, SUCH AS THAT THEY SIMPLY THINK STUDENT

19   ATHLETES ALREADY GET PAID ENOUGH BY HAVING THEIR TUITION

20   COVERED, OR THAT THEY DON'T THINK THAT'S A GOOD USE OF THE

21   SCHOOL'S RESOURCES, OR MAYBE THEY JUST DON'T LIKE SPORTS AT

22   ALL AND THEY HAVE NO REASON TO WANT ANY MONEY GOING TO SPORTS.

23   **Q.**  DO YOU HAVE ANY BASIS TO SUPPORT YOUR VIEW THAT CONSUMERS

24   MAY NOT FAVOR PAYING A SALARY TO PLAYERS FOR REASONS THAT HAVE

25   NOTHING TO DO WITH VALUING AMATEURISM?

1    **A.**  WELL, I THINK THE ONE SURVEY THAT THE NCAA PUT FORWARD

2    THAT RUBINFELD RELIED ON THAT GOT INTO THIS ISSUE AT ALL WHICH

3    WAS THE MONDELLO PAPER.

4    **Q.**  LET ME STOP YOU SO WE CAN PUT THAT ONE UP.

5            **MS. STEINER:**  MATT, WOULD YOU PUT UP 3322 AND GO TO

6    PAGE 6?  AND GO AHEAD AND HIGHLIGHT THE THIRD PARAGRAPH.

7                (EXHIBIT DISPLAYED ON SCREEN.)

8    **BY MS. STEINER:**

9    **Q.**  SO, THIS IS THE MONDELLO SURVEY THAT PROFESSOR RUBINFELD

10   RELIED ON IN HIS OPENING REPORT, CORRECT?

11   **A.**  YES.

12   **Q.**  AND IN THIS SURVEY, THEY TALK ABOUT ANOTHER SURVEY, THE

13   SCHNEIDER SURVEY.  DO YOU SEE THAT?

14       AND IS THAT WHAT YOU ARE REFERRING TO WHERE THERE IS A

15   SURVEY TALKING ABOUT WHY PEOPLE MAY DISFAVOR PAYING STUDENT

16   ATHLETES?

17   **A.**  YES.

18   **Q.**  AND CAN YOU READ THERE -- CAN YOU EXPLAIN THIS TO US?

19   **A.**  WELL, WHAT I WAS GOING TO REFER TO IS THAT IN THIS SURVEY

20   WHERE THEY MEASURED A SIGNIFICANT RATE OF OPPOSITION TO PAYING

21   SALARIES, THAT IT SAID THAT OF THOSE -- THIS IS THE BULLET

22   POINT NUMBER THREE:

23            "OF THOSE OPPOSING PAYMENTS, 49 PERCENT INDICATED

24             THAT AN ATHLETIC SCHOLARSHIP WAS ADEQUATE PAYMENT,

25             WHILE 39 PERCENT CITED THE LACK OF FINANCIAL

1          RESOURCES AS ANOTHER ISSUE."

2      SO THIS SEEMS TO SHOW THAT THE MAJOR REASONS PEOPLE CITED

3  FOR OPPOSING PAYMENT HAD NOTHING TO DO WITH THEM ENJOYING THE

4  AMATEUR NATURE OF THE GAME, IT HAD TO DO WITH THEM THINKING

5  THAT THEY ALREADY GET ENOUGH WITH SCHOLARSHIPS AND THAT

6  SCHOOLS HAVE LIMITED RESOURCES, AND THEY DON'T SEE THAT AS THE

7  BEST USE OF THOSE RESOURCES.

8  **Q.**  OKAY.  SO TO SUMMARIZE THIS FIRST SET OF SURVEYS, THEY ASK

9  QUESTIONS ABOUT PAYING SALARIES, CORRECT?

10  **A.**  YES.

11  **Q.**  THEY DIDN'T ASK PEOPLE WHY THEY DISFAVORED PAYING

12  SALARIES?

13  **A.**  RIGHT.

14  **Q.**  AND THERE WAS NO QUESTION ABOUT WHAT WOULD BE THE IMPACT

15  ON CONSUMER DEMAND OF THIS PREFERENCE FOR NOT PAYING SALARIES?

16  **A.**  YES.  THAT'S RIGHT.

17  **Q.**  OKAY.  LET'S TURN TO THE DENNIS SURVEY.

18      WHEN WAS THE DENNIS SURVEY CONDUCTED TO YOUR

19  UNDERSTANDING?

20  **A.**  THE END OF OCTOBER 2013.

21  **Q.**  AND DO YOU REMEMBER WHEN HIS REPORT WAS ISSUED, DENNIS'?

22  **A.**  I BELIEVE IT WAS THE FIRST WEEK OF NOVEMBER 2013.

23  **Q.**  OKAY.  AND THAT WAS AFTER RUBINFELD HAD ALREADY AUTHORED A

24  REPORT THAT USED THE FIRST FIVE SURVEYS WE JUST DISCUSSED,

25  CORRECT?

1    **A.**  YES.

2           **MS. STEINER:**  MATT, CAN YOU PUT UP DENNIS SLIDE 3392

3    AT PAGE 13?

4               (EXHIBIT DISPLAYED ON SCREEN.)

5    **BY MS. STEINER:**

6    **Q.**  LET'S GOING AHEAD AND START WITH QUESTION NUMBER 9A.

7        DO YOU HAVE ANY CRITICISMS OF QUESTION 9A?

8    **A.**  YES, I DO.

9    **Q.**  WHAT ARE THOSE?

10   **A.**  THERE ARE SEVERAL, BUT THERE'S REALLY ONLY ONE THAT'S

11   IMPORTANT BECAUSE IT RENDERS THE WHOLE SURVEY IRRELEVANT AND

12   THAT'S THAT THE QUESTION DOESN'T ADDRESS THE ISSUE IN THIS

13   LITIGATION, IT ASKS WHETHER PEOPLE ARE IN FAVOR OF PAYING

14   MONEY TO STUDENT ATHLETES.

15       AND THAT IS NOT AT ALL ADDRESSING THE QUESTION OF HOW

16   PEOPLE WOULD FEEL ABOUT STUDENT ATHLETES RECEIVING

17   COMPENSATION FOR THE USE OF THEIR NAME, IMAGE OR LIKENESS IN

18   PRODUCTS.

19   **Q.**  DO YOU HAVE AN OPINION WHY DR. DENNIS ASKED ABOUT PAYING

20   MONEY RATHER THAN ABOUT ASKING ABOUT COLLEGE ATHLETES' ABILITY

21   TO NEGOTIATE FOR THE USE OF NIL RIGHTS?

22   **A.**  WELL, I CAN ONLY ASSUME THAT SINCE PROFESSOR RUBINFELD HAD

23   ALREADY WRITTEN THIS REPORT RELYING ON THESE SURVEYS THAT WERE

24   ABOUT OPPOSITION TO PAYMENT FOR SALARIES, THAT IT SOUNDS LIKE

25   HE WAS ASKED TO DO THE SAME SURVEY ON THE SAME TOPIC, WHICH I

1      THINK IS WHAT HE EXPLAINED EARLIER.

2      **Q.**  OKAY.

3          NOW, DR. DENNIS SAYS THAT HE ASKED THIS SIMPLE QUESTION

4      ABOUT PAYING MONEY BECAUSE HE DIDN'T WANT TO CONFUSE THE ISSUE

5      BY BRINGING UP LOTS OF LEGAL COMPLEXITIES OR DIFFICULT

6      CONCEPTS.

7          WHAT IS YOUR RESPONSE TO THAT?

8      **A.**  WELL, I -- I TEND TO AGREE WITH HIM THAT IT'S A LITTLE BIT

9      HARDER TO WRITE A QUESTION THAT GETS AT THE SPECIFIC ISSUE OF

10     NAME, IMAGE AND LIKENESS, BUT THE REASON THAT THAT'S MORE

11     DIFFICULT IS EXACTLY THE REASON IT'S SO NECESSARY.

12         I THINK WHAT DR. DENNIS IS ESSENTIALLY SAYING IS CONSUMERS

13     ARE NOT USED TO THINKING ABOUT ISSUES LIKE NAME, IMAGE AND

14     LIKENESS AND, THEREFORE, THAT MIGHT NOT BE THE MOST EASY,

15     UNDERSTANDABLE CONCEPT TO SPRING TO THEIR MIND.

16         BUT THAT'S EXACTLY WHY IT'S SO PROBLEMATIC TO ASK A

17     QUESTION THAT SIMPLY SAYS, HOW DO YOU FEEL ABOUT PAYING MONEY

18     TO STUDENT ATHLETES BECAUSE THAT CONCEPT IS NOT GOING TO COME

19     TO THEIR MIND AND THEY ARE GOING TO BE ANSWERING THE WRONG

20     QUESTION.

21         THEY ARE GOING TO LARGELY BE ANSWERING, HOW DO I FEEL

22     ABOUT SCHOOLS PAYING -- PAYING MONEY, MEANING PAYING A SALARY

23     TO BE ON THE TEAM.

24         SO, YOU KNOW, THAT'S -- THAT'S THE BIG PROBLEM WITH THAT

25     QUESTION.

1       AND, YOU KNOW, IN TERMS OF IT BEING OVERLY DIFFICULT OR

2   LEGALLY COMPLEX, THAT'S NOT REALLY -- THAT'S NOT REALLY THE

3   CASE.  IT WOULDN'T BE TOO DIFFICULT TO WRITE QUESTIONS THAT

4   ADDRESS THESE TOPICS.

5   **Q.**  CAN YOU GIVE AN EXAMPLE OF HOW THE QUESTION SHOULD HAVE

6   BEEN PHRASED?

7   **A.**  WELL, I HAVEN'T WRITTEN THE SURVEY, BUT THERE'S LOTS OF

8   THINGS YOU COULD ASK.

9       YOU COULD ASK HOW -- HOW -- WOULD YOU FAVOR OR OPPOSE

10  STUDENT ATHLETES RECEIVING SOME COMPENSATION FOR THE SALE OF

11  JERSEYS THAT HAVE THEIR NAMES ON IT.  YOU COULD ASK WOULD YOU

12  FAVOR OR OPPOSE STUDENT ATHLETES RECEIVING SOME COMPENSATION

13  FROM THE SALE OF VIDEO GAMES WHERE THEY APPEAR AS CHARACTERS.

14  YOU COULD ASK WOULD YOU FAVOR OR OPPOSE STUDENT ATHLETES

15  RECEIVING SOME COMPENSATION FROM THE REVENUES FROM TV

16  BROADCASTS IN WHICH THEIR IMAGES APPEAR.

17      THESE ARE PRETTY SIMPLE, STRAIGHTFORWARD QUESTIONS THAT

18  DIRECTLY ADDRESS THE ISSUE.  AND IF QUESTIONS LIKE THAT WERE

19  ASKED, THEN YOU WOULD KNOW WHAT PEOPLE THINK ABOUT THOSE

20  TOPICS.

21  **Q.**  DR. DENNIS ALSO SAID THAT HE THINKS THE QUESTION IS BROAD

22  ENOUGH TO INCLUDE ALL TYPES OF PAYMENT, INCLUDING COMPENSATION

23  FOR NIL RIGHTS AND DEFERRED COMPENSATION.

24      WHAT IS YOUR RESPONSE TO THAT?

25  **A.**  MY RESPONSE IS HE'S RIGHT, IT IS BROAD ENOUGH TO COVER

1   EVERYTHING, BUT THAT'S EXACTLY THE PROBLEM.  YOU CAN'T ASK A

2   QUESTION THAT IS SO BROAD THAT IT COVERS ALL SORTS OF THINGS

3   THAT PEOPLE MIGHT HAVE DIFFERENCES OF OPINION ON.

4        SO, WHAT -- BASICALLY YOU'RE NOT FINDING OUT WHAT

5   ANYBODY'S OPINION IS ON THE SPECIFIC TOPIC THAT YOU WANT

6   BECAUSE YOU'VE ASKED SUCH A BROAD GENERAL QUESTION THAT ALL

7   YOU HEAR IS THEM SAY I OPPOSE -- I OPPOSE PAYING MONEY TO

8   STUDENTS, WHICH PROBABLY MEANS THEY OPPOSE SCHOOLS PAYING A

9   SALARY.

10  **Q.**  CAN YOU GIVE ME AN EXAMPLE OF HOW A BROAD QUESTION MIGHT

11  NOT GET AT A SPECIFIC TOPIC INCLUDED WITHIN THAT QUESTION?

12  **A.**  YES.

13       ANOTHER EXAMPLE THAT I THOUGHT OF IS IF YOU IMAGINED A

14  SURVEY WHERE -- WHERE THERE HAVE BEEN LOTS OF, WHERE THE

15  PUBLIC HAS BEEN ASKED DO YOU THINK THE GOVERNMENT SHOULD PAY

16  FOR PEOPLE'S HEALTH CARE.

17       AND YOU WOULD SEE A PRETTY HIGH OPPOSITION RATE TO THAT.

18  LET'S SAY 65 PERCENT OF THE PEOPLE SAY I'M OPPOSED TO THE

19  GOVERNMENT PAYING FOR PEOPLE'S HEALTH CARE.  THAT WOULD NOT

20  TELL YOU AT ALL ABOUT A LOT OF SPECIFIC ISSUES, SUCH AS DO

21  PEOPLE THINK THE GOVERNMENT SHOULD PAY FOR FLU SHOTS WHICH

22  HELP STOP FLU EPIDEMICS, OR SHOULD THE GOVERNMENT PAY FOR

23  BASIC VACCINATIONS FOR CHILDREN, OR SHOULD THE GOVERNMENT PAY

24  FOR SMOKING CESSATION OR OTHER PROGRAMS THAT REDUCE THE COST

25  TO THE PUBLIC.

1       SO THAT'S AN EXAMPLE OF A SURVEY WHERE YOU WOULD PROBABLY

2    SEE HIGH OPPOSITION GENERALLY WHEN ASKED SHOULD THE GOVERNMENT

3    PAY FOR HEALTH CARE, BUT THAT WOULDN'T ADDRESS LOTS OF

4    SPECIFIC TOPICS THAT PEOPLE PROBABLY WOULD SUPPORT THE

5    GOVERNMENT PAYING FOR.

6    **Q.**  OTHER THAN YOUR EXPERIENCE AS A SURVEY EXPERT WRITING

7    PROPER QUESTIONS, DO YOU HAVE ANY BASIS FOR YOUR BELIEF THAT

8    DENNIS' QUESTIONS WOULD NOT BE INTERPRETED AS ASKING ABOUT NIL

9    COMPENSATION?

10   **A.**  YES.  I THINK THE OPEN-ENDED ANSWERS IN THE DENNIS SURVEY

11   THEMSELVES CONFIRM THAT THAT'S NOT WHAT PEOPLE THINK OF WHEN

12   YOU ASK THEM ABOUT PAYING MONEY TO STUDENT ATHLETES.

13   **Q.**  OKAY.  I THINK WE JUST SAW THIS.

14          **MS. STEINER:**  BUT, MATT, IF YOU CAN PUT UP 3392 AT

15   PAGE 11.

16               (PAGE DISPLAYED ON SCREEN.)

17   **BY MS. STEINER:**

18   **Q.**  SO HERE WE SEE EXPOSURE TO THE ISSUE, QUESTION 7.  AND

19   WHAT DOES THAT -- WHAT DOES THAT TELL YOU?

20   **A.**  RESPONDENTS WERE ASKED, AS DR. DENNIS EXPLAINED, WHAT THEY

21   HAD HEARD IN THE MEDIA ABOUT PAYING MONEY TO STUDENT ATHLETES.

22       AND THOSE WHO SAID "YES" WERE THEN ASKED WHAT THEY HAD

23   HEARD.

24   **Q.**  OKAY.  THEN ON THE NEXT PAGE, WE SEE THAT THEY HAVE A TEXT

25   BOX THEY CAN TYPE IN WHAT THEY'VE HEARD, CORRECT?

1    **A.**   YES.

2    **Q.**   HOW MANY PEOPLE TYPED SOMETHING INTO THAT TEXT BOX?

3    **A.**   SOMETHING LIKE 850 PLUS.

4    **Q.**   DID YOU ANALYZE THOSE RESULTS?

5    **A.**   YES, I DID.

6    **Q.**   WHAT DID YOU FIND?

7    **A.**   I FOUND THAT THE SINGLE MOST COMMON RESPONSE THAT PEOPLE

8    TYPED IN WAS THAT WHAT THEY HAD HEARD ABOUT PAYING MONEY TO

9    STUDENT ATHLETES IS THAT THEY HAD HEARD ABOUT ILLEGAL OR

10   ILLICIT PAYMENTS.

11          **MS. STEINER:**  MATT, CAN YOU PUT UP 2629?

12               (EXHIBIT DISPLAYED ON SCREEN.)

13   **BY MS. STEINER:**

14   **Q.**   SO THIS IS YOUR CATEGORIZATION OF PEOPLE WHO HAD HEARD

15   ABOUT UNDER-THE-TABLE TYPE PAYMENTS, CORRECT?

16   **A.**   YES.

17   **Q.**   AND THIS WAS THE MOST PROMINENT ANSWER OF ANYONE WHO HAD

18   HEARD ABOUT SOMETHING ABOUT PAYING MONEY, THAT MOST OF THEM --

19   THE LARGEST CATEGORY WAS ABOUT ILLICIT PAYMENTS, CORRECT?

20   **A.**   YES.

21   **Q.**   DID YOU CATEGORIZE ANY OF THE OTHER ANSWERS TO THIS TEXT

22   BOX QUESTION?

23   **A.**   YES.  ANOTHER BIG SPECIFIC CATEGORY OF WHAT PEOPLE TALKED

24   ABOUT WHEN ASKED WHAT THEY HAD HEARD ABOUT PAYING MONEY TO

25   STUDENT ATHLETES WAS THEY TALKED ABOUT PAYING SALARIES.  THEY

1    HAD HEARD TALK IN THE MEDIA ABOUT PAYING SALARIES TO STUDENT

2    ATHLETES.

3              **MS. STEINER:**  MATT, CAN YOU PUT UP 2630?

4                   (EXHIBIT DISPLAYED ON SCREEN.)

5    **BY MS. STEINER:**

6    **Q.**  THIS IS YOUR DEMONSTRATIVE ON THE SALARY OR STIPEND

7    RESPONSE?

8    **A.**  YES.

9    **Q.**  AND THERE WERE 83 OF THESE RESPONSES?

10   **A.**  YES.

11   **Q.**  OKAY.

12       HOW MANY RESPONDENTS INDICATED THEY THOUGHT –– THEY HAD

13   HEARD ABOUT NAME, IMAGE AND LIKENESS COMPENSATION?

14   **A.**  I THINK I COUNTED A TOTAL OF 14 THAT MIGHT HAVE BEEN

15   TALKING ABOUT SOMETHING RELATED TO NAME, IMAGE OR LIKENESS.

16   **Q.**  HOW MANY OF THE RESPONDENTS INDICATED THAT THEY HAD HEARD

17   SOMETHING ABOUT DEFERRED COMPENSATION OR A TRUST FUND?

18   **A.**  I'M NOT SURE.  I MEAN –– I'M NOT SURE IF THERE WERE ANY.

19   MAYBE ONE.  I DON'T KNOW.

20   **Q.**  AS AN EXPERT IN FORMULATING SURVEY QUESTIONS, WHAT DOES

21   THIS TELL YOU?

22   **A.**  IT TELLS ME THAT THE PHRASE "PAYING MONEY TO STUDENT

23   ATHLETES" DOES NOT CONVEY THE NOTION OF COMPENSATION FOR THE

24   USE OF NAME, IMAGE OR LIKENESS ON PRODUCTS, OR ANYTHING EVEN

25   RELATED TO THAT.

1        IT HEAVILY CONVEYS THE IDEA OF PAYING SALARIES TO STUDENTS

2    OR IN SOME CASES IT CONVEYS THE IDEA OF STUDENTS RECEIVING

3    IMPROPER ILLICIT PAYMENTS.

4    **Q.**  WHAT DO YOU THINK DR. DENNIS SHOULD HAVE DONE AFTER HE SAW

5    THE RESULTS TO QUESTION 7?

6    **A.**  WELL, I -- I THINK HE SHOULD HAVE REALIZED THAT THE

7    QUESTION PAYING MONEY TO STUDENT ATHLETES IS NOT GETTING AT

8    THE TOPIC OF NAME, IMAGE OR LIKENESS.

9        BUT IT SOUNDS FROM HIS TESTIMONY LIKE -- THAT THAT ISN'T

10   WHAT HE WAS INTENDING TO MEASURE ANYWAY, SO I DON'T KNOW THAT

11   HE SHOULD HAVE DONE ANYTHING DIFFERENT.

12       I THINK REAL POINT IS THAT PROFESSOR RUBINFELD SHOULDN'T

13   HAVE LOOKED AT THESE ANSWERS AND NOT RELIED ON THEM AS IF THEY

14   TELL US ANYTHING ABOUT NAME, IMAGE OR LIKENESS.

15   **Q.**  WHAT IS A PRIMING QUESTION?

16   **A.**  IT'S A QUESTION THAT GETS SOMEBODY THINKING ABOUT

17   SOMETHING SO THAT AN IDEA IS IN THEIR HEAD AT THE TIME THAT

18   THEY ARE ASKED A SUBSEQUENT QUESTION.  SO THAT IT WILL EFFECT

19   HOW THEY INTERPRET THE QUESTION AND ANSWER IT.

20   **Q.**  IS QUESTION 7 A PRIMING QUESTION?

21   **A.**  YES.

22   **Q.**  AND WHAT DOES THIS PRIME RESPONDENTS TO DO?

23   **A.**  THE EASIEST WAY TO THINK ABOUT IT IS, IF I JUST ASKED YOU

24   A QUESTION ABOUT WHAT HAVE YOU HEARD ABOUT PAYING MONEY TO

25   STUDENT ATHLETES, AND YOU SAID I'VE HEARD THAT SOME SCHOOLS

1    ARE GETTING IN TROUBLE FOR ILLEGALLY PAYING STUDENTS, AND NOW

2    I ASK YOU, DO YOU SUPPORT OR OPPOSE PAYING MONEY TO STUDENT

3    ATHLETES, YOU'VE JUST BEEN THINKING ABOUT PAYING MONEY TO

4    STUDENT ATHLETES IN TERMS OF THESE ILLICIT PAYMENTS, SO YOU

5    ARE A BIT PREDISPOSED TO WANT TO SAY I OPPOSE PAYING MONEY TO

6    STUDENT ATHLETES BECAUSE YOU DON'T SUPPORT THESE ILLICIT OR

7    IMPROPER PAYMENTS.

8    **Q.**  YOU HEARD DR. DENNIS SAY THAT HE THOUGHT -- AND THIS IS

9    NOW MY WORDS, THAT AFTER ANSWERING 7 AND 8, ONCE THEY READ THE

10   TEXT OF QUESTION 9, THEIR MINDS WOULD BE BEEN WASHED CLEAR OF

11   THEIR ANSWERS TO QUESTIONS NUMBER 8.

12       DO YOU AGREE?

13   **A.**  NO.  I THINK SOMEBODY WHO IS A RESEARCHER OR A

14   MATHEMATICIAN LIKE MYSELF OR DR. DENNIS MIGHT BE ABLE TO LOOK

15   AT A QUESTION LIKE THAT AND LOGICALLY PIECE THROUGH AN

16   ANALYSIS LIKE THAT, BUT A CONSUMER TAKING A SURVEY IS NOT

17   GOING TO FIGURE ANYTHING OUT ALL THAT ANALYTICALLY LIKE THAT.

18       THEY ARE GOING TO -- THEY WERE JUST ASKED ABOUT PAYING

19   MONEY TO ATHLETES AND NOW THEY ARE BEING ASKED HOW THEY FEEL

20   ABOUT PAYING MONEY TO STUDENT ATHLETES.

21           **MS. STEINER:**  MATT, CAN YOU BRING UP 3392, PAGE 13

22   AGAIN?

23                   (PAGE DISPLAYED ON SCREEN.)

24   **BY MS. STEINER:**

25   **Q.**  WE ARE BACK TO QUESTION 9A.

1      DO YOU HAVE ANY OTHER CRITICISMS OF THE QUESTIONING IN

2    THIS 9A?

3    **A.**  I DO.

4      THEY ARE SMALL CRITICISMS BECAUSE I THINK THE QUESTION

5    ITSELF BEING IRRELEVANT IS REALLY ALL THAT MATTERS.

6      BUT THE OTHER CRITICISMS ARE THAT I THINK THE PHRASE "IN

7    ADDITION TO PROVIDING SCHOLARSHIPS THAT COVER COLLEGE

8    EXPENSES" COULD IMPLY TO RESPONDENTS THAT CURRENT SCHOLARSHIPS

9    DO COVER ALL COLLEGE EXPENSES AND THAT THAT COULD EFFECT HOW

10   THEY ANSWERED THE QUESTION.

11     AND THEN MY OTHER CRITICISM IS THAT THERE'S NO QUESTIONS

12   ADDRESSING THE POTENTIAL FOR DEFERRED COMPENSATION, WHICH

13   COULD ALSO IMPACT PEOPLE'S OPINIONS ON THE TOPIC.

14   **Q.**  DR. DENNIS' VIEW WAS THAT ASKING ABOUT DEFERRED

15   COMPENSATION WAS NOT GERMANE TO THE CASE.

16     DO YOU AGREE?

17   **A.**  NO.

18   **Q.**  WHY NOT?

19   **A.**  BECAUSE AS I UNDERSTAND IT, ONE OF THE PLAINTIFFS'

20   PROPOSALS WOULD INVOLVE PLAYERS BEING PAID AFTER THEY ARE OUT

21   OF COLLEGE.  AND IF THAT'S ONE OF THE PROPOSALS, THEN WHAT

22   PEOPLE WOULD THINK ABOUT THAT IS RELEVANT AND THERE COULD BE

23   PEOPLE WHO ARE OPPOSED TO STUDENTS RECEIVING A SALARY WHILE

24   THEY ARE PLAYING ON A TEAM IN COLLEGE, BUT WOULD BE PERFECTLY

25   SUPPORTIVE OF STUDENTS RECEIVING SOME DEFERRED COMPENSATION

1    FROM OTHER THINGS ONCE THEY ARE OUT OF COLLEGE.

2    **Q.**  IS IT POSSIBLE TO WRITE THE QUESTION IN THE WAY TO ELICIT

3    A RESPONSE ABOUT DEFERRED COMPENSATION?

4    **A.**  YES.

5    **Q.**  HOW WOULD YOU HAVE DONE IT?

6    **A.**  THERE IS ANY NUMBER OF WAYS.  DR. DENNIS GAVE PEOPLE

7    SCENARIOS.  HE COULD HAVE JUST GIVEN THEM A SCENARIO THAT SAYS

8    IMAGINE THAT WHEN STUDENT ATHLETES GRADUATE COLLEGE THERE'S

9    BEEN MONEY THAT'S PUT ASIDE AND THAT AFTER THEY GRADUATE, THEY

10   CAN RECEIVE SOME OF THAT AS COMPENSATION FOR THE REVENUE THAT

11   CAME FROM THE USE OF THEIR NAMES ON PRODUCTS, WOULD YOU

12   SUPPORT OR OPPOSE THAT.

13          **MS. STEINER:**  MATT, CAN YOU PULL UP 3392-16?

14                (PAGE DISPLAYED ON SCREEN.)

15   **BY MS. STEINER:**

16   **Q.**  LET'S GO AHEAD AND TURN NOW TO WHAT I WILL CALL IN

17   SHORTHAND THE DEMAND QUESTIONS.

18       YOU HAVE THESE IN MIND?

19   **A.**  YES.

20   **Q.**  WHAT IS YOUR OPINION ABOUT THE RESULTS FROM THIS DEMAND

21   QUESTION?

22   **A.**  WELL, MY FIRST OPINION IS THAT THESE ARE ALSO IRRELEVANT

23   FOR THE SAME REASON IN THAT THEY ARE NOT ADDRESSING THE TOPIC

24   OF NAME, IMAGE OR LIKENESS AT ALL, THEY ARE ADDRESSING HOW

25   PEOPLE FEEL ABOUT PLAYERS BEING PAID A SALARY, WHICH IS NOT

THE RIGHT ISSUE.

BUT EVEN GOING BEYOND THAT, MY CRITICISM IS THAT A QUESTION LIKE THIS IS -- IS VERY UNRELIABLE WITHOUT SOMETHING TO CAREFULLY CONTROL FOR IT.  AND I -- I THINK I NEED TO SAY A BIT TO EXPLAIN THAT.

ONE OF THE MOST WELL-STUDIED AND ACCEPTED THINGS ABOUT SURVEYS IS THAT THE ARTIFICIAL NATURE OF A SURVEY ENVIRONMENT OFTEN CAUSES VERY SIGNIFICANT PERCENTAGES OF RESPONDENTS TO GIVE ANSWERS THAT DO NOT REFLECT REAL WORLD CONDITIONS OR BEHAVIOR AT ALL.  THIS IS OFTEN REFERRED TO AS SURVEY NOISE. AND ONE OF THE MOST IMPORTANT THINGS IN SCIENTIFIC EXPERIMENTATION, INCLUDING SURVEYS, IS TO MEASURE AND CONTROL FOR NOISE.  AND --

**Q.**  OKAY.  LET'S GET BACK TO THAT.

FIRST EXPLAIN TO ME AND THE COURT AND EVERYONE ELSE WHY YOU THINK THE ANSWERS TO THESE QUESTIONS ABOUT CONSUMER DEMAND ARE UNRELIABLE?

**A.**  WELL, THE MAIN REASON THAT THEY ARE UNRELIABLE ON THEIR OWN IS THAT THIS IS A TYPE OF QUESTION THAT IS VERY PRONE TO EXAGGERATEDLY HIGH LEVEL OF NOISE LIKE I WAS JUST DESCRIBING BECAUSE NUMBER ONE, YOU ARE ASKING PEOPLE TO PREDICT THEIR FUTURE BEHAVIOR IF SOMETHING WERE TO OCCUR.  AND PEOPLE ARE NOTORIOUSLY BAD AT PREDICTING THEIR FUTURE BEHAVIOR IN SURVEYS.

AND, SECONDLY, IT IS SO EASY FOR SOMEBODY TO CLICK A

1   BUTTON IN A SURVEY THAT SAYS I'LL BE LESS LIKELY TO DO

2   SOMETHING.  THERE'S NO COST TO THAT.  THERE'S NO CONSEQUENCES.

3   IT'S JUST THE CLICK OF A BUTTON.  WHEREAS IN THE REAL WORLD,

4   TO ACTUALLY CHANGE YOUR BEHAVIOR IS A VERY DIFFICULT THING AND

5   IT COMES AT A LARGE COST TO A CONSUMER WHO IS –– YOU'RE

6   TALKING ABOUT THEM WATCHING LESS OR STOPPING WATCHING A SPORT

7   THAT THEY –– THEY HAVE ENJOYED.

8       SO, THERE IS A HUGE RISK THAT QUESTIONS LIKE THIS WILL

9   PRODUCE EXAGGERATED MEANINGLESS RESULTS THAT WOULD NOT

10  TRANSLATE INTO ANY REAL WORLD ACTIVITY.

11

12

13

14

15

16      (CONTINUED ON NEXT PAGE; NOTHING OMITTED.)

17

18

19

20

21

22

23

24

25

1    **BY MS. STEINER:**

2    **Q.**   CAN YOU GIVE US ANY EXAMPLES FROM THE POLLS THAT PROFESSOR

3    RUBINFELD USED TO ILLUSTRATE YOUR POINT?

4    **A.**   THERE'S A LOT OF POLLS SHOWING REAL HIGH FAN DISPLEASURE

5    OR OUTRAGE WITH CERTAIN TOPICS THAT DON'T ACTUALLY TRANSLATE

6    INTO ANY REAL-WORLD CHANGES.  FOR INSTANCE, THERE'S THE MARIST

7    POLL, IS ONE OF THE ONES THAT WE LOOKED AT.

8            **MS. STEINER:**   OKAY.  MATT, CAN YOU BRING UP THE

9    MARIST POLL, WHICH IS 3315 AND GO AHEAD AND GO TO PAGE 9.

10            (DEMONSTRATIVE PUBLISHED.)

11   **BY MS. STEINER:**

12   **Q.**   SO THIS IS, AGAIN, TO SUMMARIZE THIS IS A POLL THAT

13   PROFESSOR RUBINFELD RELIED ON IN HIS FIRST REPORT.

14       AND CAN YOU READ THE QUESTION PEOPLE WERE ASKED HERE?

15   **A.**   PEOPLE WERE ASKED IF THEY THINK TOP COLLEGE COACHES SHOULD

16   BE PAID MORE THAN PRO COACHES OR LESS THAN PRO COACHES OR

17   ABOUT THE SAME.

18       AND WHAT THE RESULTS SHOWS IS PEOPLE ARE ALMOST

19   UNIVERSALLY AGAINST COLLEGE COACHES BEING PAID MORE.  THEY ALL

20   THINK EITHER PRO COACHES SHOULD BE PAID MORE OR THAT THEY

21   SHOULD BE PAID ABOUT THE SAME.  BUT IN THE REAL WORLD, THERE

22   ARE PLENTY OF INSTANCES OF BIG COLLEGE COACHES, LIKE ALABAMA'S

23   FOOTBALL COACH OR DUKE'S BASKETBALL COACH, THAT ARE PAID LARGE

24   SALARIES THAT ARE WELL ABOVE THE -- THE PRO AVERAGES, AND

25   THERE'S -- THERE'S NO HARM TO THE COLLEGE FOOTBALL OR -- OR

1    BASKETBALL AS A RESULT OF THESE COACHES BEING PAID MORE MONEY

2    DESPITE CONSUMERS NOT SUPPORTING THAT.

3    **Q.**  SO AS COLLEGE COACHES' SALARIES HAVE GONE UP, WE HAVEN'T

4    SEEN AN IMPACT -- A NEGATIVE IMPACT ON THE DEMAND FOR THE

5    SPORT; IS THAT CORRECT?

6    **A.**  I'M NOT AWARE OF ANYTHING SUGGESTING THAT.

7    **Q.**  OKAY.  LET'S --

8        MATT, WHEN WE HAVE THAT ONE UP, LET'S GO TO THE FIRST PAGE

9    OF THAT POLL.

10                    (DEMONSTRATIVE PUBLISHED.)

