MICHAEL D. HAUSFELD (*pro hac vice*)
mhausfeld@hausfeldllp.com
HILARY K. SCHERRER (SBN 209451)
hscherrer@hausfeldllp.com
SATHYA S. GOSSELIN (SBN 269171)
sgosselin@hausfeldllp.com
SWATHI BOJEDLA (*pro hac vice*)
sbojedla@hausfeldllp.com
HAUSFELD LLP
1700 K Street NW, Suite 650
Washington, D.C. 20006
Telephone:     (202) 540-7200
Facsimile:     (202) 540-7201

MICHAEL P. LEHMANN (SBN 77152)
mlehmann@hausfeldllp.com
BRUCE J. WECKER (SBN 78530)
bwecker@hausfeldllp.com
HAUSFELD LLP
44 Montgomery Street, Suite 3400
San Francisco, California 94104
Telephone:     (415) 633-1908
Facsimile:     (415) 358-4980

*Plaintiffs' Class Counsel*

UNITED STATES DISTRICT COURT

NORTHERN DISTRICT OF CALIFORNIA

OAKLAND DIVISION

| | |
|---|---|
| EDWARD C. O'BANNON, JR. on behalf of himself and all others similarly situated,<br><br>Plaintiffs,<br><br>v.<br><br>NATIONAL COLLEGIATE ATHLETIC ASSOCIATION (NCAA); ELECTRONIC ARTS, INC.; and COLLEGIATE LICENSING COMPANY,<br><br>Defendants. | Case No. 4:09-cv-3329 CW<br><br>**PLAINTIFFS' OPENING POST-TRIAL BRIEF**<br><br>Judge:      The Honorable Claudia Wilken<br>Courtroom: 2, 4th Floor<br>Trial:       June 9-27, 2014 |

1

## **TABLE OF CONTENTS**

2

3   I.     THE NCAA'S MARKET POWER IN THE RELEVANT MARKETS. ........................... 1

4   II.    THE NCAA'S CHALLENGED CONDUCT IS A RESTRAINT OF TRADE. ................ 5

5
    III.   THE RESTRAINT WAS ANTICOMPETITIVE AND INJURED THE APS. ................ 6
6
7   IV.    THE NCAA'S PROCOMPETITIVE JUSTIFICATIONS ALL FAIL............................. 9

8   V.     LESS RESTRICTIVE ALTERNATIVES EXIST. ......................................... 25

9   VI.    CONCLUSION. ................................................................ 25

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28

1

2

## TABLE OF AUTHORITIES

3

**Page(s)**

CASES

*Ass'n for Intercollegiate Athletics for Women v. NCAA*,
558 F.Supp. 487 (D.D.C. 1983) .................................................................. 2

*Bd. of Trade of Chicago v. United States*,
246 U.S. 231 (1918) ................................................................................ 10

*Bd. of Regents of Univ. of Okla, v. NCAA*,
546 F. Supp. 1276 (W.D. Okla. 1982) .................................... 5, 6, 9, 24

*Brown v. Pro Football, Inc.*,
Civ. A. No. 90-1071 (REL), 1992 WL 88039 (D.D.C. Mar. 10, 1992).................................. 7

*Cargill Inc. v. Monfort of Colo., Inc.*,
479 U.S. 104 (1986) .................................................................................. 6

*Cason-Merenda v. Detroit Med. Ctr.*,
862 F. Supp. 2d 603 (E.D. Mich. 2012) ................................................. 7

*Datagate, Inc. v. Hewlett-Packard Co.*,
941 F.2d 864 (9th Cir. 1991)................................................................... 6

*Graphic Prods. Distribs. v. ITEK Corp.*,
717 F.2d 1560 (11th Cir. 1983)............................................................... 9

*Heike v. Guevara*,
519 F. App'x 911 (6th Cir. 2013) .......................................................... 11

*In re Brand Name Prescription Drugs Antitrust Litig.*,
186 F.3d 781 (7th Cir. 1999)................................................................. 23

*In re High-Tech Emp. Antitrust Litig.*,
856 F. Supp. 2d 1103 (N.D. Cal. 2012) .................................................. 7

*In re NCAA I–A Walk–On Football Players Litig.*,
398 F. Supp. 2d 1144 (W.D. Wash. 2005).............................................. 1

*In re NCAA Student-Athlete Name & Likeness Licensing Litig.*,
No. C 09-1967 CW, 2013 WL 5778233 (N.D. Cal. Oct. 25, 2013) ........................ 3

*Kentucky Laborers Dist. Council Health & Welfare Trust Fund v. Hill & Knowlton, Inc.*,
24 F. Supp. 2d 755 (W.D. Ky. 1998) ...................................................... 9

*Law v. NCAA*,
134 F.3d 1010 (10th Cir. 1998)........................................................... 6, 7

*Law v. NCAA*,
    902 F.Supp. 1394 (D. Kan. 1995) ........................................................................... 9

*Leegin Creative Leather Prods. v. PSKS, Inc.*,
    551 U.S. 877 (2007) ............................................................................................... 10

*Los Angeles Mem'l Coliseum Comm'n v. National Football League*,
    726 F.2d 1381 (9th Cir. 1984) ................................................................................. 9

*Mackey v. NFL*,
    543 F.2d 606 (8th Cir. 1976) .................................................................................... 7

*Mandeville Island Farms, Inc. v. Am. Crystal Sugar Co.*,
    334 U.S. 219 (1948) ................................................................................................. 8

*McNeil v. NFL*,
    No. 4-90-476, 1992 WL 315292 (D. Minn. Sept. 10, 1992) .................................... 7

*Olin Corp. v. FTC*,
    986 F.2d 1295 (9th Cir. 1993) .................................................................................. 3

*Paladin Assocs., Inc. v. Montana Power Co.*,
    328 F.3d 1145 (9th Cir. 2003) .................................................................................. 9

*Polygram Holding, Inc. v. FTC*,
    416 F.3d 29 (D.C. Cir. 2005) ................................................................................... 6

*Rock v. NCAA*,
    No. 1:12-cv-1019-JMS-DKL, 2013 WL 4479815 (S.D. Ind. Aug. 16, 2013) ......... 1

*S. Pac. Commc'ns Co. v. Am. Tel. & Tel. Co.*,
    556 F. Supp. 825 (D.D.C. 1982) ............................................................................. 23

*Smith v. Pro Football, Inc.*,
    593 F.2d 1173 (D.C. Cir. 1978) ............................................................................... 7

*State Oil Co. v. Khan*,
    522 U.S. 3 (1997) ................................................................................................... 10

*Theme Promotions, Inc. v. News America Mktg. FSI*,
    546 F.3d 991 (9th Cir. 2008) .................................................................................... 2

*Todd v. Exxon Corp.*,
    275 F.3d 191 (2d Cir. 2001) .................................................................................. 7, 8

*United States v. Oracle Corp.*,
    331 F. Supp. 2d 1098 (N.D. Cal. 2004) ................................................................... 2

*United States v. Topco Assoc., Inc.*,
    405 U.S. 596 (1972) ................................................................................................. 9

*University of Denver v. Nemeth*,
    257 P.2d 423 (Colo. 1953) ................................................................................................. 10

*Weyerhaeuser Co. v. Ross-Simmons Hardwood Lumber Co.*,
    549 U.S. 312 (2007) .......................................................................................................... 8

*White v. NCAA*,
    No. 2:06-cv-999-RGK, 2006 U.S. Dist. LEXIS 101366 (C.D. Cal. Sept. 20, 2006) ............... 1

**OTHER AUTHORITIES**

Federal Trade Commission and United States Department of Justice, Antitrust Guidelines
    For Collaboration Among Competitors (April 2000) (available at
    http://www.ftc.gov/sites/default/files/documents/public_events/joint-venture-hearings-
    antitrust-guidelines-collaboration-among-competitors/ftcdojguidelines-2.pdf) ...................... 6

Phillip Areeda, Herbert Hovenkamp, Roger Blair, & Christine Durrance, *Antitrust Law:*
    *An Analysis of Antitrust Principles and Their Application* (3d ed. 2007) ............................... 8

## GLOSSARY OF ABBREVIATIONS

| | |
|---|---|
| ACC | Atlantic Coast Division I athletic conference |
| APs | Antitrust Plaintiffs |
| AQ | Automatic qualification for FBS post-season berths |
| Big Ten | Big Ten Division I athletic conference |
| Big 12 | Big 12 Division I athletic conference |
| CLC | Collegiate Licensing Company |
| CUSA | Conference USA Division I athletic conference |
| DX ___ | NCAA Trial Exhibit |
| EA | Electronic Arts, Inc. |
| FBS | NCAA Division I Football Bowl Subdivision |
| FCS | NCAA Division I Football Championship Subdivision |
| GIAs | Grants-in-aid |
| MLB | Major League Baseball |
| NAIA | National Association of Intercollegiate Athletics |
| NCAA | Defendant National Collegiate Athletic Association |
| NBA | National Basketball Association |
| NFL | National Football League |
| NIL | Name, image, and likeness |
| Pac-12 | Pac-12 Division I athletic conference |
| PX ___ | APs' Trial Exhibit |
| RoP | Right of Publicity |
| SEC | Southeastern Conference |
| Tr. __ | Trial Transcript |
| USC | University of South Carolina |
| UT | University of Texas |

After three weeks of trial, several conclusions are clear. The NCAA cartel and its members engage in a restraint of trade by refusing to permit payment to current and former Division I men's basketball and FBS football players ("Players") for the use of their NILs. That restraint has anticompetitive effects in the relevant markets identified by the APs' expert, Dr. Roger Noll. The NCAA's proffered justifications for the restraint either have no logical connection to it, operate in different markets, or are based on speculative and unsubstantiated lay and expert opinion. Even if any justifications were valid, the goals sought to be achieved by them could be satisfied through less restrictive alternatives. None of the claimed benefits outweigh the substantial anticompetitive effects of the restraint in question. As a consequence, injunctive relief is appropriate.

