GLENN D. POMERANTZ (State Bar No. 112503)
glenn.pomerantz@mto.com
KELLY M. KLAUS (State Bar No. 161091)
kelly.klaus@mto.com
LUIS LI (State Bar No. 156081)
luis.li@mto.com
ROHIT K. SINGLA (State Bar No. 213057)
rohit.singla@mto.com
CAROLYN H. LUEDTKE (State Bar No. 207976)
carolyn.luedtke@mto.com
MUNGER, TOLLES & OLSON LLP
560 Mission Street
Twenty-Seventh Floor
San Francisco, California 94105-2907
Telephone:     (415) 512-4000
Facsimile:     (415) 512-4077

GREGORY L. CURTNER (*pro hac vice*)
gcurtner@schiffhardin.com
ROBERT J. WIERENGA (State Bar No. 183687)
rwierenga@schiffhardin.com
SCHIFF HARDIN LLP
350 S. Main Street, Suite 210
Ann Arbor, Michigan  48104
Telephone:  (734) 222-1500
Facsimile:  (734) 222-1501

Attorneys for Defendant
National Collegiate Athletic Association

UNITED STATES DISTRICT COURT

NORTHERN DISTRICT OF CALIFORNIA, OAKLAND DIVISION

| | |
|---|---|
| EDWARD O'BANNON, *et al.*,<br><br>                    Plaintiffs,<br><br>                    v.<br><br>NATIONAL COLLEGIATE ATHLETIC ASSOCIATION,<br><br>                    Defendant. | Case No. 4:09-CV-3329-CW<br><br>**DEFENDANT NCAA'S POST-TRIAL BRIEF**<br><br>Judge:   Hon. Claudia Wilken<br>Trial:    June 9, 2014 |

# TABLE OF CONTENTS

Page

I.  THE NCAA'S RULES SHOULD BE UPHELD WITHOUT A FULL-BLOWN RULE OF REASON ANALYSIS BECAUSE THE RULES ARE INTEGRAL TO THE NCAA'S CORE JOINT VENTURE ACTIVITY ........................................................ 1

    A.  Restraints that Define the Product of a Joint Venture Are Upheld Without Searching Scrutiny ........................................ 1

    B.  The Challenged Rules Are at the Core of the NCAA's Joint Venture ..................... 1

    C.  The Challenged Rules Are Integral to the NCAA's Product Offering .................... 3

II. APs DID NOT MEET THEIR BURDEN UNDER THE RULE OF REASON ................. 4

    A.  The Controlling Legal Standards ........................................ 4

    B.  APs' "Education Market" Is Irrelevant to Their Claims .......................... 6

        1.  The "Education Market" Does Not Match the Alleged Restraints .............. 6

        2.  APs Did Not Prove Anticompetitive Effects in the "Education Market" ........................................ 7

        3.  APs Did Not Prove Antitrust Injury in the "Education Market" ................... 8

    C.  APs Did Not Meet Their Burden As to the Licensing Markets ............................... 8

        1.  Broadcast Licensing Market .......................... 8

        2.  Videogame Licensing Market .......................... 14

        3.  Merchandise and Endorsement Licensing Market ...................................... 16

III. THE PROCOMPETITIVE BENEFITS OF THE CHALLENGED RULES OUTWEIGH ANY ANTICOMPETITIVE HARM .......................................... 17

    A.  Procompetitive Benefits Under the Rule of Reason............................. 17

    B.  The Procompetitive Benefits of the Challenged Rules Outweigh Any Anticompetitive Harm.......................................... 18

        1.  The Challenged Rules Maintain the NCAA's Unique Product, Amateur College Football and Men's Basketball ........................ 18

        2.  The Challenged Rules Increase Output ...................................... 23

        3.  The Challenged Rules Promote Competitive Balance ............................... 25

        4.  The Challenged Rules Improve Educational Quality by Ensuring that Athletics Are Integrated With Academics........................................... 27

**TABLE OF CONTENTS**
(continued)

Page

IV.    NO LESS RESTRICTIVE ALTERNATIVE TO THE CHALLENGED RULES
        WOULD ACHIEVE THEIR PROCOMPETITIVE BENEFITS...................................... 31

V.    THERE IS NO BASIS FOR INJUNCTIVE RELIEF........................................................ 34

# TABLE OF AUTHORITIES

**Page**

**FEDERAL CASES**

*Adidas Am., Inc. v. NCAA,*
64 F. Supp. 2d 1097 (D. Kan. 1999) ............................................................. 16

*Agnew v. NCAA,*
683 F.3d 328 (7th Cir. 2012)................................................................. passim

*Allison v. Vintage Sports Plaques,*
136 F.3d 1443 (11th Cir. 1998) ................................................................. 10

*Am. Ad Mgmt., Inc. v. GTE of Cal.,*
190 F.3d 1051 (9th Cir. 1999) .................................................................... 6

*Am. Motor Inns, Inc. v. Holiday Inns, Inc.,*
521 F.2d 1230 (3d Cir. 1975) .................................................................... 32

*American Needle, Inc. v. Nat'l Football League,*
560 U.S. 183 (2010) .......................................................... 1, 2, 17, 25

*Apple, Inc. v. Psystar Corp.,*
586 F. Supp. 2d 1190 (N.D. Cal. 2008) ...................................................... 7

*Atl. Richfield Co. v. USA Petroleum Co.,*
495 U.S. 328 (1990) ................................................................................... 5

*Bassett v. NCAA,*
528 F.3d 426 (6th Cir. 2008)...................................................................... 4

*Big Bear Lodging Ass'n v. Snow Summit, Inc.,*
182 F.3d 1096 (9th Cir. 1999)..................................................................... 6

*Brantley v. NBC Universal, Inc.,*
675 F.3d 1192 (9th Cir. 2012)............................................................ 15, 16

*Broad. Music, Inc. v. CBS,*
441 U.S. 1 (1979) ....................................................................................... 2

*C.B.C. Distrib. & Mktg., Inc. v. Major League Baseball Advanced Media, L.P.,*
505 F.3d 818 (8th Cir. 2007) .................................................................... 10

*Cal. Dental Ass'n v. FTC,*
526 U.S. 756 (1999) ..................................................................... 5, 13, 17

*Chi. Prof'l Sports Ltd. P'ship v. Nat'l Basketball Ass'n,*
95 F.3d 593 (7th Cir. 1996)........................................................... 5, 12, 23

-iii-

**TABLE OF AUTHORITIES**
(continued)

Page

*Cnty. of Tuolumne v. Sonora Cmty. Hosp.*,
    236 F.3d 1148 (9th Cir. 2001) ............................................................... 17, 27, 31, 32

*Comcast Corp. v. Behrend*,
    133 S. Ct. 1426 (2013) ..................................................................... 11

*Continental T.V., Inc. v. GTE Sylvania Inc.*,
    433 U.S. 36 (1977) ........................................................................ 18

*Deutscher Tennis Bund v. ATP Tour, Inc.*,
    610 F.3d 820 (3d Cir. 2010) ............................................................. 27

*eBay Inc. v. MercExchange, LLC*,
    547 U.S. 388 (2006) ...................................................................... 34

*Gaines v. NCAA*,
    746 F. Supp. 738 (M.D. Tenn. 1990) ............................................... 2, 4

*Grutter v. Bollinger*,
    539 U.S. 306 (2003) ...................................................................... 28

*Hamilton v. Regents*,
    293 U.S. 245 (1934) ...................................................................... 35

*In re Hayes Microcomputer Prods., Inc. Patent Litig.*,
    1989 WL 252349 (N.D. Cal. Mar. 22, 1989) ................................... 10

*In re Larry's Apartment, L.L.C.*,
    249 F.3d 832 (9th Cir. 2001) ......................................................... 14

*In re NCAA I-A Walk-On Football Players Litig.*,
    398 F. Supp. 2d 1144 (W.D. Wash. 2005) ........................................ 2

*Jones v. NCAA*,
    392 F. Supp. 295 (D. Mass. 1975) .................................................... 4

*Justice v. NCAA*,
    577 F. Supp. 356 (D. Ariz. 1983) .................................................... 4

*Kamine/Besicorp Allegany L.P. v. Rochester Gas & Elec. Corp.*,
    908 F. Supp. 1194 (W.D.N.Y. 1995) ............................................... 13

*Keyishian v. Bd. of Regents of Univ. of State of N.Y.*,
    385 U.S. 589 (1967) ...................................................................... 20

*Knevelbaard Dairies v. Kraft Foods, Inc.*,
    232 F.3d 979 (9th Cir. 2000) .......................................................... 14

-iv-

# TABLE OF AUTHORITIES
### (continued)

Page

*Law v. NCAA,*
    134 F.3d 1010 (10th Cir. 1998)........................................................................ 2, 14, 18

*Law v. NCAA,*
    902 F. Supp. 1394 (D. Kan. 1995) ............................................................................... 18

*Legal Econ. Evaluations, Inc. v. Metro. Life Ins. Co.,*
    39 F.3d 951 (9th Cir. 1994)............................................................................................ 5

*Les Shockley Racing, Inc. v. Nat'l Hot Rod Ass'n,*
    884 F.2d 504 (9th Cir. 1989)................................................................................... 5, 15

*L.A. Mem'l Coliseum Comm'n v. Nat'l Football League,*
    726 F.2d 1381 (9th Cir. 1984).................................................................................. 4, 18

*M&H Tire Co., Inc. v. Hoosier Racing Tire Corp.,*
    733 F.2d 973 (1st Cir. 1984) ....................................................................................... 32

*Mahaffey v. Official Detective Stories, Inc.,*
    210 F. Supp. 251 (W.D. La. 1962)............................................................................... 10

*Mandeville Island Farms v. Am. Crystal Sugar Co.,*
    334 U.S. 219 (1948)..................................................................................................... 12

*Marucci Sports, L.L.C. v. NCAA,*
    751 F.3d 368 (5th Cir. 2014)......................................................................................... 2

*Matthews v. Wozencraft,*
    15 F.3d 432 (5th Cir. 1994).......................................................................................... 10

*McCormack v. NCAA,*
    845 F.2d 1338 (5th Cir. 1988).......................................................................... 2, 27, 28

*Metro. Intercollegiate Basketball Ass'n v. NCAA,*
    339 F. Supp. 2d 545 (S.D.N.Y. 2004)........................................................................... 2

*Modesto Irrigation Dist. v. Pac. Gas & Elec. Co.,*
    309 F. Supp. 2d 1156 (N.D. Cal. 2004) ...................................................................... 10

*Nat'l Football League v. Alley, Inc.,*
    624 F. Supp. 6 (S.D. Fla. 1983).................................................................................... 9

*NCAA v. Bd. of Regents of Univ. of Oklahoma,*
    468 U.S. 85 (1984)............................................................................................... passim

*Newcal Indus., Inc. v. Ikon Office Solution,*
    513 F.3d 1038 (9th Cir. 2008)................................................................................... 5, 7

**TABLE OF AUTHORITIES**
(continued)

Page

*Paladin Assocs., Inc. v. Mont. Power Co.,*
    328 F.3d 1145 (9th Cir. 2003) ..................................................................... 6, 18

*Pharm. & Diagnostic Servs., Inc. v. Univ. of Utah,*
    801 F. Supp. 508 (D. Utah 1990) ..................................................................... 35

*Pittsburgh Athletic Co. v. KQV Broad. Co.,*
    24 F. Supp. 490 (W.D. Pa. 1938) ..................................................................... 10

*Pooley v. Nat'l Hole-In-One Ass'n,*
    89 F. Supp. 2d 1108 (D. Ariz. 2000) ................................................................ 10

*Rebel Oil Co., Inc. v. Atl. Richfield Co.,*
    51 F.3d 1421 (9th Cir. 1995) ........................................................................ 4, 5

*Regents of Univ. of Michigan v. Ewing,*
    474 U.S. 214 (1985) ....................................................................................... 28

*Reifert v. S. Cent. Wisc. MLS Corp.,*
    450 F.3d 312 (7th Cir. 2006) ............................................................................ 4

*Rothery Storage & Van Co. v. Atlas Van Lines, Inc.,*
    792 F.2d 210 (D.C. Cir. 1986) ........................................................................ 32

*Sherman v. Curators of Univ. of Missouri,*
    16 F.3d 860 (8th Cir. 1994) ............................................................................ 35

*Smith v. NCAA,*
    139 F.3d 180 (3d Cir. 1998) ........................................................................ 2, 4

*Sony Elec., Inc. v. Soundview Tech., Inc.,*
    281 F. Supp. 2d 399 (D. Conn. 2003) .............................................................. 10

*Sullivan v. Nat'l Football League,*
    34 F.3d 1091 (1st Cir. 1994) ........................................................................... 18

*Tanaka v. Univ. of S. Cal.,*
    252 F.3d 1059 (9th Cir. 2001) ........................................................... 5, 7, 17, 31

*Texaco Inc. v. Dagher,*
    547 U.S. 1 (2006) ......................................................................................... 1, 2

*Theme Promotions, Inc. v. News Am. Mktg. FSI,*
    546 F.3d 991 (9th Cir. 2008) ............................................................................ 6

*Toffoloni v. LFP Publ'g Grp., LLC,*
    572 F.3d 1201 (11th Cir. 2009) ....................................................................... 10

-vi-

**TABLE OF AUTHORITIES**
(continued)

Page

*U.S. Fid. & Guar. Co. v. Lee Invs. LLC,*
    641 F.3d 1126 (9th Cir. 2011) ............................................................... 32

*United States v. Brown Univ.,*
    5 F.3d 658 (3d Cir. 1993) ...................................................................... 27

