**United States District Court**
For the Northern District of California

IN THE UNITED STATES DISTRICT COURT

FOR THE NORTHERN DISTRICT OF CALIFORNIA

| | |
|---|---|
| EDWARD O'BANNON, et al. | No. C 09-3329 CW |
| Plaintiffs, | FINDINGS OF FACT AND CONCLUSIONS OF LAW |
| v. | |
| NATIONAL COLLEGIATE ATHLETIC ASSOCIATION; ELECTRONIC ARTS INC.; and COLLEGIATE LICENSING COMPANY, | |
| Defendants. | |

## INTRODUCTION

Competition takes many forms.  Although this case raises questions about athletic competition on the football field and the basketball court, it is principally about the rules governing competition in a different arena -- namely, the marketplace.

Plaintiffs are a group of current and former college student-athletes.  They brought this antitrust class action against the National Collegiate Athletic Association (NCAA) in 2009 to challenge the association's rules restricting compensation for elite men's football and basketball players.  In particular, Plaintiffs seek to challenge the set of rules that bar student-athletes from receiving a share of the revenue that the NCAA and its member schools earn from the sale of licenses to use the student-athletes' names, images, and likenesses in videogames, live game telecasts, and other footage.  Plaintiffs contend that these rules violate the Sherman Antitrust Act.  The NCAA denies this charge and asserts that its restrictions on student-athlete

compensation are necessary to uphold its educational mission and to protect the popularity of collegiate sports.

A non-jury trial on Plaintiffs' claims was held between June 9, 2014 and June 27, 2014.  After considering all of the testimony, documentary evidence, and arguments of counsel presented during and after trial, the Court finds that the challenged NCAA rules unreasonably restrain trade in the market for certain educational and athletic opportunities offered by NCAA Division I schools.  The procompetitive justifications that the NCAA offers do not justify this restraint and could be achieved through less restrictive means.  The Court makes the following findings of fact and conclusions of law, and will enter as a remedy a permanent injunction prohibiting certain overly restrictive restraints.

FINDINGS OF FACT

I.   Background

A.   The NCAA

The NCAA was founded in 1905 by the presidents of sixty-two colleges and universities in order to create a uniform set of rules to regulate intercollegiate football.  Docket No. 189, Stip. Undisputed Facts, at ¶ 6.  Today, the association has roughly eleven hundred member schools and regulates intercollegiate athletic competitions in roughly two dozen sports.  According to its current constitution, the association seeks to "initiate, stimulate and improve intercollegiate athletics programs for student-athletes and to promote and develop educational leadership, physical fitness, athletics excellence and athletics

United States District Court
For the Northern District of California

participation as a recreational pursuit."  Ex. 2340, 2013-14 NCAA

Division I Manual, at 15.[1]

      To achieve these goals, the NCAA issues and enforces rules

governing athletic competitions among its member schools.  Id. at

4.  These rules are outlined in the association's constitution and

bylaws and cover a broad range of subjects.  Among other things,

the rules establish academic eligibility requirements for student-

athletes, set forth guidelines and restrictions for recruiting

high school athletes, and impose limits on the number and size of

athletic scholarships that each school may provide.  Id. at 3-5.

      Since 1973, the NCAA's member schools have been organized

into three divisions -- Divisions I, II, and III -- based on the

number and quality of opportunities that they provide to

participate in intercollegiate athletics.  Stip. Undisputed Facts

¶ 27.  Division I schools provide the greatest number and highest

quality of opportunities to participate in intercollegiate

athletics because they sponsor more sports teams and provide more

financial aid to student-athletes than schools in Divisions II and

III.[2]  To qualify for membership in Division I, a school must

sponsor a minimum of fourteen varsity sports teams, including

football, and distribute a baseline amount of financial aid to its

student-athletes.  Trial Tr. 2043:13-:25 (Delany); Ex. 2340 at

365, 367.  Roughly three-hundred and fifty of the NCAA's eleven

---

      [1] All exhibit citations in this order are to the page numbers
provided by the parties at trial, which do not necessarily correspond to
the page numbers created by the original author of the exhibit.

      [2] The NCAA's bylaws define financial aid to mean "funds provided to
student-athletes from various sources to pay or assist in paying their
cost of education at the institution."  Ex. 2340 at 206.  The Court
adopts this definition for the purposes of this order.

United States District Court
For the Northern District of California

hundred schools currently compete in Division I.  Trial Tr.
1743:23 (Emmert).

Division I itself further is divided, for the purposes of
football competition, into two subdivisions: the Football Bowl
Subdivision (FBS) and the Football Championship Subdivision
(FCS).[3]  Trial Tr. 2144:9-:11 (Petr); Ex. 2340 at 364-67.  FBS
schools are allowed to offer up to eighty-five full scholarships
to members of their football teams.  In contrast, FCS schools are
permitted to offer only a smaller number of full scholarships to
members of their teams.  Stip. Undisputed Facts ¶ 28.  Because FBS
schools are able to offer more football scholarships than FCS
schools, the level of football competition within FBS is generally
higher than within FCS.  Currently, about one hundred and twenty
schools compete in FBS.  Id. ¶ 45.

In addition to the two football subdivisions, Division I
schools are also organized into a number of conferences, which
essentially function as smaller leagues within the NCAA.  The
conferences -- most of which contain between eight and fifteen
schools -- typically have their own membership requirements.  Most
conferences also organize conference-specific games and events
featuring their member schools, including regular season football
games, regular season basketball games, and post-season basketball
tournaments.  Although the conferences are considered members of
the NCAA and must comply with its constitution and bylaws, they
operate independently for the most part and have the authority to

---

[3] Prior to 2006, FBS was known as Division I-A and FCS was known as
Division I-AA.  For the purposes of simplicity, this order uses "FBS"
and "FCS" to refer to these subdivisions even when discussing student-
athletes who played Division I football before 2006.

generate their own revenue and set their own rules, provided those rules are consistent with NCAA policy.  Ex. 2340 at 22.

The rules governing participation and competition in Division I are enacted by an eighteen-member body known as the Division I Board of Directors, which typically receives proposals from the division's member schools and conferences.  Trial Tr. 1744:16-1745:2 (Emmert); Ex. 2340 at 35.  The Board is made up of university presidents and chancellors from eighteen different colleges or universities.  Ex. 2340 at 35.

A school or conference that seeks to propose a new rule or rule change typically does so by submitting the proposal to a designated committee or task force appointed by the Board.  Trial Tr. 1745:20-1746:15.  That committee or task force then considers the proposal and, if it approves, may forward the proposal to a body known as the Division I Legislative Council, which is made up of athletics administrators from schools in each of the thirty-two Division I conferences.  Id.; Ex. 2340 at 37.  The Legislative Council may then forward the proposal to the Board of Directors, which has the ultimate authority to approve the proposal by a majority vote.  Trial Tr. 1745:20-1746:15.  Actions by the Board may only be repealed through an override process that involves a vote of sixty-two percent of the NCAA's member institutions.  Id. 1747:6-:20.  The NCAA's current president, Dr. Mark Emmert, does not have any voting power in this process.  Id. 1746:19-:24.

B.   Electronic Arts Inc. & Collegiate Licensing Company

Electronic Arts Inc. (EA) is a corporation which develops and manufactures videogames.  Stip. Undisputed Facts ¶ 35.  It created and sold an annual NCAA-branded college football videogame every

year between 1997 and 2013.  Id. ¶ 39.  It also created and sold an annual NCAA-branded college basketball game every year between 1998 and 2010.  Id. ¶ 40.  In order to create these games, it entered into licensing agreements with the NCAA and its member schools and paid them for permission to use their intellectual property, including their marks, in the videogames.  Id. ¶¶ 37-38; Exs. 1125, 1126.  Collegiate Licensing Company (CLC) is a Georgia corporation that licenses trademarks of the NCAA and several of its member schools and conferences.  Stip. Undisputed Facts ¶¶ 32-34.  Although Plaintiffs originally brought claims against both EA and CLC in this action, they subsequently agreed to settle those claims.

   C.   Plaintiffs

   Plaintiffs are twenty current and former student-athletes, all of whom play or played for an FBS football or Division I men's basketball team between 1956 and the present.  Some, but not all, Plaintiffs went on to play professional sports after they left college.  They represent the following class, which this Court certified under Federal Rule of Civil Procedure 23(b)(2) in November 2013:

> All current and former student-athletes residing in the United States who compete on, or competed on, an NCAA Division I (formerly known as "University Division" before 1973) college or university men's basketball team or on an NCAA Football Bowl Subdivision (formerly known as Division I-A until 2006) men's football team and whose images, likenesses and/or names may be, or have been, included or could have been included (by virtue of their appearance in a team roster) in game footage or in videogames licensed or sold by Defendants, their co-conspirators, or their licensees.

Case No. 09-1967, Docket No. 1025, April 11, 2014 Order, at 47-48 (amending definition of previously certified class).

II.   The Relevant Markets

As explained in previous orders, Plaintiffs allege that the NCAA has restrained trade in two related national markets, which they refer to as the "college education market" and the "group licensing market."  Although these alleged markets involve many of the same participants, each market ultimately involves a different set of buyers, sellers, and products.  Accordingly, this order addresses each market separately.

A.   College Education Market

The evidence presented at trial, including testimony from both experts and lay witnesses, establishes that FBS football and Division I basketball schools compete to recruit the best high school football and basketball players.  Trial Tr. 9:1-:7 (O'Bannon); 114:21-117:17 (Noll); 831:8-:11 (Rascher); 1759:21-:22 (Emmert); Ex. 2530.  Specifically, these schools compete to sell unique bundles of goods and services to elite football and basketball recruits.  The bundles include scholarships to cover the cost of tuition, fees, room and board, books, certain school supplies, tutoring, and academic support services.  Trial Tr. 40:2-:20 (O'Bannon); 582:6-:18 (Prothro); 1741:10-:20 (Emmert); Ex. 2340 at 207.  They also include access to high-quality coaching, medical treatment, state-of-the-art athletic facilities, and opportunities to compete at the highest level of college sports, often in front of large crowds and television audiences. Trial Tr. 13:4-:12 (O'Bannon); 556:8-558:2 (Prothro); 1157:20-1158:7 (Staurowsky); 1721:3-1722:19 (Emmert).  In exchange for

7

these unique bundles of goods and services, football and basketball recruits must provide their schools with their athletic services and acquiesce in the use of their names, images, and likenesses for commercial and promotional purposes.  Id. 109:5-110:12 (Noll).  They also implicitly agree to pay any costs of attending college and participating in intercollegiate athletics that are not covered by their scholarships.  See Ex. 2340 at 207.

The evidence presented at trial demonstrates that FBS football and Division I basketball schools are the only suppliers of the unique bundles of goods and services described above. Recruits who are skilled enough to play FBS football or Division I basketball do not typically pursue other options for continuing their education and athletic careers beyond high school. Plaintiffs' economic expert, Dr. Roger Noll, examined the rates at which elite football and basketball recruits accept athletic scholarships to play FBS football or Division I basketball.  He observed that, between 2007 and 2011, more than ninety-eight percent of football recruits classified as four- or five-star recruits (the two highest ratings available) by Rivals.com accepted offers to play FBS football.  Trial Tr. 113:2-114:13; Ex. 2529.  None of the five-star recruits and only 0.2% of four-star recruits chose to play football at an FCS school and none chose to play at a Division II or III school during that period.  Ex. 2529. Among three-star recruits, ninety-two percent of those offered a scholarship from an FBS school accepted one.  Id.  Less than four percent of all three-star recruits accepted an offer to play football at a non-FBS school.  Id.

This pattern is even more stark for basketball recruits. Between 2007 and 2011, no four- or five-star basketball recruits and less than one percent of all two- and three-star recruits accepted offers to play for a non-Division I school.  Id.  Even among zero-star recruits, only one percent accepted offers to play basketball outside of Division I.  Id.  In contrast, roughly ninety-five percent of all recruits offered Division I basketball scholarships in the Rivals.com sample accepted one.  Id.  This data supports Dr. Noll's conclusion that "if the top athletes are offered a D-I scholarship, they take it.  They do not go anywhere else."  Trial Tr. 114:6-:7.

On cross-examination, Dr. Noll conceded that the Rivals.com data he used in his analysis came from recruits' self-reported information about the scholarship offers they received and accepted.  Id. 486:7-:9.  However, this fact does not render Dr. Noll's opinion unreliable.  Recruits have a strong incentive to report accurate information to Rivals.com because the information is relatively easy to verify; after all, a recruit's lie about accepting a scholarship from a particular school will be discovered as soon as his name does not appear on that school's roster or list of committed recruits.  In any event, the NCAA has not presented any data of its own to contradict the Rivals.com data nor any other evidence, expert or otherwise, to cast doubt on Dr. Noll's conclusion that there are no substitutes for the opportunities offered by FBS football and Division I basketball schools.

The only potential substitutes that the NCAA has identified are the opportunities offered by schools in other divisions,

collegiate athletics associations, or minor and foreign
professional sports leagues.  None of these other divisions,
associations, or professional leagues, however, provides the same
combination of goods and services offered by FBS football and
Division I basketball schools.  Schools in FCS and Divisions II
and III all provide a lower number of scholarships than FBS
football and Division I basketball schools, which results in a
lower level of athletic competition.  The National Intercollegiate
Athletic Association (NAIA), National Junior College Athletic
Association (NJCAA), National Christian Collegiate Athletic
Association (NCCAA), and United States Collegiate Athletic
Association (USCAA) likewise provide fewer scholarships and offer
a lower level of competition.  What's more, the schools in these
other divisions and associations are often smaller than FBS
football and Division I basketball schools, spend much less on
athletics, and may not even provide opportunities to attend a
four-year college.  Id. 2824:14-:24, 2826:16-2827:7, 2829:17-
2830:12 (Stiroh).  This is why, as Dr. Noll concluded, these other
schools do not compete with FBS football and Division I basketball
schools for recruits.

Dr. Noll also analyzed the Rivals.com data to show that FBS
schools almost always defeated non-FBS schools in head-to-head
recruiting contests for the same football recruit between 2007 and
2011.  Id. 116:6-118:11, 474:23-475:14; Ex. 2530.  His analysis of
head-to-head recruiting contests for basketball players revealed
the same discrepancy between Division I and non-Division I
schools.  Trial Tr. 116:6-118:11.  Notably, he did not observe
this discrepancy when comparing head-to-head recruiting contests

among FBS football schools or Division I basketball schools.  <u>Id.</u>;
Ex. 2530 at 3.  Even when he compared the success of the schools
within the five major Division I conferences -- namely, the
Pacific 12 Conference (Pac 12), Big 12 Conference, Atlantic Coast
Conference, Southeastern Conference (SEC), and Big 10
Conference -- to that of schools in less prominent Division I
conferences, he found that they were still in competition with
each other.  Trial Tr. 116:9-:13 ("And unlike the finding for
other divisions and junior colleges and NAIA and all the rest that
was in the first picture, what we find here is that although the
major conferences win more than they lose, in competing against
the lesser conferences, there is considerable competitive
overlap.").  Thus, the bundles of goods and services offered by
schools in FCS, Divisions II and III, and other non-NCAA
collegiate athletics associations are not substitutes for the
bundles of goods and services offered by FBS football and Division
I basketball schools.

    Nor are the opportunities offered by the professional leagues
that the NCAA has identified here.  Dr. Noll noted that elite
football and basketball recruits rarely forego opportunities to
play FBS football or Division I basketball in order to play
professionally.  Neither the National Football League (NFL) nor
the National Basketball Association (NBA) permits players to enter
the league immediately after high school.  <u>Id.</u> 68:17-69:6
(O'Bannon).  Although other professional leagues -- such as the
NBA Development League (D-League), the Arena Football League
(AFL), and certain foreign football and basketball leagues --
permit players to join immediately after high school, recruits do

United States District Court
For the Northern District of California

not typically pursue opportunities in those leagues.  <u>Id.</u>

482:11-:13 (Noll).  When Dr. Noll was asked why he did not conduct

an analysis of recruits who chose to play professionally in these

leagues, he replied that too few had ever done so to conduct such

an analysis.  <u>Id.</u> 484:19-485:13 ("It would be hard to do an

analysis of zero.").  He also noted that many recruits may not

even be given an opportunity to play in these leagues.  <u>Id.</u>

482:14-:17 ("The opportunity is not given to very many high school

athletes to play in Europe.").  What's more, none of these leagues

offers the same opportunity to earn a higher education that FBS

football and Division I basketball schools provide.  For all of

these reasons, the Court finds that there are no professional

football or basketball leagues capable of supplying a substitute

for the bundle of goods and services that FBS football and

Division I basketball schools provide.  These schools comprise a

relevant college education market, as described above.

B.   Group Licensing Market

Professional athletes often sell group licenses to use their

names, images, and likenesses in live game telecasts, videogames,

game re-broadcasts, advertisements, and other archival footage.[4]

Plaintiffs allege that, in the absence of the NCAA's challenged

rules, FBS football and Division I basketball players would also

be able to sell group licenses for the use of their names, images,

---

[4] Plaintiffs presented some evidence at trial of a market for
licenses to use student-athletes' names, images, and likenesses in other
merchandise, such as jerseys and bobbleheads.  The Court does not
address this market because Plaintiffs previously abandoned all of their
claims related to such markets.  Docket No. 827, June 20, 2013 Hrg. Tr.
54:13-:16.  In addition, the evidence they presented at trial regarding
merchandise-related licenses did not constitute proof of a market for
<u>group</u> licenses but, rather, only <u>individual</u> licenses.

