1

2

3

4

5

6

7 UNITED STATES DISTRICT COURT

8 NORTHERN DISTRICT OF CALIFORNIA

9

| | |
|---|---|
| 10    EDWARD C. O'BANNON, JR., et al., | |
| 11             Plaintiffs, | Case No. 09-cv-03329-CW (NC) |
| 12       v. | **ORDER GRANTING MOTION FOR ATTORNEYS' FEES** |
| 13    NATIONAL COLLEGIATE ATHLETIC | |
|    ASSOCIATION; ELECTRONIC ARTS, | Re: Dkt. No. 341 |
| 14    INC.; and COLLEGIATE LICENSING | |
|    COMPANY, | |
| 15 | |
| 16           Defendants. | |

17      Plaintiffs, a group of current and former college student-athletes, move for an award

18 of attorneys' fees incurred in prosecuting this action.  Defendant the National Collegiate

19 Athletic Association opposes plaintiffs' motion.  The NCAA's principal objection is that

20 the request for fees includes work related to prosecuting ultimately unsuccessful claims.

21 The Court, however, finds that these unsuccessful claims relate to the successful claims

22 that plaintiffs won at trial; they involve a common core of facts.  For this reason, and

23 because the Court finds that the time spent pursuing these unsuccessful claims contributed

24 to plaintiffs' litigation of successful claims, the Court rejects the NCAA's principal

25 objection.  And because the Court otherwise finds plaintiffs' fee request reasonable, the

26 Court GRANTS plaintiffs' request for attorneys' fees.  As to costs and expenses, the Court

27 GRANTS IN PART plaintiffs' request.  The Court does not have the discretion to award

28 expert fees, either as costs or expenses, because the Clayton Act does not provide explicit

Case No. 09-cv-03329 CW (NC)

1  statutory authority.  Accordingly, the Court DENIES plaintiffs' request for an expert fees
2  award.

3      The Court summarizes its findings as to the NCAA's and plaintiffs' proposed
4  reductions in table format in Exhibits 1 and 2.  *See infra* p. 27-28.

5  **I.   BACKGROUND**

6      The factual and procedural background of this case is well documented in the
7  Court's prior orders and will only be summarized briefly here.  Plaintiffs are former and
8  current student-athletes who played for NCAA men's football or basketball teams at the
9  Division I level.  Plaintiffs initiated this antitrust action in 2009.  Dkt. No. 1.  Since then,
10 hundreds of attorneys have participated in various capacities to represent plaintiffs,
11 defendant NCAA, the NCAA's member schools and conferences, defendant Electronic
12 Arts, Inc., defendant Collegiate Licensing Company, the television broadcasters, and
13 myriad other third parties featured in the litigation.  Indeed, plaintiffs' counsel grew to
14 include over 30 law firms by the time the case went to trial.

15     In 2012, plaintiffs moved to certify a class of current and former Division I football
16 and basketball players to pursue declaratory and injunctive relief.  They also moved to
17 certify a subclass of current and former student-athletes to pursue monetary damages.

18     In November 2013, the district court granted plaintiffs' request to certify the
19 injunctive relief class, but denied their request to certify a damages subclass.  No. 09-cv-
20 01967 CW, Dkt. No. 893 at 23-24.

21     Just prior to this class certification order, in September 2013, the plaintiffs reached
22 a settlement in principle with EA and CLC.  Plaintiffs, EA, and CLC then finalized their
23 agreement and the district court granted the their motion for preliminary approval in
24 September 2014.  No. 09-cv-01967 CW, Dkt. No.1177.  A fairness hearing is currently
25 scheduled for July 16, 2015.  No. 09-cv-01967 CW, Dkt. No. 1187.

26     As to plaintiffs' antitrust claims against NCAA, the district court held a non-jury
27 trial between June 9, 2014, and June 27, 2014, to resolve these issues.  Dkt. No. 291 at 2.
28 On August 8, 2014, the district court found NCAA liable to plaintiffs for violating § 1 of

United States District Court
Northern District of California

the Sherman Act.  Specifically, the district court found that the NCAA's rules barring student-athletes from receiving a share of revenue that the NCAA and its member schools earn from the sale of licenses to use the student-athletes' names, images, and likenesses in videogames, live game telecasts, and other footage "unreasonably restrain trade in the market for certain educational and athletic opportunities offered by NCAA Division I schools." *Id.* at 2.  As a remedy, the district court entered a preliminary injunction prohibiting the overly restrictive restraints.  *Id.* at 95-98.

The NCAA subsequently filed notices of appeal to the Ninth Circuit, where the case is pending.  Dkt. Nos. 299, 316.

On November 19, 2014, plaintiffs filed an amended fee petition, seeking $45,573,985.45 in attorneys' fees, and $5,295,062.20 in costs and expenses under the Clayton Act, 15 U.S.C. § 26.  Dkt. No. 341.

On December 22, 2014, the district court referred this amended motion for attorneys' fees, costs, and expenses to the undersigned magistrate judge.  Dkt. No. 349.

## II.   LEGAL STANDARD

Section 16 of the Clayton Act provides that a plaintiff who substantially prevails in an antitrust action for injunctive relief may recover reasonable attorneys' fees and costs. 15 U.S.C. § 26; *Costco Wholesale Corp. v. Hoen*, 538 F.3d 1128, 1136 (9th Cir. 2008) ("[B]ecause fee shifting under § 26 is mandatory, equity cannot influence the determination of whether fees and costs should be awarded to substantially prevailing plaintiffs under that statute.").

In determining the reasonableness of attorneys' fees, courts first determine the "lodestar" amount, or the number of hours reasonably expended on the litigation multiplied by a reasonable hourly rate.  *D'Emanuele v. Montgomery Ward & Co.*, 904 F.2d 1379, 1383 (9th Cir. 1990).

As to hours, "[t]he fee applicant bears the burden of documenting the appropriate hours expended in the litigation and must submit evidence in support of those hours worked."  *Gates v. Deukmejian*, 987 F.2d 1392, 1397 (9th Cir. 1993) (citing *Hensley v.*

United States District Court
Northern District of California

United States District Court
Northern District of California

1  *Eckerhart,* 461 U.S. 424, 433-34 (1983)).  Parties opposing the fee application, in turn,

2  carry the burden of rebuttal; they must present evidence challenging the accuracy and

3  reasonableness of the hours charged.  *Id.* at 1398.  In evaluating the evidence presented by

4  both sides, the court must exclude from the calculation hours not "reasonably expended"

5  on litigation because they were "excessive, redundant, or otherwise unnecessary." *Van*

6  *Gerwen v. Guarantee Mut. Life Co.*, 214 F.3d 1041, 1045 (9th Cir. 2000) (citing *Hensley*,

7  461 U.S. at 435-36).

8        Having determined the number of hours reasonably expended, the court must then

9  determine a reasonable hourly rate based on the fee-petition attorneys' experience, skill,

10  and reputation.  *D'Emanuele*, 904 F.2d at 1384 (citing *Chalmers v. City of Los Angeles*,

11  796 F.2d 1205, 1210 (9th Cir. 1986)).  While the Court may consider rates charged by

12  attorneys for the prevailing party, the prevailing market rates in the community should

13  drive the court's analysis.  *Id.*  The prevailing party bears the burden of producing

14  satisfactory evidence (e.g., attorney affidavits) that "the requested rates are in line with

15  those prevailing in the community for similar services by lawyers of reasonably

16  comparable skill, experience and reputation." *Blum v. Stenson*, 465 U.S. 886, 896 n.11

17  (1984).