11   **BY MS. STEINER:**

12   **Q.**  AND HERE IT SAYS THAT SPORTS FANS NATIONALLY WERE ALSO

13   ASKED WHETHER THEY THINK IT'S A COMMON PRACTICE FOR COLLEGE

14   SPORTS PROGRAMS TO BREAK NCAA RULES WHEN RECRUITING AND

15   TRAINING COLLEGE ATHLETES.

16       AND WHAT WAS THE RESULT THERE?

17   **A.**  THAT MORE THAN TWO-THIRDS BELIEVED THAT COLLEGE SPORTS

18   PROGRAMS ARE ALREADY BREAKING NCAA RULES, WHICH, AGAIN, JUST

19   GOES TO SHOW EVEN IF HIGH PERCENTAGES OF PEOPLE THINK THAT

20   SOMETHING IS HAPPENING THAT THEY DON'T APPROVE OF, THAT DOES

21   NOT MEAN THAT THESE PEOPLE JUST GO AWAY AS FANS.

22   **Q.**  AND, AGAIN, THAT'S BECAUSE FANS, LIKE THE GENERAL PUBLIC,

23   ARE BAD AT PREDICTING THEIR FUTURE BEHAVIOR ON A ISSUE EVEN IF

24   THEY'RE DISPLEASED?

25   **A.**  WELL, YES, IT'S VERY EASY IN A SURVEY TO SAY I DON'T LIKE

1   SOMETHING, AND IT'S VERY –– THAT RARELY MEANS IN THE REAL

2   WORLD SOMEBODY'S GOING TO DO SOMETHING DIFFERENT.

3   **Q.**  OKAY.

4       MATT, WHY DON'T YOU PULL UP THE BAYLOR STUDY, ALSO ANOTHER

5   STUDY RELIED ON BY PROFESSOR RUBINFELD AND GO TO THE SECOND

6   PAGE AND THE SIXTH QUESTION.

7                   (DEMONSTRATIVE PUBLISHED.)

8           **THE CLERK:**  WAS THERE AN EXHIBIT NUMBER?

9   **Q.**  CAN YOU EXPLAIN THIS ONE, PLEASE?

10          **THE CLERK:**  IS THERE AN EXHIBIT NUMBER?

11          **MS. STEINER:**  3232.

12          **THE CLERK:**  THANK YOU.

13          **MS. STEINER:**  OH, I'M SORRY.  NO, THIS IS –– YES,

14  3232.

15          **THE CLERK:**  OKAY.

16          **THE WITNESS:**  SO THIS IS A QUESTION FROM A POLL AMONG

17  PEOPLE IN BIG 12 STATES ABOUT HOW THEY WOULD FEEL IF THERE WAS

18  REALIGNMENT THAT INTERFERED WITH SOME OF THE TRADITIONAL

19  FOOTBALL RIVALRIES IN THE BIG 12.

20      AND WHAT IT SHOWED IS THAT 64 PERCENT OF PEOPLE WERE

21  DISAPPOINTED.  AND, IN FACT, THAT NUMBER WAS 84 PERCENT AMONG

22  THOSE WHO WERE AVID COLLEGE FOOTBALL FANS.  AND YET

23  REALIGNMENT DID OCCUR THAT RESULTED IN TEXAS A&M AND MISSOURI

24  AND NEBRASKA LEAVING THE CONFERENCE.  AND I'M NOT AWARE OF

25  THIS HAVING ACTUALLY TURNED THESE DISAPPOINTED FANS INTO

1    NON-FANS OR REDUCED DEMAND FOR THE -- THESE SPORTS TEAMS AND

2    PROGRAMS.

3    **BY MS. STEINER:**

4    **Q.**  AND DO YOU HAVE ANY OTHER EXAMPLES FROM THE REAL WORLD OF

5    SPORTS VIEWERSHIP WHERE THE PUBLIC HAS EXPRESSED DISPLEASURE

6    BY THINGS GOING ON AND YET THERE'S BEEN NO HARM TO -- TO

7    CONSUMER DEMAND FOR SPORTS?

8    **A.**  SURE.  THERE -- THERE HAVE BEEN LOTS OF EXAMPLES.  ALL THE

9    COLLEGE BOWL GAMES USED TO HAVE TRADITIONAL NAMES LIKE THE

10   COTTON BOWL AND THE SUGAR BOWL AND THE ORANGE BOWL, AND THOSE

11   STARTED TO GET CORPORATE SPONSORSHIP, AND SUDDENLY, THERE WAS

12   THE CHICK-FIL-A BOWL AND THE GO DADDY BOWL AND THE POULAN

13   WEEDEATER BOWL.  AND PEOPLE WERE OUTRAGED ABOUT THAT AT FIRST.

14   THEY SAID THAT -- THAT RUINS THE -- THE PURITY OF THE SPORT,

15   AND THERE WERE EVEN PEOPLE WHO SAID I'M NOT GOING TO WATCH A

16   COLLEGE BOWL GAME CALLED THE WEEDEATER BOWL.

17       THERE ARE -- THERE ARE LOTS OF OTHER EXAMPLES.  PEOPLE --

18   DURING ALL THE BASEBALL STRIKES AND THE NBA LOCKOUTS, THERE

19   HAVE BEEN POLLS ABOUT ASKING PEOPLE, WILL YOU BE LESS LIKELY

20   TO WATCH BASEBALL OR OTHER SPORTS IF THERE'S A STRIKE.  AND

21   HUGE PERCENTAGES OF PEOPLE SAID THAT THEY -- THEY WOULD BE

22   LESS LIKELY TO WATCH BASEBALL OR THEY WOULD STOP.

23       AND, YOU KNOW, THESE THINGS HAVE NOT MATERIALIZED INTO

24   THESE LARGE PERCENTAGES OF PEOPLE CEASING TO BECOME FANS OR

25   WATCHING -- WATCHING GAMES.

1          **MS. LUEDTKE:**  OBJECTION, YOUR HONOR.  THAT WAS

2    OUTSIDE THE SCOPE OF HIS REPORT.  IT CALLED ON HEARSAY, AND I

3    MOVE TO STRIKE THE ANSWER.

4          **THE COURT:**  WHICH ONE?

5          **MS. LUEDTKE:**  THE WHOLE ANSWER.  THERE WAS NOTHING IN

6    HIS REPORT ABOUT --

7          **THE COURT:**  ABOUT --

8          **MS. LUEDTKE:**  THERE WAS NOTHING IN HIS REPORT ABOUT

9    THE PEOPLE TALKING ABOUT COLLEGE BOWLS, THEIR REACTION TO

10   COLLEGE BOWLS.  THERE'S NOTHING IN HIS REPORT ABOUT WHETHER OR

11   NOT DEMAND FOR COLLEGE SPORTS HAS GONE UP OR DOWN.  THERE'S

12   NOTHING IN HIS REPORT ABOUT THE NBA LOCKOUT.  THAT'S ALL --

13   FIRST OF ALL, IT'S HEARSAY AS HE'S RECOUNTING IT.  I HAVE NO

14   IDEA WHAT THE SOURCES ARE FOR WHAT HE'S SAYING, AND IT'S

15   OUTSIDE THE SCOPE OF HIS REPORT.

16         **THE COURT:**  WELL, HEARSAY WOULD BE DISCOVERED BY THE

17   EXPERT RULES, BUT IF IT'S OUTSIDE THE SCOPE OF HIS REPORT,

18   THEN THE OBJECTION IS WELL TAKEN.

19         **MS. STEINER:**  LET ME CLEAR THAT UP.

20   **Q.**  YOU READ DR. RASCHER'S REPORT?

21   **A.**  YES.

22   **Q.**  YOU RELIED ON THAT REPORT WHEN FORMULATING YOUR OPINIONS

23   HERE?

24   **A.**  YES.

25   **Q.**  DID DR. RASCHER'S REPORT INCLUDE EXAMPLES OF SPORTS FANS

1    SAYING THEY WERE DISPLEASED BY SOMETHING BUT THEN GOING AHEAD

2    AND CONTINUING TO CONSUME THE PRODUCT?

3          **MS. LUEDTKE:**  OBJECTION, WE'RE STILL OUTSIDE THE

4    SCOPE OF HIS REPORT.  DR. RASCHER WAS HERE AND COULD HAVE

5    TESTIFIED ABOUT WHATEVER THEY WANTED TO ELICIT FROM HIM.

6       MR. PORET HAS NOT PUT ANY OF THIS IN HIS REPORT, NOR HAS

7    HE OFFERED ANY OPINION ON IT.

8          **THE WITNESS:**  THESE ARE IN MY REPORT.

9          **THE COURT:**  OH, THEY ARE?

10          **THE WITNESS:**  I'M SORRY TO INTERRUPT.  I JUST --

11   THEY'RE NOT -- NOT -- I'M NOT SAYING THAT ALL OF THOSE THINGS

12   I MENTIONED ARE IN MY REPORT, BUT THE THINGS THAT DR. RASCHER

13   TALKED ABOUT ARE IN MY REPORT.

14          **MS. LUEDTKE:**  THERE ARE THREE EXAMPLES IN HIS REPORT.

15   THEY ARE NOT THE EXAMPLES THAT ARE IN HIS TESTIMONY.  AND

16   THEY'RE NOT THE EXAMPLES THAT SHE'S ELICITING HERE.

17          **MS. STEINER:**  WHICH IS WHY I'M NOW TRYING TO ELICIT

18   THE EXAMPLES IN HIS REPORT FROM DR. RASCHER'S REPORT SO THAT

19   SHE NO LONGER HAS AN OBJECTION.

20          **THE COURT:**  OKAY.

21          **THE WITNESS:**  YES, SO THE -- THE EXAMPLES THAT

22   DR. RASCHER TALKED ABOUT, WHICH I DISCUSSED IN MY REPORT, IS

23   THAT WHEN -- WHEN THE OLYMPICS STARTED FIRST LETTING PEOPLE

24   WHO WERE PAID PROFESSIONALS PARTICIPATE IN THE OLYMPICS, THERE

25   WAS ALSO LARGE PUBLIC OPPOSITION TO THAT AND -- AND A LOT OF

```
1    RESULTS SHOWING THAT PEOPLE THOUGHT THAT THAT WAS GOING TO
2    HURT THE PURITY OF THE OLYMPICS, AND THAT IT WAS ALL ABOUT THE
3    AMATEUR SPIRIT.
4         AND YET, THAT DID NOT RESULT IN ANY REDUCTION IN SUPPORT
5    FOR THE OLYMPICS.  AND, IN FACT, THE -- THE LATEST OLYMPICS
6    HAVE HAD THE HIGHEST RATINGS EVER.
7         AND DR. RASCHER ALSO TALKED ABOUT HOW THERE HAVE BEEN LOTS
8    OF POLLS SHOWING PEOPLE'S OUTRAGE WITH EXCESSIVE SALARIES OF
9    BASEBALL PLAYERS AND HOW PROBLEMATIC PEOPLE THINK THAT IS AND
10   HOW MAJOR LEAGUE BASEBALL SUPPORT AND REVENUE HAS CONTINUED TO
11   BE AS BIG AS EVER.
12        AND DR. RASCHER ALSO DISCUSSED A POLL IN WHICH WHEN THE
13   CALIFORNIA ANGELS WERE CONSIDERING CHANGING THEIR NAME TO THE
14   ANAHEIM ANGELS.  THERE WAS A POLL DONE THAT SHOWED THAT ABOUT
15   75 PERCENT OF PEOPLE WERE OPPOSED TO THE NAME CHANGE.  AND
16   EVEN BETWEEN 20 AND 30 PERCENT SAID THAT THEY WOULD EITHER
17   STOP ATTENDING ANGELS' GAMES OR ATTEND LESS ANGELS' GAMES IF
18   THE NAME CHANGE HAPPENED.  AND NONE OF THAT MATERIALIZED.
19        THE ANGELS HAD THEIR HIGHEST ATTENDANCE THE NEXT YEAR AND
20   CONTINUED TO HAVE HIGHER ATTENDANCE FOR YEARS AFTER THAT.
21   BY MS. STEINER:
22   Q.  DOES THE DENNIS SURVEY ITSELF SHOW HOW EASY IT IS TO CLAIM
23   TO CHANGE BEHAVIOR?
24   A.  YES, IT DOES.
25            MS. STEINER:  MATT, CAN YOU PUT UP SURVEY
```

1  DEMONSTRATIVE 3?

2                    (DEMONSTRATIVE PUBLISHED.)

3  **BY MS. STEINER:**

4  **Q.**  CAN YOU WALK US THROUGH THIS, PLEASE.

5  **A.**  SURE.  IN THE DENNIS SURVEY, THERE WERE 453 RESPONDENTS

6  WHO HAD SAID THEY WATCH ZERO COLLEGE FOOTBALL GAMES, BUT THEN

7  WHEN ASKED, ARE YOU GOING TO BE LESS LIKELY TO WATCH IF

8  STUDENTS WERE PAID, SAID THEY WOULD BE LESS LIKELY TO WATCH.

9      AND IN ADDITION, 611 RESPONDENTS WHO SAID THEY WATCH ZERO

10  COLLEGE BASKETBALL GAMES IN THE PAST YEAR AND YET SAID THEY

11  WOULD BE LESS LIKELY TO WATCH.

12  **Q.**  OKAY.  SO LET ME STOP YOU THERE.  AND THOSE 1,600

13  RESPONDENTS WERE INCLUDED IN THE GRAPHS WE SAW TODAY FROM

14  DR. DENNIS?

15  **A.**  YES.  ALTHOUGH I –– I DON'T WANT TO OVERSTATE IT, 'CAUSE

16  YOU CAN'T ADD THOSE NUMBERS UP 'CAUSE THERE'S SOME OVERLAP IN

17  THESE NUMBERS.  BUT –– BUT, YES, THESE ARE –– THESE ARE

18  PART –– ARE PART OF THE PEOPLE WHO ARE IN THE SURVEY.  AND

19  WHAT IT GOES TO SHOW, IN MY OPINION, IS HOW EASY IT IS TO

20  CLICK A BUTTON SAYING I'D BE LESS LIKELY TO WATCH IF SOMETHING

21  HAPPENS THAT I'M NOT SUPPORTING EVEN IF YOU'RE ALREADY A

22  COMPLETE NON-FAN AND, OBVIOUSLY, THE ANSWER THAT YOU'RE GOING

23  TO BE LESS LIKELY TO WATCH IS GOING TO HAVE NO IMPACT ON

24  REAL-WORLD DEMAND.

25  **Q.**  CAN YOU EXPLAIN THE LAST TWO BULLET POINTS?

PORET – DIRECT / STEINER

1   **A.**   YEAH.  THE LAST TWO ALSO INDICATE THAT THERE WERE -- THERE

2   WERE -- I GUESS IT'S 116 PEOPLE IN THE SURVEY WHO INITIALLY

3   SAID I SUPPORT PAYMENT BUT THEN SAID THEY WOULD BE LESS LIKELY

4   TO WATCH IF PEOPLE DID GET PAID OR WHO SAID I OPPOSE PAYMENT

5   BUT THEN SAID I WOULD BE MORE LIKELY TO WATCH, WHICH THESE

6   ANSWERS CONTRADICT EACH OTHER.  AND IT'S JUST ANOTHER INSTANCE

7   OF HOW, YOU KNOW, VERY OFTEN, CLICKING A BUTTON IN A SURVEY

8   THAT I WILL OR WON'T DO THIS IS -- IS A MEANINGLESS ANSWER

9   WITHOUT SOMETHING TO CONTROL FOR ITS RELIABILITY.

10  **Q.**   AND AM I CORRECT THAT THERE WERE ABOUT -- INCLUDING

11  MULTIPLE VERSIONS OF THE SAME QUESTION NUMBERING, ABOUT 20

12  QUESTIONS IN THIS SURVEY?

13  **A.**   I -- I THINK THAT'S ABOUT RIGHT.

14  **Q.**   AND IT TOOK PEOPLE AN AVERAGE OF EIGHT MINUTES TO COMPLETE

15  THE SURVEY?

16  **A.**   I THINK THAT SOUNDS RIGHT.

17  **Q.**   OKAY.  WHAT DO ALL THE EXAMPLES YOU JUST GAVE US TELL YOU?

18  **A.**   THEY TELL ME THAT IN ANY SURVEY, IT'S NOT AT ALL

19  SURPRISING TO GET 20 OR 30 OR 40 PERCENT OF PEOPLE SAYING --

20  CLICKING A BUTTON AND SAYING, I'D BE LESS LIKELY TO DO

21  SOMETHING THAT THEY'VE SAID, YOU KNOW, THEY DON'T -- THEY

22  DON'T SUPPORT.

23     AND, YET, THERE'S NO RELIABILITY TO THAT WITHOUT SOME

24  CONTROL MECHANISM TO INDICATE THAT THIS MIGHT REPRESENT A

25  REAL-WORLD PHENOMENON AND ISN'T JUST PURE SURVEY NOISE.

1    **Q.**  YOU JUST MENTIONED A CONTROL MECHANISM.  WHAT'S THAT?

2    **A.**  WELL, A —— THE CLASSIC EXAMPLE OF A CONTROL IS A PLACEBO

3    IN A SCIENTIFIC EXPERIMENT.  IF YOU WERE TO THINK ABOUT, LET'S

4    SAY, A COMPANY WHO HAS AN ANTI-DEPRESSION MEDICATION, WANTS TO

5    GET IT APPROVED, AND THEY HAVE A TEST THAT SHOWS THAT 30

6    PERCENT OF THE PEOPLE WHO TOOK THEIR PRODUCT CLAIMED THAT THIS

7    IMPROVED THEIR —— YOU KNOW, THEIR MENTAL STATE.

8        IF THEY —— IF THIS STUDY WAS SUBMITTED TO THE FDA ON ITS

9    OWN, THE FDA WOULD SAY THIS IS WORTH NOTHING.  I DON'T —— I

10   DON'T CARE THAT 30 PERCENT OF PEOPLE SAID THIS.  YOU NEED A

11   CONTROL GROUP.  YOU NEED A GROUP THAT WAS GIVEN A PLACEBO AND

12   SEE HOW MANY PEOPLE IN THAT GROUP SAID THIS HELPED MY MENTAL

13   STATE.

14       AND YOU VERY WELL MIGHT FIND THAT 25 PERCENT OR 30 PERCENT

15   SAID THE SAME THING WHEN GIVEN A PLACEBO, AND THAT WOULD SHOW

16   THAT THIS TEST RESULT IS WORTH ABSOLUTELY NOTHING.

17       BUT IF THE PLACEBO SHOWED THAT 5 PERCENT OF PEOPLE —— ONLY

18   5 PERCENT SAID THIS HELPED MY MENTAL STATE, THEN THAT WOULD

19   PROVE THE DIFFERENCE BETWEEN THE 30 AND THE 5 IS —— IS

20   MEANINGFUL.

21           **MS. LUEDTKE:**  SORRY, YOUR HONOR.  I'M GOING TO OBJECT

22   AGAIN.  WE'VE GONE FAR OUTSIDE THE SCOPE OF HIS EXPERT REPORT.

23   THERE'S NOTHING IN HIS EXPERT REPORT ABOUT CONTROL GROUPS OR

24   PLACEBOS, SO I MOVE TO STRIKE THE TESTIMONY HE JUST GAVE IN

25   RESPONSE TO THAT QUESTION.

1    **MS. STEINER:**  IN HIS REPORT, HE DID TALK THAT THERE

2    WAS A NEED FOR A CONTROL HERE.  HE –– THAT WAS EXAMINED IN HIS

3    DEPOSITION.  ALL HE'S DOING HERE IS GIVING AN EXAMPLE ––

4    **THE COURT:**  WELL, I KNOW WHAT A CONTROL GROUP IS, SO

5    THAT'S NOT REALLY A PROBLEM.

6    IF THE OBJECTION IS TO WHAT CONTROL GROUP COULD HAVE BEEN

7    USED HERE, I WAS CURIOUS ABOUT THAT MYSELF.  BUT IF IT'S NOT

8    IN HIS REPORT, THEN I GUESS I WON'T FIND OUT.

9    **MS. LUEDTKE:**  YOUR HONOR, IT'S NOT IN HIS REPORT, SO

10   WE WOULD MOVE TO STRIKE THE TESTIMONY.

11   **THE COURT:**  WELL, IT'S NOT GOING TO BE STRICKEN.  I

12   KNOW WHAT A CONTROL GROUP IS.  I CAN'T STRIKE THAT, BUT I

13   GUESS, AS I SAY, YOU CANNOT BRING OUT WHAT SUCH CONTROL GROUP

14   COULD HAVE BEEN IF IT WASN'T IN HIS REPORT, SO YOU'LL NEED TO

15   MOVE ON.

16   **MS. STEINER:**  I ACTUALLY BELIEVE IT WAS IN HIS

17   REPORT, SO IF I CAN HAVE A MOMENT.

18   **THE COURT:**  SURE.

19   (PAUSE IN THE PROCEEDINGS.)

20   **THE COURT:**  OR YOU COULD GO ON TO SOMETHING ELSE, AND

21   MAYBE ONE OF YOUR COLLEAGUES AT THE TABLE COULD LOOK FOR IT,

22   CONTROL F.

23   **MS. STEINER:**  WE COULD DO THAT.

24   Q.  IS THERE A WAY TO DETERMINE IF CONSUMER DEMAND RESULTS

25   YOU'RE GETTING ARE UNRELIABLE?

1    **A.**  YES.

2    **Q.**  DID DR. DENNIS HAVE A CONTROL IN HIS SURVEY?

3    **A.**  NO.

4    **Q.**  IS THAT A FUNDAMENTAL FLAW IN YOUR OPINION?

5    **A.**  YES.  IT -- IT'S A FLAW THAT MAKES THE WHOLE SURVEY

6    UNRELIABLE.  AND I -- I THINK TO UNDERSTAND THIS -- I MEAN,

7    IT'S WORTH ADDING, YOU KNOW, DR. DENNIS SAID BEFORE, HE'S PART

8    OF THIS HUGE MULTI-BILLION-DOLLAR MARKET RESEARCH INDUSTRY,

9    AND THEY'RE NOT SPENDING ALL OF THIS MONEY FOR NOTHING.

10   AND I -- AND I AGREE WITH THAT.  AND I'M PART OF THAT

11   MARKET RESEARCH INDUSTRY, TOO.  AND EVERY DAY, I'M DOING

12   SURVEYS THAT DO ATTEMPT TO DETERMINE THE INFLUENCE ON CONSUMER

13   BEHAVIOR, SO HE'S PERFECTLY RIGHT ABOUT THAT.

14   BUT WHAT THAT IS MISSING IS THAT RESEARCH NEEDS TO HAVE

15   CONTROLS THAT RELIABLY INDICATE THAT THE RESULTS THAT YOU'RE

16   GETTING REPRESENT A REAL-WORLD PHENOMENON BECAUSE IT IS WELL

17   KNOWN THAT RESPONDENTS, IN THE ABSENCE OF CONTROLS, WILL SAY

18   LOTS OF THINGS.  AND YOU CAN GET WHAT APPEAR TO BE SIGNIFICANT

19   RATES OF ANSWERS THAT ARE NOTHING BUT SURVEY NOISE.

20   **Q.**  ARE BENCHMARKS ALSO SOMETHING THAT A SURVEY -- SURVEY

21   RESEARCHER SHOULD CONSIDER?

22   **MS. LUEDTKE:**  OBJECTION.  THIS IS, AGAIN, OUTSIDE THE

23   SCOPE OF HIS REPORT.  I DON'T BELIEVE THERE'S ANYTHING IN HIS

24   REPORT ABOUT BENCHMARKS.

25   **MS. STEINER:**  THE RASCHER EXAMPLES THAT ARE IN HIS

PORET – DIRECT / STEINER

1    REPORT ARE CALLED, IN HIS WORLD, BENCHMARKS.  I CAN NOT USE

2    THE WORD "BENCHMARKS," BUT ALL THESE EXAMPLES ARE, IN FACT,

3    BENCHMARKS, AND THAT'S WHAT HE TALKED WITH IN HIS REPORT.

4              **THE COURT:**  OKAY.  WELL, MAYBE IF YOU DO IT WITHOUT

5    USING THE WORD "BENCHMARK."

6    **BY MS. STEINER:**

7    **Q.**  ARE THERE WAYS --

8              **THE COURT:**  -- HAVE A LENGTHY DISCUSSION ABOUT

9    WHETHER THE BENCHMARK WAS THE SAME AS A YARDSTICK, SO I DON'T

10   KNOW IF WE CAN USE "YARDSTICK" OR SOMETHING ELSE.

11   **BY MS. STEINER:**

12   **Q.**  ARE THERE OTHER WAYS THAT A SURVEY RESEARCHER COULD

13   VALIDATE THE RESULTS OF HIS SURVEY?

14   **A.**  WELL, ONE -- ONE WAY THAT YOU COULD HAVE A -- HAVE A

15   CONTROL TO VALIDATE YOUR SURVEY OTHER THAN -- THAT'S PART OF

16   YOUR OWN SURVEY WOULD BE TO COMPARE IT TO -- TO OTHER

17   REAL-WORLD SURVEYS.

18        SO, FOR INSTANCE, ONE COULD LOOK AT OTHER REAL-WORLD

19   INCIDENTS WHERE PEOPLE HAVE CLAIMED IN SURVEYS THAT THEY WOULD

20   BE LESS LIKELY TO DO SOMETHING IF THERE WAS SOME POLICY THEY

21   DISAGREED WITH AND SEE HOW THAT TURNED OUT AND COMPARE THE

22   RESULTS.

23   **Q.**  IN THE SURVEY WORLD, DO YOU HAVE A NAME FOR THOSE THINGS?

24   **A.**  I -- I WOULD SOMETIMES CALL THAT BENCHMARKING TO ANOTHER

25   SURVEY.

1    **Q.** THANK YOU.

2       AS AN EXPERT IN SURVEY METHODS, WHAT DO THE BENCHMARKS AND

3    LACK OF BENCHMARKS AND LACK OF CONTROLS IN THIS SURVEY TELL

4    YOU?

5    **A.** IT TELLS ME THAT THERE'S ABSOLUTELY NO WAY TO ASSIGN ANY

6    MEANING TO THESE FIGURES SAYING HOW MANY -- WHAT PERCENT OF

7    PEOPLE WOULD BE LESS LIKELY TO WATCH BECAUSE IT'S ENTIRELY

8    POSSIBLE THAT THOSE NUMBERS ARE EQUAL TO WHAT YOU WOULD

9    CONSIDER A BASELINE LEVEL OF SURVEY NOISE AND THAT PEOPLE

10   WOULD HAVE GIVEN EXACTLY THE SAME ANSWERS HAD YOU PUT THEM IN

11   A CONTROL SCENARIO.

12   **Q.** DO YOU HAVE ANY ADDITIONAL CRITICISMS OF PROFESSOR

13   RUBINFELD'S USE OF THE DEMAND RESULT FROM THE DENNIS SURVEY?

14   **A.** YES.

15   **Q.** WHAT IS THAT?

16   **A.** WELL, IT RELATES TO THE SAME THING I TALKED ABOUT BEFORE,

17   THAT, FIRST OF ALL, THESE QUESTIONS DON'T ADDRESS THE ISSUE OF

18   NAME, IMAGE, OR LIKENESS AT ALL TO WHATEVER THE PEOPLE ARE

19   SAYING THEY'D BE LESS LIKELY TO DO IF STUDENT ATHLETES WERE

20   PAID SALARIES HAS NOTHING TO DO WITH THE DEMAND FOR HOW THE

21   DEMAND MIGHT BE IMPACTED IF PEOPLE ARE ALLOWED COMPENSATION

22   FOR THE SALE OF -- OF PRODUCTS WITH -- THAT USE THE NAME,

23   IMAGE, OR LIKENESS OF PLAYERS.

24      AND, SECONDLY, AS SOMEBODY WHO'S FAMILIAR WITH -- WITH

25   SURVEYS, I -- I WOULD ALSO THINK THAT PROFESSOR RUBINFELD

1    SHOULD HAVE GREAT SKEPTICISM FOR THE IMPACT OF THESE DEMAND

2    QUESTIONS THAT ARE COMPLETELY UNCONTROLLED.

3    **Q.**  SO IN SUMMARY, ARE THESE SURVEYS RELEVANT TO THE QUESTIONS

4    HERE?

5    **A.**  NO.

6    **Q.**  DO THESE SURVEYS GIVE YOU RESULT -- RELIABLE RESULTS FOR

7    THE QUESTIONS HERE?

8    **A.**  NO.

9            **MS. STEINER:**  THANK YOU.

10                  (PAUSE IN THE PROCEEDINGS.)

11                  **CROSS-EXAMINATION**

12   **BY MS. LUEDTKE:**

13   **Q.**  GOOD AFTERNOON (SIC), MR. PORET.

14   **A.**  GOOD AFTERNOON.

15   **Q.**  YOU TESTIFIED ON YOUR DIRECT EXAMINATION THAT YOU HAVE

16   TESTIFIED IN -- THAT YOU HAVE DESIGNED IN LITIGATION OVER A

17   HUNDRED SURVEYS; IS THAT RIGHT?

18   **A.**  YES.

19   **Q.**  YET, IN THIS CASE, YOU'VE PRESENTED NO SURVEY OF YOUR OWN,

20   RIGHT?

21   **A.**  RIGHT.

22   **Q.**  YOU'VE PRESENTED NOTHING TO THE COURT THAT WOULD SHOW THAT

23   PAYMENT FOR NAME, IMAGE, AND LIKENESS WILL NOT HURT COLLEGE

24   FOOTBALL AND MEN'S BASKETBALL AS PRODUCTS, HAVE YOU?

25   **A.**  CORRECT.

1    **Q.**  YOU'VE PRESENTED NOTHING TO THIS COURT THAT TESTS

2    EMPIRICALLY OR ANECDOTALLY WHETHER DR. DENNIS'S SURVEY IS

3    INCORRECT, HAVE YOU?

4    **A.**  I DON'T THINK THAT'S RIGHT.

5    **Q.**  YOU'VE NOT PRESENTED ANY SURVEYS THAT TEST WHETHER

6    DR. DENNIS'S SURVEY WOULD HAVE A DIFFERENT OUTCOME IF WORDED

7    TO SPECIFICALLY ASK ABOUT NAME, IMAGE, AND LIKENESS, RIGHT?

8    **A.**  IF WHAT YOU MEAN IS I HAVEN'T PRESENTED MY OWN SURVEY,

9    THEN THAT IS RIGHT.

10   **Q.**  AND YOU HAVEN'T PRESENTED ANY INTERVIEWS THAT YOU'VE

11   CONDUCTED, RIGHT?

12   **A.**  RIGHT.

13   **Q.**  YOU'VE NOT PRESENTED ANY DATA OF POLLS YOU'VE CONDUCTED,

14   RIGHT?

15   **A.**  RIGHT.

16   **Q.**  EVEN THOUGH YOU, IN MORE THAN A HUNDRED OTHER CASES, HAVE

17   CONDUCTED SURVEYS AND PRESENTED THOSE TO THE COURT, CORRECT?

18   **A.**  YES, MA'AM.

19   **Q.**  YOU'RE EXPERIENCED AT ADMINISTERING AND PREPARING SURVEYS,

20   AREN'T YOU?

21   **A.**  YES.

22   **Q.**  THAT'S WHAT YOU DO FOR A LIVING?

23   **A.**  YES.

24   **Q.**  YOU'RE A PROFESSIONAL EXPERT, AREN'T YOU?

25   **A.**  NO.

1    **Q.**  YOU HAVE A WEBSITE CALLED WWW.TRADEMARKSURVEYSEXPERT.COM,

2    RIGHT?

3    **A.**  I DON'T.  MY COMPANY HAS A NUMBER OF DIFFERENT WEB PAGES

4    THAT ADDRESS VARIOUS PEOPLE IN THE COMPANY.  AND I BELIEVE

5    THEY DO HAVE ONE THAT FEATURES THE TRADEMARK-RELATED SERVICES

6    THAT IS CALLED THAT.  BUT THAT IS JUST ONE PIECE OF THE

7    WEBSITE.

8    **Q.**  AND RECENTLY, JUDGE POSNER OF THE SEVENTH CIRCUIT CALLED

9    YOU A PROFESSIONAL EXPERT, DIDN'T HE, IN THE KRAFT FOODS CASE?

10   **A.**  I DO BELIEVE HE MADE SOME COMMENT LIKE THAT IN -- IN THE

11   OPINION, YES.

12   **Q.**  SO IRONICALLY, YOU'RE A PROFESSIONAL SURVEY EXPERT, BUT

13   YOU'RE PRESENTING NO SURVEY HERE, RIGHT?

14   **A.**  I DON'T THINK THAT'S IRONIC.  IT'S PRETTY NORMAL FOR A

15   SURVEY EXPERT TO BE PRESENTED ON THE -- THE TOPIC OF SURVEY

16   RESEARCH TO ADDRESS OTHER SURVEYS.

17   **Q.**  LET'S TALK ABOUT AREAS WHERE YOU'RE NOT CLAIMING TO BE AN

18   EXPERT.  YOU'RE NOT AN EXPERT ON SPORTS, RIGHT?

19   **A.**  I DON'T CLAIM TO BE A PROFESSIONAL EXPERT ON SPORTS, NO.

20   **Q.**  AND YOU'RE NOT AN EXPERT ON SPORTS FANS' CONSUMER

21   BEHAVIOR, RIGHT?

22   **A.**  RIGHT.

23   **Q.**  AND YOU'RE NOT AN EXPERT ON CONSUMER BEHAVIOR RELATED TO

24   TELEVISION, RIGHT?

25   **A.**  I'M NOT AN EXPERT ON ANY OF THESE THINGS SPECIFICALLY.  I

1    MEAN, AS A CONSUMER BEHAVIOR AND RESEARCH EXPERT, I DO A LOT

2    OF SURVEYS IN THESE PARTICULAR AREAS.  BUT I WOULD ONLY

3    GENERALLY STATE MY EXPERTISE AS IN SURVEY RESEARCH.  I

4    WOULDN'T CLAIM I'M SPECIFICALLY EXPERT IN SPORTS BEHAVIOR AND

5    T.V. BEHAVIOR.

6    **Q.**  AND YOU'RE NOT AN ECONOMIST, RIGHT?

7    **A.**  RIGHT.

8    **Q.**  YOU'RE NOT PRESENTED HERE AS AN EXPERT ON ECONOMIC

9    ANALYSIS OR THE PROPER THINGS FOR AN ECONOMIST TO RELY ON,

10   RIGHT?

11   **A.**  OTHER THAN -- OTHER THAN TO THE EXTENT OF WHETHER IT WOULD

12   BE PROPER FOR AN ECONOMIST TO RELY ON SURVEYS LIKE THESE.

13   **Q.**  YOU CAN TESTIFY ABOUT THAT AS -- FROM THE PERSPECTIVE OF A

14   SURVEY EXPERT, RIGHT?

15   **A.**  YES.

16   **Q.**  NOT AS AN ECONOMIST, RIGHT?

17   **A.**  I'M NOT AN ECONOMIST.