## I.     THE NCAA'S MARKET POWER IN THE RELEVANT MARKETS

**Relevant markets**. The relevant product markets are twofold: (1) the higher education services market in which Division I colleges and universities compete to recruit Players; and (2) the collegiate licensing market in which the rights to make commercial use of the NILs of college athletes are acquired, which includes a submarket for group licenses to use the NILs of all college athletes on particular Division I men's basketball and FBS football teams in live game broadcasts, archival footage, and videogames. Tr. 107:7-110:12. The relevant geographic market is the United States. Tr. 126:22-127:10.

Noll is the only expert who provided competent testimony about the contours of the relevant product and geographic markets. Tr. 133:2-25. His testimony is consistent with the caselaw.[1] The NCAA's expert, Dr. Lauren Stiroh, suggested that other collegiate sports associations—particularly the NAIA—might be included in any market, but she was unfamiliar with the NAIA and its ability to compete with NCAA conferences (Tr. 2825:21-2827:7), and her

---

[1] *In re NCAA I–A Walk–On Football Players Litig.*, 398 F. Supp. 2d 1144, 1150 (W.D. Wash. 2005) (plaintiff adequately alleged a relevant labor input market for Division I-A college football); *Rock v. NCAA*, No. 1:12-cv-1019-JMS-DKL, 2013 WL 4479815, at *10-14 (S.D. Ind. Aug. 16, 2013) (plaintiff adequately pleaded a relevant market of Division I college football); *White v. NCAA*, No. 2:06-cv-999-RGK, 2006 U.S. Dist. LEXIS 101366, at *6-8 (C.D. Cal. Sept. 20, 2006) (finding allegation of relevant market of Division I-A football was "legally sufficient" and a relevant product market "on its face").

1   testimony is inconsistent with prior case law.[2]

2        To identify the relevant markets, Noll relied on a well-accepted methodology for market

3   identification by inquiring into customer conduct in response to a "small but significant

4   nontransitory increase in price" ("SSNIP"), *i.e.*, whether a supplier could impose a SSNIP

5   (usually 5%) on the product or service under review without customers responding by purchasing

6   substitute products. Tr. 107:8-15, 108:8-23, 109:25-110:12, 128:7-17.[3] He supported his analysis

7   by showing: (a) statements by one of the NCAA's own executives recognizing Division I as an

8   elite, national entertainment environment; (b) evidence that Division I football and basketball

9   conferences compete against each other (and not Division II or Division III schools) for the

10  available qualified recruits, as reflected in win-loss records; and (c) evidence that Division I

11  conferences competed for the highest quality recruits as graded under media-sponsored "star" or

12  quality rating systems. Tr. 111:12-23, 113:2-118:22; PX 2529, 2530. As for the geographic

13  market, the NCAA and its member institutions recruit athletes and play games throughout the

14  United States, and college recruits who get offers from Division I schools and foreign institutions

15  are far more likely to choose the former. Tr. 126:22-127:10.

16       In the higher education market, Noll testified that schools sell education services in

17  bilateral transactions with athlete-recruits for their athletic skills and their commitment to

18  compete.[4]  Tr. 101:11-13, 109:5-14, 130:6-17, 146:6-148:12. In response to questioning by the

19

20  [2] *See Ass'n for Intercollegiate Athletics for Women v. NCAA,* 558 F.Supp. 487, 497 (D.D.C. 1983)("'It is only from [the] NCAA that necessary services and benefits for conduct of a Division I men's intercollegiate athletic program are available to institutions. The only other organization

21  offering men's intercollegiate governance, as opposed to open amateur governance, is the NAIA. NAIA is not a realistic option: it offers neither Division I calibre program[s] nor the direct and

22  indirect financial rewards of NCAA membership. It has no network television contracts and its member schools do not run spectator oriented programs.'"), *aff'd,* 735 F.2d 577 (D.C. Cir. 1984).

23  [3] This approach was first articulated in the 1982 United States Department of Justice Merger Guidelines and has been utilized in this Circuit. *See Theme Promotions, Inc. v. News America*

24  *Mktg. FSI,* 546 F.3d 991, 1002 (9th Cir. 2008); *United States v. Oracle Corp.,* 331 F. Supp. 2d 1098, 1112 (N.D. Cal. 2004).

25  [4] Thus, while there have been statements that the APs get a "free education," which is a "privilege" and for which they should be "thankful" (Tr. 39:21, 599:3, 1074:14-16), this assertion

26  is incorrect; as Britton Banowsky, the Commissioner of CUSA, testified, "without the student-athletes, we wouldn't be able to actually have any events." Tr. 2340:25-2341:1. Thus, the higher

27  education market is a consumer market, as Dr. Noll emphasized. Tr. 101:21-102:1, 105:24-106:9. *See* Tr. 1839:3-13.

28

Court, Noll agreed that the market could alternatively be characterized as one where the Division I colleges are buyers of the recruits' labor services. Tr. 129:18-130:17. In this market, regardless of who is buyer or seller, the restraint prevents Players from receiving any compensation for use of their NILs as part of the transaction for obtaining their athletic services. Noll testified that how one views the higher education market is unimportant; under either characterization, the APs are the "harmed party." Tr. 143:21-144:7.[5]

In the group licensing submarket of the larger collegiate licensing market, college athletes are the sellers of the rights to use their NILs, and schools, conferences, and the NCAA (or their licensees bound by NCAA rules, such as videogame makers, video clip distributors, or broadcasters) are the buyers. Tr. 144:10-18.[6] The restraint has foreclosed the group licensing submarket altogether because the college athletes cannot participate—thus depriving the APs of licensing royalties that they otherwise would have received.[7]

**NIL Rights in the Group Licensing Submarket**. The NCAA contended at trial that no group licensing market can exist because the APs have no NIL rights to sell, as reflected in the testimony of its expert, Neal Pilson. This argument fails.

The APs' expert, Edwin Desser, persuasively explained that licensing agreements explicitly or implicitly transfer a bundle of rights that includes the NIL rights of game participants (such as the college athletes) from the event organizer (here, the NCAA, conference or school) to

---

[5] Walter Byers, the former Executive Director of the NCAA, also testified that GIAs are contracts for performance. Byers Dep. 53:12-54:18; PX 424-2. Thus, contrary to the NCAA's argument, the education services market is not a zero price market; athletic scholarships do not cover the cost of attendance for four years *or* additional years necessary to graduate. Even if it were a zero price, moreover, schools sell education services at the price of athletic scholarships so that they are attractive platforms to other students who pay tuition Tr. 860:10-863:9, 1566:20-1567:8. Stiroh, for example, agreed that schools were sellers of education services when they offer full academic scholarships. Tr. 2850:25-2851:19.

[6] Documents from CLC and the NCAA itself support the existence of this market. PX 1133, PX 682 (corporate sponsors wanting to increase use of SA NILs); *see* Tr. 895:16-899:8. They may be considered by the Court in finding a market definition. *Olin Corp. v. FTC*, 986 F.2d 1295, 1299 (9th Cir. 1993).

[7] This Court has previously ruled that neither the First Amendment nor state RoP laws preclude such group licensing efforts. *In re NCAA Student-Athlete Name & Likeness Licensing Litig.*, No. C 09-1967 CW, 2013 WL 5778233, at *7 n.9 (N.D. Cal. Oct. 25, 2013) ("*NCAA I*"); *In re NCAA Student-Athlete Name & Likeness Licensing Litig.*, No. C 09-1967 CW, 2014 WL 1410451, at *7-9 (N.D. Cal. Apr. 11, 2014) ("*NCAA II*"); *Keller* Dkt. No. 1091 at 3-4.

---

the broadcaster. He pointed to several examples involving the NCAA or conferences where "rights of publicity" or NIL "rights" are explicitly referred to as part of the bundle of rights being licensed. Tr. 651:9-25, 658:8-19, 703:13-20, 707:14-708:9; PX 400, 2104, 2116, 2162, 2230. Desser noted that these contracts were typical of those he reviewed. Tr. 644:23-645:21. Other contracts had implied conveyance of NIL rights, achieved through a combination of transfer, warranty, clearance, and indemnification clauses. Tr. 629:10-631:12, 644:23-645:21; PX 730-40 (NCAA presentation stating that "[a] student-athlete has the right of publicity, whereby another may not use a name, picture, likeness or photo  for commercial activity without permission."). Desser also noted that these rights exist, regardless of whether they might be affected by a specific state statute. Tr. 706:14-24; *see also* Tr. 1016:1-1017:2 and PX 1005, 2266- 15, 2273 (release forms).

Pilson admitted that broadcast contracts implicitly convey NILs, but differentiated them from NIL rights. Tr. 797:20-799:15. His testimony, however, ignored contracts with specific language concerning NIL *rights*. *E.g*., PX 400, 2162. It also ignored PX 2230, which states in Section 6.2.3 that the "[c]onference shall be solely responsible for securing all clearances with respect to all officials and other persons participating in or otherwise connected with each Event, and such clearances shall include FOX having all rights or consents necessary or contemplated for the exercise of their rights under this Agreement, including, without limitation, *all name and likeness **rights** of all participants, officials, competing teams and any other persons* connected with the Events that are reasonable or necessary for the Telecast of the Events and the promotion and advertising thereof." *Id*. at 2230-10 to 2230-11 (emphasis added).[8]

**Market Power**. It is undisputed that the NCAA possesses market power within the higher

---

[8] The Big Ten had a broadcast agreement with its network that similarly referred to clearances of the "name and likeness rights of all participants." PX 3078-4. Its commissioner, Jim Delany, called this common "boilerplate" language. Tr. 2103:16-24. The Big Ten secures these clearances from college athletes by having them assign to it the "right" to use their NIL "for any purpose." PX 1005; Tr. 2103:5-2107:17; *see also* PX 2488-3 (2009 e-mail from Christine Plonsky, Athletic Director of UT, saying that "if a s-a [student-athlete] can sue the ncaa for these two things—one of which (the ea sports game) only uses school marks and names, not s-a names, then what's to prevent all players from suing us to get a piece of every broadcast rights fee—since clearly we use their names and images in those telecasts?").