*United States v. Syufy Enters.,*
    903 F.2d 659 (9th Cir. 1990) ................................................................. 8

*United States v. Topco Assoc., Inc.,*
    405 U.S. 596 (1972) .............................................................................. 18

*Weyerhaeuser Co. v. Ross-Simmons Hardwood Lumber Co.,*
    549 U.S. 312 (2007) ........................................................................ 12, 13

**STATE CASES**

*Battaglieri v. Mackinac Ctr. For Pub. Policy,*
    680 N.W.2d 915 (Mich. Ct. App. 2004) ................................................ 10

*J.C. v. WALA-TV, Inc.,*
    675 So. 2d 360 (Ala. 1996) ................................................................... 10

*Jaubert v. Crowley Post-Signal, Inc.,*
    375 So. 2d 1386 (La. 1979) ................................................................... 10

*Lake v. Wal-Mart Stores, Inc.,*
    582 N.W.2d 231 (Minn. 1998) .............................................................. 10

*Messenger v. Gruner + Jahr Printing & Publ'g,*
    706 N.Y.S.2d 52 (N.Y. 2000) ............................................................... 10

*Montgomery v. Montgomery,*
    60 S.W.3d 524 (Ky. 2001) .................................................................... 10

*WJLA-TV v. Levin,*
    564 S.E.2d 383 (Va. 2002) .................................................................... 10

**STATUTES AND RULES**

Fed. R. Civ. P. 37(c)(1) .............................................................................. 33

Cal. Civ. Code §§ 3344, 3344.1 ................................................................. 9

Cal. Educ. Code § 67360 ........................................................................... 35

Fla. Stat. § 540.08(4) ................................................................................. 9

-vii-

**TABLE OF AUTHORITIES**
(continued)

Page

Ga. Code Ann. § 20-2-317 ................................................................. 35

Haw. Rev. Stat. § 482P-7(b)(2) ......................................................... 9

720 Ill. Comp. Stat. 5/29-1 ................................................................ 35

765 Ill. Comp. Stat. 1075/35(b)(2) .................................................... 9

Ind. Code Ann. § 32-36-1-1(c) .......................................................... 9

Iowa Code § 722.11 ........................................................................... 35

Mich. Comp. Laws Ann. §§ 390.1502, 600.2968 .............................. 35

Neb. Rev. Stat. § 20-202(1) ............................................................... 9

Nev. Rev. Stat. § 597.790(2) ............................................................. 9

Ohio Rev. Code Ann. § 2741.02(D)(1) .............................................. 9

Okla. Stat. tit. 12, § 1449(D) ............................................................ 9

42 Pa. Cons. Stat. Ann. § 8316(e)(2)(ii) ............................................ 9

Tenn. Code Ann. § 47-25-1107(a) ..................................................... 9

Tex. Civ. Prac. & Rem. Code Ann. § 131.002, et seq. ....................... 35

Tex. Prop. Code Ann. § 26.012(a)(3) ................................................. 9

Wash. Rev. Code. Ann. § 63.60.070(2) .............................................. 9

OTHER AUTHORITIES

P. Areeda & H. Hovenkamp, *Antitrust Law* (3d ed. 2007) .................................. passim

S. Diamond, Reference Guide on Survey Research, *in* Reference Manual on Scientific
   Evidence 359 (Federal Judicial Center, 3d ed. 2011) .......................................... 23

R. Noll, "The Economics of Sports Leagues," in Gary A. Uberstine & Jeffrey K. Pressman,
   ed., *Law of Professional and Amateur Sports* (2013) ......................................... 14

Restatement (Third) of Unfair Competition (1995) .................................................. 10

**GLOSSARY OF ABBREVIATIONS**

| | |
|---|---|
| APs | Antitrust Plaintiffs |
| AP Br. | Antitrust Plaintiffs' Opening Post Trial Brief (Dkt. No. 275) |
| EA | Electronic Arts Inc. |
| FBS | NCAA Division I Football Bowl Subdivision |
| IP | Intellectual property |
| NBA | National Basketball Association |
| NCAA | Defendant National Collegiate Athletic Association |
| NFL | National Football League |
| NIL | Name, image and likeness |
| SAs | Student-athletes |
| Tr. | Trial transcript |
| TX | Trial exhibit |

APs ignore controlling law and misstate facts in pursuit of a sweeping overhaul of intercollegiate athletics.  APs' unprecedented and unsupported antitrust claims must fail.

## I.   THE NCAA'S RULES SHOULD BE UPHELD WITHOUT A FULL-BLOWN RULE OF REASON ANALYSIS BECAUSE THE RULES ARE INTEGRAL TO THE NCAA'S CORE JOINT VENTURE ACTIVITY

### A.   Restraints that Define the Product of a Joint Venture Are Upheld Without Searching Scrutiny

APs' brief ignores the Supreme Court's decision in *NCAA v. Board of Regents of the University of Oklahoma*, 468 U.S. 85 (1984), and its progeny, which have repeatedly affirmed that restraints adopted by a joint venture that help to define the "unique characteristics" of the venture's product are subject to minimal antitrust scrutiny.  In *Texaco Inc. v. Dagher*, 547 U.S. 1 (2006), for example, plaintiffs challenged an agreement between two oil companies to fix the price of gas that their joint venture distributed.  The Court held that the venturers' agreed restraint—on *price*, no less—had to be upheld without a full rule of reason analysis because the price restraint was part of "the core activity of the joint venture itself," *i.e.*, it was part of producing and selling gasoline.  *Id.* at 7-8.  The Court similarly explained in *American Needle, Inc. v. Nat'l Football League*, 560 U.S. 183 (2010), that restraints that define the very product of a joint venture can be upheld without "detailed analysis" in the "twinkling of an eye."  *Id.* at 203.

### B.   The Challenged Rules Are at the Core of the NCAA's Joint Venture

The NCAA is a *bona fide* joint venture that produces a unique type of athletic competition for which there is substantial consumer demand.  *Bd. of Regents*, 468 U.S. at 101-02.  APs rely on the district court's characterization in *Board of Regents* of the NCAA as a "classic cartel," AP Br. 5-6 n.9, but the Supreme Court rejected such formalistic labels.  Instead, the Supreme Court recognized the need for joint ventures, including the NCAA, to create and define "league sports," regardless of whether they might otherwise be considered "cartels."  *Bd. of Regents*, 468 U.S. at 96, 101.  That is because athletic competition—the output of which has been increasing for years in the NCAA, *see* III.B.2 *infra*—depends upon cooperation.  *Id.*[1]

---

[1] APs focus on whether the NCAA is a "cartel" and on Dr. Rubinfeld's textbook's use of the word "cartel," ignoring the long-standing antitrust principle that "easy labels do not always supply ready answers."  *Broad. Music, Inc. v. CBS*, 441 U.S. 1, 8 (1979).  The first issue here, as in *Dagher* and

-1-

1    The Supreme Court recognized that the fundamental rule of amateurism that APs

2 challenge—"athletes must not be paid"—is at the core of the NCAA's "particular brand." *Bd. of*

3 *Regents*, 468 U.S. at 101-02.  The Supreme Court also acknowledged that this limitation had to be

4 adopted by the NCAA rather than colleges or conferences: "the *integrity* of the [NCAA's]

5 'product' cannot be preserved except by mutual agreement; if an institution adopted such

6 restrictions unilaterally, its effectiveness as a competitor on the playing field might soon be

7 destroyed." *Id.* at 102 (emphasis added).  Nothing in the trial record calls into question *Board of*

8 *Regents*'s analysis of the NCAA's product.

9    In its order denying the NCAA's motion to dismiss, this Court described the *Board of*

10 *Regents* language as dicta.  *Keller* Dkt. 876 at 11, 15-16.  Respectfully, it is not.  The Supreme

11 Court's joint venture analysis was critical to its decision to analyze the restraints at issue there

12 under the Rule of Reason rather than the *per se* rule.  468 U.S. at 103.  Over the past 30 years,

13 *every other court* that has considered the issue has treated the discussion of the NCAA's

14 amateurism and eligibility rules in *Board of Regents* not as dicta, but as binding authority.[2]  The

15 Seventh Circuit recently held that NCAA rules that "define what it means to be an amateur or a

16 student-athlete, and are therefore essential to the very existence of the product of college football"

17 are presumptively procompetitive under *Board of Regents*.  *Agnew v. NCAA*, 683 F.3d 328, 343

18 (7th Cir. 2012).  "[W]hen an NCAA bylaw is clearly meant to help maintain the 'revered tradition

19 of amateurism in college sports'" the court explained, "the bylaw will be *presumed*

20 *procompetitive*, since we must give the NCAA 'ample latitude to play that role.'"  *Id.* at 342-43

21 (emphasis added) (quoting *Bd. of Regents*, 468 U.S. at 120).

22 _____

23 *American Needle*, is not whether the NCAA could be labeled a "cartel" but whether the challenged restraints help to define the NCAA's product.

24 [2] *See Marucci Sports, L.L.C. v. NCAA*, 751 F.3d 368, 374 (5th Cir. 2014) (eligibility rules "are presumptively procompetitive and are not generally deemed unlawful restraints on trade"); *Smith*

25 *v. NCAA*, 139 F.3d 180, 187 (3d Cir. 1998) ("In general, the NCAA's eligibility rules allow for the survival of the product, amateur sports, and allow for an even playing field."), *vacated on other*

26 *grounds*, 525 U.S. 459 (1999); *accord McCormack v. NCAA*, 845 F.2d 1338, 1344-45 (5th Cir. 1988); *Law v. NCAA*, 134 F.3d 1010, 1018 (10th Cir. 1998); *In re NCAA I-A Walk-On Football*

27 *Players Litig.*, 398 F. Supp. 2d 1144, 1148 (W.D. Wash. 2005); *Metro. Intercollegiate Basketball Ass'n v. NCAA*, 339 F. Supp. 2d 545, 550 (S.D.N.Y. 2004); *Gaines v. NCAA*, 746 F. Supp. 738,

28 747 (M.D. Tenn. 1990).

-2-

1   No court has required proof "on a case-by-case basis" that the NCAA's "no payment rules"

2   are procompetitive.  *Id.* at 343 n.7.  Instead, any NCAA rule that "is, on its face, supportive of the

3   'no payment' and 'student-athlete' models" is "clearly" procompetitive "under *Board of Regents*."

4   *Id.*  The NCAA's rules challenged here should thus be upheld without detailed analysis.

5           **C.      The Challenged Rules Are Integral to the NCAA's Product Offering**

6           The foregoing suffices to show that APs' claims fail as a matter of law.  The evidence at

7   trial confirmed it.  APs do not dispute that "the NCAA and colleges can seek to maintain the

8   principle of amateurism," Tr. 487:13-14 (Noll), but instead argue that the challenged rules do not

9   preserve amateurism.  That argument fails even under APs' proffered theories, because the

10  challenged rules are undisputedly at the core of the definition of amateur sports.

11          Both sides agree that an amateur sport is one in which the athletes are not paid.  With

12  respect to the specifics of "what amateurism requires," Dr. Noll opined that "[t]he only sensible

13  way to define amateurism is by the way it gets defined by organizations that do amateurism."  Tr.

14  222:5-6.  He admitted "that if the NCAA adopts the same amateurism principles used by the

15  organizations [he] surveyed, that the NCAA would have a very good antitrust defense."  Tr. 498:2-

16  5.  Dr. Rubinfeld's analysis established precisely that defense.  Dr. Rubinfeld surveyed a wide

17  range of amateur sports organizations: collegiate athletic associations, 46 high school athletic

18  associations, the United States Golf Association, the United States Tennis Association, the

19  Amateur Athletic Union, and others.  Tr. 2933:10-2941:18; TX 3248, 3251.  *None* of these leagues

20  permits athletes to be paid to play their sport (beyond expenses and costs of living).  *None* allows

21  athletes to be paid for appearing in televised competition.  *None* gives athletes free reign to license

22  their NIL rights.  The few that permit amateurs to endorse commercial products require advanced

23  league approval.  APs provided no contrary examples.  Dr. Noll admitted knowing of no "amateur

24  league of any kind in the U.S. ever that has shared revenue with athletes."  Tr. 499:4-8.

25          APs have suggested that "commercialism" around some college sports events cannot be

26  reconciled with amateurism.  But APs' "amateurism" expert, Dr. Staurowsky, admitted that

27  "commercialism does not equal professionalism."  Tr. 1262-1264.  APs failed to show that the

28  presence of sponsorships or television revenues affected the amateur nature of NCAA sports.

1  Numerous other amateur sports (from Little League to amateur tennis and golf) generate

2  significant revenues from broadcast license fees and have commercial sponsors—yet they

3  indisputably are amateur.  Tr. 499-509 (Noll), 746-51 (Pilson), 1263-65 (Staurowsky).  Nor is this

4  anything new: *Board of Regents* was a case about colleges earning revenue from televised football

5  games.  The fact that colleges still earn money from those broadcasts does nothing to justify

6  ignoring either that case or the continuing amateur nature of NCAA athletics.  Relatedly, the

7  NCAA's amateurism rules are not "commercial" for purposes of the Sherman Act.[3]

8  **II.     APs DID NOT MEET THEIR BURDEN UNDER THE RULE OF REASON**

9         Even if the Court rejects the joint venture analysis described above, APs failed to prove

10  that the challenged rules do not survive a full-blown rule of reason analysis.