United States District Court<br>For the Northern District of California

and likenesses.  Specifically, they contend that members of certain FBS football and Division I basketball teams would be able to join together to offer group licenses, which they would then be able to sell to their respective schools, third-party licensing companies, or media companies seeking to use student-athletes' names, images, and likenesses.  Plaintiffs have identified three submarkets within this broader group licensing market: (1) a submarket for group licenses to use student-athletes' names, images, and likenesses in live football and basketball game telecasts; (2) a submarket for group licenses to use student-athletes' names, images, and likenesses in videogames; and (3) a submarket for group licenses to use student-athletes' names, images, and likenesses in game re-broadcasts, advertisements, and other archival footage.

### 1.   Submarket for Group Licenses to Use Student-Athletes' Names, Images, and Likenesses in Live Game Telecasts

The Court finds that a submarket exists in which television networks seek to acquire group licenses to use FBS football and Division I basketball players' names, images, and likenesses in live game telecasts.  Television networks frequently enter into licensing agreements to use the intellectual property of schools, conferences, and event organizers -- such as the NCAA or a bowl committee -- in live telecasts of football and basketball games. In these agreements, the networks often seek to acquire the rights to use the names, images, and likenesses of the participating student-athletes during the telecast.  For instance, the NCAA's 1994 licensing agreement granting CBS the rights to telecast the

United States District Court
For the Northern District of California

Division I men's basketball tournament every year from 1995 to 2002 includes a "Name & Likeness" provision that states:

> The Network, its sponsors, their advertising representatives and the stations carrying the telecasts of the games will have the right to make appropriate references (including without limitation, use of pictures) to NCAA and the universities and colleges of the teams, the sites, the games and the <u>participants in and others identified with the games</u> and in the telecasting thereof, provided that the same do not constitute endorsements of a commercial product.

Ex. 2104 at 16 (emphasis added).  A 1999 agreement between the NCAA and CBS for the rights to telecast certain Division I basketball games contains a "Name & Likeness" provision with nearly identical language.  Ex. 2116 at 17 (granting the "right to make appropriate references (including without limitation, use of pictures) to . . . the <u>participants in and others identified with the games</u>" (emphasis added)).  An agreement between the FBS conferences, the University of Notre Dame, and Fox Broadcasting Company for the rights to telecast certain 2007, 2008, and 2009 bowl games similarly provides that the event organizer will be solely responsible for ensuring that Fox has "the rights to use the name and likeness, photographs and biographies of all participants, game officials, cheerleaders" and other individuals connected to the game.  Ex. 2162 at 9.  Plaintiffs also provided other contracts containing similar language.  <u>See, e.g.</u>, Ex. 2230 at 10 (granting the broadcaster "all name and likeness rights of all participants, officials, competing teams and any other persons connected with the Events that are reasonable or necessary for the Telecast of the Events"); Ex. 3078 at 2-3 (providing that the Big 10 would use "reasonable commercial efforts" to obtain from any

14

**United States District Court**
For the Northern District of California

non-conference opponent the "right . . . to use its respective players' names, likenesses, and that school's trademarks, logos and other items in promoting, advertising and Telecasting any such game"). These contracts demonstrate that there is a demand for these rights among television networks.

Plaintiffs' broadcasting industry expert, Edwin Desser, confirmed that provisions like these are common and that they have economic value to television networks. Trial Tr. 651:9-:11, 699:18-700:3, 681:18-:23 ("If you're running a business like a television network, a broadcast station, you would prefer to have consents, and you would like to have somebody stand behind those consents so that you don't have to worry about somebody coming after you later with a claim."). Thus, a market for these rights exists. Plaintiffs also demonstrated that this is a market for group licenses -- not individual licenses. Mr. Desser testified that a "television sports agreement is a bundle of rights and responsibilities that are all interrelated and that, you know, create value, provide comfort, and are [] integrated into the agreement." Id. 658:14-:19. A license to use an individual student-athlete's name, image, and likeness during a game telecast would not have any value to a television network unless it was bundled with licenses to use every other participating student-athlete's name, image, and likeness.

The NCAA's broadcasting industry expert, Neal Pilson, testified that sports broadcasters need not acquire the rights to use student-athletes' names, images, and likenesses and that the primary reason they enter into licensing agreements with event organizers is to gain exclusive access to the facility where the

**United States District Court**
For the Northern District of California

event will occur.  Trial Tr. 720:5-:17.  This testimony is not

convincing.  Mr. Pilson admitted that broadcasters must acquire

certain rights even from visiting teams who do not control access

to the event facility.  Id. 803:5-804:8.  He also acknowledged

that broadcasting agreements -- like those quoted above --

sometimes refer expressly to name, image, and likeness "rights."

Id. 805:2-:16.  Accordingly, the Court finds that, absent the

challenged NCAA rules, teams of FBS football and Division I

basketball players would be able to create and sell group licenses

for the use of their names, images, and likenesses in live game

telecasts.

> **2.    Submarket for Group Licenses to Use Student-Athletes' Names, Images, and Likenesses in Videogames**

Like television networks, videogame developers would seek to

acquire group licenses to use the names, images, and likenesses of

FBS football and Division I basketball players if the NCAA did not

prohibit student-athletes from selling such licenses. EA seeks to

make all of its sports-themed videogames "as authentic as

possible."  Trial Tr. 1656:7 (Linzner).  One of the company's vice

presidents, Joel Linzner, explained, "We have found that it is

pleasing to our customers to be able to use the real athletes

depicted as realistically as possible and acting as realistically

as possible."  Id. 1658:3-:6; see also Ex. 2007 at 50-54

(describing demand for use of student-athletes' names, images, and

likenesses in videogames).  To do this, the company typically

negotiates licenses with professional sports leagues and teams to

use their trademarks, logos, and other intellectual property in

videogames.  Trial Tr. 1656:10-1657:25.  It also negotiates with

groups of professional athletes for licenses to use their names, images, and likenesses.  Id.  EA would be interested in acquiring the same rights from student-athletes in order to produce college sports-themed videogames, if it were permitted to do so.  Id. 1669:24-1670:24.  Accordingly, the Court finds that, absent the challenged NCAA rules, there would be a demand among videogame developers for group licenses to use student-athletes' names, images, and likenesses.

The NCAA asserts that such demand would not exist because it has ceased licensing its intellectual property for use in videogames, making it unlikely that any developer would seek to develop a videogame using the names, images, and likenesses of student-athletes.  This assertion is not supported by the trial record.  Although the NCAA recently declined to renew its license with EA, it has not presented any evidence suggesting that it will never enter into such an agreement again in the future.  None of its current bylaws preclude it from entering into such an agreement.  Furthermore, the evidence presented at trial demonstrates that, prior to this litigation, the NCAA found it profitable to license its intellectual property for use in videogames.  Indeed, it continued to renew its annual licensing agreement with EA, even as the company evaded the NCAA's rules prohibiting it from using student-athletes' images and likenesses in videogames.  Throughout the late 2000s, EA's NCAA-branded videogames featured playable avatars that could easily be identified as real student-athletes despite the NCAA's express prohibition on featuring student-athletes in videogames.  The EA avatars played the same positions as their real-life counterparts,

United States District Court
For the Northern District of California

wore the same jersey numbers and uniform accessories, haled from the same home state, and shared the same height, weight, handedness, and skin color.  Trial Tr. 27:14-28:11 (O'Bannon); 568:6-569:24 (Prothro); 930:5-931:7 (Rascher).  For all of these reasons, the Court finds that a submarket would exist for group licenses to use student-athletes' names, images, and likenesses in videogames if student-athletes were permitted to receive compensation for such licenses.

> 3.   Submarket for Group Licenses to Use Student-Athletes' Names, Images, and Likenesses in Game Re-Broadcasts, Advertisements, and Other Archival Footage

Plaintiffs have shown that television networks, advertisers, and third-party licensing companies seek to use archival footage of student-athletes in game re-broadcasts, commercials, and other products.  Several of the live telecasting agreements discussed above included provisions granting the television network the rights to use archival footage, as well.  See, e.g. Ex. 3078 at 2-3 (granting the Big 10 Network the rights to use certain student-athletes' names and likenesses in "promoting, advertising and Telecasting" a game); Ex. 2230 at 2 (granting Fox Sports Net the "right to re-Telecast the Selected Events," the "right to distribute highlights of the Selected Events," and the specific right to use the "names and likenesses of the players" to promote certain games as well as the network itself).  Tyrone Prothro, a former wide receiver for the University of Alabama, saw footage in a commercial of a famous catch that he made during a game.  Trial Tr. 565:24-566:8.  Finally, one of the NCAA's vice presidents, Mark Lewis, established that the NCAA has licensed all of its

**United States District Court**
For the Northern District of California

archival footage from past NCAA championships to a third-party
licensing company, T3Media, which acts as the association's agent
in licensing that footage for use in game re-broadcasts,
advertisements, and any other products.  <u>Id.</u> 3206:13-:25.
Although T3Media is not permitted to license footage of current
student-athletes, it still acquires the rights to this footage
while the student-athletes are in school for later use (after
acquiring the student-athletes' consent).  This is enough to show
that demand for this footage exists.  Based on this evidence, the
Court finds that, absent the NCAA's challenged rules, there would
be a demand among television networks, third-party licensing
companies, and advertisers for group licenses to use student-
athletes in game re-broadcasts, advertisements, and other archival
footage.

III. The Challenged Restraint

NCAA rules prohibit current student-athletes from receiving
any compensation from their schools or outside sources for the use
of their names, images, and likenesses in live game telecasts,
videogames, game re-broadcasts, advertisements, and other footage.
Plaintiffs contend that these rules restrain trade in the two
markets identified above.

The NCAA imposes strict limits on the amount of compensation
that student-athletes may receive from their schools.  Most
importantly, it prohibits any student-athlete from receiving
"financial aid based on athletics ability" that exceeds the value
of a full "grant-in-aid."  Ex. 2340 at 208.  The bylaws define a
full "grant-in-aid" as "financial aid that consists of tuition and
fees, room and board, and required course-related books."  <u>Id.</u> at

207.  This amount varies from school to school and from year to year.  Any student-athlete who receives financial aid in excess of this amount forfeits his athletic eligibility.  Id. at 208.

In addition to this cap on athletics-based financial aid, the NCAA also imposes a separate cap on the total amount of financial aid that a student-athlete may receive.  Specifically, it prohibits any student-athlete from receiving financial aid in excess of his "cost of attendance."  Ex. 2340 at 208.  Like the term "grant-in-aid," the term "cost of attendance" is a school-specific figure defined in the bylaws.  It refers to "an amount calculated by [a school]'s financial aid office, using federal regulations, that includes the total cost of tuition and fees, room and board, books and supplies, transportation, and other expenses related to attendance" at that school.  Id. at 206. Because it covers the cost of "supplies, transportation, and other expenses," the cost of attendance is generally higher than the value of a full grant-in-aid.  The gap between the full grant-in-aid and the cost of attendance varies from school to school but is typically a few thousand dollars.[5]

The NCAA also prohibits any student-athlete from receiving compensation from outside sources based on his athletic skills or ability.[6]  Thus, while a student-athlete may generally earn money

[5] Under certain circumstances, a student-athlete who has an unexpected "special financial need" may be permitted to receive additional aid beyond the cost of attendance.  Trial Tr. 2144:25-2145:14 (Petr).  This additional aid comes from his school's "student assistance fund" and could include money for "needed clothing, needed supplies, a computer," or other academic needs.  Ex. 2340 at 238.

[6] The NCAA's bylaws contain a minor exception permitting student-athletes to receive limited compensation for educational expenses "awarded by the U.S. Olympic Committee or a U.S. national governing body."  Ex. 2340 at 211.

from any "on- or off-campus employment" unrelated to his athletic ability, he may not receive "any remuneration for value or utility that the student-athlete may have for the employer because of the publicity, reputation, fame or personal following that he or she has obtained because of athletics ability." Id. at 211. Student-athletes are also barred from endorsing any commercial product or service while they are in school, regardless of whether or not they receive any compensation to do so. Id. at 86.

Dr. Noll testified that these rules restrain competition among schools for recruits. If the grant-in-aid limit were higher, schools would compete for the best recruits by offering them larger grants-in-aid. Similarly, if total financial aid was not capped at the cost of attendance, schools would compete for the best recruits by offering them compensation exceeding the cost of attendance. This competition would effectively lower the price that the recruits must pay for the combination of educational and athletic opportunities that the schools provide. As Dr. Noll explained, "if the scholarship value is suppressed, that means the net price paid by a student-athlete to attend college is higher." Trial Tr. 105:24-107:1. Thus, he explained, because the NCAA has the power to and does suppress the value of athletic scholarships through its grant-in-aid rules, it has increased the prices schools charge recruits. Id. 127:20-129:13.

Dr. Noll's opinions are consistent with the opinions of the NCAA's own economic expert, Dr. Daniel Rubinfeld, who testified that the NCAA operates as a "joint venture which imposes restraints" on trade. Id. 2922:20-:21. Dr. Rubinfeld specifically acknowledged that "the NCAA does impose a restraint,

United States District Court
For the Northern District of California

the restraint we have been discussing in this case." Id.
2921:8-:9.  Although he opined that this restraint was lawful
because it serves procompetitive purposes, he never denied that
the NCAA restricts competition among its members for recruits.  In
fact, his own economics textbook specifically refers to the NCAA
as a "cartel," which he defined during his testimony as "a group
of firms that impose a restraint." Id. 2975:3-:4.  Although the
NCAA's other economic expert, Dr. Lauren Stiroh, testified that
the NCAA does not restrain competition in any market, her opinions
were based on the theory that anticompetitive effects cannot arise
unless consumers in a "downstream market" are harmed.  Id.
2766:16-:22.  In this case, those consumers would be people who
watch or attend college football and basketball games or purchase
goods using the names, images, and likenesses of student-athletes.
The Court rejects Dr. Stiroh's theory that Plaintiffs cannot show
any anticompetitive effects caused by the alleged restraint
without demonstrating some harm to these consumers.  The evidence
cited above demonstrates that student-athletes themselves are
harmed by the price-fixing agreement among FBS football and
Division I basketball schools.  In the complex exchange
represented by a recruit's decision to attend and play for a
particular school, the school provides tuition, room and board,
fees, and book expenses, often at little or no cost to the school.
The recruit provides his athletic performance and the use of his
name, image, and likeness.  However, the schools agree to value
the latter at zero by agreeing not to compete with each other to
credit any other value to the recruit in the exchange.  This is an
anticompetitive effect.  Thus, the Court finds that the NCAA has

the power -- and exercises that power -- to fix prices and restrain competition in the college education market that Plaintiffs have identified.

Dr. Noll testified that elite football and basketball recruits -- the buyers in Plaintiffs' college education market -- could also be characterized as sellers in an almost identical market for their athletic services and licensing rights.  Id. 143:21-144:8.  In that market, FBS football and Division I basketball schools are buyers seeking to acquire recruits' athletic services and licensing rights, paying for them with full grants-in-aid but no more.  From that perspective, the NCAA's restrictions on student-athlete compensation still represent a form of price fixing but create a buyers' cartel, rather than a sellers' cartel.  Just as in Plaintiffs' college education market, schools would engage in price competition in the market for recruits' athletic services and licensing rights if there were no restrictions on student-athlete compensation; the only difference would be that they would be viewed as buyers in the transactions rather than sellers.  Thus, because Plaintiffs' college education market is essentially a mirror image of the market for recruits' athletic services and licensing rights, the Court finds that the NCAA exercises market power, fixes prices, and restrains competition in both markets.

IV.  Asserted Purposes of the Restraint

The NCAA asserts that the challenged restrictions on student-athlete compensation are reasonable because they are necessary to preserve its tradition of amateurism, maintain competitive balance among FBS football and Division I basketball teams, promote the

integration of academics and athletics, and increase the total output of its product.

A.   Preservation of Amateurism

The NCAA asserts that its challenged rules promote consumer demand for its product by preserving its tradition of amateurism in college sports.  It relies on historical evidence, consumer survey data, and lay witness testimony to support this assertion. The Court does not find this evidence sufficient to justify the challenged restraint.

Dr. Emmert testified that "the rules over the hundred-year history of the NCAA around amateurism have focused on, first of all, making sure that any resources that are provided to a student-athlete are only those that are focused on his or her getting an education."  Trial Tr. 1737:8-:12.  The historical evidence presented at trial, however, demonstrates that the association's amateurism rules have not been nearly as consistent as Dr. Emmert represents.  In fact, these rules have changed numerous times since the NCAA -- then known as the Intercollegiate Athletic Association (IAA) -- enacted its first set of bylaws in 1906.  The IAA's first bylaws governing amateurism provided,

> No student shall represent a College or
> University in an intercollegiate game or
> contest who is paid or receives, directly or
> indirectly, any money or financial concession
> or emolument as past or present compensation
> for, or as prior consideration or inducement
> to play in, or enter any athletic contest,
> whether the said remuneration be received
> from, or paid by, or at the instance of any
> organization, committee or faculty of such
> College or University, or any individual
> whatever.

Stip. Undisputed Facts ¶¶ 6-7.  This rule would have barred even today's athletic scholarships.  Despite the breadth of this written prohibition, the IAA's member schools recruited students using "player subsidies" and other illicit forms of payment.  <u>Id.</u> ¶ 10.

In 1916, after changing its name to the NCAA, the association adopted a new rule stating that an amateur was "one who participates in competitive physical sports only for pleasure, and the physical, mental, moral, and social benefits directly derived therefrom."  <u>Id.</u>  The NCAA amended that definition in 1922 to define an amateur as "one who engages in sport solely for the physical, mental or social benefits he derives therefrom, and to whom the sport is nothing more than an avocation."  <u>Id.</u> ¶ 14.