18        Finally, even though courts strongly presume that the lodestar figure represents a

19  reasonable attorneys' fee, courts may adjust the fee upwards or downwards by an

20  appropriate positive or negative multiplier in "certain rare, exceptional circumstances" to

21  account for reasonableness factors not subsumed within the initial calculation.

22  *D'Emanuele*, 904 F.2d at 1383-84.

23  **III.  DISCUSSION**

24        Plaintiffs move for an award of attorney's fees in the amount of $45,573,985.45 in

25  attorneys' fees, and $5,295,062.20 in costs and expenses, as well as a positive multiplier.

26  Dkt. No. 341 at 7.

27        The NCAA disputes plaintiffs' fee petition based on objections that almost

28  exclusively concern the reasonableness of plaintiffs' hours expended.  In fact, the NCAA

Case No. 09-cv-03329 CW (NC)          4

clarifies that it does not challenge plaintiffs' counsel's hourly rates, with the exception of one objection regarding inefficient staffing. Dkt. No. 354-41 at 6-7 n.9. And after reviewing the plaintiffs' evidence—including extensive affidavits submitted by plaintiffs' attorneys describing how the requested rates are in line with those prevailing in the community—the Court finds that plaintiffs have satisfied their burden of demonstrating the reasonableness of plaintiffs' counsel's hourly rates. *See Blum*, 465 U.S. at 896 n.11.

The remaining issues, therefore, that the Court will discuss in this Order concern the NCAA's six objections to hours expended. Specifically, the NCAA argues that plaintiffs (1) request fees for unrecoverable work concerning unsuccessful and unrelated claims; (2) submitted insufficient evidence to support their fees request; (3) failed to apply necessary billing judgment as to fees for work on damages, jury trial preparation, and media outreach; (4) seek fees for work not appropriate for fee-shifting such as time spent soliciting clients; (5) request fees created by plaintiffs' counsel's own inefficiencies such as having partners perform document review; and (6) request excessive expenses such as expert fees. Additionally, the NCAA contends that in light of the limited victory that plaintiffs' counsel obtained for their clients, this Court should apply a negative multiplier. Dkt. No. 354-41 at 28.

The Court examines each of the NCAA's contentions below and makes any necessary reductions to plaintiffs' requested fees, costs and expenses. To the extent plaintiffs voluntarily reduce any requested fees or costs in any of the categories identified by the NCAA, the Court accepts those reductions. *See infra* Exhibits 1 and 2 (summarizing Court's findings).

## A.   Unsuccessful Claims

The NCAA's primary argument against awarding attorneys' fees is that plaintiffs cannot recover fees for time spent on ultimately unsuccessful claims, whether or not they are related or unrelated to plaintiffs' successful claims. Due to what the NCAA characterizes as plaintiffs' "limited success," the NCAA makes three requests.

First, that the Court deduct all hours spent on the litigation before the August 31,

2012, class certification motion, which amounts to 46,646.06 hours and $23,084,122.89 in requested fees. Dkt. No. 354-41 at 19. The NCAA asserts that those hours involved unsuccessful efforts to "vindicate former student-athletes who had allegedly been foreclosed from licensing their name, image or likeness ***after*** they stopped playing NCAA sports." *Id.* at 8 (emphasis in original).

Second, the NCAA requests that the Court deduct 80 percent of hours between September 1, 2012, and November 8, 2013. According to the NCAA, during this period— from the filing of the class certification motion to the Court's denial—plaintiffs' counsel was "focused almost exclusively" on its "failed class damages theory." *Id.* at 19 n.15.

Third, the NCAA requests that the Court deduct "all hours after November 8, 2013 related to damages, group licensing or live broadcast, products like jersey or trading cards, monitoring the *Keller* litigation, time related to any specific plaintiff, or other unsuccessful claims[.]" *Id.* at 19-20. Should the Court decide not to deduct these hours, the NCAA requests, in the alternative, that the Court reduce plaintiffs' fees by at least 50 percent overall. *Id.*

A Court has discretion to reduce the attorneys' fee amount according to the "results obtained" in the litigation, which is a "particularly crucial" element "where a plaintiff is deemed 'prevailing' even though he succeeded on only some of his claims for relief." *Hensley*, 461 U.S. at 434. If a plaintiff succeeds on some claims but not others, a court "must evaluate whether the successful and unsuccessful claims are 'distinctly different claims for relief that are based on different facts and legal theories' or whether they 'involve a common core of facts or [are] based on related legal theories.'" *Schwarz v. Secy. of Health and Human Servs.*, 73 F.3d 895, 901 (9th Cir. 1995) (quoting *Hensley*, 461 U.S. at 434-35.

After *Hensley*, the Ninth Circuit established a two-part analysis for district courts to follow. First, the court must ask whether the plaintiff's unsuccessful claims—that is, the claims upon which plaintiff failed to prevail—were related to the plaintiff's successful claims. *Thorne v. City of El Segundo*, 802 F.2d 1131, 1141 (9th Cir. 1986). If unrelated,

the court's award may not include time expended on the unsuccessful claims. *Id.* But if the successful and unsuccessful claims are related, then the court must apply part two of the analysis—it must evaluate the "'significance of the overall relief obtained by the plaintiff in relation to the hours reasonably expended on the litigation.'" *Id.* (quoting *Hensley*, 461 U.S. at 435).

Under part one of the analysis, to determine whether claims are related, "the test is whether relief sought on the unsuccessful claim is intended to remedy a course of conduct entirely distinct and separate from the course of conduct that gave rise to the injury on which the relief granted is premised." *Id.* (internal quotation marks and citations omitted); *see also Schwarz*, 73 F.3d at 903 ("Thus, the focus is to be on whether the unsuccessful and successful claims arose out of the same 'course of conduct.'"). "Claims may be related if either the facts *or* the legal theories are the same." *Webb v. Sloan*, 330 F.3d 1158, 1169 (9th Cir. 2003) (emphasis in original).

Here, the NCAA contends that key distinctions between the successful and unsuccessful claims render those claims unrelated. For instance, the NCAA stresses that plaintiffs' only successful claim for restraint of trade in violation of § 1 of the Sherman Act—which the NCAA argues first appeared in the August 31, 2012, class certification motion—involved prospective and current student-athletes as the market participants, while the unsuccessful claims that served as the basis for plaintiffs' case before August 31, 2012, involved former student-athletes. Dkt. No. 354-41 at 16. Moreover, according to the NCAA, the successful claim involved a pre-graduation "college education" market in which athletics services and licensing rights are exchanged for educational services; in contrast, the unsuccessful claims involved a post-graduation "collegiate licensing" market. *Id.* at 17.

The Court, however, does not find the NCAA's arguments convincing. Admittedly, there are distinctions between the facts underlying the successful and unsuccessful claims. At the same time, the Court finds that a common core of facts underlay all of the claims plaintiffs brought against the NCAA during the five years of litigation: the claims are all

premised upon defendants' exploitative use of plaintiffs' names, image, and likenesses to generate revenue for defendants.  *Compare, e.g.*, Dkt. No. 1 (initial complaint) and No. 09-cv-01967 CW, Dkt. No. 327 (Second Consolidated Amended Class Action Complaint), with No. 09-cv-01967 CW, Dkt. No. 832 (Third Consolidated Amended Class Action Complaint).  To be sure, plaintiffs' legal theories did change.  *See, e.g.*, No. 09-cv-01967 CW, Dkt. No. 876 at 4 (noting how class certification motion differed from earlier Second Consolidated Amended Class Action Complaint in that "[p]laintiffs altered their damages by placing greater emphasis on the revenue that the NCAA derives from the use of student-athletes' names and images in live television broadcasts").  In fact, it is not uncommon that cases end with theories that differ from the ones they started with.  But "[c]laims may be related if either the facts *or* the legal theories are the same."  *Webb*, 330 F.3d  at1169 (emphasis in original).  In this case, the common core of facts across all claims remained the same.  *See, e.g.*, No. 09-cv-01967 CW, Dkt. No. 832 at ¶¶ 558-630 (Third Consolidated Amended Class Action Complaint) (stating for nearly all causes of action that plaintiffs re-allege each factual allegation set forth in preceding paragraphs).