18   **Q.**  NOW, WHEN YOU TESTIFIED EARLIER TODAY ABOUT YOUR OPINIONS

19   RELATED TO THE SURVEYS THAT DR. RUBINFELD RELIED ON AND YOU

20   CRITICIZED THE FACT THAT THOSE SURVEYS ASKED QUESTIONS THAT

21   USED THE WORD "SALARY" -- DO YOU RECALL THAT TESTIMONY?

22   **A.**  YES.  IT ISN'T JUST THE WORD "SALARY" BUT "SALARY" OR

23   EQUIVALENT PHRASES.

24   **Q.**  ONE OF YOUR CRITICISMS WAS THAT THOSE SURVEYS ASKED ABOUT

25   THE PAYMENT OF A SALARY, RIGHT?

1    **A.**  YES.

2    **Q.**  AND YOU'VE DONE NOTHING TO TEST WHETHER CONSUMERS ACTUALLY

3    DISTINGUISH BETWEEN PAYMENT OF A SALARY AS COMPARED TO PAYMENT

4    FOR A GROUP LICENSE FOR ALL MEMBERS ON A TEAM TO BE PAID FOR

5    NAME, IMAGE, AND LIKENESS FOR APPEARING IN A TELEVISED GAME,

6    RIGHT?

7    **A.**  I HAVE NOT DONE ANY OF MY OWN TESTS, I THINK IS THE

8    SIMPLEST ANSWER.

9    **Q.**  AND YOU'VE DONE NOTHING TO TEST WHETHER CONSUMERS VIEW

10   PAYING A SALARY AS A VERY DIFFERENT QUESTION THAN PAYING FOR

11   NAME, IMAGE, AND LIKENESS, HAVE YOU?

12   **A.**  I HAVEN'T DONE ANY INDEPENDENT TESTS.

13   **Q.**  YOU HAVEN'T CONDUCTED ANY INTERVIEWS.

14   **A.**  NO.

15   **Q.**  AND YOU HAVE NOT TESTED WHY CONSUMERS ARE OPPOSED TO

16   PAYING STUDENT ATHLETES SALARIES, HAVE YOU?

17   **A.**  NO.

18   **Q.**  YOU ALSO TESTIFIED ABOUT DR. DENNIS'S SURVEY.  JUST TO BE

19   CLEAR ABOUT A FEW THINGS YOU'RE NOT CRITICIZING ABOUT HIS

20   SURVEY, YOU AREN'T CRITICIZING THE FACT THAT DR. DENNIS USED

21   KNOWLEDGE NETWORKS, ARE YOU?

22   **A.**  NO.

23   **Q.**  YOU BELIEVE KNOWLEDGE NETWORKS IS A LEGITIMATE, VALID

24   PANEL TO USE FOR SURVEYING ANALYSIS?

25   **A.**  YES.

1    Q.  AND YOU'RE NOT CRITICIZING THAT DR. DENNIS'S SURVEY HAD A

2    50 PERCENT RESPONSE RATE, RIGHT?

3    A.  RIGHT.

4    Q.  IN FACT, 50 PERCENT IS AN ACCEPTABLE RESPONSE RATE BASED

5    ON INDUSTRY STANDARDS, RIGHT?

6    A.  YES.

7    Q.  ONE OF YOUR CRITICISMS OF DR. DENNIS'S SURVEY AND THE

8    SURVEYS DR. RUBINFELD RELIED ON WAS THAT THEY DID NOT ASK

9    SPECIFICALLY ABOUT NAME, IMAGE, AND LIKENESS; IS THAT CORRECT?

10   A.  YES.

11   Q.  NOW, YOU, SITTING HERE, DON'T HAVE A BETTER SUGGESTION FOR

12   HOW TO WORD SUCH A QUESTION THAT WOULD ASK ABOUT NAME, IMAGE,

13   AND LIKENESS, DO YOU?

14   A.  I DO.  I GAVE THEM DURING MY DIRECT.

15   Q.  YOU'VE PRESENTED NO EVIDENCE THAT YOU TOOK ANY STEPS TO

16   TEST ANY SUCH QUESTIONS WITH CONSUMERS, RIGHT?

17   A.  I DID NOT DO ANY TESTS.

18   Q.  SO OTHER THAN YOUR OWN EXPERIENCE, YOU HAVE NO IDEA

19   WHETHER THOSE QUESTIONS WOULD HAVE CAUSED CONFUSION WITHIN A

20   CONSUMER PUBLIC, RIGHT?

21   A.  I'M NOT SURE WHAT YOU MEAN BY CAUSING CONFUSION.

22   Q.  YOU HAVE NO IDEA WHETHER OR NOT ANY QUESTIONS POSED ABOUT

23   NAME, IMAGE, AND LIKENESS WOULD HAVE BEEN CLEAR TO THE

24   CONSUMING PUBLIC; YOU DIDN'T TEST THAT, RIGHT?

25   A.  I DIDN'T TEST IT, BUT I HAVE AN OPINION ABOUT IT.

1    **Q.**  JUST BASED ON YOUR OWN PERSONAL EXPERIENCE, RIGHT?

2    **A.**  YES.

3    **Q.**  AND NORMALLY, WHEN YOU DESIGN A SURVEY THAT YOU'RE GOING

4    TO PRESENT IN LITIGATION, YOU TEST THAT, SUCH AS, LIKE, A

5    PRETEST, LIKE DR. DENNIS DESCRIBED, RIGHT?

6    **A.**  SOMETIMES YES, SOMETIMES NO.

7    **Q.**  AND THEN YOU RUN THE SURVEY, AND YOU EVALUATE WHETHER THE

8    RESULTS ARE LEGITIMATE BEFORE YOU PRESENT THEM TO A COURT,

9    RIGHT?

10   **A.**  YES.

11            **MS. LUEDTKE:**  LET'S BRING UP EXHIBIT 3392-13.

12                  (EXHIBIT PUBLISHED.)

13   **BY MS. LUEDTKE:**

14   **Q.**  THIS IS QUESTION 9A THAT YOU DISCUSSED EARLIER IN YOUR

15   TESTIMONY.

16        DO YOU SEE THAT?

17   **A.**  YES.

18   **Q.**  AND YOU CRITICIZED THE BEGINNING OF THIS QUESTION WHERE IT

19   SAYS, "THERE HAS BEEN SOME DISCUSSION OF PAYING MONEY TO

20   COLLEGE FOOTBALL AND BASKETBALL STUDENT ATHLETES IN ADDITION

21   TO PROVIDING SCHOLARSHIPS THAT COVER COLLEGE EXPENSES."

22        DO YOU SEE THAT?

23   **A.**  I -- I SEE THE WORDS HERE.

24   **Q.**  YOU'VE DONE NOTHING TO TEST WHETHER THE REFERENCE TO

25   "SCHOLARSHIPS" HERE WOULD BE INTERPRETED BY CONSUMERS TO MEAN

1    THAT ALL COLLEGE EXPENSES ARE COVERED, HAVE YOU?

2    **A.**  NO.

3    **Q.**  YOU CAN TAKE THAT DOWN.

4        HAVE YOU DONE ANYTHING TO TEST WHETHER THE RESULTS OF

5    DR. DENNIS'S WOULD CHANGE IF RESPONDENTS WERE TOLD THAT IT WAS

6    NOT ABOUT ILLICIT PAYMENTS?

7    **A.**  I -- I HAVEN'T DONE ANY INDEPENDENT TESTS.

8    **Q.**  NOW, YOU TALKED EARLIER ABOUT DEFERRED COMPENSATION.

9    YOU'VE DONE NOTHING TO TEST WHETHER CONSUMERS WOULD HAVE LESS

10   CONCERN ABOUT DEFERRED COMPENSATION TO STUDENT ATHLETES THAN

11   THEY WOULD HAVE ABOUT PAYING THEM WHILE THEY'RE STUDENTS, HAVE

12   YOU?

13   **A.**  NO.

14   **Q.**  ALL RIGHT.  LET'S TURN TO YOUR CRITICISM THAT DR. DENNIS'S

15   SURVEY DID NOT FOCUS ON FANS.

16       LET'S BRING UP YOUR EXPERT REPORT, WHICH IS P20.  THIS IS

17   PARAGRAPH 26 OF YOUR JANUARY 2014 EXPERT REPORT.

18                    (DEMONSTRATIVE PUBLISHED.)

19   **BY MS. LUEDTKE:**

20   **Q.**  AND IN THIS YOU SAY, "ONLY A VERY SMALL NUMBER OF BIG FANS

21   WERE INCLUDED IN THE SURVEY."

22       DO YOU SEE THAT?

23   **A.**  YES.

24   **Q.**  YOU DON'T HAVE A DEFINITION OF WHAT A FAN IS, DO YOU?

25   **A.**  WELL, I'M -- I GUESS I'M THINKING ABOUT THE DEFINITIONS

1    THAT DR. DENNIS USED IN -- IN CATEGORIZING HIS SURVEY.

2    **Q.**  YOU HAVE NO OPINION ABOUT HOW MANY GAMES A PERSON NEEDS TO

3    WATCH IN ORDER TO BE A FAN, DO YOU?

4    **A.**  I -- I DON'T THINK THAT WOULD BE MY ROLE, TO DEFINE WHAT A

5    BIG FAN IS IN TERMS OF NUMBER OF GAMES.

6    **Q.**  SO YOU HAVE NO OPINION ON HOW MANY GAMES SOMEONE NEEDS TO

7    WATCH TO QUALIFY AS A FAN, RIGHT?

8    **A.**  I WOULDN'T -- I WOULDN'T PUT A NUMBER ON THAT MYSELF.

9    **Q.**  BECAUSE YOU DON'T HAVE AN OPINION ON THAT, RIGHT?

10   **A.**  WELL, IT'S NOT THAT I HAVE NO OPINION.  IT'S THAT I DON'T

11   HAVE A BASIS FOR HAVING AN OPINION ABOUT WHAT A SPECIFIC

12   NUMBER WOULD BE.

13   **Q.**  YOU HEARD DR. DENNIS'S TESTIMONY TODAY ABOUT HOW THE

14   STATISTICS COME OUT IF YOU LOOK AT THEM JUST FOR PEOPLE WHO

15   WATCHED 11 OR MORE GAMES.

16       DID YOU HEAR THAT TESTIMONY?

17   **A.**  YES, I DID.

18   **Q.**  DO YOU AGREE THAT THAT'S AN APPROPRIATE DEFINITION OF A

19   "FAN"?

20   **A.**  I DON'T -- I DON'T REALLY HAVE AN OPINION ONE WAY OR

21   ANOTHER IF THAT'S THE RIGHT DEFINITION OF A "FAN."

22   **Q.**  OKAY.  WE CAN TAKE THAT DOWN.  THANK YOU.

23       NOW, YOU'RE -- WHEN YOU DESIGN A SURVEY AND -- YOU TRY TO

24   GET A CERTAIN NUMBER OF RESPONSES TO MAKE THOSE RESULTS

25   RELIABLE, RIGHT?

1    **A.**  YES.

2    **Q.**  AND IN YOUR OPINION, A SURVEY THAT HAS 300 RESPONDENTS

3    COULD BE AN APPROPRIATE AND DEFENSIBLE SURVEY, RIGHT?

4    **A.**  YES.

5         **MS. LUEDTKE:**  LET'S BRING UP P21.

6              (DEMONSTRATIVE PUBLISHED.)

7    **BY MS. LUEDTKE:**

8    **Q.**  THIS IS FROM EXHIBIT 3393-1.  I BELIEVE YOU WENT OVER

9    THESE IN YOUR DIRECT TESTIMONY.  THIS IS SOME OF THE RESPONSES

10   TO QUESTION 2B.

11      DO YOU SEE THAT?

12   **A.**  YES.

13   **Q.**  THIS IS THE QUESTION ABOUT HOW MANY GAMES OF COLLEGE

14   FOOTBALL YOU'VE WATCHED ON TELEVISION OR OVER THE INTERNET OR

15   ATTENDED IN THE PAST 12 MONTHS; IS THAT RIGHT?

16   **A.**  YES.

17   **Q.**  AND IF WE LOOK AT THE PEOPLE WHO'VE WATCHED 11 OR MORE

18   GAMES, THERE ARE 472 RESPONDENTS; IS THAT RIGHT?

19   **A.**  I TRUST YOUR MATH.

20        **MS. LUEDTKE:**  ALL RIGHT.  LET'S BRING UP P22.

21              (DEMONSTRATIVE PUBLISHED.)

22   **BY MS. LUEDTKE:**

23   **Q.**  THIS IS QUESTION 2D ABOUT COLLEGE BASKETBALL.  AND HERE,

24   IT'S -- ASKS HOW MANY GAMES YOU'VE WATCHED IN THE PAST 12

25   MONTHS OF COLLEGE BASKETBALL.  AND I'VE HIGHLIGHTED THERE

1       THOSE WHO'VE WATCHED MORE THAN 11 OR MORE GAMES.

2           DO YOU SEE THAT?

3       A.  YES.

4       Q.  AND THERE WERE 326 RESPONDENTS IN THE SURVEY WHO TOOK --

5       WHO WATCHED MORE THAN 11 BASKETBALL GAMES; IS THAT RIGHT?

6       A.  AGAIN, I TRUST YOUR MATH.

7       Q.  ALL RIGHT.  WE CAN TAKE THAT DOWN.

8           NOW, TOWARDS THE END OF YOUR TESTIMONY HERE, YOU SAID THAT

9       SURVEYS ARE NOTORIOUSLY BAD AT PREDICTING FUTURE BEHAVIOR,

10      RIGHT?

11      A.  NO.

12      Q.  THAT'S NOT YOUR TESTIMONY?

13      A.  THAT'S NOT WHAT I SAID.

14      Q.  ARE SURVEYS NOTORIOUSLY BAD AT PREDICTING FUTURE BEHAVIOR?

15      A.  I SAID SURVEY RESPONDENTS ARE NOTORIOUSLY BAD AT

16      PREDICTING THEIR OWN FUTURE BEHAVIOR.  SURVEYS THAT ARE DONE

17      PROPERLY WITH CONTROLS THAT CONTROL FOR CAUSATION CAN BE GOOD

18      AT PREDICTING FUTURE BEHAVIOR.

19      Q.  AND YOU ACKNOWLEDGE THAT YOU'RE PART OF THE CONSUMER

20      MARKET RESEARCH INDUSTRY THAT DOES SURVEYS TO TRY TO PREDICT

21      MARKET BEHAVIOR, RIGHT?

22      A.  YES.

23      Q.  AND YOU EMPLOY PREDICTIVE SURVEYS IN ASSISTING YOUR

24      CLIENTS, RIGHT?

25      A.  YES.  SOMETIMES.

PORET - CROSS / LUEDTKE

1    **Q.**  ALL RIGHT.  LET'S TURN TO A NEW TOPIC.

2       NOW, YOU CRITICIZED DR. RUBINFELD'S RELIANCE ON SURVEYS

3    THAT FOCUSED ON QUESTIONS THAT RELATED TO SALARY RATHER THAN

4    NAME, IMAGE, AND LIKENESS, RIGHT?

5    **A.**  YES.

6    **Q.**  AND YOU CRITICIZED DR. DENNIS FOR THE SAME REASON, RIGHT?

7    **A.**  YES.

8    **Q.**  WOULD YOU AGREE THAT PEOPLE WHO FOLLOW THIS LITIGATION ARE

9    MORE LIKELY TO BE COLLEGE SPORTS FANS?

10   **A.**  I -- I MEAN, I HAVE NO PROFESSIONAL BASIS FOR SAYING THAT,

11   BUT THAT SOUNDS FAIRLY REASONABLE FROM A COMMON-SENSE

12   PERSPECTIVE.

13   **Q.**  AND YOU KNOW THAT SPORTS ILLUSTRATED, ESPN AND OTHER

14   SPORTS MEDIA ARE SITTING IN THE COURTROOM FOLLOWING THE TRIAL,

15   CORRECT?

16   **A.**  I CERTAINLY UNDERSTAND PEOPLE FROM THAT WORLD ARE

17   FOLLOWING THE TRIAL.

18   **Q.**  DID YOU HEAR DR. EMMERT'S TESTIMONY LAST WEEK?

19   **A.**  NO.

20   **Q.**  HAVE YOU READ A TRANSCRIPT OF IT?

21   **A.**  NO.

22   **Q.**  DID YOU KNOW THAT HE TESTIFIED ABOUT HIS OPINION ON

23   WHETHER PAYMENT FOR NAME, IMAGE, AND LIKENESS WOULD IMPACT FAN

24   INTEREST?

25   **A.**  NO, I DON'T KNOW ANYTHING ABOUT HIS TESTIMONY.

1          **MS. LUEDTKE:**  LET'S BRING UP EXHIBIT 3961-1.

2               (DEMONSTRATIVE PUBLISHED.)

3          **MS. LUEDTKE:**  AND IF WE CAN BLOW UP THE TOP THERE.

4               (DEMONSTRATIVE PUBLISHED.)

5     **BY MS. LUEDTKE:**

6     **Q.**  THIS IS FROM A WEBSITE AL.COM FOR ALABAMA.COM, AND THE

7     TITLE IS "IF COLLEGE ATHLETES WERE PAID, WOULD YOU LOSE

8     INTEREST."

9          HAVE YOU READ THIS ARTICLE?

10    **A.**  NO.

11    **Q.**  DO YOU SEE THAT THIS IS FROM A ALABAMA.COM WEBSITE?

12    **A.**  YES.

13    **Q.**  WOULD YOU AGREE WITH ME THAT THE FANS OF FOOTBALL AND

14    ALABAMA ARE QUITE PASSIONATE ABOUT THEIR SPORTS?

15    **A.**  FROM WHAT I KNOW, THAT SEEMS TO BE TRUE.

16    **Q.**  AUBURN PLAYED FOR THE NATIONAL CHAMPIONSHIP IN FOOTBALL

17    LAST YEAR?

18    **A.**  I BELIEVE THAT'S RIGHT.

19    **Q.**  AND ALABAMA WON THE FOOTBALL CHAMPIONSHIP THE YEAR BEFORE?

20    **A.**  I HAVE NO DOUBT THAT THERE'S A LOT OF FERVOR FOR COLLEGE

21    FOOTBALL IN ALABAMA.

22    **Q.**  ALL RIGHT.  IF WE CAN SCROLL DOWN THIS EXHIBIT, YOU'LL SEE

23    THAT ON JUNE 19TH OF LAST WEEK, IT APPEARS THAT THIS REPORTER

24    WAS REPORTING ON DR. EMMERT'S TESTIMONY.  AND HE GOES ON TO

25    ASK A QUESTION --

1          **MS. STEINER:**  YOUR HONOR, I OBJECT TO THIS.  HE SAID

2     HE HASN'T SEEN THIS ARTICLE.  THIS IS SOME SORT OF ONLINE

3     POLL -- I'M NOT QUITE SURE WHAT THE POINT OF THIS IS.

4          **THE COURT:**  YES, I AGREE.

5          **MS. LUEDTKE:**  YOUR HONOR, HE HAS TESTIFIED ABOUT THE

6     ABILITY TO ASK A QUESTION ABOUT NAMES AND LIKENESSES AND THE

7     IMPACT ON CONSUMER DEMAND.  HE'S TALKED ABOUT OTHER POLLS, AND

8     THIS IS A POLL THAT GOES DIRECTLY TO THAT TESTIMONY.

9        IF YOU'D ALLOW ME TO ASK THE NEXT QUESTION, I THINK I'LL

10    BE ABLE TO SHOW YOU THE RELEVANCE.

11         **THE COURT:**  OKAY.

12         **MS. STEINER:**  I'M SORRY.  OBJECTION, YOUR HONOR.

13    THERE'S NO FOUNDATION --

14         **THE COURT:**  I --

15         **MS. STEINER:**  -- FOR THE POLL OR --

16         **THE COURT:**  I'LL HEAR IT AND STRIKE IT IF I DON'T

17    THINK IT'S OF USE.

18         **MS. STEINER:**  THANK YOU.

19    **BY MS. LUEDTKE:**

20    **Q.**  ALL RIGHT.  IF YOU SEE THIS PARAGRAPH HERE, IT SAYS,

21    "THERE IS NO STRONGER COLLEGE FOOTBALL FAN BASE THAN RIGHT

22    HERE IN ALABAMA."

23        DO YOU SEE THAT?

24    **A.**  YES.

25    **Q.**  AND IT GOES ON TO SAY, "SO WHAT ABOUT IT?  IF COLLEGE

1    FOOTBALL PLAYERS RECEIVED SOME FORM OF COMPENSATION" --

2            **THE COURT:**  YEAH, I CAN READ IT TO MYSELF.

3        WHAT DO YOU WANT TO KNOW?

4    **BY MS. LUEDTKE:**

5    **Q.**  YOU SEE THERE AT THE END, IT ASKS, WOULD YOU STOP ROOTING

6    FOR ALABAMA OR AUBURN IF, AND THEN IT HAS SOME NAMES,

7    "RECEIVED SOME OF THE PROCEEDS WHEN THEIR NAMES OR LIKENESSES

8    ARE USED COMMERCIALLY?"

9        IS THAT THE KIND OF QUESTION THAT YOU THOUGHT COULD BE

10   FORMULATED TO TEST THE IMPACT OF PAYMENT FOR NAME, IMAGE, AND

11   LIKENESS?

12   **A.**  NO.  THAT'S AN EMBARRASSINGLY JUNK-SCIENCE QUESTION.

13                    (LAUGHTER.)

14   **BY MS. LUEDTKE:**

15   **Q.**  DOES THIS QUESTION ASK ABOUT PAYMENT FOR NAME OR LIKENESS

16   AS OPPOSED TO SALARY?

17   **A.**  I MEAN, IT DOES IN A VERY VAGUE AND LEADING AND VERY

18   UNRELIABLE WAY.

19   **Q.**  IN WHICH WAY DOES THIS QUESTION LEAD?

20           **THE COURT:**  I REALLY DON'T THINK IT'S APPROPRIATE TO

21   THROW UP THINGS HE'S NEVER SEEN AND HAVE US LISTEN TO HIS

22   FIRST RESPONSE ON IT.

23          **MS. LUEDTKE:**  CAN I PUT UP THE RESULTS TO SEE IF THEY

24   CHANGE HIS OPINION ABOUT --

25           **THE COURT:**  NO.

1          **MS. LUEDTKE:**  I CANNOT PUT UP THE RESULTS?

2          **THE COURT:**  NO.

3          **MS. LUEDTKE:**  ALL RIGHT.  LET'S BRING UP EXHIBIT

4     4064.

5                    (EXHIBIT PUBLISHED.)

6     **BY MS. LUEDTKE:**

7     **Q.**  YOU HEARD DR. DENNIS'S TESTIMONY EARLIER TODAY, DID YOU

8     NOT?

9     **A.**  YES.

10    **Q.**  AND YOU SAW THIS SLIDE SUMMARIZING OTHER POLLS THAT HAVE

11    BEEN CONDUCTED RELATED TO PAYMENT OF STUDENT ATHLETES,

12    CORRECT?

13    **A.**  YES.

14    **Q.**  YOUR COUNSEL ASKED YOU ABOUT THAT?

15    **A.**  I'M NOT SURE, BUT I -- I THINK SO.

16    **Q.**  AND HAVE YOU DONE ANYTHING TO TEST WHETHER OR NOT THE

17    QUESTIONS IN THESE POLLS WERE RELIABLE?

18    **A.**  I HAVEN'T DONE ANY INDEPENDENT TESTS IF THAT'S WHAT YOU

19    MEAN.

20          **MS. LUEDTKE:**  ALL RIGHT.  I HAVE NO FURTHER QUESTIONS

21    FOR THIS WITNESS.

22          **MS. STEINER:**  NOTHING FURTHER.

23          **THE COURT:**  ALL RIGHT.  YOU'RE EXCUSED.  YOU MAY STEP

24    DOWN.  THANK YOU.

25          **THE WITNESS:**  THANK YOU.

1          **THE COURT:**  I DO NEED TO LEAVE FAIRLY SHORTLY, BUT I

2     GUESS YOU CAN CALL YOUR NEXT WITNESS FOR A FEW MINUTES.

3          **MR. SINGLA:**  YOUR HONOR, THE NCAA CALLS DR. LAUREN

4     STIROH.

5        AND WE COULD, IF THE COURT WANTS, GET STARTED, OR WE COULD

6     JUST START AT THE –– AFTER THE BREAK.

7          **THE COURT:**  NO, I GUESS WE CAN GET STARTED.

8          **MR. SINGLA:**  THANK YOU, YOUR HONOR.

9          **THE CLERK:**  IF YOU COME UP TO THE WITNESS STAND AND

10    RAISE YOUR RIGHT HAND FOR ME, PLEASE.

11                        **LAUREN STIROH**,

12    CALLED AS A WITNESS FOR THE DEFENDANTS, HAVING BEEN DULY

13    SWORN, TESTIFIED AS FOLLOWS:

14         **THE CLERK:**  PLEASE BE SEATED, AND ONCE SEATED, I'D

15    ASK YOU THAT YOU PLEASE STATE AND SPELL YOUR FIRST AND LAST

16    NAME FOR THE RECORD, PLEASE.

17         **THE WITNESS:**  MY NAME IS LAUREN STIROH.  THE FIRST

18    NAME IS L-A-U-R-E-N.  LAST NAME S-T-I-R-O-H.

19         **THE CLERK:**  THANK YOU.

20                     **DIRECT EXAMINATION**

21    BY MR. SINGLA:

22    **Q.**  DR. STIROH, CAN YOU SUMMARIZE YOUR EDUCATIONAL

23    QUALIFICATIONS?

24    **A.**  YES.  I HAVE A PH.D. IN ECONOMICS FROM HARVARD UNIVERSITY

25    THAT I OBTAINED IN 1996.

STIROH – DIRECT / SINGLA

1    **Q.** AND WHAT HAS BEEN THE FOCUS OF YOUR ECONOMICS WORK SINCE

2    1996?

3    **A.** SINCE LEAVING HARVARD, I HAVE FOCUSED ON THE ECONOMICS OF

4    ANTITRUST AND INTELLECTUAL PROPERTY.

5    **Q.** AND WHAT KINDS OF INDUSTRIES HAVE YOU ANALYZED IN YOUR

6    ANTITRUST OR INTELLECTUAL PROPERTY ECONOMICS WORK?

7    **A.** I'VE ANALYZED ANTITRUST AND INTELLECTUAL PROPERTY IN A

8    RANGE OF INDUSTRIES, INCLUDING THINGS LIKE INDUSTRIAL

9    CHEMICALS, PHARMACEUTICALS, MEDICAL DEVICES, MAGAZINES,

10   ADVERTISING AND PROMOTION -- JUST ESSENTIALLY ANYTHING THAT IS

11   THE INDUSTRY IN A CASE THAT I'M WORKING ON THAT HAS ANTITRUST

12   OR INTELLECTUAL PROPERTY ISSUES.

13   **Q.** IN APPROXIMATELY HOW MANY CASES HAVE YOU BEEN QUALIFIED AS

14   AN EXPERT IN ANTITRUST OR INTELLECTUAL PROPERTY ECONOMICS AT

15   TRIAL?

16   **A.** I'D SAY ABOUT A DOZEN TIMES.

17   **Q.** NOW, DO YOU HAVE EXPERIENCE WORKING IN THE ECONOMICS OF

18   SPORTS?

19   **A.** I DO.  I HAVE WORKED ON CASES INVOLVING SPORTS IN THE PAST

20   THAT HAD ANTITRUST OR INTELLECTUAL PROPERTY ISSUES.

21   **Q.** CAN YOU GIVE US SOME EXAMPLES?

22   **A.** YES.  I HAVE PREVIOUSLY WORKED FOR THE NCAA IN A CASE

23   INVOLVING BASKETBALL TOURNAMENTS.  I HAVE WORKED FOR NASCAR IN

24   A CASE INVOLVING CAR RACING AND RACETRACKS, AND I'VE WORKED

25   FOR -- ON A CASE FOR THE NFL INVOLVING THE ECONOMICS OF

1    STADIUMS.

2    **Q.**  NOW, DO YOU CONSIDER THE SUBJECT MATTER OF THE OPINIONS

3    YOU'RE GOING TO TESTIFY ABOUT TODAY AS RELATING PRIMARILY TO

4    THE ECONOMICS OF SPORTS?

5    **A.**  NO.  THE OPINIONS THAT I AM TESTIFYING TO, IT'S THE

6    ECONOMICS OF ANTITRUST AND INTELLECTUAL PROPERTY APPLIED TO

7    SPORTS IN THIS CASE.  BUT MY OPINIONS ARE BASED ON ANTITRUST

8    ECONOMICS.

9    **Q.**  AND HOW DO INTELLECTUAL PROPERTY ECONOMICS RELATE TO THIS

10   CASE AND THE TESTIMONY YOU'RE GOING TO GIVE IN THIS CASE?

11   **A.**  SURE.  INTELLECTUAL PROPERTY ECONOMICS IS THE BUYING AND

12   SELLING OF LICENSES, OF INTELLECTUAL PROPERTY, ESSENTIALLY

13   THINGS THAT DON'T HAVE PHYSICAL PROPERTY, THINGS YOU CAN'T

14   HOLD IN YOUR HAND.  AND IN THIS CASE, WE'RE TALKING ABOUT

15   LICENSING OF NIL'S.  THAT IS INTELLECTUAL PROPERTY.

16        **MR. SINGLA:**  YOUR HONOR, WE'D LIKE TO QUALIFY

17   DR. STIROH AS AN EXPERT WITNESS IN ANTITRUST ECONOMICS AND THE

18   ECONOMICS OF INTELLECTUAL PROPERTY.  AND I BELIEVE THERE'S NO

19   OBJECTION FROM THE PLAINTIFFS.

20        **MR. ISAACSON:**  WE HAVE NO OBJECTION TO DR. STIROH

21   BEING HEARD.  WE'RE RESERVING ANY CHALLENGES TO HER

22   QUALIFICATIONS FOR CROSS-EXAMINATION AND POST-TRIAL BRIEF.

23        **THE COURT:**  ALL RIGHT.

24        **MR. SINGLA:**  CAN WE GET THE FIRST SLIDE?

25             (DEMONSTRATIVE PUBLISHED.)

1  **BY MR. SINGLA:**

2  **Q.**  SO, DR. STIROH, WHAT I'D LIKE TO DO IS TO HAVE YOU WALK

3  THE COURT THROUGH THE ANTITRUST CLAIMS HERE ONE BY ONE, AND

4  LET'S TALK ABOUT WHAT THE RELEVANT MARKETS ARE, WHAT THE

5  RESTRAINTS ARE THAT ARE ALLEGED, AND WHAT ARE THE ALLEGED

6  ANTICOMPETITIVE EFFECTS ONE BY ONE.

7       **THE COURT:**  YOU KNOW, I'D RATHER DO THAT ALL AT ONCE

8  RATHER THAN GET STARTED AND THEN HAVE TO BREAK AFTER TEN

9  MINUTES.  SO LET'S JUST BREAK AT THIS POINT, AND WE'LL COME

10  BACK PERHAPS AS EARLY AS QUARTER OF 2:00.

11       **MR. SINGLA:**  OKAY.  THANK YOU, YOUR HONOR.

12       **THE COURT:**  OKAY.

13     (RECESS TAKEN AT 11:43.M.; PROCEEDINGS RESUMED AT 1:47

14  P.M.)

15       **THE CLERK:**  REMAIN SEATED COME TO ORDER.  COURT IS

16  BACK IN SESSION.

17       **THE COURT:**  YOU MAY PROCEED.

18       **MS. LUEDTKE:**  YOUR HONOR, BEFORE WE PROCEED WITH THE

19  WITNESS, I WANTED TO ASK IF WE COULD MAKE A PROFFER OF THE

20  RESULTS OF THE POLL, EXHIBIT 3961, THAT I USED WITH MR. PORET.

21       **THE COURT:**  OKAY.

22       **MS. LUEDTKE:**  SO WE'LL SUBMIT IT AS EXHIBIT 3961.

23  I'LL GIVE OPPOSING COUNSEL A COPY.

24       **THE COURT:**  OKAY.

25       **MR. SINGLA:**  MAY I PROCEED, YOUR HONOR?

1     **THE COURT:**  PLEASE.

2          (DEMONSTRATIVE DISPLAYED.)

3     **BY MR. SINGLA:**

4     **Q.**  SO, DR. STIROH, AGAIN, I WANT TO TRY TO WALK THROUGH EACH

5     OF THESE ALLEGED MARKETS STEP BY STEP, ISSUE BY ISSUE.

6          SO LET'S START WITH WHAT THE PLAINTIFFS ARE CALLING --

7     DR. NOLL CALLS THE EDUCATION MARKET.  CAN YOU EXPLAIN WHAT IS

8     THE EDUCATION MARKET?

9     **A.**  YES.  AS DR. NOLL HAS DEFINED IT, IT IS WHAT I HAVE

10    DEPICTED HERE ON THIS SLIDE WHERE THE STUDENT IS BUYING AN

11    EDUCATION FROM COLLEGE.  THE COLLEGE IS SELLING THE EDUCATION

12    TO THE STUDENT.  THE TRANSACTION IS THE STUDENT PAYS TUITION

13    TO THE COLLEGE; THE COLLEGE GIVES AN EDUCATION TO THE STUDENT.

14          (DEMONSTRATIVE DISPLAYED.)

15    **BY MR. SINGLA:**

16    **Q.**  AND I HAVE SOME -- WE HAVE SOME TESTIMONY FROM DR. NOLL ON

17    THE SCREEN THERE.  IS THAT WHAT HE MEANS BY "HIGHER EDUCATION

18    SERVICES"?

19    **A.**  THAT IS WHAT HE MEANS BY "HIGHER EDUCATION SERVICES," AS

20    HE HAS DESCRIBED IT IN HIS REPORTS.

21          (DEMONSTRATIVE DISPLAYED.)

22    **BY MS. LUEDTKE:**

23    **Q.**  NOW, WHAT ABOUT WITH RESPECT TO THE STUDENT ATHLETES.