1   education and collegiate licensing markets. Once the relevant markets are identified, the obvious

2   corollary is that the NCAA possesses a monopoly (or, from an alternative perspective, a

3   monopsony) within those markets. Tr. 128:1-3, 129:18-130:17, 142:24-144:7. The NCAA

4   exercises that power because it unilaterally changes the value of athletic scholarships or the

5   ability of college athletes to license their NILs with no effect on the number of scholarships to be

6   distributed. Tr. 128:4-129:13, 130:19-131:9. As Byers testified, the members of the NCAA

7   "operate a monopoly business and as an exploitation of the young athlete[s] that are engaged in

8   those [athletic] programs." Byers Dep. 62:8-10.

9   **II.      THE NCAA'S CHALLENGED CONDUCT IS A RESTRAINT OF TRADE**

10          It is undisputed that the NCAA and its members agree not to compensate college athletes

11   for use of their NIL. *Keller* Dkt. No. 1071 at 6; Tr. 1742:15-1743:12, 1851:23-1852:9; Beebe

12   Dep. 73:9-24; Berst Dep. 82:2-25, 83:9-84:1. The Court has previously determined that this

13   agreement restrains former college athletes who seek to license their NILs. *NCAA II*, 2014 WL

14   1410451, at *5.

15          Noll testified at length that the practices challenged here are the product of the NCAA's

16   anticompetitive cartel. Tr. 134:3-24, 135:8-19, 138:2-8. He noted that there is a general consensus

17   among economists who have studied the NCAA that it is a cartel. Tr. 134:3-24, 135:8-19, 136:17-

18   137:16, 138:11-14, 139:8-14. The NCAA's own expert witness, Dr. Daniel Rubinfeld, has

19   authored a textbook on microeconomics that has maintained for over 25 years that the NCAA is a

20   cartel that restricts competition by, *inter alia*, "reducing the bargaining power of college athletes

21   through creating and enforcing rules regarding eligibility and terms of compensation." Tr.

22   139:15-142:2, 3062:4-3064:23. Although Rubinfeld now prefers to label the NCAA a "joint

23   venture," which he deems to be a subcategory of cartels, he admitted repeatedly at trial that the

24   challenged conduct, no matter its label, was a restraint of trade. Tr. 2921:8-9, 3039:22-3040:6,

25   3061:22-24, 3072:13-16.[9] Rubinfeld's definition of cartel as a type of joint venture distinct from a

26   ──────────────

[9] In *Bd. of Regents of Univ. of Okla. v. NCAA*, 546 F. Supp. 1276 (W.D. Okla. 1982), *aff'd in part*

27   *and rev'd in part*, 707 F.2d 1147 (10th Cir. 1983), *aff'd*, 468 U.S. 85 (1984) ("*BoR*"), the district
    court concluded that the NCAA was not a joint venture for purposes of its television contracts,

28   but was instead a cartel. 546 F. Supp. at 1306. Indeed, the district court called the NCAA a
    *Footnote continued on next page*

1    classic cartel contradicted his own textbook's definition of a cartel. Tr. 3067:8-16.

2    **III.     THE RESTRAINT IS ANTICOMPETITIVE AND INJURES THE APs**

3        "[I]n order to seek injunctive relief under §16, a private plaintiff must allege threatened

4    loss or damage 'of the type the antitrust laws were designed to prevent and that flows from that

5    which makes defendants' acts unlawful.'" *Cargill Inc. v. Monfort of Colo., Inc.*, 479 U.S. 104,

6    113 (1986) (quoting *Brunswick Corp. v. Pueblo Bowl–O–Mat, Inc.*, 429 U.S. 477, 489 (1977)).

7    The required showing is a "'cognizable danger'" of injury. *Datagate, Inc. v. Hewlett-Packard*

8    *Co.*, 941 F.2d 864, 870 (9th Cir. 1991) (citation omitted).

9        At trial, the APs proved a cognizable threat of: (a) causal injury (b) brought about by the

10   anticompetitive effects of the restraint (antitrust injury). The NCAA's witnesses reaffirmed the

11   scope of the association's rules that prohibit payment for the use of the NILs of Players now, in

12   the past, and in the future.[10] This cognizable threat of injury caused by the restraint exists in both

13   markets.[11] The APs were deprived of compensation for the use of their NILs in both markets. The

14   harm to the markets and resulting injury to the APs are analogous to the unlawful practice in the

15   _____

16   *Footnote continued from previous page*
     "classic cartel" with "an almost absolute control over the supply of college football." *Id.* at 1300.
     In its appellate brief to the Tenth Circuit in *BoR*, the NCAA referred to itself as a cartel. 707 F.2d

17   at 1151. And in *Law v. NCAA*, 134 F.3d 1010, 1022, 1023 (10th Cir. 1998), which involved the
     NCAA's monopsonistic practices with respect to certain coaches' salaries, the appellate court

18   reasoned that "[l]ower prices cannot justify a cartel's control of prices charged by suppliers,
     because the cartel ultimately robs the suppliers of the normal fruits of their enterprises."

19   Moreover, just because a defendant is a joint venture does not mean the antitrust laws do not
     apply to it. As the federal antitrust enforcement authorities have noted, "labeling an arrangement

20   a 'joint venture' will not protect what is merely a device to raise price or restrict output; the
     nature of the conduct, not its designation, is determinative." Federal Trade Commission and

21   United States Department of Justice, Antitrust Guidelines For Collaboration Among Competitors
     at 9 (April 2000) (available at

22   http://www.ftc.gov/sites/default/files/documents/public_events/joint-venture-hearings-antitrust-
     guidelines-collaboration-among-competitors/ftcdojguidelines-2.pdf). Courts have found the Rule

23   of Reason can be violated even when the conduct is undertaken by a formal joint venture.
     *Polygram Holding, Inc. v. FTC*, 416 F.3d 29, 34 (D.C. Cir. 2005).

24   [10] The three APs who testified, and who are representative of the injunctive class, noted various
     uses of their NILs in telecasts or EA NCAA-themed videogames since July 2005 (within four

25   years of the filing of the *O'Bannon* complaint). Tr. 26:12- 28:11, 565:24-566:8, 568:9-569:21,
     1059:23-1061:9, 1061:12-22.

26   [11] In the higher education services market, Noll also identified an "inefficient substitution" effect
     where money that would be spent on college athletes for use of their NILs is instead spent on

27   coaches and facilities; Noll opined that this market distortion also harms the APs. Tr. 177:16-
     183:10. This is further evidence that Player compensation for NIL rights is feasible (should

28   schools elect to offer it) without fundamentally altering collegiate athletics.

*Law* case where the NCAA and its members agreed to limit the compensation of certain coaches.

It is also analogous to numerous cases involving NFL players who sued to challenge limits

imposed on their salaries[12] or agreements among corporations to restrict the wages paid to

employees.[13]

  The NCAA responded at trial by having Stiroh (not a university professor or peer-

reviewed author) argue that monopsony cases differ from monopoly cases, and in the former, an

anticompetitive agreement directed at sellers of a good or service is not actionable under the

antitrust laws unless there is evidence of adverse effects on output in the downstream consumer

market. Tr. 2763:12-15, 2841:11-2848:8. This would permit buyer cartels to fix prices paid to

sellers, and criminal cartels to collude without punishment, absent satisfaction of Stiroh's

additional requirement. Tr. 2848:15-2850:23, 2853:3-2863:3. She also explained that her

astounding theory would be the same with respect to seller's cartels where demand is inelastic,

such as in the case of a life-saving drug needed by a family. Tr. 2881:18-2884:19. Stiroh's

economic analysis is incorrect on several grounds.

  *First*, the United States Supreme Court has noted that "[t]he kinship between monopoly

and monopsony suggests that similar legal standards should apply to claims of monopolization

---

[12] *Smith v. Pro Football, Inc.*, 593 F.2d 1173, 1175 n.2 (D.C. Cir. 1978) ("athletes have standing to challenge player restrictions in professional sports since these restraints operate directly on, and to the detriment of, the employee"); *Mackey v. NFL*, 543 F.2d 606, 620-23 (8th Cir. 1976), *cert. dismissed*, 434 U.S. 801 (1977) (rights of first refusal and compensation restraints found to violate § 1 of the Sherman Act); *Brown v. Pro Football, Inc.*, Civ. A. No. 90-1071 (REL), 1992 WL 88039, at *5 (D.D.C. Mar. 10, 1992), *recon. denied*, 812 F.Supp. 237 (D.D.C. 1992), *rev'd on other grounds*, 50 F.3d 1041 (D.C. Cir. 1995), *aff'd*, 518 U.S. 231 (1996); *McNeil v. NFL*, No. 4-90-476, 1992 WL 315292, at *1, *5-6 (D. Minn. Sept. 10, 1992) (jury found injury to the named football players arising from the NFL's implementation of its Plan B Right of First Refusal Compensation Rules).