11         **A.     The Controlling Legal Standards**

12         APs barely discuss the controlling legal standards, which they have failed to satisfy.

13         **<u>Relevant Market</u>.**  Establishing the relevant antitrust market "is an absolutely essential

14  element of a rule of reason case."  *L.A. Mem'l Coliseum Comm'n v. Nat'l Football League*, 726

15  F.2d 1381, 1391 (9th Cir. 1984).  Market definition is analyzed from the perspective of

16  consumers: "[i]f consumers view the products as substitutes, the products are part of the same

17  market."  *Rebel Oil Co., Inc. v. Atl. Richfield Co.*, 51 F.3d 1421, 1435 (9th Cir. 1995).  A market

18  cannot be proven merely on counsel's or an expert's say-so:  "Actual data and a reasonable

19  analysis are necessary."  *Reifert v. S. Cent. Wisc. MLS Corp.*, 450 F.3d 312, 318 (7th Cir. 2006).

20  And the proposed market must include all reasonable economic substitutes for the products at

21  issue: "The outer boundaries of a product market are determined by the reasonable

22  _____

23  [3] *See Bassett v. NCAA*, 528 F.3d 426, 433 (6th Cir. 2008) ("NCAA's rules on recruiting student
    athletes, specifically those rules prohibiting improper inducements and academic fraud, are all

24  explicitly non-commercial" and "designed to promote and ensure competitiveness amongst NCAA
    member schools); *Smith*, 139 F.3d at 185-86 (NCAA eligibility rules primarily seek to ensure fair

25  competition in intercollegiate athletics and are not related to the NCAA's commercial or business
    activities for Sherman Act purposes); *Gaines*, 746 F. Supp. at 743-44 ("there is a clear difference

26  between the NCAA's efforts to restrict the televising of college football games" which do not
    concern students and are purely commercial in nature, "and the NCAA's efforts to maintain a

27  discernible line between amateurism and professionalism"); *Justice v. NCAA*, 577 F. Supp. 356,
    383 (D. Ariz. 1983); *Jones v. NCAA*, 392 F. Supp. 295, 303-04 (D. Mass. 1975) ("action of the

28  N.C.A.A. in setting eligibility guidelines" had no "nexus to commercial or business activities").

1   interchangeability of use or the cross-elasticity of demand between the product itself and

2   substitutes for it." *Newcal Indus., Inc. v. Ikon Office Solution*, 513 F.3d 1038, 1045 (9th Cir.

3   2008); *Tanaka v. Univ. of S. Cal.*, 252 F.3d 1059, 1063 (9th Cir. 2001).

4        **Anticompetitive Effects.**  APs must prove that "the restraint produces 'significant

5   anticompetitive effects' within a 'relevant market.'" *Id.* at 1063 (quotations omitted).  APs cannot

6   rely on anticompetitive effects (or "injury to competition") in *other* markets, even related ones.

7   *See Legal Econ. Evaluations, Inc. v. Metro. Life Ins. Co.*, 39 F.3d 951, 956 (9th Cir. 1994) (claim

8   failed because "the asserted harm to competition takes place in different markets" than the

9   plaintiffs' injury).  Nor can they make the necessary showing simply by demonstrating a price

10  effect; rather, they must establish that the alleged restraint reduced *output* for consumers: "An act

11  is deemed *anticompetitive* under the Sherman Act only when it harms *both* allocative efficiency

12  *and* raises the prices of goods above competitive levels or diminishes their quality." *Rebel Oil*

13  *Co.*, 51 F.3d at 1433 (emphasis altered); *see also Cal. Dental Ass'n v. FTC*, 526 U.S. 756, 776

14  (1999) (key question is "whether the limitation on advertisements obviously tends to limit the total

15  delivery of dental services").  "Unless a contract reduces output in some market, to the detriment

16  of consumers, there is no antitrust problem." *Chi. Prof'l Sports Ltd. P'ship v. Nat'l Basketball*

17  *Ass'n*, 95 F.3d 593, 597 (7th Cir. 1996).

18        Exclusion of a product or competitor from the marketplace is not an anticompetitive effect

19  by itself, even if the excluded party is financially injured.  *See Les Shockley Racing, Inc. v. Nat'l*

20  *Hot Rod Ass'n,* 884 F.2d 504, 508 (9th Cir. 1989) ("market exclusion and resulting loss of

21  income" are not "sufficient to plead an outline of facts showing injury to competition").  Rather,

22  APs have to prove that the NCAA injured consumers by significantly lowering overall output in

23  the relevant market.  Even Dr. Noll agrees that inefficiencies caused by alleged anticompetitive

24  conduct are those that "detract from the total amount of goods and services produced in the

25  economy." Tr. 180:2-14.

26        **Antitrust Injury.**  APs independently must prove that they suffered antitrust injury, *i.e.*,

27  "injury of the type the antitrust laws were intended to prevent and that flows from that which

28  makes defendants' acts unlawful." *Atl. Richfield Co. v. USA Petroleum Co.*, 495 U.S. 328, 334

(1990).  The touchstone for antitrust injury is whether the plaintiff's injury is "attributable to an anti-competitive aspect of the practice under scrutiny."  *Big Bear Lodging Ass'n v. Snow Summit, Inc.*, 182 F.3d 1096, 1102 (9th Cir. 1999) (quotations omitted); *accord Theme Promotions, Inc. v. News Am. Mktg. FSI*, 546 F.3d 991, 1003 (9th Cir. 2008).  "Where the defendant's conduct harms the plaintiff without adversely affecting competition generally, there is no antitrust injury." *Paladin Assocs., Inc. v. Mont. Power Co.*, 328 F.3d 1145, 1158 (9th Cir. 2003); *accord Am. Ad Mgmt., Inc. v. GTE of Cal.*, 190 F.3d 1051, 1055 (9th Cir. 1999) ("The antitrust laws do not provide a remedy to every party injured by unlawful economic conduct.").  APs did not meet their burden of proof with respect to any of these required elements.

> **B.      APs' "Education Market" Is Irrelevant to Their Claims**
>
> **1.      The "Education Market" Does Not Match the Alleged Restraints**

APs defined the "education market" as one where SAs buy educational services and athletic opportunities from colleges.  APs' claim of harm to competition, however, is that, but for the challenged rules, SAs would be able to *sell* their "NIL rights," or perhaps their athletic ability (with payment for NIL rights used as a cover for pay-for-performance), to colleges. Tr. 394:5-22, 517:17-518:24 (Noll).  Hence, APs' theory of restraint involves the colleges as buyers and SAs as sellers—the opposite of the roles as defined in their education market.  The restraint APs point to is thus not a restraint in their alleged education market.  That demonstrates that their "education market" is not the market of the alleged restraints here.

Nor can APs fix this problem by arguing that NIL payments would "reduce" the price of a college education.  That wordplay does not change the nature of the transaction or the alleged restraint, namely, that colleges (buyers) pay SAs (sellers) too little for supposed NIL rights.  Even as to the purchase of a college education, the vast majority of FBS football and Division I men's basketball SAs receive full scholarships, so their "price" is at or close to zero.  APs' argument that the Court should recognize "negative" prices in the education market underscores the illogical nature of their claim.  Markets do not have negative prices.  We are not aware of any case—and APs conspicuously fail to cite one—that holds that the failure to offer a negative price can be antitrust injury.

1    APs also fail to properly define an "education market" limited to college attendance and

2    the opportunity to play Division I men's basketball and FBS football.  APs offered *no* economic

3    analysis of the alternatives to playing these sports in Division I or FBS colleges.  APs tried to

4    show that some purported SA "consumers" prefer to play Division I men's basketball and FBS

5    football.[4]  Under Ninth Circuit law, however, the preferences of "consumers do not define the

6    boundaries of the market; the products or producers do."  *Newcal Indus.*, 513 F.3d at 1045; *see*

7    *also Tanaka*, 252 F.3d at 1063-65 ("Tanaka's personal preference to remain in the Los Angeles

8    area *is irrelevant* to the question of whether Los Angeles is an area of effective competition for the

9    services of women's intercollegiate soccer players." (emphasis added)).  The very fact that APs'

10   market definition results in the NCAA Division I and FBS schools being in a market unto

11   themselves demonstrates the error of this approach.  *See Apple, Inc. v. Psystar Corp.*, 586 F. Supp.

12   2d 1190, 1198 (N.D. Cal. 2008) ("In general, a manufacturer's own products do not themselves

13   comprise a relevant product market.").

14       To properly define a market for SAs seeking to play Division I basketball or FBS football,

15   APs would need to analyze with economic data whether prospective SAs on the margins would

16   switch to other alternatives if the value of the opportunity in Division I or FBS decreased.  Dr.

17   Noll did not do this.  Taking APs' theories at face value, the level of permitted educational

18   assistance to SAs—"laundry money," Pell Grants, and the like—has changed over time.  Dr. Noll,

19   however, admitted that he did not quantitatively analyze whether these price changes caused SAs

20   to switch to Division II, other collegiate organizations, or other opportunities to play football or

21   basketball, such as European basketball leagues.  Tr. 479:17-480:20.  APs assert that Dr. Noll

22   applied a SSNIP test to measure substitution.  APs Br. 2:2-6.  But he presented no actual

23   quantifiable economic analysis in his testimony at trial or in his expert reports.

24       **2.    APs Did Not Prove Anticompetitive Effects in the "Education Market"**

25       APs also failed to show any anticompetitive effect in an education market.  Indeed, Dr.

_____

26

27   [4] APs' market definition is entirely based on self-reported data from Rivals.com about where SAs say that they obtained offers and then ultimately chose to attend school, *i.e.*, looking at SAs'
     choices as buyers.  Tr. 485-86.  Dr. Noll did nothing to verify these data, *id.*, and they are an

28   insufficiently reliable basis for an antitrust challenge to the entire NCAA model of amateur sports.

1   Noll admitted that the "education market" is not where the alleged anticompetitive harm takes

2   place.  Tr. 432:7-11.  APs did not even try to prove that the NCAA's rules on payments for rights

3   to use SAs' NILs have reduced output of opportunities to attend college and/or play football or

4   basketball—or of any other measure of output in the proposed "education market."

5          **3.    APs Did Not Prove Antitrust Injury in the "Education Market"**

6          As explained below, the fact that SAs do not receive licensing revenues is not caused by

7   any anticompetitive conduct but is the result of the facts that (a) no athletes have ever been paid

8   for the use of their NILs in live broadcasts and (b) the NCAA and its colleges have decided not to

9   license their own IP in those markets that would involve the NIL rights of SAs, such as

10  videogames, merchandise, or endorsements.

11         **C.    APs Did Not Meet Their Burden As to the Licensing Markets**

12         Since the alleged restraint is on payments by colleges to SAs, the appropriate analysis for

13  APs' claim is to treat SAs as *sellers* of rights to use their NILs.  Under that framework, the SAs'

14  NIL rights (to the extent any such rights actually exist under the law) would be inputs to the

15  production of various products—including, as alleged here, broadcasts, videogames, or other

16  licensed products.  The buyers of those products would be the relevant consumers in the licensing

17  markets.  The proper antitrust claim for this theory is monopsony, a "market situation in which

18  there is a single buyer or a group of buyers making joint decisions."  *United States v. Syufy*

19  *Enters.*, 903 F.2d 659, 663 n.4 (9th Cir. 1990).  APs, however, made a tactical decision not to

20  pursue a monopsony claim.  The word does not appear in their complaint or anywhere in their

21  experts' hundreds of pages of reports.  Tr. 2759:24-2760:1 (Stiroh).  APs cannot pursue this claim

22  for the first time after trial.  That, too, should be the end of the case.

23         Even if APs were allowed to replead and relitigate their claims once again, the monopsony

24  claims would still fail for the reasons that follow.

25              **1.    Broadcast Licensing Market**

26                  *(a)    APs Have Not Defined a Relevant Antitrust Market*

27         APs neither defined nor proved a market for licenses of SAs' purported NIL rights for use

28  in live broadcasts.  APs did not even attempt to prove that there are no substitutes for college

-8-

football or basketball programming or for any associated IP rights.  Dr. Noll admitted he had not analyzed the broadcast market at all.  Tr. 361:25-363:6.  APs presented no evidence of the scope of any market for licensing NIL rights for live broadcast.

APs' failure of proof is fatal to their live broadcast claim, whether as a monopoly claim or a hypothetical monopsony claim.  The consumers of the purported licenses for live broadcasts would be broadcasters and, ultimately, television viewers.  A definition of the relevant market faced by these consumers is a necessary element of APs' claim.  If consumers have substitutes for broadcasts of college football and basketball games—for example, other college or professional sports or other forms of entertainment—then the market for broadcast inputs—including any necessary licenses—is far broader than APs have alleged or proven.

(b)     *Since SAs Have No Rights in Broadcasts, They Have Not Proven the Relevant Market or Antitrust Injury*

APs' live broadcast claim also fails because there are no NIL rights for SAs to sell for use in such broadcasts.  APs did not establish any legal recognition for such rights.  And the evidence showed there is no market for licensing SAs' NILs for live broadcast.  Absent a market for NILs for use in live broadcast, APs' claim disintegrates.  There can be no restraint on selling something that the law does not recognize—no possibility of defining a relevant antitrust market, no anticompetitive effect, and no injury caused by anything other than intellectual property law.