Most schools continued to ignore these rules for the first few decades of the NCAA's existence.  <u>Id.</u> ¶¶ 17-20.  Then, in 1948, the NCAA enacted a strict set of rules known as the "Sanity Code" designed to curb violations of its bylaws.  <u>Id.</u> ¶ 20.  The Sanity Code "required that financial aid be awarded without consideration of athletics ability," which, again, would have prohibited today's athletic scholarships.  <u>Id.</u>  The NCAA repealed the Sanity Code the following year and, in 1952, created its first enforcement committee to address and prevent rules infractions. <u>Id.</u> ¶ 24.

In 1956, the NCAA enacted a new set of amateurism rules permitting schools to award athletic scholarships to student-athletes.  <u>Id.</u> ¶ 25.  These rules established a national standard governing athletics-based financial aid and imposed a limit on the size of athletic scholarships that schools were permitted to

offer.  Id.  That limit -- now known as a full "grant-in-aid" --
precluded student-athletes from receiving any financial aid beyond
that needed for "commonly accepted educational expenses,"
including tuition, fees, room and board, books, and cash for
incidental expenses such as laundry.  Id.

The NCAA continued to revise its scholarship limits after
implementing the grant-in-aid limit in 1956. In 1975, for
instance, it removed the cash for incidental expenses from the
full grant-in-aid.  Walter Byers Depo. 21:21-22:14, 24:6-:17.  It
amended the grant-in-aid rules again in 2004 by allowing student-
athletes who receive federal Pell grants to receive total
assistance in excess of a full grant-in-aid and even in excess of
the cost of attendance.  Trial Tr. 161:10-162:4 (Noll); Ex. 2340
at 208.  As a result, student-athletes who qualify for a Pell
grant are now eligible to receive a full grant-in-aid plus the
value of their Pell grant -- currently, just over $5,500 -- even
if that total exceeds the cost of attendance.  Trial Tr.
1573:8-:16 (Pastides); Ex. 2340 at 208.  The NCAA amended its
rules again in 2013 to permit different levels of compensation for
recruits in different sports.  The new rules permit Division I
tennis recruits to earn up to ten thousand dollars per year in
prize money from athletic events before they enroll in college.
Ex. 2340 at 75.  Other Division I recruits, in contrast, remain
barred from receiving any prize money in excess of their actual
and necessary costs of competing in an event.  Id.

The amateurism provision in the NCAA's current constitution
states that student-athletes "shall be amateurs in an
intercollegiate sport, and their participation should be motivated

primarily by education and by the physical, mental and social benefits to be derived.  Student participation in intercollegiate athletics is an avocation, and student-athletes should be protected from exploitation by professional and commercial enterprises." Ex. 2340 at 18.  This conception of amateurism stands in stark contrast to the definitions set forth in the NCAA's early bylaws.  Indeed, education -- which the NCAA now considers the primary motivation for participating in intercollegiate athletics -- was not even a recognized motivation for amateur athletes during the years when the NCAA prohibited athletic scholarships.  The Court finds that the NCAA's current restrictions on student-athlete compensation, which cap athletics-based financial aid below the cost of attendance, are not justified by the definition of amateurism set forth in its current bylaws.

Although the NCAA sought to establish the importance of these restrictions by asserting that they increase consumer interest in FBS football and Division I basketball, its evidence supporting this assertion is unpersuasive.  It presented testimony from a survey research expert, Dr. J. Michael Dennis, who conducted a survey of consumer attitudes concerning college sports in 2013.  Dr. Dennis surveyed 2,455 respondents across the United States and observed that they generally opposed the idea of paying college football and basketball players.  Trial Tr. 2613:24-2614:6.  His survey contained an initial question that apparently affected many respondents' answers to the survey's substantive questions.  The initial open-ended question asked respondents what they had heard about student-athletes being paid.  Id. 2716:15-2717:7; Exs. 2629,

2630.  Plaintiffs' survey expert, Hal Poret, noted that the "single most common response" to this question was that respondents had heard about student-athletes receiving some form of illegal or illicit payments.  Trial Tr. 2714:2-:20; Ex. 2629. Many other respondents mentioned paying student-athletes a salary. Trial Tr. 2714:21-2715:2 (Poret); Ex. 2630.  Although Dr. Dennis testified that his results remained the same even after he removed these specific 274 respondents from his sample, the fact that these respondents expressly mentioned illicit payments or salaries at the start of the survey strongly suggests that the question primed respondents to think about such illicit payments when answering the other survey questions.

The NCAA relies heavily on the fact that sixty-nine percent of respondents to Dr. Dennis's survey expressed opposition to paying student-athletes while only twenty-eight percent favored paying them.  Trial Tr. 2604:21-2605:2; Ex. 4045 at 19.  These responses, however, are not relevant to the specific issues raised here and say little about how consumers would actually behave if the NCAA's restrictions on student-athlete compensation were lifted.  Although Dr. Dennis testified that these responses were consistent with those observed in other polls and surveys concerning college sports, he acknowledged that those other studies may "vary in their quality or their methodology and their implementation."  Trial Tr. 2641:24-2642:11; Ex. 4045 at 20. Accordingly, the Court does not find these findings to be credible evidence that consumer demand for the NCAA's product would decrease if student-athletes were permitted to receive compensation.

United States District Court
For the Northern District of California

The most relevant questions in Dr. Dennis's survey asked respondents specifically whether they would be more or less likely to watch, listen to, or attend college football and basketball games if student-athletes were paid.  Thirty-eight percent of all respondents stated they would be less likely to watch, listen to, or attend games if student-athletes were paid $20,000 per year. Ex. 4045 at 23.  Forty-seven percent stated that they would be less likely to watch, listen to, or attend games if student-athletes were paid $50,000 per year.  Id.  In contrast, only about four or five percent of respondents said that they would be more likely to watch, listen to, or attend games if student-athletes were paid $20,000 or $50,000 per year.  Trial Tr. 2651:14-2652:8 (Dennis).  The remaining respondents stated that they would be no more or less likely to watch, listen to, or attend games if student-athletes were paid these amounts.  Id.

While these questions are more germane to consumer behavior than the survey's findings about respondents' general opinions about compensating student-athletes, they still do not credibly establish that the specific rules challenged here contribute to consumer demand.  Dr. Dennis did not ask respondents for their opinions about providing student-athletes with a share of licensing revenue generated from the use of their own names, images, and likenesses.  Id. 2669:15-:18 (Dennis); 2709:6-:18 (Poret).  Nor did he ask their opinions about paying student-athletes the full cost of attendance, or any amount less than $20,000 per year.  Dr. Dennis also failed to ask respondents how their behavior would be affected if small or large amounts of compensation for the use of student-athletes' names, images, and

likenesses were held in trust for them until they left school --
one of Plaintiffs' proposed alternatives here.  Id. 2686:18-2687:3
(Dennis); 2711:21-2712:9, 2718:19-2714:12 (Poret).

In addition, numerous respondents provided internally
inconsistent responses to different survey questions.  Eighty-
three of the respondents who said that they favored paying
student-athletes also stated that they would be less likely to
watch, listen to, or attend games if student-athletes were paid.
Id. 2729:25-2730:9.  Another thirty-three respondents stated that
they opposed paying student-athletes but said that they would be
more likely to watch, listen to, or attend games if student-
athletes were paid.  Id.  These responses suggest that some
respondents did not understand or did not take seriously some of
the survey questions and illustrate the limits of Dr. Dennis's
conclusions.

Based on these flaws in Dr. Dennis's survey, the Court finds
that it does not provide credible evidence that demand for the
NCAA's product would decrease if student-athletes were permitted,
under certain circumstances, to receive a limited share of the
revenue generated from the use of their own names, images, and
likenesses.  Although Plaintiffs did not provide their own opinion
survey to counter Dr. Dennis's survey, the Court notes that the
NCAA produced Dr. Dennis's survey as a rebuttal report, which may
have limited Plaintiffs' opportunity to commission such a survey.
What's more, Dr. Dennis himself acknowledged that it would be
extremely difficult to ask the specific kinds of detailed survey
questions most relevant to this case -- specifically, those

United States District Court
For the Northern District of California

relating to varying amounts and methods of payment for the use of student-athletes' names, images, and likenesses.

Plaintiffs presented other evidence illustrating the limits of opinion surveys as predictors of consumer demand for sports-entertainment products.  Their expert on sports management, Dr. Daniel Rascher, described how opinion surveys conducted between 1970 and the present consistently showed that the public overwhelmingly opposed rising baseball player salaries but continued to watch, listen to, and attend Major League Baseball games at a high rate even as player salaries rose during this period.  Id. 901:12-903:24; Ex. 2549.  He specifically noted that many people felt that the removal of the reserve clause in the 1970s -- which ultimately enabled players to become free agents, thus leading to higher salaries -- would undermine the popularity of professional baseball.  However, despite these predictions and fans' stated opposition to rising salaries, Major League Baseball revenues continued to rise after the removal of the reserve clause.  Id. 903:13-:16 ("So even though the fans in polls say, 'Hey, we don't want the players to make so much money,' ultimately they continue to watch on television, you know, buy tickets, concessions, the whole thing." (internal quotation marks added)).  Dr. Rascher highlighted another survey showing public opposition to the decision of the International Olympic Committee (IOC) to permit professional athletes to compete in the Olympics, even as consumer interest in the Olympics remained high and revenues generated by the event continued to rise during the same period.  Id. 904:22-905:18; see also id. 226:15-227:17 (testimony of Dr. Noll that the Olympics are "much more popular now than they were

31

[when] amateur"). In addition to the Olympics, Dr. Rascher also pointed to various other formerly amateur sports associations -- such as those governing rugby and tennis -- whose events grew in popularity after they began to allow their athletes to accept payments. Id. 903:25-904:21.

Although the NCAA presented evidence showing that the Nielsen ratings for professional baseball and the Olympics have declined since the 1970s and 1980s, this does not cast doubt on Dr. Rascher's findings. As Dr. Rascher explained, Nielsen ratings measure the share of the population watching a particular event, not the raw number of viewers. Id. 986:7-:10, 1019:20-1020:9. As a result, Nielsen ratings have declined for virtually every television program or sporting event over the past few decades as the viewing population and number of television channels has grown. Id. Even a single event as popular as the Super Bowl, which has seen a dramatic increase in the raw number of viewers over the years, has experienced flat Nielsen ratings for several decades. Id. 1024:18-1026:7, 1025:6-:15.

Other historical evidence suggests that the NCAA's restrictions on student-athlete compensation have not contributed significantly to the popularity of FBS football and Division I basketball. The NCAA's former president, the late Walter Byers, testified during his 2007 deposition, for instance, that the NCAA's decision to remove incidental expenses from the grant-in-aid coverage in 1975 was not motivated by a desire to increase consumer demand for its product. Byers Depo. 21:21-22:14, 24:6-:17. In fact, he specifically noted that NCAA sports experienced a tremendous growth in popularity during the period

United States District Court
For the Northern District of California

between 1956 and 1975 when grants-in-aid still covered the full cost of attendance.  Id. 25:15-26:8.[7]  None of the evidence in the trial record suggests that the removal of incidental expenses or any other changes to the grant-in-aid limit had an impact on the popularity of college sports during this time.

Thus, the Court finds that the NCAA's restrictions on student-athlete compensation are not the driving force behind consumer demand for FBS football and Division I basketball-related products.  Rather, the evidence presented at trial suggests that consumers are interested in college sports for other reasons.  Mr. Pilson testified, for instance, that the popularity of college sports is driven by feelings of "loyalty to the school," which are shared by both alumni and people "who live in the region or the conference."  Trial Tr. 757:20-758:13.  Similarly, Christine Plonsky, an associate athletics director at the University of Texas (UT), testified that UT sports would remain popular as long as they had "anything in our world to do with the University of Texas."  Id. 1414:23-:24; see also id. 1376:13 ("Longhorns are pretty loyal.").  Dr. Emmert himself noted that much of the popularity of the NCAA's annual men's basketball tournament stems from the fact that schools from all over the country participate "so the fan base has an opportunity to cheer for someone from their region of the country."  Id. 1757:1-:9; see also id. ("It's become extremely popular at least in part because there's someone

---

[7] The NCAA's objections to this testimony under Federal Rules of Evidence 602 and 701 are overruled.  Walter Byers was the executive director of the NCAA between 1956 and 1975, Stip. Undisputed Facts ¶ 23, and therefore had personal knowledge of the popularity of NCAA sports during this period.

United States District Court
For the Northern District of California

from your neighborhood likely to be in the tournament."). He testified that college bowl games have the same appeal. Id. 1757:16-:19. This evidence demonstrates that the NCAA's restrictions on student-athlete pay is not the driving force behind consumer interest in FBS football and Division I basketball. Thus, while consumer preferences might justify certain limited restraints on student-athlete compensation, they do not justify the rigid restrictions challenged in this case.

B.   Competitive Balance

The NCAA asserts that its challenged restraints are reasonable and procompetitive because they are needed to maintain the current level of competitive balance among FBS football and Division I basketball teams. It further asserts that it must maintain this particular level of competitive balance in order to sustain consumer demand for its product.

The Court finds that the NCAA's current restrictions on student-athlete compensation do not promote competitive balance. As Dr. Noll testified, since the 1970s, numerous sports economists have studied the NCAA's amateurism rules and nearly all have concluded that the rules have no discernible effect on the level of competitive balance. Trial Tr. 229:8-234:2. He noted that one of the more recent articles addressing the subject, a 2007 study by economist Jim Peach published in the Social Science Journal, found that there is "'little evidence that the NCAA rules and regulations have promoted competitive balance in college athletics and no a priori reason to think that eliminating the rules would change the competitive balance situation.'" Id. 232:22-233:1 (quoting Peach article). Dr. Rascher reached the same conclusion

United States District Court
For the Northern District of California

34

based on his review of the economics literature.  Id. 920:9-
922:16.  He specifically cited one of the leading textbooks in the
field of sports economics, by Rod Fort, which found that the
NCAA's restrictions on student-athlete pay do not appear to have
any impact on competitive balance.  Id. 921:10-:18.

The academic consensus on this issue is not surprising given
that many of the NCAA's other rules and practices suggest that the
association is unconcerned with achieving competitive balance.
Several witnesses testified that the restrictions on student-
athlete compensation lead many schools simply to spend larger
portions of their athletic budgets on coaching, recruiting, and
training facilities.  Id. 296:14-297:18 (Noll); 865:11-866:2,
910:2-911:7 (Rascher).  In the major conferences, for instance,
the average salary for a head football coach exceeds $1.5 million.
Id. 1151:20-1152:14 (Staurowsky).  The fact that high-revenue
schools are able to spend freely in these other areas cancels out
whatever leveling effect the restrictions on student-athlete pay
might otherwise have.  The NCAA does not do anything to rein in
spending by the high-revenue schools or minimize existing
disparities in revenue and recruiting.  In fact, Dr. Emmert
specifically conceded that it is "not the mission of the
association to . . . try and take away the advantages of a
university that's made a significant commitment to facilities and
tradition and all of the things that go along with building a
program."  Trial Tr. 1774:23-1775:6.

This same sentiment underlies the NCAA's unequal revenue
distribution formula, which rewards the schools and conferences
that already have the largest athletic budgets.  Revenues

United States District Court
For the Northern District of California

generated from the NCAA's annual Division I men's basketball tournament are distributed to the conferences based on how their member schools performed in the tournament in recent years. Docket No. 207, Stip. Re: Broadcast Money, at ¶ 10.  As a result, the major conferences -- and the highest revenue schools -- typically receive the greatest payouts, which hinders, rather than promotes, competitive balance.

The only quantitative evidence that the NCAA presented related to competitive balance is a cursory statistical analysis conducted by Dr. Rubinfeld comparing the levels of competitive balance in FBS football and Division I basketball to the levels in the NFL and NBA.  Nothing in Dr. Rubinfeld's analysis suggests that the NFL and NBA -- each of which has fewer teams than Division I -- provide an appropriate baseline for comparing competitive balance.  More importantly, his analysis does not suggest that the NCAA's challenged rules actually produce the levels of competitive balance he observed.

Even if the NCAA had presented some evidence of a causal connection between its challenged rules and its current level of competitive balance, it has not shown that the current level of competitive balance is necessary to maintain its current level of consumer demand.  Trial Tr. 228:20-229:2 (Noll).  It is undisputed that the ideal level of competitive balance for a sports league is somewhere between perfect competitive balance (where every team has an equal chance of winning every game) and perfect imbalance (where every game has a predictable outcome).  Id. 453:8-:22 (Noll); 3127:2-:21 (Rubinfeld).  The NCAA has not even attempted to identify the specific level of competitive balance between

those extremes that is ideal or necessary to sustain its current popularity.  Given the lack of such evidence in the record, the Court finds that the NCAA's challenged rules are not needed to achieve a level of competitive balance necessary, or even likely, to maintain current levels of consumer demand for FBS football and Division I basketball.

C.   Integration of Academics and Athletics

The NCAA contends that its restrictions on student-athlete compensation are reasonable and procompetitive because they promote the integration of academics and athletics.  In particular, it asserts that its challenged rules ensure that student-athletes are able to obtain all of the educational benefits that their schools provide and participate in their schools' academic communities.  According to the NCAA, the integration of academics and athletics increases the quality of the educational services its member schools provide to student-athletes in the college education market that Plaintiffs have identified.