What is more, the Ninth Circuit reads *Hensley* as "establishing the general rule that plaintiffs are to be compensated for attorney's fees incurred for services that contribute to the ultimate victory in the lawsuit."  *Cabrales v. County of Los Angeles*, 935 F.2d 1050, 1052 (9th Cir. 1991).  "Thus, even if a specific claim fails, the time spent on that claim may be compensable, in full or in part, if it contributes to the success of other claims."  *Id.* (citing *Hensley*, 461 U.S. at 435).

Here, plaintiffs did not succeed on every claim.  But the time spent on the unsuccessful claims contributed to the decisive success by laying the groundwork for the eventual trial victory.  Indeed, as plaintiffs point out, during the period between 2009 and 2013—which the NCAA argues plaintiffs should not receive fees for—plaintiffs took depositions, conducted discovery, and defeated multiple motions to dismiss.  *See, e.g.*, 09-cv-01967, Dkt. No. 876 (October 25, 2013 order denying motion to dismiss Sherman Act claims), 09-cv-01967, Dkt. No. 345 (July 28, 2011 order denying motion to dismiss

1  antitrust claims).  And while the district court denied plaintiffs' request to certify a

2  damages subclass, it did certify the injunctive relief class, which set the stage for plaintiffs'

3  injunctive relief victory at trial.  No. 09-cv-01967 CW, Dkt. No. 893 at 23-24; *see also*

4  *O'Neal v. City of Seattle*, 66 F.3d 1064, 1069 (9th Cir. 1995) (finding fees for unsuccessful

5  class-certification motion warranted because the "motion itself was not a separate claim,

6  but rather a method of pursuing [plaintiff's] ultimately successful claims").

7  Having determined that the unsuccessful and successful claims are related, the

8  Court proceeds to part two of the inquiry concerning the overall relief's significance.  "If

9  the plaintiff obtained 'excellent results,' full compensation may be appropriate, but if only

10  'partial or limited success' was obtained, full compensation may be excessive."  *Thorne*,

11  802 F.2d at 1141 (quoting *Hensley*, 461 U.S. at 435).  Here, the NCAA tries to downplay

12  plaintiffs' success.

13  But the fact remains that plaintiffs did receive "excellent results."  Plaintiffs were

14  vindicated on their core claim—that the NCAA violated the Sherman Act by setting rules

15  that bar student-athletes from receiving payments for the use of their name, image or

16  likenesses—and granted a substantial remedy: a permanent injunction prohibiting the

17  NCAA from enforcing a set of its own longstanding rules.  The fact that plaintiffs did not

18  get certified for a damages subclass or achieve compensatory damages does not detract

19  from this unprecedented success in the antitrust field.  This win against a behemoth of an

20  institution like the NCAA could significantly change American college sports; in

21  particular, the way the NCAA treats its student-athletes.  *See* Dkt. No. 291 at 2 (the NCAA

22  has roughly 1100 member schools and regulates intercollegiate athletic competitions in

23  about two dozen sports).

24  In support of their primary argument for drastically reducing plaintiffs' fee award,

25  the NCAA alludes to Charles Dickens' *A Tale of Two Cities* and frames this case as "a tale

26  of two lawsuits"—one filed in 2009 that involved former student-athletes, and the "second

27  *O'Bannon* case" filed in 2012 involving current student-athletes.  Dkt. No. 354-41 at 8.

28  Admittedly, in their five-year uphill fight to trial, plaintiffs' experiences did fluctuate

United States District Court
Northern District of California

1  between better times and worse times.  They won some battles (e.g., motions to dismiss)

2  and lost others (e.g., failed to certify their damages class).

3  Perhaps a more apt allusion would have been to George R.R. Martin's *Game of*

4  *Thrones*, where individuals with seemingly long odds overcome unthinkable challenges,

5  but suffer stark losses along the path to victory.  In Martin's world, "When you play the

6  game of thrones, you win or you die. There is no middle ground."  GEORGE R.R. MARTIN,

7  A GAME OF THRONES: BOOK ONE OF A SONG OF ICE AND FIRE 492 (Bantam Books)

8  (1996).  For plaintiffs, their trial victory in this adventurous, risky suit, while more than a

9  mere game, is nothing less than a win that warrants attorneys' fees for work spent on all

10  claims—successful or unsuccessful.

11  In sum, because all of plaintiffs' unsuccessful claims were related to the successful

12  claims, and contributed to the litigation of the successful antitrust claims that led to

13  exemplary results, the Court finds the NCAA's argument to completely deduct all hours

14  spent before August 31, 2012, and 80 percent of all hours between September 1, 2012, and

15  November 8, 2013, unpersuasive.  Furthermore, the NCAA's attempt to find a middle

16  ground by alternatively requesting an overall 50 percent reduction on plaintiffs' entire fee

17  request is denied.

18  **B.    Sufficiency of Evidence to Support Fee Request**

19  Courts place the burden to "document[] the appropriate hours expended" on the

20  attorney-fee applicant.  *Hensley*, 461 U.S. at 437.  Such an applicant must exercise sound

21  "billing judgment" as to the number of hours worked, eliminating excessive, redundant, or

22  unnecessary hours, and provide billing records supporting the time claimed.  *Id.* at 433-34.

23  Plaintiffs' counsel "is not required to record in great detail how each minute of his time

24  was expended," but should "identify the general subject matter of his time expenditures."

25  *Id.* at 437 n.12; *Fischer v. SJB P.D. Inc.*, 214 F.3d 1115, 1121 (9th Cir. 2000) ("plaintiff's

26  counsel can meet his burden—although just barely—by simply listing his hours and

27  'identifying the general subject matter of his time expenditures'") (citation omitted).  It is

28  the burden of the party opposing the request to submit specific objections to the hours

United States District Court
Northern District of California

1    expended.  *Deukmejian*, 987 F.2d at 1397-98.

2          In this case, the NCAA claims that plaintiffs' counsel failed to submit adequate time

3    records, which the NCAA contends feature block billing, vague entries, redactions, and

4    improper time increments.  Dkt. No. 354-41 at 11.

5          **1.    Block Billing**

6          The NCAA argues that nearly half of plaintiffs' time records contain entries with

7    impermissible block billing.  Defendants state that these entries constitute 49 percent of all

8    hours documented by plaintiffs' counsel and seek to reduce the award request by

9    $6,874,133.28.  Dkt. No. 354-41 at 11-12.

10         "Block billing" is "the time-keeping method by which each lawyer and legal

11   assistant enters the total daily time spent working on a case, rather than itemizing the time

12   expended on specific tasks."  *Welch v. Metro. Life Ins. Co.*, 480 F.3d 942, 945 (9th Cir.

13   2007).  This method of "block billing has been accepted in this district."  *PQ Labs, Inc. v.*

14   *Qi*, No. 12-cv-00450 CW, 2015 WL 224970, at *3 (N.D. Cal. Jan. 16, 2015) (citing

15   *Stonebrae, L.P. v. Toll Bros., Inc.,* No. 08-cv-00221 EMC, 2011 WL 1334444, at *8

16   (N.D.Cal. Apr. 7, 2011) ("Block-billing is a typical practice in this district, and blocked-

17   bills have been found to provide a sufficient basis for calculating a fee award.")).  Of

18   course the block-billing party seeking fees must still meet the basic requirements of

19   "listing his hours and identifying the general subject matter of his time expenditures."