24    WHAT DOES THE EDUCATION MARKET LOOK LIKE WITH RESPECT TO

25    STUDENT ATHLETES?

1    **A.**   THE STUDENT -- THE MARKET LOOKS ESSENTIALLY THE SAME.  IT

2    IS NOW THE -- THE BUYERS ARE RESTRICTED TO ONLY STUDENT

3    ATHLETES IN BASKETBALL AND FOOTBALL.  THEY ARE BUYING AN

4    EDUCATION FROM THE SCHOOL.  THE SCHOOL IS GIVING THEM AN

5    EDUCATION.  HERE, YOU SEE INSTEAD OF TUITION, I HAVE A ZERO,

6    AND THAT IS TO REFLECT THE FACT THAT MOST OF THE STUDENT

7    ATHLETES AT ISSUE IN THIS CASE RECEIVE A GRANT IN AID, AND SO

8    THEY ARE PAYING A ZERO PRICE FOR THE EDUCATION THEY RECEIVE.

9    **Q.**   NOW, I NOTICE YOU'RE NOT TALKING ABOUT NIL'S WHEN YOU

10   YOU'RE DESCRIBING THIS EDUCATION MARKET.  WHY IS THAT?

11   **A.**   THE NIL'S ARE NOT PART OF THIS TRANSACTION.  WHEN THE

12   STUDENT IS BUYING AN EDUCATION AND THE COLLEGE IS SELLING AN

13   EDUCATION, THERE IS NOT A USE OF AN NIL IN THAT TRANSACTION.

14   **Q.**   NOW, IN THE -- WHEN WE'RE TALKING ABOUT NIL'S UNDER THE

15   PLAINTIFFS' THEORIES, WHO IS BUYING AND SELLING THE NIL'S?

16   **A.**   WHEN WE'RE TALKING ABOUT TRANSACTIONS USING NIL'S, THEN

17   THE STUDENTS WOULD BE SELLING THE NIL'S.  AND THE BUYERS ARE

18   PEOPLE THAT WANT TO USE THEM FOR A SPECIFIC PURPOSE.

19   **Q.**   NOW, UNDER THE PLAINTIFFS' THEORIES, COULD THE COLLEGES BE

20   ONE OF THE ENTITIES THAT IS BUYING THESE NIL'S?

21   **A.**   THE -- UNDER THE THEORIES, THEY COULD BE.  I DON'T THINK

22   THEY ARE IN ALL CASES, BUT CERTAINLY THEY COULD BE UNDER THEIR

23   THEORIES.

24   **Q.**   NOW, HOW DOES IT MATTER WHEN YOU'RE LOOKING AT THIS MARKET

25   IN TERMS OF WHETHER THE STUDENTS ARE BUYING AN EDUCATION OR

1  WHETHER THEY'RE SELLING THEIR NIL'S?

2  **A.**  IT MATTERS FROM AN ANTITRUST PERSPECTIVE HOW YOU ANALYZE

3  THE MARKET, WHETHER THE TRANSACTIONS AT ISSUE HAVE THE SCHOOL

4  OR THE NCAA AS BEING THE BUYER OR THE SELLER.

5      IN ONE CASE WHERE THEY ARE SELLING A PRODUCT, WE ARE

6  LOOKING AT THAT IN ANTITRUST TERMS AS IF IT -- IS IT A

7  MONOPOLY.  WHERE THEY ARE BUYING IN ANTITRUST TERMS, WE WOULD

8  LOOK AT IT AS IF IT WAS A MONOPSONY AND ANALYZE IT THAT WAY.

9          **THE COURT:**  I'M SORRY.  WE'RE LOOKING AT IT AS IF IT

10  IS A MONOPOLY?  OR AS IF ISN'T A MONOPOLY --

11          **THE WITNESS:**  YES.  I'LL TRY TO SAY IT MORE CLEARLY.

12      WHEN THE COLLEGES OR THE NCAA IS SELLING, THAT'S THE

13  MONOPOLY FRAMEWORK, WHEN THEY ARE SELLING SOMETHING.  WHEN

14  THEY ARE BUYING SOMETHING, THAT IS THE MONOPSONY FRAMEWORK.

15  **BY MR. SINGLA:**

16  **Q.**  NOW, DR. NOLL SAID ON THE STAND DURING THE TRIAL THAT ONE

17  CAN THINK OF THIS CASE IN TERMS OF MONOPOLY OR MONOPSONY

18  INTERCHANGEABLY.

19      DO YOU AGREE?

20  **A.**  I DISAGREE.

21          **MR. ISAACSON:**  YOUR HONOR, OBJECTION.  FIRST OF ALL,

22  OBVIOUSLY --

23          **THE COURT:**  I'M NOT SURE HE SAID THAT, BUT JUST SAY

24  IT WITHOUT THE "DR. NOLL" PART.

25          **MR. SINGLA:**  OKAY.

1    **Q.**  CAN YOU LOOK AT --

2            **THE COURT:**  I'M SORRY.  IS THAT WHAT WERE YOU

3    OBJECTING ABOUT?

4            **MR. ISAACSON:**  THAT WAS ONE PART.  BUT THE OTHER

5    IS -- THE FIRST LAST THING SHE SAID ABOUT MONOPSONY AND

6    MONOPOLY I DON'T THINK WAS CONTESTED.  BUT TO THE EXTENT THAT

7    SHE'S GOING TO START GIVING OPINIONS ABOUT MONOPSONY --

8    MONOPSONY VERSUS MONOPOLY MARKETS, THAT'S NOT SOMETHING

9    DISCUSSED IN HER REPORT.

10           **MR. SINGLA:**  YOUR HONOR, THE --

11           **THE COURT:**  WELL, I'M AFRAID IT'S MY FAULT, BECAUSE I

12   DID ASK DR. NOLL ABOUT MONOPSONY, AND HE DID TALK ABOUT IT, SO

13   I THINK IT WOULD ONLY BE FAIR TO HEAR A RESPONSE TO THAT.

14   **BY MR. SINGLA:**

15   **Q.**  SO DO YOU BELIEVE THAT THE CLAIMS CAN BE LOOKED AT WITH

16   RESPECT TO MONOPOLY OR MONOPSONY INTERCHANGEABLY?

17   **A.**  NOT INTERCHANGEABLY.  WHERE THERE'S A MARKET, WHERE THE

18   COLLEGE IS A BUYER, THAT IS A MONOPSONY MARKET.  WHERE THEY

19   ARE A SELLER, IT IS A MONOPOLY MARKET, AND YOU CAN'T

20   INTERCHANGE THE ANALYSES.  THEY ARE DIFFERENT ANALYSES WITH

21   DIFFERENT POTENTIAL COMPETITIVE EFFECTS.  AND SO YOU WOULD DO

22   THE APPROPRIATE ANALYSIS FOR THE APPROPRIATE MARKET

23   TRANSACTION.

24   **Q.**  NOW, DID DR. NOLL IN ALL OF HIS EXPERT REPORTS EVER

25   ANALYZE ANY OF THE CLAIMS HERE IN TERMS OF MONOPSONY?

1    **A.**  HE DID NOT.

2    **Q.**  DID HE MENTION "MONOPSONY" ANYWHERE IN HIS FOUR EXPERT

3    REPORTS?

4    **A.**  HE DID NOT.

5    **Q.**  OKAY.  SO WHAT IS THE DIFFERENCE AT A HIGH LEVEL BETWEEN

6    MONOPSONY AND MONOPOLY?

7    **A.**  SURE.  I'LL GIVE YOU THE VERY HIGH-LEVEL TEXTBOOK

8    DIFFERENCE.  THAT'S THE INTRODUCTORY ECONOMICS.

9        MONOPOLY IS A SINGLE SELLER WITH MANY BUYERS.  MONOPSONY,

10   A SINGLE BUYER WITH MANY SELLERS.  THEY SOUND SIMILAR.  THE

11   ECONOMIC ANALYSES ARE VERY DIFFERENT, AND THE COMPETITIVE

12   IMPLICATIONS ARE VERY DIFFERENT.

13   **Q.**  NOW, YOU SAID SINGLE BUYER OR SELLER, BUT HERE, WE'RE

14   TALKING ABOUT A GROUP OF COLLEGES.

15   **A.**  YES.

16   **Q.**  DOES THAT CHANGE THE ANALYSIS?

17   **A.**  IT DOESN'T.  YOU WOULD DO THE SAME TYPE OF ANALYSIS WHERE

18   YOU WOULD TREAT ALL OF THE SELLERS TOGETHER AS A POTENTIAL

19   MONOPOLIST OR YOU WOULD TREAT ALL OF THE BUYERS TOGETHER AS A

20   POTENTIAL MONOPSONIST.

21   **Q.**  NOW, CAN YOU GIVE US AN EXAMPLE OF WHAT WOULD BE A

22   MONOPOLY, JUST A HYPOTHETICAL EXAMPLE?

23   **A.**  YES.  JUST PURELY MADE UP, A HYPOTHETICAL EXAMPLE OF

24   MONOPOLY, IF WE THINK ABOUT CAR MANUFACTURERS GETTING TOGETHER

25   AND DECIDING THEY ARE GOING TO SELL FEWER CARS AND DRIVE THE

1    PRICE OF CARS UP TO AUTOMOBILE CONSUMERS, THAT'S WHAT WE THINK

2    OF WITH MONOPOLY, A GROUP OF FIRMS GETTING TOGETHER,

3    RESTRICTING OUTPUT, DRIVING UP PRICE.

4    **Q.**  AND WHAT IS THE ANTICOMPETITIVE CONCERN WITH MONOPOLY

5    WHERE YOU HAVE SOMEONE TRYING TO RAISE THE PRICE OF SOMETHING

6    THEY'RE SELLING?

7    **A.**  IT IS VERY STRAIGHTFORWARD, AND IT IS CONSISTENT

8    EVERYWHERE.  THE ANTICOMPETITIVE CONCERN WITH MONOPOLY IS A

9    REDUCTION IN OUTPUT AND AN INCREASE IN PRICE.

10   **Q.**  NOW, WHAT ABOUT MONOPSONY?  CAN YOU GIVE US A -- A

11   HYPOTHETICAL EXAMPLE OF WHAT WOULD BE A MONOPSONY?

12   **A.**  YES.  STAYING WITH THE SAME TYPE OF EXAMPLE, IMAGINE NOW

13   WE HAVE A GROUP OF AUTOMOBILE MANUFACTURERS WHO GET TOGETHER

14   TO TRY TO NEGOTIATE BETTER PRICES FOR ONE OF THEIR INPUTS.  SO

15   STEEL, FOR EXAMPLE.

16       IF A GROUP OF AUTOMOBILE MANUFACTURERS GET TOGETHER TO

17   NEGOTIATE SOME SORT OF A BUYER'S UNION TO BUY STEEL AT A

18   BETTER PRICE TO LOWER THEIR COSTS, THAT'S THE TYPE OF THING

19   THAT WE LOOK AT IN MONOPSONY MARKETS, WHETHER THERE CAN BE A

20   REDUCTION IN AN INPUT PRICE BECAUSE OF A LARGE BUYER.

21   **Q.**  AND WHAT IS THE ANTICOMPETITIVE CONCERN WITH MONOPSONY?

22   **A.**  AT THE OUTSET, THERE ISN'T AN ANTICOMPETITIVE CONCERN ON

23   ASSUMPTION OR PRESUMPTION.  THE ACTIVITY IS LOWERING COSTS.

24       ANTITRUST DOESN'T LOOK AT ACTIVITIES THAT REDUCE COSTS IN

25   THE SAME WAY THAT WE'D LOOK AT ACTIVITIES THAT INCREASE

STIROH – DIRECT / SINGLA

1   PRICES.  SO AT A -- THE VERY STARTING LEVEL, FINDING A

2   MONOPSONY, FINDING A REDUCTION IN PRICE DOESN'T NECESSARILY

3   GET US TO AN ANTICOMPETITIVE EFFECT.

4       THERE ARE OTHER ANALYSES THAT WOULD THEN FOLLOW ON ONCE

5   YOU'VE LOOKED AT YOUR MONOPSONY AND FOUND, IS THERE AN ACTION

6   THAT REDUCES THE INPUT PRICE.  NOW WE LOOK AT DOES THAT

7   ACTUALLY CAUSE A REDUCTION IN AN OUTPUT MARKET BUT THEN RAISES

8   PRICE IN THE OUTPUT MARKET SO THAT CONSUMERS ARE PAYING HIGHER

9   PRICES AS A RESULT OF WHAT THE MONOPSONIST DOES UPSTREAM.

10  Q.  WELL, LET'S BREAK THAT DOWN A SECOND.  SO LET'S GO TO OUR

11  CAR EXAMPLE.

12      SO IF A GROUP OF CAR COMPANIES TRY TO REDUCE THE PRICE

13  THAT THEY'RE PAYING FOR STEEL, WHEN WOULD THAT CAUSE -- UNDER

14  WHAT CONDITIONS WOULD THAT CAUSE ANTICOMPETITIVE CONCERN?

15  A.  IF, IN TRYING TO GET A BETTER PRICE FOR STEEL, THE CAR

16  COMPANIES ARE REDUCING HOW MUCH THEY BUY AND THEN REDUCING THE

17  NUMBER OF CARS THEY MANUFACTURE, THEY ARE THEN GOING TO SELL

18  FEWER CARS IN THE MARKET.  IF THAT LEADS TO AN OVERALL

19  REDUCTION IN MARKET CARS BEING SOLD, THEN WE'VE GOT A

20  POTENTIAL FOR A REDUCTION IN OUTPUT AND AN INCREASE IN PRICE

21  TO CONSUMERS OF CARS.

22      BUT IT STARTS WITH A REDUCTION IN COST, AND WE TYPICALLY

23  WOULD ENCOURAGE THINGS THAT REDUCE COSTS AS BENEFITING

24  CONSUMERS, SO THERE IS AT THE OUTSET A BIT OF A DISCONNECT

25  BETWEEN WHAT WILL HAPPEN IN THE OUTPUT MARKET AND WHAT WILL

1    HAPPEN IN THE INPUT MARKET, AND WE WON'T ASSUME AN

2    ANTICOMPETITIVE EFFECT.  WE WOULD LOOK TO SEE IF ALL OF THE

3    LINKS IN THE CHAIN ARE THERE.

4    **Q.**  SO I HEARD TWO CONDITIONS.  TELL ME IF THIS IS RIGHT.

5         SO IN A MONOPSONY SITUATION, THE FIRST CONDITION FOR THERE

6    TO BE AN ANTICOMPETITIVE EFFECT IS THAT THE BUYERS --

7              **THE COURT:**  ACTUALLY, IT WOULD BE MORE HELPFUL TO ME

8    IF YOU WOULD ASK HER TO SAY IT RATHER THAN YOU SAYING IT.

9              **MR. SINGLA:**  THANK YOU, YOUR HONOR.  OF COURSE.

10   **Q.**  SO I HEARD TWO CONDITIONS.  IS THAT RIGHT?

11   **A.**  YES.

12   **Q.**  SO CAN YOU EXPLAIN, WHAT IS THE FIRST CONDITION?

13   **A.**  I THINK IN THE ORDER THAT I PUT THEM IN, THE FIRST

14   CONDITION IS AN ABILITY TO AFFECT OUTPUT IN PRICES DOWNSTREAM,

15   AN ABILITY TO HAVE AN IMPACT ON CONSUMERS DOWNSTREAM.

16   **Q.**  SO IN YOUR CAR EXAMPLE, WHAT WOULD THAT BE?

17   **A.**  THAT WOULD BE THE ABILITY OF THESE CAR MANUFACTURERS THAT

18   ARE PART OF THE BUYERS' UNION TO, WHEN THEY REDUCE THE NUMBERS

19   OF CARS THEY MANUFACTURE, TO CAUSE THAT TO BE A REDUCTION

20   DOWNSTREAM.

21        WE CAN'T HAVE OTHER MANUFACTURERS SWOOPING IN AND JUST

22   FILLING THAT VOID.  THERE WOULD HAVE TO BE A REDUCTION

23   DOWNSTREAM.

24   **Q.**  AND WHAT'S THE SECOND CONDITION?

25   **A.**  THE SECOND CONDITION IS A -- I'D CALL IT AN ECONOMIC

1    CONDITION.  I WOULD SAY IN ECONOMIC TERMS FOR THE MONOPSONIST,

2    HE NEEDS TO FACE AN UPWARD SLOPING SUPPLY CURVE FOR THE INPUT.

3    **Q.**  WHAT DOES THAT MEAN?

4    **A.**  THAT MEANS THAT THE MONOPSONIST CAN GET A BETTER PRICE BY

5    RESTRICTING THE AMOUNT THAT HE'S BUYING.  IF HE BUYS LESS, THE

6    PRICE PER UNIT GOES DOWN, HE IS ABLE TO MAKE ALL OF HIS UNITS

7    AT A BETTER PRICE, ALL OF HIS PRODUCTION AT A BETTER PRICE.

8        IT'S NOT A CONDITION THAT HOLDS IN ALL MARKETS.  AND SO

9    THAT'S WHY IT'S SOMETHING THAT YOU WOULD LOOK AT IF YOU ARE

10   LOOKING AT A MARKET WHERE YOU THINK THERE IS BUYER POWER, DOES

11   THE BUYER HAVE AN UPWARD SLOPING SUPPLY CURVE SO THAT THEY

12   EVEN HAVE A REASON TO TRY TO RESTRICT OUTPUT AND GET A BETTER

13   PRICE THAT THEN MAYBE WOULD LEAD DOWNSTREAM TO ANOTHER

14   RESTRICTION IN OUTPUT AND AN INCREASE IN PRICE.

15   **Q.**  SO FOR THE SECOND CONDITION, IS IT CRITICAL THAT THE

16   SUPPLY OF THE INPUT, LIKE THE STEEL, BE REDUCED, THE AMOUNT OF

17   STEEL?

18   **A.**  FOR THAT CONDITION, YES, FOR THE UPWARD SLOPING SUPPLY

19   CURVE, YOU REDUCE THE AMOUNT OF STEEL, YOU REDUCE THE PRICE

20   YOU PAY FOR IT.

21   **Q.**  OKAY.  NOW, LET'S TURN TO THIS CASE.  APPLYING THE

22   MONOPOLY VERSUS MONOPSONY ANALYSIS IN THIS CASE, IF YOU LOOK

23   AT THE ALLEGED RESTRAINT ON THE PRICE PAID TO STUDENT ATHLETES

24   FOR THEIR NIL, WOULD YOU ANALYZE THAT IN TERMS OF MONOPSONY OR

25   MONOPOLY?

1    **A.**   IF YOU ARE LOOKING AT A SITUATION WHERE THE MANY STUDENTS

2    ARE SELLING AN NIL TO -- CALL THE NCAA A SINGLE BUYER FOR

3    THESE PURPOSES, THAT'S A MONOPSONY SITUATION.  WE'RE LOOKING

4    AT, DOES THE BUYER HAVE SOME KIND OF POWER.

5    **Q.**   OKAY.  I WANT TO SHOW YOU SOME -- WHAT DR. NOLL SAID IN

6    THE WHITE CASE.

7                        (DEMONSTRATIVE PUBLISHED.)

8    **BY MR. SINGLA:**

9    **Q.**   SO WHAT HE SAID IS IN THAT CASE, IS THAT THE PROPER

10   ECONOMIC --

11          **MR. ISAACSON:**  OBJECTION, YOUR HONOR.  THIS IS NOT A

12   DISCUSSION THAT'S GONE ON IN HER REPORTS.

13          **THE COURT:**  IF THAT'S TRUE, THE OBJECTION IS

14   SUSTAINED.

15          **MR. SINGLA:**  YOUR -- YOUR HONOR, THIS IS NOT A

16   DISCUSSION IN HER REPORTS; HOWEVER, I WOULD SAY THAT THE

17   PLAINTIFFS, AFTER THE COURT ASKED DR. NOLL ABOUT MONOPSONY --

18   THE PLAINTIFFS THEN PROCEEDED -- I CAN GIVE THE COURT PAGE

19   NUMBERS -- TO HAVE DR. NOLL TESTIFY BOTH THAT DAY AND THE NEXT

20   MORNING ON MONOPSONY.

21      AND MONOPSONY HAS NEVER BEEN ASSERTED OR ALLEGED IN THIS

22   CASE, AND WE ARE VERY CONCERNED THAT THE PLAINTIFFS ARE NOW

23   CHANGING THEIR THEORIES AT TRIAL.

24          **THE COURT:**  IT WAS I WHO ASKED ABOUT MONOPSONY AND --

25          **MR. SINGLA:**  I UNDERSTAND THAT, YOUR HONOR, BUT

1  THEREAFTER, PLAINTIFFS' COUNSEL PROCEEDED TO ASK DR. NOLL A

2  SERIES OF QUESTIONS TO LAY THE GROUNDWORK FOR ASSERTING THAT

3  THERE WAS SOME MONOPSONY HERE, THE NEXT MORNING --

4          **THE COURT:**  I'M NOT SURE THAT'S TRUE.

5          **MR. SINGLA:**  WELL, I'M HAPPY TO PUT THE TRANSCRIPT UP

6  AND TO TAKE A LOOK, BUT THE PLAINTIFFS DID THE NEXT MORNING

7  AGAIN THEN HAVE DR. NOLL TESTIFY TO MORE QUESTIONS AND ANSWERS

8  ABOUT MONOPSONY.

9      SO IN FAIRNESS, WE HAVE TO BE ABLE TO RESPOND.

10         **THE COURT:**  WELL, AND HOW IS TELLING HER SOMETHING

11  THAT DR. NOLL SAID BEFORE RESPONDING?  WHY NOT JUST HAVE HER

12  RESPOND AND SAY WHAT WAS WRONG WITH WHATEVER IT WAS THAT

13  PROFESSOR NOLL SAID THAT WAS WRONG.

14         **MR. SINGLA:**  THAT'S FINE, YOUR HONOR.  I CAN DO THAT.

15         **THE COURT:**  OKAY.

16  **Q.**  SO IF THIS IS A CASE OF MONOPSONY, IF YOU'RE LOOKING AT

17  THE ACQUISITION OF STUDENT ATHLETE NIL'S, THEN DO YOU HAVE TO

18  LOOK AT THE DOWNSTREAM MARKETS?

19  **A.**  YOU DO.  YOU WOULD ANALYZE IT AS MONOPSONY AND LOOK FIRST,

20  CAN THE MONOPSONIST REDUCE PRICE BY REDUCING QUANTITY

21  UPSTREAM, AND DOES THAT TRANSLATE INTO A REDUCTION IN OUTPUT

22  AND A REDUCTION IN QUANTITY AND INCREASE IN PRICE DOWNSTREAM.

23  **Q.**  NOW --

24         **THE COURT:**  AND WHY DOES ONE HAVE TO DO THAT?

25         **THE WITNESS:**  IT'S THE --

1          **THE COURT:** YOU'RE SAYING ONE HAS TO DO IT. WHY DOES

2     ONE HAVE TO DO IT?

3          **THE WITNESS:** IN AN ANTITRUST CASE TO GET TO

4     ANTICOMPETITIVE OUTCOMES, YOU NEED A REDUCTION IN OUTPUT FOR

5     CONSUMERS. IT'S THE -- THAT REDUCTION IN OUTPUT THAT

6     CONSUMERS ARE BUYING WITH THEIR ATTENDANT HIGHER PRICE.

7        AND IN MONOPSONY, WHEN THE EFFECT IS TO LOWER COSTS, YOU

8     DON'T NECESSARILY HAVE AN ANTICOMPETITIVE EFFECT DOWNSTREAM.

9          **THE COURT:** AND THAT'S THE ONLY ONE THAT EXISTS, THE

10    ONLY ONE THAT POSSIBLY COULD EXIST?

11         **THE WITNESS:** I DON'T KNOW WHAT YOU MEAN BY "THE ONLY

12    ONE."

13         **THE COURT:** WELL, YOU'RE MENTIONING ONE

14    ANTICOMPETITIVE RESULT THAT COULD ARISE OUT OF A MONOPSONY.

15    AND I'M ASKING WHETHER THAT'S THE ONLY POSSIBLE

16    ANTICOMPETITIVE RESULT THAT COULD ARISE OR IF THERE PERHAPS

17    MIGHT BE OTHER ANTICOMPETITIVE RESULTS --

18         **THE WITNESS:** I SEE.

19         **THE COURT:** -- THAT COULD ARISE FROM A MONOPSONY.

20         **THE WITNESS:** NO. THE WAY THAT I'VE SAID IT AS BEING

21    THE REDUCTION IN OUTPUT, INCREASE IN PRICE, THAT IS THE

22    ANTICOMPETITIVE EFFECT. THAT IS THE OVERARCHING

23    ANTICOMPETITIVE EFFECT.

24         **THE COURT:** AND THAT'S THE ONLY ONE THAT'S ALLOWABLE

25    UNDER THE LAW. IS THAT WHAT --

1          **THE WITNESS:**  I CAN'T BE THE ONE THAT TESTIFIES UNDER

2     THE LAW.  THAT IS MY UNDERSTANDING.  AND AS AN ECONOMIST, THAT

3     THE ANTICOMPETITIVE ECONOMIC EFFECT.

4          **THE COURT:**  OKAY.

5     **BY MR. SINGLA:**

6     **Q.**  NOW, HAVE THE PLAINTIFFS OR THE PLAINTIFFS' EXPERTS

7     SUGGESTED THAT PAYING ATHLETES MORE FOR THEIR NIL'S WILL CAUSE

8     THE NUMBER OF NCAA ATHLETES TO INCREASE?

9     **A.**  NO, THEY HAVEN'T.  THAT IS, SAYING THAT IF THERE WAS A

10    HIGHER PAYMENT FOR NIL'S IN AN UPSTREAM MARKET, THAT DOESN'T

11    NECESSARILY LEAD US TO ANY MORE OUTPUT.

12         IT'S THE FLIP SIDE OF WHAT I JUST SAID, THAT HAVING A TOO

13    LOW A PAYMENT THAT, AS IS ALLEGED, DOESN'T LEAD US TO A

14    REDUCTION IN OUTPUT.

15    **Q.**  HAVE THE PLAINTIFFS, THEIR EXPERTS, SUGGESTED THAT NOT

16    PAYING ATHLETES FOR THEIR NIL'S HAS REDUCED THE NUMBER OF

17    TEAMS OR THE AMOUNT OF COMPETITION IN THE NCAA?

18    **A.**  THEY HAVE NOT.  THEY HAVE NOT SUGGESTED ANY OUTPUT EFFECT

19    FROM PAYING N-I -- FROM PAYING STUDENT ATHLETES TOO LOW A

20    PRICE FOR THEIR NIL'S.

21    **Q.**  HAVE THE PLAINTIFFS SUGGESTED THAT THE AMOUNT OF

22    BROADCASTS OR GAMES TELEVISED HAS BEEN DECREASED BECAUSE OF

23    ATHLETES ARE NOT BEING PAID FOR THEIR NIL'S?

24    **A.**  THEY HAVE NOT.

25    **Q.**  NOW, LET'S GO BACK TO THE EDUCATION MARKET.

1                    (DEMONSTRATIVE PUBLISHED.)

2    **BY MR. SINGLA:**

3    **Q.**  SO I WANT TO SHOW YOU WHAT DR. NOLL HAS SAID WITH RESPECT

4    TO THE EDUCATION MARKET.

5                    (DEMONSTRATIVE PUBLISHED.)

6    **BY MR. SINGLA:**

7    **Q.**  HE SAID IN HIS CLASS CERTIFICATION REPORT THAT THE

8    EDUCATION MARKET IS NOT THE MARKET OF THE ALLEGED COMPETITIVE

9    HARM.

10       NOW, AT THE TIME HE WROTE HIS CLASS CERTIFICATION REPORT,

11   WAS DR. NOLL TALKING ABOUT THE SAME ALLEGED MARKETS AND THE

12   SAME ALLEGED ANTICOMPETITIVE CONDUCT?

13   **A.**  YES.

14   **Q.**  AND --

15              **THE COURT:**  THE SAME AS WHAT?

16              **MR. SINGLA:**  THE SAME AS HE'S SPEAKING ABOUT TODAY --

17   HE SPOKE ABOUT AT THE TRIAL.

18   **Q.**  IS THAT RIGHT?

19   **A.**  YES, THAT'S CORRECT.

20   **Q.**  SO THE ANTICOMPETITIVE CONDUCT AND THE MARKETS BEING

21   ASSERTED BY DR. NOLL AT CLASS CERTIFICATION WERE THE SAME AS

22   WHAT HE TESTIFIED TO AT TRIAL?

23   **A.**  YES.

24   **Q.**  NOW, DO YOU BELIEVE THERE IS AN ANTICOMPETITIVE EFFECT IN

25   THE EDUCATION MARKETS?

1  **A.**  I DO NOT.

2  **Q.**  DO YOU BELIEVE THEY HAVE ALLEGED AN ANTICOMPETITIVE HARM

3  IN THE EDUCATION MARKETS?

4  **A.**  I DON'T THINK THEY HAVE.  I THINK THE ALLEGATION OF HARM

5  IS IN MARKETS THAT USE NIL'S.  THEY HAVEN'T ALLEGED AN

6  ANTICOMPETITIVE HARM IN THE EDUCATION MARKET WHERE EDUCATION

7  IS BEING BOUGHT AND SOLD.

8  **Q.**  SO HOW DOES THE EDUCATION MARKET THAT DR. NOLL TESTIFIED

9  ABOUT RELATE TO THE CLAIMS IN THIS CASE?

10  **A.**  I DON'T THINK IT DOES.  I DON'T THINK THERE'S AN –– A

11  NECESSARY INEXTRICABLY INTERTWINING OF THE TWO MARKETS OR THE

12  MANY MARKETS THAT HAVE BEEN ALLEGED.

13  THERE IS AN EDUCATION MARKET WHERE STUDENTS GET AN

14  EDUCATION.  THERE IS OR COULD BE MARKETS WHERE NIL'S ARE

15  TRADED.  THEY DON'T HAVE TO BE CONNECTED TO AN EDUCATION

16  MARKET.  AND SO THEY'RE –– WHERE THE ALLEGED RESTRICTION AT

17  ISSUE IS ON TRADING NIL'S AND PAYMENTS FOR NIL'S, THAT'S NOT A

18  RESTRICTION IN EDUCATION.

19  AND THERE ISN'T AN ALLEGATION OF TOO LITTLE EDUCATION OR

20  TOO FEW GAMES OR TOO FEW STUDENT ATHLETES THAT WOULD TELL US

21  THAT THERE IS AN IMPACT IN THE EDUCATION MARKET.

22  **Q.**  NOW, I WANT TO SHOW YOU SOME OF DR. NOLL'S TESTIMONY FROM

23  THE TRIAL.  WERE YOU HERE TO HEAR HIS TESTIMONY?

24  **A.**  I WAS.

25  (DEMONSTRATIVE DISPLAYED.)

STIROH – DIRECT / SINGLA

**BY MR. SINGLA:**

Q.   SO HE SAID THAT THE MARKETS OF THE HARMS THAT HE WAS

ASSERTING LIES IN THE LICENSING MARKETS.

     DO YOU AGREE WITH THAT?

A.   I DO.

Q.   SO LET'S TURN, THEN, TO THE LICENSING MARKETS, AND I'D

LIKE YOU TO AGAIN WALK US THROUGH THE LICENSING MARKETS ONE BY

ONE.

                    (DEMONSTRATIVE PUBLISHED.)

**BY MR. SINGLA:**

Q.   SO FIRST, LET'S TALK ABOUT VIDEO GAMES.  WHAT IS THE

STRUCTURE OF THE MARKET THAT DR. NOLL HAS ASSERTED WITH

RESPECT TO VIDEO GAME LICENSES?

A.   IT'S DEPICTED ON THIS SLIDE.  AND WHAT YOU SEE IS THAT THE

VIDEO GAME MANUFACTURER -- SO IT'S EA ON THIS SLIDE, IS THE

VIDEO GAME MANUFACTURER -- THEY WOULD BUY THE RIGHTS THAT THEY

NEED TO MANUFACTURE A VIDEO GAME.  THEY WOULD BUY THE NIL

RIGHTS FROM THE STUDENTS.  THEY WOULD BUY THE MARKS AND LOGOS

FROM THE SCHOOLS.  THEY WOULD USE THOSE RIGHTS TOGETHER TO

MANUFACTURE A GAME AND SELL TO IT CONSUMERS.

Q.   SO IN THIS MARKET, WHO ARE THE BUYERS AND WHO ARE THE

SELLERS?  LET'S JUST BE VERY CLEAR.

A.   OF NIL RIGHTS, THE BUYER IS EA.  THE SELLER IS THE -- IS

THE STUDENT ATHLETE.

Q.   NOW -- AND WHAT DO THE GREEN LINES REPRESENT THERE?

1    **A.**   THE GREEN LINES WOULD REPRESENT PAYMENTS FROM EA TO EITHER

2    THE STUDENT ATHLETE FOR THEIR NIL OR TO THE COLLEGES FOR THE

3    RIGHTS THEY'RE BUYING FROM THE COLLEGES.

4    **Q.**   AND WHAT DO THE BLUE LINES REPRESENT?

5    **A.**   BLUE LINES REPRESENT WHAT THE STUDENT ATHLETE OR THE

6    COLLEGES WOULD BE TRANSFERRING TO EA.  THEY WOULD BE GIVING

7    THEM RIGHTS THAT THEY COULD USE IN CONNECTION WITH THE GAME.

8    IT'S JUST TO ILLUSTRATE THERE IS A TRANSACTION ON BOTH SIDES.

9    **Q.**   NOW, HOW DO YOU KNOW --

10          **THE COURT:**  -- ALSO SAY, COULDN'T YOU, THAT THE

11   STUDENTS SELL THEIR NIL TO THE COLLEGE OR TRANSFER THEIR NIL

12   IN SOME TRANSACTION TO THE COLLEGE, AND THEN THE COLLEGE

13   TRANSFERS BOTH ASPECTS TO EA?

14      WOULDN'T THAT BE ANOTHER WAY OF LOOKING AT IT?

15          **THE WITNESS:**  YES, ABSOLUTELY.  SO THIS IS ONE

16   DEPICTION, AND I THINK I'VE GOT IT BOTH WAYS AS WELL.  YOU

17   ACTUALLY SEE IT BOTH WAYS IN THE MARKETS WHERE PROFESSIONAL

18   ATHLETES SELL THEIR NIL'S TO VIDEO GAME MANUFACTURERS.

19      IT DOESN'T ACTUALLY CHANGE THE OUTCOME.  IT CAN MAKE SENSE

20   TO BUNDLE ALL OF THE RIGHTS TOGETHER AND HAVE THEM SOLD BY ONE

21   ENTITY.  OR THEY COULD BE SOLD SEPARATELY.

22      I THINK FOR VIDEO GAME MANUFACTURING, THERE ISN'T AN

23   ALLEGATION THAT THE COLLEGE HAS SOLD THOSE RIGHTS, THAT

24   THEY -- OR AT LEAST GOING FORWARD, IT IS THAT THE EA NEEDS

25   BOTH SETS OF RIGHTS, AND THEN COULD -- COULD MOVE FORWARD AND

1    MAKE A GAME.  BUT WHETHER THEY OBTAIN BOTH SETS OF RIGHTS FROM

2    A SINGLE PARTY OR FROM MANY PARTIES OR TWO PARTIES, THAT IT

3    DOESN'T MAKE A DIFFERENCE TO THE ANALYSIS HERE.

4    **BY MR. SINGLA:**

5    **Q.**  NOW, IF WE LOOK AT IT THIS WAY, THE WAY THE COURT JUST

6    SUGGESTED, WHERE THE STUDENT ATHLETES ARE ASSIGNING THEIR

7    RIGHTS TO THE COLLEGE AND THEN THE COLLEGE SELLS THEM TO EA,

8    WHO IS THE BUYER AND WHO IS SELLER OF THE STUDENT ATHLETES'

9    NIL RIGHTS?

10   **A.**  IN THAT CASE, THE COLLEGE WOULD BE THE BUYER OF THE

11   STUDENT ATHLETE'S NIL RIGHTS, AND IT WOULD THEN TURN AROUND

12   AND TELL THEM AGAIN TO EA.

13   **Q.**  AND HOW DO YOU KNOW THAT THERE IS A MARKET FOR ATHLETES TO

14   SELL THEIR NIL'S FOR USE IN VIDEO GAMES?

15   **A.**  WE SEE TRANSACTIONS.  SO WE DON'T SEE THESE TRANSACTIONS

16   THAT ARE ON THE SCREEN RIGHT NOW.  BUT IN THE RECORD -- AND I

17   HAVE SOME EXAMPLES IN MY REPORTS -- WE SEE EXAMPLES OF EA

18   LICENSING EXACTLY THESE TYPES OF RIGHTS AND MANUFACTURING

19   VIDEO GAMES.

20       AND WE SEE -- WE'VE GOT THE EXAMPLES OF THE NFL AND THE

21   NBA LICENSING RIGHTS, AND THE LEAGUES' LICENSING RIGHTS TO EA

22   FOR THE MANUFACTURE OF VIDEO GAMES.

23       SO AS AN ECONOMIST, BECAUSE WE SEE THOSE TRANSACTIONS, WE

24   CAN SAY THAT THERE IS A MARKET FOR THOSE RIGHTS.

25   **Q.**  NOW, WHAT IS THE ALLEGED RESTRAINT?  AGAIN, I JUST WANT TO

1    GO STEP BY STEP.  WHAT IS THE ALLEGED RESTRAINT WITH RESPECT

2    TO VIDEO GAME LICENSES?

3    **A.**   THE –– THE RESTRAINT THAT'S AT ISSUE HERE IS THE

4    PROHIBITION ON STUDENT ATHLETES LICENSING THEIR NIL'S TO A

5    THIRD PARTY OR ESSENTIALLY, AS IT –– IN THE CHAIN OF EVENTS

6    HERE, LICENSING THEM FOR THE COLLEGES TO LICENSE TO A THIRD

7    PARTY SUCH THAT THE STUDENTS WOULD RECEIVE PAYMENT FOR THEM.

8    **Q.**   AND HAS DR. NOLL, IN YOUR OPINION, PROVEN A RELEVANT

9    MARKET FOR VIDEO GAME LICENSES?

10   **A.**   HE HASN'T.  I DON'T THINK HE HAS ATTEMPTED TO OR TRIED TO.