[13] *E.g., Todd v. Exxon Corp.*, 275 F.3d 191, 195, 214-15 (2d Cir. 2001) ("*Todd*") (vacating dismissal with respect to allegations that oil and petrochemical companies violated the Sherman Act by sharing information regarding compensation paid to nonunion managerial, professional, and technical employees, and using that information to set salaries for such employees at artificially low levels); *Cason-Merenda v. Detroit Med. Ctr.*, 862 F. Supp. 2d 603, 607, 649 (E.D. Mich. 2012) (denying summary judgment on Rule of Reason claim that  health care providers were engaged in a conspiracy in violation of Sherman Act to hold down the wages of registered nurses); *In re High-Tech Emp. Antitrust Litig.*, 856 F. Supp. 2d 1103 (N.D. Cal. 2012) (denying dismissal of action involving allegations of a conspiracy by high-tech companies to eliminate competition between them for skilled labor by fixing and suppressing employee compensation and restricting employees' mobility).

1 and to claims of monopsonization." *Weyerhaeuser Co. v. Ross-Simmons Hardwood Lumber Co.*,

2 549 U.S. 312, 322 (2007).

3      *Second*, Stiroh's views are at odds with a long line of cases involving buyer-side price-

4 fixing. *See, e.g., Mandeville Island Farms, Inc. v. Am. Crystal Sugar Co.*, 334 U.S. 219, 235

5 (1948), quoted in *Todd*, 275 F.3d at 201 ("It is clear that the agreement is the sort of combination

6 condemned by the [Sherman] Act, even though the price-fixing was by purchasers, and the

7 persons specially injured . . . are sellers, not customers or consumers.") (footnotes omitted). In the

8 professional player cases cited above, no showing of downstream market output effects was

9 necessary for a finding of anticompetitive harm. As one leading treatise has noted, "[a]ntitrust law

10 addresses employer conspiracies controlling employment terms precisely because they tamper

11 with the employment market and thereby impair the opportunities of those who sell their services

12 there. . . . It would be perverse indeed to hold that the very object of the law's solicitude and the

13 persons most directly concerned—perhaps the only persons concerned—could not challenge the

14 restraint." 2A Phillip Areeda, Herbert Hovenkamp, Roger Blair, & Christine Durrance, *Antitrust*

15 *Law: An Analysis of Antitrust Principles and Their Application* ¶ 352c at 254-55 (3d ed. 2007).

16      The APs have also demonstrated causal antitrust injury in the submarket for the group

17 licensing of their NIL rights. It is undisputed that had the NCAA not enforced its rules prohibiting

18 Players from licensing their NILs, EA, for example, would have entered into group licenses with

19 Players for use of their NILs in its NCAA-themed videogames. Tr. 1669:24-1670:9. Joel Linzner,

20 EA's Executive Vice President, Business and Legal Affairs, testified that the ability to use college

21 athletes' names and images is important to consumers and overall game quality, and that there

22 remains an unfulfilled demand (emblematic of a market) for collegiate sports videogames today.

23 Tr. 1670:10-1671:7; *see also* Sitrin Dep. 140:16-141:20.[14]  Stiroh was completely unaware of

24 Linzner's testimony. Tr. 2779:1-5. NCAA President Dr. Mark Emmert testified that EA's

25 contract was not renewed because the use of NILs in its videogames strayed too close to the line

26

27 _____

[14] Emmert also stated that the NCAA withdrew from its website a portal that allowed consumers
to buy numbered jerseys searchable by the names of college athletes because he also deemed that
28 to be impermissible. Tr. 1896:16-1897:10.

1    of what he deemed permissible. Tr. 1846:2-20. Thus, enforcement of the NCAA's rules against

2    licensing of NILs by college athletes harmed competition not only by depriving APs of

3    compensation for use of their NILs, but also by *decreasing* output and consumer choice. Tr.

4    183:16-186:11.[15]

5         **IV.    THE NCAA'S PROCOMPETITIVE JUSTIFICATIONS ALL FAIL**

6              As the United States Supreme Court noted in *BoR*, the NCAA bears the "heavy burden of

7    establishing an affirmative defense which competitively justifies" its restraint. 468 U.S. at 113.

8    "[M]erely offering a rationale for a . . . restraint will not suffice; the record must support a finding

9    that the restraint. . . does indeed have a pro-competitive effect." *Graphic Prods. Distribs. v. ITEK*

10   *Corp.*, 717 F.2d 1560, 1576 (11th Cir. 1983).[16]

11             At the outset, the defenses fail due to the testimony of the NCAA's own experts.

12   Rubinfeld testified that whether NIL payments would have an effect on amateurism or

13   competitive balance depends on how "substantial" the payments are. Tr. 3017:16-22. He said that

14   payments of $5,000 (an amount in excess of $300 million when applied to all Players over four

15   years) or an unknown number above $5,000 would not affect amateurism or competitive balance.

16   Tr. 3114:2-3117:4. Pilson said he was comfortable with individual payments at a number

17   somewhere between $5,000 and $1 million. Tr. 771:4-7.  Stanford Athletic Director Bernard Muir

18   drew the line at NIL compensation totaling six or seven figures. Tr. 2545:6-18.

19             **Amateurism**. The NCAA's witnesses have relied on a supposed longstanding principle of

20   amateurism to justify the practices at issue here. *E.g.*, Tr. 1731:19-1732:16, 1822:6-1825:25. In a

21   Rule of Reason antitrust case, a court may consider the history of the challenged restraint in

22

---

23   [15] Loss of consumer choice can be an anticompetitive harm. *Kentucky Laborers Dist. Council*

24   *Health & Welfare Trust Fund v. Hill & Knowlton, Inc.*, 24 F. Supp. 2d 755, 765 (W.D. Ky. 1998).

     [16] The Court previously rejected a justification based on viability of sports other than Division I

25   men's basketball and FBS football. *NCAA II*, 2014 WL 1410451, at *16-17. The NCAA argued at

     the close of trial that benefits in markets other than those in which the restraint operates can be

26   considered, but the caselaw clearly rejects its position. *See United States v. Topco Assoc., Inc.*,

     405 U.S. 596, 610 (1972); *Paladin Assocs., Inc. v. Montana Power Co.*, 328 F.3d 1145, 1157 n.11

27   (9th Cir. 2003); *Los Angeles Mem'l Coliseum Comm'n v. Nat'l Football League*, 726 F.2d 1381,

     1392 (9th Cir. 1984); *Law v. NCAA*, 902 F.Supp. 1394, 1406 (D. Kan. 1995), *aff'd*, 134 F.3d

28   1010 (10th Cir. 1998).

1   assessing its validity.[17] Thus, it is appropriate to consider the history of the NCAA's

2   contradictory and changing meanings of amateurism.

3        *History of Amateurism and Payments to College Athletes*. The early history of the NCAA

4   is set forth in *O'Bannon* Dkt. No. 189 at 1-6 and summarized here. The predecessor to the NCAA

5   was created in 1906, and it enacted a bylaw requiring its members to follow the "principle of

6   amateurism" to distinguish upper class athletes. PX 2292-11, -12. Yet, up to 1948, that principle

7   was ignored. College athletes were routinely paid and college presidents inveighed against this

8   commercialism. A 1929 report by the Carnegie Foundation could have been written today; it

9   describes inducements to college athletes ranging from open payrolls to no-show jobs at movie

10  studios. The fundamental issues, the report's authors argued, were twofold: "commercialism and

11  a negligent attitude toward the educational opportunity for which a college exists." The defects

12  identified in athletics programs included heavy burdens on the athletes, disproportionate time

13  requirements, isolation from the rest of the student body, and highly compensated "professional"

14  coaches whose focus often was not on the education of their players.

15       In 1948 the NCAA enacted the "Sanity Code" to "alleviate the proliferation of exploitive

16  practices in the recruitment of student-athletes." The Sanity Code required that financial aid be

17  awarded without consideration for athletics ability. In 1951, Judge Saul Streit of the New York

18  Court of General Sessions mounted a probe into the college athletics gambling scandal. In his

19  findings, he concluded that commercialism in football and basketball was "rampant," and those

20  sports were "no longer amateur sports." Athletes were "bought and paid for." Academic standards

21  were evaded through "trickery, devices, frauds, and forgery." The Sanity Code was eliminated in

22  1951. At that point, Byers became the Executive Director of the NCAA and adopted the term

23  "student-athlete" to circumvent judicial decisions (such as *University of Denver v. Nemeth*, 257

24  P.2d 423, 429-30 (Colo. 1953)) that suggested college athletes might be entitled to employment

25  benefits. Tr. 1239:16-1240:12; *see also* PX 424-2.

26       In 1956, the NCAA enacted a national standard governing athletic scholarships. This

27
_____

28  [17] *Leegin Creative Leather Prods. v. PSKS, Inc.*, 551 U.S. 877, 885 (2007); *State Oil Co. v. Khan*, 522 U.S. 3, 10 (1997); *Bd. of Trade of Chicago v. United States*, 246 U.S. 231, 238 (1918).

standard defined a full GIA as an award to a college athlete for "commonly accepted educational expenses," subsequently defined as tuition, fees, room, board, books, and laundry expenses; athletic scholarships of up to four years were permitted. Tr. 880:12-20, 888:19-889:5, 1229:12 – 1230:23, 1268:18-21; *see* Byers Dep. 21:17-22:14. Laundry money as part of that package was later rescinded.  Tr. 1230:8-16. In succeeding years, how GIAs were calculated, their duration, and their number were often modified by vote of the NCAA.[18]

The NCAA Constitution today states "the Principle of Amateurism" as follows: "[s]tudent-athletes shall be amateurs in an intercollegiate sport, and their participation should be motivated primarily by education and by the physical, mental and social benefits to be derived. Student participation in intercollegiate athletics is an avocation, and student-athletes should be protected from exploitation by professional and commercial enterprises." PX 2340-18 (Principle 2.9).[19] The term "commercial exploitation" is undefined, however. Tr. 1807:13-15.