No state statute or judicial decision in any jurisdiction has ever recognized that it would be unlawful to show a participant in a live team sporting event in the broadcast of that event without his permission.  Numerous state right-of-publicity statutes, including California's, expressly preclude right-of-publicity claims for the use of one's NIL in the broadcast of a sporting event.[5]

---

[5] Cal. Civ. Code §§ 3344, 3344.1; Fla. Stat. § 540.08(4); Haw. Rev. Stat. § 482P-7(b)(2); 765 Ill. Comp. Stat. 1075/35(b)(2); Ind. Code Ann. § 32-36-1-1(c); Neb. Rev. Stat. § 20-202(1); Nev. Rev. Stat. § 597.790(2); Ohio Rev. Code Ann. § 2741.02(D)(1); Okla. Stat. tit. 12, § 1449(D); 42 Pa. Cons. Stat. Ann. § 8316(e)(2)(ii); Tenn. Code Ann. § 47-25-1107(a); Tex. Prop. Code Ann. § 26.012(a)(3); Wash. Rev. Code. Ann. § 63.60.070(2); *see also Nat'l Football League v. Alley, Inc.*, 624 F. Supp. 6, 9-10 (S.D. Fla. 1983) (live broadcasts of Miami Dolphins football games were matters of "legitimate public interest" under the Florida's right of publicity statute, Fla. Stat. Ann. § 540.08(4)).

And numerous cases have so held under state common law.[6]  Rather, the team owner, "by reason of its creation of the game, its control of the park, and its restriction of the dissemination of news therefrom, has a property right in such news, and the right to control the use thereof for a reasonable time following the games."  *Pittsburgh Athletic Co. v. KQV Broad. Co.*, 24 F. Supp. 490, 492 (W.D. Pa. 1938).

A supposed restriction on licensing non-existent intellectual property rights does not cause antitrust injury.  *See, e.g.*, *Sony Elec., Inc. v. Soundview Tech., Inc.*, 281 F. Supp. 2d 399, 402 (D. Conn. 2003) ("even if an illegal agreement is proved to be one reason [buyers] refused to license Soundview's patent, the proximate or legal cause of Soundview's licensing revenue loss is that no television manufacturer . . . needed a license of the patent to manufacture televisions"); *In re Hayes Microcomputer Prods., Inc. Patent Litig.*, No. C 84 4882 SC, 1989 WL 252349, *2 (N.D. Cal. Mar. 22, 1989) ("a plaintiff does not allege an antitrust injury by claiming damages stemming from an inability to license, what was later determined to be, an invalid patent").[7]

The evidence, moreover, is undisputed that athletes have *never* been paid for the use of their NILs in live broadcasts of games.  Tr. 2798-2801 (Stiroh).  APs did not identify a single transaction in the 60+ year history of television broadcasts in which an athlete was paid for the use of his NIL in the live broadcast of a league game.  In fact, both of APs' economic experts admitted they had never heard of such a transaction.  Tr. 375-377 (Noll), 1017-1018 (Rascher).  And both

---

[6] *Toffoloni v. LFP Publ'g Grp.*, LLC, 572 F.3d 1201, 1208 (11th Cir. 2009) (Georgia); *C.B.C. Distrib. & Mktg., Inc. v. Major League Baseball Advanced Media, L.P.*, 505 F.3d 818, 823-24 (8th Cir. 2007) (Missouri); *Allison v. Vintage Sports Plaques*, 136 F.3d 1443, 1446 (11th Cir. 1998) (Alabama); *Matthews v. Wozencraft*, 15 F.3d 432, 439 (5th Cir. 1994) (Texas); *Pooley v. Nat'l Hole-In-One Ass'n*, 89 F. Supp. 2d 1108, 1113 (D. Ariz. 2000); *Mahaffey v. Official Detective Stories, Inc.*, 210 F. Supp. 251, 253 (W.D. La. 1962); *WJLA-TV v. Levin*, 564 S.E.2d 383, 394-95 (Va. 2002); *Montgomery v. Montgomery*, 60 S.W.3d 524, 529 (Ky. 2001); *Messenger v. Gruner + Jahr Printing & Publ'g*, 706 N.Y.S.2d 52, 54-55 (N.Y. 2000); *Lake v. Wal-Mart Stores, Inc.*, 582 N.W.2d 231, 235-36 (Minn. 1998); *J.C. v. WALA-TV, Inc.*, 675 So. 2d 360, 362 (Ala. 1996); *Jaubert v. Crowley Post-Signal, Inc.*, 375 So. 2d 1386, 1388-90 (La. 1979); *Battaglieri v. Mackinac Ctr. For Pub. Policy*, 680 N.W.2d 915, 919 (Mich. Ct. App. 2004); *see also* Restatement (Third) of Unfair Competition § 46, § 49 (1995).

[7] *See also Modesto Irrigation Dist. v. Pac. Gas & Elec. Co.*, 309 F. Supp. 2d 1156, 1169-70 (N.D. Cal. 2004) (antitrust plaintiff "cannot prove it sustained cognizable antitrust injury" if it does not possess the "legal right" to engage in the business allegedly restrained), *aff'd*, 158 F. App'x 807 (9th Cir. 2005).

1  broadcast experts agreed that they had *never*—in their decades-long careers—heard anyone in a

2  negotiation for a broadcast license even mention participants' NIL "rights" being transferred to the

3  broadcaster.  Tr. 670:12-20, 671:24-672:13, 673:15-674:7 (Desser), 727:5-10 (Pilson).  An

4  antitrust claim cannot be based on supposed rights that have never been recognized in law and

5  supposed economic "transactions" which clearly do not take place.[8]

6          As the NCAA has demonstrated (but will not repeat here, given the Court's summary

7  judgment ruling), the First Amendment also precludes APs' broadcast claims because they would

8  substantially burden protected speech while failing directly to advance a sufficiently weighty state

9  interest—or, indeed, *any* identified state interest.

10          Finally, Dr. Noll admitted there is no connection between his antitrust analysis for

11  broadcast and any restraint on licensing of SAs' NIL rights.  He said his analysis would be the

12  same regardless of whether SAs have any rights to control the use of their NIL in live broadcasts,

13  Tr. 382-383, 394, and would also be the same if APs were complaining about a restraint on

14  payments from ticket revenue, because the crux of his theory is that colleges would be paying to

15  affect SAs' decisions about "who they play for," *i.e.*, pay-for-play.  Tr. 517-519.  This confirms

16  that the challenged NCAA rules are not the cause of any injury to APs.  It also demonstrates that

17  Dr. Noll's economic analysis is not meaningfully connected to APs' liability theories—which is

18  another reason that analysis must be rejected.  *See Comcast Corp. v. Behrend*, 133 S. Ct. 1426,

19  1433-35 (2013).[9]

20  _____

21  [8] APs cite references to NIL rights in a handful of broadcast agreements and one conference form
    as evidencing an actual market in such rights in live broadcast.  AP Br. at 4 n.8.  But these
22  agreements do not assign participants' NIL rights; they simply identify which party will obtain
    any clearances *if necessary*.  *See* TX 2162-9, 2230-10 to -11.  Many, including the NCAA's form
23  (TX 2240-4), expressly refer only to the use of NIL rights for use in promoting games and other
    events, not in the live broadcast itself.  And APs ignore the numerous other broadcast agreements
24  that make no mention of NIL rights or clearances at all.  *See, e.g.*, TX 2102, 2110, 2117, 2151,
    2179, 3004, 3008, 3069, 3089.  Given that APs' theory is that the challenged rules set the "price"
25  for SA NILs at zero, if there *were* actual market demand, then the purported transfer of rights
    should be ubiquitous and clear, not isolated and haphazard.  The evidence belies APs' theory that
26  there is actual market demand for NIL rights for live broadcast.

27  [9] The same analysis applies to rebroadcasts of entire games.  APs have failed to show any state
    law that would recognize NIL rights in such rebroadcasts, and have failed to show any market for
28  such purported rights.  The unrebutted evidence is that no such market exists.  Tr. 3206-3207.

              *(c)*     *APs Have Not Proven Anticompetitive Effects Even If a Market for these "NIL" Rights Existed*

APs' live broadcast claim also fails because they did not allege (much less prove) a reduction in the quantity or quality of any relevant output.  APs focus entirely on "wealth transfer," which is erroneous.  *Chicago Prof'l Sports*, 95 F.3d 593, is on point.  The district court there had held that the NBA had violated the antitrust laws by requiring the Chicago Bulls and their local broadcaster, WGN, to pay an excessive fee for the rights to broadcast Bulls games.  The Seventh Circuit reversed:  "WGN and the Bulls argue that the league's fee is excessive, unfair, and the like.  But they do not say that it will reduce output.  They plan to go on broadcasting 30 games, more if the court will let them, even if they must pay $138,000 per telecast."  *Id.* at 597.  This was dispositive, the court continued, because:

> Lack of an effect on output means that the fee does not have antitrust significance.  Once antitrust issues are put aside, how much the NBA charges for national telecasts is for the league to resolve under its internal governance procedures. . . .  Courts must respect a league's disposition of these issues, just as they respect contracts and decisions by a corporation's board of directors.

*Id.*  So too here:  APs failed to show that the NCAA's rules reduced output of any meaningful product in any meaningful market.  APs instead complain that the NCAA inequitably apportions broadcast fees.  That is not a cognizable anticompetitive effect under the antitrust laws.  *Id.*

The same result would hold if APs had brought and tried a monopsony claim, which also requires proof of a reduction in output relevant to consumers.  APs suggest that this is a new theory concocted by Dr. Stiroh.  But it is well established in law and economics that the reason upstream restraints are potential antitrust violations is tied to their potential impact on consumers downstream.  As the leading treatise explains, the antitrust law's concern with "monopsony power is *reduced* output on the monopsonist's selling side."  IIB P. Areeda & H. Hovenkamp, *Antitrust Law* ("Areeda"), at ¶ 575 (3d ed. 2007) (emphasis in original).  *See also, e.g.*, *Mandeville Island Farms v. Am. Crystal Sugar Co.*, 334 U.S. 219, 241 (1948) (monopsonistic cartel per se illegal because "stabilization of prices paid for the only raw material consumed in an industry" would likely reduce "competition in the distribution of the finished product"); *Weyerhaeuser Co. v. Ross-Simmons Hardwood Lumber Co.*, 549 U.S. 312, 325 (2007) (noting that "predatory bidding

presents less of a direct threat of consumer harm than predatory pricing" because "a predatory-bidding scheme could succeed with little or no effect on consumer prices").

It is also well-established that without a likely downstream effect on consumers, antitrust law has no reason to condemn monopsonistic practices. The Areeda treatise gives the example of a bid-rigging cartel focused on a single auction, so that there is no impact on the number of auctions in the future. II.B Areeda at ¶ 2011. In that situation, the treatise explains, "it is not clear that any output reduction occurs." *Id.* Though the bidders pay a lower price to the sellers, "[t]he sellers' loss is a mere wealth transfer that the antitrust laws were not designed to remedy." *Id. See also Kamine/Besicorp Allegany L.P. v. Rochester Gas & Elec. Corp.*, 908 F. Supp. 1194, 1203 (W.D.N.Y. 1995) ("The problem with this type of monopsony power, then, is that ultimately it can injure consumers by forcing up the price of the end product. Where the risk of that happening is slight or nonexistent, however, monopsony power per se does not create an antitrust concern."). *California Dental*, a case involving restraints on the sale of advertising services to dentists—an input to dental services—is to the same effect. The Supreme Court explained that "[t]he question is not whether the universe of possible advertisements has been limited (as assuredly it has), but whether the limitation on advertisements obviously tends to limit the total delivery of dental services." 526 U.S. at 776.

The NCAA has pointed to evidence, not only from Dr. Stiroh but also from APs' own experts, that this is an unusual case in which the alleged restraint has not affected the quantity or quality of output in any relevant product market. The reason for APs' failure of proof on an anticompetitive effect was explained by APs' own expert, Dr. McCormick. He testified (by deposition) that the supply of athletes who could license their NIL is nearly perfectly inelastic, *i.e.*, unaffected by whether athletes are paid for their NILs. McCormick Depo. 222-224; Tr. 423-424. As Dr. Noll has himself explained in his sports economics work outside this case, monopsony power "does not create substantial economic inefficiencies as is normally the result of market power from monopsony because wages are still sufficient to attract nearly all of the athletes in the industry. Because of the absence of substantial efficiency losses, the customers of sports are not

greatly harmed by monopsony in the player market."[10]  Without harm to "customers of sports," there is no antitrust violation under either a monopsony or monopoly theory.

APs have not shown an actual reduction in output.  To the contrary, as set forth below, the current rules increase output by, for example, ensuring that colleges either opposed to or lacking the resources to pay SAs can participate in Division I and FBS.  Instead, APs point to cases or hypotheticals involving per se illegal monopsonies, which do not require any proof of anticompetitive effects in a relevant market.  *See, e.g.*, *Knevelbaard Dairies v. Kraft Foods, Inc.*, 232 F.3d 979, 988 (9th Cir. 2000).  In per se cases, there is a presumption that fixing prices of an upstream product will reduce output of both the upstream product and the downstream product sold to consumers.  *See Bd. of Regents*, 468 U.S. at 100 ("Horizontal price fixing and output limitation are ordinarily condemned as a matter of law under an 'illegal per se' approach because the probability that these practices are anticompetitive is so high . . . . In such circumstances a restraint is presumed unreasonable without inquiry into the particular market context . . . .").  Cases decided under "quick look," such as *Law*, 134 F.3d 1010, are inapposite for the same reason.

This is a Rule of Reason case, and so APs must *prove* anticompetitive effects in a relevant market.  This they have not even attempted.[11]

### 2.    Videogame Licensing Market

#### (a)    APs Have Not Defined the Market

APs also failed to define the videogame licensing market.  While there is evidence of some demand for athletes' NILs in videogames—EA makes games with names and faces of NBA and

---

[10] Roger G. Noll, "The Economics of Sports Leagues," at 19-23, in Gary A. Uberstine & Jeffrey K. Pressman, ed., *Law of Professional and Amateur Sports* (2013).  *See also* Tr. 421-22.