For support, the NCAA relies on evidence showing that student-athletes receive both short-term and long-term benefits from being student-athletes.  One of its experts, Dr. James Heckman, testified that participation in intercollegiate athletics leads to better academic and labor market outcomes for many student-athletes as compared to other members of their socioeconomic groups.  Trial Tr. 1493:13-1494:25.  Dr. Heckman found that these benefits are particularly pronounced for student-athletes from disadvantaged backgrounds.  Id.  The NCAA presented additional evidence, including its own data on student-athlete

United States District Court
For the Northern District of California

**United States District Court**
For the Northern District of California

graduation rates, to show that student-athletes enjoy substantial

benefits from participating in intercollegiate athletics.

However, none of this data nor any of Dr. Heckman's observations

suggests that student-athletes benefit specifically from the

restrictions on student-athlete compensation that are challenged

in this case.  To the contrary, Dr. Heckman specifically testified

that the long-term educational and academic benefits that student-

athletes enjoy stem from their increased access to financial aid,

tutoring, academic support, mentorship, structured schedules, and

other educational services that are unrelated to the challenged

rules in this case.  Id. 1512:23-1516:17.  FBS football and

Division I basketball schools offer most of these services to

their student-athletes independently and are not compelled to do

so by the NCAA, particularly not by the challenged rules.

        The same is true of the various other benefits of integration

that the NCAA has identified.  For instance, the benefits that

student-athletes derive from interacting with faculty and non-

student-athletes on campus are achieved mostly through the NCAA's

rules requiring student-athletes to attend class and meet certain

academic requirements.  They are also achieved through the

association's rules prohibiting schools from creating dorms solely

for student-athletes or from requiring student-athletes to

practice more than a certain number of hours each week.  None of

these rules is challenged here.

        The only evidence that the NCAA has presented that suggests

that its challenged rules might be necessary to promote the

integration of academics and athletics is the testimony of

university administrators, who asserted that paying student-

athletes large sums of money would potentially "create a wedge" between student-athletes and others on campus.  Id. 1591:2-:20 (Pastides).  These administrators noted that, depending on how much compensation was ultimately awarded, some student-athletes might receive more money from the school than their professors. Student-athletes might also be inclined to separate themselves from the broader campus community by living and socializing off campus.

It is not clear that any of the potential problems identified by the NCAA's witnesses would be unique to student-athletes.  In fact, when the Court asked Dr. Emmert whether other wealthy students -- such as those who come from rich families or start successful businesses during school -- raise all of the same problems for campus relations, he replied that they did.  Id. 1790:18-:22.  It is also not clear why paying student-athletes would be any more problematic for campus relations than paying other students who provide services to the university, such as members of the student government or school newspaper. Nonetheless, the Court finds that certain limited restrictions on student-athlete compensation may help to integrate student-athletes into the academic communities of their schools, which may in turn improve the schools' college education product.

Plaintiffs have produced anecdotal and statistical evidence suggesting that the NCAA's current rules do not serve to integrate FBS football players or Division I basketball players into the academic communities at their schools.  For example, Ed O'Bannon, the former UCLA basketball star, testified that he felt like "an athlete masquerading as a student" during his college years.  Id.

33:11-:14.  Plaintiffs also presented testimony from Dr. Ellen
Staurowsky, a sports management professor, who studied the
experiences of FBS football and Division I basketball players and
concluded that the time demands of their athletic obligations
prevent many of them from achieving significant academic success.
Id. 1175:12-1176:21.  Some of this evidence conflicts with the
NCAA's data on student-athlete graduation rates and Dr. Heckman's
observations surrounding academic outcomes for student-athletes.
However, the Court need not resolve these factual disputes
because, regardless of how they are resolved, the restraints on
student-athlete compensation challenged in this case generally do
not serve to enhance academic outcomes for student-athletes.

         D.   Increased Output

     The NCAA asserts that its challenged rules are reasonable and
procompetitive because they enable it to increase the number of
opportunities available to schools and student-athletes to
participate in FBS football and Division I basketball, which
ultimately increases the number of games that can be played.  It
refers to this increased number of FBS football and Division I
schools, student-athletes, and games as increased output.

     The Court finds that the NCAA's restrictions on student-
athlete compensation do nothing to increase this output.  The
number of schools participating in FBS football and Division I
basketball has increased steadily over time and continues to
increase today.  Stip. Undisputed Facts ¶¶ 42-49.  This is because
participation in FBS football and Division I basketball typically
raises a school's profile and leads to increased athletics-based
revenue.  Trial Tr. 872:1-874:20 (Rascher).  Although Dr. Emmert

and other NCAA and conference officials say that this trend is not the result of increased Division I revenues but, rather, because of schools' philosophical commitment to amateurism, this theory is implausible.  Id. 1783:2-:14; 2080:11-:23 (Delany); 2418:5-:25 (Sankey); 3188:25-3189:17 (Lewis).  Schools in some of the major conferences have specifically undertaken efforts to change the NCAA's existing scholarship rules, which suggests that the rules are not the reason that they choose to participate in Division I. Ex. 2095 at 4 (2013 presentation by representatives of the five major conferences requesting autonomy to raise existing scholarship limits); Ex. 2527 at 2 (2014 letter from Pac 12 urging other major conferences to support rule changes, including raising the grant-in-aid limit).  What's more, there is no evidence to suggest that any schools joined Division I originally because of its amateurism rules.  These schools had numerous other options to participate in collegiate sports associations that restrict compensation for student-athletes, including the NCAA's lower divisions and the NAIA.  Indeed, schools in FCS, Division II, and Division III are bound by the same amateurism provisions of the NCAA's constitution as the schools in Division I.  The real difference between schools in Division I and schools in other divisions and athletics associations, as explained above, is the amount of resources that Division I schools commit to athletics. Thus, while there may be tangible differences between Division I schools and other schools that participate in intercollegiate sports, these differences are financial, not philosophical.

For this reason, the NCAA's assertion that schools would leave FBS and Division I for financial reasons if the challenged

**United States District Court**
For the Northern District of California

restraints were removed is not credible.  The testimony of Dr.
Emmert and various other athletics administrators that most
Division I athletic programs operate at a loss and would not
remain in Division I if the challenged rules were removed
conflicts with the clear weight of the evidence.  Trial Tr.
1784:6-:18 (Emmert); 3188:25-3189:3 (Lewis).  Indeed, some of the
NCAA's own witnesses undermined this claim.  Dr. Harris Pastides,
the president of the University of South Carolina, for instance,
specifically testified that his school "would probably continue to
compete in football and men's basketball" if the challenged
restrictions on student-athlete compensation were lifted.  Id.
1598:23-:25.  The commissioner of Conference USA, Britton
Banowsky, similarly expressed skepticism that universities would
leave Division I if the restrictions were removed.  Id. 2371:25-
2372:20.  Ms. Plonsky also cast doubt on Dr. Emmert's assertion
that most Division I sports programs operate at a loss by noting
that UT's athletics department is not only self-sustaining but, in
fact, generates surplus revenue that funds other university
programs and expenses.  Id. 1385:12-:18, 1465:20-1466:10.  She
indicated that UT was not abnormal in this regard and that the
"vast proportion" of athletics programs across the country are
operated by "self-sourced, self-generated" revenues.  Id. 1467:22-
1468:11.  Mr. Lewis himself acknowledged that the NCAA's revenues,
most of which are distributed back to its member schools and
conferences, have increased in recent years.  Id. 3195:19-3196:3.

Dr. Rascher offered similar testimony and documented that
participation in FBS football and Division I basketball generates
significant revenue and is highly profitable for most schools.

Id. 830:4-831:15.  These revenues are what enable them to spend so much on coaches and training facilities.  Dr. Rascher also noted that most FBS football schools used to spend even more on their student-athletes before the NCAA lowered its team scholarship cap from 105 to eighty-five.  Id. 873:20-874:20.  Furthermore, Dr. Noll testified that some of the schools that currently compete in FBS and Division I do so without providing the maximum amount of financial aid permitted under NCAA rules.

Based on this evidence, the Court finds that schools would not exit FBS football and Division I basketball if they were permitted to pay their student-athletes a limited amount of compensation beyond the value of their scholarships.  The NCAA's challenged restrictions on compensation do not increase the number of opportunities for schools or student-athletes to participate in Division I.

V.   Alternatives to the Restraint

Plaintiffs have proposed three modifications to the NCAA's challenged rules which, they contend, would allow the NCAA to achieve the purposes of its challenged rules in a less restrictive manner: (1) raise the grant-in-aid limit to allow schools to award stipends, derived from specified sources of licensing revenue, to student-athletes; (2) allow schools to deposit a share of licensing revenue into a trust fund for student-athletes which could be paid after the student-athletes graduate or leave school for other reasons; or (3) permit student-athletes to receive limited compensation for third-party endorsements approved by their schools.

The Court finds that Plaintiffs' first proposed alternative -- allowing schools to award stipends -- would limit the anticompetitive effects of the NCAA's current restraint without impeding the NCAA's efforts to achieve its stated purposes, provided that the stipends do not exceed the cost of attendance as that term is defined in the NCAA's bylaws.  A stipend capped at the cost of attendance would not violate the NCAA's own definition of amateurism because it would only cover educational expenses.  Indeed, as noted above, the NCAA's member schools used to provide student-athletes with similar stipends before the NCAA lowered its cap on grants-in-aid.  Byers Depo. 21:21-22:14, 24:6-:17.  Dr. Emmert testified that raising the grant-in-aid limit to cover the full cost of attendance would not violate the NCAA's amateurism rules.  Trial Tr. 1742:15-:18.  Greg Sankey, the executive associate commissioner and chief operating officer of the SEC, expressed the same view during his testimony, as did Dr. Rubinfeld.  Id. 2430:23-:24 (Sankey); 3117:2-:4 (Rubinfeld).

None of the evidence presented at trial suggests that consumer demand for the NCAA's product would decrease if schools were permitted to provide such stipends to student-athletes once again.  Nor does any of the evidence suggest that providing such stipends would hinder any school's efforts to educate its student-athletes or integrate them into the academic community on campus. If anything, providing student-athletes with such stipends would facilitate their integration into academic life by removing some of the educational expenses that they would otherwise have to bear, such as school supplies, which are not covered by a full

grant-in-aid.  Ex. 2340 at 207.  Raising the grant-in-aid cap to allow for such stipends also would not have any effect on the NCAA's efforts to achieve competitive balance or increase its output because, as explained above, its existing restrictions on student-athlete compensation do not advance these goals.

Plaintiffs' second proposed less restrictive alternative -- allowing schools to hold payments in trust for student-athletes -- would likewise enable the NCAA to achieve its goals in a less restrictive manner, provided the compensation was limited and distributed equally among team members.  The NCAA's own witness, Mr. Pilson, testified that he would not be troubled if schools were allowed to make five thousand dollar payments to their student-athletes and that his general concerns about paying student-athletes would be partially assuaged if the payments were held in trust.  Trial Tr. 770:25-771:18.  Stanford's athletic director, Bernard Muir, similarly acknowledged that his concerns about paying student-athletes varied depending on the size of the payments that they would receive.  Id. 254:3-:18 ("Where I set the dollar limit, you know, that varies, but it does concern me when we're talking about six figures, seven figures in some cases.").  This testimony is consistent with Dr. Dennis's general observation that, if the NCAA's restrictions on student-athlete pay were removed, the popularity of college sports would likely depend on the size of payments awarded to student-athletes.  The Court therefore finds that permitting schools to make limited payments to student-athletes above the cost of attendance would not harm consumer demand for the NCAA's product -- particularly if the student-athletes were not paid more or less based on their

athletic ability or the quality of their performances and the payments were derived only from revenue generated from the use of their own names, images, and likenesses.

Holding these limited and equal shares of licensing revenue in trust until _after_ student-athletes leave school would further minimize any potential impact on consumer demand.  Indeed, former student-athletes are already permitted to receive compensation for the use of their names, images, and likenesses in game re-broadcasts and other archival footage of their college performances as long as they enter into such agreements after they leave school.  The popularity of college sports would not suffer if current and future student-athletes were given the opportunity to receive compensation from their schools after they leave college.  Likewise, holding compensation in trust for student-athletes while they are enrolled would not erect any new barriers to schools' efforts to educate student-athletes or integrate them into their schools' academic communities.  The Court therefore finds that consumer demand for the NCAA's products would not change if schools were allowed to offer and student-athletes on FBS football and Division I basketball teams were allowed, after leaving college, to receive limited and equal shares of licensing revenue generated from the use of their names, images, and likenesses during college.

Although Drs. Emmert and Rubinfeld suggested that student-athletes could potentially monetize these future earnings while they are still in school by taking out loans against the trust, the NCAA could easily prohibit such borrowing, just as it currently prohibits student-athletes from borrowing against their

United States District Court
For the Northern District of California

future earnings as professional athletes.  See Ex. 2340 at 236
(prohibiting student-athletes from accepting any loan issued based
on the "student-athlete's athletics reputation, skill or pay-back
potential as a future professional athlete").  None of the NCAA's
witnesses testified that its current rules would not suffice to
prevent student-athletes from borrowing against their future
compensation.  Nor did they rule out that the NCAA and its member
schools could place the money in a special account, such as a
spendthrift trust, to prevent such borrowing.  Accordingly, the
Court finds that allowing FBS football and Division I basketball
schools to hold in trust a limited and equal share of licensing
revenue for their recruits would provide a less restrictive means
of achieving the NCAA's stated purposes.

Plaintiffs' third proposed alternative, however -- allowing
student-athletes to receive money for endorsements -- does not
offer a less restrictive way for the NCAA to achieve its purposes.
Allowing student-athletes to endorse commercial products would
undermine the efforts of both the NCAA and its member schools to
protect against the "commercial exploitation" of student-athletes.
Although the trial record contains evidence -- and Dr. Emmert
himself acknowledged -- that the NCAA has not always succeeded in
protecting student-athletes from commercial exploitation, this
failure does not justify expanding opportunities for commercial
exploitation of student-athletes in the future.  Plaintiffs
themselves previously indicated that they were not seeking to
enjoin the NCAA from enforcing its current rules prohibiting such
endorsements.  In light of this record, the Court finds that

Plaintiffs' third proposed less restrictive alternative does not offer the NCAA a viable means of achieving its stated goals.

CONCLUSIONS OF LAW

I.   Legal Standard under the Section 1 of the Sherman Act

Section 1 of the Sherman Act makes it illegal to form any "contract, combination in the form of trust or otherwise, or conspiracy, in restraint of trade or commerce among the several States."  15 U.S.C. § 1.  To prevail on a claim under this section, a plaintiff must show "'(1) that there was a contract, combination, or conspiracy; (2) that the agreement unreasonably restrained trade under either a per se rule of illegality or a rule of reason analysis; and (3) that the restraint affected interstate commerce.'"  Tanaka v. Univ. of S. Cal., 252 F.3d 1059, 1062 (9th Cir. 2001) (citing Hairston v. Pacific 10 Conference, 101 F.3d 1315, 1318 (9th Cir. 1996)).

In this case, Plaintiffs allege that the NCAA's rules and bylaws operate as an unreasonable restraint of trade.  In particular, they seek to challenge the set of rules that preclude FBS football players and Division I men's basketball players from receiving any compensation, beyond the value of their athletic scholarships, for the use of their names, images, and likenesses in videogames, live game telecasts, re-broadcasts, and archival game footage.  The NCAA does not dispute that these rules were enacted and are enforced pursuant to an agreement among its Division I member schools and conferences.  Nor does it dispute that these rules affect interstate commerce.  Accordingly, the only remaining question here is whether the challenged rules restrain trade unreasonably.

United States District Court
For the Northern District of California

United States District Court
For the Northern District of California

"The rule of reason is the presumptive or default standard" for making this determination.  California ex rel. Harris v. Safeway, Inc., 651 F.3d 1118, 1133 (9th Cir. 2011) (citing Texaco Inc. v. Dagher, 547 U.S. 1, 5 (2006)).  Although certain restraints may be examined under a truncated "quick look" or per se analysis, the Supreme Court has "expressed reluctance to adopt per se rules with regard to 'restraints imposed in the context of business relationships where the economic impact of certain practices is not immediately obvious.'"  State Oil Co. v. Khan, 522 U.S. 3, 10 (1997) (citing FTC v. Indiana Federation of Dentists, 476 U.S. 447, 458-459 (1986)).  The Supreme Court has specifically held that concerted actions undertaken by joint ventures should be analyzed under the rule of reason.  American Needle, Inc. v. Nat'l Football League, 560 U.S. 183, 203 (2010) ("When 'restraints on competition are essential if the product is to be available at all,' per se rules of illegality are inapplicable, and instead the restraint must be judged according to the flexible Rule of Reason." (citing NCAA v. Board of Regents of Univ. of Oklahoma, 468 U.S. 85, 101 (1984))).  Thus, as explained in prior orders, the Court analyzes the challenged restraint in this case under the rule of reason rather than a "quick look" or per se rule.  See Case No. 09-1967, Docket No. 1025, April 11, 2014 Order, at 8-9; Case No. 09-1967, Docket No. 151, Feb. 8, 2010 Order, at 9-10.

"A restraint violates the rule of reason if the restraint's harm to competition outweighs its procompetitive effects."  Tanaka, 252 F.3d at 1063.  Courts typically rely on a burden-shifting framework to conduct this balancing.  Under that

**United States District Court**
For the Northern District of California

framework, the "plaintiff bears the initial burden of showing that the restraint produces 'significant anticompetitive effects' within a 'relevant market.'"  Id. (citing Hairston, 101 F.3d at 1319).  If the plaintiff satisfies this initial burden, "the defendant must come forward with evidence of the restraint's procompetitive effects."  Id.  Finally, if the defendant meets this burden, the plaintiff must "show that 'any legitimate objectives can be achieved in a substantially less restrictive manner.'"  Id. (citing Hairston, 101 F.3d at 1319).