20   *Garcia v. Resurgent Capital Servs., L.P.*, No. 11-cv-01253 EMC, 2012 WL 3778852, at *8

21   (N.D. Cal. Aug. 30, 2012) (internal quotation marks and citation omitted).

22         Here, the Court finds that the alleged block-billed entries "contain enough

23   specificity as to individual tasks to ascertain whether the amount of time spent performing

24   them was reasonable."  *Id.*  For example, one of the entries the NCAA characterizes as

25   impermissibly block billed comes from July 12, 2009, for 2.90 hours of work and contains

26   the following information: "Review and analysis of revised draft Complaint in O'Bannon

27   v. the NCAA; prepare attorney notes regarding edits; communication with J. King

28   regarding same."  Dkt. No. 354-4 at 3.  Even entries with more hours logged are similarly

1    detailed enough.  *See, e.g.*, Dkt. No. 354-4 at 500 (entry from October 18, 2012, for 7.90

2    hours of work containing the following information: "Review motions to strike; meeting

3    with MDH and Sat re same; call with MDH, MPl and Sat re same; review and edit

4    opposition brief").

5         Because the block-billed entries are adequately detailed to permit the Court to

6    assess the reasonableness of hours expended, the Court finds that plaintiffs' counsel have

7    sufficiently documented their hours; no reduction is necessary on this basis.

8                        **2.    Vague Entries**

9         The NCAA contends that plaintiffs' time records contain a substantial number of

10   "vague" entries and seek to reduce the request award by 50 percent.  Dkt. No. 354-41 at

11   12.  The NCAA states such entries contain "bare and unhelpful explanations" as well as

12   "simply unintelligible" entries.  *Id.*

13        When submitting entries for attorneys' fee awards, attorneys are "not required to

14   record in great detail how each minute of [their] time was expended."  *Hensley,* 461 U.S. at

15   437 n.12.  Attorneys need only "keep records in sufficient detail that a neutral judge can

16   make a fair evaluation of the time expended, the nature and need for the service, and the

17   reasonable fees to be allowed."  *Id.* at 441 (Burger, C.J., concurring); *United Steelworkers*

18   *of Am. v. Ret. Income Plan For Hourly-Rated Employees of ASARCO, Inc.*, 512 F.3d 555,

19   565 (9th Cir. 2008) ("We have reviewed the relevant time records, and hold that they are

20   sufficiently detailed for the district court to have made a determination of

21   reasonableness.").

22        In this case, the Court finds no reason to reduce plaintiffs' fee award on account of

23   these "vague" entries.  Even short descriptions such as "Draft complaint" permit the court

24   to fairly evaluate the reasonableness of time expended.  *See* Dkt. No. 354-5 at 3 (entry

25   from 6/8/2009 and listing 3.50 hours expended); *see also Garcia*, 2012 WL 3778852, at *8

26   n.4 ("[O]ther than being short, there does not appear to be anything unreasonable about

27   these entries as the task for each entry is specified.").

28   //

### 3.   Redacted and Partially Redacted Entries

The NCAA properly objects to 95 redacted and 536 partially redacted entries; by obscuring the text, neither the NCAA nor the Court can evaluate the entry for reasonableness.  *See* Dkt. No. 354-41 at 13.  In response to the NCAA's objection, the Court ordered plaintiffs to produce to the Court the redacted entries and partially redacted entries for *in camera* review.  Dkt. No. 371.  The Court noted that plaintiffs did accept some of the NCAA's proposed reductions as to certain time entries.  *See* Dkt. No. 360-4 at ¶ 8.

After reviewing the remaining disputed redacted and partially redacted entries, the Court finds they are sufficiently detailed for the Court to make a reasonableness determination.  In addition, the Court finds that the time expended on each redacted and partially redacted entry to be reasonable.

Consequently, the Court denies the NCAA's request to reduce the attorneys' fee award on this basis.

### 4.   Improper Time Increments

The NCAA requests that the Court reduce by 20 percent the costs for the work identified in 5,191 of plaintiffs' entries—or 13 percent of the entries NCAA identified as deficient—on the account that plaintiffs recorded times in quarter-hour increments, as opposed to six-minute increments, for a total reduction of $1,330,576.75.  Dkt. No. 354-41 at 13; NCCA Hearing Slide at 13 (identifying 39,107 as number of deficient entries) (submitted to Court at April 29 hearing).  According to the NCAA, such billing "inflates time records because counsel bill a minimum of 15 minutes for every task, even those that likely took much less time."  *Id.* (citation omitted).  Plaintiffs note that courts in the Ninth Circuit have not adopted a uniform approach to quarter-hour billing.  *Compare Found. v. Office of Dir. of Nat. Intelligence*, No. 07-cv-05278 SI, 2008 WL 2331959, at *6 (N.D. Cal. June 4, 2008) (no reduction) *with Smith v. Citifinancial Retail Servs.*, No. C06 2966 BZ, 2007 WL 2221072, at *2 (N.D. Cal. Aug. 2, 2007) (across-the-board reduction of 5 percent).  Plaintiffs state that if the court is inclined to impose a reduction, "5% or 10% is

1   the more common and appropriate measure" in this Circuit.  Dkt. No. 361 at 16.

2          Having reviewed the disputed entries, the Court does find that a small number of

3   the entries the NCAA identified do describe tasks that likely took a fraction of the time.

4   For instance, an entry on July 23, 2009, describes the following task as taking a quarter of

5   one hour: "Arrange for delivery of Wednesday LA Times for Jon King."  Dkt. No. 354-8

6   at 13.  This, along with other e-mails and phone calls, is the type of task that likely took

7   one or two tenths of an hour.  *Welch v. Metro. Life Ins. Co.*, 480 F.3d 942, 949 (9th Cir.

8   2007) (finding that quarter-hour billing resulted in excessive billing when "counsel billed a

9   minimum of 15 minutes for numerous phone calls and e-mails that likely took a fraction of

10  the time").  But because the Court does not find the practice widespread and excessive, the

11  Court will impose only a 5 percent reduction as to the 5,191 entries the NCAA identified

12  for a total reduction of $332,644.19 (5 percent x $6,652,883.75).

13      **C.    Fees Related to Damages, Jury Trial, and Media**

14         The NCAA claims plaintiffs conceded that they cannot recover certain categories of

15  activities, which includes time concerning damages claims, jury trial preparation, and

16  "most time related to press releases, interviews and the like."  Dkt. No. 354-41 at 14

17  (quoting Dkt. No. 341 at 18 (plaintiffs' attorneys' fees brief)).  The Court disagrees with

18  the NCAA and does not read plaintiffs' statement that they "excised from this [fee]

19  application, to the extent separable, time concerning" the three issues above as such a

20  concession.  *See* Dkt. No. 341 at 18.  In fact the sentence from plaintiffs' brief that the

21  NCAA quotes does not end with the word "like."  The final part of the sentence reads:

22  ". . . and the like, even though the Northern District of California recognizes that time as

23  compensable."  Dkt. No. 341 at 19 (citing *Prison Legal News v. Schwarzenegger*, 561 F.

24  Supp. 2d 1095, 1101 (N.D. Cal. 2008)).  The next sentence reads: "As with the decision to

25  forego current rates in favor of historical rates, these time reductions again reflect the

26  conservative nature of this fees application."  *Id.*

27         Viewed in context, the purpose of the sentence the NCAA quotes is to convince the

28  Court of the "conservative nature" of plaintiffs' fee application; it is not intended to serve

as an admission that plaintiffs cannot recover fees for damages, jury trial preparation, or media contact.  The fact that plaintiffs' fee application include entries relating to those topics, while ostensibly inconsistent with their statement as to what they excluded, does not preclude them from recovering fees for those entries.  And the NCAA does not cite to any authority that convinces the Court otherwise.