11   THE –– THERE COULD BE A MARKET WHERE STUDENTS SELL THEIR NIL'S

12   TO EA COLLECTIVELY WITH THE COLLEGE NIL'S.

13       THE FACT THAT THEY COULD SELL THEIR NIL'S TO THE COLLEGE

14   DOESN'T MEAN THERE'S A RELEVANT MARKET JUST FOR NCAA STUDENT

15   ATHLETE NIL'S.  YOU NEED TO LOOK AT WHAT ARE THE OPTIONS TO

16   THE BUYER.

17       SO IN THIS CASE, IT'S –– EA IS THE BUYER OF NIL RIGHTS.

18   TO SAY WHAT IS THE RELEVANT MARKET?  WE CONSIDER WHAT THEIR

19   OPTIONS ARE, WHAT ARE ALL OF THE TYPES OF NIL RIGHTS THAT THEY

20   COULD BUY, WHAT ARE THE OTHER INPUTS THAT THEY COULD USE TO

21   MAKE VIDEO GAMES THAT CONSUMERS WANT TO BUY.

22                    (DEMONSTRATIVE DISPLAYED.)

23   **BY MR. SINGLA:**

24   **Q.**   SO I WANT TO SHOW YOU SOME TESTIMONY FROM DR. NOLL

25   TODAY –– EARLIER IN THE TRIAL, WHERE HE SAID THAT HE HAD NOT

STIROH – DIRECT / SINGLA

1   DONE ANY ANALYSIS AS TO THE MARKET FOR VIDEO GAMES OR THE

2   INTELLECTUAL PROPERTY NEEDED TO MAKE VIDEO GAMES.

3       IS THAT WHAT YOU'RE TALKING ABOUT WHEN YOU SAY THAT

4   DR. NOLL HAS NOT DONE ANY ANALYSIS?

5   **A.**  HE DID NOT DO AN ANALYSIS, AND HE AGREES HE HAS NOT DONE

6   AN ANALYSIS OF WHAT THE OPTIONS ARE FOR VIDEO GAME

7   MANUFACTURERS, SO HE DOESN'T HAVE A RELEVANT MARKET DEFINITION

8   FOR THE MARKET IN WHICH NCAA STUDENT ATHLETE NIL'S WOULD BE

9   SOLD TO VIDEO GAME MANUFACTURERS.

10  **Q.**  AND THAT WAS PAGE 322, LINES 2 TO 6 OF THE TRANSCRIPT,

11  TRIAL TRANSCRIPT.

12      NOW, SO WHAT WOULD YOU WANT TO DO TO ANALYZE WHETHER THERE

13  IS ACTUALLY A RELEVANT ANTITRUST MARKET WITH RESPECT TO VIDEO

14  GAME LICENSES?

15  **A.**  YOU WOULD LOOK AT WHAT ARE THE CONTOURS OF THAT MARKET,

16  THAT SAYS WHAT -- WHAT ELSE COMPETES IN THE MARKET WITH

17  CURRENT STUDENT ATHLETE NIL'S.

18      YOU WANT TO LOOK AT WHAT THE OPTIONS ARE TO ELECTRONIC

19  ARTS OR ANOTHER VIDEO GAME MANUFACTURER, WHAT ELSE COULD THEY

20  DO TO SELL GAMES TO COLLEGES (SIC) TO SEE IF CURRENT --

21          **THE COURT:**  COLLEGES?

22          **THE WITNESS:**  SORRY.  THANK YOU.  I MISSPOKE.

23      -- TO CONSUMERS TO SEE IF THERE IS A MEANINGFUL

24  COMPETITIVE RESTRAINT ON CURRENT STUDENT ATHLETES SELLING

25  THEIR NIL'S TO EA.

```
 1              (DEMONSTRATIVE PUBLISHED.)

 2    BY MR. SINGLA:

 3    Q.  SO WHAT IS YOUR VIEW AS TO WHETHER THE PLAINTIFFS HAVE

 4    PROVEN ANY ANTICOMPETITIVE EFFECTS WITH RESPECT TO VIDEO

 5    GAMES?

 6    A.  THEY HAVE NOT PROVEN ANTICOMPETITIVE EFFECTS WITH RESPECT

 7    TO VIDEO GAMES.  WHAT YOU SEE ON THIS SLIDE ARE JUST EXAMPLES

 8    OF OTHER GAMES.  WE KNOW THERE ARE MANY TYPES OF GAMES.  THERE

 9    ARE EVEN OTHER SPORTS GAMES.

10         THEY HAVEN'T LOOKED AT WHAT HAPPENS TO THE PRICE AND

11    OUTPUT IN A VIDEO GAME MARKET IF YOU WITHHOLD A GAME THAT HAS

12    STUDENT ATHLETE --

13              THE COURT:  WELL, BUT IF YOU'RE TALKING ABOUT A

14    MARKET FOR VIDEO GAMES OF COLLEGE FOOTBALL AND BASKETBALL,

15    THAT'S NOT GOING TO BE FILLED BY "JUST DANCE" OR --

16              THE WITNESS:  EXACTLY.

17              THE COURT:  -- ANYTHING ELSE.

18              THE WITNESS:  BUT YOUR QUESTION SAYS, IF THERE IS A

19    MARKET JUST FOR THOSE GAMES.  AND TO AN ANTITRUST ECONOMIST, A

20    MARKET MEANS THERE AREN'T SUBSTITUTES FOR THEM.  SO BEING

21    UNIQUE DOESN'T MAKE AT IT MARKET.

22         THE QUESTION THAT WE WANT TO SEE IS IF THERE -- WE TAKE

23    AWAY THIS OPTION TO HAVE STUDENT ATHLETE VIDEO GAMES.  DOES

24    THAT CAUSE PRICES TO GO UP OR DOWN, DOES IT -- WHAT HAPPENS

25    WHAT ARE THE COMPETITIVE INTERACTIONS?  DO CONSUMERS JUST
```

1    SUBSTITUTE FOR ANOTHER GAME?

2            **THE COURT:**  "JUST DANCE"?

3            **THE WITNESS:**  IT COULD BE.  I -- MAYBE NOT THE BEST

4    ONE.  THERE ARE OTHER SPORTS ONES AS WELL.  THAT'S JUST

5    ILLUSTRATING THAT THERE ARE A VARIETY OF THE OTHER THINGS, AND

6    CONSUMERS CAN BUY A VARIETY OF THE PRODUCTS.

7    **BY MR. SINGLA:**

8    **Q.**  SO FIRST DO YOU AGREE, THEN, THAT THEORETICALLY, THIS

9    COULD BE AN ANTICOMPETITIVE HARM TO CONSUMERS, THEORETICALLY,

10   IF NCAA SPORTS GAMES WERE NOT AVAILABLE TO CONSUMERS?

11   **A.**  YES, IN THEORY, THERE COULD BE.  THERE -- IT COULD BE A

12   MARKET FOR NCAA VIDEO GAMES THAT ISN'T COMPETITIVELY

13   CONSTRAINED BY THE OTHER OPTIONS.  NOBODY'S SUBSTITUTING "JUST

14   DANCE" FOR AN NCAA GAME.  THAT HASN'T BEEN SHOWN, AND THE

15   OTHER -- "JUST DANCE" ISN'T THE ONLY ONE THAT'S DEPICTED HERE.

16           **THE COURT:**  I WAS JUST TEASING.

17           **THE WITNESS:**  SURE.  BUT THE -- IT HASN'T BEEN SHOWN.

18   THERE IS A THEORY.  YES, WE'VE -- WE'VE TAKEN AWAY A CHOICE.

19   DOES THE CHOICE MATTER, IS THE QUESTION.  AND THERE HAS NOT

20   BEEN ANY SHOWING THAT THAT CHOICE MATTERS.  RESTRICTING A

21   CHOICE IS NOT THE SAME AS RESTRICTING OUTPUT.

22   **BY MR. SINGLA:**

23   **Q.**  SO IF TAKING, THE NCAA FOOTBALL AND BASKETBALL GAMES OFF

24   THE SHELF, RESULTS IN CONSUMERS JUST REPLACING THAT WITH OTHER

25   SPORTS GAMES, LET'S SAY, AT THE SAME PRICE, THEN WOULD THERE

1    BE A MARKET OF -- ANTICOMPETITIVE MARKET IMPACT?

2    **A.**  IN THAT HYPOTHETICAL, NO, THAT WE -- IN THAT EXAMPLE.

3    THERE'S NO REDUCTION IN OUTPUT BECAUSE WE'VE TAKEN A TITLE OFF

4    THE SHELF.  THERE'S NO CHANGE IN PRICE BECAUSE ONE OF THE

5    SUBSTITUTES IS NO LONGER THERE.

6        WHAT THAT WOULD MEAN IS THIS POTENTIAL CHOICE IS NOT

7    COMPETITIVELY IMPORTANT IN DRIVING PRICES AND OUTPUT.  IT IS

8    JUST AN OPTION THAT IS NOT AVAILABLE.

9    **Q.**  NOW, YOU REFERENCED --

10            **THE COURT:**  WHAT IF THERE WERE PEOPLE WHO DIDN'T WANT

11   TO BUY A "JUST DANCE" VIDEO AND REALLY WANTED TO BUY AN NCAA

12   COLLEGE FOOTBALL OR BASKETBALL VIDEO, AND THEY COULDN'T BUY

13   ONE BECAUSE IT WASN'T THERE.

14            **THE WITNESS:**  YEAH, SO THERE -- CONSUMERS THAT --

15   THIS IS THEIR TOP CHOICE.  THEY WANT NCAA SPORTS GAMES.  IT'S

16   A COMPETITIVE HARM IF THERE ARE ENOUGH OF THEM THAT THAT

17   DRIVES PRICE AND OUTPUT CONDITIONS.

18       THE FACT THAT THERE MAY BE A FEW CONSUMERS THAT THIS IS --

19   THAT WOULD PREFER NCAA GAMES OVER ALL OTHER OPTIONS ISN'T

20   ENOUGH.

21       THE -- THERE'S -- WHEN IT IS JUST A RESTRICTION IN CHOICE,

22   THERE MAY ALWAYS BE SOMEBODY THAT PREFERS THAT CHOICE, BUT IT

23   DOESN'T -- HAVING A FEW CONSUMERS PREFER THE CHOICE DOESN'T

24   MAKE IT -- THAT REDUCTION ANTICOMPETITIVE UNLESS IT ALSO HAS

25   THESE PRICE/QUANTITY EFFECTS ATTACHED TO IT.

STIROH – DIRECT / SINGLA

1          **THE COURT:**  DID YOU HEAR MR. LINZNER'S TESTIMONY?

2          **THE WITNESS:**  I DID NOT.

3          **THE COURT:**  OR READ IT.

4          **THE WITNESS:**  I DON'T THINK THAT I DID.  I DON'T

5    RECALL ON THIS.

6          **THE COURT:**  I'M SORRY.  I'M BACK A FEW STEPS EARLIER.

7    BACK TO YOUR ANALOGY WITH THE STEEL MANUFACTURERS SELLING

8    STEEL TO THE CAR COMPANIES.

9       LET'S SAY COUNTER-FACTUALLY THAT THE ONLY MARKET FOR STEEL

10   IS CARS.  NOBODY ELSE WANTS ANY STEEL EXCEPT CAR MANUFACTURERS

11   AND LET'S SAY THERE'S A BUNCH OF PEOPLE MAKING STEEL, AND

12   THAT'S ALL THEY CAN DO.  THEY GOT A LOT OF STEEL, AND THEY

13   DON'T HAVE ANYTHING ELSE TO DO WITH IT BUT SELL IT TO CAR

14   MANUFACTURERS AND ALL THE CAR MANUFACTURERS WORK TOGETHER, AND

15   THEY SAY LET'S ALL AGREE NOT TO PAY ANY MORE THAN $5 A TON FOR

16   STEEL.

17      IS THAT -- WHAT WOULD YOU CALL THAT?

18         **THE WITNESS:**  THEN YOU'VE GOT ALL THE CONDITIONS I

19   THINK THAT YOU NEED FOR AN ANTICOMPETITIVE EFFECT.

20         **THE COURT:**  OF A...?

21         **THE WITNESS:**  SORRY, WHAT?

22         **THE COURT:**  OF A...?

23         **THE WITNESS:**  OF A RESTRICTION --

24         **THE COURT:**  MONOPSONY.

25         **THE WITNESS:**  -- OF A MONOPSONY, THAT THE BUYERS

1    RESTRICT WHAT THEY WANT TO BUY.  THEY ARE ALSO IN THAT EXAMPLE

2    MONOPOLISTS, SO THERE IS AN ATTENDANT REDUCTION IN OUTPUT IN

3    THE DOWNSTREAM MARKET.

4         SO BY ASSUMPTION, WE'VE SAID THAT MONOPSONIST IS ALSO THE

5    MONOPOLIST, AND SO IF YOU REDUCED WHAT THE MONOPSONIST IS

6    PRODUCING, YOU'RE REDUCING THE MARKET OUTPUT.

7              **THE COURT:**  BUT WE'RE NOT.  WE'RE JUST -- IT'S JUST

8    GOING TO BE CHEAPER 'CAUSE WE'RE GETTING OUR STEEL SO CHEAP.

9    WE'RE GOING TO MAKE ALL THE CARS IN THE WORLD, BUT THEY'RE

10   GOING TO BE CHEAPER FOR THE CONSUMER BECAUSE WE'RE GETTING

11   CHEAP STEEL.

12             **THE WITNESS:**  WHICH IS WHY IT BECOMES CONFUSING WHEN

13   WHERE YOU ARE LOOKING AT A MONOPSONY AND IT'S REDUCING PRICE.

14   THE NATURAL INCLINATION IS TO THINK THAT'S GOT TO BE GOOD FOR

15   CONSUMERS.

16        BUT THE ONLY WAY THAT WE GO FROM MONOPSONY TO

17   ANTICOMPETITIVE EFFECTS IS IF WE REDUCE THE PRICE, THE

18   STEEL -- THE CAR MANUFACTURERS GET BETTER MARGINS ON THEIR

19   CARS, AND THEN IF THEY DON'T TRANSLATE THAT THROUGH TO

20   CONSUMERS, THEY DON'T PASS ANYTHING THROUGH TO CONSUMERS, YOU

21   CAN HAVE AN OUTPUT EFFECT AS WELL.

22   **BY MR. SINGLA:**

23   **Q.**  SO WITH THE COURT'S HYPOTHETICAL THAT THE COURT GAVE YOU,

24   THE COURT SAID "ALL THE CAR MANUFACTURERS."  RIGHT?

25   **A.**  YES.

1   **Q.** AND SO IF I'M UNDERSTANDING, WHAT THAT MEANS TO YOU IS

2   THAT IF IT'S ALL THE CAR MANUFACTURERS, THEN THEY ALSO HAVE A

3   MONOPOLY OVER THE SALE OF CARS?

4   **A.** YES.

5   **Q.** SO LET'S TALK THE COURT'S EXAMPLE AND JUST KIND OF WALK

6   THROUGH IT SO IF ALL THE CAR MANUFACTURERS GOT TOGETHER AND

7   TRIED TO SUPPRESS THE PRICE OF STEEL, WHAT WOULD HAPPEN?

8       WHAT WOULD HAPPEN TO THE OUTPUT OF THE STEEL AND THE

9   OUTPUT OF CARS?

10  **A.** AGAIN, IN THIS EXAMPLE, WHERE THERE'S –– THERE IS STEEL

11  JUST PRODUCED FOR CARS, SO THAT THEY ARE –– THEY'RE REDUCING

12  THE AMOUNT THAT THEY WANT TO BUY OF STEEL, YOU WOULD EXPECT

13  THE PRICE OF STEEL TO GO DOWN AS THE STEEL MANUFACTURERS ARE

14  COMPETING FOR NOW A FEWER AND FEWER NUMBER OF STEEL SALES.

15      **THE COURT:** WAIT. ARE YOU TALKING ABOUT THE

16  MONOPSONY SITUATION OR A FREE MARKET? I WAS POSITING THAT THE

17  PRICE OF STEEL IS GOING TO GO DOWN BECAUSE ALL THE CAR

18  MANUFACTURERS ARE GOING TO AGREE AMONG THEMSELVES THAT THAT'S

19  ALL THEY WANT TO PAY FOR STEEL.

20      **THE WITNESS:** YES. YES. I SAID IT THE OTHER WAY,

21  BUT IT'S EXACTLY THE SAME. IF THEY SET THE PRICE, THEN THE

22  STEEL MANUFACTURERS DON'T WANT TO SELL AS MUCH AND THE

23  AMOUNT ––

24      **THE COURT:** BUT THEY HAVE TO. THERE'S NOWHERE ELSE

25  TO SELL IT. THEY'VE GOT A BUNCH OF STEEL PILING UP IN THE

1    MINES OR WHEREVER STEEL PILES UP.  AND THEY NEED TO SELL IT.

2    THEY WANT TO SELL IT.  OTHERWISE, THEY'RE GOING TO HAVE TO

3    THROW IT AWAY OR STORE IT, SO THEY'RE GOING TO ESSENTIALLY

4    SELL IT FOR WHATEVER THEY CAN GET BECAUSE THEY HAVE TO.

5        AND THE CAR MANUFACTURERS ARE GOING TO SET THE PRICE THAT

6    THEY'LL PAY FOR IT, AND THEY'LL BUY AS MUCH AS THE MARKET WILL

7    BEAR.  THEY'LL SELL AS MANY CARS AS THEY CAN, BUY AS MUCH

8    STEEL TO SELL ALL THOSE CARS, AND THE CARS WILL BE CHEAPER

9    BECAUSE THE STEEL IS CHEAPER.

10       THE ONLY PERSON HURT IS THE STEEL MANUFACTURER.

11           **THE WITNESS:**  IT'S ENTIRELY --

12           **THE COURT:**  IS THAT OKAY?

13           **THE WITNESS:**  -- POSSIBLE --

14           **THE COURT:**  IS THAT OKAY?

15           **THE WITNESS:**  THEN IT IS NOT ANTICOMPETITIVE.

16           **THE COURT:**  THAT'S NOT ANTICOMPETITIVE?

17           **THE WITNESS:**  NO.  IF YOU HAVE NEGOTIATED A BETTER

18   PRICE FOR STEEL --

19           **THE COURT:**  NO, NO.  YOU DIDN'T NEGOTIATE IT.  YOU

20   DIDN'T NEGOTIATE.

21           **THE WITNESS:**  OKAY.

22           **THE COURT:**  YOU AGREED AMONGST ALL THE CAR

23   MANUFACTURERS THAT THAT'S HOW MUCH YOU WOULD ALL PAY.

24           **THE WITNESS:**  I SEE WHAT --

25           **THE COURT:**  TAKE-IT-OR-LEAVE-IT DEAL TO THE STEEL

STIROH – DIRECT / SINGLA

1      GUYS.  WE'RE PAYING $5 A TON, PERIOD, TAKE IT OR LEAVE IT.

2            THE WITNESS:  YES.

3            THE COURT:  THEY ALL HAVE TO TAKE IT 'CAUSE THEY

4      DON'T HAVE ANYWHERE ELSE TO SEND THEIR STEEL.

5            THE WITNESS:  I SEE.

6            THE COURT:  THE CAR MANUFACTURERS SAY GREAT, WE GET

7      IT ALL AT $5 A TON; WE CAN MAKE UMPTY-UMP (PHONETIC) CARS, AND

8      THE CONSUMERS GET A LITTLE CHEAPER CAR BECAUSE THE -- THE

9      SUPPLY WAS CHEAPER.  AND THE ONLY PERSON HURT IS THE STEEL

10     MANUFACTURERS.

11        IS THAT OKAY?

12           THE WITNESS:  IN THAT EXAMPLE, IT'S NOT

13     ANTICOMPETITIVE.  THERE MAY BE -- THERE'S A LOSS OF REVENUE TO

14     THE STEEL MANUFACTURERS, AND WE CAN'T ESTIMATE WHAT THAT LOSS

15     OF REVENUE IS.  WHAT WE WOULDN'T DO IS CALL THAT

16     ANTICOMPETITIVE HARM.  IT'S A REVENUE LOSS BECAUSE OF AN

17     AGREEMENT NOT TO PAY A HIGHER PRICE.

18        I THINK IN YOUR EXAMPLE, YOU SAID THE SAME AMOUNT OF

19     STEEL'S GETTING BOUGHT, THE SAME AMOUNT OF CARS ARE GETTING

20     BOUGHT, BUT THE CONSUMERS ARE PAYING LOWER PRICES.  THAT'S THE

21     ANTICOMPETITIVE PART OF IT.  THAT'S WHERE -- OR THE ANALYSIS

22     LOOKS AT --

23           THE COURT:  I'M SORRY.  WHAT'S THE ANTICOMPETITIVE

24     PART OF WHAT?

25           THE WITNESS:  THE -- THE ANTICOMPETITIVE ANALYSIS

1    THAT YOU DO FOCUSES ON OUTPUTS.  HAVE OUTPUTS GONE DOWN?

2       AND SO IN THIS EXAMPLE WHERE THEY'RE JUST BINDING

3    TOGETHER, THEY'RE SAYING, NO, THIS IS OUR PRICE, WE'RE NOT

4    PAYING A DIFFERENT AMOUNT FOR IT, THAT COULD BE A HARM THROUGH

5    SOME OTHER STRUCTURE, NOT ANTITRUST.

6       YES, THERE IS A LOSS OF REVENUE TO THE STEEL MANUFACTURER.

7    WE DON'T CALL THAT AN ANTICOMPETITIVE IMPACT BECAUSE THERE

8    ISN'T AN ATTENDANT CHANGE IN QUANTITY.

9          **THE COURT:**  WHAT DO WE CALL IT?

10         **THE WITNESS:**  I'M NOT SURE WHAT THAT EXAMPLE WOULD

11   BE.  THE -- WHY MONOPSONY IS A CONCERN IS -- WHEN IT REDUCES

12   QUANTITY AND CAUSES WHAT IS CALLED A DEAD-WEIGHT LOSS.

13      WHEN -- IN THE EXAMPLE WHERE IT HASN'T REDUCED QUANTITY,

14   IT IS JUST A BETTER PRICE, SO MAYBE AN EXAMPLE IN THE NEWS, IF

15   WAL-MART IS SAYING I WON'T PAY A PENNY MORE THAN SUCH AND

16   SUCH, WE DON'T LOOK AT THAT AS AN ANTICOMPETITIVE EFFECT, IF

17   THERE'S NOT AN OUTPUT EFFECT.  WE WOULD LOOK AT WHAT ARE --

18   WHAT ARE THE IMPLICATIONS IN THE MARKETS.

19      SO WHAT IS OBVIOUSLY TROUBLING IS IF THERE'S AN AGREEMENT

20   AMONG MANUFACTURERS NOT TO -- NOT TO PAY A HIGHER PRICE.

21         **THE COURT:**  THAT'S MY HYPOTHETICAL.

22         **THE WITNESS:**  YES, BUT THAT'S -- IT'S NOT LEADING TO

23   WHAT WE THINK OF AS ANTITRUST OUTCOMES.

24         **THE COURT:**  OKAY.

25             (DEMONSTRATIVE PUBLISHED.)

1    **BY MR. SINGLA:**

2    **Q.**  I WANT TO SHOW YOU SOMETHING THAT DR. NOLL WROTE IN AN

3    ARTICLE, AND WE LOOKED AT THIS DURING HIS TESTIMONY.

4        AND YOU WERE HERE FOR HIS TESTIMONY?

5    **A.**  YES.

6    **Q.**  AND WHAT HE SAID IS THAT MONOPSONY POWER OVER WAGES DOES

7    NOT CREATE SUBSTANTIAL ECONOMIC INEFFICIENCIES AS –– NORMAL

8    THE RESULT OF MARKET POWER FOR MONOPSONY WAGES ARE STILL

9    SUFFICIENT TO ATTRACT NEARLY ALL OF THE BEST ATHLETES INTO THE

10   INDUSTRY.

11       NOW, CAN YOU EXPLAIN, HOW DOES DR. NOLL'S ANALYSIS OF

12   RESTRICTIONS OF A PAY OF ATHLETES RELATE TO THE COURT'S

13   QUESTION ABOUT WHETHER THERE'S AN ANTICOMPETITIVE EFFECT IN

14   MONOPSONY SITUATION?

15   **A.**  THIS IS ESSENTIALLY WHAT I'M SAYING, THAT IF THERE –– EVEN

16   IF YOU HAVE DRIVEN DOWN A WAGE OR DRIVEN DOWN THE PRICE OF AN

17   INPUT, WHEN THERE ISN'T A CHANGE IN OUTPUT, THAT IS NOT

18   ANTITRUST.

19       WE HAVEN'T DONE SOMETHING THAT HARMS CONSUMERS, AND

20   ANTITRUST IS FOR THE PROTECTION OF CONSUMERS.  WE HAVEN'T DONE

21   SOMETHING THAT REDUCES THE AMOUNT THEY BUY OR THE PRICE THAT

22   THEY PAY.

23   **Q.**  NOW, LET'S TURN BACK TO THE VIDEO GAME LICENSING MARKET.

24               (DEMONSTRATIVE PUBLISHED.)

25

**BY MR. SINGLA:**

**Q.**  SO THE COLLEGES HAVE AGREED OR DECIDED, I SHOULD SAY, NOT

TO FURTHER LICENSE THESE EA VIDEO GAMES.  CORRECT?

**A.**  YES.

**Q.**  NOW, IS THAT SOMETHING THAT IS ANTICOMPETITIVE?

**A.**  NO.  THE COLLEGES HAVE MARKS THAT ARE NECESSARY FOR THE

INPUT OF THE GAME AS WELL, AND THEY WOULD BE ABLE TO DECIDE

NOT TO LICENSE THOSE MARKS.

**Q.**  AND NOW THAT THE COLLEGES HAVE DECIDED NOT TO LICENSE

THEIR MARKS FOR VIDEO GAMES, IS THERE A MARKET IN WHICH THE

STUDENT ATHLETES CAN SELL THEIR NIL'S TO -- FOR VIDEO GAMES?

         **MR. ISAACSON:**  OBJECTION, YOUR HONOR.  THIS IS NOT

PART OF HER REPORT.

              **THE COURT:**  OVERRULED.

         **MR. ISAACSON:**  AND -- AND I'M NOW -- JUST -- IF I

COULD BE SPECIFIC.  WHEN SHE STARTS TO GIVE OPINIONS ABOUT THE

ACTIONS THAT THE NCAA HAS TAKEN WITH RESPECT TO THE VIDEO

GAMES CANCELING THE CONTRACT OR THE JERSEYS, GIVING OPINIONS

ON THAT, THAT'S NEW TESTIMONY.  NOT -- I'M NOT TALKING ABOUT

THIS MONOPSONY STUFF.

              **THE COURT:**  OH, OKAY.

**BY MR. SINGLA:**

**Q.**  SO LET ME ASK THE QUESTION A LITTLE DIFFERENTLY JUST --

              **THE COURT:**  THIS, I TAKE IT, HAS TO DO WITH THE

MONOPSONY IDEA BECAUSE SHE'S POSITING THAT THE COLLEGES CHOOSE

1   FOR INDEPENDENT UNRELATED REASONS OF THEIR OWN NOT TO SELL

2   THEIR OWN HALF OF THE PRODUCT.

3           **MR. ISAACSON:**  RIGHT.  AND NOW WE'RE JUST TAKING A

4   DEFENSE ARGUMENT AND ASKING HER TO GIVE OPINIONS ON IT,

5   SOMETHING THAT WASN'T IN HER REPORTS.

6           **MR. SINGLA:**  WELL, LET ME ASK THE QUESTION THIS WAY:

7   I THINK WE CAN GETS TO IT.  IF THE COLLEGES ARE NOT LICENSING

8   THEIR INTELLECTUAL PROPERTY TO EA, IS THERE A MARKET FOR THE

9   STUDENT ATHLETES TO LICENSE THEIR NIL'S?

10           **MR. ISAACSON:**  SAME OBJECTION.  THIS IS ENTIRELY --

11           **THE COURT:**  WHAT?  THAT IT'S NOT IN THE REPORT?

12           **MR. ISAACSON:**  RIGHT.

13           **THE COURT:**  YEAH, I MEAN, IT'S SORT OF -- ONE COULD

14   ARGUE IT, I GUESS.  IF THE VIDEO GAME WANTS THE NAME OF THE

15   COLLEGE AND THE NAME OF THE STUDENT AND THE COLLEGE WON'T SELL

16   ITS NAME, THEN THE STUDENT COULDN'T SELL?

17       MAYBE SOMEBODY WOULD BUY A VIDEO GAME WITH JUST THE

18   PLAYERS AND NOT THE COLLEGE?  I DON'T KNOW.

19       IS THAT WHAT YOU'RE GETTING AT?

20           **MR. SINGLA:**  YES, YOUR HONOR.

21           **THE COURT:**  OKAY.  SO GO ON TO SOMETHING ELSE.

22           **MR. SINGLA:**  THANK YOU, YOUR HONOR.

23                   (DEMONSTRATIVE PUBLISHED.)

24   **BY MR. SINGLA:**

25   **Q.**  NOW I WANT TO SHOW YOU SOME OF DR. NOLL'S TESTIMONY FROM

1    THE TRIAL THAT YOU HEARD.  AND WHAT HE SAID IS THAT THE NCAA

2    IN HIS VIEW COULD PASS A RULE OR DECIDE THAT IT WOULD BE OKAY

3    FOR THE NCAA TO DECIDE NO VIDEO GAMES.

4        NOW, DO YOU AGREE WITH THAT?

5            **MR. ISAACSON:**  YOUR HONOR, THIS IS THE SAME ISSUE,

6    AND THIS IS A QUESTION FROM CROSS-EXAMINATION.

7            **THE COURT:**  WELL, THAT'S REALLY OUT OF CONTEXT.  I

8    DON'T KNOW WHAT --

9            **MR. ISAACSON:**  COUNSEL IS NOW ASKING HIS EXPERT TO

10   OPINE ON ONE OF HIS CROSS-EXAMINATION QUESTIONS.

11           **THE COURT:**  YEAH, I DON'T KNOW WHAT THAT MEANS.  AN

12   ISOLATED Q AND A LIKE THAT, I HAVE NO IDEA WHAT IT MEANS, WHAT

13   THE CONTEXT IS, OR WHAT HE WAS TALKING ABOUT.  THAT'S NOT

14   HELPFUL TO ME.

15       YOU CAN ASK HER THEORETICAL QUESTIONS ABOUT NOLL'S OPINION

16   VERSUS HERS, BUT IT'S NOT GOING TO BE HELPFUL TO PLUCK OUT

17   LITTLE THINGS OUT OF CONTEXT AND TALK ABOUT THEM.

18   **BY MR. SINGLA:**

19   **Q.**  DR. STIROH, YOU'VE REVIEWED THE ANALYSIS OF -- SORRY, THE

20   ALLEGATIONS OF ANTICOMPETITIVE CONDUCT MADE BY THE PLAINTIFFS?

21   **A.**  YES.

22   **Q.**  AND MADE BY DR. NOLL?

23   **A.**  YES.

24   **Q.**  DO DR. NOLL OR THE PLAINTIFFS ANYWHERE CHALLENGE THE

25   NCAA'S RIGHT TO DECIDE NOT TO MAKE VIDEO GAMES?

1          DO THEY EVER ALLEGE THAT THAT'S ANTICOMPETITIVE?

2     **A.**   THEY DO NOT.

3     **Q.**   LET'S MOVE ON TO THE MERCHANDISE MARKET.

4                    (DEMONSTRATIVE PUBLISHED.)