In January of 2008, David Berst, Vice President for the NCAA's Division I, stated that, in a study he previously had conducted, NCAA amateurism had "a definition that was not steeped in any sacred absolute principle that had to be preserved. It continues to be a balancing of vocation vs. avocation influences and can be modified as views change while preserving the line between us and the pros." PX 2027-1.

---

[18] Pell Grants were initially offset against GIAs, but that was later discontinued. Tr. 161:10-162:4. In 1975, the NCAA eliminated certain incidental expenses from GIAs as an economic move. Byers Dep. 37:10-20, 40:18- 42:13, 47:6-21. The number of football team GIAs per Division I school went from 105 to 95 to 85, while those for basketball went from 18 to 15 to 13. Tr. 200:2-13, 272:12-273:5, 3069:13-3070:2. Schools were initially allowed to offer four-year GIAs, then only one-year athletic scholarships were allowed. Byers testified that this rule change was not necessary to promote either amateurism or competitive balance. Byers Dep. 74:12-17. In 2011, the ability to offer four-year GIAs was reinstated, although relatively few schools have done so. Tr. 1202:20-1203:14. Coaches still exercise great discretion over whether or not to renew athletic scholarships. *See Heike v. Guevara*, 519 F. App'x 911, 914-15, 922 (6th Cir. 2013). In recent years, a $2000 stipend for Division I players was enacted, then promptly rescinded. Tr. 1820:12-1821:9.

[19] The term avocation (a hobby) made no sense to any NCAA witness, including Pilson. Tr. 766:1-8. The "motivation" of athletes, the large majority of whom are seeking professional careers, is ignored by the NCAA. Tr. 1840:6-13. And the NCAA's only effort to protect Players from commercial exploitation is to prevent direct promotions (*i.e.* holding up a can of cola); anything else is fair game. Tr. 1420:10-1421:10, 1807:13-1811:13. Emmert defined the principle of amateurism as athletes are not "paid," a concept not found in the rules but which he called their "intention." Tr. 1851:16-1852:3.

---

1    The NCAA has acted inconsistently with its stated notion of amateurism. In his 2006 State
2    of the Association speech, NCAA President Myles Brand stated that the NCAA and its members
3    had romanticized the notion of amateurism in connection with a "[h]alcyon ideal that college
4    sports can operate without commercial support and indifferent to the realities of a modern
5    business model." PX 2011-15. In the same speech, Brand went on to say that "'[a]mateur' defines
6    the participants, not the enterprise." *Id.* at -36. He used the term "collegiate model" to describe
7    this situation. PX 2011-14 to -16, -20, -27 to -28; *see* Tr. 1237:21-1239:6.

8    The NCAA itself expressed the view that this emphasis on commercialization was
9    impairing the principle of amateurism. *See, e.g*., PX 2017-36 (2006 NCAA Presidential Task
10   Force on the Future of Division I Intercollegiate Athletics report: "at many institutions, athletics
11   often still appears oriented more toward entertainment, and the educational value of athletics
12   participation and competition plays a secondary role to the win-loss column. . . . The drift of the
13   collegiate model toward the professional approach — in both fact and fiction — has given
14   credence to the concern"); 2065-12 ("[T]here is a general sense that 'big time' athletics is in
15   conflict with the principle of amateurism."); 2065-11 ("There has emerged a strong sense among
16   some. . . that the development of increased dollars acquired through corporate relationships does
17   not square with the principle of amateurism, especially when images of student-athletes – even
18   through the use of game video – are used in proximity to commercial products"). As Wallace
19   Renfro, Chief Policy Advisor to the NCAA's President, summed it up in a 2010 e-mail, there is a
20   "general  sense" that  intercollegiate athletics is as "thoroughly commercialized as professional
21   sports" at the "expense of the student-athlete whose participation is exploited," resulting in a
22   "great hypocrisy." PX 424-2 to -3.

23   Consistent with this new attitude, the exploitation of college athletes' NILs has become
24   rampant. In April 2008, the Presidential Task Force on Commercial Activity in Division I
25   Intercollegiate Athletics ("Commercial Task Force") produced a "Fact Sheet" on use of college
26   athletes' NIL by the NCAA and its members. PX 2033-29 to -30. Other internal NCAA
27   documents generated in the 2005-2008 period also refer generally to the use of college athletes'

28

NILs or to the use of their NILs in EA videogames.[20] *E.g.*, PX 826-2 ("The jersey number along with the position and vital statistics is clearly an attempt to have the public make the association with the current student-athlete. . . . And it appears to be working"; a representative from Princeton questioned whether this violated the NCAA's rules); PX 2012-1 ("I don't think we have any argument for student-athlete likeness in regard to these games as I even think there is sharp resemblance to the SAs."); PX 2062-1 ("I still worry about the likenesses. . . . it's pretty obvious to me"); PX 2026-2 (The "presidents have been professing that they do not want [to] support commercialism, most especially when student athletes' images are involved. Of course, the conferences and the schools are already doing that—for example, the Pontiac ads that they complain about are a staple in the fall football season, which they control."); PX 270-1 ("It is primarily because of the need for additional revenue that institutions—and the national office—are seeking ways to commercialize their rights, and those of SAs.").[21]

The evidence at trial demonstrated numerous examples of such exploitation.[22] Emmert expressed discomfort when confronted with these examples. Tr. 1961:12-14. Muir, when shown that one could buy current college athlete photographs on Stanford's website, testified he would have to report this to his compliance officer. Tr. 2549:4-23.

In light of how colleges and conferences have been exploiting college athletes' NILs, there were various efforts within the NCAA to modify the amateurism rules and let the athletes themselves profit from the use of their NILs. None succeeded.

For example, the NCAA Division I Amateurism and Agents Subcommittee in 2000 proposed to revamp the "antiquated" amateurism rules. PX 2281-6. In 2004, the NCAA again considered revising its bylaws, noting that "NCAA member institutions may license the use of

---

[20] Jeremy Strauser, a videogame producer at EA, testified that while EA did not use the names of college athletes in its NCAA-themed videogames, it would use all of their individual attributes of performance, as well as height, weight, and skin tone. Strauser Dep. 30:2-31:22, 35:3-36:10. For similar testimony, see Battle Dep. 30:23-31:16, 50:12-18, 192:6-195:17; Davis Dep. 127:17-128:2.

[21] Byers testified that the NCAA's rules do not actually promote intercollegiate athletics as an avocation or protect college athletes from commercial exploitation. Byers Dep. 67:12-24.

[22] Tr. 1809:12-1810:11, 1896:16-1897:10, 1897:22-1898:25, 1900:7-1901:18, 1959:10-1960:10, 1961:3-20, 2012:21-2013:7, 1983:24-1984:5, 1460:16-1461:12.

student-athlete jersey numbers, names and/or likenesses for retail sale" at campus stores. PX 2000-2. The "concern" was "[i]s it right to derive revenue from the sale of such products? Where is the line drawn—licensed product, television rights, sponsorships, etc.?" *Id.* One suggestion was that revenue from such sales "be placed in a trust to benefit all student-athletes." *Id.* The concern raised by this option was "[d]oes this open the door to future claims from those student-athletes contributing the most to the funds? Are we creating the 'NCAAPA?'" *Id.*

In 2008, the Presidential Task Force on Commercial Activity in Division I Intercollegiate Athletics was created, chaired by then-Penn State University President Graham Spanier. Brand stated in a January 2008 e-mail that the Task Force should examine the issue of compensating college athletes for use of their NIL, noting: "[t]he media and our critics (and Byers in his book) argue that student-athletes should receive a share of the royalties on jerseys and other goods sold with their number. Similarly, it should be possible to sell goods with their name on it and for the student-athletes to receive a share of the royalties." PX 2029-1. In Task Force minutes from October 2008, a member stated that "consideration should be given to redirecting funds obtained from commercial activities . . . into a fund available for student-athletes." PX 2045-4; *see* Tr. 1447:1-10.

In an October 2008 e-mail, Elizabeth Altmaier of the University of Iowa, who was a member of the Task Force, stated that "I remain committed to the idea of some return (financial) to the student athletes themselves." PX 2046-2; *see* Tr. 1450:13-20. Spanier wrote in response: "I disagree strongly with her idea that we compensate athletes for the use of their images. I wouldn't put this in the report at all—not even a hint of the possibility." PX 2046-1. The final Task Force report omitted Altmaier's concerns.

The inescapable conclusion from this history is that the NCAA has no firm conception of amateurism. It is constantly evolving and changing, and that evolution continues to this day. Tr. 222:7-22, 223:2-7. Nor has the concept of amateurism always been tied to not paying a college athlete any more than the GIA. As the APs' experts have noted, the NCAA's own bylaws provide that prohibited "pay" is whatever the NCAA says it should be on any given day. PX 2340-72 (Bylaw 12.02.7); *see* Tr. 163:6-20, 908:16-909:14, 1229:12-1230:6, 1231:3-19. In a recent State

1  of the Association speech, Emmert conceded that the definition of amateurism is ambiguous. PX

2  2299-4.

3     *Survey Evidence*. To justify the alleged procompetitive justification of amateurism, the

4  NCAA also relies on a smattering of consumer surveys on peoples' views about paying college

5  athletes, including one prepared by its expert, Dr. J. Michael Dennis. For several reasons, this

6  evidence should be given no weight.

7     *First*, the APs' survey expert, Hal Poret, established that the survey evidence outside of

8  this litigation measured peoples' attitudes toward paying college athletes generally or paying

9  them salaries, as opposed to compensating Players for use of their NIL; thus, they test questions

10  not relevant to this case. Tr. 2703:8-2706:22. These surveys do not "address the topic that

11  Professor Rubinfeld is opining about" and are "irrelevant." Tr. 2703:13-17. Indeed, Rubinfeld

12  himself repeatedly used the imprecise term "pay to play" to cover all payments over and above a

13  college athlete's cost of attendance, including compensation for use of NILs. Tr. 2941:18-2942:1.