[11] APs also cite labor-related cases in which courts did not consider whether alleged monopsonistic practices would reduce the supply of workers or output of what they produce.  *See* AP Br. 7 nn.12-13.  Given the laws of supply and demand that impact most industries, it might be expected that suppressing the wages of nurses or engineers would reduce the number or quality of workers that choose to enter those professions.  To the extent that courts in the NFL cases assumed (without mentioning) that this is true in sports as well, evidence from APs' own experts undermines that assumption in this case.  In any event, cases are not precedent for issues they did not address.  *See In re Larry's Apartment, L.L.C.*, 249 F.3d 832, 839 (9th Cir. 2001).

-14-

NFL players—APs did nothing to show what other videogames consumers would find to be reasonable substitutes for games that use NILs of SAs. APs made no effort to delineate whether such videogames exist in a separate market or are part of a market that includes other sports videogames or videogames generally. Dr. Noll admitted that he "did not analyze the market for videogames." Tr. 322-23.[12]

*(b)   APs Have Not Proven Anticompetitive Effects*

APs also failed to prove any harm to competition with respect to videogames. APs did not identify any reduction in output of videogames that are substitutes for college football- or basketball-themed videogames. APs tried to show only that some consumers were deprived of videogames with SAs' NILs in them. "[A]llegations that an agreement has the effect of reducing consumers' choices or increasing prices to consumers does not sufficiently allege an injury to competition." *Brantley v. NBC Universal, Inc.*, 675 F.3d 1192, 1202 (9th Cir. 2012); *Les Shockley*, 884 F.2d at 508-09. If consumers gladly switched to other videogames, there has been no harm to the market. APs have no evidence of any such harm.

*(c)   APs' Claims Fail Because They Depend Upon Intellectual Property that Colleges Have Lawfully Chosen Not to License*

Dr. Noll admitted that for a videogame maker to produce college football- and basketball-themed videogames, videogame developers need the IP of the colleges. Tr. 311:8-15. There is no use making a game with Alabama SAs if the game cannot show them playing for Alabama. There also can be no "NCAA Basketball" or "NCAA Football" without the NCAA's trademarks. It is undisputed that the NCAA and its members would not and will not license their indispensable IP for use in videogames that also use SAs' names and images. As Dr. Noll admitted, developers could not make the games for which SAs claim they would have licensed their NIL rights. Tr. 312:1-10. Hence, there is no market for licensing SAs' NIL for videogames. The cause of any

---

[12] There is no market for licensing rights to use SAs' NILs in videogames like those at issue here because the First Amendment precludes any claim to enforce such rights. The evidence showed that the in-game avatars bore only superficial similarities to real-life SAs. *E.g.*, Tr. 75:11-76:19 (O'Bannon), TX 28. That warrants a different resolution of the First Amendment issue on a full record than the Ninth Circuit's decision in *Keller* applying the anti-SLAPP standard to the pleadings, which assumed the avatars were the actual likenesses of real-life players. The NCAA also preserves its objection to the "transformative use" test applied in *Keller*.

-15-

1   injury to APs is the NCAA's and its members' decisions not to license their own IP, which Dr.

2   Noll admitted presents no antitrust problem.  Tr. 329:18-21.  APs do not challenge the NCAA's

3   and schools' decisions on when and how they will license their own IP.

### 3.     Merchandise and Endorsement Licensing Market

#### (a)     APs Have Not Defined the Market

6   APs also failed to define markets for licensing of endorsements or merchandise.  Unlike

7   with respect to broadcast, there was evidence at trial that there is demand for the use of athletes'

8   NIL in merchandise.  For example, NBA and NFL athletes' NILs are used for these purposes.  But

9   APs did not even try to meet their burden to define markets for the use of college football and

10  men's basketball SAs' NILs in merchandise.  That is fatal to their antitrust claims with respect to

11  these products.  *See Adidas Am., Inc. v. NCAA*, 64 F. Supp. 2d 1097, 1103 (D. Kan. 1999).

12  APs' claims also fail for the independent reason that they involve individual, not group,

13  licenses.  APs presented their claims as being about group licenses from all SAs on a team, not

14  individual licenses to third parties.  Having forfeited the theory through and including trial, APs

15  cannot press it after trial.

#### (b)     APs Did Not Prove Anticompetitive Effects

17  APs' claims regarding merchandise also fail because APs presented no proof of

18  anticompetitive effects in any market for such licenses.  APs did not even attempt to prove any

19  output reduction harming allocative efficiency.  Stray indications that some consumers could not

20  purchase merchandise such as jerseys or view endorsements with SAs' actual names or faces fails

21  to satisfy APs' burden to prove actual harm to competition.  *See Brantley*, 675 F.3d at 1202.

#### (c)     APs' Claims Fail Because They Depend Upon Intellectual Property that Colleges Have Lawfully Chosen Not to License

23  Endorsements with footage of SAs or jerseys with their name require the IP of their

24  colleges.  Since the NCAA and its member institutions have rules against licensing their IP for

25  merchandise with the NIL of current SAs, nobody could lawfully produce these products.  Dr.

26  Noll admits there is no antitrust problem with the NCAA's and its members' decisions not to

27  license their own IP.  Tr. 343:13-19.  APs did not challenge those decisions.  APs therefore failed

-16-

to show any injury flowing from unlawful conduct.

## III.   THE PROCOMPETITIVE BENEFITS OF THE CHALLENGED RULES OUTWEIGH ANY ANTICOMPETITIVE HARM

### A.   Procompetitive Benefits Under the Rule of Reason

Had APs satisfied their burden of showing significant anticompetitive effects in a relevant market, then the NCAA would have been obligated to "come forward with evidence of the restraint's procompetitive effects." *Tanaka*, 252 F.3d at 1063.[13]  The burden would then shift back to APs to show that "any legitimate objectives can be achieved in a substantially less restrictive manner." *Id*. (quotations omitted).[14]

In considering the proffered procompetitive benefits, the court must consider whether "'a legitimate objective is served by the challenged behavior.'"  *Cnty. of Tuolumne v. Sonora Cmty. Hosp.*, 236 F.3d 1148, 1159 (9th Cir. 2001) (quoting VII Areeda at ¶ 1502).  The NCAA offered evidence at trial establishing that the challenged rules serve four legitimate objectives:  They (1)  preserve the distinctive character of amateur collegiate sports, (2)  increase total output of Division I basketball and FBS football (as well as opportunities to play them), (3) support competitive balance, and (4) facilitate the integration of academics and athletics.  The first three objectives obviously occur in what APs allege to be the relevant markets, as they affect the quality and quantity of televised sports games, other sports products, and the educational services available to SAs who play Division I basketball and FBS football.  As to the fourth, APs tacitly concede this effect also occurs in the same alleged markets:  APs assert that "college sports are popular because they are *college* sports, played by athletes who attend *schools*." AP Br. 16.  The

---

[13] APs erroneously assert that the NCAA has a "heavy burden" to show procompetitive effects, citing *Board of Regents*.  But *Board of Regents* "formed the basis for what has come to be called abbreviated or 'quick-look' analysis."  *California Dental*, 526 U.S. at 770.  In a full Rule of Reason case, the defendant's burden is simply to "offer 'evidence that a legitimate objective is served by the challenged behavior.'"  *Cnty. of Tuolumne*, 236 F.3d at 1159 (quoting VII Areeda at ¶ 1502).

[14] In determining whether a challenged restraint is unreasonable, the court "must ordinarily consider the facts peculiar to the business to which the restraint is applied; its condition before and after the restraint is imposed; the nature of the restraint and its effect, actual or probable"; the "history of the restraint"; and "the reason for adopting the particular remedy."  *Am. Needle*, 560 U.S. at 203 n.10 (quotations omitted).

-17-

1   law, moreover, provides that a defendant may rely on procompetitive benefits that are felt in

2   related markets, because "courts should generally give a measure of latitude to antitrust defendants

3   in their efforts to explain the procompetitive justifications for their policies and practices."

4   *Sullivan v. Nat'l Football League*, 34 F.3d 1091, 1111-12 (1st Cir. 1994) (error to instruct jury to

5   "balance the injury to competition in the relevant market with the benefits of competition in that

6   same relevant market").  Thus, in *Board of Regents*, the Supreme Court considered the NCAA's

7   interest in protecting live attendance at untelevised games as a justification for a restraint that

8   operated in the related market for telecasting games.  468 U.S. at 115-20.[15]

9      **B.      The Procompetitive Benefits of the Challenged Rules Outweigh Any
             Anticompetitive Harm**

10

11         **1.      The Challenged Rules Maintain the NCAA's Unique Product, Amateur
                  College Football and Men's Basketball**

12         The challenged rules serve the procompetitive goals of defining NCAA sports as a

13  distinctive product and maintaining a clear line of demarcation between intercollegiate athletics

14  and professional sports.

15                      *(a)      Amateurism Expands Consumer Choice*

16         The NCAA rules create a unique product—amateur college sports—that competes with

17  other forms of entertainment, including professional sports.  As such, the NCAA's amateurism

18  rules expand consumer choice and promote interbrand competition, which "is the primary concern

19  of antitrust law."  *Continental T.V., Inc. v. GTE Sylvania Inc.*, 433 U.S. 36, 51, n.19 (1977).  As

20  set forth above, the evidence on this point is undisputed.  Tr. 487:8-11 (Noll), 2929:10-18

21  (Rubinfeld).  Both Drs. Noll and Rubinfeld agreed that (1) the appropriate way to define

22

23  [15] The cases APs cite do not suggest otherwise.  *See* AP Br. 9 n.16.  *United States v. Topco Assoc.,
    Inc.*, 405 U.S. 596 (1972), for example, was a case of per se illegality and is irrelevant to balancing

24  of procompetitive benefits under the Rule of Reason.  *Paladin Assocs.* expressly reserved the issue
    but suggested that considering procompetitive benefits in closely related markets may be
    appropriate.  328 F.3d at 1157 n.11 (explaining *Topco* may be distinguished on this basis).

25  Similarly, in *L.A. Mem'l Coliseum Comm'n*, the Ninth Circuit held that the finder of fact must
    "balance the gain to interbrand competition against the loss of intrabrand competition," where the

26  two types of competition operated in different markets.  726 F.2d at 1392, 1397.  Finally, while
    the district court in *Law v. NCAA*, 902 F. Supp. 1394, 1406 (D. Kan. 1995), declined to consider

27  the impact of rules regarding coaches on the related market for intercollegiate sports, the Tenth
    Circuit *did* consider the rules' impact on this market, effectively reversing the district court on this

28  point.  134 F.3d at 1021-22.

1    amateurism is to look at how other sports organizations define amateurism, Tr. 222:3-6 (Noll),

2    2930:6-10 (Rubinfeld), (2) the NCAA has a valid antitrust defense if its definition of amateurism

3    is consistent with the definition used by other sports organizations, Tr. 498:2-9 (Noll), 2930:17-

4    2931:4 (Rubinfeld), and (3) no amateur sports organizations permit athletes to share in the

5    league's revenues.  Tr. 499:4-11 (Noll), 2941:7-2942:1 (Rubinfeld).

6           There was ample additional evidence that protecting and preserving amateurism is a core

7    part of the NCAA's product.  Mr. Pilson, who has spent decades in the business of negotiating

8    broadcast licenses for college sports, opined that the "public watches colleges sports because they

9    perceive student athletes as playing for the love of the game and for the value and opportunities

10   available to them from a college education," and that the "sense of college sports that is different

11   from professional [sports]" is "at the bedrock of the popularity of college sports."  Tr. 772:1-

12   773:18; *see also* Tr. 758:21-764:13, 769:12-771:18.  Multiple fact witnesses with years of

13   experience in the relevant industry also testified that the NCAA's amateurism rules are at the core

14   of the public's understanding and appreciation of collegiate athletics.  Tr. 1765:11-1767:2,

15   1768:16-1772:13 (Emmert), 2077:6-21 (Delany), 3173:12-3178:11, 3182:7-3183:19 (Lewis).

16          The history of the challenged rules further reinforces that the NCAA has served "a critical

17   role in the maintenance of a revered tradition of amateurism in college sports."  *Board of Regents*,

18   468 U.S. at 120.  APs do not and cannot dispute that amateurism has been a core value agreed on

19   by the colleges and universities from the founding of the NCAA through the present day.  Instead,

20   APs point to the fact that in 1929, there were reports of "inducements to college athletes ranging

21   from open payrolls to no-show jobs at movie studios," and in 1951, a probe into college athletics

22   concluded that athletes were being "bought and paid for."  AP Br. 10.  But APs have stipulated

23   that these reported abuses occurred *before* the NCAA was given the power to enforce the

24   amateurism rules.  Dkt. 189 ¶ 23.  Indeed, the cause of these scandals and problems was the lack

25   of a governing body to implement and enforce specific rules of amateurism.  And it was in

26   response to these problems, and widespread concern by college presidents and faculty members

27   that collegiate sports needed a more powerful governing body, that the NCAA was given power to

28   enforce the amateurism rules.  *Id.* ¶¶ 19, 24.  The historical evidence that APs cite is in actuality

-19-

1    strong evidence of the need for a national body to adopt and enforce a uniform body of

2    amateurism rules.  Tr. 1783:15-1784:5.  Taken together, these facts establish that the NCAA's

3    rules are essential to the definition of amateurism, and essential to creating a differentiated

4    product.  APs did not rebut any of this evidence.