II.  Anticompetitive Effects in the Relevant Markets

"Proof that defendant's activities had an impact upon competition in the relevant market is 'an absolutely essential element of the rule of reason case.'"  Supermarket of Homes, Inc. v. San Fernando Valley Bd. of Realtors, 786 F.2d 1400, 1405 (9th Cir. 1986) (citations omitted).  The term "relevant market," in this context,

> "encompasses notions of geography as well as product use, quality, and description.  The geographic market extends to the area of effective competition . . . where buyers can turn for alternative sources of supply.  The product market includes the pool of goods or services that enjoy reasonable interchangeability of use and cross-elasticity of demand."

Tanaka, 252 F.3d at 1063 (quoting Oltz v. St. Peter's Cmty. Hosp., 861 F.2d 1440, 1446 (9th Cir. 1988) (internal citations omitted)).

Here, Plaintiffs allege that the challenged restraint causes anticompetitive effects in two related national markets: (1) the "college education market," in which colleges and universities compete to recruit student-athletes to play FBS football or Division I basketball; and (2) the "group licensing market," in

which videogame developers, television networks, and others
compete for group licenses to use the names, images, and
likenesses of FBS football and Division I men's basketball players
in videogames, telecasts, and clips.  The Court addresses each of
these markets in turn.

      A.   College Education Market

          1.   Market Definition

As outlined in the findings of fact, Plaintiffs produced
sufficient evidence at trial to establish the existence of a
national market in which NCAA Division I schools compete to sell
unique bundles of goods and services to elite football and
basketball recruits.  Specifically, these schools compete to offer
recruits the opportunity to earn a higher education while playing
for an FBS football or Division I men's basketball team.[8]  In
exchange, the recruits who accept these offers provide their
schools with their athletic services and acquiesce in their
schools' use of their names, images, and likenesses while they are
enrolled.  The recruits must also pay for any other costs of
attendance not covered by their grants-in-aid.

The NCAA contends that it does not restrain competition in
this market.  In particular, it argues that FBS football and
Division I basketball schools lack the power to fix prices in this
market because they must compete with other colleges and
universities -- such as those in other divisions and college

_____

[8] This market could be divided into two submarkets -- one in which
Division I basketball schools compete for elite basketball recruits and
one in which FBS football schools compete for elite football recruits.
However, because the parties' evidence and arguments in this case apply
generally to both of these submarkets, there is no need to subdivide the
broader market for the purposes of this analysis.

United States District Court
For the Northern District of California

**United States District Court**
For the Northern District of California

athletic associations -- in supplying educational and athletic opportunities to elite recruits.   The NCAA also points to foreign professional sports leagues and domestic minor leagues which might likewise provide alternatives to playing FBS football or Division I basketball.   By failing to account for these other schools and leagues, the NCAA argues, Plaintiffs have defined the field of competition in the college education market too narrowly.

The "field of competition" within a given product market consists of "the group or groups of sellers or producers who have actual or potential ability to deprive each other of significant levels of business."   Thurman Indus., Inc. v. Pay 'N Pak Stores, Inc., 875 F.2d 1369, 1374 (9th Cir. 1989).   This group is not limited to producers of the particular "product at issue" but also includes the producers of "all economic substitutes for the product."   Newcal Indus., Inc. v. Ikon Office Solution, 513 F.3d 1038, 1045 (9th Cir. 2008).   To determine whether a product has economic substitutes, courts typically consider two factors: "first, [the product's] reasonable interchangeability for the same or similar uses; and second, cross-elasticity of demand, an economic term describing the responsiveness of sales of one product to price changes in another."   Los Angeles Memorial Coliseum Comm'n v. Nat'l Football League, 726 F.2d 1381, 1393 (9th Cir. 1984); see also Brown Shoe Co. v. United States, 370 U.S. 294, 325 (1962) ("The outer boundaries of a product market are determined by the reasonable interchangeability of use or the cross-elasticity of demand between the product itself and substitutes for it.").   This analysis requires an examination of the price, use, and qualities of all potential substitutes for the

product at issue.  See Paladin Associates, Inc. v. Montana Power
Co., 328 F.3d 1145, 1163 (9th Cir. 2003) ("For antitrust purposes,
a 'market is composed of products that have reasonable
interchangeability for the purposes for which they are produced --
price, use and qualities considered.'" (citations omitted)).  An
analysis of these factors in the present case demonstrates that
Plaintiffs have properly defined the scope of a relevant college
education market.

       As set forth in the findings of fact, the product that FBS
and Division I schools offer is unique.  The combination of
educational and athletic opportunities offered by schools outside
of FBS football and Division I -- including schools in FCS,
Divisions II and III, and associations like the NAIA, USCAA,
NJCAA, or NCCAA -- differ significantly in both price and quality
from those offered by FBS and Division I schools.  Non-Division I
schools typically offer a lower level of athletic competition,
inferior training facilities, lower-paid coaches, and fewer
opportunities to play in front of large crowds and on television.
Furthermore, because many of these schools do not offer athletic
scholarships, the cost of attending these institutions is much
higher for many student-athletes than the cost of attending an FBS
football or Division I basketball school.  This is why recruits
who receive scholarship offers to play FBS football or Division I
basketball rarely turn them down and, when they do, almost never
do so to play football or basketball at a school outside of FBS or
Division I.  In short, non-FBS and non-Division I schools do not
compete with FBS and Division I schools in the recruiting market,
just as they do not on the football field or the basketball court.

The same holds true for professional sports leagues such as the AFL, NBA D-League, and foreign football and basketball leagues. These leagues do not offer recruits opportunities to earn a higher education or regularly showcase their athletic talents on national television. The NCAA's own evidence demonstrates that FBS football and Division I basketball command a significantly larger domestic television audience than virtually every other football or basketball league, with the exceptions of the NFL and NBA (neither of which permits an athlete to enter its league directly from high school). The evidence shows that elite football and basketball recruits rarely pursue careers in these second-tier leagues immediately after high school and overwhelmingly prefer to play for FBS football teams and Division I basketball teams.

In sum, the qualitative differences between the opportunities offered by FBS football and Division I basketball schools and those offered by other schools and sports leagues illustrate that FBS football schools and Division I basketball schools operate in a distinct market. See Rock v. NCAA, 2013 WL 4479815, at *13 (S.D. Ind.) (finding plaintiff's allegations regarding "the superior competition, institutional support, overall preference, higher revenue, and more scholarship opportunities provided in Division I football, as opposed to Division II or NAIA football" sufficient to support his assertion that "Division II and NAIA football are not adequate substitutes for Division I football and, thus, not part of the same relevant market"); White v. NCAA, Case No. 06-999, Docket No. 72, at 3 (C.D. Cal. Sept. 20, 2006) (finding plaintiff's allegations that student-athletes had no

United States District Court
For the Northern District of California

reasonably interchangeable alternatives for the "unique combination of coaching-services and academics" offered by FBS football and Division I basketball schools sufficient to plead a relevant market). So, too, does the fact that historic fluctuations in the price of attending FBS and Division I schools resulting from changes in the grant-in-aid limit have not caused large numbers of FBS football and Division I basketball recruits to migrate toward other schools or professional leagues. See Trial Tr. 127:4-:17 (Noll); Lucas Auto. Engineering, Inc. v. Bridgestone/Firestone, Inc., 275 F.3d 762, 767 (9th Cir. 2001) ("The determination of what constitutes the relevant product market hinges, therefore, on a determination of those products to which consumers will turn, given reasonable variations in price."). Taken together, this evidence shows that the various schools and professional leagues that the NCAA has identified lack the power to deprive FBS football and Division I basketball schools of a significant number of recruits. Accordingly, these other schools and leagues are not suppliers in the market that Plaintiffs have identified.

2.    The Challenged Restraint

Because FBS football and Division I basketball schools are the only suppliers in the relevant market, they have the power, when acting in concert through the NCAA and its conferences, to fix the price of their product. They have chosen to exercise this power by forming an agreement to charge every recruit the same price for the bundle of educational and athletic opportunities that they offer: to wit, the recruit's athletic services along with the use of his name, image, and likeness while he is in

United States District Court
For the Northern District of California

school.  If any school seeks to lower this fixed price -- by offering any recruit a cash rebate, deferred payment, or other form of direct compensation -- that school may be subject to sanctions by the NCAA.

This price-fixing agreement constitutes a restraint of trade. The evidence presented at trial makes clear that, in the absence of this agreement, certain schools would compete for recruits by offering them a lower price for the opportunity to play FBS football or Division I basketball while they attend college. Indeed, the NCAA's own expert, Dr. Rubinfeld, acknowledged that the NCAA operates as a cartel that imposes a restraint on trade in this market.

Despite this undisputed evidence, the NCAA contends that its conduct does not amount to price-fixing because the price that most student-athletes actually pay is "at or close to zero" due to their athletic scholarships.  This argument mischaracterizes the commercial nature of the transactions between FBS football and Division I basketball schools and their recruits.  While it is true that many FBS football and Division I basketball players do not pay for tuition, room, or board in a traditional sense, they nevertheless provide their schools with something of significant value: their athletic services and the rights to use their names, images, and likenesses while they are enrolled.  They must also pay the incidental expenses of their college attendance.  The Seventh Circuit recently observed that these "transactions between NCAA schools and student-athletes are, to some degree, commercial in nature, and therefore take place in a relevant market with respect to the Sherman Act."  Agnew v. NCAA, 683 F.3d 328, 341

(7th Cir. 2012).  The court reasoned that "the transactions those schools make with premier athletes -- full scholarships in exchange for athletic services -- are not noncommercial, since schools can make millions of dollars as a result of these transactions."  Id. at 340.

A court in the Central District of California similarly concluded that these transactions take place within a cognizable antitrust market.  In White, the court found that a group of student-athletes had stated a valid Sherman Act claim against the NCAA by alleging that its cap on the value of grants-in-aid operated as a price-fixing agreement among FBS football and Division I basketball schools.  Case No. 06-999, Docket No. 72, at 4.  The court specifically rejected the NCAA's argument that the plaintiffs had failed to allege a sufficient harm to competition. It explained,

> Plaintiffs' [complaint] alleges that student-athletes are consumers of the higher education and coaching services that the NCAA schools provide.  Plaintiffs allege that the GIA [grant-in-aid] cap operates to restrict the price at which student-athletes purchase those services by forcing student-athletes to bear a greater portion of the cost of attendance than they would have borne if the GIA cap had not been in place.  Taken in a light most favorable to the Plaintiffs, these allegations suggest that the GIA cap harms would-be buyers, forcing them to pay higher prices than would result from unfettered competition.

Id. (citations omitted).  The same reasoning governs here, where Plaintiffs have shown that FBS football and Division I basketball schools have fixed the price of their product by agreeing not to offer any recruit a share of the licensing revenues derived from the use of his name, image, and likeness.

United States District Court
For the Northern District of California

     The fact that this price-fixing agreement operates by undervaluing the name, image, and likeness rights that the recruits provide to the schools -- rather than by explicitly requiring schools to charge a specific monetary price -- does not preclude antitrust liability here.  Federal antitrust law prohibits various kinds of price-fixing agreements, even indirect restraints on price.  See United States v. Socony-Vacuum Oil Co., 310 U.S. 150, 223 (1940) ("[T]he machinery employed by a combination for price-fixing is immaterial.  Under the Sherman Act a combination formed for the purpose and with the effect of raising, depressing, fixing, pegging, or stabilizing the price of a commodity in interstate or foreign commerce is illegal per se.").  In Catalano, Inc. v. Target Sales, Inc., for instance, the Supreme Court held that an agreement among beer wholesalers to cease providing interest-free credits to retailers was "merely one form of price fixing" and could therefore be "presumed illegal" under § 1 of the Sherman Act.  446 U.S. 643, 650 (1980).  The Court reasoned that the "agreement to terminate the practice of giving credit is [] tantamount to an agreement to eliminate discounts, and thus falls squarely within the traditional per se rule against price fixing."  Id. at 648; see also id. ("[C]redit terms must be characterized as an inseparable part of the price.").  It noted that, prior to their agreement, the "wholesalers had competed with each other with respect to trade credit, and the credit terms for individual retailers had varied substantially."  Id. at 644-45.  The agreement to eliminate this practice thus "extinguish[ed] one form of competition among the sellers" and could be presumed unlawful, even though it did not

ultimately require the sellers to set their prices at some specific, pre-determined level.  Id.

Like the wholesalers' agreement in Catalano, the agreement among FBS football and Division I basketball schools not to offer recruits a share of their licensing revenue eliminates one form of price competition.  Although this agreement may operate to fix prices indirectly, rather than directly, it is nevertheless sufficient to satisfy Plaintiffs' initial burden under the rule of reason.  Plaintiffs need not identify an agreement as obviously unlawful as the wholesalers' agreement in Catalano to establish a per se violation, let alone to meet the lower burden imposed by the first step of a rule of reason analysis.  See 446 U.S. at 644-45 ("[W]e have held agreements to be unlawful per se that had substantially less direct impact on price than the agreement alleged in this case.").

Indeed, in another case involving concerted action by members of a sports league, then-Judge Sotomayor observed that an antitrust plaintiff may sometimes meet its burden by identifying an agreement to fix prices indirectly.  See Major League Baseball Properties, Inc. v. Salvino, Inc., 542 F.3d 290, 337 (2d Cir. 2008) (Sotomayor, J., concurring).  In that case, the plaintiff sought to challenge an agreement among Major League Baseball teams to license their trademarks and other intellectual property exclusively through a designated third party called Major League Baseball Properties (MLBP).  The plaintiff alleged that the agreement violated the Sherman Act because it eliminated price competition among the teams as suppliers of intellectual property. A three-judge panel of the Second Circuit rejected this claim,

**United States District Court**
For the Northern District of California

finding that the agreement did not constitute price-fixing.  In a separate concurrence, then-Judge Sotomayor noted that, although she agreed that the licensing arrangement was lawful, she believed that the majority had endorsed "an overly formalistic view of price fixing."  <u>Id.</u> at 334.  She reasoned, "While the MLBP agreement does not specify a price to be charged, the effect of the agreement clearly eliminates price competition between the [teams] for trademark licenses.  An agreement to eliminate price competition from the market is the essence of price fixing."  <u>Id.</u> at 335; see also <u>id.</u> at 336-37 ("In other words, an agreement between competitors to 'share profits' or to make a third party the exclusive seller of their competing products that has the purpose and effect of fixing, stabilizing, or raising prices may be a <u>per se</u> violation of the Sherman Act, even if no explicit price is referenced in the agreement.").  Then-Judge Sotomayor also noted that such an agreement could be unlawful, even if it was only meant to bind members of a joint venture.  She explained,

> [T]he antitrust laws prohibit two companies A and B, producers of X, from agreeing to set the price of X.  Likewise, A and B cannot simply get around this rule by agreeing to set the price of X through a third-party intermediary or "joint venture" if the purpose and effect of that agreement is to raise, depress, fix, peg, or stabilize the price of X.

<u>Id.</u> at 336.[9]  Although she ultimately concluded that the MLBP agreement served a procompetitive purpose, because it increased

---

[9] The Supreme Court recently relied on this language from then-Judge Sotomayor's concurrence in another Sherman Act case involving a challenge to concerted action by members of a sports league.  <u>American Needle</u>, 560 U.S. at 202 ("[C]ompetitors 'cannot simply get around' antitrust liability by acting 'through a third-party intermediary or

the total number of licenses sold, her opinion nevertheless illustrates that price-fixing agreements take many forms and may be unlawful even if they are implemented by members of a joint venture.

Although Plaintiffs have characterized FBS football and Division I basketball schools as sellers in the market for educational and athletic opportunities, in their post-trial brief they argued that the schools could alternatively be characterized as buyers in a market for recruits' athletic services and licensing rights. The relevant market would be that for the recruitment of the highest ranked male high school football and basketball players each year. Viewed from this perspective, Plaintiffs' antitrust claim arises under a theory of monopsony, rather than monopoly, alleging an agreement to fix prices among buyers rather than sellers. Such an agreement, if proven, would violate § 1 of the Sherman Act just as a price-fixing agreement among sellers would. See generally Omnicare, Inc. v. UnitedHealth Grp., Inc., 629 F.3d 697, 705 (7th Cir. 2011) ("Ordinarily, price-fixing agreements exist between sellers who collude to set their prices above or below prevailing market prices. But buyers may also violate § 1 by forming what is sometimes known as a 'buyers' cartel.'"); Vogel v. Am. Soc. of Appraisers, 744 F.2d 598, 601 (7th Cir. 1984) ("Just as a sellers' cartel enables the charging of monopoly prices, a buyers' cartel enables the charging of monopsony prices; and monopoly and monopsony are symmetrical distortions of competition from an economic standpoint."

'joint venture.'" (quoting Salvino, 542 F.3d at 336 (Sotomayor, J., concurring)).

United States District Court
For the Northern District of California

(citations omitted)).  The Supreme Court has noted that the "kinship between monopoly and monopsony suggests that similar legal standards should apply to claims of monopolization and to claims of monopsonization."  Weyerhaeuser Co. v. Ross-Simmons Hardwood Lumber Co., Inc., 549 U.S. 312, 322 (2007) (citing Roger G. Noll, "'Buyer Power' and Economic Policy," 72 Antitrust L.J. 589, 591 (2005)).