Accordingly, the Court denies the NCAA's request to reduce plaintiffs' fee request as to damages, jury trial preparation, and media-related activities, on the grounds that "[p]laintiffs failed to remove all fees that they concede are not recoverable."  *See* Dkt. No. 354-41 at 14.

**D.    Work the NCAA Claims is Inappropriate for Fee Shifting**

The NCAA contends that the Court should not award fees to plaintiffs based on work related to claims not subject to fee shifting.  This includes: (1) work against EA and CLC; (2) work related to state law claims; (3) work soliciting clients and competing to be lead counsel; and (4) certain clerical work.

**1.    Work Related to EA or CLC**

The NCAA asserts that plaintiffs' fee request should be reduced for work done against EA or CLC.  According to the NCAA, non-settling defendant NCAA "cannot be liable for the litigation fees and expenses of a plaintiff pursuing claims settled against a settling defendant [EA and CLC] when those settled claims did not contribute to the plaintiff's success against" the NCAA.  Dkt. No. 354-41 at 21.  Put differently, plaintiffs should not be permitted to recover fees twice—once from this present fee petition and again from the EA/CLC settlement—for the same work relating to EA and CLC.

The Court agrees in part; plaintiffs should not be compensated two times for the same work.  Plaintiffs also appear to agree.  In fact, they state that each plaintiffs' counsel's accompanying declaration to the fee petition "segregates time spent principally litigating against, and obtaining discovery from, EA and CLC (to the extent possible)." Dkt. No. 341 at 19; *see also, e.g.*, Dkt. No. 341-2 at ¶ 4 (Hausfeld Decl.) (specifically identifying hours spent principally litigating against EA and CLC); Dkt. No. 341-3 at ¶ 19

1    (Isaacson Decl.) (same).  Additionally, plaintiffs clarify that "Class Counsel's settlement of

2    claims against EA and CLC, and subsequent related work, are not included in this fees

3    application."  Dkt. No. 341 at 19 n.9; *see also, e.g.*, Dkt. No. 341-2 at ¶ 4 (Hausfeld Decl.)

4    (excluding "time spent mediating, negotiating, and finalizing the $40 million settlement

5    agreement that releases EA and CLC"); Dkt. No. 341-12 at ¶ 16 (Steiner Decl.) (excluding

6    "time spent on EA and CLC settlement matters (mediation, drafting the settlement

7    agreement and exhibits and so on) and time expended in preparing this fee and expense

8    application").

9            Nonetheless, the NCAA contends that plaintiffs cannot recover hours related to EA

10   and CLC because they are not related to plaintiffs' successful claims against the NCAA.

11   Dkt. No. 354-41 at 21.  Alternatively, the NCAA seeks a 60 percent reduction for entries

12   relating to EA and CLC.  *See* NCCA Hearing Slide at 30 ("EA/CLC Billing Entries")

13   (submitted to Court at April 29 hearing).

14           For the same reasons that the Court elucidated in Section III.A., the Court rejects

15   the NCAA's request to reduce plaintiffs' fees based on hours spent litigating against EA

16   and CLC; the claims against EA and CLC involve a common core of facts with the claims

17   brought against the NCAA.  *See Schwarz*, 73 F.3d at 901; *see also, e.g.*, *Cabrales*, 935

18   F.2d at 1052 ("plaintiffs are to be compensated for attorney's fees incurred for services

19   that contribute to the ultimate victory in the lawsuit"); Dkt. No. 341-2 at ¶ 4 (Hausfeld

20   Decl.) (stating that work against EA and CLC contributed to success of plaintiffs' class-

21   certification, summary-judgment, and trial proceedings against the NCAA).

22           But as to the NCAA's concern over plaintiffs' potential double-recovery, the Court

23   finds that plaintiffs cannot recover fees from the EA/CLC settlement that they recover as a

24   result of this Court's Order.  In other words, to the extent plaintiffs submitted the same

25   entries for work spent litigating against EA and CLC in both this current the NCAA fee

26   request and in their EA/CLC settlement fee request, they can only recover those fees

27   once—that is, through this current request for fees against the NCAA.

28           In short, for the reasons stated above, and because the plaintiffs properly excluded

United States District Court
Northern District of California

1   from this immediate fee petition work related to the EA/CLC settlement, the Court rejects

2   the NCAA's request to reduce plaintiffs' attorneys' fee award on the basis of their EA and

3   CLC billing entries.

### 2.   State Law Claims (Unjust Enrichment, Accounting)

5   The NCAA asserts that plaintiffs cannot recover fees related to their unsuccessful

6   state law claims for unjust enrichment and accounting.  Dkt. No. 354-41 at 20.  Indeed,

7   plaintiffs voluntarily dismissed these claims.  Dkt. No. 291 at 72 n.12.  Yet for the same

8   reasons explained in Section III.A., the Court rejects the NCAA's request to reduce

9   plaintiffs' fees based on hours spent litigating state law claims; they share a common core

10  of facts with the successful antitrust claims brought against the NCAA.  *See Schwarz*, 73

11  F.3d at 901; Dkt. No. 832 at 193-95 (Third Consolidated Amended Class Action

12  Complaint) (applying same allegations made against defendants for antitrust claims to both

13  unjust enrichment and accounting claims).

### 3.   Soliciting Clients and Lead Counsel

15  The NCAA argues that plaintiffs cannot recover hours spent "soliciting clients or

16  competing for lead counsel."  Dkt. No. 354-41 at 22 (identifying 391 entries related to

17  soliciting clients and 763 entries related to "[t]ime sparring with other firms over the lead

18  counsel role or motion practice regarding the same").

19  The Court disagrees.  As an initial matter, plaintiffs identify entries that the Court

20  agrees are incorrectly identified as involving client solicitation.  *See, e.g.*, Dkt. No. 360-4

21  at 13 (Bojedla Decl.) (identifying entry dated 12/27/2011 with the description "NCAA

22  Review complaint").  Still, the NCAA cites to *American Civil Liberties Union of Georgia

23  v. Barnes*, 168 F.3d 423, 435 (11th Cir. 1999), for the proposition that "time spent

24  procuring potential plaintiffs is obviously not expended on the litigation because until the

25  attorney has a client, there is no case to litigate."  Dkt. No. 354-41 at 22 (internal quotation

26  marks omitted).

27  But here, as plaintiffs point out, all except 12 of the disputed entries are dated on or

28  after plaintiffs filed their initial complaint on July 21, 2009, and had a "case to litigate."

United States District Court
Northern District of California

United States District Court
Northern District of California

1   Dkt. No. 361 at 12, Dkt. No. 354-21 at 3.  These entries largely involve either calls with

2   potential clients or research in preparation for those calls.  *See, e.g.*, Dkt. No. 354-21 at 3

3   (entry dated June 1, 2009 stating "Research history and background of potential plaintiff

4   for Jon King interview.").  The fact remains that the *Barnes* court stated fee recovery for

5   time spent on interviews, correspondence, and meetings with potential plaintiffs was

6   recoverable.  *Barnes*, 168 F.3d at 435-36.  Accordingly, the Court rejects the NCAA's

7   argument as to this client-solicitation issue.

8        Yet the NCAA, referring to time spent on motions for lead counsel, also argues

9   "plaintiffs should not recover hours when they pitch the court."  Dkt. No. 354-41 at 22.