5     **BY MR. SINGLA:**

6     **Q.**   SO COULD YOU EXPLAIN –– AND, AGAIN, WHAT IS THE GENERAL

7     STRUCTURE OF THE MERCHANDISE MARKET BEING ASSERTED BY

8     DR. NOLL?

9     **A.**   YES.  IT LOOKS ESSENTIALLY THE SAME.  THE SAME TYPES OF

10    TRANSACTIONS.  THE –– IN THE MERCHANDISE MARKET, HERE, MORE

11    ACCURATE TO SAY MARKETS THAT EACH OF THE INDIVIDUAL PRODUCTS

12    BEING SOLD COULD BE IN AN INDIVIDUAL MARKET.  THE BOBBLEHEADS

13    AND THE JERSEYS ARE NOT NECESSARILY IN THE SAME MARKET.

14         BUT EACH OF THE INDIVIDUAL CATEGORIES OF MERCHANDISE ––

15    THERE IS A CATEGORY OF BOBBLEHEADS THAT COULD BE SOLD THAT

16    DEPICTS CURRENT STUDENT ATHLETES.  THE MANUFACTURERS OF THE

17    MERCHANDISE WOULD BUY NIL RIGHTS FROM THIS (SIC) CURRENT

18    STUDENT ATHLETES AND BUY THE MARKS OF THE COLLEGE, IF THEY

19    WANT TO DEPICT THE STUDENT ATHLETE IN HIS COLLEGE UNIFORM, AND

20    SELL THOSE TO CONSUMERS.

21    **Q.**   NOW, HOW DO YOU KNOW THAT THERE IS A MARKET FOR ATHLETES

22    TO LICENSE THEIR NIL'S FOR JERSEYS AND BOBBLEHEADS AND THINGS

23    LIKE THAT?

24    **A.**   FOR THE SAME REASON IN THE VIDEO GAMES.  WE SEE

25    TRANSACTIONS, WE SEE LICENSES WHERE MANUFACTURERS BUY NIL

1    RIGHTS FROM FORMER STUDENT ATHLETES OR PROFESSIONAL ATHLETES

2    FOR USE IN THESE TYPES OF PRODUCTS.

3    **Q.**  AND ONCE AGAIN, WHO ARE THE BUYERS AND SELLERS HERE?

4    **A.**  FOR THE NIL TRANSACTION, THE STUDENT ATHLETES ARE THE

5    SELLERS, THE MANUFACTURERS ARE THE BUYERS.

6    **Q.**  AND ONCE AGAIN, WE COULD LOOK AT THIS IN TERMS OF STUDENT

7    ATHLETES LICENSING THEIR NIL'S TO THE COLLEGE FIRST.

8    **A.**  YES, THE STUDENT ATHLETE WOULD STILL BE A SELLER THERE.

9    IT WOULD TAKE A DETOUR BUT EVENTUALLY GET TO THE MANUFACTURERS

10   AS BUYERS.

11   **Q.**  NOW, HAVE DR. NOLL OR DR. RASCHER ANALYZED THE MARKETS FOR

12   LICENSING NIL'S FOR THIS KIND OF MERCHANDISE?

13   **A.**  THEY HAVE NOT ANALYZED THE MARKETS.  TO ME, AS AN

14   ANTITRUST ECONOMIST, THAT MEANS THEY HAVE NOT ANALYZED THE

15   CONTOURS OF THE MARKET.  THEY HAVEN'T LOOKED AT WHAT THE

16   OPTIONS ARE FOR MANUFACTURERS.

17       SELLING A T-SHIRT OR A BOBBLEHEAD THAT HAS THE NIL OF A

18   CURRENT STUDENT ATHLETE IS ONE OPTION.  OTHER OPTIONS ARE

19   FORMER STUDENT ATHLETES, PROFESSIONAL ATHLETES, SINGERS OR

20   ACTORS, POLITICAL FIGURES, OTHER PEOPLE OF FAME.

21       WHAT WE WANT TO KNOW IS DO THESE MANUFACTURERS -- IS THERE

22   SOME SORT OF COMPETITIVE IMPORTANCE TO CURRENT STUDENT NIL'S

23   THAT WOULD MAKE THAT A STAND-ALONE MARKET.  AND THAT HAS NOT

24   BEEN PROVEN.

25           **THE COURT:**  BUT IF THERE WERE, IT WOULD BE.

1      **THE WITNESS:**  IF IT WERE PROVEN, IT WOULD, YES.

2  **BY MR. SINGLA:**

3  **Q.**  I'M SORRY.  COULD YOU JUST CLARIFY, IF IT WERE PROVEN, IT

4  WOULD WHAT?

5      **THE COURT:**  -- MARKET.

6      **THE WITNESS:**  IF IT WERE PROVEN THAT THERE WAS A

7  STAND-ALONE MARKET FOR THE USE OF NCAA STUDENT ATHLETE NIL'S,

8  AND THAT MARKET HAS DISAPPEARED BECAUSE OF A RESTRICTION AND

9  THAT'S THE IMPORTANT -- BECAUSE OF THE RESTRICTION ON STUDENT

10  ATHLETE NIL'S, THEN WE WOULD SAY YES, THERE IS A MARKET

11  OUTPUT, THAT -- A MARKET EFFECT, THAT MARKET HAS DISAPPEARED

12  BECAUSE OF THE RESTRICTION ALLEGED.

13  **BY MR. SINGLA:**

14  **Q.**  NOW, HOW WOULD THE PLAINTIFFS PROVE THAT THERE IS A

15  SEPARATE MARKET?

16      WHAT WOULD BE THE STANDARD ECONOMIC TOOLS YOU WOULD USE TO

17  TRY TO PROVE THE EXISTENCE OF THIS MARKET FOR LICENSING NCAA

18  STUDENT ATHLETE NIL'S FOR THIS KIND OF MERCHANDISE?

19  **A.**  YOU COULD LOOK AT THE PRODUCTS THAT ARE SOLD USING

20  POTENTIALLY COMPARABLE NIL'S AND SEE, DOES IT LOOK LIKE THERE

21  IS A MARKET FOR T-SHIRTS WITH SOMEBODY'S NAME ON THEM.  AND DO

22  ALL OF THE T-SHIRTS WITH SOMEBODY'S NAME ON THEM COMPETE WITH

23  EACH OTHER.

24      THE SAME WITH BOBBLEHEADS.  DO WE SEE BOBBLEHEADS

25  ESSENTIALLY BEING SOLD AT ONE PRICE REGARDLESS OF WHOSE HEAD

1    IS BOBBLING ON IT.

2       FOR POSTERS, FOR TRADING CARDS, WHEN THEY SHOW DIFFERENT

3    ATHLETES, ARE THEY STILL BEING SOLD AT THE SAME PRICE EVEN IF

4    THE ATHLETES IS IN THE NBA VERSUS THE NFL, EVEN IF IT IS A

5    FORMER COLLEGE STUDENT ATHLETE FROM ONE SCHOOL VERSUS ANOTHER

6    SCHOOL?

7       IF THOSE ARE BEING SOLD AT THE SAME PRICE, THAT INDICATES

8    THAT THEY ARE ALL COMPETING IN THE SAME MARKET EVEN THOUGH

9    EACH ONE HAS ITS OWN UNIQUE CHARACTERISTICS IN THE SENSE OF

10   BEING A UNIQUE NAME.

11   Q.  SO ARE THERE STANDARD ECONOMETRIC TOOLS THAT ECONOMISTS

12   USE TO ANALYZE WHETHER THERE ARE SEPARATE MARKETS FOR

13   ANTITRUST PURPOSES?

14   A.  YES.  IF YOU HAVE THE DATA, YOU WOULD BE LOOKING AT

15   ELASTICITY OF SUBSTITUTION.  YOU WOULD BE LOOKING AT THINGS,

16   IS THE NIL OF CURRENT STUDENT ATHLETES COMPETITIVELY

17   IMPORTANT, WHICH IS TO SAY, CAN IT AFFECT THE PRICE AND OUTPUT

18   IN MARKETS THAT USE NIL'S OF ATHLETES.

19   Q.  AND IS THAT A COMMONLY USED TOOL IN ANTITRUST LITIGATION

20   BY ECONOMISTS, CROSS-ELASTICITY STUDIES?

21   A.  YES.  WHERE DATA EXISTS, YES.

22   Q.  NOW, HAVE THE PLAINTIFFS' EXPERTS DONE ANY SUCH ANALYSIS

23   HERE?

24   A.  THEY HAVE NOT LOOKED AT THE MARKETS FOR JERSEYS,

25   BOBBLEHEADS OR TRADING CARD COMPANIES.  THEY HAVEN'T LOOKED AT

1    WHAT THE OPTIONS TO BUYERS ARE.  THAT'S WHERE YOU START,

2    WHAT -- HOWEVER YOU DO IT, THE ANALYSIS STARTS WITH WHAT ARE

3    THE OPTIONS TO BUYERS.  AND THEY HAVEN'T DONE THAT.

4    Q.  AND FOR VIDEO GAMES -- AND WE'RE GOING TO TALK ABOUT

5    ENDORSEMENTS IN A SECOND -- FOR ALL OF THESE MARKETS OR

6    MERCHANDISE, HAVE THEY DONE ANY KIND OF ECONOMIC ANALYSIS TO

7    TRY TO IDENTIFY THESE AS SEPARATE ANTITRUST RELEVANT MARKETS?

8    A.  THEY HAVE NOT.

9    Q.  NOW, WHAT ABOUT ANTICOMPETITIVE EFFECTS?  HAVE THE

10   PLAINTIFFS SHOWN ANY ANTICOMPETITIVE EFFECTS FROM AN ALLEGED

11   RESTRICTION ON LICENSING CURRENT STUDENT NIL'S FOR THIS KIND

12   OF MERCHANDISE?

13   A.  THEY HAVE NOT.  AGAIN, HERE, WHAT IS BEING ALLEGED IS A

14   REDUCTION IN CHOICE.  A REDUCTION IN CHOICE ISN'T

15   AUTOMATICALLY A REDUCTION IN OUTPUT.  IT DOESN'T NECESSARILY

16   HAVE A PRICE EFFECT.  IF THE CONSUMERS WOULD JUST SWITCH TO

17   ANOTHER BOBBLEHEAD OR A JERSEY WITH A DIFFERENT NAME ON IT OR

18   A JERSEY WITH JUST THE MARKS OF THE SCHOOL, THEN THERE ISN'T

19   AN ANTICOMPETITIVE EFFECT.

20   Q.  SO IN OTHER WORDS, IF -- IF IT WERE THAT CONSUMERS ARE

21   JUST AS HAPPY WITH A PROFESSIONAL JERSEY AS A JERSEY WITH A

22   NAME FROM A COLLEGE ATHLETE, THAT MIGHT DEMONSTRATE THAT

23   THERE'S NO SEPARATE MARKET FOR COLLEGE ATHLETE MERCHANDISE?

24   A.  YES.  IF THEY ARE ALL IN THE SAME MARKET, THEY ALL

25   COMPETITIVELY CONSTRAIN THE PRICES OF EACH OTHER, THEN ALL OF

1   THOSE THINGS ARE SUBSTITUTES TO CONSUMERS.

2   **Q.**   AND ARE THERE STANDARD ECONOMIC TECHNIQUES AND TOOLS THAT

3   ARE USED TO ESTABLISH ANTICOMPETITIVE EFFECTS IN THIS KIND OF

4   CASE?

5   **A.**   YES.   YOU WOULD LOOK AT REDUCTION IN OUTPUT AND INCREASE

6   IN PRICE BECAUSE OF AN ALLEGED RESTRAINT.

7   **Q.**   AND HAVE THE PLAINTIFFS' EXPERTS DONE ANYTHING IN THE

8   MERCHANDISE MARKET, THE VIDEO GAMES MARKET, THE ENDORSEMENT

9   MARKET WE WILL LOOK AT IN A MOMENT TO ANALYZE WHETHER THERE'S

10  ACTUALLY BEEN AN ANTICOMPETITIVE EFFECT?

11  **A.**   THEY HAVE NOT.

12  **Q.**   NOW, WHAT IF AN ATHLETE, A STUDENT ATHLETE, SAID, YOU KNOW

13  WHAT, I THINK IT VIOLATES MY RIGHTS FOR THERE TO BE A JERSEY

14  WITH THE NO. 37 ON IT 'CAUSE I PLAYED NO. 37.

15      DOES THAT CHANGE THE ANTITRUST ANALYSIS?

16  **A.**   IT DOESN'T CHANGE THE ANTITRUST ANALYSIS.   I UNDERSTAND

17  THAT TO BE A DIFFERENT CLAIM.   THAT WOULD RELATE TO A PRODUCT

18  ACTUALLY BEING SOLD WITH THE USE OF AN NIL AND THE SELLER OF

19  THE NIL NOT BEING COMPENSATED.   I THINK THAT IS SOMETHING MORE

20  OF A ROYALTY DISPUTE, WHETHER THE -- THE SELLER OF THE NIL

21  SHOULD HAVE RECEIVED A ROYALTY BUT DIDN'T.

22      WE DON'T TREAT THAT THE SAME AS A COMPETITIVE EFFECT

23  BECAUSE, AGAIN, HERE, THE PRODUCT WAS SOLD.   IT WAS SOLD AT

24  A -- WHAT WE WOULD ASSUME WOULD BE A COMPETITIVE PRICE IN THE

25  MARKET.   THERE WASN'T A PAYMENT THAT WENT BACK TO THE STUDENT

1    ATHLETE IF THEY HAVE A RIGHT OVER THEIR NUMBER AS WELL.  BUT

2    THAT IS A –– IT'S A LICENSING DISPUTE OR AN INTELLECTUAL

3    PROPERTY DISPUTE, NOT ANTITRUST.

4    **Q.**  NOW, IN THIS MARKET ALSO, THE COLLEGES HAVE DECIDED TO

5    MAKE A RULE PRECLUDING THE LICENSING OF STUDENT ATHLETE NIL'S

6    FOR MERCHANDISE.  RIGHT?

7    **A.**  YES.

8    **Q.**  AND IS THAT ANTICOMPETITIVE?

9    **A.**  NO.  AS DR. NOLL SAID, THE COLLEGES CAN –– MAKE RULES

10   REGARDING THESE INDIVIDUAL MARKETS FOR WHAT THE –– THEY WILL

11   DO WITH THEIR INTELLECTUAL PROPERTY AND WHAT THEIR STUDENTS

12   WILL DO.

13                    (DEMONSTRATIVE PUBLISHED.)

14   **BY MR. SINGLA:**

15   **Q.**  NOW, LET'S TURN QUICKLY TO THE MARKET FOR GAME CLIPS

16   USED –– OR ENDORSEMENTS USED FOR ADVERTISING.  SO HOW DOES THE

17   STRUCTURE OF THE ALLEGED MARKET HERE COMPARE TO WHAT WE ARE

18   LOOKING AT WITH RESPECT TO VIDEO GAMES AND MERCHANDISE?

19   **A.**  IT'S THE SAME.  IT'S THE –– THE ADVERTISERS WANT TO USE AN

20   NIL TO SELL A PRODUCT.  AND SO POTENTIALLY, STUDENTS COULD

21   SELL THEIR NIL'S TO ADVERTISERS, COLLEGES COULD SELL THEIR

22   MARKS TO ADVERTISERS FOR USE IN THIRD–PARTY PRODUCTS.

23       AND AGAIN, MAYBE JUMPING TO THE END, THAT THERE HAS NOT

24   BEEN AN ANALYSIS OF WHAT ALL THE OPTIONS ARE FOR ADVERTISERS.

25   AND I THINK WE WOULD AGREE, EVEN WITHOUT THAT ANALYSIS,

1    ADVERTISERS HAVE ABUNDANT OPTIONS FOR HOW THEY'RE GOING TO

2    SELL THEIR PRODUCT.  SO THERE HASN'T BEEN AN ALLEGATION THAT

3    THIS HAS AN ANTICOMPETITIVE EFFECT ON THE ADVERTISERS WHO ARE

4    BUYERS OR ON CONSUMERS OF ADVERTISING PRODUCTS.

5    **Q.**  AND HOW DO YOU KNOW THERE'S A DEMAND YOU -- YOU'VE DRAWN

6    THESE ARROWS SHOWING THE ADVERTISERS PRESUMABLY TRYING TO BUY

7    STUDENT ATHLETE NIL'S.

8        HOW DO YOU KNOW THERE'S A DEMAND FOR ATHLETE NIL'S TO BE

9    USED IN ADVERTISING?

10   **A.**  AGAIN, WE DO SEE TRANSACTIONS.  YOU SEE ENDORSEMENTS.  YOU

11   SEE ADVERTISERS NEGOTIATING OR LICENSING NIL'S FROM ATHLETES

12   OR OTHER PEOPLE OF FAME FOR USE IN ENDORSING THEIR PRODUCTS IN

13   THE HOPE OF MAKING HIGHER SALES OF THEIR PRODUCTS.

14   **Q.**  NOW, I WANTED TO SHOW YOU -- JUMP AHEAD HERE AND SHOW YOU

15   AGAIN SOME OF DR. NOLL'S TESTIMONY THAT YOU HEARD.

16                   (DEMONSTRATIVE PUBLISHED.)

17   **BY MR. SINGLA:**

18   **Q.**  AND HE SAID THAT THERE WAS NO ANTITRUST PROBLEM WITH THE

19   RULE ABOUT PRECLUDING STUDENT ATHLETE ENDORSEMENTS.

20       YOU HEARD THAT?

21   **A.**  YES, I DID.

22           **MR. ISAACSON:**  YOUR HONOR, IT SAYS "THAT RULE."

23           **MR. SINGLA:**  OKAY.  LET'S BACK UP.

24           **THE COURT:**  COULDN'T YOU JUST ASK HER WHETHER SHE

25   AGREES WITH THE CONCEPT WITHOUT TRYING TO PIN IT TO A FRAGMENT

1   OF TESTIMONY?

2           **MR. SINGLA:**  SURE, YOUR HONOR.

3   **Q.**  SO DO YOU AGREE THAT THERE'S NO ANTICOMPETITIVE CONCERN IF

4   THE COLLEGES ISSUE A RULE OR ADOPT A RULE PRECLUDING THE

5   LICENSING OF STUDENT ATHLETE NIL'S FOR USE IN ADVERTISING OR

6   ENDORSEMENTS?

7   **A.**  DO I AGREE THERE'S NOT A PROBLEM, IS WHAT YOU ASKED ME?

8   **Q.**  YES, THERE'S NO ANTICOMPETITIVE CONCERN IN THAT SITUATION.

9   **A.**  YES, I DO.

10  **Q.**  OKAY.

11      NOW, LET'S TURN TO BROADCAST.

12                  (DEMONSTRATIVE PUBLISHED.)

13  **BY MR. SINGLA:**

14  **Q.**  SO CAN YOU GENERALLY DESCRIBE WHAT THE STRUCTURE OF THE

15  MARKET IS THAT HAS BEEN ASSERTED WITH RESPECT TO LICENSING FOR

16  BROADCAST?

17  **A.**  YES.  SO FROM WHAT I UNDERSTAND HAS BEEN ASSERTED IS THAT

18  BROADCASTERS WOULD NEED AN NIL FROM STUDENT ATHLETES.  THEY

19  WOULD NEED OTHER RIGHTS FROM THE COLLEGES IN ORDER TO

20  BROADCAST THE GAME.  AND IT HAS BEEN ASSERTED THAT STUDENT

21  ATHLETE -- HAVE BEEN PRECLUDED FROM OBTAINING REVENUE FROM THE

22  USE OF THEIR NIL'S IN BROADCASTS.

23      IT'S A LITTLE DIFFERENT FROM SOME OF THE OTHER MARKETS

24  THAT WE WERE LOOKING AT BECAUSE HERE, THE BROADCASTS ARE

25  ACTUALLY BEING BROADCAST.  AND I UNDERSTAND THE CLAIM HAS TO

1    DO WITH WHETHER THE NIL'S ARE USED IN THE BROADCASTS, WHETHER

2    THERE -- THERE NEED TO BE A RIGHT THAT GETS TRANSACTED FOR THE

3    BROADCASTERS TO USE THOSE NIL'S.

4    Q.  OKAY.  SO LET'S JUST KIND OF GO THROUGH THAT STEP BY STEP.

5        SO IN THIS MARKET, WHO IS THE BUYER AND WHO IS THE SELLER?

6    A.  THE BROADCASTER IS THE BUYER.  THE SELLERS ARE ALL OF THE

7    ENTITIES THAT HAVE RIGHTS THAT THE BROADCASTER NEEDS.  AND I

8    SAY IT THAT WAY BECAUSE I THINK THERE IS AN OUTSTANDING LEGAL

9    QUESTION OF WHETHER THE STUDENT ATHLETES HAVE A RIGHT THAT THE

10   BROADCASTERS NEED.  IT'S NOT, OBVIOUSLY, FOR ME OR DR. NOLL TO

11   ANSWER, BUT WE CAN THINK ABOUT WHAT IMPLICATIONS THAT HAS FOR

12   THE MARKET.

13       BUT IN THE THEORY THAT'S BEEN PUT FORWARD, THE SELLERS ARE

14   THE STUDENT ATHLETES, THE BUYERS ARE THE BROADCASTERS.

15   COLLEGES ARE ALSO SELLERS OF RIGHTS THAT ARE NEEDED.

16   Q.  NOW, IN THE VIDEO GAMES AND MERCHANDISE AND ENDORSEMENT

17   CONTEXT, YOU SAID THAT YOU SAW MARKET TRANSACTIONS FOR

18   LICENSING OF STUDENT NIL'S.

19       IS THE SAME TRUE WITH RESPECT TO BROADCAST?

20   A.  IT IS NOT.  WE DO NOT SEE TRANSACTIONS WHERE THERE IS A

21   PAYMENT TO ATHLETES FOR THE USE OF THEIR NIL'S FOR USE IN

22   BROADCASTS.

23   Q.  WELL, LET'S TALK THROUGH SOME EXAMPLES.  WHAT ABOUT WITH

24   RESPECT TO THE PROFESSIONAL ATHLETES, IS THERE ANY EVIDENCE

25   THAT YOU HAVE SEEN THAT PROFESSIONAL ATHLETES ARE PAID FOR

1    THEIR NIL TO BE USED IN BROADCASTS?

2    **A.**   AGAIN, NO.  FOR PROFESSIONAL ATHLETES –– AND HERE,

3    THINKING OF THE NFL AND THE NBA, THEY HAVE AGREEMENTS AMONG

4    THE PLAYERS AND WITH ANYBODY THAT THE PLAYERS THEN LICENSE

5    THEIR IMAGE TO.

6        THERE ARE GROUP LICENSES FOR WHEN NIL'S ARE LICENSED, HOW

7    THAT MONEY GETS DIVIDED UP.  AND THERE IS A SEPARATE AGREEMENT

8    FOR WHEN THERE'S BROADCAST REVENUE, HOW THAT MONEY GETS USED

9    AND WHAT IT –– WHAT IT PAYS FOR.

10       THE GROUP LICENSE AGREEMENT THAT HAS BEEN AGREED TO BY THE

11   PLAYERS IS NOT APPLIED TO THE BROADCAST REVENUES.  SO FOR ME,

12   AS AN ECONOMIST, WHAT I SEE IS THAT THERE EXISTS A STRUCTURE

13   TO DEAL WITH NIL REVENUES.  THAT STRUCTURE IS NOT APPLIED TO

14   THE BROADCASTS.

15       AND FOR ME IN READING THE AGREEMENTS, I CAN SEE THAT THE

16   BROADCASTS –– OR WHAT I READ OUT OF IT, THAT THE BROADCAST

17   PAYMENTS ARE USED FOR PAYING SALARIES, FOR ACTUALLY PLAYING

18   THE GAME, NOT THE TYPES OF THINGS THAT WE WERE THINKING ABOUT

19   FOR TRANSACTIONS FOR NIL'S.

20   **Q.**   WHAT ABOUT FOR AMATEUR SPORTS?  THERE'S NO SALARIES PAID

21   IN AMATEUR SPORTS.  SO DO YOU SEE IN THE MARKET PLACE AMATEUR

22   ATHLETES BEING PAID FOR THE USE OF THEIR NIL'S IN BROADCAST?

23   **A.**   NO, THERE ARE NO EXAMPLES WHERE AMATEUR ATHLETES ARE BEING

24   PAID A SHARE OF BROADCAST REVENUES FOR THE USE OF THEIR NIL'S

25   IN THE BROADCASTS.

STIROH – DIRECT / SINGLA

1    **Q.**  WELL, WHAT ABOUT WITH THE OLYMPICS, THE OLYMPICS ARE

2    TELEVISED AND THE TELEVISION RIGHTS ARE WORTH BILLIONS OF

3    DOLLARS.  ARE THERE EXAMPLES THAT YOU HAVE SEEN OF WHERE

4    OLYMPIC ATHLETES ARE BEING PAID FOR THEIR NIL'S TO BE USED IN

5    BROADCAST?

6    **A.**  NO.  THERE ARE NOT.  THERE ARE CERTAINLY EXAMPLES WHERE

7    OLYMPIC ATHLETES CAN SELL THEIR NIL'S FOR ENDORSEMENTS.  WE

8    SEE THOSE TRANSACTIONS WHERE THERE IS A BUYING AND SELLING OF

9    AN NIL, BUT OLYMPIC ATHLETES ARE NOT PAID A SHARE OF BROADCAST

10   REVENUES EVEN THOUGH THEY APPEAR IN THE BROADCASTS OF THE

11   OLYMPIC GAMES.

12   **Q.**  WELL, WHAT ABOUT FOR COLLEGE OR HIGH SCHOOL SPORTS OUTSIDE

13   OF THE NCAA?

14       HAVE YOU SEEN ANY EXAMPLES OUTSIDE OF NCAA WHERE COLLEGE

15   OR HIGH SCHOOL ATHLETES ARE PAID FOR THE USE OF THEIR NIL IN

16   BROADCASTING A GAME?

17   **A.**  I HAVE NOT SEEN ANY OTHER EXAMPLE OF ANY OTHER ATHLETIC

18   ASSOCIATION THAT PAYS A SHARE OF WHATEVER THE BROADCAST

19   REVENUES IT HAS TO THE ATHLETES THAT MAY APPEAR IN THE

20   BROADCAST FOR USE OF THEIR NIL'S.

21   **Q.**  AND TO YOUR KNOWLEDGE, HAVE DR. NOLL OR DR. RASCHER

22   IDENTIFIED ANY SITUATION EVER WHERE AN ATHLETE WAS PAID FOR

23   THE USE OF THEIR NIL FOR BROADCAST?

24   **A.**  THEY HAVE NOT.

25   **Q.**  AND DID YOU HEAR DR. NOLL TESTIFY TO THAT AT TRIAL?

1  **A.**  I DID.

2  **Q.**  NOW, DR. NOLL ALSO TESTIFIED --

3                    (DEMONSTRATIVE PUBLISHED.)

4  **BY MR. SINGLA:**

5  **Q.**  AND THIS IS AT PAGE 394 OF THE TRANSCRIPT, THAT IT DIDN'T

6  MATTER TO HIS ANALYSIS WHETHER THERE WERE NIL RIGHTS.

7      AND SO BASED ON THAT, WHAT IS THE SUPPOSED ANTICOMPETITIVE

8  CONDUCT THAT YOU UNDERSTAND DR. NOLL HAS IDENTIFIED WITH

9  RESPECT TO BROADCASTS?

10  **A.**  SO WHAT I UNDERSTOOD DR. NOLL TO BE SAYING IS THAT THE

11  REVENUE THAT COLLEGES EARN FROM BROADCASTS, REGARDLESS OF

12  WHETHER THAT REVENUE IS COMING FROM THE USE OF AN NIL RIGHT,

13  WOULD FIND ITS WAY TO STUDENTS BECAUSE OF RESTRICTIONS ON

14  RECRUITING, THAT IF IN -- BACK TO THE EDUCATION MARKET, IF IT

15  IS A BUYING AND SELLING ATHLETIC ABILITY, RECRUITING ATHLETES,

16  AND THERE ARE RESTRICTIONS ON HOW MUCH AN ATHLETE CAN BE PAID

17  IN RECRUITING, THEN REGARDLESS OF WHETHER THE MONEY COMES FROM

18  A USE OF THE NIL, THAT PRESSURE IS THE RECRUITING MARKET WILL

19  BE SUCH THAT ANY VALVE YOU OPEN, ANY FLOW OF MONEY CAN GO

20  THROUGH TO THE ATHLETES BECAUSE OF A RESTRICTION ON

21  RECRUITING, NOT BECAUSE OF A RESTRICTION ON NIL'S.

22  **Q.**  SO WOULD DR. NOLL, TO YOUR UNDERSTANDING, HAVE THE SAME

23  ANALYSIS IF WE ARE TALKING ABOUT MONEY FROM PARKING OR

24  CONCESSIONS?

25  **A.**  I THINK THAT IS EXACTLY WHAT HE'S SAYING.  IF THERE IS

1    MORE MONEY IN THE SYSTEM AND YOU CAN FLOW IT TO STUDENT

2    ATHLETES TO RECRUIT THEM, THAT MONEY WOULD FLOW TO THEM

3    REGARDLESS OF WHETHER IT STEMS FROM A USE OF AN NIL.

4    **Q.**   SO WITH RESPECT TO BROADCAST, IS THERE ANYTHING THAT YOU

5    SAW IN DR. NOLL'S ANALYSIS THAT WAS TIED TO NIL?

6    **A.**   THERE IS NOT.  AS I HAVE SAID IN MY REPORT, THERE IS NO

7    MARKET EVIDENCE OF THE BROADCAST REVENUE INCLUDING PAYMENTS

8    FOR NIL RIGHTS.  AND DR. NOLL'S ANALYSIS IS THAT JUST MONEY

9    WOULD GO.

10       IF THERE IS A -- IF THERE IS MORE MONEY IN THE SYSTEM MORE

11   MONEY COULD GO TO ATHLETES IF WE EASED RECRUITING RESTRICTIONS

12   REGARDLESS OF WHAT WE DO IN NIL MARKETS.

13                    (DEMONSTRATIVE PUBLISHED.)

14   **BY MR. SINGLA:**

15   **Q.**   SO WHAT IS, FROM YOUR UNDERSTANDING --

16                    (DEMONSTRATIVE PUBLISHED.)

17   **BY MR. SINGLA:**

18   **Q.**   NOW, ARE THERE ANTICOMPETITIVE EFFECTS THAT EITHER

19   DR. NOLL OR DR. RASCHER HAVE ASSERTED WITH RESPECT TO

20   BROADCAST?

21   **A.**   WITHIN THE BROADCAST MARKET, WHICH IS WHAT IS ON THE

22   SCREEN RIGHT NOW, THEY HAVE NOT ASSERTED ANTICOMPETITIVE

23   EFFECTS, WHICH, AGAIN, WOULD BE A CHANGE IN OUTPUT.  THEY

24   HAVEN'T SAID BUT FOR THE RESTRICTION ON NIL'S, THERE WOULD BE

25   MORE BROADCAST OF MORE GAMES.

1          THERE ISN'T A QUANTITY EFFECT BECAUSE OF THE RESTRICTION

2     ON PAYING STUDENT ATHLETES FOR THE USE OF THEIR NIL'S.

3     **Q.**   NOW, ONE OF THE THINGS THAT THE PLAINTIFFS TALK ABOUT AS

4     AN ANTICOMPETITIVE EFFECT IS THE WEALTH TRANSFER.

5          WHAT IS THE WEALTH TRANSFER?

6     **A.**   AS THEY HAVE DESCRIBED IT, THE WEALTH TRANSFER IS IF THERE

7     IS A PAYMENT THAT SHOULD GO TO THE STUDENTS BECAUSE OF USE OF

8     THEIR NIL AND INSTEAD IT IS GOING TO THE SCHOOLS, THEN THE

9     WEALTH TRANSFER IS THE MONEY THAT SHOULD HAVE GONE TO THE

10    STUDENTS THAT INSTEAD WENT TO THE SCHOOLS.

11         WE'RE STARTING WITH THE -- THE SAME REVENUE POOL,

12    BROADCAST REVENUE.  AND THEIR ALLEGATION IS THAT THE MONEY GOT

13    DIVERTED AND WAS TRANSFERRED FROM THE STUDENTS TO THE SCHOOLS.

14    BUT, AGAIN, THAT IS IF THERE IS A USE OF THE NIL'S IN THE

15    BROADCAST.

16    **Q.**   SO IF THERE IS NO MARKET FOR THE STUDENTS' NIL FOR USE IN

17    BROADCAST, IS THERE ANY WEALTH TRANSFER?

18    **A.**   THERE IS NOT.

19    **Q.**   WHY NOT?

20    **A.**   THEN IF ALL OF THE REVENUE FROM BROADCAST IS BEING

21    ACCURATELY PAID FOR THE BUNDLE OF RIGHTS THAT THEY ARE PAYING

22    FOR, WHICH DOES NOT INCLUDE A NEED FOR A STUDENT ATHLETE NIL,

23    NONE OF THAT MONEY IS THEN TIED TO THE USE OF STUDENT ATHLETE

24    NIL'S.  AND FROM THE RESTRICTION IN -- THE ALLEGED RESTRICTION

25    IN THE NIL MARKET, THERE IS NO WEALTH TRANSFER.

STIROH – DIRECT / SINGLA

1    **Q.**  WELL, LET'S SAY HYPOTHETICALLY, LET'S SAY THAT THERE WAS A

2    MARKET FOR THE STUDENT ATHLETE NIL'S.  LET'S SAY THAT,

3    CONTRARY TO YOUR FINDINGS, THAT BROADCASTERS WOULD PAY FOR

4    STUDENT ATHLETES NIL'S.  IN THAT SITUATION WOULD THE WEALTH

5    TRANSFER BE AN ANTICOMPETITIVE EFFECT?

6    **A.**  NO.  AGAIN, WE'RE STARTING WITH A POOL OF MONEY AND

7    TALKING ABOUT HOW TO DIVIDE IT UP.  THAT'S A ROYALTY DISPUTE

8    OR A LICENSING DISPUTE.  IN ECONOMICS, WE SAY THAT IS HOW WE

9    DIVIDE THE RENTS.  WE --

10   **Q.**  THE WHAT?

11   **A.**  THE RENTS.  HOW WE PAY OUT THE PROFITS.

12        IT IS NOT AN ANTICOMPETITIVE EFFECT WHEN WE ARE NOT

13   TALKING ABOUT A CHANGE IN OUTCOME -- A CHANGE IN OUTPUT.

14   WE'RE TALKING ABOUT MONEY THAT GOT CREATED FROM THE SAME

15   NUMBER OF GAMES BEING PLAYED IN BROADCAST AND JUST HOW TO

16   DIVIDE THAT UP BETWEEN -- AMONG ALL OF THE PEOPLE THAT

17   CONTRIBUTED.

18   **Q.**  SO YOU SAY THERE'S NO CHANGE IN OUTPUT CAUSED BY THIS

19   WEALTH TRANSFER.  WHAT DO YOU MEAN?

20   **A.**  AGAIN, I THINK I -- MAY HAVE SAID THIS EARLIER, BUT

21   THERE'S NO ALLEGATION THAT THERE WOULD HAVE BEEN MORE

22   BROADCASTS OF GAMES.  THAT'S THE QUANTITY THAT IS BEING

23   TRANSACTED HERE IN THE MARKET, THE NUMBER OF GAMES BROADCAST

24   AND THOSE ARE SET.  THIS MARKET IS A LITTLE BIT DIFFERENT FROM

25   THE OTHERS WHERE I WAS TALKING ABOUT WHETHER A REDUCTION IN

STIROH — DIRECT / SINGLA

1    CHOICE CAN HAVE AN ANTICOMPETITIVE EFFECT.

2         HERE, WE'RE NOT TAKING ANYTHING AWAY.  ALL OF THE SALES

3    HAPPENED.  THERE'S NO ALLEGATION THAT THERE WOULD HAVE BEEN

4    MORE SALES.  IT'S JUST WHO GETS THE REVENUE AND THAT IS -- I

5    THINK I SAY IN MY REPORT, IT'S LIKE A ROYALTY DISPUTE.  IT'S

6    LIKE IF YOU HAVE TWO INVENTORS ON A PATENT AND ONE OF THEM

7    LICENSES IT BUT DOESN'T PAY THE OTHER.  THAT'S A PATENT

8    DISPUTE.  IT'S A ROYALTY DISPUTE.  IT'S NOT ANTITRUST.

9         THE OTHER PATENT OWNER MIGHT HAVE A CLAIM ON SOME OF THAT

10   REVENUE, BUT IT'S NOT SOMETHING THAT WE THINK ABOUT HARMING

11   CONSUMERS.

12   **Q.**  SO YOU SAID THERE'S NO ASSERTION OF A REDUCTION IN THE

13   NUMBER OF BROADCASTS.  IS THERE AN ASSERTION OF A REDUCTION IN

14   THE QUALITY OF GAME BROADCASTS BECAUSE STUDENT ATHLETES ARE

15   NOT BEING PAID?

16   **A.**  NO.