14     *Second*, the Dennis survey had no questions directed specifically to NIL payments or to

15  deferred compensation. Tr. 2669:10-18, 2686:18-21, 2687:21-25; 2709:6-2712:9. Underscoring

16  this deficiency, some respondents thought college athletes should not be paid because they

17  thought the questions inquired about illicit payments (191) or payments of salaries (83). PX 2629,

18  2630; Tr. 2672:12-2673:14, 2679:13-25, 2682:25-2683:20, 2703:8-2704:12, 2714:6-2715:10.

19  Thus, the Dennis survey suffered from the same flaws as the other polls and surveys: it was not

20  designed to fit the facts of this case. In fact, as Poret stated, there was a "dramatic disconnect"

21  between the survey questions and the APs' claims. Tr. 2706:7-22.[23]

22     *Third,* the survey results relied on by Rubinfeld are not necessarily reflective of what

23

---

24  [23] Poret also testified that Dennis used an initial "priming" question that affected subsequent
answers, as shown by initial responses about illicit payments and payments of salaries. PX 2629,

25  2630; Tr. 2714:6-2715:10. The survey also yielded internally inconsistent results showing just
how costless it is to check a box forecasting a change in behavior. Totals of 453 and 611

26  respondents watched no college football or basketball games, respectively, but said they were
likely to cut down on their viewing; 83 who favored payment to college athletes said they would

27  view fewer games, while 33 who opposed payment said they would watch more. Tr. 2729:4-11,
2729:25-2730:9. All of this caused Poret to opine that the Dennis survey was deeply flawed and

28  of no assistance. Tr. 2703:8-2704:12, 2732:24-2733:19, 2704:13-2705:12.

1  consumers will actually do. Poret noted that surveys are not useful predictors on such topics. Tr.

2  2720:15-2721:10. The APs' economic expert, Dr. Daniel Rascher, agreed. Tr. 913:18-918:5. Fans

3  of Division I men's basketball and FBS football will not abandon those sports because college

4  athletes are paid for use of their NILs. If fans were alienated by the commercialism of "amateur"

5  sports, they logically would have ceased watching them long ago in the face of repeated scandals

6  of Division I basketball and FBS football players being paid under the table by colleges and

7  universities. *See* Tr. 438:11-25; PX 2531. They have not done so. Tr. 886:5-899:8.

8      This point is underscored by PX 2074, an October 2010 NCAA Strategic Communication

9  Plan. The document states that as perceived by the public and the media, "[o]ne of the most

10  damaging criticisms [the NCAA] face[s] is the hypocrisy in which we operate." PX 2074-11. The

11  document then presents a "long list of issues that affect how intercollegiate athletics is viewed,"

12  including questionable recruitments, conference realignments that are perceived as a "money

13  grab," multi-million dollar coaching salaries, violations of NCAA rules, misconduct by coaches

14  and college athletes, the "facilities 'arms' race," and academic integrity. *Id*. Yet, nearly four years

15  later, the record does not show that these many issues caused people to stop attending or viewing

16  Division I men's basketball and FBS football games.[24]

17      History shows that the NCAA's amateurism rules do not drive consumer demand. Rather,

18  as the Court observed, college sports are popular because they are *college* sports, played by

19  athletes who attend *schools* that claim the loyalty of millions of fellow students, alumni, and local

20  and regional fans. The NCAA's evidence showed many other reasons that consumer demand is

21  not driven by amateurism, including the love of sports, the multitude of television channels,

22  commercial sponsorships, the March Madness tournament, and other factors.  Tr. 752:5-754:14.

23  As Rascher has also noted, fans still flocked to watch Ohio State University play in the 2010

24  Sugar Bowl despite the fact that six of its athletes had been fined for profiting from the sale of

25  championship memorabilia, and the 2013 game in which Texas A&M University's Johnny

26

27  _____

[24] During the period from 1956-76 when stipends for incidental expenses were paid to Division I
men's basketball and FBS football players, this additional sum did not decrease popularity or

28  demand for intercollegiate sports. Byers Dep. 24:6-17, 25:15-26:8, 26:14-17.

1   Manziel was suspended for one half for allegedly selling his autograph finished 61% above the

2   average ESPN rating for comparable telecasts. Tr. 893:3-895:15.

3       There are instructive examples from other sports as well. After free agency was

4   introduced in MLB in 1976, numerous consumer surveys noted that fans deemed higher player

5   salaries to be excessive or problematic, yet MLB revenues continued to climb steeply. Tr. 901:8-

6   903:24. The same was true after professionals were allowed to play in certain sports in the

7   Olympics. Tr. 904:22-905:18.[25] Put simply, even if they were relevant, surveys about what

8   consumers might do if college athletes were paid are of little value in determining what those

9   individuals would actually do. Tr. 913:18-914:15, 915:5-916:4. Rubinfeld expressed a similar

10  view, in testimony his counsel later tried to repair unsuccessfully. Tr. 2969:7-16 ("people may be

11  complaining about a lot of things but that doesn't mean they're not going to attend the sports and

12  enjoy them").

13      **Competitive Balance.** The Court previously noted that the NCAA had not presented any

14  evidence to suggest that NCAA restrictions on compensation prevent disparities in competitive

15  balance. *NCAA II*, 2014 WL 1410451, at *13-15. Nothing changed on this point at trial. The

16  NCAA offered no evidence establishing that: (1) the restraint is responsible for producing the

17  current level of balance, (2) the current level of balance is responsible for the popularity of

18  Division I men's basketball and FBS football, and (3) lifting the restraint will affect the current

19  level of balance in either sport. The evidence instead establishes that competitive balance does not

20  presently exist because the power conferences dominate the field.

21      Rubinfeld asserted that the current level of competitive balance is sufficient to maintain

22  growing demand, but his analysis amounted to the obvious: college sports are popular today. Tr.

23

24  [25] The NCAA attempted to counter this evidence by showing that MLB television ratings have
    slipped in recent years. But, as Rascher noted, (a) while ratings may have fallen, the number of
25  viewers has increased, and (b) sports programs generally have suffered ratings declines due to the
    explosion of viewing options made possible by cable broadcasters and other forms of telecast
26  competition. Tr. 988:24-990:4, 1019:20-1020:9, 1024:9-1026:7. Rubinfeld agreed that the
    number of viewers of sporting events has increased. Tr. 3097:21-3098:1-3. The NCAA's counsel
27  attempted to impeach Rascher's testimony by showing Nielsen ratings for the Super Bowl over
    the last few decades, but those indicated a flattening out, which supports Rascher's opinion. Tr.
28  1024:9-1026:7.

2988:2-12. He did not demonstrate that current competitive balance levels support future demand. Nor did he even attempt to show that the NCAA's restrictions on sharing of NIL revenues contribute to a level of competitive balance necessary to maintain demand. The record is to the contrary. PX 2049-1 ("competitive advantage or disadvantage doesn't appear to have any rational connection to the principle of amateurism"). The NCAA also did not show that, in the absence of the restraint, high-revenue schools would have any more of a competitive advantage than they already do as a result of, *inter alia*, large recruiting budgets and extravagant facilities. The NCAA and Rubinfeld also failed to estimate how lifting the restraint would harm competitive balance and how any diminished balance would affect demand.

Like amateurism, the NCAA has advanced various inconsistent definitions of competitive balance not based on its rules. NCAA Principle 2.10 speaks only of "competitive equity," defined as "promot[ing] opportunity for equity in competition to assure that individual athletes will not be prevented unfairly from achieving the benefits inherent in participation in" athletics. PX 2340-18; *see also* PX 2083-3. The NCAA has acknowledged that "an impartial observer would likely conclude" that "competitive equity has failed." PX 2083-5. It also has recognized that competitive balance within conferences, or groups of conferences—not, as asserted at trial, balance across FBS schools or Division I—is the appropriate goal to protect the popularity of college sports. PX 2081-7 ("'[c]ompetitive equity' should be defined as fundamentally conference-based"); PX2084-35 ("Greater emphasis should be placed on permissive rules that govern institutions with similar resources.").

At trial, Emmert supplied a new NCAA definition of competitive balance, meaning simply a "chance to win." Tr. 1773:24-1774:22. Rubinfeld also testified that competitive balance was linked to the "idea of having the teams that perhaps don't have the same resources have a real chance to upset the teams that do." Tr. 3125:21-3126:8. Using this definition, the NCAA and Rubinfeld provided no evidence, other than anecdotes about upsets in games, of the current "chance to win" or how or to what extent lifting the restraint would affect the "chance to win" and reduce upsets, much less the ultimate relationship to consumer demand.

In contrast, based on statistics concerning wins and losses, revenue, rankings (including

persistence), margin of victory, and betting spreads, the evidence from Noll and Rascher showed that the NCAA lacks competitive balance. PX 2556, 2557, 2558; Tr. 234:12-236:16; Tr. 933:10-939:5. The statistical analysis "basically proves there isn't balance." Tr. 235:21-24, 236:8-16.

Both Noll and Rascher also testified that the consensus in economics literature is that restraints on payments to college athletes do not contribute to competitive balance; rather, the opposite is true because the restraints prevent schools from competing. Tr. 231:1-234:2; 921:1-922:16. This examination of the literature illustrated a difference between the experts at trial. Noll and Rascher are experts in the field of sports economics; Noll is even a founder of the field. Rubinfeld's only experience with sports economics prior to this case were the sections of his textbook devoted to the NCAA cartel and MLB's reserve clause, which undercut his testimony here.