5         Lacking any evidence that consumers today perceive college sports to be professional, APs

6    relied on (1) Dr. Staurowsky's testimony that college athletics is a "big business" that generates

7    large revenues and corporate sponsorship, Tr. 1121:16-1122:5, and (2) selective quotations about

8    commercialism from various NCAA documents, including documents from the Presidential Task

9    Force on Commercial Activity, and other related task forces from the same time period.  AP Br.

10   11-15.  Neither point rebuts amateurism's procompetitive benefits because, as Dr. Staurowsky

11   admitted, "commercialism and professionalism are analytically distinct" and "a sport [may] be

12   commercialized and still be amateur."  Tr. 1262:11-20, 1263:18-1264:1.  Dr. Staurowsky

13   presented no evidence that her views are shared by any consumers, rendering her opinion

14   irrelevant to the question whether amateur college sports is a distinctive product in the market.

15        APs' reliance on NCAA debates over commercialism also erroneously conflates that

16   concept with amateurism.  For many years, the NCAA and its members have debated issues of

17   commercialism in college sports, including whether certain commercialism rules or proposals

18   were consistent with academic values.  Tr. 1749-1750.  But the existence of debates about

19   *commercialism* in no way reflects disagreement among the NCAA and its members about the core

20   value of *amateurism*.  Tr. 2026-2028.  Debate among academics about programs that are part of

21   their educational mission is not surprising or inconsistent with the NCAA's and its members' core

22   values.  A "robust exchange of ideas" is an essential component of our Nation's colleges and

23   universities.  *Keyishian v. Bd. of Regents of Univ. of State of N.Y.*, 385 U.S. 589, 603 (1967).

24        In any event, evidence from these debates confirms that amateurism remains the

25   centerpiece of the collegiate model of athletics.  Tr. 1794.  The membership overwhelmingly

26   rejected proposals that would have permitted commercial uses of SAs' NILs.  Tr. 2468:11-

27   2469:20.  Accordingly, the rules continue to prohibit the NCAA, the member colleges and

28

-20-

1    universities, and SAs from engaging in commercial use of SAs' NILs.  TX 2340-82-85.[16]  APs'

2    examples of supposed "commercial exploitation" primarily involve promotions of the events and

3    institutions themselves—something that APs pointedly have *not* challenged.  APs also point to the

4    types of corporate sponsorship and support that are undisputedly used in many amateur sports and

5    have nothing to do with whether NCAA sports are amateur.  Tr. 2450-2465.  The individual APs'

6    own testimony undercuts counsel's refrain of any other kind of so-called "exploitation."[17]

7         Regardless, the question whether SAs are commercially exploited is different than the

8    question whether college sports are amateur.  Essentially, APs' allegations about exploitation are

9    complaints that the NCAA and its member schools may not always live up to all of their ideals,

10   including goals that go above and beyond the core definition of amateurism.  Even if those

11   accusations were true, it would mean only that the NCAA and its member schools should work

12   harder to better implement their own goals and ideals.  It would not mean that amateurism should

13   be banned.  The NCAA has never wavered from its commitment to the core value of

14   amateurism—that athletes do not get paid for playing their sport.  Tr. 1730-1731.

15               *(b)     Amateurism Increases the Popularity of College Sports*

16        The popularity of college sports would decline if SAs were paid shares of broadcast

17   revenue.  Tr. 759:17-760:18, 763:12-16, 778:2-779:3 (Pilson), 1759-60 (Emmert).

18        Unrebutted survey evidence shows that the public values amateur college sports and that

19   fewer consumers would watch, listen to, and attend college sports if athletes began to receive

20   payments beyond those necessary to cover their college expenses.  *See* Tr. 2632-2667 (Dennis);

21   TX 4045-19, -23, -27.  The results were consistent with the findings of multiple public opinion

22

23   [16] The evidence is also undisputed that the NCAA did not relax its rules against the use of SAs'
     NILs in videogames, but instead ceased licensing videogames in response to concerns about the
24   increasing realism of the avatars in the videogames.  Tr. 1845:11-1846:25, 2018-2020.

     [17] The named APs in fact saw the opportunity to play college sports as a "privilege," knew their
25   games were being televised, and welcomed this fact.  Tr. 599 (Prothro); Alipate Depo. 6:13-16,
     19:3-7, 64:24-65:7; Fischer Depo. 58:14-59:24;  Rhodes Depo. 363:3-17; Robinson Depo. 10:18-
26   25; Ellis Depo. 15 123:25-14:12; Garnham Depo. 166:15-23; Lattin Depo. 74:21-75:8; Maynor
     Depo. 34:18-35:11; Riley Depo. 55:3-21.  Indeed, several named APs testified that college sports
27   should remain amateur and that SAs should not be paid while in college.  *See* Tr. 83:12-84:4
     (O'Bannon); Fischer Depo. 27:21-28:2, 107:3-6; Gilbert Depo. 103:11-24; 104:18-24; Jaracz
28   Depo. 117:8-14; Tallent Depo. 50:23-51:18.

polls carried out between 2001 and March 2014.  Tr. 2642-2643; TX 4045-20.  Tellingly, APs
made no attempt to present any survey of their own; nor did APs point to any survey anywhere
that has remotely suggested that the American public in general, or people who currently watch
college sports, favor paying SAs or would continue to watch in the same numbers if SAs were
paid, whether for their "NILs" or otherwise.  APs instead made a hodge-podge of arguments to
undermine the Dennis survey, none of which withstands scrutiny.  AP Br. 15-16.

 APs first criticize the survey for not spelling out that payments to SAs would be for
supposed NIL rights.  But Dr. Dennis testified that phrasing such questions would have been
complex and difficult to comprehend and would not have changed the results.  Tr. 2646-49
(Dennis).  Moreover, it is abundantly clear that the payments APs are proposing would not be for
any "NIL" rights, which have never been recognized by any court.  APs point to no analysis
suggesting that consumers would actually distinguish between payment for NILs and payment for
playing the game that features those NILs.  Tr. 2739:24-2740:8 (Poret).  Even APs' experts could
not separate the concepts of payment for appearing on television from payment for playing.  *See*
Tr. 393:23-394:8 (Noll); *see also* Tr. 3362 (APs' counsel stating that it is not possible to "isolate
something specific like NIL money" in the context of a survey).

 APs next fault the survey for not asking about deferred compensation, but there was no
evidence the results would have been different, Tr. 2649-51 (Dennis), and deferred compensation
is still compensation, Tr. 3028-29 (Rubinfeld).  Moreover, APs have no basis to rely on this
criticism where, as discussed in Part IV *infra*, APs first raised "deferred compensation" after the
close of expert discovery and introduced no evidence to support this speculative alternative on
which they bear the burden of proof.  APs also hypothesize that a small number of survey
respondents (191 of nearly 2,500) might have interpreted "paying" SAs as referring to illicit
payments, but that critique was inapposite, and in any event, Dr. Dennis reran the analysis without
the 191 cases and the results did not change.  Tr. 2638:25-2640:19.[18]

---

[18] The same was true after eliminating respondents who did not watch or attend college sports in the past 12 months, Tr. 2657-2658—although the views of these respondents were nevertheless

Finally, APs' attempt to cast doubt on whether surveys can predict future behavior cannot be reconciled with the fact that there is a multi-billion dollar market research industry and courts routinely admit similar survey data.  Tr. 2659:3-22 (Dennis).[19]

### 2.    The Challenged Rules Increase Output

"The core question in antitrust is output."  *Chicago Prof'l Sports Ltd.*, 95 F.3d at 597. Indeed, "a market can be said to become increasingly competitive when its output increases."  XI Areeda at ¶ 1901(a).  The reason that a sports league is a prime example of an activity that "can only be carried out jointly," *Bd. of Regents*, 468 U.S. at 101, is that it increases the output of athletic competition by making it possible to organize more games among more different teams. Having nationwide rules for colleges and universities with elite intercollegiate athletic programs increases output.

In every market APs allege, total output is a function of the number of schools participating in FBS football and Division I basketball.  When more schools participate, there are more games to be played and more opportunities for SAs to participate.  The number of schools and SAs playing FBS football, and the number of schools and SAs playing Division I basketball, have increased significantly over time.  Dkt. 189 ¶¶ 42-49.  The evidence at trial demonstrates that the NCAA's amateurism rules significantly contribute to these increases in output.

---

relevant because Dr. Noll testified that they were part of the market.  Tr. 438:4-10.  They may well have watched in the past or planned to watch in the future.  Tr. 2656-2657.

APs at trial faulted the Dennis survey for lacking a control group.  But a control group is appropriate when there is a question about what is causing consumers' actual observed behavior or beliefs.  It is unnecessary in a survey such as the Dennis survey that is directly measuring what consumers' beliefs and behavior are in the first place.  Tr. 2960:17-2962:8 (Rubinfeld); *see* Shari Seidman Diamond, Reference Guide on Survey Research, *in* Reference Manual on Scientific Evidence 359, 397-98 (Federal Judicial Center, 3d ed. 2011) (control group not needed when survey designed "to describe attitudes or beliefs or reported behaviors," but should be used when survey tests "directly the influence of [a] stimulus").  Mr. Poret's mistaken testimony about the need for a control group serves only to reveal that his opinions are entitled to little weight.

[19] APs' witnesses attempted to cast doubt on surveys about future behavior by citing the examples of Major League Baseball and the Olympics, but their testimony reinforces the NCAA's position. In the almost 35 years since polls began showing complaints among Major League Baseball fans about player salaries, viewership of the World Series declined by roughly two-thirds.  Tr. 987:14-988:10 (Rascher).  The percentage of American households watching the Olympics has declined dramatically since 1980, in the same period as polls showing opposition to the Olympics' decision to abandon amateurism.  Tr. 989:1-990:8 (Rascher).  By contrast, Super Bowl ratings have not declined in the same period.  Tr. 1026:2-7 (Rascher).

*First*, schools have a philosophical commitment to amateurism, and are interested in competing in a sports organization that shares that commitment.  Multiple witnesses testified regarding this point.  Tr. 1783:21-1784:5 (Emmert) (schools in Division I "would look at a competitor university that was, in fact, paying its players and they would say we don't want to play against them"), 2080:11-23 (Delany), 2418:5-25, 2420:12-20 (Sankey), 1693:18-1695:3 (Muir), 3188:25-3189:17 (Lewis); TX 2084-21 (79.9% of education professionals at Division I institutions believe amateurism rules are "essential" to conduct of intercollegiate athletics).

*Second*, even if some schools would consider payments to SAs, these schools would face financial obstacles to doing so, and some would be financially unable to remain in Division I.  Most Division I athletic departments generate less revenue than they spend.  Tr. 1781:17-23 (Emmert).  Of 345 schools in Division I, only 23 had more generated revenue than expenses, a number that has remained roughly constant for nearly a decade.  Tr. 2187:17-23 (Petr).  If the rules were changed to permit compensation to SAs, some schools would leave Division I due to financial concerns.  Tr. 1784:6-18 (Emmert), 2305:11-2309:25 (Banowsky), 3188:25-3189:9 (Lewis).  This would diminish the number of scholarships available for SAs to play Division I sports, and also the number of scholarships available to play collegiate sports at any level.  Tr. 1784:19-1785:5 (Emmert).[20]

APs tried to rebut these facts through Dr. Rascher's testimony, but that testimony was unreliable as a matter of law.  To begin, Dr. Rascher's opinion rests on the assumption that colleges and universities are profit-maximizing actors, and would only make "economically rational" decisions.  APs, however, offered no evidence to rebut the fact that many colleges have a philosophical commitment to amateurism and would not participate in a sporting competition that lacked that commitment, regardless of whether it was profitable.  Dr. Rascher himself admitted

---

[20] In some cases, colleges might decide not to drop out of Division I, but instead would decide to cut sports and scholarships in non-revenue generating sports.  The trial evidence showed without dispute that supporting other collegiate sports is a major procompetitive purpose and effect of the challenged rules.  Tr. 1598:17-1599:3 (Pastides), 1785:6-1786:9 (Emmert).  The NCAA continues to assert that the viability of other sports is an independent procompetitive justification for its amateurism rules.  It could and should have presented additional evidence on this point, but the Court has granted APs partial summary adjudication on this issue.  *Keller* Dkt. 1025 at 40.  The NCAA preserves this argument for appeal, if necessary.

1   that colleges are not profit-maximizing institutions:  he candidly said that the NCAA's existing

2   amateurism rules result in schools "leaving a lot of money on the table."  Tr. 896:3-897:9.

3        The trial evidence also undermined the key factual predicate for Dr. Rascher's opinion.

4   Dr. Rascher's opinion, rejecting audited financial statements showing that most athletics programs

5   are not profitable, was based entirely on his speculation that the statements "do not reflect

6   economic reality."  Tr. 1002:14-1003:1.  Dr. Rascher's method for "correcting" the statements

7   involved wholesale reallocation of revenue to college football and basketball programs.  Tr. 871:1-

8   9, 1015:3-6.  But Dr. Rascher did not undertake a study of *any* individual school to confirm the

9   accuracy of his method.  Tr. 1007:8-25.[21]  And the very examples on which Dr. Rascher relied

10  prove that his method for allocating revenues is inaccurate.  Applying his method, Dr. Rascher

11  assumed that nearly all of more than $17 million in non-sport-specific ticket sales on the

12  University of Texas's EADA statement actually reflected football and basketball ticket sales.  Tr.

13  1021:10-25 (Rascher).  However, the University of Texas's Christine Plonsky explained that all of

14  this money was from tickets for non-athletic entertainment events at a multi-purpose center,

15  meaning Dr. Rascher's method was simply wrong.  Tr. 1390:17-1392:6.