In recent years, several courts have specifically recognized that monopsonistic practices in a market for athletic services may provide a cognizable basis for relief under the Sherman Act.  See, e.g., Rock, 2013 WL 4479815, at *11 (finding that plaintiff had identified a cognizable market in which "buyers of labor (the schools) are all members of NCAA Division I football and are competing for the labor of the sellers (the prospective student-athletes who seek to play Division I football)"); In re NCAA I-A Walk-On Football Players Litig., 398 F. Supp. 2d 1144, 1150 (W.D. Wash. 2005) ("Plaintiffs have alleged a sufficient 'input' market in which NCAA member schools compete for skilled amateur football players.").  Indeed, the Seventh Circuit recently noted in Agnew that the "proper identification of a labor market for student-athletes . . . would meet plaintiffs' burden of describing a cognizable market under the Sherman Act."  683 F.3d at 346.  Given that Plaintiffs' alternative monopsony theory mirrors their monopoly price-fixing theory, the evidence presented and facts found above are sufficient to establish a restraint of trade in a market for recruits' athletic services just as they are to establish a restraint of trade in the college education market.  As explained above, viewed from this perspective, the sellers in

this market are the recruits; the buyers are FBS football and
Division I basketball schools; the product is the combination of
the recruits' athletic services and licensing rights; and the
restraint is the agreement among schools not to offer any recruit
more than the value of a full grant-in-aid.  In the absence of
this restraint, schools would compete against one another by
offering to pay more for the best recruits' athletic services and
licensing rights -- that is, they would engage in price
competition.

The NCAA argues that Plaintiffs cannot prevail under a
monopsony theory because they have not presented evidence of an
impact on price or output in a "downstream market."  Trial Tr.
2766:16-:22 (Stiroh).  They cite Dr. Stiroh's testimony that the
only way that a restraint on an input market -- such as a market
for recruits' athletic services and licensing rights -- can give
rise to an anticompetitive harm is if that restraint ultimately
harms consumers by reducing output or raising prices in a
downstream market.  Whatever merit Dr. Stiroh's views might have
among economists, they are not supported by the relevant case law.
The Supreme Court has indicated that monopsonistic practices that
harm suppliers may violate antitrust law even if they do not
ultimately harm consumers.  In Mandeville Island Farms v. Am.
Crystal Sugar Co., 334 U.S. 219 (1948), the Supreme Court
considered whether an agreement among sugar refiners to fix the
prices they paid for sugar beets constituted a violation of the
Sherman Act.  It concluded that "the agreement is the sort of
combination condemned by the Act, even though the price-fixing was
by purchasers, and the persons specially injured . . . are

sellers, not customers or consumers." Id. at 235. Notably, the Court reached this conclusion despite a vehement dissent from Justice Jackson noting that the price of sugar had not been affected by the refiners' agreement. Id. at 247. The majority's decision, thus, "strongly suggests that suppliers . . . are protected by antitrust laws even when the anti-competitive activity does not harm end-users." Telecor Communications, Inc. v. Sw. Bell Tel. Co., 305 F.3d 1124, 1134 (10th Cir. 2002); see also Knevelbaard Dairies v. Kraft Foods, Inc., 232 F.3d 979, 988 (9th Cir. 2000) ("The Supreme Court's references to the goals of achieving 'the lowest prices, the highest quality and the greatest material progress' and of 'assur[ing] customers the benefits of price competition' do not mean that conspiracies among buyers to depress acquisition prices are tolerated. Every precedent in the field makes clear that the interaction of competitive forces, not price-rigging, is what will benefit consumers." (emphasis added)).

This is consistent with a long line of cases, including some decided by the Ninth Circuit, recognizing that restraints on competition within a labor market may give rise to an antitrust violation under § 1 of the Sherman Act. See, e.g., Anderson v. Shipowners' Ass'n, 272 U.S. 359, 365 (1926) (holding that a multi-employer agreement among ship owners restrained trade in a labor market for sailors); Todd v. Exxon Corp., 275 F.3d 191, 201 (2d Cir. 2001) (Sotomayor, J.) (holding that a conspiracy among oil industry employers to set salaries at "artificially low levels" restrained trade in a labor market and noting that "a horizontal conspiracy among buyers [of labor] to stifle competition is as unlawful as one among sellers"); Ostrofe v. H.S. Crocker Co.,

United States District Court
For the Northern District of California

_Inc._, 740 F.2d 739, 740 (9th Cir. 1984) (holding that a multi-employer agreement in the paper lithograph label industry may restrain trade in a "market for personal services").  It is also consistent with the many recent cases, some of which are cited above, recognizing the validity of antitrust claims against the NCAA based on anticompetitive harms in a labor market.  _See, e.g._, _Agnew_, 683 F.3d at 346 (recognizing that the NCAA's scholarship rules may restrain trade in a "labor market for student-athletes" and noting that "labor markets are cognizable under the Sherman Act"); _Law v. NCAA_, 134 F.3d 1010, 1015 (10th Cir. 1998) (finding that an NCAA rule capping compensation for entry-level coaches restrained trade in a "labor market for coaching services" and noting that "[l]ower prices cannot justify a cartel's control of prices charged by suppliers, because the cartel ultimately robs the suppliers of the normal fruits of their enterprises"); _In re NCAA I-A Walk-On Football Players Litig._, 398 F. Supp. 2d at 1150 (recognizing that the NCAA's scholarship rules may restrain trade in an "'input' market in which NCAA member schools compete for skilled amateur football players").  In fact, a court in the Southern District of Indiana recently rejected the NCAA's argument that a student-athlete would need to plead a "'market-wide impact on the price or output of any commercial product'" in order to state a valid Sherman Act claim challenging its former prohibition on multi-year football scholarships.  _Rock_, 2013 WL 4479815, at *14 (S.D. Ind.) (quoting NCAA's brief).  The court in that case found that the student-athlete's complaint "adequately plead[] anticompetitive effects of the challenged bylaws" in the "'nationwide market for the labor of Division I football student

athletes'" based on his allegations that, in the absence of the challenged scholarship rules, the schools competing for his services would have offered him a multi-year scholarship.  Id. at *3, *15 (quoting complaint).  The court specifically noted that the plaintiff had identified a cognizable harm to competition by alleging that removing the challenged restraint would "would force the schools to 'compete' for recruits."  Id. at *15.  Plaintiffs here have presented sufficient evidence to show an analogous anticompetitive effect in a similar labor market.  Accordingly, they have shown a cognizable harm to competition under the rule of reason.

The Court notes that Plaintiffs had not articulated a monopsony theory prior to trial.  Their expert addressed it at trial in response to the Court's questions.  For this reason, the Court has addressed Plaintiffs' monopoly theory in greater detail.  However, Plaintiffs presented significant evidence to support a monopsony theory during trial.  Both sides discussed the theory at length in their post-trial briefs.  The evidence presented at trial and the facts found here, as well as the law, support both theories.  The NCAA is not prejudiced by alternative reliance on a monopsony theory.

B.   Group Licensing Market

Plaintiffs also allege that the NCAA has restrained competition in three specific national submarkets of a broader national group licensing market: namely, the submarkets for group licenses to use student-athletes' names, images, and likenesses in (1) live game telecasts, (2) videogames, and (3) game re-

broadcasts, highlight clips, and other archival footage.  The
Court addresses each of these submarkets separately.

1.   Submarket for Group Licenses to Use Student-
     Athletes' Names, Images, and Likenesses in Live
     Game Telecasts

As noted above, television networks compete for the rights to
telecast live FBS football and Division I basketball games.  In
order to secure these rights, networks typically purchase licenses
to use the intellectual property of the participating schools and
conferences during the game telecast as well as the names, images,
and likenesses of the participating student-athletes.[10]  Because
student-athletes are not permitted by NCAA rules to license the
rights to use their names, images, and likenesses, the networks
deal exclusively with schools and conferences when acquiring the
student-athletes' rights.

As the Court found above, in the absence of the NCAA's
restrictions on student-athlete compensation, student-athletes on
certain FBS football and Division I basketball teams would be able
to sell group licenses for the use of their names, images, and
likenesses to television networks.  They would either sell those
licenses to the television networks directly or do so through some
intermediate buyer -- such as their school or a third-party
licensing company -- which would bundle the group license with
other intellectual property and performance rights and sell the

---

[10] As discussed in the findings of fact, when a third party -- such
as a bowl committee or the NCAA itself -- has organized a particular
athletic event, the networks may also purchase a separate license from
that party to use its intellectual property during the telecast.
Because these transactions do not involve the transfer of rights to use
student-athletes' names, images, and likenesses, they are not relevant
to this discussion.

United States District Court
For the Northern District of California

full bundle of rights to the network.  Regardless of whether the student-athletes would sell their group licenses to the networks directly or through some intermediate buyer, however, a submarket for such group licenses would exist.

The NCAA denies that such a market exists as a matter of law. It argues that the First Amendment and certain state laws preclude student-athletes from asserting any rights of publicity in the use of their names, images, and likenesses during live game telecasts. The Court has previously rejected this argument.  See April 11, 2014 Order at 21.  Furthermore, even if some television networks believed that student-athletes lacked publicity rights in the use of their names, images, and likenesses, they may have still sought to acquire these rights as a precautionary measure.  Businesses often negotiate licenses to acquire uncertain rights.  See C.B.C. Distribution & Mktg., Inc. v. Major League Baseball Advanced Media, L.P., 505 F.3d 818, 826 (8th Cir. 2007) (Colloton, J., dissenting) ("CBC surely can 'agree,' as a matter of good business judgment, to bargain away any uncertain First Amendment rights that it may have in exchange for the certainty of what it considers to be an advantageous contractual arrangement."); Hynix Semiconductors, Inc. v. Rambus, Inc., 2006 WL 1991760, at *4 (N.D. Cal.) (crediting expert testimony that "a negotiating patentee and licensee generally agree to a lower royalty rate if there is uncertainty as to whether the patents are actually valid and infringed").  The NCAA's argument does not undermine Plaintiffs' evidence of the existence of a national submarket for group licenses.

That said, Plaintiffs have not identified any harm to competition in this submarket.  As previously noted, an "essential element of a Section 1 violation under the rule of reason is injury to competition in the relevant market."  Alliance Shippers, Inc. v. S. Pac. Transp. Co., 858 F.2d 567, 570 (9th Cir. 1988). That injury must go "beyond the impact on the claimant" and reach "a field of commerce in which the claimant is engaged."  Austin v. McNamara, 979 F.2d 728, 738 (9th Cir. 1992) (citations and quotation marks omitted); see also Sicor Ltd. v. Cetus Corp., 51 F.3d 848, 854 (9th Cir. 1995) ("Under the rule of reason approach, the plaintiff must show an injury to competition, rather than just an injury to plaintiff's business." (emphasis in original; citations and quotation marks omitted)).  While Plaintiffs have shown that the NCAA's challenged rules harm student-athletes by depriving them of compensation that they would otherwise receive, they have not shown that this harm results from a restraint on competition in the group licensing market.  In particular, they have failed to show that the challenged rules hinder competition among any potential buyers or sellers of group licenses.

The sellers in this market would be the student-athletes. Plaintiffs have not presented any evidence to show that, in the absence of the challenged restraint, teams of student-athletes would actually compete against one another to sell their group licenses.  In fact, the evidence in the record strongly suggests that such competition would not occur.  This is because any network that seeks to telecast a particular athletic event would have to obtain a group license from every team that could potentially participate in that event.  For instance, a network

seeking to telecast a conference basketball tournament would have to obtain group licenses from all of the teams in that conference. Under those circumstances, none of the teams in the conference would compete against each other as sellers of group licenses because the group licenses would constitute perfect complements: that is, every group license would have to be sold in order for any single group license to have value.  See generally Herbert Hovenkamp, "Implementing Antitrust's Welfare Goals," 81 Fordham L. Rev. 2471, 2487 (2013) ("Perfect complements are goods that are invariably used together -- or, more technically, situations in which one good has no value unless it can be consumed together with the other good.").  At the same time, the teams in that conference would never have to compete with teams outside of the conference because those teams -- as non-participants in the conference tournament -- would not be able to sell their group licenses with respect to that event in the first place.  Thus, in this scenario, teams of student-athletes would never actually compete against each other as sellers of group licenses, even if the challenged NCAA rules no longer existed.

The same outcome would result whenever any network sought to telecast any other FBS football and Division I basketball event. Although the specific set of group licenses required for each event would vary, the lack of competition among student-athlete teams would remain constant: in every case, the network would need to acquire group licenses from a specific set of teams, none of which would have any incentive to compete either against each other or against any teams whose group licenses were not required for the telecast.  These conditions would hold regardless of

United States District Court
For the Northern District of California

whether the student-athlete teams sold their group licenses to the television networks directly or through some intermediary, such as their schools, because the demand for group licenses would be dictated primarily by the identity of the teams eligible to participate in each event.  To the extent that entire conferences might compete against each other in order to secure a specific telecasting contract with a particular network, the challenged NCAA rules do not inhibit this type of competition.  Conferences are already free to compete against each other in this way.  So, too, are any individual pairs of schools whose teams are scheduled to play against each other in specific regular season games.  Like the conferences, these pairs may freely compete against other pairs of schools whose games are scheduled for the same time in order to secure a contract with whatever networks can show games during that time slot.[11]  In any event, Plaintiffs have not presented sufficient evidence to show that student-athlete teams would actually compete against each other in any of these ways if they were permitted to sell group licenses to use their names, images, and likenesses.

Plaintiffs have also failed to identify any situation in which buyers of group licenses might compete against each other. As noted above, there are two sets of potential buyers in this market: the television networks, which would buy group licenses directly from the student-athlete teams, and intermediate buyers,

---

[11] The evidence presented at trial suggests that most telecasting contracts, even for regular season games, are negotiated at the conference-wide level -- not the individual team level.  Nevertheless, the Court notes that the challenged rules would not suppress competition in this market even if contracts to telecast regular season games were negotiated at the individual team level.

**United States District Court**
For the Northern District of California

**United States District Court**
For the Northern District of California

which would bundle those licenses with other rights and sell those
bundles of rights to the networks.  The first set of potential
buyers -- the television networks -- already compete freely
against one another for the rights to use student-athletes' names,
images, and likenesses in live game telecasts.  Although they may
not be able to purchase these rights directly from the student-
athletes, they nevertheless compete to acquire these rights from
other sources, such as schools and conferences.  The fact that the
networks do not compete to purchase these rights directly from the
student-athletes is due to the assurances by the schools,
conferences, and NCAA that they have the authority to grant these
rights.  Such assurances might constitute conversion by the
schools of the student-athletes' rights, or otherwise be unlawful,
but they are not anticompetitive because they do not inhibit any
form of competition that would otherwise exist.[12]  Allowing
student-athletes to seek compensation for group licenses would not
increase the number of television networks in the market or
otherwise enhance competition among them.

Nor would it increase competition among any potential
intermediate buyers in this market, such as third-party licensing
companies and schools.  Third-party licensing companies are, like
television networks, already free to compete against one another
to acquire the rights to use student-athletes' names, images, and
likenesses in live game telecasts.  They may be barred from

---

[12] Plaintiffs voluntarily dismissed all of their claims against the
NCAA for "individual damages, disgorgement of profits, and an
accounting."  Docket No. 198, Stip. Dismissal, at 2.  They also
dismissed their claims for unjust enrichment.  Accordingly, the Court
does not consider these claims here.

purchasing these rights directly from the student-athletes but they are not barred from competing to acquire these rights through other channels.

Unlike television networks and third-party licensing companies, schools do not currently compete for group licenses to use student-athletes' names, images, and likenesses in live game telecasts. This lack of competition, however, does not stem solely from the challenged restraint. Even if the restraint were lifted, each school would still only be able to purchase group licenses from its own student-athletes because those are the only licenses that the school could bundle with its own intellectual property rights for sale to a network. No school would be able to purchase a marketable group license from student-athletes at another school. To the extent that schools do compete against one another for the rights to use individual student-athletes' names, images, and likenesses, they do so only as sellers in the college education market or consumers in the market for recruits' athletic services and licensing rights. They do not compete as buyers in the market for group licenses.

Accordingly, Plaintiffs have failed to show that the challenged NCAA rules harm competition in this submarket. Although they have presented sufficient evidence to establish that they were injured by the NCAA's conduct, as noted above, "[i]njury to an antitrust plaintiff is not enough to prove injury to competition." O.S.C. Corp. v. Apple Computer, Inc., 792 F.2d 1464, 1469 (9th Cir. 1986). Plaintiffs have shown an injury to competition only in the college education market or the market for recruits' athletic services and licensing rights.

**United States District Court**
For the Northern District of California

2.   Submarket for Group Licenses to Use Student-
Athletes' Names, Images, and Likenesses in
Videogames

Plaintiffs have presented sufficient evidence to establish
that, absent the challenged NCAA rules, a national submarket would
exist in which videogame developers would compete for group
licenses to use student-athletes' names, images, and likenesses.
This submarket is analogous to the live telecasting submarket
discussed above.  As in that submarket, the sellers of group
licenses in the videogame submarket would be student-athletes on
certain FBS football and Division I basketball teams.  The buyers
would either be videogame developers or intermediate buyers who
would bundle the student-athletes' rights with other parties'
rights and sell those bundles to videogame developers.

The NCAA contends that, even if student-athletes were
permitted to receive compensation for the use of their names,
images, and likenesses, this submarket would not exist.  It notes
that it and some of its member conferences recently decided to
stop licensing their intellectual property for use in videogames.
Without access to this intellectual property, the NCAA argues,
videogame developers cannot develop marketable videogames and,
thus, would not seek to purchase group licenses from student-
athletes.