10   The same goes for time spent on case-management efforts consolidating with *Keller*, as

11   well as "time related to the task of managing the financial or time contributions of the 33

12   firms involved in the litigation."  *Id.*  The NCAA, however, cites to no authority

13   supporting their proposition that plaintiffs cannot recover for time spent on case

14   administration.  Moreover, these efforts relate to the claim on which plaintiffs succeeded

15   and the Court finds the time expended on such efforts reasonable.  Thus, the Court also

16   rejects the NCAA's arguments as to this case-administration issue.

17        **4.   Clerical Work**

18        Plaintiffs cannot recover time for purely clerical or secretarial work.  *See Davis v.*

19   *City of San Francisco*, 976 F.2d 1536, 1543 (9th Cir. 1992) ("[P]urely clerical or

20   secretarial tasks should not be billed at a paralegal [or lawyer's] rate, regardless of who

21   performs them . . . .  [The] dollar value [of such non-legal work] is not enhanced just

22   because a lawyer does it.") (internal quotation marks and citation omitted).

23        But here, what the NCAA calls "clerical or secretarial work" actually involved

24   substantive work that substantially differs from the  "purely clerical or secretarial tasks" in

25   *Davis*.  For instance, the disputed entries include drafting discovery responses and brief

26   writing.  *See, e.g.*, Dkt. No. 360-4 at 19 (Bojedla Decl.) (entries from May 11, 2011, and

27   October 6, 2011).  The Court does not find the NCAA's arguments convincing and will not

28   reduce plaintiffs' fee request on account of alleged "clerical work."

**E.    Fees for Alleged Inefficiencies (Inappropriate Staffing) in Litigation**

The NCAA raises a series of objections concerning plaintiffs' counsels alleged staffing inefficiencies.  The Court does not find any of these objections persuasive.  For instance, the NCAA argues that plaintiffs impermissibly chose to assign associate-level work—document review, legal research and draft writing—to partners with higher billing rates.  Dkt. No. 354-41 at 23.  The Court does not see why such integral litigation tasks cannot be reasonably assigned to partners as well as associates.  *See, e.g.*, *Moreno v. City of Sacramento*, 534 F.3d 1106, 1115 (9th Cir. 2008) ("The difficulty and skill level of the work performed, and the result achieved—not whether it would have been cheaper to delegate the work to other attorneys—must drive the district court's decision.").  In particular, the NCAA does not offer any authority for its suggestion that plaintiffs should have had only "contract attorneys and paralegals" complete document review.  *See* Dkt. No. 354-41 at 24.

In response to the NCAA's objections, plaintiffs identify examples of entries inaccurately characterized as entries as associate-level work improperly billed by partners.  *See, e.g.*, Dkt. No. 360-4 at 23-24 (partner entry dated 10/24/2009 with description "Edit and draft the NCAA opposition to motion to dismiss").  Nonetheless, plaintiffs voluntarily accept the NCAA's proposal that certain entries warrant an hourly rate adjustment from the partner rate to the median associate rate of $420 for a total reduction of $17,969.50 (associate-level work by partners) and $38,665.50 (document-review entries).  *Id.* at ¶ 24, 26.

The NCAA also contends that plaintiffs cannot recover hours for overstaffing.  According to the NCAA, for instance, "16 timekeepers traveled from across the country to attend the class certification hearing, at which only one plaintiffs' attorney spoke."  Dkt. No. 354-41 at 24.  The NCAA further states that plaintiffs' counsel overstaffed at depositions, hearings, and at trial.  *Id.*  But the Ninth Circuit has held that "[c]ourts must exercise judgment and discretion, considering the circumstances of the individual case, to decide whether there was unnecessary duplication [of effort]."  *Democratic Party of*

Case No. 09-cv-03329 CW (NC)          19

1  *Washington State v. Reed*, 388 F.3d 1281, 1286-87 (9th Cir. 2004). Moreover, a party's

2  overstaffing objections is undermined when that objecting party uses the same number of

3  attorneys as the other allegedly overstaffed party. *Id.*

4        Here, the NCAA's claims of overstaffing are undercut by their own staffing

5  decisions. For example, while it cries foul over plaintiffs' counsels' alleged over-

6  attendance at trial, the NCAA had close to a dozen attorneys, not to mention paralegals,

7  assistants, and technical staff members, representing its interests at the trial. Dkt. No. 360-

8  4 at ¶ 30. But instead of acknowledging how this case's complexity and scope could

9  require a plethora of attorneys and legal staff, the NCAA seeks to eliminate time related to

10  alleged overstaffing, including time spent by plaintiffs' counsel's paralegals assisting

11  attorneys at trial by managing trial exhibits and searching for and retrieving documents

12  requested by examining counsel. *Id.* at ¶ 31.

13        In light of the reasonableness of plaintiffs' justification—especially given the

14  complexity, size, and novelty of the case—and the NCAA's own decision to highly staff

15  various parts of the litigation process, the Court denies the NCAA's request to reduce

16  plaintiffs' fee award on the basis of overstaffing.

17        The NCAA further argues that plaintiffs cannot recover for "unnecessary and

18  duplicative conferencing and meetings between lawyers or law firms," which resulted from

19  "plaintiffs' inefficient decision to imprudently staff this case with nearly 400 individuals

20  from 33 firms." Dkt. No. 354-41 at 25. The NCAA then identifies 9,799 alleged

21  inappropriate conferencing entries in an attached exhibit. Dkt. No. 354-29.

22        Aside from containing inaccuracies as plaintiffs demonstrate, e.g., Dkt. No. 354-29

23  at 370 (entry from 9/20/2013 that has nothing to do with conferencing and reads "Further

24  revisions and edits and research to opp'n to motions to dismiss filed by CLC and EA"), the

25  NCAA fails to demonstrate how such entries describing conferencing between more than

26  one attorney are actually unnecessary and duplicative. *See Deukmejian*, 987 F.2d at 1398

27  (party opposing fee application carries burden of rebuttal and must present evidence

28  challenging the reasonableness of hours expended). Conclusory statements about the

United States District Court
Northern District of California

1     "unnecessary and duplicative" nature of these multiple-lawyer conferences are not

2     sufficient to carry the NCAA's burden of rebuttal.

3             The NCAA has also failed to satisfy its burden of demonstrating that plaintiffs'

4     hours should be reduced for duplicative work.  Dkt. No. 354-41 at 25.  The NCAA claims

5     that two of its exhibits "identify the redundant billing entries."  Dkt. No. 354-30, 354-31.

6     The entries, however, look reasonable and not (as the document's title suggests) "excessive

7     and duplicative."  In any case, plaintiffs voluntarily accept that certain entries warrant

8     reductions of $134.10 (excessive and duplicative, Dkt. No. 354-30) and $39,296 (excessive

9     deposition prep, Dkt. No. 354-31).  Dkt. No. 360-4 at ¶¶ 36-39.

10            Finally, the NCAA asserts that plaintiffs' "hours should be reduced for work that

11    took too long or did not add value to the case."  Dkt. No. 354-41 at 26.  In particular, the

12    NCAA identifies 269 entries related to filing pro hac vice applications with the Northern

13    District that took too long, as well as 750 entries involving preparing and filing "copycat"

14    complaints—that is, complaints nearly identical to the *O'Bannon* complaint—that "added

15    no value" to the case.  *Id.*  The NCAA also points to entries for hours "that did nothing to

16    move the case forward" such as time related to challenges to confidentiality designations

17    and privilege determinations, as well as to what the NCAA refers to as "churning entries."

18    *Id.* at 26-27.