17   **Q.**  IS THERE AN ASSERTION BY THE PLAINTIFFS OR THEIR EXPERTS

18   THAT THE NUMBER OF STUDENT ATHLETES OR THE NUMBER OF GAMES OR

19   THE NUMBER OF COMPETITIONS IS BEING REDUCED BECAUSE THE

20   ATHLETES ARE NOT BEING PAID THROUGH THE WEALTH TRANSFER?

21   **A.**  THERE IS NO SUCH ASSERTION.

22   **Q.**  NOW, YOU TALKED ABOUT AN EXAMPLE ABOUT TWO INVENTORS.

23   LET'S SAY THERE WAS A GROUP OF INVENTORS AND ALL OF THEM AGREE

24   THAT THEY WOULD NOT PAY ONE OF THE INVENTORS.  THEY WOULD

25   LEAVE ONE OF THE INVENTORS OUT OF THE ROYALTIES.

1        WOULD THAT CREATE ANTICOMPETITIVE CONCERNS?

2   **A.**  NO.  IT MAY BE TROUBLING TO US THAT THERE'S AN AGREEMENT

3   AND THERE'S BEEN AN AGREEMENT NOT TO PAY SOMEONE.  BUT HERE,

4   WHERE WE'VE GOT THIS NUMBER OF BROADCASTS BEING BROADCAST --

5   WE'VE GOT ALL OF THE SALES, WE JUST HAVEN'T APPROPRIATELY

6   DIVIDED UP THE REVENUE, THAT'S NOT ANTITRUST.

7   **Q.**  NOW, CAN'T YOU LOOK AT THE COLLEGE STUDENTS IN THE NIL

8   MARKET?  CAN'T YOU LOOK AT THEM AS CONSUMERS?

9   **A.**  IN -- IN THIS MARKET, THEY ARE NOT CONSUMING SOMETHING.

10  THAT'S THE -- THERE'S A QUESTION OF WHETHER THEIR NIL'S ARE

11  USED.  IF THEY ARE USED, THEY WOULD BE A SELLER.  BUT THEY ARE

12  NOT A CONSUMER IN THIS NIL MARKET.

13  **Q.**  NOW, BRIEFLY, I WANT TO RETURN BACK TO THE EDUCATION

14  MARKET FOR A SECOND.

15       HAS THERE BEEN ANY SHOWING THAT THE NCAA HAS FORECLOSED

16  COMPETITION FOR STUDENT ATHLETES?

17  **A.**  NO.  THERE IS AN ALLEGATION THAT THERE IS A RELEVANT

18  MARKET JUST FOR NCAA STUDENT ATHLETES.  AND IN THAT RELEVANT

19  MARKET, THERE IS A PROHIBITION ON STUDENT ATHLETES MARKETING

20  OR LICENSING THEIR NIL'S TO THIRD PARTIES.  BUT THERE IS NO

21  FORECLOSURE OF OTHER SCHOOLS OR OTHER ASSOCIATIONS, THERE'S NO

22  PREVENTING ANY OTHER ENTITY FROM DECIDING TO PAY ITS STUDENTS

23  A SHARE OF THE NIL PERHAPS IN AN EFFORT TO TRY TO PULL AWAY

24  SOME OF THESE HIGH-QUALITY ATHLETES FROM THE NCAA.

25       THERE -- THERE ARE -- NCAA RULES ONLY APPLY TO THE NCAA.

1          THE COURT:  WELL, WHAT IF ALL THE SCHOOLS ARE IN THE

2     NCAA.

3          THE WITNESS:  SO IN -- THAT IS WHAT THE ALLEGATION

4     IS, IN THE RELEVANT MARKET.  IN REALITY, WE KNOW THERE ARE

5     OTHER SCHOOLS, SO THAT'S WHAT I'M TALKING ABOUT, THAT IF THERE

6     ARE OTHER SCHOOLS, THERE ARE OTHER ORGANIZATIONS, THAT HAVE

7     THEIR OWN SETS OF STUDENTS AND STUDENT ATHLETES.

8          THE REASON THAT DR. NOLL SAYS THEY'RE NOT IN THE NCAA

9     MARKET IS BECAUSE HE SAYS THEY'RE LOWER-QUALITY ATHLETIC

10    COMPETITION, THAT THEY'RE NOT AS GOOD ATHLETES AS THE NCAA.

11    AND TO ME, THAT'S GOT AN IMPLICATION FOR WHAT HE'S SAYING THE

12    EFFECTS OF ALL OF THIS ARE, THAT IF THERE IS A MEANINGFUL

13    RESTRICTION ON LICENSING YOUR NIL IN NCAA, YOU WOULD EXPECT

14    OTHER FIRMS TO TRY TO FILL THAT GAP.  YOU WOULD EXPECT -- I

15    SAID "FIRMS," BUT IN THE INSTANCE, IT'S SCHOOLS.

16         YOU WOULD EXPECT THEN OTHER ASSOCIATIONS TO SAY WE CAN

17    ATTRACT BETTER ATHLETES IF WE PAY THEM FOR THE NIL'S.  AND

18    THAT DOESN'T HAPPEN.  AND THAT'S WHAT I MEAN WHEN I SAY

19    THERE'S NO FORECLOSURE IN THEM.  THE MARKET -- THAT THE NCAA

20    IMPOSES ON ANY OTHER INSTITUTION.  AND IF THIS WERE AN

21    ANTICOMPETITIVE EFFECT, YOU WOULD EXPECT TO SEE A MARKET

22    REACTION WHERE OTHER ENTITIES TRY TO GRAB THESE GOOD STUDENTS

23    BY MAKING IT MORE PROFITABLE FOR THEM TO COME TO THEIR

24    SCHOOLS.

25         THE COURT:  SO SOME RIVAL NCAA WOULD TRY TO ROUND UP

1    A BUNCH OF SCHOOLS WHO WERE IN THE NCAA AND START ITS OWN NCAA

2    IN WHICH THIS COULD BE DONE?

3              **THE WITNESS:**  THERE ARE RIVAL ATHLETIC ASSOCIATIONS.

4    THERE'S SOME THAT I HAVE LISTED IN MY REPORT.  THEY ARE NOT AS

5    BIG AS THE NCAA.  AND DR. NOLL HAS SAID THEY DON'T COMPETE

6    BECAUSE THE -- THE ATHLETES AREN'T AS HIGH A QUALITY.

7         AND I AM SAYING, IF THIS IS A RESTRICTION, YOU WOULD

8    EXPECT THAT TO CORRECT ITSELF.  IF THERE IS A -- IF WE TRY TO

9    EXERCISE MARKET POWER AND WE'RE PREVENTING SOMETHING THAT IS

10   ANTICOMPETITIVE, YOU WOULD EXPECT THE MARKET TO RESPOND.  AND

11   I WOULD EXPECT AS AN ECONOMIST TO SEE OTHER SCHOOLS REACTING

12   TO TRY TO GET THE HIGHER-QUALITY ATHLETES BY PAYING THEM, AND

13   YOU DON'T SEE THAT.

14   **BY MR. SINGLA:**

15   **Q.**  LET'S MOVE ON TO A DIFFERENT SUBJECT.  INEFFICIENT

16   SUBSTITUTION.

17             **THE COURT:**  COULD WE GO BACK TO THE EDUCATION MARKET

18   AGAIN?

19             **MR. SINGLA:**  YES OF COURSE, YOUR HONOR.

20             **THE COURT:**  AND -- AND MAYBE THOSE VERY FIRST COUPLE

21   OF SLIDES YOU HAD.

22             **MR. SINGLA:**  TAKE A MOMENT TO SCREEN ALL THE WAY

23   BACK.

24        MR. NICKELS, CAN YOU GO BACK TO SLIDE 1.

25             **THE COURT:**  YEAH, RIGHT THERE.

```
 1              (DEMONSTRATIVE PUBLISHED.)

 2        MR. SINGLA:  THAT ONE.

 3        THE COURT:  YEAH, I THINK THAT'S THE ONE.

 4     IF THE STUDENT IS THE SELLER –– NO, THE STUDENT IS THE

 5  BUYER AND THE SCHOOL IS THE SELLER AND THE STUDENT IS BUYING A

 6  SORT OF A PACKAGE OF COLLEGE EDUCATION PLUS THE ABILITY TO

 7  PLAY SPORTS AND THERE'S GOING TO BE SOME COMPENSATION GOING

 8  BACK AND FORTH TO ARRANGE THAT RELATIONSHIP BETWEEN THE

 9  STUDENT AND THE SCHOOL THAT'S PROVIDING THAT EDUCATION AND

10  OPPORTUNITY TO PLAY ATHLETICS.

11     AND LET'S SAY THE NET MONEY TRANSFER IS ACTUALLY GOING TO

12  THE STUDENT INSTEAD OF TO THE SCHOOL, SO IT'S SORT OF A CREDIT

13  PRICE OR A REBATE PRICE OR –– I DON'T KNOW WHAT YOU CALL.

14        MR. SINGLA:  OR LIKE A NEGATIVE PRICE.

15        THE COURT:  NEGATIVE PRICE, IS THAT –– IS THERE NO ––

16  IS THAT COGNIZABLE IN ANTITRUST ECONOMICS THEORY?

17        THE WITNESS:  I WOULD SAY AS AN ECONOMIST, IF YOU SEE

18  A NEGATIVE PRICE, YOUR FIRST INSTINCT SHOULD BE TO SAY YOU'VE

19  DEFINED THE MARKETS INCORRECTLY, THAT PRICES ARE NOT NEGATIVE.

20     PRICES ARE FOR A TRANSACTION HERE.  ZERO IS AS LOW AS YOU

21  CAN GET.  THE REASON IN THE PLAINTIFFS' ECONOMIC ANALYSIS HE

22  WOULD TALK ABOUT A NEGATIVE PRICE OR A NET PRICE IS BECAUSE

23  HE'S COMBINED TWO MARKETS, ONE THAT'S GOT REVENUE FLOWING TO

24  THE STUDENTS AND ONE THAT'S GOT THE –– WHAT THE STUDENT IS

25  BUYING FROM THE COLLEGE.
```

1       BUT TAKE OVER -- SEPARATE THOSE TWO MARKETS, AND YOU DON'T

2   SEE THE NEGATIVE PRICE.

3           THE COURT:  BUT WHAT IF IT IS A SINGULAR TRANSACTION

4   THAT INCLUDES MANY ELEMENTS?

5       IT'S A COMPLICATED SINGULAR TRANSACTION THAT INCLUDES I

6   GIVE YOU THIS, YOU GIVE ME THAT, I GIVE YOU THIS, YOU GIVE ME

7   THAT.  SOME THINGS I'M ON TOP, SOME THINGS YOU'RE ON TOP.  AND

8   WE COME UP WITH A PACKAGE OF WHO ENDS UP WITH WHAT.

9       NOW, THEORETICALLY, IT COULD COME UP WITH THE ATHLETE PAYS

10  THE SCHOOL.  THE KINDS OF THINGS WE'RE TALKING ABOUT IT,

11  DOESN'T TURN OUT THAT WAY.  TURNS OUT THE SCHOOL PAYS THE

12  ATHLETE --

13                  (SIMULTANEOUS COLLOQUY.)

14          THE COURT:  -- LAUNDRY MONEY.

15          THE WITNESS:  YEAH.

16          THE COURT:  SO IS THAT -- CAN YOU ANALYZE SOMETHING

17  AS A SINGLE, COMPLICATED TRANSACTION?

18          THE WITNESS:  YES.

19          THE COURT:  HOW WOULD DO YOU THAT?

20          THE WITNESS:  IT'S LIKE LICENSING AGREEMENTS WHERE

21  BOTH PARTIES MIGHT HAVE A WHOLE BUNCH OF PATENTS.  THEY'RE

22  BOTH GOING TO LICENSE THEM TO THE OTHER PARTIES.  AND THERE

23  MAY BE A -- WHAT WE WOULD CALL A BALANCING PAYMENT, AND IT

24  COULD GO IN EITHER DIRECTION, BUT IT DOESN'T MEAN THAT EACH OF

25  THE INDIVIDUAL COMPONENTS COULDN'T BE VALUED SEPARATELY.

STIROH – DIRECT / SINGLA

1    AND SO WHEN WE'RE LOOKING AT A RESTRICTION ON JUST ONE OF

2    THOSE COMPONENTS, WE CAN STILL LOOK AT IT SEPARATELY, EVEN IF

3    IT WERE APPROPRIATE TO THINK OF IT AS A BUNDLE OF THINGS BEING

4    TRANSACTED IN ONE TRANSACTION.

5         **THE COURT:**  YOU COULD LOOK AT IT SEPARATELY.

6         **THE WITNESS:**  YES.

7         **THE COURT:**  BUT COULD YOU ALSO LOOK AT IT TOGETHER?

8         **THE WITNESS:**  I GUESS IT WOULD DEPEND ON WHAT YOUR

9    PURPOSE IS, THAT -- SO QUITE OFTEN IN LICENSING --

10        **THE COURT:**  NO -- WELL, NOT LICENSING.  THAT'S A

11   DIFFERENT DEAL 'CAUSE YOU'VE GOT PATENTS AND ALL OF THAT.  BUT

12   A COMPLICATED TRANSACTION THAT HAD ASPECTS OF IT IN WHICH

13   EITHER SIDE HAD THE ADVANTAGE, AND THEY HAD TO REACH SOME SORT

14   OF ACCOMMODATION THAT COULD END UP IN MONEY GOING EITHER WAY

15   BUT HAVING A NUMBER OF DIFFERENT FACTORS INVOLVED IN IT.

16   COULD YOU NOT ANALYZE THAT AND LOOK FOR ANTICOMPETITIVE

17   CONDUCT WITHIN IT LOOKING AT THE TRANSACTION AS A WHOLE?

18        **THE WITNESS:**  YOU -- IF YOU LOOK AT THE TRANSACTION

19   AS A WHOLE AND THERE'S A LOT OF COMPLICATING FACTORS, THEN YOU

20   DON'T KNOW WHAT THAT ANTITRUST IMPACT ATTACHES TO.  AND WHAT

21   WE WANT TO FIND OUT IS WHAT ATTACHES TO A RESTRICTION ON JUST

22   ONE OF THE COMPONENTS.

23   SO WHEN I SAID BEFORE YOU DON'T HAVE TO, BECAUSE TO

24   ANALYZE THE CLAIMS IN THIS CASE, IT IS MUCH MORE

25   STRAIGHTFORWARD TO PULL OUT THE MARKET WHERE THE RESTRICTION

1    IS SUPPOSED TO TAKE PLACE.

2        INSTEAD, IF WE LOOK AT ONE OVERARCHING TRANSACTION BETWEEN

3    THE STUDENT OF -- THE STUDENT AND THE SCHOOL AND SAY, WELL, IN

4    THAT TRANSACTION, THE PAYMENT COULD GO EITHE R WAY, THERE ARE

5    TOO MANY THINGS BEING TRANSACTED AT THE SAME TIME TO KNOW WHAT

6    IT IS THAT'S RESTRICTING THE PAYMENT THAT GOES TO THE STUDENT.

7    **BY MR. SINGLA:**

8    **Q.**  SO IF I COULD FOLLOW UP ON THE COURT'S QUESTIONS.  SO

9    FIRST IN ECONOMICS, DO YOU LOOK AT MARKETS WITH NEGATIVE

10   PRICES?

11   **A.**  TYPICALLY NO.  I CAN'T THINK OF AN EXAMPLE.

12   **Q.**  WHY NOT?

13   **A.**  IN MARKETS, THE PRICE IS GOING TO TRACK COSTS, COSTS ARE

14   NOT NEGATIVE.  YOU WOULD -- THE -- WHEN YOU'RE LOOKING AT A

15   PARTICULAR MARKET THAT IS THE BUYING AND SELLING OF SOMETHING,

16   THEN THAT HAS A PRICE THAT IS POSITIVE.

17   **Q.**  AND YOU SAID THAT THE -- THE FACT THAT WE'RE TALKING IN

18   THE PLAINTIFFS' THEORY SOMETIMES ABOUT NEGATIVE PRICES

19   INDICATES -- I THINK YOU SAID THEY'RE PUTTING TWO TRANSACTIONS

20   TOGETHER OR SOMETHING LIKE THAT YOU SAID.

21       WHAT DO YOU MEAN?

22   **A.**  WELL, IN THIS CASE, WHAT HAS BEEN BUNDLED TOGETHER IS AN

23   ALLEGED NIL TRANSFER FROM THE STUDENT ATHLETE TO THE COLLEGE,

24   WITH SOME IMPLICIT PAYMENT AND THE TRANSFER OF THE EDUCATION

25   FROM THE COLLEGE TO THE STUDENT ATHLETE.

STIROH – DIRECT / SINGLA

1    **Q.**  AND THOSE ARE THE TWO TRANSACTIONS YOU WERE SAYING WERE

2    BEING MIXED TOGETHER?

3    **A.**   THOSE ARE -- YES, THE ONES THAT I THINK DON'T NEED TO BE

4    MIXED TOGETHER AND THAT THEY COMPLICATE HOW WE THINK ABOUT THE

5    IMPLICATIONS OF THE RESTRICTION AT ISSUE.

6            **THE COURT:**  BUT THERE'S ALSO THE PROVIDING TO THE

7    STUDENT BY THE SCHOOL OF THE OPPORTUNITY TO PLAY COLLEGE

8    SPORTS AND THE PROVIDING BY THE STUDENT TO THE SCHOOL OF HIS

9    SKILL AND PLAYING SUCH SPORTS AND ANY NUMBER OF OTHER THINGS.

10           **THE WITNESS:**  YES.

11           **THE COURT:**  THERE'S A LOT OF THINGS IN THERE.

12           **THE WITNESS:**  THERE ARE A LOT OF THINGS, YES.

13           **THE COURT:**  AND YOU THINK EACH HAS TO BE PULLED OUT

14   AND ANALYZED SEPARATELY?

15           **THE WITNESS:**  NOT NECESSARILY.  I THINK TO ANSWER THE

16   CLAIMS TO EVALUATE THE CLAIMS IN THIS CASE, IF THE CLAIM IS ON

17   RESTRICTIONS AND LICENSING, AND STUDENT ATHLETES BEING PAID

18   TOO LITTLE FOR THEIR NIL, WHAT YOU WANT TO KNOW IS HOW MUCH

19   SHOULD THEY BE PAID FOR THEIR NIL AND IS THAT -- IS WHAT

20   THEY'RE ACTUALLY PAYING LESS THAN THAT -- OR WHAT THEY'RE

21   ACTUALLY RECEIVING, I SHOULD HAVE SAID, LESS THAN THE VALUE OF

22   PAYMENT.

23       AND TO GET THAT, YOU NEED TO LOOK AT WHAT IS THE NIL PART

24   AND SEPARATE IT OUT FROM THE REST OF THE TRANSACTION.

25

1    **BY MR. SINGLA:**

2    **Q.**  OKAY.  CAN WE TURN TO A DIFFERENT SUBJECT.

3        NOW, PROFESSOR NOLL AND RASCHER CLAIM THAT THERE IS

4    INEFFICIENT SUBSTITUTION GOING ON, SO FIRST, COULD YOU EXPLAIN

5    WHAT THE PLAINTIFFS' EXPERTS MEAN BY THE WORD "SUBSTITUTION"

6    IN THIS CONTEXT?

7    **A.**  YES.  WHAT THEY MEAN IS THAT PAYMENTS THAT THEY THINK

8    SHOULD HAVE GONE TO THE STUDENT ATHLETE FROM THE BROADCAST

9    REVENUES ARE, INSTEAD, GOING TO THE COLLEGE, AND THE COLLEGE

10   IS SPENDING THEM ON THINGS OTHER THAN JUST TRANSFERRING THAT

11   MONEY TO THE STUDENT.

12                    (DEMONSTRATIVE PUBLISHED.)

13   **BY MR. SINGLA:**

14   **Q.**  SO WHAT KINDS OF EXAMPLES HAVE THE PLAINTIFFS IDENTIFIED

15   OR YOU IDENTIFIED OF WHAT THE COLLEGE IS SPENDING THIS MONEY

16   ON?

17   **A.**  SO HERE, IT'S THE PLAINTIFFS' EXAMPLES OF WHAT THEY HAVE

18   CALLED "INEFFICIENT SUBSTITUTION."  AND THEIR EXAMPLES ARE

19   THINGS LIKE THE COACHING, THE FACILITIES THAT THE ATHLETES

20   PLAY THE SPORTS IN, THE LOCKER ROOM FACILITIES, THE

21   NUTRITIONIST, THE PHYSICAL THERAPISTS, THE TUTORING, THE

22   STUDENT CENTERS, THINGS THAT THE ATHLETES CAN USE.  BUT THOSE

23   ARE THE -- THAT'S A PART OF THE LIST OF THINGS THAT THE

24   PLAINTIFFS HAVE SAID REFLECT INEFFICIENT SUBSTITUTION WHERE

25   THE COLLEGE IS SPENDING MONEY ON THESE TYPES OF THINGS INSTEAD

1   OF GIVING MONEY DIRECTLY TO THE STUDENTS.

2   **Q.**  AND SO THEIR THEORY IS THAT THE COLLEGES ARE SPENDING THE

3   MONEY THAT ATHLETES WOULD GET UNDER THEIR THEORY, THAT THE

4   COLLEGES ARE ALREADY SPENDING THAT ON SERVICES AND SUPPORT FOR

5   THE ATHLETES.

6   **A.**  YES.

7   **Q.**  NOW, WHAT DO THEY MEAN BY "INEFFICIENT"?

8   **A.**  THEY MEAN THAT THE MONEY COULD -- IF YOU TRANSFERRED IT

9   DIRECTLY TO THE STUDENT ATHLETES, YOU COULD GET THEM TO -- TO

10  COME TO THE -- THE COLLEGE WITHOUT SPENDING SO MUCH MONEY.

11      YOU WOULDN'T HAVE TO SPEND AS MUCH ON COACHING AND

12  FACILITIES AND EVERYTHING ELSE, AND YOU COULD STILL GET ALL OF

13  SAME STUDENTS TO COME AS LONG AS YOU GAVE THEM PAYMENTS.

14  **Q.**  DO YOU AGREE THAT THEY HAVE PROVEN THAT?

15  **A.**  PROVEN WHAT?  SORRY JUST --

16  **Q.**  DO YOU BELIEVE THEY HAVE PROVEN THAT THE SPENDING BY THE

17  COLLEGES IS INEFFICIENT?

18  **A.**  I DON'T THINK THEY HAVE.  THEY HAVE SAID THAT THERE IS

19  SPENDING BY THE COLLEGE TO TRY TO RECRUIT THE ATHLETES.  THEY

20  HAVE SAID THAT THE ATHLETES DON'T BENEFIT FROM THAT BY AS MUCH

21  AS THEY WOULD BENEFIT FROM A DIRECT PAYMENT, BUT THEY HAVEN'T

22  PROVEN THAT.

23      AND I THINK IT IS STRAIGHTFORWARD TO SEE THAT CERTAINLY

24  NOT ALL OF THE ATHLETES WOULD NECESSARILY BE BETTER OFF WITH

25  DIRECT PAYMENTS THAN THEY ARE WITH THE BENEFIT OF ALL OF THESE

1    THINGS THE SCHOOL SPENDS THE MONEY ON.

2    **Q.**  WELL, SO ONE OF THE THINGS THEY SAY IS THAT COACH SALARIES

3    HAVE BEEN INCREASING VERY QUICKLY.

4    **A.**  YES.

5    **Q.**  CORRECT?

6        AND IN YOUR REPORT, YOU CITED PROFESSOR NOLL'S DEPOSITION

7    TESTIMONY WHERE HE AGREED THAT FOOTBALL AND BASKETBALL COACHES

8    COMPETE IN A MARKET THAT INCLUDES PROFESSIONAL COACHES.

9        CORRECT?

10   **A.**  YES.

11   **Q.**  AND SO HOW DOES THIS RELATE TO THE CLAIM THAT COACH

12   SALARIES IN THE NCAA HAVE BEEN INCREASING QUICKLY?

13   **A.**  IT RELATES TO THEIR CLAIM THAT THE REASON THAT THEY'RE

14   INCREASING QUICKLY IS BECAUSE OF INEFFICIENT SUBSTITUTION,

15   THAT JUST TOO MUCH MONEY IS BEING SPENT THERE.

16       IF THE COACHES COMPETE IN COMPETITIVE MARKET WITH

17   PROFESSIONAL COACHES, THEN THE AMOUNT THAT THEY ARE PAID IN

18   THE SALARY IS GOING TO REFLECT ALL OF THOSE MARKET

19   INTERACTIONS.  IT'S A COMPETITIVE PRICE.  SO I THINK WE CAN'T

20   NECESSARILY SAY JUST BECAUSE THE COACHES' SALARIES HAVE BEEN

21   INCREASING, THAT THAT'S A REFLECTION OF INEFFICIENT

22   SUBSTITUTION, THAT THEY HAVE INDICATED, THAT THE COACHES

23   COMPETE WITH COACHES FOR NBA AND NFL, AND NBA AND NFL COACHES

24   GET PAID MORE THAN THE COLLEGE COACHES.

25   **Q.**  NOW, DO THE STUDENT ATHLETES BENEFIT FROM THE SPENDING

1    THAT WE'RE TALKING ABOUT BY COLLEGES ON COACHES AND FACILITIES

2    AND TRAINERS AND NUTRITIONISTS AND ALL OF THIS?

3    **A.**   THEY DO.   THERE IS TESTIMONY FROM THE NAMED PLAINTIFFS IN

4    THIS CASE TALKING ABOUT THE BENEFITS THAT THEY RECEIVE, AND

5    PLAINTIFFS' EXPERTS DR. NOLL AND DR. RASCHER TALK ABOUT IT --

6    THE SPENDING AS A WAY TO RECRUIT ATHLETES.

7        YOU'RE -- THE COLLEGE IS SPENDING ITS MONEY ON THINGS THAT

8    ATHLETES WILL VALUE TO GET THEM TO COME TO THE SCHOOL, SO JUST

9    BY THE WAY THAT IT IS SET UP OR DESCRIBED, THERE IS VALUE TO

10   THE -- THE STUDENT ATHLETES FROM THIS TYPE OF SPENDING.

11   **Q.**   NOW, HAVE THIRD PARTIES STUDIED THE VALUE THAT STUDENT

12   ATHLETES RECEIVE FROM THIS KIND OF SPENDING?

13   **A.**   YES, THERE IS A STUDY THAT I MENTION IN MY REPORT, A

14   *U.S.A. TODAY* STUDY THAT LOOKED AT THE VALUE THAT BASKETBALL

15   STUDENTS RECEIVE FROM ALL OF THE TYPES OF THINGS THAT THEY

16   GET, THE GRANT IN AID, THE COACHING, THE TRAINING, THE

17   PHYSICAL THERAPY, THE HEALTH CARE, THE FOOD, THE ROOM AND

18   BOARD.

19       AND I -- AS I RECALL, THE VALUE THAT THE *U.S.A. TODAY*

20   STUDY PLACED ON A YEAR FOR A BASKETBALL STUDENT WAS AROUND

21   $120,000.

22   **Q.**   NOW, PLAINTIFFS SAY -- I THINK YOU SAID THAT THE VALUE

23   THAT THE STUDENTS GET THEY BELIEVE OR THEY ASSERT WOULD BE

24   LESS THAN THEY WOULD GET IF THEY WERE JUST PAID CASH.

25   **A.**   YES.   THAT IS WHY THEY CALL IT INEFFICIENT SUBSTITUTION.

1    THEY SAY THE VALUE THE STUDENTS GET OF ALL OF THESE THINGS

2    MUST BE LESS THAN IF THEY GOT THE MONEY DIRECTLY.

3    **Q.**  NOW, ONE SECOND.  I WANT TO ASK A DIFFERENT QUESTION FOR A

4    SECOND.  WHAT ARE PUBLIC GOODS?

5    **A.**  PUBLIC GOODS ARE GOODS THAT CAN BE CONSUMED ESSENTIALLY

6    OVER AND OVER AGAIN BY A LOT OF PEOPLE.  IT DOESN'T GET USED

7    UP.  A PARK OR A LIBRARY IS A PUBLIC GOOD.  YOU BUILD THE

8    PUBLIC GOOD, EVERYBODY CAN COME IN AND ENJOY IT.

9    **Q.**  AND DO -- DO THE VALUES, THE PENDING THAT WE'RE TALKING

10   ABOUT, ALL OF THIS SPENDING OR THE SUBSTITUTION SPENDING, ARE

11   THOSE PUBLIC GOODS?

12   **A.**  YES.  IN A SENSE WHERE NOW THE PUBLIC -- OR THE FOOTBALL

13   PLAYERS OR THE BASKETBALL PLAYERS, BUT THE SCHOOL SPENDS MONEY

14   TO BUILD A FACILITY.  EVERYBODY GETS TO USE THE FACILITY OR

15   ESSENTIALLY GETS SOME VALUE OF ALL OF THAT SPENDING.

16       SO THAT'S TRUE FOR THE FACILITIES OR THE LOCKER ROOMS OR

17   THE TRAINING TABLE, THE THINGS THAT THE MONEY GETS SPENT ON

18   THAT ALL OF BASKETBALL AND FOOTBALL PLAYERS GET TO USE.

19   **Q.**  NOW --

20       **THE COURT:**  COULD YOU EXPLAIN TO ME HOW -- I

21   UNDERSTAND WHAT "INEFFICIENT SUBSTITUTION" IS.  COULD YOU

22   EXPLAIN HOW THAT FITS INTO THE ANALYTIC FRAMEWORK OF AN

23   ANTITRUST VIOLATION?

24       DOES IT PROVE THE PRICE FIXING?  DOES IT PROVE WHAT THE

25   REAL VALUE SHOULD HAVE BEEN?  DOES IT PROVE WHAT THE REAL COST

STIROH – DIRECT / SINGLA

1    SHOULD HAVE BEEN?  DOES IT -- WHAT DOES IT DO?  WHY WOULD YOU

2    EVEN THINK ABOUT IT OR TALK ABOUT IT?

3            **THE WITNESS:**  YES.

4        **THE COURT:**  WHAT IS IT DOING IN THERE?

5        **THE WITNESS:**  I GUESS IN AN ANTITRUST ANALYSIS, IT

6    DOESN'T FIT IN.

7        **THE COURT:**  DOES NOT FIT.

8        **THE WITNESS:**  DOES NOT.  IT'S THE MONEY THAT COMES

9    FROM THE BROADCAST THAT THE PLAINTIFFS HAVE SAID SHOULD HAVE

10   GONE DIRECTLY TO THE STUDENTS AND THAT THEY WOULD HAVE BEEN

11   BETTER OFF GETTING THE MONEY DIRECTLY RATHER THAN THIS, SO IT

12   COMES INTO HOW THE STUDENTS ARE AFFECTED BY THE ALLEGED WEALTH

13   TRANSFER.  BUT AS I SAY IN MY REPORT, THAT IS NOT AN

14   ANTICOMPETITIVE EFFECT.  IT IS HOW A (SIC) STUDENTS MIGHT BE

15   AFFECTED.

16       **THE COURT:**  SO INEFFECT- -- WHAT IS IT --

17   "INEFFICIENT SUBSTITUTION" A TERM OF ART IN ANTITRUST

18   ECONOMICS?  IS IT SOMETHING YOU TALK ABOUT?  OR IS IT JUST

19   SOMETHING THAT WAS BROUGHT UP IN THIS CASE IDIOSYNCRATICALLY?

20       **THE WITNESS:**  AS I -- I THINK IT IS SOMETHING BROUGHT

21   UP IN THIS CASE, IN TERMS OF INEFFICIENT -- THE MONEY BEING

22   SPENT INEFFICIENTLY TO RECRUIT ATHLETES RATHER THAN

23   EFFICIENTLY TO RECRUIT THEM.  EFFICIENCY IS CERTAINLY A

24   SUBJECT IN ECONOMICS, BUT THIS IDEA THAT IT IS THE SPENDING ON

25   THINGS THAT THEY WOULDN'T VALUE AS MUCH AS JUST GETTING MONEY

1    THAT IS SPECIFIC TO THIS CASE.

2    **BY MR. SINGLA:**

3    **Q.**  NOW, DO -- LET'S SAY ALL THE STUDENTS ARE PAID THE SAME ON

4    A TEAM.  CAN YOU THEN CONCLUDE THAT THE PLAINTIFFS ARE RIGHT,

5    THAT THEY BE BETTER OFF WITH THE CASH RATHER THAN THESE PUBLIC

6    GOODS THAT YOU WERE TALKING ABOUT?

7    **A.**  NO, I CAN'T CONCLUDE THAT.  SO WHAT -- IF THE STUDENTS GET

8    CASH, THEY VALUE THE CASH.  IF THE STUDENTS GET BETTER

9    COACHING, BETTER FACILITIES, THERE IS SOME VALUE TO THEM, SO

10    WE DON'T KNOW JUST AT THE OUTSET WHICH THEY VALUE MORE.

11        WHAT WE DO KNOW, THOUGH, IS IF YOU POOL ALL THE MONEY

12    TOGETHER AND SPEND IT ON A FACILITY, THAT'S SOMETHING THAT THE

13    STUDENT CAN'T REPLICATE WITH JUST ITS OWN SHARE.  SO WE'D BE

14    NEEDING TO LOOK AT WHAT IS THE SHARE THAT THE STUDENT WOULD

15    GET COMPARED TO WHAT IS THE VALUE THAT THEY GET FROM ALL OF

16    THESE PUBLIC GOODS TO BE ABLE TO SEE, ARE THEY BETTER OFF OR

17    WORSE OFF.

18        THE ALLEGATION IS THAT THEY ARE WORSE OFF BECAUSE THE

19    SPENDING IS ON PUBLIC GOODS.  BUT THAT CAN'T JUST ASSUMED.

20    YOU WOULD HAVE TO EVALUATE THAT.

21    **Q.**  NOW, WHAT IF THERE WAS NO RULE MANDATING EQUAL PAYMENT?