NCAA documents also recognize, based on revenues and the results of games and championships, that "the teams from the six FBS AQ conferences [are] dominating competition on the field." PX 2080-2, -3, -4; PX 2615-3 (transcript of NCAA video presentation noting that "[o]bviously, such differences [in revenues] have large impacts on the competitive equity within [FBS]"); *see also* PX 424-4 (discussing "the 'haves' the 'have-nots' and the 'forget-about-its'"). Byers testified that "competitive balance is an elastic term that can be stretched in any direction you want to justify a present circumstance." Byers Dep. 48:21-23. In sum, as Delany of the Big Ten testified, "[i]t is painfully obvious it's not all a level playing field." Tr. 2119:10-18.[26]

In his supplemental analysis created on the eve of trial, Rubinfeld analyzed the relationship between revenues and rankings. Inexperienced in sports economics, he used the wrong rankings (the Colley rank) for basketball, but even his analyses showed a high correlation between revenues and football and basketball rankings. Tr. 942:3-13; PX 2559, 2560. Rascher confirmed the high correlation using both Colley and Sagarin rankings and offered an unrebutted

---

[26] Todd Petr of the NCAA likewise noted that the wide disparities in revenues among NCAA member schools have led to continued examination of the sustainability of the current intercollegiate model and whether competitive balance exists. Tr. 2263:12-2264:24. The evidence showed that NCAA rules make matters worse by distributing funds predominantly to big conferences, including the "Basketball Fund," which is distributed based on victories in the March Madness tournament. Tr. 2140:21-2141:8; DX 3308-9.

1    regression analysis to show a correlation between revenue and winning at a 95% confidence level.

2    PX 2559, 2560; Tr. 933:5-935:9, 939:12-945:25. Without accounting for limits on athletic

3    scholarships in men's basketball and FBS football, Rubinfeld also analyzed potential movements

4    by recruits between schools if they made offers based on Rascher's 50% fully pooled model

5    (which the NCAA always argued was baseless), and those offers were not matched. As Rascher

6    showed, in testimony that was also unrebutted, the actual results of Rubinfeld's analysis showed

7    potential switching of players within and among major conferences, and small numbers of

8    changes between low- and high-revenue schools. PX 2561; Tr. 947:14-951:4.

9         **Integration**. The NCAA's defense of integration of athletics and academics fails because

10   it is not procompetitive, and, even if it were, the NCAA offers no way to measure this benefit to

11   justify the restraint. Moreover, there was no proof that the restraint is what produces integration

12   or that lifting it will harm integration. With or without the restraint, Players will remain

13   scholarship students. And the NCAA's steady stream of evidence on its ongoing and hoped-for

14   educational reforms all showed that there are alternatives that could better serve the goal of

15   integration.

16        The APs' expert, Dr. Ellen Staurowsky, supported by other witnesses and stipulated facts,

17   described the big business of college football and basketball and enormous revenues that they

18   generate.[27] She explained how these forces place an emphasis on athletics first and academics

19   second—to the point where, as the KC and the 2006 Presidential Task Force concluded, these

20   sports have become an entertainment industry that is "the antithesis of academic values." Tr.

21   1165:24-1166:12, 1171:8-1174:24. Noll testified on the same point from an economic

22   perspective. Tr. 523:22-524:23. Pilson even talked about a "win at all costs" mentality of the

23   schools. Tr. 788:21-789:18. Staurowsky described an ongoing "arms race" (a known term within

24

25   _____

26   [27]Tr. 1128:11-1129:9, 1132:13-21, 1133:6-1134:23, 1139:23-1141:25; PX 2536, 2537, 2539
     (major conference school revenues); PX 2538, 2542, 2543 (FBS football and Division I
27   basketball revenues); PX 2544 (broadcast revenues); PX 2545 (current television contracts); PX
     2550, 2551(coaching pay relative to NFL/NBA); PX 2565 (March Madness revenue); PX 2569,
28   2570 (recruiting expenditures); *see also O'Bannon* Dkt. No. 214 (Rascher Declaration regarding
     PX 2537, 2538, 2539, 2542, 2543); *see generally O'Bannon* Dkt. No. 207.

the NCAA) of expenditures on, *inter alia*, facilities and coaching salaries.[28] The NCAA's own

Division I principles even refer to basketball and football as the "emphasized" "spectator-oriented

sports" because, as Staurowsky testified, "they are the economic driver for the enterprise." Tr.

1126:2-1127:2; PX 2340-359 to -360 (Bylaw 20.9.2).

Staurowsky provided evidence supported by the testimony of the three APs and

unrebutted by any NCAA expert that: (1) despite a 20-hour rule for structured activity, men's

football and basketball players face extreme time demands, spending 40 or more hours a week on

their sports;[29] (2) football and basketball players, sometimes at the direction of athletic

department staff, choose classes to avoid conflicts with their athletic commitments and then miss

those classes due to game-related travel, often driven by television scheduling (Tr. 1191:15-

1198:14; PX 2078-22, -23, -28, -29); (3) athletic scholarships and recruiting are based on

athletics, not academics (Tr. 1198:22-1201:5); (4) admission standards known as "special admits"

are different for men's football and basketball players (Tr. 1204:5-1205:25); (5) men's football

and basketball players, unlike other students, "cluster" into particular majors (Tr. 1220:19-

1225:12); and (6) federally reported graduation rates for Players are lower than the rates for both

students and other athletes (Tr. 1206:10-24, 1209:2-1212:14).[30]

The lay opinions from a handful of NCAA witnesses about the purported risks of lifting

the restraint reinforced Staurowsky's testimony. Delany of the Big Ten was quite candid that

athletes already spend far too much time on athletics. Tr. 2086:20-2088:19, 2111:21-2112:20.

Likewise, Banowsky acknowledged the time demands imposed by athletics and testified that he

would like to see athletes spend more time with other students and "do[] regular student things."

---

[28]Tr. 1145:20-1146:19, 1149:9-17, 1150:13-25, 1161:2-16; PX 2448-3 to -5 (coaching salaries compared to college presidents).

[29] Tr. 1176:1-14, 1188:10-1190:9; PX 2297-11, 424-2 ("a 'wink-and-nod-approach' to voluntary activity"), PX 2078-17, -19, -21 (NCAA GOALS study).

[30] The NCAA has even adopted a measure of academic success called the Graduation Success Rate ("GSR"), which is applied to athletes only and avoids comparisons to the student body as a whole; the GSR is intended to remove drop outs and transfers from the federal graduation rates— without tracking whether the transfers ever graduate at a later institution. Tr. 1212:16-1214:6; PX 3369. The NCAA's Diane Dickman testified that the association has adopted another metric not applied to the student body, an "Academic Progress Rate" of 930, which translates to a graduation rate of 50%, and GPAs of 1.8 to 2.0. Tr. 2572:19-20, 2580:18-2581:6, 2582:10-21.

---

Tr. 2379:8-18, 2380:24-2381:4. The NCAA's own Task Force on Intercollegiate Athletics,

further emphasizing that testimony, warned in its 2006 report of the need to "strengthen the

integration of athletics within our universities" or "we can foresee . . . failure to meet our

responsibilities"; that the goals of intercollegiate athletics were being "jeopardized as the

collegiate model drifts toward the professional approach"; and that intercollegiate athletics has

"isolate[d] the activity from the academic mission of the university." PX 2017-9, -13, -25.

Rubinfeld relied on this report, citing its conclusions that "yet at many institutions, athletics often

still appear oriented toward more entertainment and the educational value of athletics

participating and competition plays a secondary role to the win/loss column." Tr. 3109:14-

3110:24.[31] Inside the NCAA, Renfro and the Strategic Communications team discussed the

public perception that "the notion that athletes are students is the great hypocrisy of

intercollegiate athletics" (PX 424-3) and "the hypocrisy in which we operate" (PX 2074-11).

Rubinfeld admitted that many organizations have concluded that commercialism in college

athletics is undermining the "fundamental tenets" of academics. Tr. 3103:9-16.

The NCAA never proved that the challenged restraint integrates athletes with other

students and athletes on other teams. To the contrary, the evidence demonstrates that students

currently have diverse backgrounds, wealth, talents, and a multitude of other distinctions. Tr.

520:5-521:11. It also demonstrates that, unlike other students, Players perform in stadiums and on

television (some are even celebrities) and are used to promote commercial sponsors; they also

live in unique dorms, eat in special dining halls, practice in lavish facilities, and enjoy their own

game rooms. Tr. 1161:2-16. Indeed, Stanford's Muir admitted that his opinions on this issue were

"speculation . . . . I don't think any of us knows" what will happen. Tr. 2542:13-24.

The NCAA's argument against sharing commercial revenues with athletes is also

patronizing. Many Players come from low-income families, posing difficulties already for their

---

[31] The NCAA argues that deference should be given to the lay opinions of its university and conference personnel about the risks of an injunction, but their lay witnesses only predicted that sharing revenues with athletes would cause them to be classified differently. Tr. 1373:21-1374:15, 1379:20-1380:7 (Plonsky reasoned it would be "separatist" and "incongruous"); 1594:12-1595:5 (Harris Pastides of USC: students who do not receive payments would be "second-class citizens").

integration into campus life and academics. The NCAA neglected to acknowledge any current "classification" issues between low-income and other students, and argued instead that providing NIL monies to athletes would create classification issues, as if to say, in effect, that the poor must remain poor in order to protect our campus life.

The NCAA called Dr. James Heckman to testify that college education is valuable to athletes. But Heckman's testimony was irrelevant. He established no causal inference between the challenged restraint and the positive social outcomes he identified, nor did he establish any causal inference between lifting the restraint and a diminution in those outcomes; in fact, he did not even try. Tr. 1517:19-1520:1. His testimony was also irrelevant because if an injunction issues, college football and basketball players will *remain* students who attend college; in other words, they will still receive the benefits Heckman identifies.