16       The NCAA's amateurism rules also boost output by preserving the national character of

17  collegiate athletics, including the national scope and popularity of the men's basketball

18  championship tournament.  Numerous witnesses testified that, absent uniform national rules on

19  compensation to SAs, traditional intra-regional collegiate sports rivalries and the national reach of

20  the men's basketball tournament would be undermined.  Tr. 1758:25-1760:4 (Emmert), 2419:24-

21  2420:11 (Sankey), 3190:12-3191:6 (Lewis).  This evidence was unrebutted.

22          **3.**       **The Challenged Rules Promote Competitive Balance**

23       "[T]he interest in maintaining a 'competitive balance' among 'athletic teams is legitimate

24  and important,'" and is "unquestionably an interest that may well justify a variety of collective

25  decisions made by the teams."  *Am. Needle*, 560 U.S. at 204 (quoting *Bd. of Regents*, 468 U.S. at

26  

27  [21] The only such study cited by Dr. Rascher, a 20+ year old study of Western Kentucky
    University, is unreliable because the accounting standards for college athletic programs have been

28  completely overhauled since that time.  Tr. 1003:2-18 (Rascher), 2183:17-2184:19 (Petr).

117).  The Supreme Court has expressly noted that the NCAA's "restrictions designed to preserve amateurism" are "tailored to the goal of competitive balance" and "are 'clearly sufficient' to preserve competitive balance to the extent it is within the NCAA's power to do so." *Bd. of Regents*, 468 U.S. at 119.

APs' experts agree that there is a relationship between the popularity of a sports league and the level of competitive balance in that league. Tr. 453:23-454: 6 (Noll), 953:8-21 (Rascher). Both sides' experts agree that the optimum level of competitive balance for a sports league is somewhere between complete equality of teams in the league and having one team or group of teams that is clearly dominant over others. Tr. 453:9-22 (Noll), 2989:7-11 (Rubinfeld).  And both sides' experts agree that the NCAA currently has a level of competitive balance that falls within that range, and that is sufficient to sustain consumer interest in college football and basketball.  Tr. 455:18-456:4 (Noll), 2989:12-25 (Rubinfeld).[22]

Three of APs' expert witnesses testified that if colleges could make cash payments to prospective SAs for the use of their NILs, top recruits would receive significant—in many cases, six-figure or more—incentives to attend schools with more revenue.  *See* Tr. 436:21-437:9 (Noll), 967:19-970:6, 974:24-977:25 (Rascher), 1271:16-1272:11 (Staurowsky).  Given these great disparities in potential payments to SAs, permitting such payments would tilt the distribution of talent and success towards colleges and universities with more cash to spend.  Multiple fact witnesses confirmed what plaintiff Chase Garnham testified:  Players would be "more likely to go to the schools in conferences that make more money on television."  Tr. 1080:20-1081:2 (Garnham); *see also* Tr. 1776:6-15, 1777:24-1778:19 (Emmert), 2082:5-12 (Delany), 3187:20-3188:6 (Lewis).  Upsetting the current level of competitive balance would negatively affect the popularity of college sports.  Tr. 2322:6-2324:25 (Banowsky).

Economic analysis corroborated the lay opinion testimony on this point.  Dr. Rubinfeld

---

[22] APs cite their experts' testimony regarding the lack of competitive balance in the NCAA, AP Br. 18:28-19:3, but that testimony merely shows that there is not complete parity in the NCAA. *See* Tr. 235:9 (Noll: college sports are not "completely balanced").  As Dr. Noll conceded on cross examination, parity is not a desirable outcome for a sports league.  So the fact that APs' experts or others complain that some colleges have an advantage currently does not undermine the importance or existence of competitive balance to NCAA sports.

1   demonstrated that a significant number of college football and basketball players would have gone

2   to a higher-resource school than they actually attended, and further testified that this redistribution

3   of athletic talent would have an adverse effect on the ability of lower-resource schools to compete

4   in basketball.  Tr. 3014:1-3015:10, 3016:18-3017:7.  Dr. Rascher agreed that restrictions on

5   compensation to players are important to competitive balance, Tr. 953:22-25, 954:12-18, and that

6   if SAs switched from schools in lower-tier conferences to schools in higher-tier conferences, this

7   "might really affect competitive balance."  Tr. 949:14-25.  Indeed, under Dr. Rascher's own

8   analysis, around 9 percent of all FBS football players and around 7 percent of all Division I

9   college basketball players would have switched from "the little schools to the big schools."  Tr.

10   949:14-25, 950:19-951:4.  That represents approximately the top 20% of football and 10% of

11   basketball athletes recruited by the "small schools."  Avoiding that outcome is procompetitive.[23]

### 4.   The Challenged Rules Improve Educational Quality by Ensuring that Athletics Are Integrated With Academics

12
13            The challenged rules are also procompetitive because they "integrate athletics with

14   academics."  *McCormack*, 845 F.2d at 1345.  This both enhances consumer demand and improves

15   product quality.  *See Cnty. of Tuolumne*, 236 F.3d at 1159 ("any anticompetitive harm is offset by

16   the procompetitive effects of SCH's effort to maintain the quality of patient care that it provides");

17   *see also Deutscher Tennis Bund v. ATP Tour, Inc.*, 610 F.3d 820, 833 (3d Cir. 2010) (sport "rules

18   and regulations can be procompetitive where they enhance the 'character and quality of the

19   "product"'") (quoting *Bd. of Regents*, 468 U.S. at 112).  Courts have recognized that improving

20   the quality of the educational product can justify joint policymaking by competing schools.  *See*

21   *United States v. Brown Univ.*, 5 F.3d 658, 674 (3d Cir. 1993) (colleges' agreement was

22   procompetitive if it "improved the quality of the educational program"); *McCormack*, 845 F.2d at

23   1345.  As noted in *Brown University*, "enhancing the quality of our educational system redounds

24   to the general good," and "[i]t may be that institutions of higher education require that a particular

25

26   _____

27   [23] APs rely on some proposals found in NCAA discussion documents to argue that the NCAA has not maintained a consistent commitment to competitive balance.  AP Br. 18.  This reliance is misguided.  Unrebutted evidence at trial established that these proposals were "uniformly
28   rejected."  Tr. 2002:22-2003:2.

1   practice, which could properly be viewed as a violation of the Sherman Act in another context, be

2   treated differently."  5 F.3d at 678 (internal quotations omitted).  The Supreme Court has

3   recognized in a wide variety of contexts that universities should be given deference in the means

4   chosen to pursue their educational missions.  *Grutter v. Bollinger*, 539 U.S. 306, 328 (2003)

5   (noting Court's "tradition of giving a degree of deference to a university's academic decisions");

6   *Regents of Univ. of Michigan v. Ewing*, 474 U.S. 214, 225 (1985).

7                            (a)      *The Challenged Rules Are Successful at Integrating Athletics and
                                     Academics*

8

9          Multiple professional educators testified that integrating the athletic and academic

10  components of SAs' college experience is an important part of their universities' academic

11  mission.  Tr. 1591:21-1592:19 (Pastides), 1360:8-1361:2 (Plonsky), 1684:21-1690:21 (Muir).  The

12  named APs—who by definition must be typical of the class—agreed that their schools stressed the

13  importance of education, and that they valued their education.[24]  Indeed, the vast majority of SAs

14  (87% in men's basketball and 92% in football) see themselves as part of the campus community

15  and overwhelmingly (92% in men's basketball and 83% in football) report that their athletic

16  participation provides them with a connection to campus.  TX 2078-32-33; Tr. 2216:5-2218:8.

17         APs do not deny that the integration of athletics and academics is a fundamental goal of

18  the NCAA and its member institutions.  Rather, APs contend that male football and basketball

19  SAs are not perfectly integrated because, according to Dr. Staurowsky, SAs face extreme time

20  demands in their sports, cluster into certain majors, and graduate at lower rates than other students

21  in the student body.  But what matters for antitrust analysis is not whether the NCAA and its

22  member schools have achieved the ideal level of integration, but rather whether integration of

23  academics and athletics is a legitimate objective of the NCAA and whether the alleged restraint is

24  reasonably tailored to that objective.  *McCormack*, 845 F.2d at 1345.  There is no dispute as to this

25  point.  *See, e.g.*, Tr. 2553:7-12 (Dickman: the integration of academics with athletics is NCAA's

26  "core mission . . . because at its heart, the NCAA's an educational entity and we're about

27  _____

    [24] Tr. 575:4-11 (Prothro), 1074:8-1075:8 (Garnham); Alipate Depo. 48:6-21; Fischer Depo. 31:3-
28  24; Lattin Depo. 59:7-16;  Maynor Depo. 377:11-378:1; Rhodes Depo. 322:1-23; Riley Depo.
    33:5-21; Robinson Depo. 32:20-33:2; Smith Depo. 55:14-56:1.

                                              -28-

1   educating young people").

2       Moreover, Dr. Staurowsky's criticisms of current integration efforts are undermined by the

3   record evidence.  Dr. Staurowsky did not conduct any actual empirical analysis of the academic

4   performance of these SAs, and did not even consider the testimony of the plaintiffs in this case

5   regarding their academic focus.  Tr. 1303-1304, 1313-1314, 1326-1328.  Moreover, the evidence

6   thoroughly disproved her unsupported conjectures:  (1) male basketball and football SAs spend

7   similar amounts of time on their sport as other SAs, including SAs who play Division II and III

8   football and basketball, and do so because they love playing and want to excel, Tr. 549:15-21

9   (Prothro), 1284-1292 (Staurowsky), TX 2078-17; (2) not only do football and basketball SAs have

10  time for studies but they  spend more time on classwork than other students, Tr. 1295-1295, TX

11  2078-18; (3) accounts of clustering, drawn primarily from non-scientific media reports, may be

12  attributable to SAs having similar areas of interest, Tr. 1224:3-22, 1328-1332; and (4) SAs have

13  the same choices in terms of majors as other students, Tr. 2592-2593.

14      Further, actual data prove that, contrary to Dr. Staurowsky's hyperbole, male football and

15  basketball SAs do achieve academic success.  The most accurate way to measure this is a

16  regression analysis, which compares students who played college football or basketball with

17  students who did not play these sports but are otherwise similar in all relevant respects.  Nobel

18  Prize-winning economist James Heckman performed such a regression using the leading source of

19  government data on educational outcomes.  He found that participation in football and basketball

20  has no negative effects on SAs' overall graduation rates, and that among children from single-

21  parent households, such participation results in a 38 percentage point higher chance of graduation.

22  Tr. 1509:5-1510:5.  Dr. Heckman's regression also showed that participation in college football

23  and basketball improves post-graduation wages and white-collar status, especially for

24  disadvantaged SAs.  For example, there is a 23.5 percent increase in post-college wages for

25  African-American students who played college football or basketball, and these students are 27.5

26  percent more likely to have white-collar jobs after college.  Tr. 1510:14-1514:25.  Contrary to

27  APs' claims, Dr. Heckman considered these effects just within Division I and reached conclusions

28  that are identical or stronger among students at those schools.  Tr. 1525:22-1526:5, 1558:4-9.

1    Federal graduation rates ("FGR") tell a similar story. The FGR for white FBS football

2  players is higher than the same rate for white males in the general student body at Division I

3  institutions, and the FGR for African-American FBS football players is higher than the same rate

4  for African-American males in the general student body at Division I institutions. TX 3373-20 to

5  -21. The same is true for African-American Division I men's basketball players. *Id.*

6    The graduation success rate ("GSR"), provides a more accurate picture of SAs' academic

7  outcomes than the FGR because it accounts for high transfer rates among SAs that can distort the

8  FGR. Tr. 1546:2-9 (Heckman: the actual graduation rate would be closer to the GSR), 2207:9-

9  2208:10 (Petr). The NCAA has worked with academic researchers to devise this measure to

10 improve the reliability of data on these issues. Tr. 2203:18-2205:11. Both the FGR and the GSR

11 for SAs in FBS football and Division I men's basketball have improved over time. TX 3369-13;

12 Tr. 2213:17-2214:4, 2557-2558. For example, in the past 11 years, the GSR for Division I men's

13 basketball SAs has improved from 56 percent to 73 percent, and GSR for FBS football SAs has

14 improved from 63 percent to 71 percent. Tr. 2213:17-2214:4. These increases mean that around

15 2,300 more football and men's basketball SAs have earned a college degree. Tr. 2215:5-7. These

16 increased graduation rates correlate with heightened eligibility and progress-toward-degree

17 requirements and the greater availability of academic resources over this same time period,

18 indicating that the NCAA's and its member institutions' efforts to integrate athletics and

19 academics are moving graduation rates in the right direction. Tr. 2580-81, 2561.

20   APs introduced nothing to rebut this evidence of academic success of football and men's

21 basketball SAs. Their only witness on graduation data—Dr. Staurowsky—is not an economist or

22 statistician and did not conduct a quantifiable analysis of SA academic performance.[25]

23       *(b)    Changing the Rules as APs Demand Would Negatively Affect the
                Integration of Athletics and Academics*

24   APs' injunction would have a negative effect on the integration of academics and athletics.

25 *First*, permitting NIL payments would "create a wedge between those student athletes who

26

27 [25] Dr. Staurowsky relied in large part on a metric called the "Adjusted Graduation Gap." This
   metric is based on faulty statistical principles and has not been accepted in the academic
28 community beyond its inventors. Tr. 2210:1-2211:6.