This argument overstates the significance of the decisions of
the NCAA and some of its member conferences not to license their
intellectual property to videogame developers.  To begin with,
videogame developers do not need the intellectual property rights
of both the NCAA and <u>all</u> of its conferences in order to produce a
college sports videogame.  If a sufficient number of schools and

conferences were willing to license their intellectual property
for use in videogames, a submarket for student-athletes' group
licenses would likely exist.  Indeed, Mr. Linzner specifically
testified at trial that EA remains interested in acquiring the
rights to use student-athletes' names, images, and likenesses and
would seek to acquire them if not for the NCAA's challenged rules
and the present litigation.  This testimony suggests that the
recent decisions of the NCAA and some of its conferences not to
license their intellectual property has not permanently eliminated
the demand for group licenses to use student-athletes' names,
images, and likenesses.[13]  Accordingly, these decisions -- which
could have been adopted due to this litigation and could be
reversed at any time -- do not establish the lack of a videogame
submarket.

        Nevertheless, Plaintiffs have not identified any injury to
competition within this submarket.  Just as in the live
telecasting submarket, the ultimate buyers in this submarket --
videogame developers -- would need to acquire group licenses from
a specific set of teams in order to create their product.  This
set might include all of the teams within Division I, all of the
teams within the major conferences, or some other set of teams

---

[13] The NCAA's other argument -- that videogame developers would not
need to acquire group licenses because their use of student-athletes'
names, images, and likenesses is protected under the First Amendment --
was rejected by the Ninth Circuit earlier in this litigation.  In re
NCAA Student-Athlete Name & Likeness Licensing Litig., 724 F.3d 1268,
1284 (9th Cir. 2013) (concluding that "EA's use of the likenesses of
college athletes like Samuel Keller in its video games is not, as a
matter of law, protected by the First Amendment"); see also Hart v.
Electronic Arts, Inc., 717 F.3d 141, 170 (3d Cir. 2013) (holding that
"the NCAA Football 2004, 2005 and 2006 games at issue in this case do
not sufficiently transform Appellant's identity to escape the right of
publicity claim").

United States District Court
For the Northern District of California

that the videogame developer believed would be necessary to produce a marketable product.  Regardless of which teams were included within that set, those teams would not compete against each other as sellers of group licenses, even in the absence of the challenged rules, because they would all share an interest in ensuring that the videogame developer acquired each of the group licenses required to create its product.  These teams would also not compete against any teams outside of the set because the videogame developer determined that those other teams' group licenses were not required to produce the videogame.  Indeed, competition between teams (or conferences) is even less likely in the videogame submarket than the live telecasting submarket because videogame developers -- unlike television networks -- are not constrained by the number of group licenses that they could use to produce their product.  The evidence presented at trial demonstrates that videogame companies could, and often did, feature nearly every FBS football and Division I basketball team in their videogames.  Under these circumstances, competition among individual teams and conferences to sell group licenses is extremely unlikely.  And, to the extent that it happens (or would happen), it is not restrained by the challenged NCAA restrictions on student-athlete compensation.  Thus, just as with the live telecasting submarket, the challenged rules do not suppress competition in this submarket.

3.     Submarket for Group Licenses to Use Student-
Athletes' Names, Images, and Likenesses in Game Re-
Broadcasts, Highlight Clips, and Other Archival
Footage

Plaintiffs allege that the NCAA's challenged rules impose restraints on a national submarket for group licenses to use student-athletes' names, images, and likenesses in game re-broadcasts, highlight clips, and other archival game footage, both for entertainment and to advertise products. However, they have not presented sufficient evidence to show that the NCAA has imposed any restraints in this submarket. As found above, the undisputed evidence shows that the NCAA has designated a third-party agent to negotiate and manage all licensing related to its archival footage. That third-party agent, T3Media, is expressly prohibited from licensing any footage that features current student-athletes. It is also contractually required to obtain the rights to use the names, images, and likenesses of any former student-athletes who appear in footage that it has licensed. Thus, under this arrangement, no current or former student-athletes are actually deprived of any compensation for game re-broadcasts or other archival footage that they would otherwise receive in the absence of the challenged NCAA rules. What's more, even if Plaintiffs had made such a showing, they have not presented sufficient evidence to show an injury to competition in this submarket. In order to license all of the footage in the NCAA's archives, T3Media would have to obtain a group license from every team that has ever competed in FBS or Division I. These teams, once again, would have no incentive to compete against each

other in selling their group licenses.  Enjoining the NCAA from
enforcing its challenged rules would not change that.

III. Procompetitive Justifications

Because Plaintiffs have presented sufficient evidence to show
that the NCAA's rules impose a restraint on competition in the
college education market, the Court must determine whether that
restraint is justified.  In making this determination, it must
consider whether the "anticompetitive aspects of the challenged
practice outweigh its procompetitive effects."  Paladin
Associates, 328 F.3d at 1156.

The NCAA has asserted four procompetitive justifications for
its rules barring student-athletes from receiving compensation for
the use of their names, images, and likenesses: (1) the
preservation of amateurism in college sports; (2) promoting
competitive balance among FBS football and Division I basketball
teams; (3) the integration of academics and athletics; and (4) the
ability to generate greater output in the relevant markets.  The
Court considers each of these procompetitive justifications in
turn.

A.   Amateurism

As noted in the findings of fact, the NCAA asserts that its
restrictions on student-athlete compensation are necessary to
preserve the amateur tradition and identity of college sports.  It
contends that this tradition and identity contribute to the
popularity of college sports and help distinguish them from
professional sports and other forms of entertainment in the
marketplace.  For support, it points to historical evidence of its
commitment to amateurism, recent consumer opinion surveys, and

testimony from various witnesses regarding popular perceptions of college sports.  Although this evidence could justify some limited restrictions on student-athlete compensation, it does not justify the specific restrictions challenged in this case.  In particular, it does not justify the NCAA's sweeping prohibition on FBS football and Division I basketball players receiving any compensation for the use of their names, images, and likenesses.

Although the NCAA has cited the Supreme Court's decision in Board of Regents as support for its amateurism justification, its reliance on the case remains unavailing.  As explained in previous orders, Board of Regents addressed limits on television broadcasting, not payments to student-athletes, and "does not stand for the sweeping proposition that student-athletes must be barred, both during their college years and forever thereafter, from receiving any monetary compensation for the commercial use of their names, images, and likenesses."  Oct. 25, 2013 Order at 15. The Supreme Court's suggestion in Board of Regents that, in order to preserve the quality of the NCAA's product, student-athletes "must not be paid," 468 U.S. at 102, was not based on any factual findings in the trial record and did not serve to resolve any disputed issues of law.  In fact, the statement ran counter to the assertions of the NCAA's own counsel in the case, who stated during oral argument that the NCAA was not relying on amateurism as a procompetitive justification and "might be able to get more viewers and so on if it had semi-professional clubs rather than amateur clubs."  Oral Arg. Tr. at 25, Board of Regents, 468 U.S. 85.  He further argued, "When the NCAA says, we are running programs of amateur football, it is probably reducing its net

profits." Id. (emphasis added); see also id. ("The NCAA might be able to increase its intake if it abolished or reduced the academic standards that its players must meet."). Plaintiffs have also presented ample evidence here to show that the college sports industry has changed substantially in the thirty years since Board of Regents was decided. See generally Banks v. NCAA, 977 F.2d 1081, 1099 (7th Cir. 1992) (Flaum, J., concurring in part and dissenting in part) ("The NCAA continues to purvey, even in this case, an outmoded image of intercollegiate sports that no longer jibes with reality. The times have changed."). Accordingly, the Supreme Court's incidental phrase in Board of Regents does not establish that the NCAA's current restraints on compensation are procompetitive and without less restrictive alternatives.

The historical record that the NCAA cites as evidence of its longstanding commitment to amateurism is unpersuasive. This record reveals that the NCAA has revised its rules governing student-athlete compensation numerous times over the years, sometimes in significant and contradictory ways. Rather than evincing the association's adherence to a set of core principles, this history documents how malleable the NCAA's definition of amateurism has been since its founding.

The association's current rules demonstrate that, even today, the NCAA does not consistently adhere to a single definition of amateurism. A Division I tennis recruit can preserve his amateur status even if he accepts ten thousand dollars in prize money the year before he enrolls in college. A Division I track and field recruit, however, would forfeit his athletic eligibility if he did the same. Similarly, an FBS football player may maintain his

**United States District Court**
For the Northern District of California

amateur status if he accepts a Pell grant that brings his total
financial aid package above the cost of attendance.  But the same
football player would no longer be an amateur if he were to
decline the Pell grant and, instead, receive an equivalent sum of
money from his school for the use of his name, image, and likeness
during live game telecasts.  Such inconsistencies are not
indicative of "core principles."

Nonetheless, some restrictions on compensation may still
serve a limited procompetitive purpose if they are necessary to
maintain the popularity of FBS football and Division I basketball.
If the challenged restraints actually play a substantial role in
maximizing consumer demand for the NCAA's products --
specifically, FBS football and Division I basketball telecasts,
re-broadcasts, ticket sales, and merchandise -- then the
restrictions would be procompetitive.  See Board of Regents, 468
U.S. at 120 (recognizing that "maximiz[ing] consumer demand for
the product" is a legitimate procompetitive justification).
Attempting to make this showing, the NCAA relies on consumer
opinion surveys, including the survey it commissioned from Dr.
Dennis specifically for this case.  As noted above, however, this
survey -- which contained several methodological flaws and did not
ask respondents about the specific restraints challenged in this
case -- does not provide reliable evidence that consumer interest
in FBS football and Division I basketball depends on the NCAA's
current restrictions on student-athlete compensation.  Further,
Plaintiffs offered evidence demonstrating that such surveys are
inevitably a poor tool for accurately predicting consumer
behavior.  Dr. Rascher highlighted various polls and surveys which

United States District Court
For the Northern District of California

documented widespread public opposition to rule changes that ultimately led to increased compensation for professional baseball players and Olympic athletes even as Major League Baseball and the IOC were experiencing periods of massive revenue growth. This evidence counsels strongly against giving any significant weight to Dr. Dennis's survey results. What Dr. Dennis's survey does suggest is that the public's attitudes toward student-athlete compensation depend heavily on the level of compensation that student-athletes would receive. This is consistent with the testimony of the NCAA's own witnesses, including Mr. Muir and Mr. Pilson, who both indicated that smaller payments to student-athletes would bother them less than larger payments.

Ultimately, the evidence presented at trial suggests that consumer demand for FBS football and Division I basketball-related products is not driven by the restrictions on student-athlete compensation but instead by other factors, such as school loyalty and geography. Mr. Pilson explained that college sports tend to be more popular in places where college teams are located. Similarly, Ms. Plonsky noted that popular interest in college sports was driven principally by the loyalty of local fans and alumni. She testified, "I would venture to say that if we [UT] offered a tiddlywinks team, that would somehow be popular with some segment of whoever loves our university." Trial Tr. 1414:25-1415:2.

The Court therefore concludes that the NCAA's restrictions on student-athlete compensation play a limited role in driving consumer demand for FBS football and Division I basketball-related products. Although they might justify a restriction on large

payments to student-athletes while in school, they do not justify the rigid prohibition on compensating student-athletes, in the present or in the future, with any share of licensing revenue generated from the use of their names, images, and likenesses.

B.   Competitive Balance

The NCAA asserts that its challenged rules are justified by the need to maintain the current level of competitive balance among its FBS football and Division I basketball teams in order to maintain their popularity.  This Court has previously recognized that a sports league's efforts to achieve the optimal competitive balance among its teams may serve a procompetitive purpose if promoting such competitive balance increases demand for the league's product.  See April 11, 2014 Order at 33; American Needle, 560 U.S. at 204 ("We have recognized, for example, 'that the interest in maintaining a competitive balance' among 'athletic teams is legitimate and important.'" (citing Board of Regents, 468 U.S. at 117)).  As the Supreme Court has explained, the "hypothesis that legitimates the maintenance of competitive balance as a procompetitive justification under the Rule of Reason is that equal competition will maximize consumer demand for the product."  Board of Regents, 468 U.S. at 119-20.

Here, the NCAA has not presented sufficient evidence to show that its restrictions on student-athlete compensation actually have any effect on competitive balance, let alone produce an optimal level of competitive balance.  The consensus among sports economists who have studied the issue, as summarized by Drs. Noll and Rascher, is that the NCAA's current restrictions on compensation do not have any effect on competitive balance.

Although Dr. Rubinfeld disagreed with this conclusion, he could not identify another economist who shared his view and did not offer any testimony to rebut the specific findings of the academic literature cited by Drs. Noll and Rascher.  When the Court asked him whether his opinions were based on any academic literature, Dr. Rubinfeld directed the Court to the economic articles cited in his most recent report on competitive balance.  But none of the articles cited in that report found that the NCAA's restrictions on student-athlete compensation promote competitive balance.  In fact, the only article his report cited that actually examined competitive balance in college sports was a 2004 article by Katie Baird, which Dr. Noll quoted during his testimony.  As Dr. Noll testified, that article concluded, "'[L]ittle evidence supports the claim that NCAA regulations help level the playing field.  At best, they appear to have had a very limited effect, and at worst they have served to strengthen the position of the dominant teams.'"  Trial Tr. 230:18-231:11 (quoting Baird article).  Dr. Rubinfeld's independent analysis of competitive balance was also unpersuasive because it did not show a causal link between the NCAA's challenged rules and competitive balance.  More importantly, his analysis did not show that consumer demand for the NCAA's product would decrease if FBS football or Division I basketball teams were less competitively balanced than they currently are.  As found above, the popularity of college sports is driven primarily by factors such as school loyalty and geography.  Neither of these is dependent on competitive balance.

     In its post-trial brief, the NCAA cites a passage from Board of Regents which states that the district court in that case found

that the NCAA's "restrictions designed to preserve amateurism"
served to promote competitive balance.  468 U.S. at 119 (citing
district court order, 546 F. Supp. 1276, 1296, 1309-10 (W.D. Okla.
1982)).  That factual finding is not binding on this Court and,
more importantly, is contrary to the evidence presented in this
case.  The record in this case shows that revenues from FBS
football and Division I basketball have grown exponentially since
Board of Regents was decided and that, as a result of this growth,
many schools have invested more heavily in their recruiting
efforts, athletic facilities, dorms, coaching, and other amenities
designed to attract the top student-athletes.  This trend, which
several witnesses referred to as an "arms race," has likely
negated whatever equalizing effect the NCAA's restraints on
student-athlete compensation might have once had on competitive
balance.  These changed factual circumstances -- in addition to
the wealth of academic studies concluding that the restraints on
student-athlete compensation do not promote competitive balance --
preclude this Court from giving any significant weight to the
district court's factual findings in Board of Regents.

　　　Accordingly, the NCAA may not rely on competitive balance
here as a justification for the challenged restraint.  Its
evidence is not sufficient to show that it must create a
particular level of competitive balance among FBS football and
Division I basketball teams in order to maximize consumer demand
for its product.  Nor is it sufficient to show that the challenged
restraint actually helps it achieve the optimal level of
competitive balance.

C.   Integration of Academics and Athletics

The NCAA asserts that its restrictions on student-athlete compensation help educate student-athletes and integrate them into their schools' academic communities.  It argues that the integration of academics and athletics serves to improve the quality of educational services provided to student-athletes in the restrained college education market.[14]  Courts have recognized that this goal -- improving product quality -- may be a legitimate procompetitive justification.  See County of Tuolumne v. Sonora Cmty. Hosp., 236 F.3d 1148, 1160 (9th Cir. 2001) (recognizing that improving product quality may be a legitimate procompetitive justification); Law, 134 F.3d at 1023 (recognizing that "increasing output, creating operating efficiencies, making a new product available, enhancing service or quality, and widening consumer choice" may be procompetitive justifications).

The evidence presented by the NCAA suggests that integrating student-athletes into the academic communities at their schools improves the quality of the educational services that they receive.  As noted above, several university administrators testified about the benefits that student-athletes derive from participating in their schools' academic communities.  Plaintiffs confirmed that they appreciated receiving these educational

---

[14] In its post-trial brief, the NCAA argues that the integration of academics and athletics also increases consumer demand for its other product -- FBS football and Division I basketball games.  It presented scant evidence at trial to support this assertion.  In any event, to the extent that the NCAA contends that its restrictions on student-athlete compensation increase consumer demand for FBS football and Division I basketball games, the Court addresses that argument in its discussion of the NCAA's asserted procompetitive justification of amateurism.

**United States District Court**
For the Northern District of California

benefits when they were student-athletes, while Dr. Heckman testified that these benefits also carry long-term value.

That said, the NCAA has not shown that the specific restraints challenged in this case are necessary to achieve these benefits.  Indeed, student-athletes would receive many of the same educational benefits described above regardless of whether or not the NCAA permitted them to receive compensation for the use of their names, images, and likenesses.  They would continue to receive scholarships, for instance, and would almost certainly continue to receive tutoring and other academic support services. As long as the NCAA continued to monitor schools' academic progress rates and require that student-athletes meet certain academic benchmarks -- a requirement that is not challenged here -- the schools' incentives to support their student-athletes academically would remain unchanged.  Similarly, the student-athletes' own incentives to perform well academically would remain the same, particularly if they were required to meet these academic requirements as a condition of receiving compensation for the use of their names, images, and likenesses.  Such a requirement might even strengthen student-athletes' incentives to focus on schoolwork.

As found above, the only way in which the challenged rules might facilitate the integration of academics and athletics is by preventing student-athletes from being cut off from the broader campus community.  Limited restrictions on student-athlete compensation may help schools achieve this narrow procompetitive goal.  As with the NCAA's amateurism justification, however, the NCAA may not use this goal to justify its sweeping prohibition on

any student-athlete compensation, paid now or in the future, from licensing revenue generated from the use of student-athletes' names, images, and likenesses.