19            As to the NCAA's objections to time spent on pro hac vice applications, plaintiffs

20    voluntarily accept some of the NCAA's proposal to reduce the amount requested and

21    reduce their fee request by $71,473.67.  Dkt. No. 360-4 at 40.  As to the "copycat" entries,

22    plaintiffs point to inaccuracies in the NCAA's characterization of certain entries.  *See, e.g.*,

23    Dkt. No. 360-4 at 42 (entry from 2/4/2012 describing "Read and respond to email from the

24    NCAA re scheduling of Tate George deposition").  The Court also identifies numerous

25    inaccuracies that demonstrate the NCAA's failure to meet their burden that these alleged

26    "copycat" entries should lead to a reduction in requested fee.  *See, e.g.*, Dkt. No. 354-34 at

27    5 (entry from 8/4/2009 with description "Research the NCAA athletes" that, on its face,

28    has nothing to do with alleged copycat complaints). The Court also reviewed what the

NCAA identified—again in conclusory fashion—as improper entries involving confidentiality designations and privilege determinations, and finds them reasonable.  And as to the alleged 3,258 "churning" entries, the NCAA simply has not met their burden that such entries are unreasonable.  *See, e.g.*, Dkt. No. 360-4 at 49 (Bojedla Decl.) (identifying examples of entries incorrectly characterized as "churning" entries).

### F.    Fees for Alleged Excessive Costs

The NCAA argues that the Court should not permit plaintiffs to recover costs related to expert fees, witness fees, pro hac vice application fees, as well as certain expenses like travel and legal research expenses.

#### 1.    Expert Fees

Title 28 U.S.C. § 1920 provides that a district court judge may tax as costs "Fees and disbursements for printing and witnesses . . . ."  *W. Virginia Univ. Hospitals, Inc. v. Casey*, 499 U.S. 83, 86 (1991).  Recovery of such fees, including expert witness fees by prevailing parties in antitrust cases, however, is limited by the statutory amount set by 28 U.S.C. § 1821(b) (currently $40 per diem).  *See Crawford Fitting Co. v. J.T. Gibbons, Inc.*, 482 U.S. 437, 445 (1987) (finding that "when a prevailing party seeks reimbursement for fees paid to its expert witnesses, a federal court is bound by the limits of § 1821(b), absent contract or explicit statutory authority to the contrary").

Here, the NCAA argues that the Court does not have the discretion to award expert fees, either as costs or expenses, because the Clayton Act does not provide explicit statutory authority.  Dkt. No. 354-41 at 29-30.  Indeed, the Clayton Act allows only for recovery of "cost of suit, including a reasonable attorney's fee."  *Id.*; 15 U.S.C. § 26.  And "reasonable attorney's fee" does not include expert fees.  *Trustees of Constr. Indus. & Laborers Health & Welfare Trust v. Redland Ins. Co.*, 460 F.3d 1253, 1258 (9th Cir. 2006) (expert fees "have by tradition and statute been treated as a category of expenses distinct from attorney's fees") (citation omitted).

In response, plaintiffs do cite to cases they argue "awarded expert fees to prevailing plaintiffs in complex antitrust cases, even after *Crawford*."  Dkt. No. 361 at 21 (citing, e.g.,

*Auto. Prods. PLC v. Tilton Eng'g, Inc.*, 855 F. Supp. 1101, 1106-08 (C.D. Cal. 1994) (finding that a "[p]revailing antitrust plaintiff can recover expert witness fees above [the] statutory limit of $40 per day")).

Still, the Court finds the NCAA's position more persuasive.  The Supreme Court's ruling in *Crawford* is unambiguous.  482 U.S. at 445 ("[A]bsent explicit statutory or contractual authorization for the taxation of the expenses of a litigant's witness as costs, federal courts are bound by the limitations set out in 28 U.S.C. § 1821 and § 1920."); *see also Casey*, 499 U.S. at 87 (denying fees for nontestifying experts as "[n]one of the categories of expenses listed in § 1920 can reasonably be read to include fees for services rendered by an expert employed by a party in a nontestimonial advisory capacity").  Moreover, plaintiffs' strongest case, *Tilton*, is flawed; it fails to explain how *Crawford* "does not specifically limit a prevailing antitrust plaintiff to statutory damages only." *Tilton*, 855 F. Supp. at 1107.

This Court, therefore, will join the majority position and find that prevailing plaintiffs in antitrust cases may not recover expert witness fees in excess of the § 1821 limit.  *See, e.g.*, *Reazin v. Blue Cross and Blue Shield of Kansas, Inc.*, 899 F.2d 951, 980 (10th Cir. 1990) (recovery of expert witness fees in an antitrust action cannot exceed the amount set by 28 U.S.C. § 1821), *cert. denied* 497 U.S. 1005 (1990); *Parts and Elec. Motors, Inc. v. Sterling Elec., Inc.*, 123 F.R.D. 584, 588-89 (N.D. Ill. 1988) (successful antitrust plaintiff entitled only to $240 [$30 per day] for eight days of expert testimony at trial or deposition although expert witness charged over $15,000 for his services); *see also In re TFT-LCD (Flat Panel) Antitrust Litig.*, No. 10-cv-4572 SI, 2014 WL 1991269, at *1 (N.D. Cal. May 12, 2014) (upholding special master's recommendation not to award expert fees because there is "no basis to recover expert fees or other non-taxable costs under the Clayton Act.").

The Court notes that while plaintiffs are technically entitled to $40 per day in expert witness fees, plaintiffs have failed to ask for this in their amended fee petition.  Because plaintiffs have not satisfied their burden, and because the Clayton Act does not provide

United States District Court
Northern District of California

explicit statutory authority for expert fee awards, the Court denies plaintiffs' request of

$3,655,696.39 for expert fees.

### 2.   Witness Expenses, Pro Hac Vice Application Fees, and Local Travel

The NCAA argues that plaintiffs cannot recover fees related to witness expenses for

trial, pro hac vice application fees, and local travel expenses.  Dkt. No. 354-41 at 30, 32.

Plaintiffs voluntarily accept the NCAA's proposal to eliminate the related entries and agree

to the following reductions: $50,221.38 for witness expenses, $5,635.60 for pro hac vice

application fees, and $4,148.02 for local travel expenses.  Dkt. No. 360-4 at ¶¶ 49-50, 56.

As such, the Court need not engage in an analysis of these entries.

### 3.   Other Costs

The NCAA contends that plaintiffs submitted an insufficient request for copying

and printing because they "failed to provide the cost billed per page, the number of pages,

[and] any information about the documents that were copied."  Dkt. No. 354-41 at 31

(internal quotation marks and citations omitted).  Plaintiffs thus cannot recover

$143,542.49 worth of expenses.  *Id.*

The Court rejects the NCAA's argument and will grant plaintiffs' request.

Plaintiffs' documentation of its copying and printing expenses admittedly identify only the

firm name, the date, a non-substantive description (e.g. "Photocopying Expense"), and the

amount spent.  Dkt. No. 355-44.  Yet plaintiffs have already produced a prodigious amount

of reasonable time entries; the NCAA has failed to explain why these copying and printing

expenses are inconsistent with the time entries.  *See also* Dkt. No. 361 at 21 n.47 ("Indeed,

the detailed time entries Plaintiffs provided cast significant light on each of these expenses,

when paired by firm or timekeeper.").  Moreover, in light of the size, complexity, and

duration of this five-year case, the Court does not find the $143,542.49 figure spent on

copying and printing unreasonable.  And as Justice Kagan recently wrote in an attorneys'

fee case, "[T]rial courts need not, and indeed should not, become green-eyeshade

accountants. The essential goal in shifting fees (to either party) is to do rough justice, not

to achieve auditing perfection." *Fox v. Vice*, 131 S. Ct. 2205, 2216 (2011).