22    WHAT WOULD OCCUR, THEN, IN TERMS OF HOW THE SCHOOLS WOULD PAY

23    THE ATHLETES?

24                    (DEMONSTRATIVE PUBLISHED.)

25        **THE WITNESS:**  AGAIN, THIS COMES FROM -- THINK ABOUT

STIROH – DIRECT / SINGLA

```
1    WHAT IS THE --
2              THE COURT:  SORRY.  NO RULE MANDATING EQUAL PAYMENT?
3              MR. SINGLA:  YES.
4              THE COURT:  BY WHO?
5              MR. SINGLA:  SORRY.  LET ME BE MORE CLEAR.
6    Q.  IF THERE IS NO RULE MANDATING THAT THE COLLEGES PAY EACH
7    ATHLETE ON THE TEAM THE SAME AMOUNT OF THE BROADCAST REVENUES.
8    IN THAT SITUATION --
9              THE COURT:  FIRST, YOU'RE SAYING THEY CAN PAY ANYBODY
10   ANYTHING OUT OF THE BROADCAST REVENUES.  AND THEN FROM THERE
11   YOU'RE SAYING, WHAT IF THEY COULD, AND ALSO THEY COULD PAY
12   DIFFERING AMOUNTS.  IS THAT WHAT YOU'RE GETTING AT?
13             MR. SINGLA:  YES, YOUR HONOR.  THANK YOU.
14   Q.  IN THAT SITUATION THAT THE COURT JUST IDENTIFIED, HOW
15   WOULD THE SCHOOLS, TO YOUR UNDERSTANDING, SPREAD THEIR
16   PAYMENTS AMONG THE ATHLETES?
17   A.  YOU WOULD EXPECT, THEN, THAT THE -- THIS PAYMENTS (SIC) TO
18   GO DISPROPORTIONATELY TO THE STAR ATHLETES.  AGAIN, THE --
19   PLAINTIFFS' THEORIES THAT THERE'S RESTRICTIONS ON RECRUITING
20   AND THAT IS WHY BUT FOR THOSE RESTRICTIONS, THE PAYMENTS WOULD
21   BE USED TO RECRUIT ATHLETES.
22        SO RIGHT NOW, THEY CAN'T BE USED TO RECRUIT ATHLETES
23   THEY'RE BEING FUNNELED INTO COACHING AND FACILITIES.  IF THEY
24   COULD BE USED TO RECRUIT ATHLETES, WE WOULD TAKE THE MONEY
25   AWAY FROM SOMETHING, POUR IT INTO RECRUITING, AND IF THERE'S
```

STIROH – DIRECT / SINGLA

1    NOTHING THAT SAYS YOU HAVE TO PAY STUDENTS THE SAME AMOUNT,

2    WHAT YOU WOULD EXPECT IS THE STAR ATHLETES TO BE HEAVILY

3    RECRUITED AND RECEIVE HIGHER PAYMENTS THAN THE ORDINARY

4    ATHLETES.

5                    (DEMONSTRATIVE DISPLAYED.)

6    **BY MR. SINGLA:**

7    **Q.**  NOW, I WANT TO SHOW YOU SOME TESTIMONY FROM DR. NOLL AT

8    TRIAL, WHERE HE SAID THE RATIOS IN THE NFL AND THE NBA BETWEEN

9    STARS AND ORDINARY ATHLETES WERE 20 OR EVEN 40 TO 1.

10        NOW WHAT WOULD BE YOUR EXPECTATION --

11            **THE COURT:**  OF WHAT?

12            **MR. SINGLA:**  SALARIES, YOUR HONOR.

13   **Q.**  NOW, IF THERE WAS NO MINIMUM SALARY IN THE NCAA, WHAT

14   WOULD BE YOUR EXPECTATION OF THE RATIO THAT SCHOOLS WOULD PAY

15   STARS VERSUS ORDINARY ATHLETES IF THEY CAN MAKE DIFFERING

16   PAYMENTS?

17   **A.**  I DON'T HAVE AN EXPECTATION OF WHAT THE ULTIMATE RATIO

18   WOULD BE, BUT YOU WOULD EXPECT IT TO MIMIC SOMETHING LIKE THIS

19   WHERE MORE MONEY GETS PAID TO THE STARS THAN THE ORDINARY

20   ATHLETES.  HERE, WE SEE 20 TO 1 OR 40 TO 1, WHERE THERE ARE

21   MINIMUM SALARIES.

22        IF THERE'S NO MINIMUM SALARIES, THEN YOU WOULD EXPECT IT

23   TO GO HIGHER.  I DON'T HAVE A SENSE OF HOW MUCH HIGHER IT

24   GOES.

25   **Q.**  DID DR. NOLLS IDENTIFY IN HIS REPORTS A RANGE OF VALUES

STIROH – DIRECT / SINGLA

1    THAT HE THINKS THE ATHLETES WOULD BE WORTH TO THE COLLEGES?

2    **A.**  YES.  HE REFERS TO AN ANALYSIS OF WHAT IS CALLED THE MRP

3    OR MARGINAL REVENUE PRODUCT OF THE ATHLETES.  AND THAT IS AN

4    ANALYSIS OF HOW MUCH EACH INDIVIDUAL STUDENT IS WORTH TO THE

5    COLLEGE IN TERMS OF HOW MANY REVENUE IT GENERATES FOR THE

6    COLLEGE.  AND HE HAS A REFERENCE TO THAT IN HIS REPORT.

7    **Q.**  AND WHAT'S THE RANGE HE GIVES?

8    **A.**  THE RANGE, AS I RECALL IN HIS REPORT, IS BETWEEN ZERO AND

9    2 MILLION, A WIDE RANGE.

10    SOME STUDENT ATHLETES MAY NOT CONTRIBUTE ANYTHING TO THEIR

11    SCHOOL AND SOME BIG STARS MAY CONTRIBUTE QUITE A LOT.

12    **Q.**  DOES HE GIVE A VALUE OR AN ESTIMATE FOR A MEDIAN ATHLETE?

13    **A.**  YES.  THE MEDIAN OF THE MIDDLE VALUE, I THINK, WAS AROUND

14    $44,000.

15    **Q.**  NOW, IF YOU HAVE THESE KINDS OF DIFFERENCES IN PAYMENTS,

16    WIDE DISPARITY IN PAYMENTS, CAN YOU SAY THAT THE STUDENTS

17    WOULD BE BETTER OFF IF THE SCHOOL USED THE MONEY THAT THEIR

18    SPENDING NOW ON FACILITIES OR COACHES OR NUTRITIONISTS TO PAY

19    CASH TO THE STUDENTS?

20    **A.**  YOU CERTAINLY CAN'T SAY THAT ALL OF THEM WOULD BE BETTER

21    OFF.  IF YOU DIDN'T HAVE A RESTRICTION ON RECRUITING AND SO

22    ALL OF THAT MONEY COULD FLOW THROUGH RECRUITING TO THE

23    STUDENTS AND SOME WERE GETTING $2 MILLION AND SOME ZERO, THE

24    ONES THAT GET ZERO ARE CERTAINLY WORSE OFF THAN WHEN THEY GET

25    THE BENEFIT OF THE FACILITIES THAT THE MONEY IS CURRENTLY

1    BEING USED FOR.

2    **Q.**  SO UNDER THE PLAINTIFFS' SUBSTITUTION THEORY, THE MONEY

3    THAT WAS BEING SPENT ON PUBLIC GOODS SHARED EQUALLY, BUT ALL

4    OF THE STUDENT ATHLETES WOULD BE -- INSTEAD BE GIVEN AS CASH

5    TO THE STARS ON THE TEAM?

6    **A.**  THAT IS THEIR THEORY, YES.

7          **MR. SINGLA:**  NO FURTHER QUESTIONS.  NO FURTHER

8    QUESTIONS, YOUR HONOR.

9              (PAUSE IN THE PROCEEDINGS.)

10                 **CROSS-EXAMINATION**

11   **BY MR. ISAACSON:**

12   **Q.**  GOOD AFTERNOON, DR. STIROH.  NICE TO SEE YOU AGAIN.

13   **A.**  NICE TO SEE YOU.

14   **Q.**  YOU MENTION -- LET'S TALK ABOUT FORECLOSURE.  YOU

15   MENTIONED THAT THERE WOULD BE OTHER ATHLETIC ASSOCIATIONS

16   THAT -- IF THERE WAS A DEMAND FOR NIL'S, THAT YOU WOULD EXPECT

17   TO COME INTO THIS -- TO ENTER THIS MARKET.

18       AND YOU DESCRIBE, AS YOU SAID IN YOUR REPORTS, THAT THERE

19   WERE OTHER ATHLETIC ASSOCIATIONS, AND YOU SPECIFICALLY --

20   SPECIFICALLY REFERENCE THOSE IN YOUR REPORTS.

21       LET'S GO THROUGH THOSE.  ONE OF THEM IS THE NATIONAL

22   JUNIOR COLLEGE ATHLETIC ASSOCIATION, WHICH IS A -- AN ATHLETIC

23   ASSOCIATION OF TWO-YEAR COLLEGES, CORRECT?

24   **A.**  YES.

25   **Q.**  ALL RIGHT.  SO IT'S YOUR EXPECTATION IT WOULD -- WHAT YOUR

1    CONTENTION HERE IS, IS THAT TWO-YEAR COLLEGES WOULD SOMEHOW

2    COME IN AND COMPETE IN THIS MARKET WITH FOUR-YEAR COLLEGES BY

3    USING NIL RIGHTS.

4         THAT'S YOUR POINT?

5    **A.**  NO, NOT READILY.  I THINK YOU'VE SKIPPED OVER THE NAIA

6    WHICH IS PROBABLY THE FIRST ONE THAT I MENTIONED --

7                        (SIMULTANEOUS COLLOQUY.)

8    **BY MR. ISAACSON:**

9    **Q.**  I'M GOING TO GO THROUGH THEM ALL.

10   **A.**  OKAY.  BUT IT IS NOT MY CONTENTION THAT THE TWO-YEAR

11   COLLEGE IS NECESSARILY THE NEXT IN LINE THAT WE WOULD EXPECT

12   TO SEE TO COME IN TO FILL A VOID LEFT BY A MONOPOLY.

13   **Q.**  OKAY.  WELL, LET'S GO THROUGH THE LIST IN YOUR REPORT.

14   LET'S GET OUT THE LIST.  PARAGRAPH 27 OF YOUR REPLY REPORT.

15        MATT, CAN WE PUT THAT ON SCREEN?

16                        (DEMONSTRATIVE PUBLISHED.)

17            **MR. ISAACSON:**  PARAGRAPH 27.

18   **Q.**  YOU RECOGNIZE THIS FROM YOUR REPLY REPORT MAKING THAT

19   POINT, THE NCAA REGULATIONS DO NOT IMPEDE ENTRY.

20        ALL RIGHT.  AND YOU MENTION THE NAIA.  WHAT'S THE AVERAGE

21   SIZE OF THOSE SCHOOLS?

22   **A.**  I DON'T HAVE THAT INFORMATION AS I SIT HERE.  IT IS AN

23   ASSOCIATION OF FEWER SCHOOLS THAN IS IN THE NCAA.  I THINK

24   THERE MIGHT BE 300 SCHOOLS IN IT.  I DON'T KNOW THE SIZE IN

25   TERMS OF THEIR STUDENT BODIES.

1    **Q.**  ALL RIGHT.  ARE THERE -- DO YOU HAVE ANY CHARACTERIZATION

2    TO -- OF THE NAIA AS -- AS -- AS TO HOW LARGE THOSE SCHOOLS

3    TYPICALLY ARE?

4    **A.**  ON -- NO, I DON'T HAVE AN INFORMATION AS I SIT HERE ON HOW

5    LARGE THOSE SCHOOLS ARE.  I THINK THIS IS THE NEXT CLOSEST

6    ASSOCIATION OUTSIDE OF THE NAIA -- OUTSIDE OF NCAA.  AND SO IT

7    WOULD BE THE RELEVANT ONE, I THINK, TO CONSIDER IN TERMS OF

8    WOULD IT MAKE SENSE FOR SOMEBODY ELSE TO TRY TO FILL THE VOID

9    THAT'S ALLEGEDLY BEING LEFT BY THE NCAA.

10   **Q.**  DO YOU HAVE ANY INFORMATION ABOUT THE -- WHAT THE FOOTBALL

11   STADIUMS LOOK LIKE FOR THE NAIA COMPARED TO THE FOOTBALL

12   STADIUMS OF THE BIG FIVE CONFERENCES?

13   **A.**  I DO NOT AS I SIT HERE.  CERTAINLY, I WOULD ASSUME THE BIG

14   FIVE CONFERENCES WOULD HAVE THE BEST FACILITIES OF ALL OF

15   COLLEGES.

16   **Q.**  AND IF THE NAIA WANTED TO COMPETE WITH THE NCAA, DO YOU

17   HAVE ANY ESTIMATE OF WHAT IT WOULD COST TO BUILD THOSE

18   STADIUMS, BUILD THE BASKETBALL STADIUMS AS WELL, AND TO BUILD

19   THE FACILITIES NECESSARY IN ORDER TO PERFORM -- PROVIDE

20   ATHLETICS AT THE SAME LEVEL AS DIVISION I F- -- MEN'S

21   BASKETBALL FOOTBALL?  DO YOU HAVE THAT ESTIMATE?

22   **A.**  I DON'T HAVE THAT ESTIMATE.  IT WOULD BE A SUBSTANTIAL

23   INVESTMENT TO BUILD A FACILITY THAT COMPETES WITH THE

24   FACILITIES OF THE BIG FIVE CONFERENCE.  THAT DOES NOT PREVENT

25   THE TYPE OF COMPETITIVE INTERACTION THAT I WAS TALKING WHERE

STIROH - CROSS / ISAACSON

1    THERE ARE ALSO COLLEGES AT THE END OF THE SPECTRUM.

2    **Q.**  MY QUESTION WAS SIMPLE, DO YOU KNOW HOW MUCH THAT WOULD

3    COST?

4    **A.**  I DO NOT, AS I SIT HERE.  I THINK THERE HAVE BEEN

5    ESTIMATES.  I KNOW THAT IT IS A LARGE NUMBER.

6    **Q.**  ALL RIGHT.  IT'S A NUMBER OF BILLIONS, ISN'T IT?

7    **A.**  YES.

8    **Q.**  OKAY.  THE NATIONAL CHRISTIAN COLLEGIATE ATHLETIC

9    ASSOCIATION, YOU PUT THAT IN YOUR REPORT.

10       DO YOU KNOW ANYTHING ABOUT THAT ORGANIZATION?

11   **A.**  I HAVEN'T LOOKED AT INFORMATION ABOUT THAT ONE SINCE I

12   WROTE THIS REPORT, SO I DON'T RETAIN ANY INFORMATION ABOUT THE

13   NUMBER OF SCHOOLS THAT ARE THERE.  I THINK AGAIN, THE CLOSEST

14   ONE THAT IS RELEVANT IS THE NAIA.

15   **Q.**  ALL RIGHT.  WELL, I -- YOU'VE SAID THIS ONE IS RELEVANT;

16   YOU STAND BY THAT?

17   **A.**  I HAVE NOTED IT AS ANOTHER ATHLETIC ASSOCIATION THAT

18   EXISTS IN THE UNITED STATES, AND IT IS ONE THAT THE NCAA'S

19   REGULATIONS DON'T AFFECT.

20   **Q.**  OKAY.  BY --

21   **A.**  -- RAISED IT WITH FORECLOSURE, WHICH IS WHAT YOU WERE

22   ASKING ME ABOUT.

23   **Q.**  YES, THAT'S --

24   **A.**  ALL WE NEED IS ONE OF THEM TO SHOW AN INDICATION.  IF THIS

25   IS A COMPETITIVE CONSTRAINT --

1    **Q.**  CAN I ASK A QUESTION?  ALL RIGHT.

2        MATT, CAN WE LOOK AT RULE 7.09 OF THE NATIONAL CHRISTIAN

3    COLLEGIATE ATHLETIC ASSOCIATION?

4                        (DEMONSTRATIVE PUBLISHED.)

5    **BY MR. ISAACSON:**

6    **Q.**  DID -- BEFORE YOU PUT THIS IN YOUR REPORT, DID YOU LOOK AT

7    ANY OF THESE RULES SUCH AS PROHIBITED PRACTICES THAT THE

8    COACHES AND STUDENT ATHLETES MUST REFRAIN FROM THE USE OF

9    PROFANE OR ABUSIVE LANGUAGE, HOMOSEXUAL BEHAVIOR, OR -- OR

10   ALCOHOLIC BEVERAGES AND TOBACCO.

11       DID YOU LOOK AT THAT?

12   **A.**  I DON'T THINK I NOTICED THAT ONE --

13                        (SIMULTANEOUS COLLOQUY.)

14   **BY MR. ISAACSON:**

15   **Q.**  LET'S LOOK AT RULE 6.01.

16                        (DEMONSTRATIVE PUBLISHED.)

17   **BY MR. ISAACSON:**

18   **Q.**  ALL RIGHT.  THERE'S A REFERENCE TO SUB C, THE CHRISTIAN

19   STATEMENT OF FAITH, TO BE INELIGIBLE, AN INSTITUTION MUST SIGN

20   AND COMPLY WITH THE STATEMENT OF FAITH.  TO BE ELIGIBLE FOR

21   CONTINUED PARTICIPATION, EACH PARTICIPATING INSTITUTION MUST

22   SIGN AND COMPLY STATEMENT OF FAITH -- OF FAITH EACH YEAR.

23       CAN WE LOOK AT THE STATEMENT OF FAITH.

24                        (DEMONSTRATIVE PUBLISHED.)

25

```
 1    BY MR. ISAACSON:

 2    Q.  I'M NOT GOING TO READ THIS WHOLE THING, BUT WE BELIEVE THE

 3    BIBLE ALONE -- THE BIBLE IN ITS ENTIRETY IS THE WORD OF GOD.

 4    WE BELIEVE IN SALVATION BY GRACE THROUGH FAITH, ET CETERA,

 5    ET CETERA.

 6        WAS THIS -- DID YOU INVESTIGATE ANY OF THIS BEFORE YOU

 7    WROTE YOUR REPORT?

 8    A.  YES, I DID READ INFORMATION ABOUT THESE.  AND THE WAY THAT

 9    I'M LISTING THEM --

10    Q.  IT'S A SIMPLE.

11    A.  -- I THINK, IS NOT RELEVANT TO THE DISCUSSION THAT WE HAD

12    ON FORECLOSURE.

13    Q.  ALL RIGHT.  THE NEXT -- SO NEXT ON YOUR LIST WAS THE -- IF

14    WE GO BACK TO PARAGRAPH 27.

15                    (DEMONSTRATIVE PUBLISHED.)

16    BY MR. ISAACSON:

17    Q.  WAS THE -- THE NEXT ON YOUR LIST IS THE NATIONAL JUNIOR

18    COLLEGE ATHLETIC ASSOCIATION.

19                    (DEMONSTRATIVE PUBLISHED.)

20    BY MR. ISAACSON:

21    Q.  THAT'S THE TWO-YEAR COLLEGES, RIGHT?  GOING DOWN -- YEAH,

22    THAT'S THE TWO-YEAR COLLEGES.  CORRECT?

23    A.  YES.

24    Q.  OKAY.  THEN THERE'S THE UNITED STATES COLLEGIATE ATHLETIC

25    ASSOCIATION.
```

1          YOU'RE AWARE THAT THAT ASSOCIATION IS LIMITED TO COLLEGES

2     WITH FEWER THAN 1500 STUDENTS?

3     **A.**  I MIGHT HAVE BEEN AWARE AT SOME POINT.  I HAVEN'T LOOKED

4     AT INFORMATION ABOUT EACH OF THESE SINCE I WROTE MY REPORT.

5     **Q.**  ALL RIGHT.  WHAT ARE YOU GOING TO DO WITH A STADIUM THAT

6     HOUSES 50,000 OR A HUNDRED THOUSAND PEOPLE IF YOU'VE GOT 1500

7     STUDENTS ON CAMPUS?

8     **A.**  SO THESE SCHOOLS ARE NOT THE ONES THAT YOU WOULD LOOK TO

9     TO SEE IF THERE'S EVIDENCE OF FORECLOSURE.  YOU WOULD LOOK AT

10    THE NEXT CLOSEST SUBSTITUTE, WHICH WOULD BE, I THINK, THE

11    NAIA, AND INVESTIGATE WHETHER IT IS ACTING IN SUCH A WAY THAT

12    SUGGESTS THERE IS AN ANTICOMPETITIVE FORECLOSURE.

13    **Q.**  ALL I CAN DO IS GO THROUGH YOUR LIST, DOCTOR.

14         THE NORTHWEST ASSOCIATION OF COMMUNITY COLLEGES AND THE

15    CALIFORNIA COMMUNITY COLLEGE ATHLETIC ASSOCIATION, THOSE ARE

16    ALL TWO-YEAR COLLEGES, RIGHT?

17    **A.**  I BELIEVE SO, YES.

18    **Q.**  ALL RIGHT.  YOU DIDN'T ANALYZE HOW CBS, TURNER, ESPN, WHAT

19    THEIR REACTION WOULD BE IF THE NAIA ALL OF A SUDDEN ANNOUNCED

20    THAT THEY WERE GOING TO RUN THE NCAA MARCH MADNESS TOURNAMENT?

21         YOU DIDN'T LOOK AT THAT, DID YOU?

22    **A.**  THAT'S NOT A QUESTION THAT'S RELEVANT TO MY ANALYSIS.

23    **Q.**  I GATHER.

24         OKAY.  NOW, LET'S -- YOUR COUNSEL DIDN'T SPEND MUCH TIME

25    GOING THROUGH YOUR BACKGROUND.  LET'S DO A LITTLE BIT OF THAT.

1      AS AN ECONOMIST, YOU HAVE NO PUBLISHED WORK IN ANY

2    PEER-REVIEWED JOURNALS, CORRECT?

3    **A.**  I -- I DO NOT PUBLISH IN PEER-REVIEWED JOURNALS.  IT'S NOT

4    PART OF MY CAREER.

5    **Q.**  RIGHT.

6      ALL OF YOUR PUBLISHED WORK IN BOOKS ARE IN BOOKS EDITED BY

7    PEOPLE YOU WORK WITH AT NERA AND IN BOOKS PUBLISHED BY NERA?

8    **A.**  IN BOOKS --

9    **Q.**  YES.

10   **A.**  -- I THINK THAT IS TRUE.  I HAVE A CHAPTER IN AN ABA

11   VOLUME ON ECONOMETRICS, BUT I THINK THE EDITOR HAPPENS TO BE

12   SOMEBODY FROM NERA CURRENTLY.

13   **Q.**  AND NERA IS THE NAME OF THE FIRM THAT YOU WORK WITH AND

14   THAT SUPPORTED YOU IN THIS CASE?

15   **A.**  CORRECT.

16   **Q.**  OKAY.  NOW, YOU'VE NEVER TAUGHT AS A PROFESSOR AT ANY

17   UNIVERSITY?

18   **A.**  THAT'S RIGHT.

19   **Q.**  OKAY.  NOW SINCE YOUR PH.D. IN 1996, ALL OF YOUR

20   PROFESSIONAL CAREER AS AN ECONOMIST HAS BEEN AT YOUR FIRM NERA

21   AS A LITIGATION CONSULTANT OR TESTIFYING EXPERT; IS THAT

22   CORRECT?

23   **A.**  THAT IS CORRECT.

24   **Q.**  SO WHEN COUNSEL TALKED TO YOU ABOUT THE INDUSTRIES YOU'VE

25   ANALYZED, THAT'S ALL BEEN IN THE CONTEXT OF LITIGATION OR

1    LITIGATION CONSULTING?

2    **A.**  THAT IS CORRECT.  AND ANTITRUST AND INTELLECTUAL PROPERTY.

3    ALL OF MY WORK IS IN THE CONTEXT OF LITIGATION.

4         **THE COURT:**  I'M SORRY TO INTERRUPT.  I'M GOING TO

5    NEED TO LEAVE IN A FEW MINUTES.

6         **MR. ISAACSON:**  YES.

7         **THE COURT:**  BUT I STILL HAVE SOME MORE QUESTIONS.

8         **MR. ISAACSON:**  ABSOLUTELY.  YOUR QUESTIONS ARE MORE

9    IMPORTANT THAN MINE, YOUR HONOR.

10        **THE COURT:**  I'M STILL TRYING TO FIGURE OUT THIS

11   TRANSACTION BETWEEN THE STUDENT AND THE COLLEGE.

12        LET'S SAY YOU HAVE A BUNCH OF STUDENTS THAT ALL WANT TO GO

13   TO COLLEGE.  AND THE COLLEGE IS GOING TO SELL THEM AN

14   EDUCATION ALONG WITH AN OPPORTUNITY TO PLAY SPORTS.  AND SOME

15   OF THEM AREN'T SUCH GOOD ATHLETES SO THEY'RE GOING TO ACTUALLY

16   HAVE TO PAY TUITION.  AND OTHERS ARE PRETTY GOOD ATHLETES SO

17   THEY'RE GOING TO GET A FULL SCHOLARSHIP BUT THAT'S IT.  AND

18   OTHERS ARE REALLY GOOD ATHLETES, AND THEY'RE GOING TO GET A

19   FULL SCHOLARSHIP PLUS $15 A MONTH IN LAUNDRY MONEY.

20        SO WHAT IS THAT MARKET?  IS THIS A MARKET OF BUYING

21   COLLEGE STUDENTS AND SELLING COLLEGES?  IN OTHER WORDS, IS THE

22   COLLEGE THE SELLER AND ALL THESE STUDENTS ARE BUYERS?

23        OR IS THE ONE WHO'S GETTING THE LAUNDRY MONEY NOT A BUYER

24   BECAUSE HE'S ACTUALLY GETTING SOME MONEY, WHEREAS THE OTHER

25   TWO ARE BUYERS?  IN OTHER WORDS, DO YOU DETERMINE WHETHER

1    SOMEONE IS A BUYER OR A SELLER BY THE NET EFFECT OF THE

2    TRANSACTION OR OF THE PART OF THE TRANSACTION YOU'RE LOOKING

3    AT?

4         **THE WITNESS:**  SO TO ME AS AN ECONOMIST -- SORRY.

5         TO ME AS AN ECONOMIST, THERE IS A TRANSACTION OVER THE

6    EDUCATION.  AND WHAT WOULD BE MAKING THE PRICE NEGATIVE FOR

7    ONE OF THE PARTICIPANTS IS THE LAUNDRY MONEY.  BUT THAT

8    DOESN'T HAVE TO BE PART OF THE TRANSACTION.  THE TRANSACTION

9    FOR EDUCATION COULD BE EVERYTHING ELSE.  AND THEN THERE IS

10   LAUNDRY THAT THEY GET ANOTHER PRODUCT FOR FREE.

11        **THE COURT:**  BUT THERE ISN'T.  THEY'RE GETTING THIS

12   EDUCATION FOR FREE.  BUT ONE STUDENT IS GETTING 15 BUCKS ON

13   TOP OF IT.  AND THE OTHER TWO AREN'T, SO I'M HAVING A HARD

14   TIME JUST FIGURING OUT WHY SOME OF THEM WOULD BE BUYERS AND

15   OTHERS OF THEM WOULDN'T BE BUYERS.

16        AND IT INTERESTS ME BECAUSE YOU'RE TELLING ME, I GUESS,

17   THAT ONLY THE BUYER CAN BE THE VICTIM OF AN ANTITRUST

18   RESTRAINT.  SO IF I LOOK AT SOMEBODY AS A SELLER, THEN THEY

19   CAN'T BE A VICTIM BECAUSE ONLY THE CONSUMER CAN BE THE VICTIM.

20        **THE WITNESS:**  THE --

21        **THE COURT:**  SO IT'S KIND OF IMPORTANT WHO'S A BUYER

22   AND WHO'S A SELLER.  AND IN A SITUATION WHERE IT'S

23   COMPLICATED, I'M TRYING TO FIGURE OUT HOW ONE DECIDES WHO'S A

24   BUYER AND WHO'S A SELLER.

25        AND WHAT I GOT FROM YOU BEFORE WAS THAT -- THAT YOU CAN'T

1    HAVE A NEGATIVE -- WHAT DID YOU SAY?  YOU CAN'T HAVE A

2    NEGATIVE PRICE, SO IF IT'S A NEGATIVE PRICE THAT I'M -- IN A

3    THE SCHOOL IS PAYING ONE GUY 15 BUCKS A MONTH IN ADDITION TO

4    EVERYTHING ELSE THEY'RE GETTING FOR FREE, THEN THAT'S NOT --

5    THAT PERSON ISN'T A BUYER, EVEN THOUGH THEY'RE IN THE SAME

6    RELATIONSHIP BETWEEN THE OTHER -- AS THE OTHER TWO ARE WITH

7    THAT COLLEGE.  AND THAT --

8              THE WITNESS:  I DON'T KNOW THAT THAT'S --

9                    (SIMULTANEOUS COLLOQUY.)

10             THE WITNESS:  -- NECESSARILY TRUE.

11             THE COURT:  SO HOW WOULD YOU --

12             THE WITNESS:  IF THE STUDENT IS --

13             THE COURT:   -- SAY IS HAPPENING THERE?

14             THE WITNESS:  -- IS THE BETTER ATHLETE.

15             THE COURT:  I'M SORRY?

16             THE WITNESS:  IF ONE OF THE STUDENTS IS A

17   PARTICULARLY GOOD ATHLETE, YOU COULD THINK OF THEM SELLING

18   ATHLETIC ABILITY TO THE STUDENTS.

19             THE COURT:  YOU COULD, BUT DO YOU HAVE TO?

20             THE WITNESS:  I THINK WHEN YOU WANT TO ANALYZE A

21   RESTRAINT, YOU WANT TO FIGURE OUT HOW TO ISOLATE THAT

22   RESTRAINT FROM ALL OF THE OTHER INTERACTIONS.

23             THE COURT:  LET'S SAY THE -- I DON'T WANT TO ANALYZE

24   A RESTRAINT.  I WANT TO FIND OUT WHO'S THE BUYER AND WHO'S THE

25   SELLER JUST TO START WITH.

1          **THE WITNESS:**  THEN I WOULD SAY LOOK AT WHAT IS BEING

2     BOUGHT AND SOLD.  IF IT'S EDUCATION, YOU CAN LOOK AT THAT ON

3     ITS OWN, AND ALL OF THESE OTHER THINGS DON'T NEED TO BE PART

4     OF IT.  YOU CAN ANALYZE THEM SEPARATELY AS SEPARATE

5     INTERACTIONS THAT HAPPEN SIMULTANEOUSLY, BUT THEY DON'T HAVE

6     TO BE ALL BUNDLED TOGETHER.

7          **MR. ISAACSON:**  CAN I ASK A FOLLOW-UP QUESTION ON

8     THIS, YOUR HONOR?

9          **THE COURT:**  OKAY.

10    BY MR. ISAACSON:

11    **Q.**  THE -- I WANT TO UNDERSTAND YOUR CONCEPT OF ANTITRUST

12    PRINCIPLES.  UNDER YOUR CONCEPT OF ANTITRUST PRINCIPLES, DOES

13    ANTITRUST CONDEMN PRICE-FIXING BY PURCHASERS WHERE THE PERSONS

14    SPECIFICALLY INJURED ARE SELLERS NOT DOWNSTREAM CUSTOMERS OR

15    CONSUMERS?

16    **A.**  YES.  IF THERE IS THE OUTPUT EFFECT IN THE PURCHASING.

17    YES.

18    **Q.**  OKAY.  ABSENT AN OUTPUT EFFECT, YOU DON'T BELIEVE THAT THE

19    ANTITRUST PRINCIPLES WOULD CONDEMN PRICE-FIXING BY PURCHASERS

20    WHERE THE PERSONS SPECIFICALLY INJURED ARE THE SELLERS AND NOT

21    THE DOWNSTREAM CUSTOMERS OR CONSUMERS; IS THAT CORRECT?

22    **A.**  I THINK YOU WOULD ONLY FIND AN ANTICOMPETITIVE EFFECT IF

23    THE PRICE-FIXING REDUCED THE AMOUNT THAT WAS BEING PURCHASED

24    IF THERE WAS A QUANTITY EFFECT.

25    **Q.**  ALL RIGHT.  LET'S GO BACK --

```
1              THE COURT:  I'M SORRY.  I'M GOING TO HAVE TO GO.

2              MR. ISAACSON:  ALL RIGHT.

3              THE COURT:  WE'LL SEE YOU, WHAT, TOMORROW MORNING AT

4    8:30?

5              MR. ISAACSON:  YES, YOU WILL.

6              THE COURT:  AND THIS WITNESS WILL BE BACK ON THE

7    STAND --

8              MR. ISAACSON:  YES.

9              THE COURT:  -- OR ARE YOU SUBSTITUTING IN SOMEONE

10   ELSE?

11             MR. ISAACSON:  NO, I THINK WE'RE CONTINUING STRAIGHT

12   THROUGH AT THIS POINT.

13             THE COURT:  AND THEN YOU'RE GOING TO HAVE RUBINFELD

14   AFTER THAT?

15             MR. POMERANTZ:  YES, YOUR HONOR.

16             THE COURT:  AND THAT'S GOING TO BE IT?

17             MR. POMERANTZ:  THERE'S ONE WITNESS AFTER THAT,

18   MR. LEWIS WHO'S BEEN SITTING HERE ALL TRIAL.  HE'LL BE OUR

19   LAST WITNESS.

20             THE COURT:  OKAY.

21             (PROCEEDINGS WERE CONCLUDED AT 3:27 P.M.)

22                           --O0O--

23

24

25
```

1

2

3                    **CERTIFICATE OF REPORTERS**

4

5        WE CERTIFY THAT THE FOREGOING IS A CORRECT TRANSCRIPT

6    FROM THE RECORD OF PROCEEDINGS IN THE ABOVE-ENTITLED MATTER.

7    WE FURTHER CERTIFY THAT WE ARE NEITHER COUNSEL FOR, RELATED

8    TO, NOR EMPLOYED BY ANY OF THE PARTIES TO THE ACTION IN WHICH

9    THIS HEARING WAS TAKEN, AND FURTHER THAT WE ARE NOT

10   FINANCIALLY NOR OTHERWISE INTERESTED IN THE OUTCOME OF THE

11   ACTION.

12

13   _____

14        DIANE E. SKILLMAN, CSR, RPR, FCRR

15

16

17   _____

18     RAYNEE H. MERCADO, CSR, RMR, CRR, FCRR, CCRR

19              WEDNESDAY, JUNE 25, 2014

20

21

22

23

24

25