Heckman analyzed data from the National Educational Longitudinal Study of 1988 ("NELS") following eighth graders beginning in 1988 to the year 2000. Tr. 1496:14-1497:3, 1522:22-1523:5. He assumed that those who played basketball or football in high school went on to play those sports in college; he never measured how many actually played Division I men's basketball or FBS football—as opposed to other sports, Division II or Division III football or basketball, or FCS football. Tr. 1535:13-24. A 1996 study using the NELS data conducted by the National Center for Education Statistics shows that only 2.2 percent of the high schoolers went on to play athletics in Division I schools. PX 2595-1. This report also shows that less than half the athletes Heckman used in his analysis were actually in Division I athletics rather than Division II or III. *Id.* (5.2 percent of the dataset played intercollegiate sports, but only 2.2 percent played Division I). Heckman did not control for FBS and Division I men's basketball athletes or the majors in which they are clustered, or study athletes after the year 2000. Tr. 1534:9-18, 1535:25-1536:21. As in another district court that rejected his economic evidence, Dr. Heckman's testimony here bears little relation to the real world facts and is entitled to little weight.[32]

---

[32] *S. Pac. Commc'ns Co. v. Am. Tel. & Tel. Co.*, 556 F. Supp. 825, 869-70 (D.D.C. 1982), *aff'd*, 740 F.2d 980 (D.C. Cir. 1984), *cert. denied*, 470 U.S. 1005 (1985); *see also In re Brand Name Prescription Drugs Antitrust Litig*., 186 F.3d 781, 786 (7th Cir. 1999) (rejecting the evidence offered by a Nobel Prize-winning economist for not addressing the relevant causal issue).

1    **Output**. As Noll pointed out, the NCAA conducted no economic analysis of output. Tr.

2    250:23-251:1. Rubinfeld looked to the increases in the number of Division I teams and the

3    number of games played in Division I compared to the professional leagues (Tr. 2980:5-2981:18,

4    2950:2-2952:25), but he made no showing that those increases resulted from the challenged

5    restraint. Rubinfeld abandoned his earlier claims that the numbers of scholarships would be

6    limited, focusing only on the limited number of schools that might drop out of Division I, which

7    he asserted without additional analysis. Tr. 2972:10-21, 2983:12-18, 3077:22-3078:6. He even

8    conceded that he had done no statistical analysis on what would happen if an injunction were

9    entered. Tr. 3102:17-3103:7.

10   Emmert and Mark Lewis of the NCAA testified about the possibility of schools leaving

11   Division I if the injunction issues, but this was purely speculative testimony. Noll and Rascher

12   testified at length that this made no economic sense. Tr. 242:2-244:25, 881:19-883:1. This

13   testimony is also undercut by the testimony of representatives of specific schools or conferences.

14   Pastides of USC testified that his board of directors would replace him if he allowed USC to drop

15   out of Division I football or men's basketball. Tr. 1599:4-10. Similarly, Plonsky noted that while

16   UT might not want to compensate college athletes for use of their NILs, it might face competitive

17   pressures from other colleges to do so. Tr. 1471:2-15. And Banowsky of CUSA acknowledged

18   that schools that already supposedly lose money on athletics nonetheless remain in FBS, that

19   numerous other schools are lining up to join FBS because of the attendant benefits (and despite

20   the purported financial disadvantages), and that "low revenue" schools will not have to tap their

21   budgets much more than they already do to share TV revenue with athletes. Tr. 2373:1-2377:25.

22   He stated that even if a 50-50 split of broadcast revenues *were required*, no school would leave

23   Division I; each would instead negotiate with college athletes independently; some might pay

24   licensing fees, others might not, and it is "possible" that some might just drop out of FBS (to

25   FCS). Tr. 2310:10-12, 2371:25-2372:24. Greg Sankey of the SEC likewise could not predict that

26   any school in his conference would leave Division I if an injunction issues.  He thought some

27   schools might pay royalties and some might not but readily admitted that "in the prediction

28   business, [he has] not always been very good." Tr. 2412:5-2414:12, 2417:16-2418:4.

1    The examples involving the demise of EA's NCAA-branded videogames and jerseys

2    available on the NCAA's website show that the restraint has actually reduced, rather than

3    enhanced, output of products that would thrive if group licensing were permitted. In addition, a

4    2007 NCAA document (PX 682) reflects comments received by potential or actual licensees

5    (broadcasters, videogame developers, wireless telephone companies, apparel makers) who all saw

6    increased value for themselves and their customers if they were allowed to make more liberal use

7    of college athletes' NILs.[33]

8    **V.    LESS RESTRICTIVE ALTERNATIVES EXIST**

9    Given the absence of valid procompetitive justifications, the anticompetitive aspects of the

10   restraint of trade far outweigh any alleged procompetitive justifications, and no consideration of

11   less restrictive alternatives is necessary. Noll nonetheless identified three less restrictive

12   alternatives:  (1) allowing only certain types of NIL payments, equivalent to adding a stipend to

13   existing athletic scholarships; (2) the deposit of a group license royalty amount in a trust fund

14   payable after the Players graduate or otherwise leave school;[34] or (3) use of the Olympic model,

15   which would permit Players to obtain money from endorsements. Tr. 283:19-284:13; 287:2-22;

16   291:15-294:15.[35]

17   **VI.    CONCLUSION**

18   For all of the foregoing reasons, the APs' requests for injunctive relief should be granted.

19   The alternatives proposed in *O'Bannon* Dkt. No. 252-1 will not pose any antitrust issues if they

20   are ordered by the Court.

21

22

23

---

24   [33] A 2004 presentation by CLC states that fewer restrictions "[w]ould likely lead to a giant leap in royalties, retail presence, and differentiates college from pro." PX 1133-42. In addition, as Rascher noted, the NCAA told the United States Supreme Court in oral argument in *BoR* that

25   paying college athletes would increase demand for the NCAA's intercollegiate sports product, thus directly affecting the higher education market. Tr. 951:11-952:23.

26   [34] For similar suggestions in NCAA documents or from NCAA witnesses, see PX 280-3, 2000-2, 2006-1; Tr. 2365:11-2367:7.

27   [35] In the higher education market, increased output could potentially be reflected in more athletic

28   scholarships, but the NCAA has artificially restricted the number of them.

1  Dated: July 2, 2014                    Respectfully submitted,

2

3                                         By:  _/s/ Michael P. Lehmann_
                                          Michael P. Lehmann (Cal. Bar No. 77152)
                                          Bruce J. Wecker (Cal. Bar No. 78530)
4                                         HAUSFELD LLP
                                          44 Montgomery St., 34th Floor
5                                         San Francisco, CA 94104
                                          Telephone:  (415) 633-1908
6                                         Facsimile:  (415) 358-4980
                                          E-mail: mlehmann@hausfeldllp.com
7                                               bwecker@hausfeldllp.com

8                                         Michael D. Hausfeld (*pro hac vice*)
                                          Hilary K. Scherrer (Cal. Bar No. 209451)
9                                         Sathya S. Gosselin (Cal. Bar. No. 269171)
                                          Swathi Bojedla (*pro hac vice*)
10                                        HAUSFELD LLP
                                          1700 K Street, NW, Suite 650
11                                        Washington, DC 20006
                                          Telephone:  (202) 540-7200
12                                        Facsimile:  (202) 540-7201
                                          E-mail: mhausfeld@hausfeldllp.com
13                                              hscherrer@hausfeldllp.com
                                                sgosselin@hausfeldllp.com
14                                              sbojedla@hausfeldllp.com

15                                        *Plaintiffs' Class Counsel*

16

17                                        _/s/ William A. Isaacson_
                                          William A. Isaacson (*pro hac vice*)
18                                        BOIES, SCHILLER & FLEXNER LLP
                                          5301 Wisconsin Ave. NW
19                                        Washington, DC 20015
                                          Telephone:  (202) 237-5607
20                                        Facsimile:  (202) 237-6131
                                          E-mail: wisaacson@bsfllp.com

21                                        _/s/ Renae D. Steiner_
                                          Renae D. Steiner (*pro hac vice*)
22                                        HEINS MILLS & OLSON PLLC
                                          310 Clifton Avenue
23                                        Minneapolis, MN 55403
                                          Telephone:  (612) 338-4605
24                                        Facsimile:  (612) 338-4605
                                          E-mail: rsteiner@heinsmills.com

25

26

27

28

1

2

3

4

5

6

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28

*/s/ Seth A. Rosenthal*
Seth A. Rosenthal (*pro hac vice*)
VENABLE LLP
575 7th Street, NW
Washington, DC 20004
Telephone:  (202) 344-4741
Facsimile:  (202) 344-8300
E-mail: sarosenthal@venable.com

*/s/ Steven J. Greenfogel*
Steven J. Greenfogel (*pro hac vice*)
LITE DEPALMA GREENBERG LLC
1521 Locust Street - 7th Floor
Philadelphia, PA 19102
Telephone:  (267) 519-8306
Facsimile:  (215) 569-0958
E-mail: sgreenfogel@litedepalma.com

*Additional Counsel for Plaintiffs*

1

### CERTIFICATE OF SERVICE

2

3    I, Sathya S. Gosselin, declare that I am over the age of eighteen (18) and not a party to the entitled action. I am a partner in the law firm of HAUSFELD LLP, and my office is located at 1700 K Street NW, Washington, DC 20010.

4

5    On July 2, 2014, I caused to be filed the foregoing **PLAINTIFFS' OPENING POST-TRIAL BRIEF** with the Clerk of Court using the Official Court Electronic Document Filing System, which served copies on all interested parties registered for electronic filing.

6

7    I declare under penalty of perjury that the foregoing is true and correct.

8
                                              */s/ Sathya Gosselin*
                                              Sathya S. Gosselin
9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28