-30-

1   receive the funds and those who don't, between those athletes who receive the funds and the

2   student body at large." Tr. 1591:2-20 (Pastides); *accord* Tr. 1690:22-1692:9 (Muir), 1790:4-8

3   (Emmert).  Creating such a wedge would detract from the academic self-identity of SAs, which is

4   an important indicator of their likelihood of success in college.  Tr. 2222:16-18, 2233:25-2234:3;

5   TX 3210-26.  Permitting such payments would also make it less likely that prospective SAs would

6   consider academic factors in deciding on which college to attend.  Tr. 2424:4-20 (Sankey).

7           *Second*, permitting payments would reduce SAs' focus on education and ultimately

8   "diminish the intrinsic value and importance of them receiving a great education and graduating."

9   Tr. 1591:2-20 (Pastides); Tr. 1694:5-1695:3 (Muir), 2417:4-15 (Sankey), 3195:3-17 (Lewis).

10          The testimony of these fact witnesses was corroborated by the testimony of expert

11  witnesses from both sides.  Dr. Staurowsky admitted that payments to SAs would have negative

12  consequences for their educational experience.  Tr. 1270:12-18 (Staurowsky: paying SAs

13  "cause[s] confusion with the student athlete about whether he or she is a student or an athlete" and

14  "pay subverts the educational mission").  Dr. Heckman testified that economic theory predicts that

15  paying a person for one activity and not for another will "change the mix of their effort towards"

16  the compensated activity.  Tr. 1551:23-1552:14, 1553:14-1554:19.  Dr. Rubinfeld also opined,

17  based on discussions with athletic department administrators and economic analysis, that

18  "integrating athletics and academics is an important procompetitive benefit," and that "there is

19  evidence that the NCAA's rules improve the educational experience."  Tr. 3022:9-18.

20          In short, the challenged NCAA rules have a host of procompetitive benefits, such that even

21  if APs had carried their initial burden to show anticompetitive effects, the NCAA would have met

22  its burden to bring forward evidence of offsetting procompetitive effects.

23  **IV.    NO LESS RESTRICTIVE ALTERNATIVE TO THE CHALLENGED RULES
        WOULD ACHIEVE THEIR PROCOMPETITIVE BENEFITS**

24
25          APs failed to satisfy their burden of showing that the procompetitive benefits discussed

    above can be achieved "in a *substantially* less restrictive manner."  *Tanaka*, 252 F.3d at 1063
26
    (emphasis added).  To meet this burden, APs must clear three hurdles.
27
            *First*, APs must prove that the alternative is "substantially less restrictive *and* is virtually as
28

1    effective in serving the legitimate objective *without significantly increased cost*."  *Cnty. of*

2    *Tuolumne*, 236 F.3d at 1159 (emphasis in original).  Courts must not "calibrate degrees of

3    reasonable necessity."  *Rothery Storage & Van Co. v. Atlas Van Lines, Inc*., 792 F.2d 210, 227-28

4    (D.C. Cir. 1986).

5         *Second*, any proffered alternative "whose efficacy is mainly a matter of speculation" or that

6    "has been tried but failed" or "is otherwise unlawful" does not count.  XI Areeda at ¶ 1913b

7    (proffered alternatives "should either be based on actual experience in analogous situations

8    elsewhere or else be fairly obvious"); *see M&H Tire Co., Inc. v. Hoosier Racing Tire Corp.*, 733

9    F.2d 973, 987 (1st Cir. 1984) (rejecting alternatives that "are more hypothetical than practical");

10   *Am. Motor Inns, Inc. v. Holiday Inns, Inc.*, 521 F.2d 1230, 1249-50 (3d Cir. 1975).

11        *Third*, any less restrictive alternative must have been disclosed, so that the NCAA had an

12   opportunity to rebut it.  *See, e.g.*, *U.S. Fid. & Guar. Co. v. Lee Investments LLC*, 641 F.3d 1126,

13   1137 (9th Cir. 2011); Fed. R. Civ. P. 37(c)(1).

14        APs propose—in one short paragraph—three alternatives, AP Br. 25, but cite no evidence

15   showing that their proposals satisfy the above standards.[26]

16        **Group licenses**.  This proposal is speculative and has no grounding in fact.  No license is

17   needed to feature athletes in live television broadcasts, *supra* II.C.1.c, and Dr. Noll conceded that

18   no sport—amateur or professional—has ever implemented group licenses providing equal revenue

19   sharing.  Tr. 445:6-9, 451:14-25.  APs point to no evidence establishing that NIL payments, even

20   if capped, would achieve as effectively as the current rules the relevant procompetitive benefits.

21   To the contrary, APs' licensing model is clearly not amateur.  It is based on what is "done in the

22   professional sports."  Tr. 287:12-18 (Noll).  And diverting money into the pockets of SAs would

23   result in significantly increased costs to fund other sports and academic opportunities funded by

24

25

26   _____

27   [26] APs have not taken up multiple possible less restrictive alternatives suggested for the first time
     at the hearing following the close of evidence.  Tr. 3376-79.  The NCAA had no notice of, or
28   opportunity to respond to, many of these proposals (which also have no evidentiary support).

---

-32-

1    broadcast revenue.[27]

2        **Deferred payment**.  Dr. Noll made no mention of deferred payment or a trust fund in his

3    expert reports.  Tr. 288:7-290:15; *see* Dkt. No. 166 at 11 ("Plaintiffs represented … they [would]

4    not proffer any less restrictive alternatives at trial that their experts did not discuss in their

5    reports.").  Dr. Noll's trial testimony about a trust fund was entirely speculative, as he has not

6    identified "any mechanism that would then implement some alternative set of rules."  Tr. 444:2-

7    24.  Nor have APs identified any evidence showing that a trust fund would be as effective at

8    achieving the proven procompetitive benefit as the challenged rules.  The undisputed testimony

9    confirms that SAs could borrow against the fund, Tr. 1790:10-17 (Emmert), 3028:12-25

10   (Rubinfeld), and future payment would influence SAs' choice of school and incentives during

11   school thereby undermining competitive balance and academic integration.  Tr. 2449:11-2450:1

12   (Sankey); *also* Tr. 771:11-18 (Pilson), 1791:11-1793:5 (Emmert), 3100:21-3101:8 (Rubinfeld).

13   Most fundamentally, pay—whether received now or later—is inconsistent with amateurism.

14       **Permitting endorsement licensing**.  This alternative has no relationship to APs' claims,

15   which are based on group licenses for live broadcasts, videogames, and broadcast clips and

16   merchandise.  APs propose a group licensing market, AP Br. at 7, and represented they were not

17   seeking a model where SAs would be paid by third parties, such as boosters.  Tr. 3383:3-17.  Nor

18   did APs show how allowing endorsements would further the procompetitive benefits at issue.  APs

19   point to the Olympics as a model, but the undisputed evidence shows that Olympics viewership

20   "declined dramatically" when athletes with endorsements were allowed to compete—a

21   development that consumers opposed, Tr. 990 (Rascher), and that the chase for endorsements

22   interferes with SAs' balance of education and athletics, Tr. 3192-94 (Lewis).

---

[27] Any less restrictive alternative theory capping NIL payments should be excluded because APs have not alleged and Dr. Noll did not disclose it.  *See* Fed. R. Civ. P. 37(c)(1).  In any event, a cap's efficacy is speculative because, as Dr. Noll testified, concerted effort would be needed to set any payment cap and schools would lack incentive to have a uniform payment package if current rules were lifted.  Tr. 450-51.  Further, APs contend that the rules precluding payments for NILs constitute the restraint, not the rules limiting financial aid to tuition, room, board, and books; the latter rules are the subject of other pending lawsuits.  *See, e.g.*, *Alston v. NCAA*, No. 14-cv-01011 (N.D. Cal.).

## V.        THERE IS NO BASIS FOR INJUNCTIVE RELIEF

APs fail to satisfy the requirements for injunctive relief—not only success on the merits but also irreparable injury, that the balance of hardships favors them, or that an injunction would serve the public interest.  *eBay Inc. v. MercExchange, LLC*, 547 U.S. 388, 391 (2006).  There is no irreparable injury regarding videogames, as there is no evidence that the NCAA or any college is likely to license videogames in the future.  More generally, the balance of hardships tilts decidedly to the NCAA, whose ability to define its core product would be undermined.  The hardship to the class is non-existent to minimal.  APs' experts testified that the result of the injunction will be less spending on facilities and coaches, which benefit all football and men's basketball SAs on a team.  There is no evidence that this loss of in-kind benefits will be offset by payment to the vast majority of SAs.  And there is a substantial public interest both in having access to the distinct product of amateur college sports, *Bd. of Regents*, and in allowing universities to define their own mission and rules.

Even if APs had satisfied the test for some injunction, their 11 proposed injunctions are staggeringly broad and should be rejected.  APs say nothing of substance about those proposals, so the NCAA will be brief here.[28]  Several of APs' proposals would allow *third parties* to pay or otherwise provide benefits to current SAs directly.  *See* Dkt. 252-1 ("Injunction") ¶ 1(a)-1(e).  These proposals are inconsistent with earlier representations that bans on third-party payments were not at issue.  Tr. at 2421:1-15, 2327:24-2329:13.  The balancing of harms weighs strongly against an injunction allowing third-party payments to SAs.  *See* Tr. 2420:23-2427:16 (Sankey), 3194:20-3195:17 (Lewis).  The proposals that allow individual, rather than group licensing, payments, Injunction ¶ 1(b), 1(d), 1(e), and 1(h), likewise are inconsistent with APs' representations about the nature of their claims.  *Keller*, Dkt. No. 893, at 12; Dkt. No. 832, ¶ 391; *Keller*, Dkt. No. 554, at 18; *Keller*, Dkt. No. 898-1, at 8; *O'Bannon*, Dkt. No. 172, at 1.

The Court also should reject APs' proposal for an unlimited amount of payment unrelated

---

[28] The NCAA requests the opportunity for full briefing and argument in the event the Court determines that APs may be entitled to some form of injunction, and also that the Court stay any injunction pending appeal, in the event the Court issues an injunction.

to the cost of attendance at a college or university.  *See* Injunction ¶ 1(a), 1(b), and 1(e).  Payments to SAs based on their status as athletes that are unrelated to their cost of attendance would be fatally inconsistent with the NCAA's (and every other amateur body's) rules.  Tr. at 499:4-11, 501:19-509:23 (Noll), 1591:2-20, 1603:11-1604:20 (Pastides), 1728:17-1729:3, 1730:4-1732:16 (Emmert), 2430:21-2431:1 (Sankey).  APs' proposal to allow payment for "use," not simply "licensing," of NIL, Injunction ¶ 1(a), 1(b), 1(c), 1(d), 1(f), 1(g), 1(h), 1(i), expands the Injunction beyond rules prohibiting SAs from receiving payments for licenses of rights of publicity related to their NILs.  Any payment for this "use" would be a payment to play, not a license of NIL IP rights.  But APs have stated repeatedly that "pay-for-play" is "not at issue" here.  Dkt. 172 at 13:25; *see Keller*, Dkt. 999 at 1:17-18.[29]  APs are not entitled to any injunction.[30]

DATED:  July 8, 2014                        MUNGER, TOLLES & OLSON LLP


By:   */s/ Glenn D. Pomerantz*
        GLENN D. POMERANTZ

Attorneys for Defendant
National Collegiate Athletic Association

---

[29] Numerous portions of the proposed injunction have no evidentiary support whatsoever.  *See* Injunction ¶ 1 (a), 1(d), 1(g), 1(h), 1(i), 1(j).  The proposed injunction also is improperly broad because it applies to non-party "member schools," "conferences," and "licensees."

[30] APs' proposed injunctive relief should be denied also because many colleges and universities are not free to pay SAs and many SAs are not free to accept any such payments.  This is because a number of states have made it illegal to offer SAs compensation beyond a scholarship or grant-in-aid to entice them to attend a particular school.  *See, e.g.*, Cal. Educ. Code § 67360; Ga. Code Ann. § 20-2-317; 720 Ill. Comp. Stat. 5/29-1; Iowa Code § 722.11; Mich. Comp. Laws Ann. §§ 390.1502, 600.2968 (West); Tex. Civ. Prac. & Rem. Code Ann. § 131.002, et seq. (West).  APs' proposals simply ignore the fact that many states have outlawed the very payments on which APs base their entire claim.  These statutes demonstrate, moreover, that state legislatures have determined that the NCAA's amateurism rules are an appropriate accommodation to the educational mission of universities.  The conclusions of universities, state officials, and state legislatures are entitled to significant deference in this area.  Separately, a large portion of Division I and FBS colleges are public institutions whose conduct is not subject to the Sherman Act.  Public universities are not mere municipalities but are rather arms of the sovereign states.  *See, e.g.*, *Hamilton v. Regents*, 293 U.S. 245, 261 (1934); S*herman v. Curators of Univ. of Missouri*, 16 F.3d 860, 863 n.3 (8th Cir. 1994); *Pharm. & Diagnostic Servs., Inc. v. Univ. of Utah*, 801 F. Supp. 508, 511-14 (D. Utah 1990).

**CERTIFICATE OF SERVICE**

I hereby certify that on July 8, 2014, I electronically filed the foregoing document with the Clerk of the Court using the CM/ECF system which will send notification to the e-mail addresses registered.

By: */s/ Glenn D. Pomerantz*
GLENN D. POMERANTZ
MUNGER, TOLLES & OLSON LLP

Attorneys for Defendant NCAA

-36-