D.   Increased Output

The NCAA argues that the challenged restraint increases the output of its product.  Courts have recognized that increased output may be a legitimate procompetitive justification.  See Board of Regents, 468 U.S. at 114; Law, 134 F.3d at 1023.

Here, the NCAA argues that its restrictions on student-athlete compensation increase the number of opportunities for schools and student-athletes to participate in Division I sports, which ultimately increases the number of FBS football and Division I basketball games played.  It claims that its rules increase this output in two ways: first, by attracting schools with a "philosophical commitment to amateurism" to compete in Division I and, second, by enabling schools that otherwise could not afford to compete in Division I to do so.  Docket No. 279, NCAA Post-Trial Brief, at 24.  Neither of these arguments is persuasive.

The NCAA has not presented sufficient evidence to show that a significant number of schools choose to compete in Division I because of a "philosophical commitment to amateurism."  As noted in the findings of fact, some Division I conferences have recently sought greater autonomy from the NCAA specifically so that they could enact their own rules, including new scholarship rules.  These efforts suggest that many current Division I schools are committed neither to the NCAA's current restrictions on student-athlete compensation nor to the idea that all Division I schools must award scholarships of the same value.

**United States District Court**
For the Northern District of California

Similarly, the NCAA's argument that the current rules enable some schools to participate in Division I that otherwise could not afford to do so is unsupported by the record.  Neither the NCAA nor its member conferences require high-revenue schools to subsidize the FBS football or Division I basketball teams at lower-revenue schools.  Thus, to the extent that schools achieve any cost savings by not paying their student-athletes, there is no evidence that those cost savings are being used to fund additional teams or scholarships.  In any event, Plaintiffs are not seeking an injunction <u>requiring</u> schools to provide compensation to their student-athletes -- they are seeking an injunction to permit schools to do so.  Schools that cannot afford to re-allocate any portion of their athletic budget for this purpose would not be forced to do so.  There is thus no reason to believe that any schools' athletic programs would be driven to financial ruin or would leave Division I if other schools were permitted to pay their student-athletes.  The high coaches' salaries and rapidly increasing spending on training facilities at many schools suggest that these schools would, in fact, be able to afford to offer their student-athletes a limited share of the licensing revenue generated from their use of the student-athletes' own names, images, and likenesses.  Accordingly, the NCAA may not rely on increased output as a justification for the challenged restraint here.

IV.  Less Restrictive Alternatives

As outlined above, the NCAA has produced sufficient evidence to support an inference that some circumscribed restrictions on student-athlete compensation may yield procompetitive benefits.

First, it presented evidence suggesting that preventing schools from paying FBS football and Division I basketball players large sums of money while they are enrolled in school may serve to increase consumer demand for its product.  Second, it presented evidence suggesting that this restriction may facilitate its member schools' efforts to integrate student-athletes into the academic communities on their campuses, thereby improving the quality of educational services they offer.  Thus, because the NCAA has met its burden under the rule of reason to that extent, the burden shifts back to Plaintiffs to show that these procompetitive goals can be achieved in "'other and better ways'" -- that is, through "'less restrictive alternatives.'" Bhan v. NME Hospitals, Inc., 929 F.2d 1404, 1410 n.4 (9th Cir. 1991) (citations omitted).

     "As part of their burden to show the existence of less restrictive alternatives, [] plaintiffs must also show that 'an alternative is substantially less restrictive and is virtually as effective in serving the legitimate objective without significantly increased cost.'"  County of Tuolomne, 236 F.3d at 1159 (citations omitted; emphasis in original).  In addition, any less restrictive alternatives "should either be based on actual experience in analogous situations elsewhere or else be fairly obvious."  Phillip E. Areeda & Herbert Hovenkamp, Antitrust Law ¶ 1913b (3d ed. 2006).  A defendant may show that a proffered less restrictive alternative is not feasible with "evidence that the proffered alternative has been tried but failed, that it is equally or more restrictive, or otherwise unlawful."  Id.

**United States District Court**
For the Northern District of California

A court need not address the availability of less restrictive alternatives for achieving a purported procompetitive goal "when the defendant fails to meet its own obligation under the rule of reason burden-shifting procedure."  Id.; see also Law, 134 F.3d at 1024 n.16 ("Because we hold that the NCAA did not establish evidence of sufficient procompetitive benefits, we need not address question of whether the plaintiffs were able to show that comparable procompetitive benefits could be achieved through viable, less anticompetitive means.").  Thus, in the present case, the Court does not consider whether Plaintiffs' proposed less restrictive alternatives would promote competitive balance or increase output because the NCAA failed to meet its burden with respect to these stated procompetitive justifications.[15]  Rather, the Court's inquiry focuses only on whether Plaintiffs have identified any less restrictive alternatives for both preserving the popularity of the NCAA's product by promoting its current

---

[15] The Court notes, however, that the NCAA could easily adopt several less restrictive rules if it wished to increase competitive balance or output.  With respect to competitive balance, for instance, the NCAA could adopt a more equal revenue distribution formula.  As noted above, its current formula primarily rewards the schools that already have the largest athletic budgets.  This uneven distribution of revenues runs counter to the association's stated goal of promoting competitive balance.  See, e.g., Salvino, 542 F.3d at 333 (noting that "disproportionate distribution of licensing income would foster a competitive imbalance" among Major League Baseball teams); Smith v. Pro Football, Inc., 593 F.2d 1173, 1188 (D.C. Cir. 1978) ("The least restrictive alternative of all, of course, would be for the NFL to eliminate the draft entirely and employ revenue-sharing to equalize the teams' financial resources [as] a method of preserving 'competitive balance' nicely in harmony with the league's self-proclaimed 'joint-venture' status.").  As for the NCAA's stated goal of increasing output, the NCAA already has the power to achieve this goal in a much more direct way: by amending its current requirements for entry into Division I or increasing the number of athletic scholarships Division I schools are permitted to offer.

understanding of amateurism and improving the quality of educational opportunities for student-athletes by integrating academics and athletics.

As set forth in the findings of fact, Plaintiffs have identified two legitimate less restrictive alternatives for achieving these goals. First, the NCAA could permit FBS football and Division I basketball schools to award stipends to student-athletes up to the full cost of attendance, as that term is defined in the NCAA's bylaws, to make up for any shortfall in its grants-in-aid. Second, the NCAA could permit its schools to hold in trust limited and equal shares of its licensing revenue to be distributed to its student-athletes after they leave college or their eligibility expires. The NCAA could also prohibit schools from funding the stipends or payments held in trust with anything other than revenue generated from the use of the student-athletes' own names, images, and likenesses. Permitting schools to award these stipends and deferred payments would increase price competition among FBS football and Division I basketball schools in the college education market (or, alternatively, in the market for recruits' athletic services and licensing rights) without undermining the NCAA's stated procompetitive objectives.

The NCAA notes that Dr. Noll did not discuss a system of holding payments in trust for student-athletes in his expert reports or during his testimony. However, this does not bar Plaintiffs from proposing such a system as a less restrictive alternative here. As noted above, courts may consider any less restrictive alternatives that are "based on actual experience in analogous situations elsewhere" or otherwise "fairly obvious."

United States District Court
For the Northern District of California

Areeda & Hovenkamp, <u>Antitrust Law</u> ¶ 1913b.  Plaintiffs' proposal
for holding payments in trust falls squarely within this category.
One of Plaintiffs' experts, Dr. Rascher, discussed the creation of
a trust in his opening report, which was disclosed to the NCAA
more than eight months before trial.  <u>See</u> Sept. 2013 Rascher
Report ¶¶ 80, 86.  Although the Court does not rely on the content
of Dr. Rascher's report here, it notes that the report provided
the NCAA with ample notice of this proposal.[16]  Plaintiffs' counsel

---

[16] The Court also notes that, over the past two decades, numerous
commentators have suggested that the NCAA could hold payments in trust
for its student-athletes without violating generally accepted
understandings of amateurism used by other sports organizations.  <u>See,</u>
<u>e.g.</u>, Sean Hanlon & Ray Yasser, "'J.J. Morrison' and His Right of
Publicity Lawsuit Against the NCAA," 15 <u>Vill.</u> <u>Sports</u> & <u>Ent.</u> <u>L.J.</u> 241,
294 (2008) ("Searching for a solution to the problem posed by this
Comment, commentators have suggested a 'have-your-cake-and-eat-it-too'
approach whereby a trust would be created, allowing student-athletes the
ability to preserve their amateur status while their athletic
eligibility remains.  The money generated through the use of the
commercial value of their identity would be placed in a trust until the
expiration of their athletic eligibility."); Kristine Mueller, "No
Control over Their Rights of Publicity: College Athletes Left Sitting
the Bench," 2 <u>DePaul</u> <u>J.</u> <u>Sports</u> <u>L.</u> & <u>Contemp.</u> <u>Probs.</u> 70, 87-88 (2004)
("One suggestion put forth is to create a trust for the athletes, which
would become available to them upon graduation. . . . [This proposal]
allows the athletes to reap the financial benefits of their labors,
while maintaining the focus on amateur athletics."); Vladimir P. Belo,
"The Shirts Off Their Backs: Colleges Getting Away with Violating the
Right of Publicity," 19 <u>Hastings</u> <u>Comm.</u> & <u>Ent.</u> <u>L.J.</u> 133, 155 (1996)
("Should the NCAA hold steadfastly to its notions of amateurism and
resist payment to the athletes, the trust fund alternative could be a
fair and reasonable compromise.  First of all, it could be limited to
certain merchandising monies, such as those associated with selling game
jerseys or any other revenue from marketing a student-athlete's name and
likeness."); Stephen M. Schott, "Give Them What They Deserve:
Compensating the Student-Athlete for Participation in Intercollegiate
Athletics," 3 <u>Sports</u> <u>Law.</u> <u>J.</u> 25, 45 (1996) ("Revenue from television
rights, tickets sales, and donations from boosters could be used to
establish these trust funds.  Overall, some type of trust fund may
provide the best alternative way of compensating the student-athlete and
preserving the educational objectives of the NCAA."); Kenneth L.
Shropshire, "Legislation for the Glory of Sport: Amateurism and
Compensation," 1 <u>Seton</u> <u>Hall</u> <u>J.</u> <u>Sport</u> <u>L.</u> 7, 27 (1991) ("From an NCAA
established trust fund the student athlete could receive a student life
stipend.").

also raised the issue repeatedly during trial and several of the NCAA's key witnesses -- including Dr. Emmert, Mr. Pilson, and Dr. Rubinfeld -- were specifically given an opportunity to respond to the idea.   None of these witnesses provided a persuasive explanation as to why the NCAA could not implement a trust payment system like the one Plaintiffs propose.   The Court therefore concludes that a narrowly tailored trust payment system -- which would allow schools to offer their FBS football and Division I basketball recruits a limited and equal share of the licensing revenue generated from the use of their names, images, and likenesses -- constitutes a less restrictive means of achieving the NCAA's stated procompetitive goals.

V.    Summary of Liability Determinations

For the reasons set forth above, the Court concludes that the NCAA's challenged rules unreasonably restrain trade in violation of § 1 of the Sherman Act.   Specifically, the association's rules prohibiting student-athletes from receiving any compensation for the use of their names, images, and likenesses restrains price competition among FBS football and Division I basketball schools as suppliers of the unique combination of educational and athletic opportunities that elite football and basketball recruits seek. Alternatively, the rules restrain trade in the market where these schools compete to acquire recruits' athletic services and licensing rights.

The challenged rules do not promote competitive balance among FBS football and Division I basketball teams, let alone produce a level of competitive balance necessary to sustain existing consumer demand for the NCAA's FBS football and Division I

basketball-related products.  Nor do the rules serve to increase the NCAA's output of Division I schools, student-athletes, or football and basketball games.  Although the rules do yield some limited procompetitive benefits by marginally increasing consumer demand for the NCAA's product and improving the educational services provided to student-athletes, Plaintiffs have identified less restrictive ways of achieving these benefits.

In particular, Plaintiffs have shown that the NCAA could permit FBS football and Division I basketball schools to use the licensing revenue generated from the use of their student-athletes' names, images, and likenesses to fund stipends covering the cost of attendance for those student-athletes.  It could also permit schools to hold limited and equal shares of that licensing revenue in trust for the student-athletes until they leave school.  Neither of these practices would undermine consumer demand for the NCAA's products nor hinder its member schools' efforts to educate student-athletes.

VI.   Remedy

"The several district courts of the United States are invested with jurisdiction to prevent and restrain violations" of § 1 of the Sherman Act.  15 U.S.C. § 4.  Although the NCAA asserts that Plaintiffs must make a showing of irreparable harm in order to obtain permanent injunctive relief here, it failed to cite any authority holding that such a showing is required in an action brought under the Sherman Act.  The Sherman Act itself gives district courts the authority to enjoin violations of its provisions and does not impose any additional requirements on plaintiffs who successfully establish the existence of an

**United States District Court**
For the Northern District of California

**United States District Court**
For the Northern District of California

1  unreasonable restraint of trade.  Accordingly, this Court will

2  enter an injunction to remove any unreasonable elements of the

3  restraint found in this case.[17]

4      Consistent with the less restrictive alternatives found, the

5  Court will enjoin the NCAA from enforcing any rules or bylaws that

6  would prohibit its member schools and conferences from offering

7  their FBS football or Division I basketball recruits a limited

8  share of the revenues generated from the use of their names,

9  images, and likenesses in addition to a full grant-in-aid.  The

10 injunction will not preclude the NCAA from implementing rules

11 capping the amount of compensation that may be paid to student-

12 athletes while they are enrolled in school; however, the NCAA will

13 not be permitted to set this cap below the cost of attendance, as

14 the term is defined in its current bylaws.

15     The injunction will also prohibit the NCAA from enforcing any

16 rules to prevent its member schools and conferences from offering

17 to deposit a limited share of licensing revenue in trust for their

18 FBS football and Division I basketball recruits, payable when they

19 leave school or their eligibility expires.  Although the

20 injunction will permit the NCAA to set a cap on the amount of

21 money that may be held in trust, it will prohibit the NCAA from

22 setting a cap of less than five thousand dollars (in 2014 dollars)

23 for every year that the student-athlete remains academically

24

25     [17] In a footnote to its post-trial brief, the NCAA argues for the
first time that "a number of states have made it illegal to offer
26 [student-athletes] compensation beyond a scholarship or grant-in-aid to
entice them to attend a particular school."  NCAA Post-Trial Brief at
27 35.  However, all of the statutes it cites for support expressly exempt
colleges and universities or distinguish between the prohibited payments
28 and scholarships, financial aid, and other grants.

eligible to compete.  The NCAA's witnesses stated that their
concerns about student-athlete compensation would be minimized or
negated if compensation was capped at a few thousand dollars per
year.  This is also comparable to the amount of money that the
NCAA permits student-athletes to receive if they qualify for a
Pell grant and the amount that tennis players may receive prior to
enrollment.  None of the other evidence presented at trial
suggests that the NCAA's legitimate procompetitive goals will be
undermined by allowing such a modest payment.  Schools may offer
lower amounts of deferred compensation if they choose but may not
unlawfully conspire with each another in setting these amounts.
To ensure that the NCAA may achieve its goal of integrating
academics and athletics, the injunction will not preclude the NCAA
from enforcing its existing rules -- or enacting new rules -- to
prevent student-athletes from using the money held in trust for
their benefit to obtain other financial benefits while they are
still in school.  Furthermore, consistent with Plaintiffs'
representation that they are only seeking to enjoin restrictions
on the sharing of group licensing revenue, the NCAA may enact and
enforce rules ensuring that no school may offer a recruit a
greater share of licensing revenue than it offers any other
recruit in the same class on the same team.  The amount of
compensation schools decide to place in trust may vary from year
to year.  Nothing in the injunction will preclude the NCAA from
continuing to enforce all of its other existing rules which are
designed to achieve its legitimate procompetitive goals.  This
includes its rules prohibiting student-athletes from endorsing
commercial products, setting academic eligibility requirements,

prohibiting schools from creating athlete-only dorms, and setting limits on practice hours.  Nor shall anything in this injunction preclude the NCAA from enforcing its current rules limiting the total number of football and basketball scholarships each school may award, which are not challenged here.

The injunction will not be stayed pending any appeal of this order but will not take effect until the start of next FBS football and Division I basketball recruiting cycle.

CONCLUSION

College sports generate a tremendous amount of interest, as well as revenue and controversy.  Interested parties have strong and conflicting opinions about the best policies to apply in regulating these sports.  Before the Court in this case is only whether the NCAA violates antitrust law by agreeing with its member schools to restrain their ability to compensate Division I men's basketball and FBS football players any more than the current association rules allow.  For the reasons set forth above, the Court finds that this restraint does violate antitrust law.

To the extent other criticisms have been leveled against the NCAA and college policies and practices, those are not raised and cannot be remedied based on the antitrust causes of action in this lawsuit.  It is likely that the challenged restraints, as well as other perceived inequities in college athletics and higher education generally, could be better addressed as a policy matter by reforms other than those available as a remedy for the antitrust violation found here.  Such reforms and remedies could be undertaken by the NCAA, its member schools and conferences, or Congress.  Be that as it may, the Court will enter an injunction,

in a separate order, to cure the specific violations found in this case.

The clerk shall enter judgment in favor of the Plaintiff class.  Plaintiffs shall recover their costs from the NCAA.  The parties shall not file any post-trial motions based on arguments that have already been made.

IT IS SO ORDERED.

Dated: August 8, 2014

CLAUDIA WILKEN
United States District Judge