United States District Court
Northern District of California

1    Indeed, despite the lack of auditing perfection, the Court also rules in plaintiffs'

2    favor as to the NCAA's objections over plaintiffs' requests for long distance travel

3    expenses and legal research expenses.  The NCAA argues that plaintiffs failed to provide,

4    among other details, itemized accounting of each travel expense and that many entries

5    involve unreasonable or excessive expenses.  Dkt. No. 354-41 at 31.  Plaintiffs respond by

6    listing examples of travel expenses the NCAA incorrectly characterized as insufficiently

7    documented.  Dkt. No. 360-4 at ¶¶ 51-52.  These entries include details the NCAA deems

8    lacking: the date, description, and cost of each expense.  For instance, one entry that the

9    NCAA incorrectly deemed insufficient is dated 10/12/2013 and reads, "Hotel Charges

10   NCAA Fischer and Smith depositions.  Lodging Oct 12, 2013 – Hilary Scherrer" and

11   includes the cost $526.38.  Dkt. No. 360-4 at ¶ 51.

12   The Court does note plaintiffs voluntarily reduce by 50 percent expenses involving

13   "first or business class airfare or comparable hotel costs for senior partners," for a total

14   reduction of $33,490.23.  Dkt. No. 360-4 at ¶ 54.

15   As to legal research expenses, the Court disagrees with the NCAA that plaintiffs

16   failed to provide adequate documentation.  *See, e.g.*, Dkt. No. 360-4 at ¶ 55 (providing

17   examples of legal research expenses with sufficient details listed including date, cost, and

18   description).

19   In short, the Court will reduce plaintiffs' fee request as to witness expenses

20   ($50,221.38), local travel expenses ($4,148.02), pro hac vice application fees ($5,635.60),

21   and long distance travel expenses ($33,490.23).

22   **G.    Multiplier**

23   Plaintiffs argue that their lodestar should receive a positive multiplier because the

24   case "carried an exceptional risk of defeat and required a tremendous amount of time and

25   labor that in turn precluded other employment."  Dkt. No. 341 at 22.  The NCAA continues

26   to reiterate plaintiffs' "limited victory," and, that because "[n]o damages were awarded,

27   and no former student-athlete will receive any additional benefit as a result of the court's

28   injunction," the Court should apply a negative multiplier.  Dkt. No. 354-41 at 28.

To be sure, "[o]ne exceptional circumstance that may lead to an adjustment of the lodestar figure is whether payment for the attorney's services is contingent upon success and the attorney bears the risk of nonpayment in case of failure." *D'Emanuele*, 904 F.2d at 1384. Still, balancing plaintiffs' risk of defeat with the fact that they did not succeed on every claim, the Court denies plaintiffs' request for a positive multiplier. But given that plaintiff did secure a significant victory at trial on its claim for injunctive relief, the Court also denies the NCAA's request for a negative multiplier.

## IV.  CONCLUSION

For the reasons above, plaintiffs' motion for attorneys' fees is GRANTED. The NCAA is ordered to pay plaintiffs' attorneys' fees in the amount of $44,422,856.04 (requested amount ($45,573,985.45) – Court's reductions ($1,151,129.41)). As to costs and expenses, the Court orders the NCAA to pay plaintiffs in the amount of $1,545,870.58 (requested amount ($5,295,062.20) – Court's reductions ($3,749,191.62)).

Any party may object to this nondispositive order under Federal Rule of Civil Procedure 72.

**IT IS SO ORDERED.**

Dated:  July 13, 2015

_____
NATHANAEL M. COUSINS
United States Magistrate Judge

United States District Court
Northern District of California

# EXHIBT 1: LODESTAR REDUCTIONS

| NCAA's Category of Entries | NCAA's Proposed Minimum Reduction | Plaintiffs' Voluntary Reduction | Court's Total Reduction |
|---|---|---|---|
| Limited Success | $32,835,828.85 | $0.00 | $0.00 |
| Block Billing | $6,874,133.28 | $0.00 | $0.00 |
| Vague Entries | $2,192,858.38 | $37,690.45 | $37,690.45 |
| Fully Redacted | $146,398.20 | $0.00 | $0.00 |
| Partially Redacted | $427,978.21 | $0.00 | $0.00 |
| Quarter-Hour Billing | $1,330,576.75 | $0.00 | $332,644.19 |
| Rounded Quarter-Hour Billing | $160,445.65 | $0.00 | $0.00 |
| Jury Trial Preparation | $639,305.39 | $1,975.00 | $1,975.00 |
| Media/Public Relations | $185,224.00 | $0.00 | $0.00 |
| Damages | $116,348.00 | $35,442.50 | $35,442.50 |
| EA/CLC | $3,634,334.54 | $0.00 | $0.00 |
| State Law Claims | $105,143.61 | $0.00 | $0.00 |
| Client Solicitation | $262,971.94 | $0.00 | $0.00 |
| Lead Counsel Administration | $245,884.79 | $618.75 | $618.75 |
| Clerical Entries | $1,719,551.35 | $118,837.75 | $118,837.75 |
| Associate-Level Work by Partners | $2,983,547.18 | $17,969.50 | $17,969.50 |
| Document Review | $2,356,053.88 | $38,665.50 | $38,665.50 |
| Overstaffing: Depositions | $163,229.50 | $42,490.00 | $42,490.00 |
| Overstaffing: Hearings | $396,650.00 | $396,650.00 | $396,650.00 |
| Overstaffing: Trial | $668,912.50 | $0.00 | $0.00 |
| Conferencing | $5,701,445.25 | $0.00 | $0.00 |
| Excessive and Duplicative | $226,816.79 | $134.10 | $134.10 |
| Excessive: Deposition Prep | $1,801,481.12 | $39,296.00 | $39,296.00 |
| Pro Hac Vice | $71,473.67 | $71,473.67 | $71,473.67 |
| Copycat Complaint | $381,309.14 | $0.00 | $0.00 |
| Confidentiality Challenge | $97,559.40 | $0.00 | $0.00 |
| Privilege Challenge | $578,309.33 | $0.00 | $0.00 |
| Churning | $1,316,466.41 | $0.00 | $0.00 |
| Non-Contributing Work | $411,633.00 | $17,242.00 | $17,242.00 |
| TOTAL REDUCTIONS | | | $1,151,129.41 |

United States District Court
Northern District of California

1
2
3
4
5
6
7
8
9
10
11
12
13
14
15
16
17
18
19
20
21
22
23
24
25
26
27
28

1

## EXHIBIT 2: EXPENSE REDUCTIONS

2

3

| NCAA's Category of Entries | NCAA's Proposed Minimum Reduction | Plaintiffs' Voluntary Reduction | Court's Total Reduction |
|---|---|---|---|
| Expert Fees | $3,655,696.39 | $0.00 | $3,655,696.39 |
| Named Plaintiff Witness Fees | $50,221.38 | $50,221.38 | $50,221.38 |
| PHV/Admission Fees | $5,635.60 | $5,635.60 | $5,635.60 |
| Copying and Printing | $143,542.49 | $0.00 | $0.00 |
| Long Distance Travel | $491,632.72 | $33,490.23 | $33,490.23 |
| Legal Research | $173,629.51 | $0.00 | $0.00 |
| Local Travel | $4,148.02 | $4,148.02 | $4,148.02 |
| Miscellaneous or Vague | $56,750.03 | $0.00 | $0.00 |
| Other Expenses (Limited Success) | $272,595.79 | $0.00 | $0.00 |
| **TOTAL REDUCTIONS** | | | **$3,749,191.62** |

4

5

6

7

8

9

10

11

United States District Court
Northern District of California

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28